**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq. (krosen@lowenstein.com)
Michael S. Etkin, Esq. (metkin@lowenstein.com)
Paul Kizel, Esq. (pkizel@lowenstein.com)
Wojciech F. Jung, Esq. (wjung@lowenstein.com)
Philip J. Gross, Esq. (pgross@lowenstein.com)
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| ACETO CORPORATION, *et al.*,[1] | Case No. 19-13448 (VFP) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ORDERS (I) (A) AUTHORIZING AND APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS COMPRISING THE DEBTORS' PHARMA BUSINESS; (B) AUTHORIZING AND APPROVING BID PROTECTIONS; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) SCHEDULING A SALE HEARING; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II) (A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS COMPRISING THE DEBTORS' PHARMA BUSINESS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto (0520); Aceto Agricultural Chemicals Corporation (3948); Aceto Realty LLC (7634); Rising Pharmaceuticals, Inc. (7959); Rising Health, LLC (1562); Acetris Health, LLC (3236); PACK Pharmaceuticals, LLC (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned proposed counsel, hereby move (the "Sale Motion") this Court, pursuant to sections 105(a), 363, 365, 503 and 554(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1, 6004-2 and 6004-3 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), for entry of orders, as follows:

First, the Debtors request entry of an order substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): authorizing and approving (a) the proposed bidding procedures (the "Bidding Procedures"),[2] substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, in connection with the sale (the "Sale") of substantially all assets (as defined in the Stalking Horse Agreement (defined below), the "Purchased Assets") comprising the Debtors' Pharma Business (as defined herein) pursuant to that certain Asset Purchase Agreement, dated as of March 7, 2019 (together with the schedules thereto and related documents, and as may be amended, supplemented or otherwise modified from time to time, the "Stalking Horse Agreement"), substantially in the form attached hereto as **Exhibit B**, by and among Rising Pharmaceuticals, Inc., Pack Pharmaceuticals, LLC, Rising Health, LLC, and Acetris Health, LLC (together, the "Sellers" and each a "Seller"), Aceto Corporation, as Parent, and Shore Suven Pharma, Inc. (the "Buyer" or "Stalking Horse Bidder"), subject to higher or otherwise better offers at an auction (the "Auction") to be held if the Debtors receive one or more timely and acceptable Qualified Bids (as defined in the Bidding Procedures); (b) authorizing the Sellers to pay the Buyer a "break-up" fee of $672,500, as more fully

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures or the Stalking Horse Agreement (as defined herein), as applicable.

described in the Stalking Horse Agreement (as defined therein, the "Break-Up Fee") and an expense reimbursement of no more than $750,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections") if and when payable pursuant to the terms of the Stalking Horse Agreement; (c) approving procedures for the assumption and assignment of certain of the Sellers' executory contracts and unexpired leases (the "Assumption and Assignment Procedures") and approving the form and manner of notice thereof (substantially in the form attached hereto as **Exhibit C**, the "Cure Notice"); (d) scheduling the Auction, if applicable, and a hearing to consider approval of the Sale (the "Sale Hearing"); (e) approving the form and manner of notice thereof (substantially in the form attached hereto as **Exhibit D**, the "Sale Notice"); and (f) granting related relief.

Second, the Debtors also request entry of an order, substantially in the form attached hereto as **Exhibit E** (the "Sale Order"): (a) authorizing and approving the Sale of the Purchased Assets (as defined in the Stalking Horse Agreement) free and clear of Liens, Claims and Interests (each as defined in the Sale Order), except as provided in the Stalking Horse Agreement or other Proposed Asset Purchase Agreement (as defined herein); (b) approving the assumption and assignment of certain of the Sellers' executory contracts (each, an "Executory Contract") and unexpired leases (each, an "Unexpired Lease") related thereto (any such Executory Contract or Unexpired Lease designated by the Successful Bidder to be assumed and assigned pursuant to the Sale, a "Buyer Assumed Agreement" and collectively, the "Buyer Assumed Agreements"); (c) authorizing the Sellers to abandon and dispose of expired Inventory (as defined in the Stalking Horse Agreement) prior to or upon the closing of the Sale; and (d) granting related relief.

In support of the Sale Motion, the Debtors rely upon and incorporate by reference the *Declaration of Rebecca A. Roof in Support of First Day Relief* [Docket No. 19] (the "First Day Declaration") and the *Declaration of Mark Buschmann in Support of Debtors' Motion to Approve Bidding Procedures in Connection with the Sale of Substantially all Assets Comprising the Debtors' Pharma Business*, filed contemporaneously herewith, and respectfully state as follows:

### BACKGROUND

1.      On February 19, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") in this Court (the "Bankruptcy Court").

2.      The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On February 27, 2019, an official committee of unsecured creditors (the "Committee") was appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of New Jersey pursuant to section 1102(a)(1) of the Bankruptcy Code.

4.      Aceto Corporation ("Aceto"), incorporated in 1947 in the State of New York, together with its Debtor and non-debtor subsidiaries (collectively, the "Company"), is an international company with operations in ten countries, including the United States, China, Germany, France, the Netherlands, Singapore, India, Hong Kong, Philippines, and the United Kingdom. The Company is engaged in the development, marketing, sales and distribution of finished dosage form generic pharmaceuticals, nutraceutical products, pharmaceutical active ingredients and intermediates, specialty performance chemicals inclusive of agricultural intermediates and agricultural protection products.   The Company does not operate any manufacturing facilities.

5.    The Company functions as a "virtual" manufacturing company, distributing more than 1,100 chemical compounds used principally as finished products or raw materials in the pharmaceutical, nutraceutical, agricultural, coatings and industrial chemical industries.    The Company's global reach enables the Company to source and supply quality products on a worldwide basis.

6.    The Company's business is organized along product lines into three reporting segments:

(a)    the human health ("Human Health") segment, which is operated primarily through Aceto's wholly-owned subsidiary Debtor Rising Pharmaceuticals, Inc. ("Rising Pharmaceuticals") (and Rising Pharmaceuticals' wholly-owned subsidiaries, Debtors PACK Pharmaceuticals, LLC, Rising Health, LLC and Acetris Health, LLC), focuses on the development, marketing, distribution and sale of finished dosage form generic drugs (the finished dosage generic drug business is referred to herein as the "Pharma Business" and excludes the Human Health Nutritional Products Line (defined below))[3] and, with respect to sales of certain nutritional products (the "Human Health Nutritional Products Line"), is also operated through Aceto and certain non-debtor subsidiaries of Aceto;

(b)    the pharmaceutical ingredients ("Pharmaceutical Ingredients") segment, operated through Aceto and certain foreign non-debtor subsidiaries; and

(c)    the performance chemicals ("Performance Chemicals") segment, operated through Aceto, Debtor Aceto Agricultural Chemicals Corporation, and certain foreign non-debtor subsidiaries of Aceto (the Performance Chemicals segment, together with the Pharmaceutical Ingredients segment and the Human Health Nutritional Products Line, are collectively referred to herein as "Chemical Plus" or the "Chemical Plus Business").

7.    Aceto is a publicly-traded company and its common stock is traded on the NASDAQ Global Select Market using the symbol "ACET".

8.    Additional details regarding the Debtors' businesses, the events leading up to the Petition Date, and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration.

---

[3] For the avoidance of doubt, the Company's Human Health Nutritional Products Line (that is considered part of the Human Health segment) is not part of the Pharma Business.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

10.      The legal predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 554(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 6007 and Local Rules 6004-1, 6004-2 and 6004-3.

**RELIEF REQUESTED**

11.      By this Sale Motion, the Debtors first seek entry of the Bidding Procedures Order, (a) authorizing and approving the Bidding Procedures, (b) authorizing and approving, if and when payable, the payment of the Bid Protections, (c) approving the Assumption and Assignment Procedures and the Cure Notice, (d) scheduling the Auction and Sale Hearing, (e) approving the Sale Notice, and (f) granting related relief.

12.      Second, at the Sale Hearing, the Debtors will seek entry of the Sale Order, (a) authorizing and approving the Sale of the Purchased Assets free and clear of Liens, Claims and Interests (each as defined in the Sale Order), except as provided by the Stalking Horse Agreement or a Proposed Asset Purchase Agreement (as defined herein), (b) authorizing and approving the assumption and assignment of certain of the Sellers' Executory Contracts and Unexpired Leases related thereto, (c) authorizing the Sellers to abandon and dispose of expired

Inventory (as defined in the Stalking Horse Agreement) prior to or upon the closing of the Sale, and (d) granting related relief.[4]

13.    For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and therefore, should be granted.

## EVENTS LEADING TO THE PROPOSED SALE

14.    As set forth in the First Day Declaration, on April 18, 2018,  the Company issued a press release, announcing, among other things, that in light of certain persistent adverse business conditions the Company was facing, Aceto's Board of Directors had taken several immediate and proactive steps, including initiating a process (the "Strategic Review Process") to identify and evaluate a range of strategic alternatives for the Company, including the potential sale of a key business segment(s), a merger or other business combination with another party, continuing as a standalone entity or other potential alternatives.

15.    In April 2018, the Company engaged PJT Partners, Inc. ("PJT") to assist it with the Strategic Review Process and to explore potential alternatives to maximize value, including a sale, restructuring or other transaction with respect to the Company. After a months' long and thorough process of considering all options available to them, the Debtors, in consultation with their professional advisors, ultimately determined that given the challenges the Company was facing, as described in the First Day Declaration, one or more sales of the Company's businesses and assets as a going concern was the best available option to maximize value.

---

[4] As set forth in section 6.9(d) of the Stalking Horse Agreement, it is intended by the Debtors that, prior to the closing of the Sale, Rising Pharmaceuticals will convert to a limited liability company under the Delaware conversion statute.  Approval of this transaction will be included in the Sale Order or such other order as may be required.

16.     Based on the issues faced by the Company, in October 2018, at the instruction of the Company, PJT commenced a broad marketing process and contacted approximately 100 potential strategic and financial parties to garner interest in pursuing a strategic transaction. Approximately 80 of these parties were provided with a "teaser" to gauge their interest and the opportunity to enter into a non-disclosure agreement (an "NDA") with the Company to gain access to a virtual data room established by the Company for interested parties to conduct due diligence.  The data room contained extensive information about the Company, including confidential documents and other information concerning the Company's business and financial results in considerable detail.  Approximately 50 of the parties who received the teaser executed NDAs, were granted access to the data room, and received a confidential information memorandum prepared by the Company and PJT.

17.     First round, non-binding indications of interest ("IOIs") to acquire the Company's assets were due on November 14, 2018.  The Company received IOIs from eleven (11) potential bidders for proposed acquisitions of the Company as a whole, the Pharma Business and/or the Chemical Plus Business.[5]  Thereafter, these potential acquirers continued to conduct further due diligence, including being granted access to a more expansive data room and the opportunity to participate in management presentations.

18.     In late November and December 2018, the Company held extensive and detailed management presentations with each of the potential bidders and the Company's senior management team.

19.     Second round, non-binding bids to acquire the Company or one of its key business units were due on January 15, 2019.  The Company received a number of second round

---

[5] Four of these eleven IOIs were for the Chemical Plus Business only.

IOIs, including IOIs to acquire the Company as a whole, the Pharma Business and/or the Chemical Plus Business.

20.    As a result of the bids received on January 15, 2019, the Company determined that an in-court sale process pursuant to section 363 of the Bankruptcy Code was the best available executable structure through which such sale transactions could be completed.

21.    The Company and its advisors continued the prepetition marketing process by inviting these bidders to perform additional detailed diligence and to submit their best and final binding offer to acquire the Pharma Business and/or the Chemical Plus Business, including a binding asset purchase agreement and other documents by February 12, 2019.

22.    While the Company received a number of binding offers for the Chemical Plus Business, the Buyer was the only party to submit a binding asset purchase agreement and other documents to acquire the Pharma Business by the February 12, 2019 deadline.  After thoroughly evaluating all alternatives available to the Company, including a potential liquidation of the Pharma Business, the Company's Board of Directors, in consultation with the Company's professionals, determined that the proposed sale of the Pharma Business to the Buyer as a going concern was the best alternative available to the Company to maximize the value of the Pharma Business for the benefit of the Company and its creditors.

23.    Thereafter, the Company, through its advisors, engaged in extensive negotiations with the Buyer on the terms of the proposed sale of the Pharma Business and finalized definitive documentation in the form of the Stalking Horse Agreement to effectuate a sale of the Pharma Business assets pursuant to section 363 of the Bankruptcy Code, subject to higher and better offers in accordance with agreed upon procedures to be approved by the Court.  The Debtors finalized and executed the Stalking Horse Agreement on March 7, 2019.

24.     As outlined above, the transaction negotiated with the Stalking Horse Bidder is the culmination of a 4½ month long, thorough, fair, arms-length and fulsome prepetition marketing process and an additional post-petition process of negotiations with the Stalking Horse Bidder over the course of more than two weeks. In addition to the Purchase Price of approximately $27 million (excluding the Assumed Liabilities), the Buyer has agreed to assume liability for Cure Costs and other Assumed Liabilities that may exceed $125 million in the aggregate.

25.     The Debtors believe that, taken as a whole, the terms of the proposed sale of the Pharma Business to the Buyer are fair and reasonable, and that the Stalking Horse Bid represents the highest and best offer – *indeed it is the <u>only</u> offer* – for the Pharma Business available to the Debtors at this time, subject to any higher or otherwise better offers that may be received during the additional post-petition marketing process contemplated by the Bidding Procedures.

26.     The Debtors believe that it is critical to establish a floor for the proposed Sale of the Purchased Assets, subject to higher or otherwise better offers pursuant to an open auction process, to afford the Debtors the best opportunity to maximize the value of their estates for the benefit of their creditors and other stakeholders.  Subject to the Bidding Procedures, the Debtors and their advisors will retain the right to pursue any transaction or restructuring strategy that, in the Debtors' business judgment, will maximize the value of their estates.  If the Debtors receive competitive offers based on the proposed qualification criteria in the Bidding Procedures for the Pharma Business, the Debtors will conduct the Auction to determine the highest or otherwise best offer(s) for the Purchased Assets, subject to final approval by the Court.

27.     Consequently, the Debtors believe that the sale of the Purchased Assets to the Stalking Horse Bidder or to any other Successful Bidder will maximize the value of the Debtors' estates for the benefit of all of their creditors and other stakeholders.

## THE BIDDING PROCEDURES

28.     The proposed Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process.

29.     The Debtors propose that the Stalking Horse Agreement serve as the form asset purchase agreement to be provided to all prospective bidders (each, a "Potential Bidder") that wish to participate in the Bidding Process (as defined below) for the Purchased Assets.  Among other requirements, each Potential Bidder for the Purchased Assets will be required to submit an executed copy of a Proposed Asset Purchase Agreement (as defined below) to the Sellers reflecting the terms upon which the Potential Bidder would agree to purchase the Purchased Assets and assume certain liabilities.

### A.     The Bid Protections

30.     Pursuant to the Stalking Horse Agreement, the Sellers have agreed, subject to Bankruptcy Court approval, to provide the Stalking Horse Bidder with certain Bid Protections, consisting of the Break-Up Fee and the Expense Reimbursement, payable as set forth in the Stalking Horse Agreement.

31.     The Stalking Horse Agreement including, but not limited to the Bid Protections, was heavily negotiated between the Sellers and the Stalking Horse Bidder.  The Bid Protections are integral to the Stalking Horse Agreement because they will secure the highest or otherwise best offer available to the Debtors and their estates for the Purchased Assets.   The Bid Protections were heavily negotiated and are an essential condition of the Stalking Horse Bidder for its entry into the Stalking Horse Agreement and agreeing to act as the Stalking Horse Bidder.

B.      **The Bidding Procedures**[6]

32.      Subject to this Court's approval, the Debtors propose to establish the following

dates and deadlines in connection with the Bidding Process:

| Sale Dates and Deadlines | |
|---|---|
| Deadline to Serve Sale Notice and Cure Notice | No later than two (2) business days after entry of the Bidding Procedures Order |
| Cure Objection Deadline and Assignment Objection Deadline | No later than ten (10) days after service of the Cure Notice or Supplemental Cure Notice, as applicable |
| Sale Objection Deadline | March 28, 2019 at 5:00 p.m. prevailing ET |
| Bid Deadline | March 29, 2019 at 5:00 p.m. prevailing ET |
| Deadline to Notify Qualified Bidders | April 1, 2019 |
| Deadline to Select Starting Bid | April 1, 2019 |
| Auction (if required) | April 2, 2019 at 10:00 a.m. prevailing ET |
| Notice of Successful Bidder to be Filed | One (1) business day after conclusion of the Auction |
| Deadline for Reply Pleadings in Support of Sale | April 3, 2019 at 12:00 p.m. prevailing ET |
| Sale Hearing | April 4, 2019 at 10:00 a.m. prevailing ET |

33.      The Bid Procedures describe, among other things, the procedures for interested

parties to access due diligence, the manner in which Potential Bidders and bids become

"qualified," the procedures for receipt and negotiation of bids received, the conduct of any

auction, the selection and approval of the ultimately successful bidder, and related deadlines

---

[6] Capitalized terms used, but not otherwise defined, in this section have the meanings ascribed to them in the Bidding Procedures. To the extent there are any ambiguities or inconsistencies between the following summary and the Bidding Procedures, a copy of which are attached as **Exhibit 1** to the proposed Bidding Procedures Order, the terms of the Bidding Procedures shall govern in all respects.

(collectively, the "Bidding Process").  The Debtors believe that the Bidding Process will afford

the Debtors the best opportunity to continue to pursue the robust prepetition sale process and

enable them to maximize value for the benefit of their estates and creditors.

34.    In accordance with Local Rule 6004-2(b), the material terms of the proposed

Bidding Procedures are as follows:

- **Due Diligence**:  The Sellers will afford any Potential Bidder that has executed or that will execute a confidentiality agreement in accordance with paragraph 2 of the Bidding Procedures such due diligence access or additional information as the Sellers, in consultation with their advisors, deem appropriate, in their discretion and within their reasonable business judgment.  The Sellers will use good faith efforts to provide to the Stalking Horse Bidder access to written information made available to any Qualified Bidder (as defined below) if not previously made available to the Stalking Horse Bidder.

  The due diligence period shall end on the Bid Deadline, and none of the Sellers nor any of their representatives shall be obligated to furnish any due diligence information to any Qualified Bidder after the Bid Deadline, provided that the Sellers shall continue to provide due diligence to the Stalking Horse Bidder.

- **Consultation Parties**:  The "Consultation Parties" are (a) the DIP Agent and its counsel and advisors with respect to the Purchased Assets, and (b) counsel and any other retained advisors to the Committee.  Notwithstanding anything herein to the contrary, the Sellers shall not be required to consult with any Consultation Party during the bidding and Auction process to the extent such Consultation Party is a Potential Bidder, a Qualified Bidder, or a financing source for a bidder, including, if the Sellers determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to goal of maximizing value for the Sellers' estates from the sale process.

- **Submission of Bids**: A Qualified Bidder that desires to make a bid regarding some or all of the Purchased Assets must deliver written copies of its bid, so as to be received on or before the Bid Deadline, to each of the following parties (the "Notice Parties"):

  a.    counsel to the Sellers: Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020 (Attn: Steven E. Siesser, Esq. (ssiesser@lowenstein.com), Paul Kizel, Esq. (pkizel@lowenstein.com), Kenneth A. Rosen, Esq. (krosen@lowenstein.com), and Philip J. Gross, Esq. (pgross@lowenstein.com));

b.  counsel to the DIP Agent: McGuireWoods LLP, 1251 Avenue of the Americas, 20th Floor, New York, New York 10020-1104 (Attn: Kenneth Noble, Esq. (knoble@mcguirewoods.com ) and Benjamin B. Iselin, Esq. (biselin@mcguirewoods.com)); and

c.  proposed counsel to the Official Committee of Unsecured Creditors, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038-4982 (Attn: Jayme T. Goldstein, Esq. (jgoldstein@stroock.com) and Erez E. Gilad, Esq. (egilad@stroock.com)).

- **Qualified Bidder**: A bid submitted will be considered a "Qualified Bid" only if the bid complies with all of the following, in which case the party submitting the bid shall be a "Qualified Bidder"; provided that, if the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the bidder with the opportunity to remedy any deficiencies until one (1) day prior to the Auction:

a.  it expressly discloses whether the bid is for some or all of the Purchased Assets;

b.  it fully discloses the identity of each entity that will be bidding for or purchasing some or all of the Purchased Assets, including any equity holders in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such bid (including any co-bidder or team bidder), and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid.  A bid must also fully disclose any connections, relationships (business or otherwise), whether or not known, to the Sellers or agreements or understandings with the Sellers, the Stalking Horse Bidder or any other known bidders, Potential Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Sellers;

c.  it states that the Qualified Bidder offers to purchase, in cash, some or all of the Purchased Assets upon terms and conditions that the Sellers reasonably determine are at least as favorable to the Sellers as those terms and conditions set forth in the Stalking Horse Agreement (or pursuant to an alternative structure that the Sellers reasonably determine is no less favorable to the Sellers than the terms and conditions of the Stalking Horse Agreement).  For the avoidance of doubt, any Qualified Bid must, either on its own or when considered together with other Qualified Bid(s), provide value in excess of the Stalking Horse Agreement plus the Break-Up Fee, Expense Reimbursement and minimum overbid requirements detailed below in Section 4(k);

d.      it provides a detailed description of any anticipated regulatory or governmental approvals necessary to consummate the bid including, but not limited to, all foreign antitrust or anti-competition approvals required;

e.      it includes a commitment to close the transactions within the timeframe contemplated by the Stalking Horse Agreement;

f.      it includes a binding and enforceable signed writing that the Qualified Bidder's offer is irrevocable unless and until the Sellers accept a higher or otherwise better bid and such Qualified Bidder is not selected as a Back-Up Bidder (as defined below); provided that if such Qualified Bidder is selected as the Successful Bidder, its offer shall remain irrevocable until four (4) months after the execution of the applicable Proposed Asset Purchase Agreement. Such writing shall guarantee performance of the Qualified Bidder by its parent entities, if any, or provide such other guarantee of performance requested by and acceptable to the Sellers;

g.      it shall be accompanied by a deposit into escrow with the Sellers of an amount in cash equal to ten percent (10%) of the aggregate purchase price in the Proposed Asset Purchase Agreement (the "Good Faith Deposit");

h.      it includes confirmation that all necessary internal and shareholder or similar approvals have been obtained prior to the bid;

i.      it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement (collectively, the "Proposed Asset Purchase Agreement") and a proposed form of order to approve the sale, together with a copy marked to show amendments and modifications to the proposed form of sale approval order attached to the motion to approve the sale of the Purchased Assets to the Stalking Horse Bidder; provided, however, that such Proposed Asset Purchase Agreement shall not include any financing or diligence conditions, or any other conditions that are less favorable to the Sellers than the conditions in the Stalking Horse Agreement;

j.      it includes written evidence of (i) sufficient cash on hand to fund the purchase price or (ii) sources of immediately available funds that are not conditioned on third-party approvals or commitments, in each case, that will allow the Sellers to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Proposed Asset Purchase Agreement. Such written evidence shall include the most current audited and the most current unaudited financial statements, or such other financial information of the Qualified Bidder as may be requested by and acceptable to the

Sellers (collectively, the "Financials") or, if the Qualified Bidder is an entity formed for the purpose of acquiring some or all of the Purchased Assets, the Financials of the Qualified Bidder's equity holder(s) or other financial backer(s) that are guaranteeing the Qualified Bidder's performance; provided that if a Potential Bidder is unable to provide Financials, the Sellers may accept such other information sufficient to demonstrate to each Seller's reasonable satisfaction that such Potential Bidder has the financial wherewithal to consummate the applicable sale transaction. The Potential Bidder also must establish to the Sellers' satisfaction that it has the financial ability to consummate its proposed transaction within the timeframe contemplated for consummation of the Stalking Horse Agreement;

k.  it (in combination with any other bids for some or all of such assets) provides for a cash purchase price that exceeds the aggregate cash consideration to be paid to or for the benefit of the Sellers' estates set forth in the Stalking Horse Agreement by at least $2,422,500, which represents the sum of: (i) the Break-Up Fee of $672,500, plus (ii) the maximum amount of the Expense Reimbursement of $750,000, plus (iii) an overbid of $1,000,000, and otherwise has a value to the Sellers, in their exercise of their reasonable business judgment, after consultation with their advisors, that is greater or otherwise better than the value offered under the Stalking Horse Agreement (including taking into account the impact of any liabilities assumed in the Stalking Horse Agreement);

l.  it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related Cure Costs (as defined in the Bidding Procedures Order), and contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned;

m.  it includes an express acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding acquiring the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Proposed Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, termination fee, or similar type of payment in connection with its bid;

n.      it includes evidence, in form and substance satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) or, if required, the equity holders of the Qualified Bidder, with respect to the submission, execution, delivery, performance and closing of the Proposed Asset Purchase Agreement;

o.      it provides an irrevocable undertaking by the Qualified Bidder to execute and deliver to the Sellers such other guarantee of performance or assurance acceptable to the Sellers in their discretion;

p.      it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court, as applicable;

q.      it contains such other information reasonably requested by the Sellers;

r.      it contains written confirmation that the bidder has not engaged in any collusion with respect to the bidding or the sale process; and

s.      it is received by the applicable Notice Parties (as defined in, and in accordance with, Section B.5) on or prior to **5:00 p.m. (prevailing Eastern Time) on March 29, 2019** (the "Bid Deadline").

- **Notification to Qualified Bidders**: The Sellers shall promptly notify each Qualified Bidder in writing (including via email) as to whether or not its bid constitutes a Qualified Bid.  If any bid is determined by the Sellers not to be a Qualified Bid, the Debtors will refund such bidder's Good Faith Deposit and all accumulated interest thereon within ten (10) business days after the Bid Deadline. The Sellers shall also notify the Stalking Horse Bidder and all other Qualified Bidders in writing (including via email) as to whether or not any bids constitute Qualified Bids no later than one (1) business day after the notification to any Qualified Bidder that its bid constitutes a Qualified Bid and provide a copy of Qualified Bids (excluding the Stalking Horse Agreement) to the Stalking Horse Bidder.  The notices described in this paragraph shall not be given later than one (1) business day following the expiration of the Bid Deadline.

- **Stalking Horse Bidder Deemed a Qualified Bidder**: Notwithstanding anything in the Bidding Procedures to the contrary, the Buyer is deemed to be a Qualified Bidder with respect to the Purchased Assets and the Stalking Horse Bid is deemed to be a Qualified Bid for all purposes in connection with the Bidding Procedures, the Auction, and the Sale, and the Stalking Horse Bidder shall not be required to take any further action in order to attend and participate in the Auction (if any) or, if the Stalking Horse Bidder is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.

- **Auction Process**: Only if the Sellers receive one or more Qualified Bids with respect to the Purchased Assets in addition to the Stalking Horse Bid, the Sellers will conduct an auction (the "Auction") for the Purchased Assets (which the

Sellers intend to transcribe) at **10:00 a.m. (prevailing Eastern Time) on April 2, 2019**, at the offices of Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, or such other location as shall be timely communicated by the Sellers to all entities entitled to attend the Auction. The Auction shall be conducted in accordance with the following procedures:

a.    only the Sellers, the Notice Parties, the Stalking Horse Bidder, and any other Qualified Bidders, in each case along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person);

b.    only the Stalking Horse Bidder and such other Qualified Bidders will be entitled to participate as bidders in, or make any Subsequent Bids at, the Auction; <u>provided</u> that all such Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

c.    each Qualified Bidder shall be required to confirm in a manner acceptable to the Sellers that it has not engaged in any collusion with respect to the bidding or the sale (including communicating with other Bidders during the Auction (concerning any aspect of the Auction or bidding) without the consent of the Debtors on the record of the Auction;

d.    at least one (1) business day prior to the Auction, each Qualified Bidder (other than a Stalking Horse Bidder) must inform the Sellers whether it intends to attend the Auction; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall, subject to the terms of the Stalking Horse Agreement, nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction, or (ii) if selected as the Successful Bidder, four (4) months after the execution of the applicable Proposed Asset Purchase Agreement.  No later than one business day prior to the start of the Auction, the Sellers will provide copies of the Qualified Bid (or combination of Qualified Bids, if applicable) which the Sellers believe, in their discretion, is the highest or otherwise best offer for the Purchased Assets (the "<u>Starting Bid</u>") to the Stalking Horse Bidder and all other Qualified Bidders;

e.    all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.    the Sellers, after consultation with their advisors, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, <u>provided</u> such rules: (i) are not inconsistent with the Bidding Procedures, title 11 of the

United States Code (the "Bankruptcy Code"), any order of the Bankruptcy Court entered in connection herewith or the Stalking Horse Agreement; (ii) provide that bids be made and received on an open basis, with all material terms of each bid to be fully disclosed to all other Qualified Bidders at the Auction; and (iii) are disclosed to each Qualified Bidder at the Auction;

g.    bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the Sellers' estates of at least an additional $1,000,000 above the prior bid for the Purchased Assets.  After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (including the identity of the bidder or bidders and the value of such bid(s)) that they believe to be the highest or otherwise best offer for the Purchased Assets (the "Highest Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity, as determined by the Sellers, to submit a Subsequent Bid with full knowledge of the then Highest Bid.  The failure of the Stalking Horse Bidder to bid in a particular round of bidding shall not preclude the applicable Stalking Horse Bidder from bidding in subsequent rounds, if any.  For the purpose of evaluating the value of the consideration provided by the Subsequent Bids (including any Subsequent Bid by the Stalking Horse Bidder), the Sellers will give effect (on a dollar for dollar basis) to the Break-Up Fee and the maximum amount of the Expense Reimbursement payable to the Stalking Horse Bidder under the Stalking Horse Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers, as well as any other items of value included in such Subsequent Bid.  If the Stalking Horse Bidder bids at the Auction, the Stalking Horse Bidder will be entitled to credit bid on a dollar for dollar basis the amount of the Break-Up Fee and the maximum amount of the Expense Reimbursement.  To the extent a Subsequent Bid has been accepted entirely or in part because of the addition, deletion or modification of a provision or provisions in the applicable Proposed Asset Purchase Agreement or Stalking Horse Agreement, the Sellers will identify such added, deleted or modified provision or provisions and the Qualified Bidders shall be given the opportunity to modify the applicable Proposed Asset Purchase Agreement or Stalking Horse Agreement in a manner that materially provides any additional value that factored into selecting a Subsequent Bid from another Qualified Bidder.  The Sellers shall, in consultation with the Consultation Parties, determine whether an addition, deletion or modification of the applicable Proposed Asset Purchase Agreement or Stalking Horse Agreement meets the standard of materially providing additional value. For the avoidance of doubt, the Stalking Horse Bidder shall be entitled to submit additional bids and make modifications to the Stalking Horse Agreement at the Auction consistent with the Bidding Procedures;

h.   No participant (including but not limited to any counterparty to an executory contract or unexpired lease) during the Auction may lodge any objection during the Auction to the proposed Sale or the assumption/assignment of an executory contract or unexpired lease; objections to the Sale or any assumption/assignment of any executory contract or unexpired lease shall only be preserved if filed as a Sale Objection, Cure Costs Objection or Assignment Objection (as the case may be) by the deadlines set forth in the Bidding Procedures Order;

i.   the Sellers shall, in their reasonable discretion and after consultation with the Consultation Parties, honor reasonable requests for breaks in the auction; and

j.   the Auction may be adjourned as the Sellers, in consultation with the Consultation Parties, deem appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to the Stalking Horse Bidder, all other Qualified Bidders, the United States Trustee and the Consultation Parties.

- **Selection of Successful Bid**: Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors and the Consultation Parties, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer for the Purchased Assets is the highest or otherwise best offer from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at or prior to the Auction by a Qualified Bidder (such bid, the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and communicate to the Stalking Horse Bidder and the other Qualified Bidders the identity of the Successful Bidder and the material terms of the Successful Bid. Upon identification of the Successful Bid at the conclusion of the Auction, the Sellers may not solicit, encourage or accept any additional bids, except if, following consultation with their legal and financial advisors, the Sellers determine that rejecting an additional unsolicited bid submitted after the conclusion of the Auction would be inconsistent with their fiduciary duties. The determination of the Successful Bid by the Sellers at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

- **Alteration of Procedures**: Without prejudice to the rights of the Stalking Horse Bidder under the terms of the Stalking Horse Agreement and the Bidding Procedures Order, the Sellers may modify the rules, procedures and deadlines set forth herein, or adopt new rules, procedures and deadlines that, in their reasonable discretion, will better promote the goals of the Bidding Procedures (namely, to maximize value for the estates); provided, however, that the Sellers may not modify the Bid Protections afforded to the Stalking Horse Bidder in accordance with the Stalking Horse Agreement, unless agreed in writing by the Stalking Horse Bidder and Sellers. For the avoidance of doubt, the Sellers may not modify the rules, procedures, or deadlines set forth in the Bidding Procedures, or adopt new rules, procedures, or deadlines that would impair in any material respect the

Stalking Horse Bidder's right to payment of the Break-Up Fee or the Expense Reimbursement without the express written consent of the Stalking Horse Bidder. All such modifications and additional rules will be communicated to each of the Notice Parties, Potential Bidders, and Qualified Bidders (including the Stalking Horse Bidder) or announced at the Auction.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

35.     The Sellers believe that their Executory Contracts and Unexpired Leases represent valuable rights necessary to the continued operation of their businesses.  To that end, the Debtors seek to establish the following procedures permitting them to assume and assign certain of these Executory Contracts and Unexpired Leases to the Successful Bidder and to notify counterparties to such Executory Contracts and Unexpired Leases of proposed cure amounts, if any, necessary to cure any defaults existing thereunder:

a.     **Cure Notice**:  The Debtors shall, within two (2) business days of the entry of the Bidding Procedures Order, serve the Cure Notice upon each non-Debtor counterparty[7] to each Executory Contract or Unexpired Lease to which a Seller is a party that may be assumed and assigned to the Stalking Horse Bidder, regardless of whether, at that time, the Executory Contract or Unexpired Lease is listed as being proposed to be assumed and assigned to the Stalking Horse Bidder.  The Cure Notice shall state the date, time and place of the Sale Hearing and the date by which any objection to the assumption and assignment of such Executory Contract or Unexpired Lease must be filed and served.  The Cure Notice shall also identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Executory Contract or Unexpired Lease to cure any defaults that exist under such contract or lease (such amounts, the "Cure Costs") pursuant to section 365 of the Bankruptcy Code.  The Cure Notice does not constitute an admission that an Executory Contract or Unexpired Lease is in fact an executory contract or unexpired lease for the purposes of section 365 of the Bankruptcy Code, and the Debtors reserve any and all rights with respect to the Executory Contracts and Unexpired Leases.  The inclusion of an Executory Contract or Unexpired Lease on the Cure Notice shall not obligate the Successful Bidder to take assignment of such Executory Contract or Unexpired Lease.  Only those contracts that constitute (a) Buyer Assumed Agreements pursuant to the Stalking Horse Agreement or (b) if the Successful Bidder is not the Stalking Horse Bidder, Buyer

---

[7]  The Cure Notice served upon each non-Debtor counterparty may, in the Debtors' discretion, include an individualized Exhibit 1 that lists only the recipient counterparty's Executory Contract(s) and/or Unexpired Lease(s).

Assumed Agreements identified in the Successful Bidder's Proposed Asset Purchase Agreement, shall be assumed, assigned and sold to such Successful Bidder.

b.    **Cure Costs Objections**: If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to any proposed Cure Costs set forth in the Cure Notice or any Supplemental Cure Notice, such counterparty must (a) file with the Court a written objection (a "Cure Costs Objection") and (b) serve such Cure Costs Objection, so as to be received no later than ten (10) days after service of the Cure Notice or Supplemental Cure Notice, as applicable (the "Cure Objection Deadline"), on: (i) counsel to the Debtors, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, NY 10020 (Attn: Steven E. Siesser, Esq. (ssiesser@lowenstein.com), Paul Kizel, Esq. (pkizel@lowenstein.com) and Philip J. Gross (pgross@lowenstein.com)); (ii) counsel to the Buyer, Reed Smith LLP, 599 Lexington Ave, New York, New York 10036 (Attn: Niket Rele, Esq. (nrele@reedsmith.com), John Algie, Esq. (jalgie@reedsmith.com) and Derek J. Baker, Esq. (dbaker@reedsmith.com)); (iii) the Office of The United States Trustee, One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, New Jersey 07102 (Attn: Fran B. Steele (Fran.B.Steele@usdoj.gov) and David Gerardi, Esq. (David.Gerardi@usdoj.gov)); and (iv) proposed counsel to the Official Committee of Unsecured Creditors, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038-4982 (Attn: Jayme T. Goldstein, Esq. (jgoldstein@stroock.com) and Erez E. Gilad, Esq. (egilad@stroock.com)) (collectively, the "Notice Parties").

If, at any time and from time to time after the entry of the Bidding Procedures Order, the Debtors or the Stalking Horse Bidder or other Successful Bidder identify additional Executory Contracts or Unexpired Leases to be assumed and assigned as Buyer Assumed Agreements in accordance with the terms of the Stalking Horse Agreement or Successful Bidder's Proposed Asset Purchase Agreement, the Debtors shall serve a supplemental Cure Notice (each, a "Supplemental Cure Notice") by facsimile, electronic transmission, hand delivery or overnight mail on the applicable non-debtor counterparty and its counsel (if known) no later than ten (10) days before the closing ("Closing") of the Sale, or, if such Executory Contract or Unexpired Lease is identified less than ten (10) days prior to the Closing, by the date set forth on the Supplemental Cure Notice. Each Supplemental Cure Notice shall: (a) state the date, time and place of the Sale Hearing (or later hearing, if applicable); (b) state the date by which any objection to the assumption and assignment of such Buyer Assumed Agreement must be filed and served; and (c) identify the proposed Cure Costs, if any.

Each Cure Costs Objection must set forth with specificity each and every asserted default in any Executory Contract or Unexpired Lease and the

monetary cure amount asserted by such counterparty to the extent it differs from the Cure Costs, if any, specified by the Debtors in the Cure Notice or Supplemental Cure Notice, as applicable.

c.    **Disputed Cure Costs**: In the event that the Debtors and the non-debtor party cannot resolve a Cure Costs Objection, disputed Cure Costs shall not be paid until the resolution of any such disputes by the Court or mutual agreement of the Debtors, with the consent of the Stalking Horse Bidder to the extent required in the Stalking Horse Agreement, and the objecting party. Cure Costs Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing. Any resolution of an objection to a Cure Cost occurring after the Sale Hearing shall nevertheless remain subject to the rights, obligations and duties of the Debtors and the Stalking Horse Bidder under the Stalking Horse Agreement.

d.    **Deemed Consent to Cure Costs**: Any counterparty to an Executory Contract or Unexpired Lease that fails to timely file and serve a Cure Costs Objection shall be forever barred from asserting that Cure Costs are owed in an amount in excess of that set forth in the Cure Notice or Supplemental Cure Notice. If no Cure Costs Objection is timely filed and served by the Cure Objection Deadline with respect to a Buyer Assumed Agreement, the Cure Costs identified in the Cure Notice or Supplemental Cure Notice, as applicable, with respect to the applicable Executory Contract(s) and/or Unexpired Lease(s) shall be the only amounts necessary to be paid to cure all monetary defaults pursuant to section 365(b) of the Bankruptcy Code under such Buyer Assumed Agreement(s), to the extent the Stalking Horse Bidder (or other Successful Bidder) ultimately decides to have the applicable Buyer Assumed Agreement(s) assumed and assigned to it. Any party failing to timely file a Cure Costs Objection shall be deemed to have consented and forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates or the Successful Bidder, notwithstanding anything to the contrary in any Executory Contract or Unexpired Lease, or any other document. To the extent a Cure Costs Objection is resolved or determined unfavorably to the applicable Debtor, such Debtor may, with the prior written consent of the Successful Bidder, seek to instead reject the applicable Executory Contract or Unexpired Lease after such determination.

e.    **Assignment Objections**: If any counterparty to an Executory Contract or Unexpired Lease objects to the assumption and assignment of such Executory Contract or Unexpired Lease for any reason (including with respect to adequate assurance of future performance) other than the amount of the proposed Cure Costs (an "Assignment Objection"), such counterparty must file and serve such Assignment Objection so as to be received by the Notice Parties by no later than ten (10) days after service

of the Cure Notice or Supplemental Cure Notice, as applicable (the "<u>Assignment Objection Deadline</u>"). The Court shall make any and all determinations concerning an Assignment Objection, including adequate assurance of future performance under the Buyer Assumed Agreements pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code, at the Sale Hearing (or such later hearing as may be requested by the Debtors).

If no Assignment Objection is timely filed and served by the Assignment Objection Deadline, the counterparty to an Executory Contract or Unexpired Lease shall be deemed to have consented (including deemed consent under section 365(c)(1) of the Bankruptcy Code), to the assumption, assignment and sale of the Executory Contract or Unexpired Lease to the Successful Bidder if such Executory Contract or Unexpired Lease is elected by the Successful Bidder as a Buyer Assumed Agreement and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale; provided, however, in the event that the Successful Bidder is not the Stalking Horse Bidder, the non-debtor parties to the Executory Contracts and Unexpired Leases to be assumed and assigned to such Successful Bidder shall have until 4:00 p.m. on the date that is one (1) business day prior to the Sale Hearing to object to the assumption, assignment and/or sale of their Executory Contracts and Unexpired Leases to such Successful Bidder; provided further, however, any such objection may relate solely to adequate assurance of future performance by such Successful Bidder pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code.

f.   **Addition or Removal of Certain Buyer Assumed Agreements**: The Stalking Horse Bidder may add or remove any Buyer Assumed Agreement to be assumed by the Debtors and assigned to the Stalking Horse Bidder at any time prior to five (5) days prior to the Sale Hearing in accordance with the terms of the Stalking Horse Agreement.

## <u>SALE NOTICE PROCEDURES</u>

36.   The Debtors propose that within two (2) business days after entry of the Bidding Procedures Order, the Debtors will serve a copy of the Sale Notice, substantially in the form attached hereto as **<u>Exhibit D</u>**, by first class mail, postage prepaid to: (a) the Office of The United States Trustee for the District of New Jersey; (b) McGuireWoods LLP, c/o Kenneth Noble, Esq., as counsel for the DIP Agent and Prepetition Agent; (c) the Indenture Trustee for the Noteholders; (d) any proposed counsel to the Official Committee of Unsecured Creditors; (e) the U.S. Securities and Exchange Commission, New York Regional Office; (f) the Internal Revenue

Service; (g) the U.S. Food and Drug Administration; (h) the Assistant Attorney General in charge of the Antitrust Division of the U.S. Department of Justice; (i) all applicable state and local taxing authorities; (j) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets during the previous six months; (k) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Purchased Assets (for which identifying information and addresses are available to the Debtors); (l) all non-Debtor parties to the Executory Contracts and Unexpired Leases; (m) all of the Debtors' known creditors; (n) the Office of the Attorneys General of the States of New York and New Jersey; (o) the United States Attorney's Office for the District of New Jersey; (p) the United States Attorney's Office for the Eastern District of New York; and (q) all parties that have requested to receive notice in these cases under Bankruptcy Rule 2002.

37.    Additionally, within seven days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will publish a notice, setting forth the information contained in the Sale Notice, on one occasion, in either *The New York Times, Wall Street Journal or USA Today*.  The Debtors submit that such publication notice is sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

38.    The Debtors submit that the proposed Sale Notice complies fully with Bankruptcy Rule 2002, is reasonably calculated to provide all interested parties with timely and proper notice and constitutes good and adequate notice of the proposed Sale, the date, time, and place of the Auction (if one is held), all proceedings with respect thereto, the deadline for any objections to the Sale, and the date, time, and place of the Sale Hearing. Therefore, the Debtors respectfully

request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

39.     The Debtors further request that any party failing to timely file an objection to the Sale shall be forever barred from objecting and shall be deemed to have consented to the Sale, including the transfer of the Debtors' right, title, and interest in, to and under the Purchased Assets free and clear of any and all claims, liens, rights, interests and encumbrances in accordance with the definitive agreement for the Sale.

## THE STALKING HORSE AGREEMENT

40.     As set forth above, the Debtors entered into the Stalking Horse Agreement after extensive prepetition marketing efforts, negotiations, consideration and analysis, and submit that the terms of the Stalking Horse Agreement are fair and provide reasonable value in exchange for the Purchased Assets.  By establishing a minimum acceptable bid for the Pharma Business, the Stalking Horse Agreement, together with the Bidding Procedures, promote competitive bidding and will ensure that the Debtors maximize the value received from the sale of the Pharma Business.

41.     The Stalking Horse Agreement was negotiated, proposed, and entered into by the Sellers and Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions. Vimal Kavuru, a member of Aceto's Board of Directors, is the CEO of the Stalking Horse Bidder.  Mr. Kavuru recused himself from the Board of Directors on November 14, 2018 and has been excluded from all meetings of the Board since that date, including all deliberations concerning the proposed Sale.

42.     As set forth below, the Stalking Horse Agreement contains various conditions to closing, including that the Bankruptcy Court approve a release of certain claims against the

Stalking Horse Bidder and various related parties.  The Debtors will seek approval of such release by separate motion.[8]  Pursuant to the terms of the Stalking Horse Agreement, the Debtors retain the right to terminate the Stalking Horse Agreement if such release is not approved.

## MATERIAL TERMS OF THE PROPOSED SALE[9]

### A.    The Stalking Horse Agreement

43.    In accordance with Local Rule 6004-1(a)(3), the material terms of the proposed sale to the Buyer (or other Successful Bidder for the Purchased Assets) are as follows:

- **Sellers**. Rising Pharmaceuticals, Inc., Pack Pharmaceuticals, LLC, Rising Health, LLC, and Acetris Health, LLC.  Aceto Corporation is also a party to the Stalking Horse Agreement solely with respect to certain Articles and Sections thereof.

- **Property to be Sold**. The Purchased Assets consist of:

    On the terms and subject to the conditions set forth in [the Stalking Horse Agreement], at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase, free and clear of all Liabilities and Liens (other than Liens created by Buyer and the Permitted Liens), the right, title and interest of Sellers in, to or under the following properties and assets of Sellers (herein collectively called the "Purchased Assets"):

    (a)    all Accounts Receivable of each Seller outstanding as of the Closing Date, including as set forth on Schedule 1.1(a);

    (b)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, all rights, benefits and interests under the Contracts listed or described on Schedule 1.1(b) (the "Assumed Contracts");

    (c)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, the Real Property Leases, and rights thereunder, listed on Schedule 1.1(c) (such Real Property Leases, the "Assumed Real Property Leases");

---

[8] Aside from the closing being conditioned upon the release, the release would result in the Debtors receiving additional consideration.

[9] The following summaries of the material terms of the proposed Sale and "special provisions" of the Stalking Horse Agreement and Sale Order are provided in accordance with Local Rule 6004-1 and are qualified in their entirety by reference to the provisions of the Stalking Horse Agreement and Sale Order. In the event of any inconsistencies between these summaries and the actual provisions of the Stalking Horse Agreement and Sale Order, the terms of the Stalking Horse Agreement and Sale Order shall govern in all respects. Capitalized terms used, but not otherwise defined, in this section shall have the meanings ascribed thereto in the Stalking Horse Agreement.

(d)    all rights (including goodwill, if any) in and to the products that Sellers own or have an interest in, including as set forth on Schedule 1.1(d) (the "Products");

(e)    all Product Registrations and the Regulatory Documentation (including applications that are in the process of being prepared by any Sellers for Product Registrations);

(f)    the equipment, machinery, forklifts, vehicles, fixtures, furniture, furnishings, signage, leasehold improvements and other tangible personal property owned by each Seller as of the Closing Date that are (A) located on or at the Acquired Real Property and held for, or used in, the Acquired Business and existing as of the Closing or (B) set forth on Schedule 1.1(f);

(g)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, all Governmental Authorizations (and all pending applications therefor) of Sellers, including the Governmental Authorizations set forth on Schedule 1.1(g);

(h)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, all Intellectual Property that is owned or licensed by each Seller and (A) primarily held for, or used in, the Acquired Business and existing as of the Closing, including all operating and financial software, enterprise resource planning programming and licenses to use Sellers' technology infrastructure, or (B) set forth on Schedule 1.1(h), in each case, including all goodwill associated therewith;

(i)    all Books and Records of the Acquired Business, except those: (i) relating primarily to any Excluded Asset or Excluded Liability; (ii) relating to employees of Sellers who are not Transferred Employees; (iii) in connection with, to the extent not being assumed by Buyer, any Proceeding, judgment or privilege of any nature available to or being pursued by or on behalf of, asserted against, or otherwise involving any Seller, whether arising by counterclaim or otherwise, assumed pursuant to [the Stalking Horse Agreement], or (iv) that Sellers are not permitted to transfer under applicable Law;

(j)    all telephone and facsimile numbers, all rights to receive mail and other communications addressed to Sellers, and other directory listings used in connection with the Acquired Business, to the extent assignable;

(k)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, the equipment leases listed or described on Schedule 1.1(k) (the "Assumed Equipment Leases" and together with the Assumed Contracts and Assumed Real Property Leases, the "Buyer Assumed Agreements");

(l)    all rights of each Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with (i) the Transferred Employees or any employees of each Seller terminated within twelve

(12) months prior to the Closing Date, (ii) any agents of each Seller or with third parties, (iii) any other Person, in each case, related to the Acquired Business;

(m)    all Prepaid Assets;

(n)    all Inventory as of the Closing Date (including, for the avoidance of doubt, Qualified Inventory and Short-Dated Inventory), other than as set forth in Section 1.2(s);

(o)    the additional assets listed on Schedule 1.1(o);

(p)    all rights, claims, causes of action, choses in action, rights of recovery and setoff rights relating to the Proceedings as set forth on Schedule 1.1(p) (the "Assumed Proceedings"); and

(q)    all goodwill associated with the Acquired Business as of the Closing Date that is not expressly referenced in Sections 1.1(a) through 1.1(p).

*See* Stalking Horse Agreement § 1.1.

- **Date, Time and Place of Sale**.  If the Sellers receive one or more Qualified Bids with respect to the Purchased Assets in addition to the Stalking Horse Bid (as defined in the Bidding Procedures), the Sellers propose to conduct the Auction for the Purchased Assets at **10:00 a.m. (prevailing Eastern Time) on April 2, 2019**, at the offices of Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, or such other location as shall be timely communicated by the Sellers to all entities entitled to attend the Auction.  The Debtors propose that the Sale Hearing be scheduled for **April 4, 2019 at 10:00 a.m. (prevailing Eastern Time)**.

- **Purchase Price**. The Purchase Price under the Stalking Horse Agreement is defined in Section 2.1 of the Stalking Horse Agreement as follows:

    The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be the sum of the following:

    (a)    the Good Faith Deposit [$2,690,000]; plus

    (b)    the sum of $12,306,304.36 (the "Cash Balance"); plus

    (c)    the Seller Credit as set forth on Schedule 2.2(a); plus

    (d)    a reduction of the Deferred Payment Amount (as defined in that certain Product Purchase Agreement, dated as of November 2, 2016, by and among Parent and the other parties thereto (the "Citron PPA")) due and owing from Sellers equal to $2,000,000 (the "Deferred Payment Reduction"); plus

    (e)    the assumption by Buyer of the Assumed Liabilities.

*See* Stalking Horse Agreement § 2.1.

- **Conditions of the Sale**. The closing of the transactions contemplated by the Stalking Horse Agreement is subject to the satisfaction or waiver of a number of closing conditions set forth in Article VII of the Stalking Horse Agreement.

The conditions to each Party's obligation to close the Sale as set forth in Section 7.1 of the Stalking Horse Agreement are as follows:

Conditions to Each Party's Obligation to Close. The respective obligations of each Party to effect the Asset Purchase shall be subject to the fulfillment (or waiver in a writing signed by the waiving party, to the extent permissible under applicable Law and provided that such waiver shall only be effective as to the conditions of the waiving party) at or prior to the Closing of the following conditions:

(a) no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no Law shall have been adopted that remains in effect or be effective, in each case, that prevents, enjoins, prohibits or makes illegal the consummation of the Asset Purchase;

(b) any waiting periods applicable to the Asset Purchase under the HSR Act and any other Antitrust Laws have expired or been terminated and/or the relevant approvals under such Laws have been acquired, and all material consents, licenses, registrations, or declarations of, or filings with, any Governmental Entities in any such jurisdictions required under any Laws for the Asset Purchase to be completed have been obtained or made on a basis acceptable to Sellers and Buyer, such acceptance not to be unreasonably withheld, delayed or conditioned; and

(c) the Sale Order is not subject to any stay and is in effect.

Additional conditions to the Sellers' obligation to close the Sale as set forth in Section 7.2 of the Stalking Horse Agreement are as follows:

Conditions to Obligation of Sellers to Close. The obligation of Sellers to sell the Purchased Assets at Closing is further subject to the fulfillment (or waiver in a writing signed by Sellers, to the extent permissible under applicable Law) at or prior to the Closing of the following conditions:

(a) the representations and warranties of Buyer contained herein shall be true and correct in all material respects as of the Agreement Date and as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date);

(b)     Buyer shall have performed and complied in all material respects with all covenants required by [the Stalking Horse Agreement] to be performed or complied with by Buyer prior to Closing;

(c)     Buyer shall have delivered to Sellers a certificate, dated the Closing Date and signed by a duly authorized executive officer (in such officer's capacity as such and not individually) of Buyer, certifying to the effect that the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied;

(d)     Buyer shall have paid the Purchase Price in accordance with Section 2.2;

(e)     the Sale Order shall have been entered and not be subject to any stay;

(f)     Buyer shall be prepared to deliver, or cause to be delivered, to Sellers the items set forth in Section 2.6; and

(g)     the sale of the Chemicals Plus Business pursuant to Section 363 of the Bankruptcy Code shall have been consummated, or shall be consummated substantially concurrently with, the Closing, unless such sale has not occurred within five (5) Business Days following satisfaction of the closing conditions set forth in Sections 7.2(a) through (f).

Additional conditions to the Buyer's obligation to close the Sale as set forth in Section 7.3 of the Stalking Horse Agreement are as follows:

Conditions to Obligation of Buyer to Close.  The obligation of Buyer to purchase the Purchased Assets at Closing is further subject to the fulfillment (or the waiver in a writing signed by Buyer, to the extent permissible under applicable Law) at or prior to the Closing of the following conditions:

(a)     the representations and warranties of Sellers contained [in the Stalking Horse Agreement] shall be true and correct as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications, except where all failures of such representations and warranties to be true and correct, in the aggregate, do not have or would not reasonably be expected to have, a Material Adverse Effect;

(b)     Sellers shall have performed and complied in all material respects with all covenants required by [the Stalking Horse Agreement] to be performed or complied with by them prior to the Closing (which, for the

avoidance of doubt, shall not include the transactions referred to in Section 6.9(d));

(c)    each Seller shall have delivered to Buyer a certificate, dated the Closing Date and signed by a duly authorized executive officer (in such officer's capacity as such and not individually) of such Seller, certifying to the effect that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied;

(d)    Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 2.7; provided, however, that (i) provision of the certifications referenced in Section 2.7(h) shall not be a condition to Closing and (ii) the sole remedy for failure to provide such certifications shall be that Buyer shall be entitled to withhold any amount required to be withheld pursuant to applicable Law;

(e)    since the Agreement Date, there shall not have occurred and be continuing any event, change, effect or circumstance constituting, or which would reasonably be likely to result in, individually or in the aggregate, a Material Adverse Effect;

(f)    the Sale Order shall have been entered and deemed a Final Order;

(g)    the Qualified Inventory Amount shall be not less than $60,000,000;

(h)    the Release shall have been approved by Final Order of the Bankruptcy Court; and

(i)    Buyer shall have received a notification from the Department pursuant to Section 1.6(b), setting forth the amount of the Purchase Price to be set aside in the Tax Escrow, or stating that no Tax Escrow is required.

*See* Stalking Horse Agreement §§ 7.1-7.3.

- **Deadlines for Approval or Closing of Sale**. Section 8.1(b) of the Stalking Horse Agreement provides that the Stalking Horse Agreement may be terminated by either Sellers or Buyer "if the transactions contemplated [t]hereby (other than the transactions referred to in Section 6.9(d)), including the Asset Purchase, shall not have been consummated on or prior to 5:00 p.m. New York City Time, on May 31, 2019 (the "End Date"); provided that, if as of the End Date any of the conditions set forth in Section 7.1(a) (solely to the extent such condition has not been satisfied due to an order or injunction arising under any Antitrust Law), Section 7.1(b) shall not have been satisfied or waived, the End Date may be extended on one occasion by either Buyer or Sellers for a period of up to thirty (30) calendar days by written notice to the other Party, and such date, as so extended, shall be the End Date; provided, further, that the right to terminate [the

Stalking Horse Agreement] pursuant to this <u>Section 8.1</u>   shall not be available to a Party, if the failure of the transactions contemplated hereby to be consummated by such date shall be due to the breach by such Party of any covenant or other agreement of such Party set forth in [the Stalking Horse Agreement]."

Section 8.1(f) of the Stalking Horse Agreement provides that the Stalking Horse Agreement may be terminated by either Sellers or Buyer "if (i) the Bidding Procedures Order has not been entered by the Bankruptcy Court on or prior to the date that is forty-five (45) calendar days after the Sale Motion is filed with the Bankruptcy Court, (ii) the Sale Order has not been entered by the Bankruptcy Court on or prior to the date that is sixty-seven (67) calendar days after the execution and delivery of [the Stalking Horse Agreement] (which, in no event, shall be later than the End Date), <u>provided</u> that, in the case of a termination by Buyer, Buyer is not in material breach of any terms of [the Stalking Horse Agreement] prior to such termination, or, in the case of a termination by Sellers, Sellers are not in material breach of any terms of [the Stalking Horse Agreement] prior to such termination, or (iii) Sellers withdraw the Sale Motion without Buyer's consent, with such termination to occur no earlier than three (3) Business Days after such withdrawal."

*See* Stalking Horse Agreement §§ 8.1(b), (f).

- **<u>Deposit and Forfeiture of Deposit</u>**. Pursuant to Section 2.3 of the Stalking Horse Agreement, the Buyer has deposited $2,690,000 into escrow as a good faith deposit (the "<u>Good Faith Deposit</u>").

Section 2.3 of the Stalking Horse Agreement provides, in relevant part, the following with respect to disposition of the Good Faith Deposit:

> Following the execution of this Agreement by the Parties, other than upon termination of [the Stalking Horse Agreement] by Sellers pursuant to <u>Section 8.1(b)</u> (in the event that the Closing does not occur on or prior to the End Date solely as a result of Buyer's material breach of its obligations under [the Stalking Horse Agreement]) or <u>Section 8.1(d)</u>, in which cases, the Good Faith Deposit shall be nonrefundable and paid to Sellers pursuant to the terms of this <u>Section 2.3</u>, the Good Faith Deposit shall be refunded to Buyer upon the termination of [the Stalking Horse Agreement] for any reason, including pursuant to <u>Section 8.1</u>. At the Closing, the Good Faith Deposit (and any interest or income accrued thereon) shall be paid over to Sellers by the Good Faith Deposit Escrow Holder and upon such payment, the Good Faith Deposit shall be credited and applied toward payment of the Purchase Price (and such interest thereon shall reduce the amount of the Cash Balance). In the event the Good Faith Deposit becomes nonrefundable as provided herein before the Closing by reason of Sellers terminating [the Stalking Horse Agreement] pursuant to <u>Section 8.1(b)</u> (in the event that the Closing does not occur on or prior to the End Date solely as a result of Buyer's material breach of its

obligations under [the Stalking Horse Agreement]) or <u>Section 8.1(d)</u>, the Good Faith Deposit Escrow Holder shall immediately disburse the Good Faith Deposit and all interest or income accrued thereon to Sellers to be retained by Sellers for their own account.  Sellers' retention of the Good Faith Deposit pursuant to the preceding sentence shall constitute liquidated damages and shall be the exclusive remedies available to Sellers in the event of such termination by Sellers. If the transactions contemplated by [the Stalking Horse Agreement] terminate in accordance with the termination provisions [t]hereof for any reason other than by Sellers pursuant to <u>Section 8.1(b)</u> (in the event that the Closing does not occur on or prior to the End Date as a result of Buyer's material breach of its obligations under [the Stalking Horse Agreement]) or <u>Section 8.1(d)</u> before the Sale Order is entered by the Bankruptcy Court, the Good Faith Deposit Escrow Holder shall, subject to <u>Section 8.1</u>, return to Buyer the Good Faith Deposit (together with all income or interest accrued thereon), within three (3) Business Days after [the Stalking Horse Agreement] is so terminated.

Section 8.4 of the Stalking Horse Agreement provides as follows:

<u>Return of Good Faith Deposit</u>.  In the event that this Agreement is validly terminated pursuant to <u>Sections 8.1(a)</u>, <u>Section 8.1(b)</u>, <u>Section 8.1(c)</u>, <u>Section 8.1(e)</u>, <u>Section 8.1(f)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u>, <u>Section 8.1(i)</u>, <u>Section 8.1(j)</u> or <u>Section 8.1(k)</u> and provided that Buyer is not in material breach of any terms of this Agreement prior to such termination, the Good Faith Deposit Escrow Holder shall disburse to Buyer any amounts held in the Good Faith Deposit Escrow pursuant to the Bidding Procedures.

Sections 9.5(c)-(d) of the Stalking Horse Agreement provide as follows:

In the event of any breach prior to the Closing by Sellers or Parent of any of their respective agreements, representations, or warranties contained herein or in the Bidding Procedures Order or the Sale Order, including any Willful Breach, Buyer's sole and exclusive remedies shall be (i) to exercise Buyer's rights to terminate this Agreement pursuant to <u>ARTICLE VIII</u>, in accordance with the terms of such <u>ARTICLE VIII</u>, (ii) the return of the Good Faith Deposit as provided in <u>Section 2.3</u>, and (iii) to the Break-Up Fee and the Expense Reimbursement, as applicable, if earned in accordance with <u>Section 8.3</u>, and Buyer shall not have any further cause of action for damages, specific performance, or any other legal or equitable relief against Sellers with respect thereto.

In the event of any breach prior to the Closing by Buyer of any of Buyer's agreements, representations, or warranties contained herein, including any Willful Breach, Parent and Sellers' sole and exclusive remedies shall be (i) to exercise Sellers' rights to terminate this Agreement pursuant to

ARTICLE VIII, in accordance with the terms of such <u>ARTICLE VIII</u>, (ii) the payment of the Good Faith Deposit as provided in <u>Section 2.3</u>, and (iii) to enforce any provision of this Agreement pursuant to <u>Section 9.5(a)</u> (including the right to such remedies as are available at law and in equity).

*See* Stalking Horse Agreement §§ 2.3, 8.4 and 9.5(c)-(d).

- **<u>Request for a Tax Determination Under Section 1146(b) of the Bankruptcy Code</u>**. The proposed Sale is not being effectuated pursuant to a plan.  Thus, section 1146(b) of the Bankruptcy Code is inapplicable.

- **<u>Retention / Access to Books and Records</u>**. Section 1.1(i) of the Stalking Horse Agreement provides that the Purchased Assets include the following:

  all Books and Records of the Acquired Business, except those: (i) relating primarily to any Excluded Asset or Excluded Liability; (ii) relating to employees of Sellers who are not Transferred Employees; (iii) in connection with, to the extent not being assumed by Buyer, any Proceeding, judgment or privilege of any nature available to or being pursued by or on behalf of, asserted against, or otherwise involving any Seller, whether arising by counterclaim or otherwise, assumed pursuant to [the Stalking Horse Agreement], or (iv) that Sellers are not permitted to transfer under applicable Law.

Section 6.2(f) of the Stalking Horse Agreement provides the Sellers with post-Closing access to the Books and Records as follows:

  In order to facilitate Sellers' efforts to (i) administer and close the Bankruptcy Case (including reconcile claims, wind down benefit plans and attend to other pending litigation), and (ii) prepare Tax Returns (together, the "<u>Post-Close Filings</u>"), for a period of eighteen (18) months following the Closing, Buyer shall permit Sellers and Sellers' counsel, accountants and other Representatives and successors in interest (collectively, "<u>Permitted Access Parties</u>") during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to the financial and other Books and Records which comprised part of the Purchased Assets (prior to the Closing Date) that are required to complete the Post-Close Filings, which access shall include (A) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (B) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and applicable Permitted Access Party reimburses Buyer for the reasonable costs and expenses thereof; <u>provided</u>, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of

any of Buyer's business after the Closing Date.  Notwithstanding anything contained in this <u>Section 6.2(f)</u> to the contrary, in no event shall Sellers have access to any information that, based on advice of Buyer's counsel, could (i) reasonably be expected to create liability under applicable Law, or waive any legal privilege, (ii) result in the discharge of any Trade Secrets of Buyer, its affiliates or any third parties, (iii) violate any obligation of Buyer with respect to confidentiality.

*See* Stalking Horse Agreement §§ 1.1(i) and 6.2(f).

- **<u>Assumption and Assignment of Executory Contracts and Unexpired Leases</u>**. The Stalking Horse Agreement provides for the assumption and assignment of the Buyer Assumed Agreements to the Buyer pursuant to section 365 of the Bankruptcy Code.

   *See* Stalking Horse Agreement §§ 1.1(b), (c) and (k) and 1.5.

- **<u>Credit Bidding</u>**. The proposed Sale to the Buyer does not involve a credit bid pursuant to section 363(k) of the Bankruptcy Code.

44.      In accordance with Local Rule 6004-1(b), the Stalking Horse Agreement and/or the Sale Order, as applicable, include the following "special provisions":

- **<u>Sale to Insider</u>**:  The proposed Sale is not to an insider.  Vimal Kavuru, a member of Aceto's Board of Directors, is the CEO of the Stalking Horse Bidder.  Mr. Kavuru recused himself from the Board of Directors on November 14, 2018 and has been excluded from all meetings of the Board since that date, including all deliberations concerning the proposed Sale.

- **<u>Agreements with Management or Key Employees</u>**

   Pursuant to Section 6.3(a) of the Stalking Horse Agreement, the Buyer shall offer employment to the Sellers' employees in Buyer's sole discretion.

   Section 6.3(e) of the Stalking Horse Agreement provides as follows:

   > No later than ten (10) calendar days following the Agreement Date, Buyer shall enter into non-competition agreements, in form and substance mutually and reasonably agreed to by all Parties, with certain Business Employees designated by Sellers, in consideration for compensation by Buyer, on the expiry thereof, to such employees as determined by Sellers (<u>provided</u> that in no event shall the aggregate compensation pursuant to such non-competition agreements for all such designated employees exceed $3,000,000), with terms expiring on September 13, 2019.

   *See* Stalking Horse Agreement §§ 6.3(a) and (e).

-36-

- **Waiver, Release or Satisfaction of Any Claim**: The Stalking Horse Agreement requires the Sellers to deliver to the Buyer the Release (as defined in Section 2.7(b)(vi) of the Stalking Horse Agreement).  It is a condition to Closing under the Stalking Horse Agreement that the Release is approved by Final Order of the Bankruptcy Court. [10]  *See* Stalking Horse Agreement §§ 2.7(m) and 7.3(h).

  In addition, Section 6.14 of the Stalking Horse Agreement provides as follows:

  > Parent and Sellers shall not, and shall cause their respective Affiliates not to, enforce, or pursue any claims with respect to, any of the restrictive covenants set forth in (a) that certain Restrictive Covenants Agreement dated November 2, 2016, by and among Citgen Pharma Holding LLC, a New Jersey limited liability company, Gensource Pharma LLC, a Delaware limited liability company, SS Pharma LLC, a New Jersey limited liability company, Shore Pharma LLC, a New Jersey limited liability company, Pharma Reach LLC, a New Jersey limited liability company, Vimal Kavuru, Sudha Kavuru, Subha Sri Thogarchedu, Ashok Mayya (collectively, the "Released Parties"), Parent and Sellers party thereto and (b) that certain Employment Agreement dated November 2, 2016, by and between Rising and Vimal Kavuru, and the Released Parties are hereby released from any and all obligations arising under such restrictive covenants.

  *See* Stalking Horse Agreement § 6.14.

- **Agreement to Limit Marketing or Not Solicit Competing Offers**: The Stalking Horse Agreement and Sale Order do not include any agreement to limit marketing of the Purchased Assets or not solicit competing offers for the Purchased Assets. The Stalking Horse Bid is subject to higher or better bids as described herein and set forth in the Bidding Procedures.

- **Sale or Limitation of Right to Pursue Avoidance Actions**:  The Stalking Horse Agreement and Sale Order do not provide for any sale or limitation of rights to pursue avoidance actions.

- **Limitation on Successor Liability**: The Sale Order provides that except as expressly provided in the Purchase Agreement, neither the Buyer nor any Buyer Party (as defined therein) shall have any Successor or Transferee Liability (as defined therein) by virtue of the Buyer's purchase of the Purchased Assets, assumption of the Assumed Liabilities, or hiring of certain employees of the Debtors pursuant to the terms of the Purchase Agreement.  *See* Sale Order ¶ 14.

- **Sale Free and Clear**: The Purchase Agreement provides that the Purchased Assets shall be sold to the Buyer free and clear of all Liabilities and Liens (other

---

[10] *See* footnote 8 above.

than Liens created by Buyer and Permitted Liens).  *See* Stalking Horse Agreement §1.1.

The Sale Order provides that as of the Closing, the Purchased Assets shall have been transferred to the Buyer free and clear of all Liens, Claims and Interests, except to the extent set forth in the Purchase Agreement.  *See* Sale Order ¶ 9.

- **Relief From Bankruptcy Rules 6004(h) and 6006(d)**: The Debtors seek a waiver of the 14-day stay of the effectiveness of the Sale Order imposed by Bankruptcy Rules 6004(h) and 6006(d), respectively.  *See* Order ¶ 33.

## BASIS FOR RELIEF REQUESTED

**I.     The Bidding Procedures are Appropriate and Will Maximize the Value Received for the Purchased Assets.**

45.     The paramount goal of any proposed sale of property of a debtor's estate is to maximize the value of the proceeds received by the estate. *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (the debtor has the "fiduciary duty to maximize the value of the bankruptcy estate."); *Burtch et al. v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing *Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors."). To that end, courts have recognized that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *see also In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("court-imposed rules for the disposition of assets . . . [should]

provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

46.     In this case, the proposed Bidding Procedures are appropriate under sections 105(a) and 363 of the Bankruptcy Code and will ensure that the bidding process is fair and reasonable and will yield the maximum value for the Debtors' estates, creditors, stakeholders, and other parties in interest. The Bidding Procedures are designed to maximize the value received for the Purchased Assets by facilitating a fair and competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to attract competitive and active bidding for the Purchased Assets. The Bidding Procedures will allow the Debtors to conduct an Auction, if necessary, in a fair, controlled and transparent manner that will encourage participation by financially capable bidders that demonstrate the financial wherewithal to close a transaction. The Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their business judgment, the highest and best offer for the Purchased Assets. The Bidding Procedures further provide potential bidders with sufficient notice and an opportunity to obtain due diligence information necessary to submit a timely and informed competing bid.

47.     As outlined above, the Debtors, in conjunction with their professional advisors, already engaged in an extensive 4½ month marketing process before the Petition Date.  The proposed timeline for the submission of competing bids will permit bidders to submit bids on or before March 29, 2019.  Given that the universe of potential bidders was identified and contacted months ago in an effort to solicit bids, it is highly likely that any prospective bidders (a) have been aware of the potential sale of the Pharma Business assets months before the Chapter 11

Cases were filed and (b) have already had a sufficient and adequate opportunity to conduct due diligence and submit a bid within the proposed timeline.  Thus, the proposed timeline for the submission of competing bids and the entry of a Sale Order is more than reasonable under the circumstances.  It is also necessary to preserve the going concern value of the Pharma Business and avoid an immediate liquidation of the Pharma Business, which would provide far less value to the Debtors' estates and creditors.

48.    Notably, the Stalking Horse Agreement contains no prohibition on the Debtors' soliciting or receiving offers for the Purchased Assets and, accordingly, the Debtors are able to continue marketing such assets for sale even prior to entry of the Bidding Procedures Order. Therefore, the Debtors and all parties in interest can be assured that the consideration ultimately received for the Purchased Assets as a result of the Bidding Process will not only be fair and reasonable, but will reflect the maximum price that the market will bear for the Purchased Assets.

49.    Bidding procedures similar to those proposed herein are routinely approved by courts in this and other districts in large, complex bankruptcy cases. *See, e.g., In re East Orange General Hospital, Inc., et al.,* Case No. 15-31232 (VFP) (Bankr. D.N.J. Dec. 15, 2015); *In re Crumbs Bake Shop, Inc.*, Case No. 14-24287 (MBK) (Bankr. D.N.J. July 25, 2014); *In re Ashley Stewart Holdings, Inc., et al.*, Case No. 14-14383 (MBK) (Bankr. D.N.J. April 3, 2014); *In re Appvion, Inc., et al.*, Case No. 17-12082 (KJC) (Bankr. D. Del. 2018 March 12, 2018); *KII Liquidating Inc. (f/k/a Katy Indus., Inc.)*, Case No. 17-11101 (KJC) (Bankr. D. Del. Jul. 18, 2017); *In re Aralez Pharmaceuticals US Inc., et al.*, Case No. 18-12425 (MG) (Bankr. S.D.N.Y. October 11, 2018); *In re Gawker Media LLC*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. July

8, 2016); I*n re The Great Atlantic & Pacific Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr.

S.D.N.Y. Nov. 16, 2015).

50.    Accordingly, the Debtors submit that the Bidding Procedures should be approved

as reasonable, appropriate, and in the best interests of the Debtors, their creditors, estates and all

parties in interest.

## II.    The Bid Protections Are Appropriate Under the Circumstances and Should Be Approved.

51.    As described above, the Stalking Horse Agreement provides for certain Bid

Protections for the Stalking Horse Bidder triggered under certain limited circumstances

described herein and set forth in the Stalking Horse Agreement.  Approval of break-up fees,

expense reimbursements, and other forms of bidding protections in connection with the sale of

significant assets pursuant to section 363 of the Bankruptcy Code has become established

practice in chapter 11 cases and is oftentimes, as it is here, a necessary component of such sales

because it assures the debtor a locked-in committed floor price.

52.    To compensate the Stalking Horse Bidder for serving as a "stalking horse" whose

bid will be subject to higher or better offers, the Debtors seek authority to provide the Stalking

Horse Bidder with the Bid Protections in the event it is not the Successful Bidder.  The Debtors

believe that (i) the Bid Protections are reasonable, given the significant benefits to their estates

and these Chapter 11 Cases of having a definitive Stalking Horse Agreement in place and the

risk to the Stalking Horse Bidder that a third-party offer ultimately may be accepted by the

Debtors, and (ii) the Bid Protections are necessary and, in fact, critical, to preserve and enhance

the value of the Debtors' estates.

53.    Bidding incentives encourage a potential purchaser to invest the requisite time,

money and effort to negotiate with a debtor and perform the necessary due diligence attendant to

the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. *See*, *e.g.*, *In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *Integrated Resources*, 147 B.R. 650, 660 (Bankr. S.D.N.Y. 1992) (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

54.     Historically, bankruptcy courts approved bidding incentives similar to the proposed Bid Protections under the "business judgment rule," which proscribes judicial second-guessing of the actions of an entity's board taken in good faith and in the exercise of honest judgment. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

55.    Under the "business judgment rule," the Bid Protections contemplated by the Stalking Horse Agreement are appropriate. The Stalking Horse Agreement and Bid Protections are the product of extensive good faith, arms'-length negotiations between the Debtors and the Stalking Horse Bidder. The Bid Protections are fair and reasonable in amount, particularly in light of the Stalking Horse Bidder's efforts to date and the risk to the Stalking Horse Bidder of being used as a "stalking horse" for others to bid against.

56.    The United States Court of Appeals for the Third Circuit established standards for determining the appropriateness of expense reimbursement and other financial protections in the bankruptcy context in *Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). *See also In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010). In *O'Brien*, the Third Circuit identified at least two instances in which an award of a break-up fee or expense reimbursement may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537. Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.* The Third Circuit held that although payment of expenses and break-up fees are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Therefore, to be approved, the debtor must demonstrate that the expenses to be reimbursed provide a benefit to its estate. *Id.* at 533.

57.     Here, the Bid Protections have enabled the Debtors to secure a substantial sale price floor for the Purchased Assets of approximately $27 million (which consists of the Purchase Price excluding the Assumed Liabilities), plus assumption by the Buyer of Cure Costs and other Assumed Liabilities that may exceed $125 million in the aggregate, and require that competing bids be materially higher or otherwise better than the Stalking Horse Bid – a clear benefit to the Debtors' estates.  In addition, as noted above, the Bid Protections were *a condition of the Stalking Horse Bidder for its entry into the Stalking Horse Agreement* and agreeing to act as the Stalking Horse Bidder.

58.     Without the commitment of the Stalking Horse Bidder under the Stalking Horse Agreement, the Debtors will lose the opportunity to test the Stalking Horse Bid for the Purchased Assets in the marketplace and the downside protection afforded by the Stalking Horse Bid. Furthermore, without the benefit of the Stalking Horse Bid, there can be no assurance that the Debtors would receive a bid equal to that offered by the Stalking Horse Bidder for the Pharma Business.  Notably, during the prepetition marketing process, no bidder submitted a bid that did not include payment of bid protections to that bidder.

59.     The Debtors submit that the Bid Protections satisfy both the historical "business judgment rule" and the Third Circuit's "administrative expense" standard for approval. The Debtors reasonably believe that it is necessary to ensure the Stalking Horse Bidder's willingness and desire to proceed with the Stalking Horse Agreement, and therefore, agreed to the Bid Protections. The Stalking Horse Agreement containing the Bid Protections will serve as a minimum bid for the Purchased Assets on which other potential bidders can present higher and better offers, thereby maximizing value for the Debtors' estates and increasing the likelihood that the price ultimately obtained for the Purchased Assets will reflect their true value.  Additionally,

the Break-Up Fee will be paid only from the sale proceeds actually received by the Debtors from the closing of a higher or better transaction.[11]

60.    In addition, the Bid Protections are actual and necessary to preserve and enhance the value of the Debtors' estates. But for the Bid Protections, the Stalking Horse Bidder would not have entered into the Stalking Horse Agreement. In the absence of a stalking horse bidder, the possibility of an Auction would be imperiled, with no one party willing to be bound to a baseline bid. Finally, the amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the proposed Sale and the efforts that have been and will be expended by the Stalking Horse Bidder. The Break-Up Fee of $672,500 is approximately 2.5% of the Purchase Price (excluding the Assumed Liabilities) of approximately $26,936,955, and the Expense Reimbursement of a maximum of $750,000 is reasonable in light of the substantial due diligence costs that were undoubtedly incurred by the Staking Horse Bidder given the size and complexity of the Debtors' business. In addition, the Stalking Horse Bidder has agreed to pay Cure Costs and assume the other Assumed Liabilities under the Stalking Horse Agreement that may exceed $125 million in the aggregate.

61.    Courts in the Third Circuit and elsewhere have regularly approved stalking horse protections similar to the Bid Protections in other chapter 11 cases. *See, e.g.*, *In re Revel AC, Inc.*, No. 14-22654 (GMB) (Bankr. D.N.J. September 15, 2014) (Doc. No. 625) (approving break-up fee of $3 million (approximately 3.3%) in connection with $90 million sale of assets); *In re Ashley Stewart Holdings, Inc.*, Case No. 14-14383 (MBK) (Bankr. D.N.J. April 3, 2014) (Doc. No. 192) (approving break-up fee of 3% and expense reimbursement of up to $400,000 in connection with $18 million sale of assets); *In re Crumbs Bake Shop, Inc.*, No. 14-24287 (MBK)

---

[11] The Expense Reimbursement will be paid either from the sale proceeds actually received by the Debtors from the closing of a higher or better transaction or upon certain other termination events as set forth in Section 8.3(b) of the Stalking Horse Agreement.

(Bankr. D.N.J. July 25, 2014) (Doc. No. 79) (approving break-up fee of $82,500 and expense reimbursement of up to $125,000 in connection with a credit bid sale of assets); *In re Zloop, Inc.*, Case No. 15-11660 (KJC) (Bankr. D. Del. May 16, 2016) (Doc. No. 468) (approving break-up fee of 3% and expense reimbursement of up to $75,000 in connection with $1.4 million sale of assets); *In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. July 7, 2015) (Doc. No. 572) (authorizing expense reimbursements of $100,000 in connection with $12 million sale of assets and $82,000 in connection with $4.1 million sale of assets); *In re Old FOH Inc. (f/k/a Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (Bankr. D. Del. May 6, 2015) (Doc. No. 120) (authorizing a termination fee of $775,000 and an expense reimbursement of up to $300,000 in connection with $22.5 million sale of assets); *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (Doc. No. 206) (approving break-up fee of $8 million (or approximately 3.1%) and expense reimbursement of up to $2.5 million in connection with a $258.5 million sale of assets); *In re Solyndra LLC*, Case No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) (Doc. No. 1113) (approving break-up fee of 2% and expense reimbursement of up to $500,000 in connection with an approximate $90 million sale of assets); *In re Conex Holdings, LLC*, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011) (Doc. No. 132) (approving break-up fee of 3% of final purchase price). *See also In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016) (Doc. No. 1032) (approving break-up fee of $5.5 million (or approximately 3.8%)   and expense reimbursement of up to $4.5 million in connection with $144 million sale); *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 11, 2013) (Doc. No. 2275) (approving break-up fee of no less than 3% of cash amount of purchase price).

62.    In sum, the Debtors respectfully submit that the Bid Protections enable the Debtors to ensure a sale to a contractually committed bidder at a price that is market-tested, fair and reasonable, while providing the Debtors with an opportunity to enhance value through an auction process that will be more robust due to the presence of a firm and committed baseline bid. Accordingly, the Bid Protections should be approved.

## III.    Approval of the Sale Is Warranted Under Section 363(b) of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment.

63.    Section 363(b) of the Bankruptcy Code provides that a debtor may, "after a notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

64.    While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363(b), courts uniformly agree that the business judgment standard applies. *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

65.    Courts typically apply four factors in determining whether a section 363 sale is appropriate under the business judgment standard—namely, whether: (a) a sound business justification exists for the sale; (b) adequate and reasonable notice of the sale was provided to interested parties; (c) the sale will produce a fair and reasonable price for the property; and (d) the parties have acted in good faith. *Id.* at 1070 (setting forth the "sound business" purpose standard for the sale of the debtor's assets under section 363 of the Bankruptcy Code); *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002)

(adopting *Lionel* factors) (citing *Guilford Transportation Industries, Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing nonexclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)). When a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### A.    The Debtors Have Demonstrated a Sound Business Justification for the Sale of the Purchased Assets.

66.    A sound business justification exists where a sale of the debtor's assets is necessary to preserve the value of the debtor's estate. *See, e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . ."); *Lionel*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

67.    The Debtors have articulated a clear business justification for entering into the proposed Sale. As explained in greater detail above, the Debtors have determined in their business judgment that a sale of the Purchased Assets, conducted in accordance with the Bidding Procedures, will maximize value and is in the best interests of the Debtors, their creditors, estates, stakeholders, and other parties in interest.  For months prior to the Petition Date, the Debtors with the assistance of experienced and nationally recognized advisors considered all strategic alternatives given the decline in their businesses and inability to secure necessary

financing to sustain their businesses.  The Debtors evaluated all alternatives and determined that a sale as a going concern which would result in continued employment for virtually all of their employees would maximize value for all stakeholders. Accordingly, a sound business justification exists for the Sale of the Purchased Assets pursuant to the Bidding Procedures.

**B.      The Notice Procedures are Appropriate and Comply with Bankruptcy Rule 2002**

68.      Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the proposed Sale, including disclosure of the time and place of the Auction and the deadline for filing any objections to the Sale.

69.      The Debtors submit that the proposed form and manner of notice of the Sale complies with Bankruptcy Rule 2002 and the Sale Notice is reasonably calculated to provide all creditors and parties in interest with adequate and timely notice of the Sale, the Bidding Procedures, the Auction, the Sale Objection Deadline and the Sale Hearing.  Moreover, the Debtors will publish a notice, setting forth the information contained in the Sale Notice, in *The New York Times, Wall Street Journal or USA Today*.  Accordingly, the Debtors submit that the proposed notice of the Sale is adequate and reasonable.

**C.      The Proposed Sale Will Yield a Fair and Reasonable Purchase Price**

70.      As set forth in detail above, the Debtors entered into the Stalking Horse Agreement as the culmination of an extensive and deliberate prepetition marketing process led by PJT that took place over a period of several months.  Further, the Debtors and their advisors engaged in extensive negotiations with the Stalking Horse Bidder in the formulation of the Stalking Horse Agreement and the terms of the proposed Sale. As a result, the Debtors are confident in their belief that the Purchase Price under the Stalking Horse Agreement is fair and provides reasonable value in exchange for the Purchased Assets.

71.     In addition, the Bidding Procedures were carefully designed to yield the maximum value for the Debtors' estates and creditors.  The Debtors constructed the Bidding Procedures to encourage competitive bidding, while giving the Debtors the opportunity to review and analyze all competitive bids only from Qualified Bidders, who will have been vetted prior to the Auction.  These carefully constructed measures will prevent any bid that does not constitute a fair and adequate purchase price for the Purchased Assets.

72.     Finally, both the Debtors and the Stalking Horse Bidder were represented by experienced advisors and attorneys in the arm's-length negotiation of the Stalking Horse Agreement, and the Debtors and Stalking Horse Bidder are proceeding in good faith.  Accordingly, the relief sought herein is a valid exercise of the Debtors' business judgment and should be approved under section 363(b) of the Bankruptcy Code.

## IV.    The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of All Liens, Claims and Interests, Including Successor Liability Claims.

73.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances provided that one of the following conditions are met:

   a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

   b.    such entity consents;

   c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

   d.    such interest is in bona fide dispute; or

   e.    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5).

74.    Because section 363(f) of the Bankruptcy Code is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale.  *See id.*; *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that court may approve sale "free and clear" provided at least one of the subsections of section 363(f) is met); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D.Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have been met"); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

75.    The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the Sale of the Purchased Assets pursuant to the Stalking Horse Agreement. In particular, the Debtors believe that the proposed Sale will generate  more than sufficient proceeds to satisfy the claims of the Debtors' existing prepetition and post-petition secured lenders and that they will agree to the Sale.  In addition, all parties known to have asserted a lien or other encumbrance on the Purchased Assets will receive notice of the Sale.  To the extent they have not objected by the Sale Objection Deadline, they will be deemed to have consented to the Sale free and clear of all Liens, Claims and Interests (except as otherwise provided in the Stalking Horse Agreement or other definitive purchase agreement) pursuant to section 363(f)(2). Further, where consent is not obtained, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the relevant lien or other encumbrances will attach to the proceeds of the Sale with the same validity, priority, and force and effect as such lien or encumbrance had immediately prior to the closing of the Sale, and the Debtors will establish at the Sale Hearing that the relevant creditors can be compelled to accept a monetary satisfaction of

their respective claims. Accordingly, section 363(f) authorizes the Sale of the Purchased Assets free and clear of all Liens, Claims and Interests (except as otherwise provided in the Stalking Horse Agreement or other definitive purchase agreement).

76.     The Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of successor liability relating to the Purchased Assets. Such limitations on successor liability will ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors. If such relief is not granted, the purpose of a "free and clear" sale of assets under section 363 of the Bankruptcy Code could be frustrated by the potential for claimants to thereafter use the transfer of assets as a basis to assert claims against the Successful Bidder arising from the Sellers' pre-sale conduct. Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. Under section 363(f) of the Bankruptcy Code, potential purchasers are entitled to know that the Debtors' assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed.

77.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests."  Although the term "any interests" is not defined in the Bankruptcy Code, *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000), the Third Circuit specifically addressed the scope of that term in *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003).  The Third Circuit observed that while some courts have "narrowly interpreted interests in property to mean only *in rem* interests in property," the trend in modern cases is toward "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id*. at 289 (citing 3 *Collier on*

*Bankruptcy* 15th Ed. Rev., ¶ 363.06[1] (L. King, 15th rev. ed. 1988)). As determined by the

Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case

cited with approval and extensively by the Third Circuit in *Folger, supra*, the scope of section

363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger* stated that *Leckie* held

that the debtors "could sell their assets under § 363(f) free and clear of successor liability that

otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

78.    Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes such assets free and clear from successor liability relating to the debtor's

business. *See, e.g., In Matter of Motors Liquidation Co.*, No. 15-2844-BK(L), 2016 WL 3766237

(2d Cir. July 13, 2016), *12, *13 ("We agree that successor liability claims can be 'interests'

when they flow from a debtor's ownership of transferred assets" and holding that "a bankruptcy

court may approve a § 363 sale 'free and clear' of successor liability claims if those claims flow

from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to

payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly

giving rise to the claim"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n

personam* claims, including any potential state successor or transferee liability claims against

New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore

extinguished by the Sale."); *The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195

B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell

assets free and clear of any interest that could be brought against the bankruptcy estate during the

bankruptcy).

79.    For these reasons, the Successful Bidder should not be liable under any theory of

successor liability relating to the Purchased Assets, but instead, should hold the Purchased Assets

free and clear of all Liens, Claims and Interests (except as otherwise provided in the Stalking

Horse Agreement or other definitive purchase agreement), including successor liability claims.

**V.    The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

80.    Section 363(m) of the Bankruptcy Code is designed to protect the sale of a

debtor's assets to a good faith purchaser. Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m).

81.    While the Bankruptcy Code does not define good faith, the Third Circuit has held

that indicia of bad faith typically include "fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn.,*

*Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter*

*Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983) (other citations omitted)); *see also Kabro Assoc. of West*

*Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997)

(noting that the type of "misconduct that would destroy a [purchaser]'s good faith status at a

judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee or

an attempt to take grossly unfair advantage of other bidders.").

82.    As set forth in detail above, the Stalking Horse Agreement was negotiated at

arm's-length and without collusion, with all parties represented by their own sophisticated

counsel and advisors.  As noted above, Mr. Kavuru did not participate in any Board meetings or

deliberations with respect to the proposed sale of the Pharma Business.  In addition, the Stalking

Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in

section 101 of the Bankruptcy Code. Accordingly, the Debtors request that the Sale Order

include a finding that the Successful Bidder is a "good faith" buyer within the meaning of section

363(m) of the Bankruptcy Code. The Debtors believe that providing the Successful Bidder with

such protection will ensure that the maximum price for the Purchased Assets will be received by

the Debtors and that the closing of the Sale will occur promptly.

83.     In addition, neither the Sellers nor the Stalking Horse Bidder have engaged in any

conduct that would cause or permit the Stalking Horse Agreement to be avoided under section

363(n) of the Bankruptcy Code. If, following the Auction, the Stalking Horse Bidder is not the

Successful Bidder, the Sellers will have negotiated a purchase agreement with the Successful

Bidder in good faith and at arms'-length. Additionally, the Bidding Procedures are designed to

prevent the Sellers or the Successful Bidder (or the Backup Bidder as defined in the Bidding

Procedures) from engaging in any conduct that would cause or permit the Stalking Horse

Agreement or the Sale of the Purchased Assets to be avoided under section 363(n) of the

Bankruptcy Code.

## VI.   Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

84.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in

possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor."  11 U.S.C. § 365(a). The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is

whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.,*

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.*), 4 F.3d 1095,

1098 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or

debtor in possession, subject to the approval of the bankruptcy court, to go through the inventory

of executory contracts of the debtor and decide which ones it would be beneficial to adhere to

and which ones it would be beneficial to reject").

85.     The business judgment test "requires only that the trustee [or debtor in

possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel

Corp.*), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the

administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten the court's ability to

control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th

Cir. 1985).

86.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any

executory contract provide "adequate assurance of future performance . . . whether or not there

has been a default in such contract." 11 U.S.C. § 365(f)(2). Section 365(b), which codifies the

requirements for assuming an executory contract or unexpired lease, provides, in pertinent part

that the debtor may only assume an executory contract or unexpired lease if it:

> (A) cures, or provides adequate assurance that the [debtor] will
> promptly cure, [any defaults existing under the contract or lease];
>
> (B) compensates, or provides adequate assurance that the [debtor]
> will promptly compensate, a party other than the debtor to such
> contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
>
> (C) provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

87.    While undefined by the Bankruptcy Code, adequate assurance is guided by "a practical, pragmatic construction based upon the facts and circumstances of each case." *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1995)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations."). While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538. Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

88.    The Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of certain Executory Contracts and Unexpired Leases to the Stalking Horse Bidder or other Successful Bidder. The Debtors further request that the Sale Order provide that the Buyer Assumed Agreements will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or other Successful Bidder notwithstanding any provisions in such contracts or leases, including those described in sections 365(f)(1) and (f)(3) of the Bankruptcy Code, that may prohibit such assignment.[12]

---

[12] Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such

89.    The Bidding Procedures specifically require any Qualified Bid to contain information concerning a Qualified Bidder's ability to provide adequate assurance of future performance with respect to executory contracts and unexpired leases to be assumed and assigned under such bid.  Counterparties to the Buyer Assumed Agreements who are unsatisfied with the proposed adequate assurance of future performance by the Successful Bidder will be able to file an objection with respect thereto.

90.    To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Stalking Horse Bidder or other Successful Bidder to perform under the Buyer Assumed Agreements. The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance as required under section 365(f)(2)(B) of the Bankruptcy Code.

91.    Further, as set forth above, the Cure Notice to be sent to all parties to Buyer Assumed Agreements will include the amounts the Debtors believe are necessary to cure any defaults under the Buyer Assumed Agreements in accordance with section 365(b) of the Bankruptcy Code. Accordingly, the Debtors have satisfied the requirements of section 365 of the Bankruptcy Code with respect to the assumption and assignment of the Buyer Assumed Agreements.

**VII.    The Sellers Should Be Authorized to Abandon and Dispose of Expired Inventory Prior to or upon the Closing of the Sale.**

---

contract or lease, the trustee may assign such contract or lease. . ." 11 U.S.C. § 365(f)(1). Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

92.     Pursuant to the Stalking Horse Agreement, the Buyer is not acquiring any Inventory (as defined in the Stalking Horse Agreement) that is expired as of the date of entry into the Stalking Horse Agreement.  In addition, the Debtors are required under Section 6.10(b) of the Stalking Horse Agreement, subject to approval of this Court, to promptly dispose of such expired Inventory.  The expired Inventory that the Debtors seek to dispose of consists primarily of finished dosage form generic drugs that the Debtors can no longer sell and therefore have no value to the Debtors.

93.     Section 554(a) of the Bankruptcy Code provides that a debtor, after notice and a hearing, "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).  Bankruptcy Rule 6007, meanwhile, provides that a debtor may abandon property of the estate by giving notice of the proposed abandonment to various parties, and allowing those parties to file an objection.  A debtor's power to abandon property is discretionary and to authorize an abandonment of property, the court needs to find only that the debtor has made (a) a business judgment, (b) in good faith, (c) upon some reasonable basis, and (d) within the debtor's scope of authority.  *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) (citing *In re Fulton*, 162 B.R. 539, 540 (Bankr. W.D. Mo. 1993).

94.     The expired Inventory is no longer saleable and therefore has no value to the Debtors' estates.  Accordingly, the Debtors request that the Court, pursuant to section 554(a) of the Bankruptcy Code and Bankruptcy Rule 6007, authorize the Debtors to abandon and dispose of the expired Inventory as provided for in the Staking Horse Agreement.

## **REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY**

95.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Sale Order.  Bankruptcy Rule 6004(h) provides that "[a]n

order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court order otherwise."

96.    As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders. Accordingly, the Debtors submit that ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that each such rule applies.

## WAIVER OF MEMORANDUM OF LAW

97.    The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis upon which the Debtors rely is incorporated herein and this Sale Motion does not raise any novel issues of law.

## NO PRIOR REQUEST

98.    No prior request for the relief sought herein has been made to this Court or to any other court.

## NOTICE

99.    Notice of this Sale Motion has been given to (i) the Office of the United States Trustee for the District of New Jersey; (ii) the Internal Revenue Service; (iii) the New Jersey Division of Taxation Compliance and Enforcement - Bankruptcy Unit; (iv) the Office of the Attorney General of the State of New Jersey, Division of Law; (v) the United States Attorney's Office for the District of New Jersey; (vi) the New York State Department of Taxation and Finance; (vii) the Office of the Attorney General of the State of New York; (viii) the United

States Attorney's Office for the Eastern District of New York; (ix) the Securities and Exchange

Commission, New York Regional Office; (x) McGuireWoods LLP, c/o Kenneth Noble, Esq., as

counsel for the DIP Administrative Agent and Prepetition Administrative Agent; (xi) McCarter

& English LLP, c/o Joseph Lubertazzi, Jr., Esq. and Deirdre E. Burke, Esq., as local counsel for

the DIP Administrative Agent and Prepetition Administrative Agent, (xii) the Indenture Trustee

for the Noteholders; (xiii) Stroock & Stroock & Lavan LLP, c/o Erez E. Gilad, Esq., Jayme T.

Goldstein, Esq., Gabriel Sasson, Esq., and Joanne Lau, Esq., as counsel for the Committee; (xiv)

Porzio, Bromberg & Newman, P.C., c/o Warren J. Martin, Jr., Esq., Robert M. Schecter, Esq.,

and Rachel A. Parisi, Esq., as local counsel for the Committee; (xv) Reed Smith LLP, c/o Derek

J. Baker, Esq., as counsel for the Buyer; and (xvi) all parties that have requested to receive notice

pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the

Debtors respectfully submit that no other or further notice is required.  In light of the nature of

the relief requested herein, the Debtors respectfully submit that no other or further notice is

required.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, (ii) enter the Sale Order after the Sale Hearing, substantially in the form attached hereto as **Exhibit E**, authorizing the Sale of the Purchased Assets to the Successful Bidder, and (iii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: March 8, 2019                                Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

/s/ *Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Michael S. Etkin, Esq.
Paul Kizel, Esq.
Wojciech F. Jung, Esq.
Philip J. Gross, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
metkin@lowenstein.com
pkizel@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

*Proposed Counsel to the Debtors and
Debtors-in-Possession*