**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| ACETO CORPORATION, *et al.*,[1] | Case No. 19-13448 (VFP) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MARK BUSCHMANN IN SUPPORT OF DEBTORS'
MOTION TO APPROVE BIDDING PROCEDURES IN CONNECTION WITH
THE SALE OF SUBSTANTIALLY ALL ASSETS COMPRISING THE
DEBTORS' PHARMA BUSINESS**

I, Mark Buschmann, pursuant to 28 U.S.C. § 1746, declare that the following is true to the best of my knowledge, information and belief:

1. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"), an investment banking firm listed on the New York Stock Exchange with its principal offices located at 280 Park Avenue, New York, New York 10017. PJT is the proposed investment banker to the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and together with their non-Debtor affiliates, the "Company" or "Aceto").

2. I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Orders (I) (A) Authorizing and Approving Bidding Procedures in Connection With the Sale of Substantially All Assets Comprising the Debtors' Pharma Business; (B) Authorizing and Approving Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Scheduling a Sale Hearing; (E)*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Aceto Agricultural Chemicals Corporation (3948); Aceto Realty LLC (7634); Rising Pharmaceuticals, Inc. (7959); Rising Health, LLC (1562); Acetris Health, LLC (3236); PACK Pharmaceuticals, LLC (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

*Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors' Pharma Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* (the "<u>Motion</u>").[2]

3.  All of the facts set forth in this Declaration are based upon (i) my personal knowledge, (ii) my discussions with the Debtors' senior management, other members of the PJT team, other professional advisors to the Debtors or other interested parties, (iii) information learned from my review of relevant documents, and/or (iv) my opinion based upon my professional restructuring experience and knowledge. If called upon, I would and could testify competently to the facts set forth herein based on such personal knowledge, discussions, review of documents and/or my opinion.

## **Qualifications**

4.  PJT was spun off from The Blackstone Group L.P. ("<u>Blackstone</u>") effective October 1, 2015. Upon the consummation of the spin-off, Blackstone's restructuring and reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. PJT and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings. PJT has over 500 employees located in New York, San Francisco, Boston, Chicago, London, Sydney, Hong Kong, and Madrid. PJT has extensive experience in providing financial advisory and investment banking services to financially distressed companies and representing both debtors and other parties in interest in connection with distressed mergers and

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

-2-

acquisitions. PJT is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5. Since joining Blackstone in 2001, and continuing at PJT, I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, special committees of corporate boards, corporate parents of troubled companies, governmental entities and acquirers of distressed assets. Over the course of my career, I have advised senior management and boards of directors of companies in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions, both outside of court and within Chapter 11 proceedings. In particular, I have been involved in numerous restructurings, including, among others, 21st Century Oncology; Alestra S. de R.L. de C.V.; Angiotech Pharmaceuticals, Inc.; API Heat Transfer Inc.; Arch Coal, Inc.; Cable & Wireless America; Central European Distribution Corporation; Delta Air Lines, Inc.; Doshi Diagnostic; Excite@Home; Homer City Funding; Homer City Generation, L.P.; IAP Worldwide Services, Inc.; Los Angeles Dodgers LLC; Magnetation LLC; Mattress Discounters Corporation; Noranda Aluminum, Inc.; Nortek, Inc.; Nybron Flooring International; Patriot Coal Corporation; Philadelphia Newspapers, LLC; Pinnacle Airlines; Six Flags; Taro Pharmaceutical Industries Ltd; Tribune Media Company; Trident Holding Company, LLC; Ultra Petroleum Corp.; WCI Steel, Inc; Westinghouse Electric Company, LLC; and WilTel Communications Group Inc.

6. I hold a Bachelor of Arts degree from Dartmouth College and an MBA with a concentration in Finance from Kellogg School of Management at Northwestern University. Prior to joining Blackstone, I was a Financial Analyst in the Financial Institutions Group at Salomon Smith Barney, where I executed various mergers and acquisitions and financing assignments.

Additionally, I have served as an expert witness on numerous occasions.

### The Marketing and Sale Process

7. PJT was initially retained by the Company in April 2018. PJT's role included, among other services, assisting the Company in exploring potential alternatives to maximize value, including a sale, restructuring or other transaction with respect to the Company. After a months' long and thorough process of considering all available options, the Debtors, in consultation with PJT and their other advisors, ultimately determined that given the business and other challenges the Company was facing, one or more sales of the Debtors' businesses and assets as a going concern was the best available option to maximize value.

8. Based on the issues faced by the Company, in October 2018, at the instruction of the Company, PJT commenced a broad marketing process and contacted approximately 100 potential strategic and financial parties to garner interest in pursuing a strategic transaction. Approximately 80 of these parties were provided with a "teaser" to gauge their interest and the opportunity to enter into a non-disclosure agreement (an "NDA") with the Company to gain access to a virtual data room established by the Company for interested parties to conduct due diligence. The data room contained extensive information about the Company, including confidential documents and other information concerning the Company's business and financial results in considerable detail. Approximately 50 of the parties who received the teaser executed NDAs, were granted access to the data room, and received a confidential information memorandum prepared by the Company and PJT.

9. First round, non-binding indications of interest ("IOIs") to acquire the Company's assets were due on November 14, 2018. The Company received IOIs from eleven (11) potential bidders for proposed acquisitions of the Company as a whole, the Pharma Business and/or the

Chemical Plus Business.[3]  Thereafter, these potential acquirers continued to conduct further due diligence, including being granted access to a more expansive data room and the opportunity to participate in management presentations.

10. In late November and December 2018, the Company held extensive and detailed management presentations with each of the potential bidders and the Company's senior management team.

11. Second round, non-binding bids to acquire the Company or one of its key business units were due on January 15, 2019.  The Company received a number of second round IOIs, including IOIs to acquire the Company as a whole, the Pharma Business and/or the Chemical Plus Business.

12. As a result of the bids received on January 15, 2019, the Company determined that an in-court sale process pursuant to section 363 of the Bankruptcy Code was the best available executable structure through which such sale transactions could be completed.

13. The Company and its advisors continued the prepetition marketing process by inviting these bidders to perform additional detailed diligence and to submit their best and final binding offer to acquire the Pharma Business and/or the Chemical Plus Business, including a binding asset purchase agreement and other documents by February 12, 2019.

14. While the Company received a number of binding offers for the Chemical Plus Business, the Buyer was the only party to submit a binding asset purchase agreement and other documents to acquire the Pharma Business by the February 12, 2019 deadline.  After thoroughly evaluating all alternatives available to the Company, including a potential liquidation of the Pharma Business, the Company's Board of Directors, in consultation with the Company's

---

[3] Four of these eleven IOIs were for the Chemical Plus Business only.

professionals, determined that the proposed sale of the Pharma Business to the Buyer as a going concern was the best alternative available to the Company to maximize the value of the Pharma Business for the benefit of the Company and its creditors.

15. Thereafter, the Company, through its advisors, engaged in extensive negotiations with the Buyer on the terms of the proposed sale of the Pharma Business and finalized definitive documentation in the form of the Stalking Horse Agreement to effectuate a sale of the Pharma Business pursuant to section 363 of the Bankruptcy Code, subject to higher and better offers in accordance with agreed upon procedures to be approved by the Bankruptcy Court. The Debtors finalized and executed the Stalking Horse Agreement on March 7, 2019.

16. The Stalking Horse Agreement was negotiated, proposed, and entered into by the Sellers and Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions. Vimal Kavuru, a member of Aceto's Board of Directors, is the CEO of the Stalking Horse Bidder. Mr. Kavuru recused himself from the Board of Directors on November 14, 2018 and has been excluded from all meetings of the Board since that date, including all deliberations concerning the proposed Sale.

17. I understand that the Stalking Horse Agreement contains various conditions to closing, including that the Bankruptcy Court approve a release of certain claims against the Stalking Horse Bidder and various related parties. I further understand that the Debtors will seek approval of such release by separate motion and that, pursuant to the terms of the Stalking Horse Agreement, the Debtors retain the right to terminate the Stalking Horse Agreement if such release is not approved.

18. The transaction negotiated with the Stalking Horse Bidder is the culmination of a 4½ month long, thorough, fair, arms-length and fulsome prepetition marketing process and an

additional post-petition process of negotiations with the Stalking Horse Bidder over the course of more than two weeks. In addition to the Purchase Price of approximately $27 million (excluding the Assumed Liabilities), the Buyer has agreed to assume liability for Cure Costs and additional liabilities that may exceed $125 million in the aggregate.

19. I believe that, taken as a whole, the terms of the proposed sale of the Pharma Business to the Buyer are fair and reasonable, and that the Stalking Horse Bid represents the highest and best offer – *indeed it is the only offer* – for the Pharma Business available to the Debtors at this time, subject to any higher or otherwise better offers that may be received during the additional post-petition marketing process contemplated by the Bidding Procedures.

20. I further believe the sale price floor established by the Stalking Horse Bid will afford the Debtors the best opportunity to maximize the value of the Pharma Business assets for the benefit of the Debtors' estates, creditors and other stakeholders.

**The Bidding Procedures and Timeline**

21. I believe that the proposed Bidding Procedures are appropriately designed to maximize value for the Debtors' estates, while ensuring a fair, orderly and effective sale process. The Bidding Procedures will facilitate a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures will allow the Debtors to conduct an Auction, if necessary, in a fair, controlled and transparent manner that will encourage participation by financially capable bidders that demonstrate the financial wherewithal to close a transaction in a timely manner.

22. Pursuant to the terms of the Debtors' DIP financing facility (the "DIP Facility") and the Interim DIP Order, the Debtors were obligated to execute a Pharma Assets Stalking Horse APA (as defined in the DIP Credit Agreement) by Friday, March 8, 2019, or present a

wind-down or liquidation plan with respect to the Pharma Business to the DIP Administrative Agent by March 13, 2019. Thus, if the Debtors do not proceed with the Sale of the Pharma Business at this time, the Debtors will be forced to commence an immediate liquidation of the Pharma Business.

23. The Debtors, with the assistance of PJT and their other professional advisors, engaged in an extensive 4½ month marketing process for the Debtors' assets prior to the Petition Date. The proposed timeline for the submission of competing bids will permit bidders to submit bids on or before March 29, 2019. Given that the universe of potential bidders was identified and contacted months ago in an effort to solicit bids, it is highly likely that any prospective bidders (a) have been aware of the potential sale of the Pharma Business assets months before the Chapter 11 Cases were filed and (b) have already had a sufficient and adequate opportunity to conduct due diligence and submit a bid within the proposed timeline.

24. In addition, the proposed timeline for the submission of competing bids is necessary because of the risk to the Pharma Business that any adverse event could have, which would likely result in a termination of the proposed transaction and an immediate liquidation of the Pharma Business. In my opinion, the proposed timeline for the submission of competing bids and the entry of a Sale Order is more than reasonable under the circumstances and is necessary to preserve the going concern value of the Pharma Business and avoid an immediate liquidation of the Pharma Business, which would provide far less value to the Debtors' estates and creditors.

25. In sum, I believe that an orderly sale within the timeline proposed in the Bidding Procedures is critical to preserving and realizing the going concern value of the Pharma Business and that interested parties will not be prejudiced by the proposed timeline for the Sale,

particularly in light of the fulsome prepetition marketing process conducted by the Debtors.  I further believe that the additional costs, expenses and delay that would be associated with a longer post-petition sale process would likely be detrimental to the Debtors' estates.

26.    I further believe that the consideration ultimately received for the Purchased Assets as a result of the Bidding Process will not only be fair and reasonable, but will reflect the maximum price that the market will bear for the Purchased Assets under the circumstances.

### The Bid Protections

27.    As set forth in the Motion, the Sellers have agreed, subject to Bankruptcy Court approval, to provide the Stalking Horse Bidder with the Bid Protections, consisting of (i) the Break-Up Fee of $672,500, which is equal to approximately 2.5% of the Purchase Price (excluding the Assumed Liabilities) of approximately $26,936,955, (ii) the Expense Reimbursement, which is not to exceed $750,000, if and when payable pursuant to the terms of the Stalking Horse Agreement, and (iii) a minimum bidding increment of $1,000,000.

28.    The Bid Protections were heavily negotiated between the Sellers and the Stalking Horse Bidder. When considering whether to support the Break-Up Fee and Expense Reimbursement, the Debtors and their advisors considered a number of factors, all of which favored approval of such protections.  The Debtors and their advisors recognized that definitive proposals to acquire the Pharma Business would likely include a demand for certain protections, such as a break-up fee and/or expense reimbursement. The Stalking Horse Bidder expressly demanded a break-up fee and expense reimbursement.  In my view, consideration of a break-up fee and/or expense reimbursement was necessary to sustain the interest of the Stalking Horse Bidder.

29.    Moreover, I believe that the Bid Protections are fair and reasonable in amount,

given not only the significant benefits to the Debtors and their estates of having a definitive Stalking Horse Agreement in place for a value maximizing transaction, but also the risk to the Stalking Horse Bidder that its efforts could benefit a competing bidder if an alternative transaction is ultimately accepted by the Debtors as higher or otherwise better than the Stalking Horse Bid.

30. I further believe that the amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the proposed Sale, the efforts that have been and will be expended by the Stalking Horse Bidder, and the substantial financial and legal due diligence and transaction negotiation and documentation costs that have been incurred by the Staking Horse Bidder over the past several months given the size and complexity of the Debtors' business.

31. In addition, based on my experience and analysis of comparable transactions, I believe that the Break-Up Fee and Expense Reimbursement, along with the $1,000,000 minimum bidding increment, are reasonable and commensurate with the size and nature of the proposed Sale transaction and will not chill bidding.

32. In my opinion, the Bid Protections are necessary to preserve and enhance the value of the Debtors' estates and provide a clear and substantial benefit to the Debtors' estates because they (a) have enabled the Debtors to secure a substantial sale price floor for the Purchased Assets, and (b) will help to secure the highest or otherwise best offer available for the Purchased Assets.

33. I understand that (a) the Bid Protections were a condition to the Stalking Horse Bidder agreeing to act as the Stalking Horse Bidder, and (b) without the Stalking Horse Bid, the Debtors would be required to immediately liquidate the Pharma Business under the terms of the

Debtors' DIP Facility.

34. The Bid Protections enable the Debtors to ensure a sale to a contractually committed bidder at a price that is market-tested, fair and reasonable, while providing the Debtors with an opportunity to enhance value through an auction process that, in my view, is more likely to be robust due to the presence of a firm and committed baseline bid.

35. Without the benefit of the Stalking Horse Bid, there can be no assurance that the Debtors would receive a bid equal to that offered by the Stalking Horse Bidder. I believe the Stalking Horse Bid will increase the likelihood that the price ultimately obtained for the Purchased Assets will reflect their true value.

## Good Faith of the Successful Bidder

36. I understand that the Motion requests that the Sale Order include a finding that the Successful Bidder is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code. In this regard, I believe that the Stalking Horse Agreement was negotiated at arm's-length and without collusion, with all parties represented by their own sophisticated counsel and advisors. As noted above, Mr. Kavuru did not participate in any Board meetings or deliberations with respect to the proposed sale of the Pharma Business. I believe that providing the Successful Bidder, whether it is the Stalking Horse Bidder or a competing bidder, with the protections afforded to a good faith buyer under section 363(m) of the Bankruptcy Code will help ensure that the maximum price for the Purchased Assets is obtained and that the closing of the Sale will occur promptly.

Dated: March 8, 2019    */s/ Mark Buschmann*
                        Mark Buschmann