UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. LBR 9004-1

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq. (krosen@lowenstein.com)
Michael S. Etkin, Esq. (metkin@lowenstein.com)
Paul Kizel, Esq. (pkizel@lowenstein.com)
Wojciech F. Jung, Esq. (wjung@lowenstein.com)
Philip J. Gross, Esq. (pgross@lowenstein.com)
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and
Debtors-in-Possession*

**Order Filed on April 16, 2019
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

| | |
|---|---|
| In re:<br><br>ACETO CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-13448 (VFP)<br><br>(Jointly Administered) |

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS COMPRISING THE DEBTORS' CHEMICAL PLUS BUSINESS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE DEBTORS TO PERFORM THEIR OBLIGATIONS UNDER THE PURCHASE AGREEMENT, (C) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (D) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through forty-three (43), is hereby **ORDERED**.

**DATED: April 16, 2019**

_____
**Honorable Vincent F. Papalia
United States Bankruptcy Judge**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Aceto Agricultural Chemicals Corporation (3948); Aceto Realty LLC (7634); Rising Pharmaceuticals, Inc. (7959); Rising Health, LLC (1562); Acetris Health, LLC (3236); PACK Pharmaceuticals, LLC (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

Page:      2
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

Upon the motion [Docket No. 45] (the "Sale Motion"), of the above-captioned debtors

and debtors in possession (collectively, the "Debtors"), seeking entry of an order (this "Sale

Order"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rules 6004-1, 6004-2 and 6004-3 of the Local Rules of the

United States Bankruptcy Court for the District of New Jersey (the "Local Rules"),

(a) authorizing and approving the Debtors' entry into and performance under the terms and

conditions of that certain Amended and Restated Asset Purchase Agreement, dated as of April

14, 2019 (together with the schedules and/or exhibits thereto and all related documents, and as

may be amended, supplemented or otherwise modified from time to time after the date hereof in

accordance with paragraph 40 of this Sale Order, the "Purchase Agreement"),[2] attached hereto as

**Exhibit 1**, by and among Aceto Corporation, Aceto Agricultural Chemicals Corporation and

Aceto Realty LLC (each a "Seller", and together, the "Sellers") and NMC Atlas, L.P. (together

with its subsidiaries and permitted assignees under the Purchase Agreement, the "Buyer"), and

all other Ancillary Documents (as defined in the Purchase Agreement) (together with the

Purchase Agreement, the "Transaction Documents"), (b) authorizing and approving the sale

(collectively, and including all actions taken or required to be taken in connection with the

implementation and consummation of the Purchase Agreement, the "Sale") of the Purchased

_____

[2] Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Purchase Agreement or Bidding Procedures Order (as defined herein), as applicable.

Page:      3
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief

_____

Assets (as defined in the Purchase Agreement) free and clear of all Liens, Claims and other Liabilities, except to the extent set forth in the Purchase Agreement, and the assumption of the Assumed Liabilities to the extent set forth in the Purchase Agreement upon the closing of the Sale (the "Closing"), (c) authorizing the assumption and assignment of certain of the Sellers' (as applicable) executory contracts and unexpired leases related thereto as set forth on the applicable schedules of the Purchase Agreement (each, a "Buyer Assumed Agreement," and, collectively, the "Buyer Assumed Agreements"), upon the Closing, subject to payment by the Buyer of all costs necessary to cure any defaults arising under any Buyer Assumed Agreement to the extent required by section 365(b) of the Bankruptcy Code, and (d) granting related relief, all as more fully set forth in the Sale Motion; and this Court having entered the *Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All Assets Comprising the Debtors' Chemical Plus Business, (B) Authorizing and Approving Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Scheduling a Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [Docket No. 142] (the "Bidding Procedures Order"); and the Debtors having conducted an auction (the "Auction") for the Purchased Assets; and the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures), having determined that the Buyer has submitted the highest or otherwise best bid for the Purchased Assets and determined that the Buyer is the Successful Bidder and that LBB

Page:       4
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

Specialties Intermediate Holding Company LLC is the Back-Up Bidder (as defined in the

Bidding Procedures), in accordance with the Bidding Procedures; and the Court having

conducted a hearing on the Sale Motion (the "Sale Hearing") on April 16, 2019, at which time all

interested parties were offered an opportunity to be heard with respect to the Sale Motion; and

the Court having reviewed and considered the Sale Motion, the Purchase Agreement, and any

and all objections to the Sale, the Purchase Agreement and the other Transaction Documents

filed in accordance with the Bidding Procedures Order; and the Court having heard statements of

counsel and the evidence presented in support of the relief requested in the Sale Motion at the

Sale Hearing and in the *Declaration of Rebecca A. Roof in Support of First Day Relief* [Docket

No. 19] and *Declaration of Mark Buschmann in Support of Debtors' Motion to Approve Bidding*

*Procedures in Connection With the Sale of Substantially all Assets Comprising the Debtors'*

*Chemical Plus Business* [Docket No. 45-7]; and it appearing that due notice of the Sale Motion,

the Sale Hearing, the Purchase Agreement, and the Sale has been provided; and it appearing that

the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their

stakeholders, and all other parties in interest; and it appearing that the Court has jurisdiction over

this matter; and it appearing that the legal and factual bases set forth in the Sale Motion and at

the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is

hereby

Page:      5
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

### FOUND, CONCLUDED, AND DETERMINED THAT:

### Jurisdiction, Venue, and Final Order

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28

U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is

proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Order constitutes a final and appealable order within the meaning of 28

U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d) or any other

applicable Bankruptcy Rule, and to any extent necessary under Bankruptcy Rule 9014 and

Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court

expressly finds that there is no just reason for delay in the implementation of this Sale Order and

the terms and conditions of this Sale Order should be immediately effective and enforceable

upon its entry, and expressly directs entry of judgment as set forth herein.

C.      The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this

proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact

constitute conclusions of law, they are adopted as such. To the extent any of the following

conclusions of law constitute findings of fact, they are adopted as such.

Page:         6
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief
_____

### Notice of the Sale Motion, Auction, Sale Hearing, Purchase Agreement and Sale and the Cure Costs

D.      As evidenced by declarations and/or affidavits of service and publication previously filed with this Court [see Docket Nos. 78, 188, 200 and 209], proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction, the Sale Hearing, the Purchase Agreement, and the Sale has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014. The Debtors have complied with all obligations to provide notice of the Sale Motion, the Auction, the Sale Hearing, the Purchase Agreement, and the Sale as required by the Bidding Procedures Order. The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the Purchase Agreement, or the Sale is required. With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice (as defined in the Sale Motion) in *The New York Times* on March 20, 2019, as evidenced by the Affidavit of Publication filed on March 20, 2019 [Docket No. 188] was sufficient and reasonably calculated under the circumstances to reach such entities.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Sale Motion was afforded to all interested persons and entities.

F.      In accordance with the Bidding Procedures Order, the Debtors have served a notice of their intent to assume and assign the Buyer Assumed Agreements and of the Cure Costs upon

Page:      7
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

each counterparty to a Buyer Assumed Agreement as set forth in the *Notice of Potential
Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with
Proposed Sale of Certain Assets of the Debtors Relating to the Chemical Plus Business* [Docket
No. 210], *Supplement to Notice of Potential Assumption and Assignment of Executory Contracts
and Unexpired Leases in Connection with Proposed Sale of Certain Assets of the Debtors
Relating to the Chemical Plus Business* [Docket No. 223], *First Supplemental Notice of Potential
Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with
Proposed Sale of Certain Assets of the Debtors Relating to the Chemical Plus Business* [Docket
No. 222] and *Second Supplemental Notice of Potential Assumption and Assignment of Executory
Contracts and Unexpired Leases in Connection with Proposed Sale of Certain Assets of the
Debtors Relating to the Chemical Plus Business* [Docket No. 371] (the "Second Supplemental
Cure Notice") (each a "Cure Notice" and collectively, the "Cure Notices").  The Cure Notices
reflect the amounts the Debtors proposed as the costs (each a "Cure Cost") necessary to cure any
defaults under each Buyer Assumed Agreement.  The service and provision of such notice was
good, sufficient, and appropriate under the circumstances and no further notice need be given in
respect of assumption and assignment of the Buyer Assumed Agreements or establishing a Cure
Cost for the respective Buyer Assumed Agreements. Counterparties to the Buyer Assumed
Agreements have been provided with an adequate opportunity to object to assumption and
assignment of the applicable Buyer Assumed Agreements and the Cure Costs set forth in the

Page:       8
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

Cure Notices (including objections related to the adequate assurance of future performance and

objections based on whether applicable law excuses the counterparty from accepting

performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the

Bankruptcy Code). All objections, responses, or requests for adequate assurance in connection

with the assumption and assignment of the Buyer Assumed Agreements that are not adjourned as

set forth in this Sale Order or as otherwise set forth on the record at the Sale Hearing have been

resolved, overruled, or denied, as applicable, except with respect to Buyer Assumed Agreements

listed in the Second Supplemental Cure Notice, for which the objection deadline is April 22,

2019 and a hearing, if necessary, will be held on April 30, 2019 at 10:00 a.m. (ET).

### **Highest and Best Offer**

G.     As demonstrated by the evidence proffered or adduced at the Sale Hearing, and

the representations of counsel made on the record at the Sale Hearing, the Debtors conducted a

sale process in accordance with, and have, along with the Buyer, complied in all material

respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity

for any interested party to make a higher or otherwise better offer to purchase the Purchased

Assets and assume the Assumed Liabilities.

H.     (i) The Debtors and their advisors engaged in a robust and extensive marketing

and sale process, both prior to the commencement of these Chapter 11 Cases and through the

post-petition sale process in accordance with the Bidding Procedures Order and the sound

Page:       9
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

exercise of the Debtors' business judgment; (ii) the Debtors conducted a fair and open sale

process; (iii) the sale process, the Bidding Procedures, and the Auction were non-collusive, duly

noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either

expressed an interest in acquiring the Purchased Assets, or who the Debtors believed may have

had an interest in acquiring the Purchased Assets, to make an offer to purchase the Debtors'

assets, including, without limitation the Purchased Assets; (iv) the Debtors and the Buyer have

negotiated and undertaken their roles leading to the entry into the Purchase Agreement in a

diligent, non-collusive, fair, reasonable, and good faith manner; (v) the sale process conducted in

good faith by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures

resulted in the highest or otherwise best value for the Purchased Assets for the Debtors and their

estates, was in the best interests of the Debtors, their creditors, and all parties in interest; and (vi)

the Committee properly exercised its fiduciary duties in connection with the sale process and the

Sale. There is no legal or equitable reason to delay consummation of the Purchase Agreement

and the transactions contemplated therein.

I.       The Debtors have determined, in a valid and sound exercise of their business

judgment and in consultation with their advisors and the Consultation Parties, that the next

highest or otherwise best Qualified Bid (the "Designated Back-Up Bid") for the Purchased

Assets was that of LBB Specialties Intermediate Holding Company LLC (the "Designated Back-

Up Bidder").

Page:       10
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

J.       Approval of the Sale Motion and the Purchase Agreement, and the consummation
of the Sale contemplated thereby, is in the best interests of the Debtors, their respective creditors,
estates, and other parties in interest. The Debtors have demonstrated good, sufficient, and sound
business reasons and justifications for entering into the Sale and the performance of their
obligations under the Purchase Agreement.

K.       The consummation of the Sale outside a plan of reorganization pursuant to the
Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor
impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors. The
Sale does not constitute a *sub rosa* chapter 11 plan.

L.       Entry of an order approving the Purchase Agreement and all the provisions
thereof is a necessary condition precedent to Buyer's consummation of the Sale, as set forth in
the Purchase Agreement.

### Good Faith of Buyer

M.       The consideration to be paid by the Buyer under the Purchase Agreement was
negotiated at arm's-length, in good faith and without collusion pursuant to section 363(m) of the
Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate
consideration for the Purchased Assets. Specifically: (i) the Buyer recognized that the Debtors
were free to deal with any other party interested in purchasing the Purchased Assets; (ii) the
Buyer complied in all respects with the applicable provisions of the Bidding Procedures Order in

Page:      11
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

negotiating and entering into the Purchase Agreement and the other Transaction Documents, and

the Purchase Agreement, the other Transaction Documents and the transactions described therein

comply with the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the

competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made or

to be made by the Buyer in connection with the Sale have been disclosed in the Purchase

Agreement; (v) no common identity of directors, officers or controlling stockholders exists

among the Buyer and the Debtors and Buyer is not an "insider" or "affiliate" of the Debtors, as

those terms are defined in the Bankruptcy Code; (vi) the negotiation and execution of the

Purchase Agreement and the other Transaction Documents were at arm's-length and in good

faith without collusion or fraud, and at all times each of the Buyer and the Debtors were

represented by competent counsel of their choosing; and (vii) the Buyer has not acted in a

collusive manner with any person and at all times acted in good faith and reasonably. The Buyer

will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in

closing the transactions contemplated by the Purchase Agreement and the other Transaction

Documents. The terms and conditions set forth in the Purchase Agreement are fair and

reasonable under the circumstances and were not entered into for the purpose of, nor do they

have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any

applicable laws.

Page:        12
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

N.      The Debtors and the Buyer, and each of their respective management, boards of

directors, members, officers, directors, employees, agents, and representatives, have acted in

good faith in connection with negotiations and entry into the Purchase Agreement. The Purchase

Agreement and the other Transaction Documents, and each of the transactions contemplated

therein, were negotiated, proposed, and entered into by the Debtors and the Buyer in good faith,

without collusion or fraud, and from arm's-length bargaining positions. The Buyer is a "good

faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is

entitled to all the protections afforded thereby.

**No Fraudulent Transfer**

O.      The consideration provided by the Buyer pursuant to the Purchase Agreement for

its purchase of the Purchased Assets and the assumption of the Assumed Liabilities constitutes

reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform

Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent

Transfer Act, and under the laws of the United States, all states, territories, possessions, and the

District of Columbia.

P.      Neither the Buyer nor its past, present and future subsidiaries, parents, divisions,

affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor

their respective directors, managers, officers, employees, shareholders, members, agents,

representatives, attorneys, contractors, subcontractors, independent contractors, owners,

Page:      13
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

insurance companies or partners (each, a "<u>Buyer Party</u>") is a continuation of the Debtors or their respective estates and no Buyer Party is holding itself out to the public as a continuation of the Debtors or their respective estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer (or any other Buyer Party) and the Debtors.

**Validity of Transfer**

Q.      Each Seller's board of directors has authorized the execution and delivery of the Purchase Agreement and the Sale of the Purchased Assets to the Buyer. The Debtors (i) have full corporate power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Sale, and (iii) have taken all action necessary to authorize and approve the Purchase Agreement and to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the transactions contemplated by the Purchase Agreement. The Purchased Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

**Section 363(f) Is Satisfied**

R.      The Sale of the Purchased Assets to the Buyer and the assumption and assignment to the Buyer of the Buyer Assumed Agreements (including Buyer's payment of any Cure Costs and/or funding of an escrow account with respect to any disputed Cure Costs in accordance with

Page:      14
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

paragraph 23 hereof) under the terms of the Purchase Agreement meets the applicable provisions

of section 363(f) of the Bankruptcy Code such that the Sale of the Purchased Assets will be free

and clear of all Liens, Claims and other Liabilities, whether known or unknown, and will not

subject any Buyer Party to any liability for any Liens, Claims or other Liabilities whatsoever

(including, without limitation, under any theory of equitable law, antitrust, or successor or

transferee liability), except as expressly provided in the Purchase Agreement with respect to

Assumed Liabilities. All holders of Liens, Claims or other Liabilities who did not object, or

withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to

section 363(f)(2) of the Bankruptcy Code, and all holders of Liens, Claims or other Liabilities

are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having

their Liens, Claims or other Liabilities, if any, attach to the proceeds of the Sale ultimately

attributable to the property against or in which they assert Liens, Claims or other Liabilities, in

the same order of priority and with the same validity, force, and effect that such holder had prior

to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as

applicable. Those holders of Liens, Claims or other Liabilities who did object and that have an

interest in the Purchased Assets fall within one or more of the other subsections of section 363(f)

of the Bankruptcy Code.

S.      The transfer of the Purchased Assets to the Buyer under the Purchase Agreement

will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title,

Page:      15
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

and interest in and to the Purchased Assets free and clear of all Liens, Claims and other

Liabilities, except as expressly provided in the Purchase Agreement. The Sellers may sell their

interests in the Purchased Assets free and clear of all Liens, Claims and other Liabilities; in each

case, one or more of the standards set forth in section 363(f) has been satisfied. The Buyer would

not have entered into the Purchase Agreement and Transaction Documents and would not

consummate the transactions contemplated thereby, including, without limitation, the Sale and

the assumption and assignment of the Buyer Assumed Agreements (i) if the transfer of the

Purchased Assets were not, except as otherwise expressly provided in the Purchase Agreement,

free and clear of all Liens, Claims and other Liabilities of any kind or nature whatsoever,

including, without limitation, rights or claims based on any successor, transferee, derivative or

vicarious liability or any similar theory and/or applicable state or federal law or otherwise,

whether at this time known or unknown, or (ii) if the Buyer or any of its affiliates or designees

would, or in the future could, be liable for any interests or other Liabilities, including, without

limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or

any similar theory and/or applicable state or federal law or otherwise, in each case subject only

to the Assumed Liabilities and expressly excluding the Excluded Liabilities.  Not transferring the

Purchased Assets free and clear of all Liens, Claims and other Liabilities of any kind or nature

whatsoever, except as otherwise expressly provided in the Purchase Agreement, including,

without limitation, rights or claims based on any successor, transferee, derivative or vicarious

Page:      16
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

liability or any similar theory and/or applicable state or federal law or otherwise (subject only to

the Assumed Liabilities), would adversely impact the Debtors' efforts to maximize the value of

their estates.

**Assumption and Assignment of the Buyer Assumed Agreements**

T.    The assumption and assignment of the Buyer Assumed Agreements pursuant to

the terms of this Sale Order are integral to the Purchase Agreement, are in the best interests of

the Debtors and their respective estates, creditors, and other parties in interest, and represent the

reasonable exercise of sound and prudent business judgment by the Debtors.

U.    The Debtors have met all requirements of section 365(b) and (f) of the

Bankruptcy Code for assumption and assignment of each of the Buyer Assumed Agreements.

The Buyer and/or the Debtors have (i) cured and/or provided adequate assurance of cure

(including through Buyer's payment of any Cure Costs and/or funding of an escrow account with

respect to any disputed Cure Costs in accordance with paragraph 23 hereof) of any default

existing prior to the Closing under all of the Buyer Assumed Agreements within the meaning of

section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation or adequate assurance

of compensation to any counterparty for actual pecuniary loss to such party resulting from a

default prior to the Closing under any of the Buyer Assumed Agreements within the meaning of

section 365(b)(1)(B) of the Bankruptcy Code, and (iii) provided adequate assurance of future

performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code. The Buyer has

Page:      17
Debtors:  ACETO CORPORATION, *et al.*
Case No.: 19-13448 (VFP)
Caption:  Order (A) Authorizing and Approving the Sale of Substantially All Assets
          Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
          Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
          Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
          the Assumption and Assignment of Certain Executory Contracts and Unexpired
          Leases Related Thereto, and (D) Granting Related Relief

_____

provided adequate assurance of future performance within the meaning of sections 365(b)(1)(C)

and 365(f)(2)(B) and in accordance with the Bidding Procedures to the extent that any such

assurance is required and not waived by the counterparties to such Buyer Assumed Agreements.

V.      At any time prior to the Closing and prior to the rejection of an executory contract

or unexpired lease, the Debtors shall have the right, upon request of the Buyer and in accordance

with the Bidding Procedures Order, to serve a Supplemental Cure Notice upon any non-Debtor

counterparty thereto indicating the Debtors' intent to assume and assign (but not reject) such

executory contract or unexpired lease. The objection deadline for all Buyer Assumed

Agreements, other than those subject to the Second Supplemental Cure Notice, lapsed on April

5, 2019. Objections, if any, to the proposed assumption and assignment or the Cure Cost

proposed in any Supplemental Cure Notice with respect thereto, must (i) be in writing,

(ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules,

(iii) state with specificity the nature of the objection and, if the objection pertains to the proposed

Cure Cost, the correct Cure Cost alleged by the objecting counterparty, together with any

applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and

served upon counsel to the Debtors and counsel to the Buyer so as to be actually received on or

before the deadline set forth in the applicable Supplemental Cure Notice, which shall be no

earlier than ten (10) calendar days after service thereof.  If the parties cannot agree on a

resolution of any such objection, the Debtors will seek an expedited hearing before the Court to

Page:      18
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief

_____

determine the Cure Cost or other matter in dispute and approve the assumption and assignment of such executory contract or unexpired lease to Buyer. If no objection is filed prior to the applicable objection deadline, then the counterparties will be deemed to have consented (including consent under Section 365(c)(1) of the Bankruptcy Code) to the assumption and assignment to Buyer and the Cure Cost, and such assumption and assignment to Buyer and the Cure Cost shall be deemed approved by this Sale Order without further order of this Court.

W.      Except as provided in the Purchase Agreement, the (i) transfer of the Purchased Assets to the Buyer and (ii) assignment to the Buyer of the Buyer Assumed Agreements, will not subject the Buyer to any liability whatsoever that arises, or is based on conduct of any Seller that occurred, prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise.

**Prompt Consummation**

X.      Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Purchased Assets must be approved and consummated promptly to preserve the value of the Purchased Assets. Time, therefore, is of the essence in effectuating the Purchase Agreement. As such, the Debtors and the Buyer intend to close the sale

Page:     19
Debtors:  ACETO CORPORATION, *et al.*
Case No.: 19-13448 (VFP)
Caption:  Order (A) Authorizing and Approving the Sale of Substantially All Assets
          Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
          Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
          Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
          the Assumption and Assignment of Certain Executory Contracts and Unexpired
          Leases Related Thereto, and (D) Granting Related Relief

_____

of the Purchased Assets as soon as reasonably practicable. The Debtors have demonstrated

compelling circumstances and a good, sufficient, and sound business purpose and justification

for the immediate approval and consummation of the Purchase Agreement. Accordingly, there is

sufficient cause to waive the stay provided in Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d) or

any other applicable Bankruptcy Rule.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.     The Sale Motion is GRANTED to the extent set forth herein.

2.     Except to the extent provided in paragraph 23 hereof, all objections to or

reservation of rights with respect to the Sale Motion or the relief requested therein that have not

been withdrawn or resolved as stated on the record of the Sale Hearing are overruled.  All

persons and entities who did not object or withdrew their objections to the Sale Motion are

deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.     The record of these cases, including the Court's findings of fact and conclusions

of law set forth in the Bidding Procedures Order, are incorporated herein by reference and the

Court takes judicial notice of the record.

4.     The Purchase Agreement and the other Transaction Documents, and all terms and

conditions thereof, are hereby approved.  The failure to specifically include any particular

provision of the Purchase Agreement or any other Transaction Document in this Sale Order shall

Page:    20
Debtors:    ACETO CORPORATION, *et al.*
Case No.:    19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
the Assumption and Assignment of Certain Executory Contracts and Unexpired
Leases Related Thereto, and (D) Granting Related Relief

_____

not diminish or impair the effectiveness of such provision, it being the intent of the Court that the

Purchase Agreement and other Transaction Documents be authorized and approved in their

entirety.

5.    The Designated Back-Up Bidder is hereby approved as the Back-Up Bidder (as

defined in the Bidding Procedures), and the Designated Back-Up Bid is hereby approved and

authorized as the Back-Up Bid (as defined in the Bidding Procedures) in accordance with the

Bidding Procedures.  To the extent necessary, the terms and conditions of the Back-Up Bid will

be approved pursuant to a separate sale order to be submitted at a later date consistent with the

terms of the Back-Up Bid.

**Transfer of the Purchased Assets as set forth in the Purchase Agreement**

6.    The Debtors are authorized and directed to (a) take any and all actions necessary

or appropriate to perform, consummate, implement, and close the Sale or consistent with or in

furtherance of the Sale in accordance with the terms and conditions set forth in the Transaction

Documents and this Sale Order, (b) assume and assign any and all Buyer Assumed Agreements,

and (c) take all further actions and execute and deliver the Transaction Documents and any and

all additional instruments and documents that are consistent with, in furtherance of, or may be

necessary or appropriate to implement the Purchase Agreement and the other Transaction

Documents and consummate the Sale in accordance with the terms thereof, all without further

order of the Court.

Page:       21
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

7.      The Buyer is not acquiring any of the Excluded Assets or assuming any of the

Excluded Liabilities (each as defined in the Purchase Agreement).

8.      All persons and entities are prohibited and enjoined from taking any action to

adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors

to transfer the Purchased Assets to the Buyer in accordance with the Purchase Agreement, the

other Transaction Documents and this Sale Order.

9.      At Closing, all of the Debtors' right, title, and interest in and to, and possession

of, the Purchased Assets shall be immediately vested in the Buyer pursuant to sections 105(a),

363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer shall constitute a legal, valid,

enforceable, and effective transfer of the Purchased Assets. All persons or entities, presently or at

or after the Closing, in possession of some or all of the Purchased Assets, are directed to

surrender possession of any and all portions of the Purchased Assets to the Buyer on the Closing

Date or at such time thereafter as the Buyer may request.

10.      This Sale Order (a) shall be effective as a determination that, as of the Closing,

(i) the Purchased Assets shall have been transferred to the Buyer free and clear of all Liens,

Claims and other Liabilities, except to the extent set forth in the Purchase Agreement, and (ii) the

conveyances described herein have been effected, and (b) is and shall be binding upon and

govern the acts of all entities, including, without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars

Page:      22
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

---

of patents, trademarks, or other intellectual property, administrative agencies, governmental

departments, secretaries of state, federal and local officials, and all other persons and entities

who may be required by operation of law, the duties of their office, or contract, to accept, file,

register, or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title; and each of the foregoing persons and entities is hereby

directed to accept for filing any and all of the documents and instruments necessary and

appropriate to consummate the transactions contemplated by the Purchase Agreement and the

other Transaction Documents.

11.     All Liens, Claims and other Liabilities with respect to the Purchased Assets shall

attach to the proceeds of the Sale ultimately attributable to the property against which such

Liens, Claims and other Liabilities applied, in the same order of priority and with the same

validity, force, and effect that such Liens, Claims and other Liabilities applied prior to the Sale,

subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as

otherwise provided herein. The Debtors shall apply net proceeds from the sale of the Purchased

Assets in accordance with paragraph 23 of the Final DIP Order and Section 2.18(b) of the DIP

Credit Agreement, and wire funds at Closing to Wells Fargo Bank as the administrative agent for

the DIP Lenders and the Prepetition Lenders, sufficient to pay all of the secured obligations in

full.

Page:      23
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
the Assumption and Assignment of Certain Executory Contracts and Unexpired
Leases Related Thereto, and (D) Granting Related Relief

_____

12.     At or substantially contemporaneous with the Closing of the Sale, the Debtors are

hereby authorized to pay off all amounts due and owing in connection with that certain Mortgage

dated June 30, 2011 given by Aceto Realty LLC, as borrower, and Nassau County Industrial

Development Agency, as mortgagor, for the benefit of JPMorgan Chase Bank, N.A., as

mortgagee, affecting the Port Washington Facility in the current outstanding principal amount of

approximately $2,500,000.00.

13.     The Buyer shall receive the benefits and burdens of the Assumed Liabilities and if

the Buyer disputes any alleged charge, credit or payment under any of the Assumed Liabilities

and the parties are unable to come to an agreement regarding the amount owed, the dispute may

be adjudicated by the Bankruptcy Court or any other court of competent jurisdiction.

14.     Except as otherwise provided in this Sale Order or the Purchase Agreement, all

persons and entities (and their respective successors and assigns), including, but not limited to,

all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory

authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and

other creditors holding claims of any kind or nature whatsoever against the Debtors or in any

way relating to the Acquired Business or the Purchased Assets (whether at this time known or

unknown) are forever barred, estopped, and permanently enjoined from asserting such claims

(including, without limitation, any right of set-off or recoupment) against any Buyer Party and its

property (including, without limitation, the Purchased Assets).

Page:      24
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

15.     If any person or entity that has filed financing statements, mortgages, mechanic's

claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or

in the Purchased Assets shall not have delivered to the Debtors prior to the Closing of the Sale,

in proper form for filing and executed by the appropriate parties, termination statements,

instruments of satisfaction, and/or releases of all Liens, Claims and other Liabilities that the

person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then only

with regard to the Purchased Assets that are purchased by the Buyer pursuant to the Purchase

Agreement and this Sale Order, (a) the Debtors are hereby authorized and directed to execute and

file such statements, instruments, releases, and other documents on behalf of the person or entity

with respect to the Purchased Assets, (b) the Buyer is hereby authorized to file, register, or

otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise

recorded, shall constitute conclusive evidence of the release of all Liens, Claims, and other

Liabilities against each Buyer Party and the Purchased Assets, and (c) upon consummation of the

Sale, the Buyer may seek in this Court or any other court to compel appropriate parties to

execute termination statements, instruments of satisfaction, and releases of all Liens, Claims and

other Liabilities that are extinguished or otherwise released pursuant to this Sale Order under

section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with

respect to the Purchased Assets. This Sale Order is deemed to be in recordable form sufficient to

be placed in the filing or recording system of each and every federal, state, or local government

Page:        25
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
             Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
             Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
             Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
             the Assumption and Assignment of Certain Executory Contracts and Unexpired
             Leases Related Thereto, and (D) Granting Related Relief

_____

agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order

authorizing the Sale and assignment of the Purchased Assets free and clear of Liens, Claims and

other Liabilities shall be self-executing and neither the Debtors nor the Buyer shall be required to

execute or file releases, termination statements, assignments, consents, or other instruments to

effectuate, consummate, and implement the provisions of this Sale Order.

### No Successor or Transferee Liability

16.    No Buyer Party shall be deemed, as a result of any action taken in connection

with the Purchase Agreement, the consummation of the Sale contemplated by the Purchase

Agreement, or the transfer, operation, or use of the Purchased Assets to (a) be a legal successor,

or otherwise be deemed a successor to the Debtors (other than, for the Buyer, with respect to any

Assumed Liabilities), (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be

an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of

the Debtors including, without limitation, within the meaning of any foreign, federal, state, or

local revenue law, pension law, the Employee Retirement Income Security Act of 1974

("ERISA"), tax law, labor law, products liability law, employment law, environmental law, or

other law, rule, or regulation (including, without limitation, filing requirements under any such

laws, rules or regulations).

17.    Other than as expressly set forth in the Purchase Agreement, no Buyer Party shall

have any responsibility for (a) any liability or other obligation of the Debtors or (b) any claims

Page:      26
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the

Purchase Agreement with respect to the Buyer, no Buyer Party shall have any liability

whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective

businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations

("Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory

of successor or vicarious liability of any kind or character, or based upon any theory of antitrust,

environmental, successor, or transferee liability, de facto merger or substantial continuity, labor

and employment or products liability, whether known or unknown as of the Closing, now

existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or

unliquidated, including, without limitation, liabilities on account of (a) any taxes arising,

accruing, or payable under, out of, in connection with, or in any way relating to the Purchased

Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b)

any plan, agreement, practice, policy, or program, whether written or unwritten, providing for

pension, retirement, health, welfare, compensation or other employee benefits which is or has

been sponsored, maintained or contributed to by any Debtor or with respect to which any Debtor

has any liability, whether or not contingent, including, without limitation, any "multiemployer

plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of

ERISA) to which any Debtor has at any time contributed, or had any obligation to contribute.

Except to the extent expressly included in the Assumed Liabilities with respect to the Buyer or as

Page:       27
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

otherwise expressly set forth in the Purchase Agreement, no Buyer Party shall have any liability

or obligation under any applicable law, including, without limitation, (a) the WARN Act (29

U.S.C. §§ 2101 *et seq.*), (b) the Comprehensive Environmental Response Compensation and

Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the

Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29

U.S.C. § 151 *et seq.*, (f) the Fair Labor Standards Act, (g) the Americans with Disabilities Act of

1990 (as amended), (h) Title VII of the Civil Rights Act of 1964, (i) the Consolidated Omnibus

Budget Reconciliation Act of 1985, or (j) any foreign, federal, state, or local labor, employment

or environmental law, by virtue of the Buyer's purchase of the Purchased Assets, assumption of

the Assumed Liabilities, or hiring of certain employees of the Debtors pursuant to the terms of

the Purchase Agreement. Without limiting the foregoing, no Buyer Party shall have any liability

or obligation with respect to any environmental liabilities of the Debtors or any environmental

liabilities associated with the Purchased Assets except to the extent they are Assumed Liabilities

set forth in the Purchase Agreement.

18.      Effective upon the Closing, all persons and entities are forever prohibited and

enjoined from commencing or continuing in any matter any action or other proceeding, whether

in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Buyer

Party or their respective assets (including, without limitation, the Purchased Assets), with respect

to any Successor or Transferee Liability including, without limitation, the following actions, in

Page:      28
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

---

each case, with respect to any such Successor or Transferee Liability: (i) commencing or

continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching,

collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating,

perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right

of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any

manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale

Order or other orders of this Court, or the agreements or actions contemplated or taken in respect

hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or

authorization to operate any business in connection with the Purchased Assets or conduct any of

the businesses operated with respect to such assets.

**Good Faith of Buyer**

19.    The Sale contemplated by the Purchase Agreement is undertaken by the Buyer

without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorization provided

herein to consummate the Sale shall not affect the validity of the Sale (including, without

limitation, the assumption and assignment of the Buyer Assumed Agreements), unless such

authorization and consummation of such Sale are duly and properly stayed pending such appeal.

20.    Neither the Debtors nor the Buyer have engaged in any action or inaction that

would cause or permit the Sale to be avoided or costs or damages to be imposed under section

Page:     29
Debtors:  ACETO CORPORATION, *et al.*
Case No.: 19-13448 (VFP)
Caption:  Order (A) Authorizing and Approving the Sale of Substantially All Assets
          Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
          Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
          Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
          the Assumption and Assignment of Certain Executory Contracts and Unexpired
          Leases Related Thereto, and (D) Granting Related Relief

_____

363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Purchased

Assets under the Purchase Agreement is fair and reasonable and the Sale may not be avoided,

and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

**Assumption and Assignment of Buyer Assumed Agreements**

21.    The Debtors are authorized and directed at the Closing to assume and assign each

of the Buyer Assumed Agreements to the Buyer pursuant to sections 105(a) and 365 of the

Bankruptcy Code and to execute and deliver to the Buyer such documents or other instruments

as may be necessary to assign and transfer the Buyer Assumed Agreements to the Buyer. The

payment by the Buyer of the applicable Cure Costs (if any) under a Buyer Assumed Agreement

shall (a) effect a cure of all defaults existing thereunder as of the Closing, and (b) compensate for

any actual pecuniary loss to such counterparty resulting from such default.

22.    Only those objections identified on the Notice of Agenda filed on April 15, 2019

were timely filed with respect to assumption and assignment of certain Buyer Assumed

Agreements.  The Cure Costs for any Buyer Assumed Agreement to which no objection was

timely filed (including those set forth in the Second Supplemental Cure Notice filed at Docket

No. 338 to the extent no objection is timely filed) are hereby fixed at the amounts set forth on the

applicable Cure Notice, and the contract counterparties to such Buyer Assumed Agreements are

forever bound by such Cure Costs.  Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy

Code, the Buyer shall pay to the applicable contract counterparty the Cure Costs relating to such

Page:      30
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

Buyer Assumed Agreements at or prior to the Closing.  Upon payment of such Cure Costs as

provided for herein, the contract counterparties to such Buyer Assumed Agreements are enjoined

from taking any action against the Debtors or their estates with respect to any claim for cure.

23.    Timely filed objections to the proposed Cure Costs that remain unresolved with

respect to certain Buyer Assumed Agreements (each, a "Cure Objection") were filed by certain

parties identified on **Exhibit 2** attached hereto.  To the extent not resolved between the Debtor

and the applicable contract counterparty prior thereto, an evidentiary hearing on each Cure

Objection listed on **Exhibit 2** shall be held on May 7, 2019 at 10:00 a.m. (EST) (or such other

date agreed to by the Debtors and the applicable contract counterparties, subject to the Court's

availability).  The applicable Buyer Assumed Agreements shall be assumed and assigned to the

Buyer effective upon the Closing, provided that Buyer shall pay the undisputed portions of any

Cure Costs with respect to the Buyer Assumed Agreements identified in such Cure Objections

and deposit any disputed portions of any Cure Costs in an escrow account established at Closing

and maintained at the sole expense of the Buyer, pending resolution of the Cure Objections.

Upon resolution of such Cure Objections (whether by Court order or consent of the Buyer and

contract counterparty), the Cure Cost for the applicable Buyer Assumed Agreement shall be

fixed and shall constitute the "Cure Cost" for all purposes under this Sale Order, and the Buyer

shall pay to the applicable contract counterparty the remaining Cure Costs, if any, as determined

Page:     31
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

in accordance with this paragraph, within three (3) business days after the Cure Objection is

resolved.

24.    Pursuant to section 365(f) of the Bankruptcy Code (subject to Buyer's payment or

provision of the Cure Costs and/or funding of an escrow account with respect to any disputed

Cure Costs in accordance with paragraph 23 hereof), the Buyer Assumed Agreements to be

assumed and assigned under the Purchase Agreement shall be assigned and transferred to, and

remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in the

Buyer Assumed Agreements or other restrictions prohibiting their assignment or transfer. Any

provisions in any Buyer Assumed Agreement that prohibit or condition the assignment of such

Buyer Assumed Agreement to the Buyer (including the invocation of Section 1927 of the Social

Security Act, 42 U.S.C. § 1396r-8, if applicable) or allow the counterparty to such Buyer

Assumed Agreement to terminate, recapture, setoff or recoup, impose any penalty, condition on

renewal or extension, or modify any term or condition upon the assignment of such Buyer

Assumed Agreement to the Buyer, constitute unenforceable anti-assignment provisions that are

void and of no force and effect. All other requirements and conditions under sections 363 and

365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of

the Buyer Assumed Agreements have been satisfied. Upon the Closing, in accordance with

sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested

with all right, title, and interest of the Debtors under the Buyer Assumed Agreements, and such

Page:       32
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

Buyer Assumed Agreements shall remain in full force and effect for the benefit of the Buyer.

Each counterparty to the Buyer Assumed Agreements shall, with respect to each Buyer Assumed

Agreement, be forever barred, estopped, and permanently enjoined from (a) asserting against the

Debtors or any Buyer Party or their respective property any assignment fee, acceleration, default,

breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of

the Closing or arising by reason of the Closing, including, without limitation, any breach related

to or arising out of change-in-control provisions in such Buyer Assumed Agreements, or any

purported written or oral modification to the Buyer Assumed Agreements and (b) asserting

against any Buyer Party (or its respective property, including, without limitation, the Purchased

Assets) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable

against the Debtors existing as of the Closing or arising by reason of the Closing except for the

Assumed Liabilities.

25.    Upon the Closing, the Buyer shall be deemed to be substituted for the Debtors as

a party to the applicable Buyer Assumed Agreements and the Debtors shall be released, pursuant

to section 365(k) of the Bankruptcy Code, from any liability under the Buyer Assumed

Agreements. There shall be no rent or payment accelerations, assignment fees, increases, or any

other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of

the Buyer Assumed Agreements. The failure of the Debtors or the Buyer to enforce at any time

one or more terms or conditions of any Buyer Assumed Agreement shall not be a waiver of such

Page:       33
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
the Assumption and Assignment of Certain Executory Contracts and Unexpired
Leases Related Thereto, and (D) Granting Related Relief

_____

terms or conditions or of the right of the Debtors or the Buyer, as the case may be, to enforce

every term and condition of such Buyer Assumed Agreement. The validity of the assumption and

assignment of any Buyer Assumed Agreement to the Buyer shall not be affected by any existing

dispute between the Debtors and any counterparty to such Buyer Assumed Agreement. Any

party that may have had the right to consent to the assignment of any Buyer Assumed Agreement

is deemed to have consented for the purposes of section 365(e)(2)(A) of the Bankruptcy Code.

26.     Buyer has provided adequate assurance of future performance with respect to

each of the Buyer Assumed Agreements within the meaning of sections 365(b)(1)(C) and

365(f)(2)(B) of the Bankruptcy Code.

27.     The assignments of each of the Buyer Assumed Agreements are made in good

faith under sections 363(b) and (m) of the Bankruptcy Code.

28.     Notwithstanding anything in the Sale Motion, any notice related thereto, or this

Sale Order to the contrary, none of the Cigna Contracts as defined in the *Objection of Cigna

Entities to Notice of Potential Assumption and Assignment of Executory Contracts and

Unexpired Leases in Connection with Proposed Sale of Certain Assets of the Debtors Relating to

the Chemical Plus Business* [Docket No. 273] shall be assumed and assigned pursuant to this

Sale Order.

Page:      34
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

---

### **Other Provisions**

29.       To the extent provided by section 525 of the Bankruptcy Code, no governmental

unit (federal or state) may revoke or suspend any permit or License relating to the Purchased

Assets sold, transferred, or conveyed to the Buyer on account of (i) the filing or pendency of

these Chapter 11 Cases or (ii) the consummation of the Sale contemplated by the Purchase

Agreement or the failure of the Debtors to pay any pre-petition claims of such governmental unit.

30.       The Buyer shall not be required to seek or obtain relief from the automatic stay

under section 362 of the Bankruptcy Code to enforce any of its remedies or exercise any of its

rights under the Purchase Agreement or any other Sale-related document. The automatic stay

imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to

implement the preceding sentence, *provided, however*, that this Court shall retain exclusive

jurisdiction over any and all disputes with respect thereto.

31.       The terms and provisions of the Purchase Agreement, the other Transaction

Documents and this Sale Order shall be binding in all respects upon the Debtors, their affiliates,

their estates, all creditors of (whether known or unknown) and holders of equity interests in any

Debtor, any holders of claims against or on all or any portion of the Purchased Assets, all

counterparties to the Buyer Assumed Agreements, the Buyer, and all of their respective

successors and assigns including, but not limited to, any subsequent trustee(s) appointed in any

of the Debtors' Chapter 11 Cases or upon conversion of any of the Chapter 11 Cases to a case

Page:      35
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

---

under chapter 7 of the Bankruptcy Code, as to which trustee(s) such terms and provisions

likewise shall be binding. The Purchase Agreement shall not be subject to rejection or avoidance

by the Debtors, their estates, their creditors, their shareholders, or any trustee(s).

32.     The terms and provisions of this Sale Order and any actions taken pursuant hereto

shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any

of these Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7

of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases; or (d) pursuant to which

this Court abstains from hearing any of the Chapter 11 Cases. The terms and provisions of this

Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall

continue in these Chapter 11 Cases, or following dismissal of these Chapter 11 Cases.

33.     Each and every federal, state, and local governmental agency, department, or

official is hereby directed to accept any and all documents and instruments necessary and

appropriate to consummate the transactions contemplated by the Purchase Agreement (including

any document requesting a name change or assignment thereof and regardless of whether such

agency or department has a Claim against the Debtors).

34.     The Purchase Agreement and the Sale contemplated hereunder shall not be

subject to any bulk sales laws or any similar law of any state or jurisdiction.

35.     Nothing in this Sale Order or the Purchase Agreement releases, nullifies,

precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit

Page:      36
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

that any entity would be subject to as the post-sale owner or operator of property after the date of

entry of this Sale Order; provided, however, that (i) nothing herein shall subject the Purchaser to

any liability to a governmental unit for penalties for days of violation prior to closing, and

(ii) Purchaser shall retain all rights and defenses it may have under non-bankruptcy law with

respect to any police or regulatory action brought by governmental units. Nothing in this Sale

Order or the Purchase Agreement authorizes the transfer or assignment of any governmental

(a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of

any obligation thereunder, without compliance with all applicable legal requirements and

approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any

jurisdiction it may have under police or regulatory law to interpret this Sale Order or to

adjudicate any defense asserted under this Sale Order.

36.      Notwithstanding any other provision of this Sale Order or the Purchase

Agreement, the Purchased Assets shall not include any buprofezin products or buprofezin

registrations, including the Buprofezin 70 WDG IGR registration, which is the subject of a

previously filed petition to cancel and for which the Debtor has submitted a request for voluntary

cancellation.

37.      Notwithstanding anything herein to the contrary, upon the PILOT Unwind, the

Nassau County Industrial Development Agency ("NCIDA") shall be paid (A) at or prior to

Closing, to the extent the PILOT Unwind will be effectuated at Closing, or (B) upon the PILOT

Page:       37
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

Unwind, to the extent the PILOT Unwind has not been and cannot be effectuated at Closing, (i)
the recapture of the portion of certain tax benefits the Debtors received in connection with the
PILOT program agreements entered into between the NCIDA and certain of the Debtors
(collectively, the "PILOT Agreements"), (ii) any missed PILOT payments, and (iii) other
amounts due under the PILOT Agreements and documents executed in connection with the
PILOT Agreements, including legal fees and costs, in each case in accordance with the terms of
those agreements (collectively, the "PILOT Termination Costs"); and upon said payment, the
NCIDA shall (the below, collectively together with any payments made or to be made to the
NCIDA in connection with the PILOT Termination Costs, the "PILOT Unwind Transactions"):

> (i) deliver title with respect to the Port Washington Property (as defined in the
> First Day Declaration) back to Aceto Realty LLC  which will transfer title to the
> Buyer at or following the Closing as soon as reasonably practicable;
>
> (ii) release its liens against the Facility;
>
> (iii) terminate all associated agreements; and
>
> (iv) use its best efforts to obtain the release of the PILOT Mortgage from Nassau
> County, which shall be provided no later than 45 days after the Closing.

38.    For the avoidance of doubt, all PILOT Termination Costs shall be paid by as set
forth in the PILOT Agreements and documents executed in connection with the PILOT
Agreements, by Buyer (or, to the extent paid by Sellers prior to the closing, shall be reimbursed

Page:       38
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets
            Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
            Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
            Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
            the Assumption and Assignment of Certain Executory Contracts and Unexpired
            Leases Related Thereto, and (D) Granting Related Relief

_____

by Buyer to Sellers at closing).  In addition, notwithstanding anything herein to the contrary, any

and all obligations of Aceto Realty LLC and Aceto Corporation, to the extent such obligations

survive the termination of the PILOT Agreements and the documents executed in connection

with the PILOT Agreements, shall remain in full force and effect and shall survive the closing

(including but not limited to the Environmental Compliance and Indemnification Agreement and

Guaranty, both  dated October 1, 2010 and thereafter reaffirmed on June 30, 2011, pursuant to a

Ratification and Reaffirmation Agreement (Environmental Indemnification) and Ratification and

Reaffirmation Agreement (Guaranty) (the "Surviving Potential Claims").  The Debtors, Nassau

County and NCIDA reserve all rights and defenses with respect to the Surviving Potential

Claims, if any.  Sellers are hereby authorized to immediately proceed with any actions necessary

to effectuate the PILOT Unwind and PILOT Unwind Transactions.  For the further avoidance of

doubt, any delivery and transfer of title to the Port Washington Property as set forth herein and in

the Purchase Agreement is a conveyance pursuant to the Bankruptcy Code and therefore is

exempt from New York State real estate transfer tax pursuant to N.Y. Tax Law § 1405(b)(8).

    39.    In accordance with section 5.3(f) of the Purchase Agreement, to the extent that as

of the Closing Date any Transferred Employee has any benefit payable to him or her as of the

Closing Date in the nonqualified deferred compensation plans of Sellers (each, a "NQ Plan),

Sellers are authorized to, as soon as practical after the Closing Date, split such NQ Plans into one

or more separate plans that contains assets equal to the benefits payable to Transferred

Page:     39
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief

_____

Employees to the extent such benefits are not otherwise distributed upon or promptly following the Closing Date under the terms of such NQ Plan. The Sellers are further authorized, in accordance with section 5.3(f) of the Purchase Agreement, to either (i) as soon as practical after the Closing Date, establish a New NQ Trust and cause the assets of the Existing NQ Trust, in an amount equal to the benefits payable to a Transferred Employee who has a benefit as of the Closing Date in the NQ Plan that is not otherwise distributed upon or promptly following the Closing Date under the terms of the applicable NQ Plan (the "Transferable Assets"), to be transferred to the New NQ Trust, which New NQ Trust shall be assumed by Buyer, or (ii) as soon as practical after the Closing Date, cause the Transferable Assets to be transferred to a new rabbi trust established by Buyer in form and substance satisfactory to the Sellers for the benefit of Transferred Employees who have benefits payable to them as of the Closing Date in the NQ Plan that are not otherwise distributed upon or promptly following the Closing Date under the terms of the applicable NQ Plan (the "Buyer Trust"), and Buyer shall cause the Buyer Trust to accept the Transferable Assets, as soon as practical after such Buyer Trust is established.  For the avoidance of doubt, Sellers are authorized to transfer the Transferable Assets in an amount necessary to fund the obligations of the NQ plans with respect to the Transferred Employees.  In order to facilitate the foregoing, (a) Aceto Corporation and Delaware Charter Guarantee & Trust Company conducting business as Principal Trust Company (the "Trustee") are authorized to enter into an amendment to that certain Rabbi Directed Trust Agreement, effective as of January

Page:      40
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

---

15, 2017 (the "Trust Agreement"), with respect to the Aceto Corporation Supplemental

Executive Retirement Plan, the Aceto Corporation Supplemental Executive Deferred

Compensation Plan and the Aceto Corporation Senior Executive Retirement Plan, amending the

Trust Agreement to permit the transfer of the Transferable Assets to either the New NQ Trust or

the Buyer Trust, and (b) the Trustee is ordered and directed to accept the directions of the

Committee (as defined in the Trust Agreement) or other authorized person(s) regarding such

amendment and transfer.

      40.    The terms of the Purchase Agreement may be waived, modified, amended, or

supplemented by the parties thereto in accordance with the terms thereof, without further order

of the Court, provided that any such waiver, modification, amendment, or supplement does not,

based on the Debtors' business judgment, and in consultation with the Consultation Parties, have

an adverse effect on the Debtors' estates or their creditors. The Debtors shall provide the

Consultation Parties with reasonable prior written notice (which may be by e-mail to counsel of

record for each Consultation Party) under the circumstances of any such waiver, modification,

amendment, or supplement of the Purchase Agreement.  For the avoidance of doubt, all other

waivers, modifications, amendments, or supplements to the terms of the Purchase Agreement

shall require Court approval.

      41.    From time to time, as and when requested by any party, each party shall execute

and deliver, or cause to executed and delivered, all such documents and instruments and shall

Page:       41
Debtors:    ACETO CORPORATION, *et al.*
Case No.:   19-13448 (VFP)
Caption:    Order (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief

_____

take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale without further order of the Court, including, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in the Buyer its right, title and interest in and to the Purchased Assets and the Buyer Assumed Agreements.

42.    The failure specifically to include any particular provisions of the Purchase Agreement or the Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors, and the Buyer that the Purchase Agreement and Transaction Documents are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Sale Order. Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.

43.    Notwithstanding anything to the contrary in the Sale Motion, the Purchase Agreement, or this Order, Canegrass LLC shall not be a Purchased Subsidiary and (A) the outstanding equity, membership, and other interests of the Sellers in and/or with respect to Canegrass LLC and/or that certain Canegrass LLC Operating Agreement (collectively, the "Canegrass Interests") shall (i) not be sold or assigned to Buyer, (ii) the Canegrass Interests shall not be Purchased Assets, and (iii) neither the Canegrass LLC Operating Agreement, the Distributor Agreement by and between Aceto Agricultural Chemicals Corporation and Canegrass

Page:      42
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

_____

LLC, nor any related membership certificates shall be Buyer Assumed Agreements, (B) the

Buyer shall not assume any liabilities, obligations, rights or benefits of Canegrass LLC or Sellers

in respect of Canegrass LLC, and (C) none of the representations, warranties or covenants in the

Purchase Agreement shall apply to Canegrass LLC or the Canegrass Interests.

44.    All time periods set forth in this Sale Order shall be calculated in accordance with

Bankruptcy Rule 9006(a).

45.    Notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3),

6004(h), 6006(d), 7062, 9014 or any other applicable Bankruptcy Rule, or Rule 62(a) of the

Federal Rules of Civil Procedure, the terms and conditions of this Sale Order shall be

immediately effective and enforceable upon its entry, there shall be no stay of execution or

effectiveness of this Sale Order, and the Debtors and the Buyer are authorized to close the Sale

immediately upon entry of this Sale Order.

46.    To the extent there is any conflict between the terms of this Sale Order and the

Purchase Agreement, the terms of this Sale Order shall control. Nothing contained in any chapter

11 plan hereinafter confirmed in these Chapter 11 Cases or any order confirming such chapter 11

plan, or any other order of the Court, shall conflict with or derogate from the provisions of the

Purchase Agreement or any other Transaction Document or the terms of this Sale Order.

47.    This Court shall retain exclusive jurisdiction to: (a) interpret, implement, and

enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, and the

Page:      43
Debtors:   ACETO CORPORATION, *et al.*
Case No.:  19-13448 (VFP)
Caption:   Order (A) Authorizing and Approving the Sale of Substantially All Assets
           Comprising the Debtors' Chemical Plus Business Free and Clear of All Claims,
           Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Perform
           Their Obligations Under the Purchase Agreement, (C) Authorizing and Approving
           the Assumption and Assignment of Certain Executory Contracts and Unexpired
           Leases Related Thereto, and (D) Granting Related Relief

---

Purchase Agreement, including all amendments thereto and any waivers and consents thereunder

and each of the agreements executed in connection therewith; and (b) decide any issues or

disputes concerning this Sale Order and the Purchase Agreement or the rights and duties of the

parties hereunder or thereunder, including any disputed Cure Costs and the interpretation of the

terms, conditions, and provisions hereof and thereof, and the status, nature, and extent of the

Purchased Assets.

## <u>Exhibit 1</u>

**Purchase Agreement**

*Execution Version*

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

**by and among**

**ACETO CORPORATION,**

**ACETO AGRICULTURAL CHEMICALS CORPORATION**

**and**

**ACETO REALTY LLC,**

**as Sellers,**

**and**

**NMC ATLAS, L.P.,**

**as Buyer**

**Dated as of April 14, 2019**

# TABLE OF CONTENTS

**PAGES**

ARTICLE I      PURCHASE AND SALE ................................................................................ 2

   1.1      Purchased Assets ................................................................................ 2

   1.2      Excluded Assets ................................................................................ 4

   1.3      Assumed Liabilities ................................................................................ 6

   1.4      Excluded Liabilities ................................................................................ 6

   1.5      Assignments; Cure Amounts ................................................................ 8

   1.6      Further Assurances ................................................................................ 9

   1.7      PILOT Program ................................................................................ 9

   1.8      Bulk Sales Laws ................................................................................ 10

ARTICLE II      PURCHASE PRICE ................................................................................ 10

   2.1      Purchase Price ................................................................................ 10

   2.2      Closing Date Payment ................................................................ 10

   2.3      Good Faith Deposit ................................................................ 11

   2.4      Adjustment to Base Purchase Price ........................................... 11

   2.5      Allocation of Purchase Price ..................................................... 13

   2.6      Closing Date ................................................................................ 13

   2.7      Deliveries of Buyer ................................................................ 13

   2.8      Deliveries of Sellers ................................................................ 14

   2.9      Withholding Rights ................................................................ 15

   2.10      Transfer of Aceto Shanghai Interests .................................... 15

ARTICLE III      REPRESENTATIONS AND WARRANTIES OF SELLERS ................ 17

   3.1      Organization ................................................................................ 17

   3.2      Acquired Subsidiaries ................................................................ 18

   3.3      Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation ................................................................ 18

   3.4      Financial Statements ................................................................ 19

   3.5      Compliance with Law; Permits .............................................. 19

   3.6      Environmental Matters ................................................................ 20

   3.7      Employee Benefit Plans ................................................................ 20

   3.8      Litigation ................................................................................ 21

   3.9      Tax Matters ................................................................................ 22

   3.10      Employment and Labor Matters ............................................ 23

   3.11      Real and Tangible Property ..................................................... 23

i

| 3.12 | Intellectual Property | 23 |
| 3.13 | Material Contracts | 24 |
| 3.14 | Certain Regulatory Matters | 24 |
| 3.15 | Finders or Brokers | 25 |
| 3.16 | Sufficiency of Assets | 25 |
| 3.17 | Inventory | 25 |
| 3.18 | No Other Representations or Warranties | 25 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF BUYER | 26 |
| 4.1 | Organization | 26 |
| 4.2 | Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation | 26 |
| 4.3 | Litigation | 26 |
| 4.4 | Buyer Information | 27 |
| 4.5 | Finders or Brokers | 27 |
| 4.6 | Solvency | 27 |
| 4.7 | Adequate Assurances Regarding the Buyer Assumed Agreements | 27 |
| 4.8 | Certain Arrangements; Ownership of Sellers | 27 |
| 4.9 | Guarantee | 28 |
| 4.10 | Investment Intention | 28 |
| 4.11 | Investigation; No Other Representations | 28 |
| ARTICLE V | COVENANTS AND AGREEMENTS | 29 |
| 5.1 | Conduct of Business | 29 |
| 5.2 | Access | 30 |
| 5.3 | Employees and Employee Benefit Plans | 31 |
| 5.4 | Regulatory Approvals; Efforts | 33 |
| 5.5 | Notification of Certain Matters | 35 |
| 5.6 | Adequate Assurances regarding the Buyer Assumed Agreements | 35 |
| 5.7 | Bankruptcy Court Approval | 35 |
| 5.8 | Taxes | 35 |
| 5.9 | Public Announcements | 37 |
| 5.10 | Consents; Notices | 37 |
| 5.11 | WARN Act | 38 |
| 5.12 | Directors and Officers | 38 |
| 5.13 | Cooperation with Financing | 38 |
| 5.14 | Controlled Substances | 40 |
| ARTICLE VI | CONDITIONS TO THE PURCHASE AND SALE | 40 |
| 6.1 | Conditions to Each Party's Obligation to Close | 40 |

| | | | |
|---|---|---|---|
| 6.2 | | Conditions to Obligation of Sellers to Close | 41 |
| 6.3 | | Conditions to Obligation of Buyer to Close | 41 |
| ARTICLE VII | TERMINATION | | 42 |
| 7.1 | | Termination | 42 |
| 7.2 | | Effect of Termination | 44 |
| 7.3 | | Break-Up Fee; Expense Reimbursement | 44 |
| 7.4 | | Return of Good Faith Deposit | 45 |
| ARTICLE VIII | MISCELLANEOUS | | 45 |
| 8.1 | | No Survival | 45 |
| 8.2 | | Expenses | 45 |
| 8.3 | | Counterparts; Effectiveness | 45 |
| 8.4 | | Governing Law; Jurisdiction | 45 |
| 8.5 | | Remedies | 45 |
| 8.6 | | WAIVER OF JURY TRIAL | 46 |
| 8.7 | | Notices | 46 |
| 8.8 | | Assignment; Binding Effect | 48 |
| 8.9 | | Severability | 48 |
| 8.10 | | Entire Agreement | 48 |
| 8.11 | | Amendments; Waivers | 48 |
| 8.12 | | Headings | 48 |
| 8.13 | | No Third-Party Beneficiaries | 48 |
| 8.14 | | Interpretation | 49 |
| 8.15 | | Non-Recourse | 49 |
| 8.16 | | Definitions | 49 |
| 8.17 | | Sellers Disclosure Schedule | 62 |
| 8.18 | | Limitation on Good Faith Deposit Escrow Holder's Liability | 63 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(c) | Assumed Contracts |
| Schedule 1.1(d) | Assumed Real Property Lease(s) |
| Schedule 1.1(e) | Owned Real Property |
| Schedule 1.1(f) | Products |
| Schedule 1.1(g) | Tangible Personal Property |
| Schedule 1.1(i) | Intellectual Property |
| Schedule 1.1(l) | Assumed Equipment Leases |
| Schedule 1.1(m) | Excluded Claims |
| Schedule 1.1(o) | Assumed Plans |
| Schedule 1.1(r) | Additional Purchased Assets |

Schedule 1.2(o)       Additional Excluded Assets
Schedule 1.3(b)       Accounts Payable
Schedule 1.4(e)       Excluded Accrued Liabilities
Schedule 1.4(f)       Excluded Environmental Liabilities
Schedule 1.5          Cure Costs
Schedule 2.8(h)       Share Transfer Requirements
Schedule 2.8(i)       Additional Sellers' Closing Deliverables

Sellers Disclosure Schedule
Buyer Disclosure Schedule

## **EXHIBITS**

EXHIBIT A:    Purchase Price Allocation Constraints
EXHIBIT B:    Form of Assignment and Assumption Agreement
EXHIBIT C:    Form of Bill of Sale

# ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of April 14, 2019 (the "<u>Agreement Date</u>"), is by and among Aceto Corporation, a New York corporation ("<u>Parent</u>"), Aceto Realty LLC, a New York limited liability company ("<u>Aceto Realty</u>"), and Aceto Agricultural Chemicals Corporation, a New York corporation ("<u>NY Agri</u>" and together with Parent and Aceto Realty, "<u>Sellers</u>" and each, a "<u>Seller</u>"), and NMC Atlas, L.P., a Delaware limited partnership ("<u>Buyer</u>").  Capitalized terms used in this Agreement and not otherwise defined above or in the text below have the meanings given to them in <u>Section 8.16</u>.

WHEREAS, Parent, collectively with its direct and indirect wholly-owned subsidiaries (including NY Agri), is an international company engaged in the development, marketing, sales and distribution of finished dosage form generic pharmaceuticals, nutraceutical products, pharmaceutical active ingredients, pharmaceutical intermediates, and specialty performance chemicals, including agricultural intermediates and agricultural protection products (collectively, the "<u>Business</u>");

WHEREAS, the Business is organized along product lines into three principal segments: (i) Human Health, (ii) Pharmaceutical Ingredients, and (iii) Performance Chemicals;

WHEREAS, on February 19, 2019, Sellers and Buyer entered into an Asset Purchase Agreement the "<u>Original Agreement</u>") pursuant to which Sellers agreed to sell to Buyer all of the Purchased Assets (as defined in the Original Agreement), subject to the assumption by Buyer of the Assumed Liabilities (as defined in the Original Agreement) (which Purchased Assets and Assumed Liabilities generally comprise the Chemical Plus Business), and Buyer agreed to purchase from Sellers such Purchased Assets and assume such Assumed Liabilities, in each case, upon the terms and conditions set forth in the Original Agreement;

WHEREAS, Sellers and certain of their Affiliates filed voluntary petitions for relief commencing cases (collectively, the "<u>Bankruptcy Case</u>") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), on February 19, 2019 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>") under Case No. 19-13448;

WHEREAS, Sellers and Buyer desire to amend and restate in its entirety the Original Agreement as set forth herein;

WHEREAS, the Parties intend to effectuate the transactions contemplated hereby, including the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "<u>Asset Purchase</u>"), pursuant to Section 363 and 365 of the Bankruptcy Code;

WHEREAS, Buyer is the "Successful Bidder" as such term is defined in the Bidding Procedures Order (as defined herein);

WHEREAS, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions contemplated hereby are subject, among other things, to the entry of the Sale Order pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, the Parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements specified herein.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Buyer and Sellers hereby agree to amend and restate the Original Agreement as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1     Purchased Assets.  In addition to all properties and assets of the Acquired Subsidiaries (which shall remain properties and assets of such entities upon the Closing, but which shall not constitute Purchased Assets for purposes of this Agreement), on the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase, free and clear of all Liabilities and Liens (other than Liens created by Buyer and Permitted Liens), the right, title and interest of Sellers in, to or under all of the properties and assets of Sellers used primarily in the Chemical Plus Business (other than the Excluded Assets), including the following (herein collectively called the "Purchased Assets"):

(a)     all outstanding shares of capital stock or other equity interests of the Purchased Subsidiaries (other than (i) 8,401 shares of Aceto HK that are owned by Aceto Bermuda and (ii) 70% of the outstanding equity interests of the Joint Venture, which are owned by United Phosphurus Inc.); provided, notwithstanding anything contained herein to the contrary, Buyer may, upon prior written notice to Sellers, assign the right to purchase such shares of capital stock or other equity interests to one or more wholly-owned Subsidiaries of the Buyer; provided, further, that no such assignment shall relieve Buyer of any Liability or obligation under this Agreement; provided further that, at the request of Buyer, NY Agri will transfer to Aceto Bermuda, contemporaneously with Closing, the one share of capital stock of Aceto HK owned by NY Agri;

(b)     the Accounts Receivable and Intercompany Accounts Receivable of Sellers outstanding as of the Closing Date;

(c)     to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, the Contracts listed or described on Schedule 1.1(c) as of the Assumption Deadline, as may be amended by Buyer as provided herein (the "Assumed Contracts"), and all purchase orders of the Sellers in respect of the Acquired Business that are issued in the Ordinary Course of Business and outstanding as of the Closing Date (the "Assumed Purchase Orders");

(d)     to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, the Real Property Lease(s) of Sellers, and rights thereunder, listed or described on Schedule 1.1(d) (such Real Property Lease(s), the "Assumed Real Property Lease(s)");

(e)     subject to Section 1.7, any Owned Real Property of a Seller set forth on Schedule 1.1(e);

(f)     all rights (including goodwill, if any) in and to the products set forth on Schedule 1.1(f) (the "Products") and all Product registrations and related registration information (including applications that are in the process of being prepared by a Seller or an Acquired Subsidiary for Product registrations);

(g)    the equipment, machinery, forklifts, vehicles, fixtures, furniture, furnishings, signage, leasehold improvements and other tangible personal property owned by each Seller as of the Closing Date that are (A) located on or at the Acquired Real Property and held primarily for, or used primarily in, the Acquired Business, (B) held primarily for, or used primarily in, the Acquired Business and existing as of the Closing or (C) set forth on Schedule 1.1(g);

(h)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, all Permits and pending applications therefor;

(i)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, all Intellectual Property that is owned or licensed by each Seller (A) held primarily for, or used primarily in, the Acquired Business and existing as of the Closing or (B) set forth on Schedule 1.1(i);

(j)    all Books and Records related primarily to the Acquired Business, except those: (i) relating primarily to any Excluded Asset or Excluded Liability; (ii) relating primarily to employees of a Seller or any Purchased Subsidiary who are not Transferred Employees; or (iii) that a Seller or any Purchased Subsidiary is not permitted to transfer under applicable Law;

(k)    all telephone and facsimile numbers, email and web addresses, social media accounts and other directory listings used primarily in connection with the Acquired Business, to the extent assignable;

(l)    to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, the equipment leases listed or described on Schedule 1.1(l) (the "Assumed Equipment Leases" and together with the Assumed Contracts and Assumed Real Property Lease(s), the "Buyer Assumed Agreements");

(m)    other than as set forth on Schedule 1.1(m), any rights, claims, credits, refunds, causes of action, choses in action, rights of recovery and rights of setoff of each Seller against third parties arising out of, or primarily related to, the Purchased Assets or the Acquired Business, including any rights in connection with product returns, rebates, credits and related claims and any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to each Seller primarily related to the Purchased Assets or the Acquired Business;

(n)    all rights of each Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with the Transferred Employees or any employees of each Seller terminated within two (2) years prior to the Closing Date, or with any agents of each Seller or with third parties, in each case, related primarily to the Acquired Business;

(o)    (1) the Seller Benefit Plans listed on Schedule 1.1(o)(1), solely to the extent such pertains to a Transferred Employee and (2) the Seller Benefit Plans listed on Schedule 1.1(o)(2), whether or not pertaining to a Transferred Employee (collectively, the "Assumed Plans"), and any trusts, assets, reserves, credits and service agreements, but only to the extent of the Transferred Employees, and all documents created, filed or maintained in connection with the Assumed Plans to the extent transferable in accordance with the existing terms and conditions of such Assumed Plans, any applicable insurance policies related to the Assumed Plans and Bankruptcy Court approval;

(p)    all Purchased Deposits;

3

(q)        all Inventory held by each Seller primarily for use in the Acquired Business as of the Closing Date;

(r)        the additional assets listed on Schedule 1.1(r);

(s)        all rights under insurance policies of the Sellers to the extent relating to any Assumed Liability;

(t)        all goodwill as of the Closing Date that is associated with the Acquired Business not expressly referenced in Sections 1.1(a) through 1.1(s); and

(u)        all avoidance actions (including any proceeds thereof), including all claims and causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law, but only to the extent such actions are against the following parties (collectively, the "Designated Parties"): (i) any of the Sellers' vendors, suppliers, customers, or trade creditors in regards or related to the Purchased Assets or Acquired Business and (ii) any counterparties to any Buyer Assumed Agreements (collectively, the "Purchased Avoidance Actions"); provided, that it is understood and agreed by the parties that the Buyer will not assert or pursue any Purchased Avoidance Actions against any of the Designated Parties other than as a defense, offset, or counterclaim against any claim or cause of action raised or asserted by such Designated Party.

Buyer shall have the right at any time prior to 5:00 p.m. prevailing Eastern Time on the day that is one (1) day prior to the Auction to amend Schedule 1.1(c) in accordance with the Bidding Procedures and Bidding Procedures Order so as to exclude any Contract from being an Assumed Contract. A schedule of Assumed Contracts and any Cure Costs relating thereto (to the extent such Assumed Contracts have not already been included on one or more notices of potential assumption and assignment of executory contracts and unexpired leases filed by Sellers with the Bankruptcy Court) shall be filed by Sellers with the Bankruptcy Court and served on the counterparties to the Assumed Contracts in accordance with the Bidding Procedures Order.  Notwithstanding anything to the contrary, in connection with any change to Schedule 1.1(c) described in the preceding sentence, (i) any Purchased Assets exclusively related  to any Contract that is excluded shall become an Excluded Asset to the extent applicable in accordance with Section 1.2, (ii) Sellers shall be permitted to update the Sellers Disclosure Schedule as necessary to correct or complete any such disclosure contained therein, (iii) Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to remove any Contract listed on Schedule 1.1(c), and (iv) the Cure Cost shall be adjusted, as applicable.

1.2        Excluded Assets.    Notwithstanding the provisions of Section 1.1, nothing herein contained shall be deemed to sell, transfer, assign or convey to Buyer (i) the assets of the Excluded Subsidiaries or (ii) the Excluded Assets. The Excluded Subsidiaries shall retain all right, title and interest to, in and under the assets of the Excluded Subsidiaries, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" shall mean the following assets of each Seller:

(a)        all shares of capital stock or other equity interest of each Seller and the Excluded Subsidiaries or any securities convertible into, exchangeable, or exercisable for shares of capital stock or other equity interest of Sellers or any of the Excluded Subsidiaries;

(b)        all Cash of Sellers;

(c)        any Contracts other than Buyer Assumed Agreements;

(d)      any lease of Leased Real Property, and rights thereunder, that is not a Buyer Assumed Agreement (the "Excluded Real Property Leases");

(e)      any equipment leases other than Assumed Equipment Leases (the "Excluded Equipment Leases");

(f)      all minute books, stock ledgers, corporate seals and stock certificates of each Seller and other similar Books and Records (1) that are primarily related to any Excluded Assets or Excluded Liabilities, or (2) which a Seller or any of the Excluded Subsidiaries is required by Law or determines are necessary or advisable to retain, including all Tax Returns and related workpapers (other than Tax Returns and related workpapers of the Acquired Subsidiaries), financial statements and corporate or other entity filings (but copies of such Books and Records identified in this clause (f) shall be retained by Sellers and made available to Buyer upon Buyer's reasonable request and at Buyer's expense);

(g)      all Seller Benefit Plans, except the Assumed Plans, and trusts or other assets attributable thereto (except to the extent provided by Section 5.3(f)), including any assets, reserves, credits and service agreements, and all documents created, filed or maintained in connection with such Seller Benefit Plans and any applicable insurance policies related to such Seller Benefit Plans;

(h)      any rights, claims or causes of action of each Seller under this Agreement or the Ancillary Documents and as set forth on Schedule 1.1(m);

(i)      all receivables, claims or causes of action related primarily to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Seller or any of the Excluded Subsidiaries in respect of an Excluded Asset or Excluded Liability;

(j)      all refunds, credits and rebates of Taxes;

(k)      all rights under insurance policies relating to claims for losses pending as of the Closing Date except to the extent such losses are an Assumed Liability;

(l)      all Intellectual Property owned or licensed by Sellers that is neither: (i) held primarily for, nor (ii) used primarily in, the Acquired Business, with respect to subclauses (i) and (ii) other than as set forth on Schedule 1.1(i);

(m)      all post-petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to a Seller on a prepetition or post-petition basis;

(n)      all derivative financial instruments, including, except to the extent assigned pursuant to Section 1.1(r), future foreign currency contracts;

(o)      all other assets set forth on Schedule 1.2(o);

(p)      any and all accounts receivable owed to any Seller from any other Seller or any Affiliate of a Seller (other than an Acquired Subsidiary); and

(q)      all avoidance actions (including any proceeds thereof), including all claims or causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law, other than the Purchased Avoidance Actions.

For the avoidance of doubt, no goodwill or other intangible assets not expressly set forth in this <u>Section 1.2</u> shall constitute "Excluded Assets."

1.3     <u>Assumed Liabilities</u>. In addition to the Liabilities of the Acquired Subsidiaries (which shall remain Liabilities of such entities upon the Closing, but which shall not constitute Assumed Liabilities for purposes of this Agreement), upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall assume and agree to pay, perform and discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof), only the following Liabilities (without duplication) (collectively the "<u>Assumed Liabilities</u>") and no others:

(a)     any and all Liabilities of each Seller arising under the Buyer Assumed Agreements and the Assumed Purchase Orders;

(b)     (i) the obligation to pay the amounts owed (and no other Liabilities) for goods or services received by each Seller in the Ordinary Course of Business in respect of any trade and vendor accounts payable due as of, or after, the Petition Date, including the amounts set forth on <u>Schedule 1.3(b)</u>, but only to the extent incurred in connection with the Acquired Business, and excluding any amounts owed to professionals retained by an order of the Bankruptcy Court under Section 327, 328, 1102 or 1103 of the Bankruptcy Code (such payables, the "<u>Accounts Payable</u>") and (ii) any accounts payable from any Seller to any Acquired Subsidiary outstanding as of the Closing Date;

(c)     all Accrued Liabilities;

(d)     any and all Liabilities arising under any Assumed Plan, if any (to the extent transferable in accordance with the existing terms and conditions of the applicable Assumed Plan);

(e)     other than as set forth on <u>Schedule 1.4(f)</u>, any Liability directly related to the Acquired Business arising under Environmental Laws attributable to or incurred as a result of any acts, omissions, or conditions first occurring after the Closing, including any Liability with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Regulated Substances at any location and compliance with any Environmental Laws, in each case first occurring after the Closing, relating to the foregoing;

(f)     all Liabilities arising out of the conduct of the Acquired Business, ownership of the Purchased Assets, or associated with the Transferred Employees on or after the Closing Date;

(g)     all Taxes arising out of the conduct of the Acquired Business, ownership of the Purchased Assets or associated with the Transferred Employees, in each case, attributable to periods (or portions thereof) beginning after the Closing Date; and

(h)     all Liabilities under the WARN Act arising as a result of a failure of Buyer to comply with <u>Section 5.11</u>.

1.4     <u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of any Seller, and each Seller shall be solely and exclusively liable with respect to all Liabilities of such Seller, other than the Assumed Liabilities (collectively, the "<u>Excluded Liabilities</u>"). For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, the Excluded Liabilities with respect to each Seller include (i) any claims under Sections 503 and 507 of the Bankruptcy Code and (ii) the following:

(a)    any Liability of such Seller, arising out of, or relating to, this Agreement or the transactions contemplated hereby, whether incurred prior to, at or subsequent to the Closing Date, including all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of such Seller, but excluding (x) any Liabilities of such Seller arising from or otherwise attributable to a breach of the covenant in <u>Section 5.8(a)</u>, and (y) any Transfer Taxes as provided in <u>Section 5.8(b)</u>;

(b)    any Liability incurred by either Seller's respective directors, officers, managers, stockholders, members, partners, agents or employees (acting in such capacities);

(c)    any Liability of such Seller to any Person on account of any Proceeding to the extent relating to facts, circumstances or events that existed or occurred before the Closing;

(d)    any Liability to the extent relating to, resulting from, or arising out of the ownership or operation of an Excluded Asset;

(e)    the accrued Liabilities of such Seller set forth on <u>Schedule 1.4(e)</u>; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary set forth in this Agreement, in no event shall any Accrued Liability constitute an Excluded Liability;

(f)    any Liability arising out of or incurred as a result of any actual or alleged violation by any Seller of any Law prior to the Closing, or related to the Acquired Business that arises under or relates to a violation of or obligation under Environmental Laws with respect to acts, omissions or conditions occurring on or prior to the Closing, including any Liability of any Seller or related to the Acquired Business with respect to the release, handling, discharge, treatment, storage, generation, disposal or presence of Regulated Substances occurring on or prior to the Closing at any location,, including as set forth on <u>Schedule 1.4(f)</u>;

(g)    all checks and drafts that have been written or submitted by such Seller prior to the close of business on the Closing Date but have not yet cleared;

(h)    other than as explicitly included in Assumed Liabilities, any Liability of such Seller for any Indebtedness, including Indebtedness under the Credit Facility, any Indebtedness owed to any stockholder or other Affiliate of any such Seller, and any Contract evidencing any such financing arrangement;

(i)    all Liabilities under the WARN Act to the extent resulting from an employment loss or layoff (as defined in the WARN Act) initiated by Seller or any of its Affiliates or the purchaser of the Pharma Business;

(j)    all Liabilities in respect of any employee or other service provider of Seller or any of its Affiliates who does not become a Transferred Employee (whether arising prior to, on or after the Closing Date), and all Liabilities (other than any Assumed Liability) in respect of any Transferred Employee arising prior to the Closing Date;

(k)    other than (x) Tax Liabilities included in clauses (ii) or (vii) of the definition of Accrued Liabilities, and (y) Transfer Taxes for which Buyer is responsible pursuant to <u>Section 5.8(b)</u>, (i) all Liabilities for Taxes of such Seller or its Affiliates (other than the Acquired Subsidiaries) for any taxable period, and (ii) Liabilities for Taxes relating to the Acquired Business or the Purchased Assets attributable under the principles of <u>Section 5.8(c)</u> to periods (or portions thereof) ending on or prior to the Closing Date, except for any Taxes of an Acquired Subsidiary, in each case;

7

(l)      any and all accounts payable owed by any Seller to any other Seller or any Affiliate of a Seller (other than an Acquired Subsidiary); and

(m)      other than as specifically set forth herein, fees or expenses of such Seller incurred with respect to the transactions contemplated by this Agreement.

1.5      Assignments; Cure Amounts.

(a)      Notwithstanding anything to the contrary contained herein, Buyer reserves the right, in consultation with Sellers, to amend or supplement, at any time prior 5:00 p.m. prevailing Eastern Time on the day that is one (1) day prior to the Auction (the "Assumption Deadline"), Schedule 1.1(c) to add any contracts, so long as any such contract to be added to Schedule 1.1(c) (x) is not to be assumed or available to be assumed pursuant to any other sale or transaction previously approved by the Bankruptcy Court in connection with the Bankruptcy Case, and (y) is added to such schedule(s) prior to the entry of any Order of the Bankruptcy Court approving the rejection of such contract or lease, and subject to the party to such contract or lease receiving information evidencing Buyer's adequate assurance of future performance and having an opportunity to object within seven (7) days or such other period of time set forth in an Order of the Bankruptcy Court of the receipt of such information to the assignment of such contract or lease on the ground that Buyer has not demonstrated adequate assurance of future performance of such contract or lease pursuant to Section 365 of the Bankruptcy Code.  Any contract added to Schedule 1.1(c) (to the extent consistent with the prior sentence) shall be deemed an Assumed Contract. Each Seller shall transfer and assign all Buyer Assumed Agreements (that such Seller is a party thereto and to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code) to Buyer, and Buyer shall assume all Buyer Assumed Agreements from a Seller that is a party thereto, as of the Assumption Deadline pursuant to Section 365 of the Bankruptcy Code and the Sale Order.  In connection with and as a prerequisite to such assignment and assumption, Buyer shall pay in full all costs (as determined by such Seller that is party thereto based on the Books and Records of such Seller or as otherwise determined by the Bankruptcy Court) to cure all defaults under such Buyer Assumed Agreements to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "Cure Costs") and Sellers shall have no Liability therefore.  The Cure Costs for each Buyer Assumed Agreement are set forth opposite the name of each Buyer Assumed Agreement set forth on Schedule 1.5, but for the avoidance of doubt, to the extent that the Cure Costs for any Buyer Assumed Agreement are determined by the Bankruptcy Court to be higher than the amounts listed on Schedule 1.5, Buyer shall be fully responsible to pay such higher Cure Costs.

(b)      The Sale Order shall provide that as of the Closing, each Seller shall assign to Buyer the Buyer Assumed Agreements to which it is a party, with each Buyer Assumed Agreement identified by its name and date (if available), the other party to such Buyer Assumed Agreement and the address of such party for notice purposes, all included on one or more exhibit(s) attached to either the motion filed in connection with the Sale Order or one or more motion(s) or notice(s) regarding such Seller's intention to have such Buyer Assumed Agreement assumed by, and assigned to, Buyer.  Such exhibit(s) shall also (i) set forth the Cure Costs (if any) necessary to cure any defaults under each Buyer Assumed Agreement and (ii) delineate a procedure for transferring to Buyer the rights to any Purchased Deposits in the form of cash or letters of credit on deposit with the other party to any Assumed Real Property Lease.

(c)      In the case of licenses, certificates, approvals, authorizations, leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, at Buyer's sole cost and expense, paid in advance, subject to any approval of the Bankruptcy Court that may be required and the

terms set forth in Section 5.4, cooperate with Buyer in endeavoring to obtain such consent (or restructure the acquisition of the underlying asset and unwind any associated agreements to enable the acquisition thereof) and this Agreement shall not operate as an assignment thereof in violation of any such license, certificate, approval, authorization, Real Property Lease, Contract or other commitment.  For the avoidance of doubt, Sellers shall not be obligated to pay any consideration to any third party from whom consent or approval is requested or otherwise incur any out-of-pocket costs or expenses, or to initiate any litigation or Proceedings to obtain any such consent or approval.

1.6    Further Assurances.

(a)    At the Closing, and at all times thereafter as may be necessary, Sellers and Buyer shall, at Buyer's sole cost and expense, execute and deliver such other instruments of transfer as shall be reasonably necessary to vest in Buyer title to the Purchased Assets free and clear of all Liens (other than Permitted Liens), and such other instruments as shall be reasonably necessary to evidence the assignment by Sellers and the assumption by Buyer or its designee of the Assumed Liabilities, including the Buyer Assumed Agreements. Each of Sellers, on the one hand, and Buyer, on the other hand, shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated by this Agreement; provided, however, that Sellers' compliance with its obligations under this Section 1.6 shall, in each case, be conditioned upon Buyer's advancement of any expenses to be incurred by Sellers in connection therewith.  At the Closing, and at all times thereafter as may be necessary, Buyer shall cooperate with Sellers, at Parent's request, to facilitate the procurement, possession and return to Sellers of any Excluded Assets, including any equipment subject to any lease which does not constitute an Assumed Equipment Lease.

(b)    At the Closing, and at all times thereafter as may be necessary, Sellers shall, at the reasonable request and expense of Buyer, execute, deliver, and file, or cause to be executed, delivered, and filed, such other instruments of conveyance and transfer and take such other actions as Buyer may reasonably request, in order to more effectively consummate the transactions contemplated hereby and to vest in Buyer good and marketable title to the Intellectual Property included in the Purchased Assets, including executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the prior chain of title with respect to ownership of the Intellectual Property included in the Purchased Assets.

1.7    PILOT Program.  Aceto Realty shall use its commercially reasonable efforts to, prior to Closing, exercise its option to terminate the arrangements set forth on Schedule 1.7 and repurchase the real property to which such arrangements relate (the "Port Washington Property" and, such exercise of such option and repurchase of the Port Washington Property, the "PILOT Unwind"), in which case, Aceto Realty shall sell, convey, transfer, deliver and assign all of its right, title and interest in and to the Port Washington Property to Buyer at the Closing and such real property shall constitute "Owned Real Property" for all purposes of this Agreement.  If Aceto Realty is unable to complete the PILOT Unwind prior to the Closing: (a) Aceto Realty shall retain, and not assign to Buyer, the lease(s) and other arrangements set forth on Schedule 1.7, (b) Aceto Realty shall cooperate with Buyer, at Buyer's sole expense, in any lawful and reasonable arrangement reasonably proposed by Buyer under which Buyer shall use the Port Washington Property and otherwise obtain the economic claims, rights and benefits thereunder (including subcontracting, sublicensing or subleasing), and (c) Aceto Realty shall complete the PILOT Unwind as soon as practicable after the Closing, and upon such completion sell, convey, transfer, deliver and assign all of its right, title and interest in and to the Port Washington Property to Buyer.  Prior to the Closing, Aceto Realty shall use its commercially reasonable efforts to cooperate with Buyer, at Buyer's sole expense, in connection with any lawful and reasonable alternative to the PILOT Unwind requested by Buyer for transferring to Buyer at Closing either the Port Washington Property or the arrangements set forth on Schedule 1.7. For the avoidance of doubt, provided that Aceto Realty has

complied with its obligations set forth in this Section 1.7, neither completion of the PILOT Unwind, nor completion of any alternatives thereto requested by Buyer, shall be a condition to Closing.

1.8    <u>Bulk Sales Laws</u>.  Buyer hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Law of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.  Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any and all Liens and Liabilities in the Purchased Assets (other than Permitted Liens), including any Liens or claims arising out of any bulk-transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

# ARTICLE II
# PURCHASE PRICE

2.1    <u>Purchase Price</u>.  The aggregate consideration for the Purchased Assets (the "<u>Base Purchase Price</u>") shall be the sum of the following:

(a)    the Good Faith Deposit; <u>plus</u>

(b)    (i) cash in the amount of three hundred thirty-two million four hundred forty thousand dollars ($332,440,000), <u>plus</u> (ii) the amount, if any, by which Net Current Assets exceeds one hundred twelve million four hundred nine thousand seven hundred eighty-eight dollars ($112,409,788), <u>minus</u> (iii) the amount, if any, by which Net Current Assets are less than one hundred twelve million four hundred nine thousand seven hundred eighty-eight dollars ($112,409,788), minus (iv) Net Debt (such amount, as adjusted pursuant to <u>Section 2.4</u> below, the "<u>Cash Balance</u>"); <u>plus</u>

(c)    the Cure Costs; <u>plus</u>

(d)    if the Closing occurs on or after April 30, 2019, for any reason other than an adjournment of the Sale Hearing, at the initial request of the Sellers (and not at the initial request of the Bankruptcy Court, the U.S. Trustee or any other party in interest), to a date that is after April 26, 2019, the Prepetition Credit Agreement Penalty (if any); <u>plus</u>

(e)    the assumption by Buyer of the Assumed Liabilities.

2.2    <u>Closing Date Payment</u>.  At the Closing, Buyer shall satisfy the Base Purchase Price as follows:

(a)    Buyer shall deliver the Estimated Cash Balance <u>less</u> the Adjustment Escrow Amount, via wire transfer of immediately available funds into the account(s) designated in writing by Parent;

(b)    Buyer shall deposit an amount equal to ten  million dollars ($10,000,000) (the "<u>Adjustment Escrow Amount</u>") via wire transfer of immediately available funds into an escrow account (the "<u>Adjustment Escrow</u>") with Citibank, N.A. or such other financial institution as shall be satisfactory to Parent and Buyer (the "<u>Escrow Agent</u>"), to be held and disbursed by the Escrow Agent in accordance with the terms and conditions of this Agreement and an escrow agreement (the "<u>Escrow Agreement</u>") with the Escrow Agent, such escrow agreement to be mutually acceptable to the Parties. The fees and expenses of the Escrow Agent shall be borne and paid by Buyer;

(c)        Buyer shall pay directly to the obligees identified on <u>Schedule 1.5</u> the Cure Costs;

(d)        If determined to be payable in accordance with <u>Section 2.1(d)</u>, Buyer shall pay to Parent an amount in cash equal to the Prepetition Credit Agreement Penalty via wire transfer of immediately available funds into the account(s) designated in writing by Parent; and

(e)        Buyer shall assume the Assumed Liabilities; <u>provided</u>, <u>however</u>, that to the extent any such Assumed Liabilities are able to be satisfied at Closing, without preventing the transfer of the Purchased Assets or the assumption of the Assumed Liabilities, Buyer shall satisfy such Assumed Liabilities either at Closing or, in Buyer's sole discretion, in the ordinary course of business.

2.3    <u>Good Faith Deposit</u>.    Buyer has deposited into an escrow account (the "<u>Good Faith Deposit Escrow</u>") at Bank of America maintained by Lowenstein Sandler LLP, counsel to Sellers (the "<u>Good Faith Deposit Escrow Holder</u>"), an amount equal to thirty-three million eight hundred thousand dollars $33,800,000 (the "<u>Good Faith Deposit</u>") in immediately available funds. The Good Faith Deposit has been funded by Buyer pursuant to the Bidding Procedures.    Following the execution of this Agreement by the Parties, other than upon termination of this Agreement by Sellers pursuant to <u>Section 7.1(d)</u> or <u>Section 7.1(k)</u>, in which case, the Good Faith Deposit shall be nonrefundable and paid to Sellers pursuant to the terms of this <u>Section 2.3</u>, the Good Faith Deposit shall be refunded to Buyer upon the termination of this Agreement for any reason. At the Closing, the Good Faith Deposit (and any interest or income accrued thereon) shall be paid over to Sellers by the Good Faith Deposit Escrow Holder and, upon such payment, the Good Faith Deposit shall be credited and applied toward payment of the Purchase Price (but shall not reduce the amount of the Cash Balance). In the event the Good Faith Deposit is finally determined by the Bankruptcy Court to have become nonrefundable as provided herein before the Closing by reason of Sellers terminating this Agreement pursuant to <u>Section 7.1(d)</u> or <u>Section 7.1(k)</u>, the Good Faith Deposit Escrow Holder shall immediately disburse the Good Faith Deposit and all interest or income accrued thereon to Sellers to be retained by Sellers for their own account. Sellers' retention of the Good Faith Deposit pursuant to the preceding sentence shall constitute liquidated damages and shall be the exclusive damages available to the Sellers in the event of any termination by Sellers pursuant to <u>Section 7.1(d)</u> (except in the case of a Willful Breach of this Agreement by Buyer, in which case Sellers' retention of the Good Faith Deposit shall be in addition to any other remedies the Sellers may have under <u>Section 8.5</u>) or <u>Section 7.1(k)</u>.    If this Agreement terminates in accordance with the termination provisions hereof for any reason other than by Sellers pursuant to <u>Section 7.1(d)</u> or <u>Section 7.1(k)</u>, Sellers shall cause the Good Faith Deposit Escrow Holder to return to Buyer, without prejudice to Buyer's right to receive the Break-Up Fee and Expense Reimbursement, if any, when payable in accordance with <u>Section 7.3(a)</u>, the Good Faith Deposit (together with all income or interest accrued thereon), within three (3) Business Days after this Agreement is so terminated. The Parties hereto agree that, prior to the earliest of (i) application of the Good Faith Deposit against the payment of the Purchase Price, (ii) the Good Faith Deposit becoming nonrefundable as provided herein before the Closing by reason of Sellers terminating this Agreement pursuant to <u>Section 7.1(d)</u> or <u>Section 7.1(k)</u> or (iii) the return of the Good Faith Deposit to Buyer under the provisions of this <u>Section 2.3</u>, the Good Faith Deposit shall be treated for federal, and applicable state and local, income Tax purposes as owned by Buyer.

2.4    <u>Adjustment to Base Purchase Price</u>.

(a)        Not later than three (3) Business Days prior to the Closing, Parent shall deliver to Buyer a statement setting forth Parent's good faith and reasonably detailed estimate of Net Current Assets (the "<u>Estimated Net Current Assets</u>"), Net Debt ("<u>Estimated Net Debt</u>"), and the Cash Balance based thereon (the "<u>Estimated Cash Balance</u>").

(b)      Not later than forty-five (45) days following the Closing, Buyer shall deliver to Parent a statement (the "Closing Statement") setting forth Buyer's good faith and reasonably detailed calculation of Net Current Assets, Net Debt and the Cash Balance based thereon.  If the Cash Balance, as finally determined by this Section 2.4, is less than the Estimated Cash Balance, the Base Purchase Price shall be adjusted downward by the absolute value of such difference (the "Shortfall").  If the Cash Balance, as finally determined by this Section 2.4, is greater than the Estimated Cash Balance, the Base Purchase Price shall be adjusted upward by the absolute value of such difference (the "Surplus").

(c)      The Adjustment Escrow Amount shall be payable in accordance with the Closing Statement and Section 2.4(d) no later than forty-five (45) days after receipt by Parent of the Closing Statement (and Sellers and Buyer shall instruct the Escrow Agent accordingly) unless and to the extent Parent delivers a notice of disagreement in accordance with the following sentence, setting forth the basis for such disagreement and Parent's calculation of Net Current Assets, Net Debt and the Cash Balance based thereon.  During the forty five (45) day period referred to above, Buyer shall and shall cause the Acquired Subsidiaries to provide Parent and its representatives reasonable access to the relevant books, records, facilities and employees of the Acquired Business and the Acquired Subsidiaries to evaluate the calculation of Net Current Assets, Net Debt and the Cash Balance based thereon.  In the event of any such disagreement, Parent shall so notify Buyer in writing prior to the end of the forty five (45) day period referred to above, and the Parties shall use their commercially reasonable efforts to resolve such disagreement. If the Parties are unable to resolve their disagreement through such consultation, the Parties shall refer the disagreement to the Accounting Firm to review promptly the Closing Statement and the disputed items or amounts. Promptly, but no later than twenty (20) days after acceptance of its appointment, the Accounting Firm shall determine (it being understood that in making such determination, the Accounting Firm shall be functioning as an expert and not as an arbitrator), based solely on written submissions by Buyer and Parent, and not by independent review, only those issues in dispute and shall render a written report as to the resolution of those issues in dispute and the resulting computation of Net Current Assets, Net Debt and the Cash Balance based thereon, as the case may be, which shall be conclusive and binding on the Parties.  In resolving any disputed item, the Accounting Firm (x) shall be bound by the provisions of this Section 2.4 and (y) may not assign a value to any item greater than the greatest value for such items claimed by either Party or less than the smallest value for such items claimed by either Party or include in its computation any item not included in the computation provided by either Party.  The Party (either Buyer, on the one hand, or Parent on behalf of Sellers, on the other hand) whose determination of the amount of the adjusted Cash Balance was farthest from the final determination of the adjusted Cash Balance by the Accounting Firm shall bear the fees and expenses of the Accounting Firm plus any out-of-pocket expenses (including attorneys' and accountants' fees) of the Party whose determination of the adjusted Cash Balance was closest to the final determination by the Accounting Firm.  If the determination of the adjusted Cash Balance by the Accounting Firm is equidistant between the determinations of the parties, the fees of the Accounting Firm shall be borne equally by Buyer, on the one hand, and Sellers, on the other hand, and each of Buyer, on the one hand, and Sellers, on the other hand, shall bear the cost of their own out-of-pocket expenses.

(d)      Any Shortfall shall be paid to Buyer and satisfied solely from the Adjustment Escrow Amount and the remainder, if any, of the Adjustment Escrow Amount shall be promptly paid over to Sellers by wire transfer of immediately available funds into the account(s) designated in writing by Parent (and Sellers and Buyer shall instruct the Escrow Agent accordingly promptly upon final resolution of such Shortfall in accordance with Section 2.4(c)).  Sellers shall have no liability for a Shortfall in excess of the Adjustment Escrow Amount.  Any Surplus shall be satisfied by payment of the amount of the Surplus to Sellers from Buyer via wire transfer of immediately available funds to the account(s) designated in writing by Parent (and, in such case, the full Adjustment Escrow Amount shall be promptly paid over to Sellers by wire transfer of immediately available funds into the account(s) designated in writing by Parent, and Sellers and Buyer shall instruct the Escrow Agent accordingly

promptly upon final resolution of such Surplus in accordance with Section 2.4(c)).  Buyer shall have no liability for a Surplus in excess of the Adjustment Escrow Amount.

(e)      The Base Purchase Price less the Shortfall, if any, or plus the Surplus, if any, shall be the "Purchase Price".

2.5      Allocation of Purchase Price.  Within one hundred and twenty (120) calendar days after the Closing Date, Parent shall deliver to Buyer an allocation of the Purchase Price (and all other capitalized costs) as determined for tax purposes, among the Purchased Assets.  Such allocation shall be made pursuant to Code Section 1060 and the Treasury Regulations thereunder (and any similar provision of state, local or non-U.S. Law, as appropriate).  If, within thirty (30) calendar days of Buyer's receipt of Parent's proposed allocation, Buyer does not deliver to Parent written notice (a "Buyer Allocation Objection Notice") of any objections that it has to such allocation, Parent's proposed allocation shall be final.  If Buyer timely delivers to Parent a Buyer Allocation Objection Notice, then Parent and Buyer shall work together in good faith to resolve the disputed items.  If Parent and Buyer are unable to resolve all of the disputed items within thirty (30) calendar days of Parent's receipt of the Buyer Allocation Objection Notice (or such later date as Parent and Buyer may agree), then Parent and Buyer shall refer the disputed items for resolution, consistent with the side constraints set forth in Exhibit A, to the Accounting Firm in accordance with procedures analogous to those set forth in Section 2.4(c).  Notwithstanding anything in this Section 2.5 to the contrary, in no event will the allocation finalized pursuant to this Section 2.5 include any allocations contrary to the restrictions set forth in Exhibit A.  Sellers and Buyer agree that the allocation determined under this Section 2.5 shall be binding on all Parties, and that Sellers and Buyer will (and Buyer will cause the Acquired Subsidiaries to) report, act and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with such allocation, except to the extent inconsistent with applicable Law.  Neither Sellers nor Buyer shall (and Buyer will not permit an Acquired Subsidiary to) take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable Law.

2.6      Closing Date.  Upon the terms and conditions set forth in this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, at 10:00 a.m. local time on the third Business Day following the day on which the last of the conditions set forth in ARTICLE VI are satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions in accordance with this Agreement), or at such other place or time as Buyer and Sellers may agree in writing; provided, however, that without the prior written consent of Parent, the Closing shall not occur earlier than the earlier of (i) the date of the consummation of the sale of the Pharma Business pursuant to Section 363 of the Bankruptcy Code (provided, however, that Sellers shall keep Buyer reasonably informed of the progress of such sale and the anticipated consummation date thereof) and (ii) July 1, 2019; provided, further, however, that if all of the conditions set forth in ARTICLE VI are satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions in accordance with this Agreement) on or before 5:00 p.m. Eastern Time on April 28, 2019, the Closing shall take place no later than April 29, 2019. Notwithstanding anything to the contrary herein, the Closing shall not take place prior to April 26, 2019 without the consent of Buyer (in its sole discretion).  The date on which the Closing actually occurs is referred to as the "Closing Date."

2.7      Deliveries of Buyer.  At or prior to the Closing, Buyer shall:

(a)      satisfy the Base Purchase Price in accordance with Section 2.2; and

(b)      deliver to Sellers:

13

(i)     the Assignment and Assumption Agreement, the Assignment and Assumption of Leases, the Escrow Agreement and each other Ancillary Document to which the Buyer is a party, each dated as of the Closing Date and duly executed by Buyer (and in the case of the Escrow Agreement, duly executed by the Escrow Agent);

(ii)    a copy of resolutions of the governing body of the Buyer approving and authorizing the Asset Purchase;

(iii)   the officer's certificate required to be delivered pursuant to Section 6.2(c); and

(iv)    such resale certificates for sales tax purposes as are reasonably requested by a Seller.

2.8    Deliveries of Sellers.   At or prior to the Closing, Sellers shall deliver to Buyer the following:

(a)    the Bill of Sale, the Assignment and Assumption Agreement, the Escrow Agreement and each other Ancillary Document to which a Seller is a party, dated as of the Closing Date and duly executed by such Seller (and in the case of the Escrow Agreement, duly executed by the Escrow Agent);

(b)    instruments of assignment of the Registered Intellectual Property (the "Assignment of Intellectual Property") that are owned by a Seller and included in the Purchased Assets, if any, dated as of the Closing Date, duly executed by such Seller, in form for recordation with the appropriate Governmental Entities, in form reasonably acceptable to the Parties;

(c)    a copy of the final Sale Order;

(d)    the officer's certificates required to be delivered pursuant to Section 6.3(c);

(e)    (i) with respect to each Seller that is not a disregarded entity (as defined for purposes of Treasury Regulations Section 1.1445-2(b)(2)(iii)), a statement from such Seller, dated as of the Closing Date prepared in accordance with Treasury Regulations Section 1.1445-2(b)(2) and Section 1446(f) of the Code certifying such Seller's non-foreign status for purposes of Section 1445 and 1446(f)(2) of the Code; and (ii) with respect to each Seller that is a disregarded entity (as defined for purposes of Treasury Regulations Section 1.1445-2(b)(2)(iii)), a statement from the Person treated for federal income Tax purposes as the owner of such Seller, dated as of the Closing Date and in form reasonably satisfactory to Buyer, certifying (A) such Seller's status as a disregarded entity (as defined for purposes of Treasury Regulations Section 1.1445-2(b)(2)(iii)) whose separate existence from such Person is disregarded and (B) such Person's non-foreign status for purposes of Section 1445 and 1446(f)(2) of the Code;

(f)    instruments of assignment and assumption of the Assumed Real Property Lease(s), dated as of the Closing Date, in form reasonably acceptable to the Parties (the "Assignment and Assumption of Leases"), duly executed by the applicable Seller, in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments necessary for the conveyance of any Assumed Real Property Lease;

(g)    a copy of resolutions of the governing body of each Seller approving and authorizing the Asset Purchase;

(h)    share certificates (or an affidavit of lost or stolen share certificate, in form and substance acceptable to the Parties), with stock powers duly endorsed in blank, or other evidence of Sellers' or each Purchased Subsidiaries' ownership interest, if any, in each of the Acquired Subsidiaries and such other documents, if any, that may be required to effectively deliver title thereto under applicable non-U.S. Law as set forth on Schedule 2.8(h);

(i)    such other bills of sale, deeds, endorsements, assignments and instruments of conveyance and transfer listed on Schedule 2.8(i), dated as of the Closing Date and in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all of the Purchased Assets; and

(j)    one or more powers of attorney or other authorization letters, notices or filings as required by applicable Law in form and substance reasonably satisfactory to Sellers and Buyer (the "Powers of Attorney") reasonably necessary to permit Buyer and/or its Subsidiaries to utilize Sellers' DEA, FDA, EPA, FIFRA and state controlled substance registrations, licenses and/or permits and any other registrations, licenses and/or permits issued by a Governmental Entity that the Sellers and Buyer reasonably agree require Powers of Attorney (collectively, the "Registrations") after the Closing until the Buyer or one of its Subsidiaries, as applicable, has obtained its own Registrations. The Powers of Attorney shall authorize the appropriate personnel of Buyer or its Subsidiaries to take reasonable actions under the Sellers' Registrations including, but not limited to, as applicable, (a) placing and filling orders for controlled substances as well as importing and exporting controlled substances and DEA listed chemicals in accordance with applicable regulations and recordkeeping and reporting requirements, (b) producing and distributing pesticide products (including all products licensed by Sellers for sale as supplemental distributor products) under the existing state and federal pesticide registrations at the contract production facilities used by Sellers, using existing commercial labels, until the EPA or other applicable Governmental Entity approves the transfers of the Registrations to Buyer or Buyer's applicable Subsidiary and (c) maintaining and renewing the existing Registrations.  The Powers of Attorney shall not be revocable until Buyer or an applicable Subsidiary of Buyer has obtained its own Registrations ("Buyer Registrations") provided that Buyer is in compliance with the terms and conditions of the Powers of Attorney during the term of the Powers of Attorney and has used its commercially reasonable efforts to obtain such Buyer Registrations as promptly as possible at Buyer's expense.

2.9    Withholding Rights.  Buyer, the Escrow Agent, the Acquired Subsidiaries and any agent or affiliate thereof shall be entitled to deduct and withhold with respect to any payments made pursuant to this Agreement or any Ancillary Document such amounts that are required to be deducted and withheld with respect to any such payments under the Code (or any other provision of applicable Law).  To the extent that such amounts are withheld and remitted to the appropriate Taxing Authority, such withheld amounts shall be treated for all purposes of this Agreement or the applicable Ancillary Document as having been paid to such Persons in respect of which such deduction and withholding was made. Notwithstanding anything to the contrary, any compensatory amounts payable to an employee pursuant to or as contemplated by this Agreement or any Ancillary Document shall be remitted to the applicable payor for payment to the applicable Person through regular payroll procedures, as applicable. Prior to the withholding, Buyer shall (a) notify the Sellers of any anticipated withholding, (b) consult with the Sellers in good faith to determine whether such deduction and withholding is required under applicable Tax law, and (c) cooperate with the Sellers in good faith to minimize the amount of any applicable withholding.

2.10    Transfer of Aceto Shanghai Interests.  Notwithstanding anything to the contrary herein:

(a)    If the PRC Transfer Approvals have not been obtained (including acceptance of any filings, as applicable) prior to Closing, then from and after the Closing, and until such time as all PRC Transfer Approvals have been obtained (or filings accepted, as applicable) (the "Deferral Period"), except

with the prior written consent of Buyer, the Sellers shall use commercially reasonable efforts, to the extent Sellers have the corporate power to do so, with all necessary personnel and administrative support supplied by Buyer, in each case, at no cost to Sellers, to (i) cause Aceto Shanghai (including all Cash generated with respect thereto) to be managed and operated by Sellers and their Affiliates (with Buyer's personnel and administrative support) for Buyer's (or its designated Affiliate's) sole benefit or detriment, including, for the avoidance of doubt, all items of income, expense, gain and loss, with respect to the Deferral Period, (ii) not permit Aceto Shanghai to make any distribution or payment to any Seller, any affiliate of any Seller, or any third party other than a customer, supplier or employee (*i.e.*, in respect of payroll) of Aceto Shanghai or Sellers, or others doing business with Aceto Shanghai or Sellers, in each case, in the Ordinary Course of Business, and (iii) not transfer or take any action to transfer or purport to transfer the equity of Aceto Shanghai to any Person other than Buyer or its designated Affiliate. During the Deferral Period, Sellers will, to the extent Sellers have the corporate power to do so (with Buyer's personnel and administrative support), cause Aceto Shanghai to be operated in the Ordinary Course of Business or, unless prohibited by applicable Law, otherwise in such manner as Buyer shall reasonably request in writing, and Seller's pre-Closing obligations pursuant to Section 5.1 will, to the extent Sellers have the corporate power to do so, with the personnel and administrative support supplied by Buyer, in each case, at no cost to Sellers, continue in force with respect to Aceto Shanghai, until all PRC Transfer Approvals have been obtained (or filings accepted, as applicable).

(b)    If the PRC Transfer Approvals have not been obtained (including acceptance of any filings, as applicable) on or prior to the first anniversary of the Closing Date, then Buyer and Sellers shall enter into one or more separate asset purchase agreements (the "Shanghai APA") with respect to the assets and Liabilities of Aceto Shanghai (the "Shanghai Assets"), pursuant to which, among other things, to the extent permitted under applicable Law, Aceto Shanghai shall assign to Buyer (or its designated Affiliate) for no additional consideration other than the Tax Adjustment (as defined below) all assets, and Buyer shall assume all Liabilities, of Aceto Shanghai, including all Accounts Receivable, Accounts Payable, inventory, Contracts, Owned Real Property, books and records, Intellectual Property, equipment leases, rights, claims and causes of action against third parties and all goodwill of and used by Aceto Shanghai and all Permits required by the applicable Governmental Entity to operate the business of Aceto Shanghai on terms and conditions reasonably satisfactory to Buyer and Sellers. If any Shanghai Assets cannot be so transferred, then Sellers will cooperate with Buyer to establish an agency, services or similar arrangement (including by means of any subcontracting, sublicensing or subleasing arrangement) reasonably satisfactory to Sellers and Buyer intended to provide Buyer, to the fullest extent practicable, the claims, rights, benefits, costs and Liabilities of those assets that cannot be transferred.

(c)    If the Shanghai Assets are sold pursuant to Section 2.10(b), then the amount of the Purchase Price allocated to the equity of Aceto Shanghai (as adjusted for the Tax Adjustment (as defined below)) shall be instead allocated among the Shanghai Assets in accordance with this Section 2.10(c). Within forty-five (45) calendar days after the first anniversary of the Closing Date, Buyer shall deliver to Parent an allocation of the Purchase Price allocated to the equity of Aceto Shanghai (as adjusted for the Tax Adjustment (as defined below) and all other capitalized costs) as determined for tax purposes, among the Shanghai Assets. Such allocation shall be made pursuant to Code Section 1060 and the Treasury Regulations thereunder (and any similar provision of state, local or non-U.S. Law, as appropriate). If, within ten (10) calendar days of Parent's receipt of Buyer's proposed allocation, Parent does not deliver to Buyer written notice (a "Parent Shanghai Allocation Objection Notice") of any objections that it has to such allocation, Buyer's proposed allocation shall be final. If Parent timely delivers to Buyer a Parent Shanghai Allocation Objection Notice, then Buyer shall consider in good faith Parent's comments. Sellers and Buyer agree that the allocation determined under this Section 2.10(c) shall be binding on all Parties, and that Sellers and Buyer will (and Buyer will cause the Acquired Subsidiaries to and Sellers will cause Aceto Shanghai to) report, act and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with such allocation, except

to the extent inconsistent with applicable Law.  Neither Sellers nor Buyer shall (and Buyer will not permit an Acquired Subsidiary to and Sellers will not permit Aceto Shanghai to) take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable Law.

(d)    The Buyer agrees to indemnify Sellers and Aceto Shanghai for any additional Tax owed by Sellers or Aceto Shanghai (including Tax owed by Sellers or Aceto Shanghai due to this indemnification payment) resulting from (x) any transaction engaged in by Sellers or Aceto Shanghai pursuant to Sections 2.10(b), (c) and (d) and (y) the operations of Aceto Shanghai from the Closing Date through the last of the Shanghai Asset Closing Dates.  Buyer shall pay to Parent, in cash, the amount of additional consideration necessary to cause Sellers' after-Tax net proceeds from the sale of the Shanghai Assets on the Shanghai Asset Closing Dates pursuant to Sections 2.10(b), (c) and (d), taking into account any Taxes attributable to payments pursuant to this Section 2.10 and Taxes resulting from the operations of Aceto Shanghai from the Closing Date through the last of the Shanghai Asset Closing Dates, to be equal to the after-Tax net proceeds that Sellers would have received from the sale of Aceto Shanghai stock on the Closing Date, taking into account all appropriate federal, state, local and non-U.S. Tax implications (the "Tax Adjustment").  Parent shall provide Buyer with a calculation of the amount of the Tax Adjustment within ninety (90) days after the last of the Shanghai Asset Closing Dates.  If, within thirty (30) calendar days of Buyer's receipt of Parent's proposed calculation computing the amount of the Tax Adjustment, Buyer does not deliver to Parent written notice (a "Buyer Tax Adjustment Objection Notice") of any objections that it has to such schedule, Parent's proposed calculation shall be final.  If Buyer timely delivers to Parent a Buyer Tax Adjustment Objection Notice, then Parent and Buyer shall work together in good faith to resolve the disputed items.  If Parent and Buyer are unable to resolve all of the disputed items within thirty (30) calendar days of Parent's receipt of the Buyer Tax Adjustment Objection Notice (or such later date as Parent and Buyer may agree), then Parent and Buyer shall refer the disputed items for resolution to the Accounting Firm in accordance with procedures analogous to those set forth in Section 2.4(c).  Sellers and Buyer agree that the amount of the Tax Adjustment determined under this Section 2.10 shall be binding on all Parties.  The amount of the Tax Adjustment shall be paid to Parent within ten (10) days after the finalization by the Parties of the amount of the Tax Adjustment.

(e)    Except as set forth in this Section 2.10, the equity interests of Aceto Shanghai shall be deemed transferred to Buyer or its designee as of the Closing for purposes of this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to Buyer  to enter into this Agreement and to consummate the transactions contemplated hereby, except (a) as disclosed in any form, document or report publicly filed with or publicly furnished to the U.S. Securities and Exchange Commission (the "SEC") by Parent or any of its Subsidiaries from and after July 1, 2015 and prior to the Agreement Date (excluding any disclosures set forth in any "risk factors," "forward-looking statements" or "market risk" sections to the extent they are cautionary, predictive or forward-looking in nature) (collectively, the "Parent SEC Disclosures"), (b) as disclosed in any Bankruptcy Court filings by Sellers or any of their respective Subsidiaries made prior to the Agreement Date (the "Bankruptcy Court Filings"), or (c) as disclosed in the disclosure schedule delivered by Sellers to Buyer concurrently with the execution of this Agreement (the "Sellers Disclosure Schedule"), each Seller, jointly and severally, represents and warrants to Buyer as follows:

3.1    Organization.  Such Seller is a legal entity duly incorporated, validly existing and in good standing under the laws of the State of New York.  Subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code, such Seller has full power and authority to own, lease and operate its properties and assets and to carry on its business as presently

conducted in the Acquired Business, except where the failure to have such power or authority would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.2    <u>Acquired Subsidiaries</u>.

(a)    <u>Section 3.2</u> of the Sellers Disclosure Schedule sets forth the name of each Acquired Subsidiary, and, with respect to each such entity, the jurisdiction in which it is incorporated or organized, the jurisdictions, if any, in which it is qualified to do business, the names of all shareholders or other equity owners and the number of shares of stock owned by each such shareholder or the amount of equity owned by each such equity owner. Each Acquired Subsidiary is a legal entity duly organized, validly existing and (where such concept is recognized) in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.  Each Acquired Subsidiary (other than the Joint Venture) is duly qualified or licensed, and has all necessary governmental approvals, to do business and is in good standing (where such concept is recognized) in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such approvals, qualification or licensing necessary, except where the failure to be so duly approved, qualified or licensed and in good standing (where such concept is recognized) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    The outstanding shares of capital stock of each Acquired Subsidiary are duly authorized, validly issued, fully paid and non-assessable and free of pre-emptive rights, and all such shares or other equity interests are owned by the applicable holder free and clear of any and all Liens (other than Permitted Liens and Liens created by Buyer).  Sellers own, directly or indirectly, all of the issued and outstanding shares of capital stock or other equity interests of the Acquired Subsidiaries (other than the Joint Venture). There is no existing option, warrant, call, right or Contract to which any Acquired Subsidiary (other than the Joint Venture)  is a party requiring, and there are no convertible securities of any Acquired Subsidiary (other than the Joint Venture) outstanding which upon conversion would require, the issuance of any shares of capital stock or other equity interests of any Acquired Subsidiary (other than the Joint Venture) or other securities convertible into shares of capital stock or other equity interests of any Acquired Subsidiary (other than the Joint Venture).

3.3    <u>Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation</u>.

(a)    Such Seller has the full corporate power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party and, subject to the entry of the Sale Order and such other authorization as is required by the Bankruptcy Code, perform its obligations under and consummate the transactions contemplated by this Agreement, including the Asset Purchase, and the Ancillary Documents to which it is a party.  The execution, delivery and performance by such Seller of this Agreement and the Ancillary Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, including the Asset Purchase, have been duly and validly authorized by such Seller's board of directors (or a committee thereof) and no other actions on the part of such Seller, subject to the entry of the Sale Order and such other authorization as is required by the Bankruptcy Code, are necessary to authorize the execution and delivery by such Seller of this Agreement and the Ancillary Documents to which it is a party or the consummation of the transactions contemplated hereby or thereby, including the Asset Purchase.  This Agreement has been, and the Ancillary Documents to which it is a party have been (or will be at Closing) duly and validly executed and delivered by such Seller and, assuming this Agreement constitutes the legal, valid and binding agreement of Buyer, this Agreement and the Ancillary Documents to which it is a party constitute (or upon execution at Closing will constitute, as applicable), the entry of the Sale Order and such other authorization as is required by the Bankruptcy Code, the legal, valid and binding agreements of such Seller, enforceable against such

18

Seller in accordance with their terms, except as and to the extent that such validity and enforceability may be limited by equitable principles of general applicability (whether considered in a proceeding at law or in equity) (the "Enforceability Exceptions").

(b)      Other than in connection with or in compliance with (i) the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "HSR Act"), (ii) the approvals set forth in Section 3.3(b) of the Sellers Disclosure Schedule (covering the applicable Laws or other legal restraints of foreign countries designed to govern competition or trade regulation or to prohibit, restrict or regulate actions with the purpose or effect of monopolization or restraint of trade (collectively, "Antitrust Laws")) and (iii) the Sale Order (clauses (i) through (iii), collectively, the "Transaction Approvals"), and subject to the accuracy of Buyer's representations and warranties set forth in Section 4.2(b), no authorization, consent, order, license, permit or approval of, or registration, declaration, notice or filing with, any Governmental Entity is required to be made or obtained under applicable Law for the consummation by such Seller of the transactions contemplated hereby, except for such authorizations, consents, orders, licenses, permits, approvals, registrations, declarations, notices and filings that are not required to be made or obtained prior to the consummation of such transactions or that the failure to make or obtain would not, in the case of this Section 3.3(b), reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)      Except as set forth in Section 3.3(c) of the Sellers Disclosure Schedule (the "Consents"), the execution and delivery by such Seller of this Agreement does not, and (assuming the Transaction Approvals are obtained and after giving effect to the Sale Order and such other authorization as is required by the Bankruptcy Code) the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, (i) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, constitute an impermissible change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of a Lien (other than Permitted Liens) upon any of the respective properties or assets of such Seller or any of the Acquired Subsidiaries pursuant to, any Contract to which such Seller or any of the Acquired Subsidiaries is a party or by which they or any of their respective properties or assets are bound, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) conflict with or result in any violation of any provision of the Organizational Documents of such Seller or (iii) conflict with or violate any applicable Laws except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.4      Financial Statements.  Sellers have made available to Buyer copies of the audited balance sheet of the Acquired Business as of June 30, 2018 (the "Most Recent Balance Sheet"), the related audited income statement and audited statement of cash flows for the twelve month period ended June 30, 2018, together with the accompanying notes thereto (collectively, the "Financial Statements").  Each of the Financial Statements has been prepared in all material respects in conformity with U.S. generally accepted accounting principles ("GAAP") (except as permitted by the SEC in connection with financial statements prepared on a carve-out basis) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of the Acquired Business as at the dates and for the periods indicated therein.

3.5      Compliance with Law; Permits.

(a)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, such Seller and the Acquired Subsidiaries (other than the Joint Venture) are, and since July 1, 2016 have been, in compliance with all applicable federal, state, local and

foreign laws, statutes, ordinances, rules, regulations, judgments, Orders, injunctions, decrees or agency requirements of Governmental Entities (collectively, "Laws" and each, a "Law") applicable to the Purchased Assets, the Acquired Subsidiaries or the operation of the Acquired Business.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, since July 1, 2016, Sellers and the Acquired Subsidiaries (other than the Joint Venture) have not received any written notice or, to Sellers' knowledge, other communication from any Governmental Entity regarding any actual or alleged failure to comply with any Law applicable to the Purchased Assets, any Acquired Subsidiary or the operation of the Acquired Business.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and subject to the limitations imposed on Sellers as a result of having filed a petition for relief under the Bankruptcy Code, Sellers and the Acquired Subsidiaries (other than the Joint Venture) hold all authorizations, licenses, permits, certificates, variances, exemptions, approvals, orders, registrations and clearances of any Governmental Entity necessary for Sellers and the Acquired Subsidiaries (other than the Joint Venture) to own, lease and operate the Purchased Assets, and to carry on and operate the Acquired Business as currently conducted.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, neither Sellers, nor the Acquired Subsidiaries (other than the Joint Venture) or, to Sellers' knowledge, any of their respective directors or officers, in each case, acting on behalf of Sellers or the Acquired Subsidiaries (other than the Joint Venture), has in the past three years, directly or indirectly in respect of the Acquired Business, (i) used any funds of the Acquired Business for unlawful contributions, unlawful gifts, unlawful entertainment or other unlawful expenses relating to political activity; (ii) made any unlawful payment to foreign or domestic governmental officials or employees or to foreign or domestic political parties or campaigns from funds of the Acquired Business; or (iii) violated or is in violation of applicable Bribery Legislation of any jurisdiction in which the Acquired Business operates.

3.6    Environmental Matters.    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) Parent (solely in respect of the Acquired Business), NY Agri and the Acquired Subsidiaries (other than the Joint Venture) are, to Sellers' knowledge, in compliance with applicable Environmental Laws, and each has, or has timely applied for, all Environmental Permits necessary for the conduct and operation of the Acquired Business as presently conducted, (b) since July 1, 2016, neither Sellers, nor the Acquired Subsidiaries (other than the Joint Venture), have received any written notice, demand, letter or claim alleging that Parent (solely in respect of the Acquired Business), NY Agri or such Acquired Subsidiary (other than the Joint Venture)  is in violation of, or liable under, any Environmental Law and (c) neither any Sellers, nor the Acquired Subsidiaries (other than the Joint Venture), are subject to any Order in respect of the Acquired Business relating to compliance with Environmental Laws, Environmental Permits or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Regulated Substances.   Notwithstanding anything herein to the contrary, the representations and warranties contained in this Section 3.6 (together with the representations and warranties in Section 3.5) are the sole and exclusive representations of Sellers with respect to Environmental Laws, Environmental Permits, Regulated Substances or any other matter related to the environment or the protection of human health and worker safety.

3.7    Employee Benefit Plans.

(a)    Section 3.7(a) of the Sellers Disclosure Schedule sets forth a correct and complete list, as of the Agreement Date, of each Seller Benefit Plan. With respect to each Assumed Plan, to the extent applicable, correct and complete copies of the following have been delivered or made available to Buyer by Sellers: (i) the most recent plan document (which, for the avoidance of doubt, with

respect to any Assumed Plan for which a form agreement is used, shall consist of a copy of such form); (ii) the most recent related trust document; (iii) the most recent annual report (Form 5500) filed with the Internal Revenue Service (the "IRS"); (iv) the most recent determination, opinion or advisory letter from the IRS for any Assumed Plan that is intended to qualify under Section 401(a) of the Code; (v) the most recent summary plan description and (vi) with respect to the Aceto Corporation 2013 Senior Executive Retirement Plan and the Aceto Corporation Supplemental Executive Deferred Compensation Plan (the "Seller Deferred Compensation Plans"), an accurate accounting as of March 22, 2019 of the account balances of each employee as of the Agreement Date, and copies of all written elections made by such employees under the Seller Deferred Compensation Plans.

(b)     Except (i) as set forth on Section 3.7(b) of the Sellers Disclosure Schedule or (ii) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (x) each U.S. Seller Benefit Plan has been established, operated and administered in accordance with its terms and the requirements of all applicable Laws, including ERISA and the Code, and (y) there are no pending or, to Sellers' knowledge, threatened in writing claims (other than claims for benefits in the Ordinary Course of Business) with respect to any Seller Benefit Plan.

(c)     Except as set forth on Section 3.7(c) of the Sellers Disclosure Schedule, none of the Sellers, the Acquired Subsidiaries (other than the Joint Venture) or any of their respective ERISA Affiliates, sponsor, maintain, or contribute to, any employee benefit plan that is (i) subject to Title IV of ERISA or Section 412 of the Code, (ii) a "multiple employer plan" within the meaning of Sections 4063 or 4064 of ERISA, or (iii) a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA (a "Multiemployer Plan").

(d)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Non-U.S. Seller Benefit Plan (i) if intended to qualify for special tax treatment, meets all the requirements for such treatment, (ii) if required to be funded, book-reserved or secured by an insurance policy, is funded, book-reserved, or secured by an insurance policy, as applicable, based on reasonable actuarial assumptions in accordance with applicable accounting principles, and (iii) has been maintained in compliance with all applicable Laws.

(e)     Except (i) as set forth on Section 3.7(e) of the Sellers Disclosure Schedule, or (ii) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, neither the execution of this Agreement nor the completion of the transactions contemplated by this Agreement (either alone or in conjunction with any other event) will result in (x) any compensation payment becoming due to any employee of Parent (who is or was primarily employed in respect of the Acquired Business), NY Agri or of the Acquired Subsidiaries (other than the Joint Venture), (y) the acceleration of vesting or payment to any employee of Parent (who is or was primarily employed in respect of the Acquired Business), NY Agri or of the Acquired Subsidiaries (other than the Joint Venture), or (z) any increase to the compensation or benefits otherwise payable under any Seller Benefit Plan.

3.8     Litigation.  As of the Agreement Date, neither such Seller, nor any Acquired Subsidiary (other than the Joint Venture), is a party to any pending or, to such Seller's knowledge, threatened Proceeding relating to the Acquired Business or the Purchased Assets that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  As of the Agreement Date, neither Sellers, nor the Acquired Subsidiaries (other than the Joint Venture), are subject to any outstanding Order relating to the Acquired Business or the Purchased Assets that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.9     Tax Matters.  For purposes of this Section 3.9, the Joint Venture shall not be treated as either a Purchased Subsidiary or Acquired Subsidiary. Except as set forth on Section 3.9 of the Sellers Disclosure Schedule:

(a)     Parent (solely in respect of the Acquired Business), NY Agri and the Acquired Subsidiaries have timely filed (taking into account any extension of time within which to file) all income and other material Tax Returns required to be filed by any of them and all such filed Tax Returns are complete and accurate in all material respects; (ii) Parent (solely in respect of the Acquired Business), NY Agri and the Acquired Subsidiaries have paid all income and other material Taxes that are required to be paid by any of them, except, in each case of clauses (i) and (ii), with respect to matters contested in good faith or for which adequate reserves have been established in the Most Recent Balance Sheet, in accordance with GAAP; and (iii) there are not pending, or to Sellers' knowledge, threatened in writing, audits, examinations, investigations or other administrative or judicial Proceedings in respect of material Taxes of Parent (solely in respect of the Acquired Business), NY Agri or the Acquired Subsidiaries, in each case, other than in respect of matters for which adequate reserves have been established in the Most Recent Balance Sheet, in accordance with GAAP.

(b)     There are no Liens for Taxes on any of the Purchased Assets or the assets of the Acquired Subsidiaries other than Permitted Liens.

(c)     Sellers have not participated in any "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(d)     No Acquired Subsidiary (and no Seller in respect of the Acquired Business) has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency which waiver or extension remains outstanding.

(e)     The Acquired Subsidiaries that are organized outside the United States are not subject to income Tax in any country other than their respective countries of incorporation or formation. Sellers expect to recognize a de minimis amount of Tax as a result of the inclusion of Subpart F income (as defined for purposes of Section 951(a)(1)(A) of the Code) and global intangible low-taxed income (as defined in Section 951A of the Code) through the Closing Date (exclusive of any election under Section 338(g) of the Code), determined as though the taxable year of the Acquired Subsidiaries ended on the Closing Date and calculated taking into account foreign Taxes paid and creditable and the Tax attributes of the Sellers, including the deduction available under Section 250 of the Code.

(f)     Section 3.9(f) of the Sellers Disclosure Schedule lists the U.S. federal income tax classification of each of the Acquired Subsidiaries and all entity classification elections (and related effective dates) under Treasury Regulations Section 301.7701-3 made with respect to any of the Acquired Subsidiaries.

(g)     The Most Recent Balance Sheet reflects all Liabilities for unpaid Taxes of the Acquired Subsidiaries for periods (or portions of periods) through the date of the Most Recent Balance Sheet.  Since the date of the Most Recent Balance Sheet, none of Parent (solely in respect of the Acquired Business), NY Agri or the Acquired Subsidiaries has incurred any liability for Taxes outside the Ordinary Course of Business.

(h)     Notwithstanding anything herein to the contrary, the representations and warranties in this Section 3.9 and, to the extent related to Taxes or Tax matters, Section 3.7, are the sole and exclusive representations of such Seller with respect to Taxes and Tax matters.

3.10    Employment and Labor Matters.

(a)    Neither Parent (solely in respect of the Acquired Business), NY Agri, nor any Acquired Subsidiary (other than the Joint Venture) is a party to any collective bargaining agreement, works council agreement, labor union contract, or trade union agreement (each, a "Collective Bargaining Agreement") covering employees in the United States or any foreign jurisdiction.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) there is not currently, nor has there been in the past year, any strike, lockout, slowdown, or work stoppage against Parent (solely in respect of the Acquired Business), NY Agri or the Acquired Subsidiaries (other than the Joint Venture)  pending or, to Sellers' knowledge, threatened in writing; (ii) there is no pending charge or complaint against Parent (solely in respect of the Acquired Business), NY Agri or the Acquired Subsidiaries (other than the Joint Venture) by the National Labor Relations Board or any comparable Governmental Entity; and (iii) Parent (solely in respect of the Acquired Business), NY Agri and the Acquired Subsidiaries (other than the Joint Venture) have complied with all Laws regarding employment and employment practices (including anti-discrimination), terms and conditions of employment and wages and hours (including classification of employees and equitable pay practices) and other Laws in respect of any reduction in force (including notice, information and consultation requirements), and no claims against Parent (solely in respect of the Acquired Business), NY Agri or the Acquired Subsidiaries (other than the Joint Venture) relating to non-compliance with the foregoing are pending or, to Sellers' knowledge, threatened in writing.

3.11    Real and Tangible Property.  Such Seller or an Acquired Subsidiary has good and valid title to the Owned Real Property set forth on Schedule 1.1(e) (which constitutes all parcels of Owned Real Property) and to all of the buildings, structures and other improvements thereon.  Such Seller or an Acquired Subsidiary has a good and valid leasehold interest in each of the Assumed Real Property Leases listed on Schedule 1.1(d).  A copy of each Assumed Real Property Lease has been delivered to the Buyer, and no changes have been made to any Assumed Real Property Lease since the date of delivery. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) neither Sellers, nor the Acquired Subsidiaries, have received written notice of any default under any agreement evidencing any Lien affecting the Owned Real Property set forth on Schedule 1.1(e) or any Assumed Real Property Lease, which default continues on the Agreement Date, and (b) such Seller or an Acquired Subsidiary has good and marketable title to, a good and enforceable leasehold interest in or a valid and enforceable license to, all of the tangible Purchased Assets, free and clear of all Liens (other than Permitted Liens).

3.12    Intellectual Property.

(a)    The Patents, pending Patent applications, registered Marks, pending applications for registration of Marks and registered Copyrights owned by Sellers or the Acquired Subsidiaries (other than the Joint Venture) and used primarily or held primarily for use in the Acquired Business are referred to collectively as the "Registered Intellectual Property."

(b)    Sellers and/or the Acquired Subsidiaries own all right, title, and interest, free and clear of all Liens (except for Permitted Liens) to all Registered Intellectual Property, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) to Sellers' knowledge, as of the Agreement Date, the conduct of the Acquired Business does not infringe, violate or constitute misappropriation of any Intellectual Property of any third Person; (ii) to Sellers' knowledge, as of the Agreement Date, no third Person is

23

infringing, violating, or misappropriating any Intellectual Property that is a Purchased Asset; and (iii) as of the Agreement Date, there is no pending claim asserted in writing against a Seller or any Acquired Subsidiary (other than the Joint Venture) (including any "cease and desist" letters and invitations to license) asserting that Sellers' or any Acquired Subsidiary's (other than the Joint Venture's)  conduct of the Acquired Business has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any Intellectual Property rights of any third Person.

(d)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) Sellers and the Acquired Subsidiaries (other than the Joint Venture) comply with their internal policies and procedures and any other legal requirements, to the extent applicable, relating to privacy, data protection, and the collection, retention, protection and use of personal information collected, used, or held for use in the operation of the Acquired Business and (ii) there are no claims pending or, to Sellers' knowledge, threatened against Sellers or any Acquired Subsidiary (other than the Joint Venture) alleging a violation of any third Person's privacy or personal information or data rights, solely with respect to the operation of the Acquired Business.

3.13    Material Contracts.

(a)     Section 3.13(a) of the Sellers Disclosure Schedule sets forth each material Contract relating to the Purchased Assets and the Assumed Liabilities (the "Material Contracts").

(b)     Each Material Contract is a valid and binding obligation of a Seller  and, to Sellers' knowledge, the other party or parties thereto in accordance with its terms and conditions, except as and to the extent that such validity and enforceability may be limited by (i) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally, (ii) the Enforceability Exceptions and (iii) the obligation to pay Cure Costs under Section 365 of the Bankruptcy Code and Section 1.3.

(c)     With respect to any Material Contract, no event has occurred or not occurred through such Seller's action or inaction or, to Sellers' knowledge, prior to the Agreement Date, through the action or inaction of any third party which, with notice or the lapse of time or both, would constitute a default or result in the termination of or a right of termination or cancelation under any Material Contract, accelerate the performance or obligations required thereby, or result in the loss of any benefit under the terms of any Material Contract to which such Seller is a party, except for the obligation to pay Cure Costs and/or such events that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.14    Certain Regulatory Matters.

(a)     The facilities of Sellers used in the operation of the Acquired Business and the facilities of the Acquired Subsidiaries (other than the Joint Venture) are in compliance with the FDCA, to the extent applicable, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Except as set forth in Section 3.14(b) of the Sellers Disclosure Schedule, as of the Agreement Date and for the three (3) years prior thereto, none of the Products have been subject to any material recall or market withdrawal and no material recall or market withdrawal is currently under consideration by such Seller or the Acquired Subsidiaries (other than the Joint Venture).

(c)    Since July 1, 2016, neither Parent (solely in respect of the Acquired Business), NY Agri, nor any Acquired Subsidiaries (other than the Joint Venture) have been the subject of any material enforcement action by the FDA (solely in respect of the Acquired Business).

(d)    Notwithstanding anything herein to the contrary, the representations and warranties in this Section 3.14 (together with the representations and warranties in Section 3.5) are the sole and exclusive representations and warranties of Sellers with respect to the regulatory matters expressly set forth in this Section 3.14.

3.15    Finders or Brokers.  Other than PJT Partners, Inc. and AP Services LLC, no broker, finder or investment banker is entitled to any broker's, finder's or financial advisor's fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers, the Acquired Subsidiaries or a Seller's board of directors.

3.16    Sufficiency of Assets.  The Purchased Assets, together with the assets of the Acquired Subsidiaries, (a) constitute all of the material assets used by Sellers in the current operations of the Acquired Business and (b) are sufficient for Buyer to operate the Acquired Business immediately following the Closing in substantially the same manner as it is currently conducted.

3.17    Inventory.  All Inventory, whether or not reflected in the Closing Statement, consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established.

3.18    No Other Representations or Warranties.  THE PURCHASED ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED, AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS", NOTWITHSTANDING ANYTHING SET FORTH HEREIN (OTHER THAN AS EXPRESSLY SET FORTH IN THIS ARTICLE III, AS QUALIFIED BY THE SELLERS DISCLOSURE SCHEDULE AND THE PARENT SEC DISCLOSURES AND BANKRUPTCY COURT FILINGS) OR IN ANY ANCILLARY DOCUMENT (INCLUDING ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT) TO THE CONTRARY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE III (AS QUALIFIED BY THE SELLERS DISCLOSURE SCHEDULE AND THE PARENT SEC DISCLOSURES AND BANKRUPTCY COURT FILINGS) OR IN ANY ANCILLARY DOCUMENT (INCLUDING ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT), NONE OF SELLERS, ANY OF THEIR AFFILIATES OR ANY OTHER PERSON ON BEHALF OF SELLERS OR THEIR AFFILIATES MAKES ANY REPRESENTATIONS OR WARRANTIES (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED), TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL ASSIGNMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE WITH RESPECT TO (A) THE PURCHASED ASSETS, THE ACQUIRED BUSINESS, SELLERS, OR THEIR RESPECTIVE BUSINESSES, OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED, OR MADE AVAILABLE, TO BUYER OR ITS AFFILIATES OR THEIR OFFICERS, DIRECTORS, EMPLOYEES, ACCOUNTANTS, CONSULTANTS, LEGAL COUNSEL, INVESTMENT BANKERS, ADVISORS, REPRESENTATIVES OR AUTHORIZED AGENTS (COLLECTIVELY, "REPRESENTATIVES") IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING THE ACCURACY OR COMPLETENESS THEREOF OR (B) THE CONDITION OF ANY REAL PROPERTY OWNED, LEASED OR USED IN THE ACQUIRED BUSINESS OR WITH REGARD TO THE USE, EXISTENCE OR RELEASE OF ANY REGULATED SUBSTANCES AT, ON, UNDER OR AROUND

ANY REAL PROPERTY OWNED, LEASED OR USED IN THE ACQUIRED BUSINESS. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS SECTION SHALL LIMIT OR OTHERWISE IMPAIR IN ANY MANNER BUYER'S RIGHT TO MAKE A CLAIM FOR ACTUAL FRAUD.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, except as disclosed in the disclosure schedule delivered by Buyer to Sellers concurrently with the execution of this Agreement (the "Buyer Disclosure Schedule"), Buyer represents and warrants to Sellers as follows:

4.1     Organization.  Buyer is a limited partnership duly formed, validly existing and in good standing under the laws of the Delaware.  Buyer has all requisite limited partnership power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

4.2     Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation.

(a)     Buyer has the requisite limited partnership power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party and to consummate the transactions contemplated hereby, including the Asset Purchase. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party and the consummation by Buyer of the transactions contemplated hereby, including the Asset Purchase, have been duly and validly authorized by the general partner of Buyer and, no other action or proceedings on the part of Buyer, or vote of Buyer's partners, are necessary to authorize the execution and delivery by Buyer of this Agreement and the Ancillary Documents to which it is a party and the consummation of the transactions contemplated hereby, including the Asset Purchase.  This Agreement and the Ancillary Documents to which it is a party have been duly and validly executed and delivered by Buyer and, assuming this Agreement constitutes the legal, valid and binding agreement of Sellers, this Agreement and the Ancillary Documents to which it is a party constitute the legal, valid and binding agreements of Buyer and are enforceable against Buyer in accordance with their terms, except as such enforcement may be subject to the Enforceability Exceptions.

(b)     Other than in connection with or in compliance with the Transaction Approvals, no authorization, consent, order, license, permit or approval of, or registration, declaration, notice or filing with, any Governmental Entity or other third party, is required to be made or obtained, under applicable Law, for the consummation by Buyer of the transactions contemplated hereby, including the Asset Purchase, except for such authorizations, consents, orders, licenses, permits, approvals, registrations, declarations, notices and filings that are not required to be made or obtained prior to the consummation of such transactions.

(c)     The execution and delivery by Buyer of this Agreement does not, and (assuming the Transaction Approvals are obtained) the consummation of the transactions contemplated hereby, including the Asset Purchase, and compliance with the provisions hereof will not, (i) require the making by Buyer of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court, (ii) conflict with or result in any violation of any provision of the Organizational Documents of Buyer or (iii) conflict with or violate any applicable Laws.

4.3     Litigation.  There is no Proceeding to which Buyer or any of its Subsidiaries is a party pending or, to Buyer's knowledge, threatened, and Buyer is not subject to any outstanding Order, in each

26

case that would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, for Buyer to assume and perform the Assumed Liabilities or for Buyer to consummate on a timely basis the transactions contemplated hereby or thereby.

4.4     Buyer Information.   None of the information supplied or to be supplied by Buyer to Parent in writing for inclusion or incorporation by reference in any filings required under the applicable U.S. federal securities Laws, including the rules and regulations of the SEC thereunder, relating to the Asset Purchase will, at the time such documents are filed with the SEC or at any time such documents are amended or supplemented, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.   Notwithstanding the foregoing, no representation or warranty is made by Buyer with respect to statements made or incorporated by reference therein based on information supplied by or on behalf of Sellers expressly for inclusion or incorporation by reference therein.

4.5     Finders or Brokers.   Other than CIM Partners and Vasto Advisors, no broker, finder or investment banker is entitled to any broker's, finder's or financial advisor's fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer or Buyer's board of directors (or similar governing body).

4.6     Solvency.   Buyer has, as of the Agreement Date, and will have at and as of the Closing Date sufficient available funds to consummate the Asset Purchase and to promptly make, when due, all payments required to be made in connection with this Agreement, including payment of the Cash Balance, and satisfaction of all of the Assumed Liabilities and the Cure Costs.   As of the Agreement Date, Buyer has no reason to believe that the representations contained in the immediately preceding sentence will not be true at and as of the Closing Date.   Based on the accuracy of the representations and warranties set forth in Article III, immediately after giving effect to the transactions contemplated hereby, (a) Buyer and its Subsidiaries, taken as a whole, will not (i) be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) have incurred Indebtedness beyond their ability to pay such Indebtedness as it matures or becomes due and (iii) have unreasonably small capital to carry on their businesses as presently conducted or as proposed to be conducted, (b) the then present fair saleable value of the assets of Buyer and its Subsidiaries, taken as a whole, will exceed the amount that will be required to pay their Liabilities (including the amount of all contingent Liabilities) and Indebtedness as it becomes absolute or matured, and (c) the assets of Buyer and its Subsidiaries, taken as a whole, at a fair valuation, will exceed their Liabilities (including the amount of all contingent Liabilities) and Indebtedness.

4.7     Adequate Assurances Regarding the Buyer Assumed Agreements.   As of the Closing, Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(c) of the Bankruptcy Code with respect to the Buyer Assumed Agreements.

4.8     Certain Arrangements; Ownership of Sellers.   There are no contracts, undertakings, commitments, agreements, obligations or understandings, whether written or oral, between Buyer or any of its Affiliates, on the one hand, and any member of Sellers' management or Sellers' boards of directors, on the other hand, relating in any way to Sellers (including with respect to the management or control of Sellers), the transactions contemplated hereby or to the operations of Parent (solely related to the Acquired Business), NY Agri and the Acquired Subsidiaries after the Closing. Buyer does not hold, directly or indirectly, any beneficial or other ownership interest in any of Sellers or their Subsidiaries or any of their respective securities.

4.9   <u>Guarantee</u>. Concurrently with the execution of this Agreement, New Mountain Partners V, L.P., a Delaware limited partnership (the "<u>Guarantor</u>"), has delivered to Sellers a duly executed limited guarantee pursuant to which the Guarantor has guaranteed certain obligations under this Agreement (the "<u>Guarantee</u>"). The Guarantee is in full force and effect, has not been amended or modified and is a legal and valid and binding obligation of the Guarantor. No event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach or failure to satisfy a condition under the terms and conditions of the Guarantee on the part of the Guarantor under the Guarantee.

4.10   <u>Investment Intention</u>. Buyer is acquiring the capital stock of the Acquired Subsidiaries for its own account, for investment purposes only and not with a view to the distribution (as such term is used in Section 2(a)(11) of the Securities Act). Buyer understands that the capital stock of the Acquired Subsidiaries may not have been registered under the Securities Act and may not be sold unless subsequently registered under the Securities Act or an exemption from such registration is available

4.11   <u>Investigation; No Other Representations</u>.

(a)   BUYER HAS CONDUCTED ITS OWN INDEPENDENT REVIEW AND ANALYSIS OF THE BUSINESS, OPERATIONS, ASSETS, CONTRACTS, INTELLECTUAL PROPERTY, REAL ESTATE, TECHNOLOGY, LIABILITIES (CONTINGENT, PRESENT AND OTHERWISE), RESULTS OF OPERATIONS, FINANCIAL CONDITION AND PROSPECTS OF SELLERS, THE ACQUIRED SUBSIDIARIES AND THE ACQUIRED BUSINESS, AND ACKNOWLEDGES THAT IT AND ITS REPRESENTATIVES HAVE RECEIVED ACCESS TO SUCH BOOKS AND RECORDS, FACILITIES, EQUIPMENT, CONTRACTS AND OTHER ASSETS AND PROPERTIES OF SELLERS, THE ACQUIRED SUBSIDIARIES AND THE ACQUIRED BUSINESS THAT IT AND ITS REPRESENTATIVES HAVE REQUESTED TO REVIEW AND THAT IT AND ITS REPRESENTATIVES HAVE HAD THE OPPORTUNITY TO MEET WITH THE MANAGEMENT OF SELLERS AND TO DISCUSS THE RESPECTIVE BUSINESSES AND ASSETS OF PARENT (IN RESPECT OF THE ACQUIRED BUSINESS), NY AGRI AND THE ACQUIRED SUBSIDIARIES AND THE ACQUIRED BUSINESS. BUYER, ON BEHALF OF ITSELF AND ON BEHALF OF ITS RESPECTIVE AFFILIATES AND REPRESENTATIVES, ACKNOWLEDGES THAT THE PURCHASED ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED, AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND THAT, NOTWITHSTANDING ANYTHING SET FORTH HEREIN OR IN ANY OTHER ANCILLARY DOCUMENT TO THE CONTRARY, OTHER THAN THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE III</u> (AS QUALIFIED BY THE SELLERS DISCLOSURE SCHEDULE AND THE PARENT SEC DISCLOSURES AND BANKRUPTCY COURT FILINGS) OR IN ANY ANCILLARY DOCUMENT (INCLUDING ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT), NONE OF SELLERS, THE ACQUIRED SUBSIDIARIES, ANY OF THEIR RESPECTIVE AFFILIATES OR ANY OTHER PERSON ON BEHALF OF SELLERS, THE ACQUIRED SUBSIDIARIES OR THEIR AFFILIATES MAKES ANY REPRESENTATIONS OR WARRANTIES (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED), TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL ASSIGNMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE WITH RESPECT TO (A) THE PURCHASED ASSETS, THE ACQUIRED BUSINESS, SELLERS OR THE ACQUIRED SUBSIDIARIES, OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED, OR MADE AVAILABLE, TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING THE ACCURACY OR COMPLETENESS THEREOF, OR (B) THE CONDITION OF ANY REAL PROPERTY OWNED, LEASED OR USED IN THE ACQUIRED BUSINESS OR WITH REGARD TO

THE USE, EXISTENCE OR RELEASE OF ANY REGULATED SUBSTANCES AT, ON, UNDER OR AROUND ANY REAL PROPERTY OWNED, LEASED OR USED IN THE ACQUIRED BUSINESS.

(b)      WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR ANY REMEDIES AVAILABLE UNDER THIS AGREEMENT WITH RESPECT TO THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III (AS QUALIFIED BY THE SELLERS DISCLOSURE SCHEDULE AND THE PARENT SEC DISCLOSURES AND BANKRUPTCY COURT FILINGS) OR IN ANY ANCILLARY DOCUMENT (INCLUDING ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT), NONE OF SELLERS, THE ACQUIRED SUBSIDIARIES OR ANY OTHER PERSON WILL HAVE OR BE SUBJECT TO ANY LIABILITY OR OTHER OBLIGATION TO BUYER OR ITS REPRESENTATIVES OR AFFILIATES OR ANY OTHER PERSON RESULTING FROM BUYER'S, ITS REPRESENTATIVES' OR AFFILIATES' USE OF ANY INFORMATION, DOCUMENTS, PROJECTIONS, FORECASTS OR OTHER MATERIAL MADE AVAILABLE TO BUYER OR ITS REPRESENTATIVES OR AFFILIATES, INCLUDING ANY INFORMATION MADE AVAILABLE IN THE ELECTRONIC DATA ROOM MAINTAINED BY OR ON BEHALF OF SELLERS OR THEIR REPRESENTATIVES FOR PURPOSES OF THE TRANSACTIONS CONTEMPLATED HEREBY, TEASERS, MARKETING MATERIALS, CONSULTING REPORTS OR MATERIALS, CONFIDENTIAL INFORMATION MEMORANDA, MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF BUYER OR ITS REPRESENTATIVES OR IN ANY OTHER FORM IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY. IN CONNECTION WITH THE DUE DILIGENCE INVESTIGATION OF SELLERS, THE ACQUIRED SUBSIDIARIES AND THE ACQUIRED BUSINESS BY BUYER, BUYER HAS RECEIVED AND MAY CONTINUE TO RECEIVE FROM SELLERS OR THEIR REPRESENTATIVES CERTAIN ESTIMATES, PROJECTIONS, FORECASTS AND OTHER FORWARD-LOOKING INFORMATION, AS WELL AS CERTAIN BUSINESS PLAN INFORMATION, REGARDING SELLERS, THE ACQUIRED SUBSIDIARIES, THE PURCHASED ASSETS AND/OR THE ACQUIRED BUSINESS. BUYER HEREBY ACKNOWLEDGES, ON BEHALF OF ITSELF AND ITS AFFILIATES AND REPRESENTATIVES, THAT THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH ESTIMATES, PROJECTIONS, FORECASTS AND OTHER FORWARD-LOOKING STATEMENTS, AS WELL AS IN SUCH BUSINESS PLANS, WITH WHICH BUYER IS FAMILIAR, THAT BUYER AND ITS AFFILIATES AND REPRESENTATIVES ARE NOT RELYING ON, AND ARE TAKING FULL RESPONSIBILITY FOR MAKING THEIR OWN EVALUATION OF, THE ADEQUACY AND ACCURACY OF ALL ESTIMATES, PROJECTIONS, FORECASTS AND OTHER FORWARD-LOOKING INFORMATION, AS WELL AS SUCH BUSINESS PLANS, SO FURNISHED TO THEM (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS, FORECASTS, FORWARD-LOOKING INFORMATION OR BUSINESS PLANS).  NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS SECTION SHALL LIMIT OR OTHERWISE IMPAIR IN ANY MANNER BUYER'S RIGHT TO MAKE A CLAIM FOR ACTUAL FRAUD.

## ARTICLE V
## COVENANTS AND AGREEMENTS

5.1     Conduct of Business.  During the period from the Agreement Date until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Sellers shall, and shall cause the Acquired Subsidiaries to, use commercially reasonable efforts to maintain the Purchased Assets and conduct the Acquired Business in all material respects in the Ordinary Course of Business, except (i) as may be required by applicable Law, (ii) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), (iii) as may be required by the Bankruptcy Court, (iv) as

expressly permitted or contemplated or required by this Agreement  (including Section 5.8(d)), (v) as set forth in Section 5.1 of the Sellers Disclosure Schedule or (vi) to the extent the effect their being in bankruptcy may have on them and the Acquired Business.

      5.2    Access.

      (a)    For purposes of furthering the transactions contemplated hereby, Sellers shall afford Buyer and its Representatives reasonable access during normal business hours upon reasonable advance notice to Sellers, throughout the period from the Agreement Date until the earlier of the termination of this Agreement and the Closing, to Sellers' and any Acquired Subsidiary's personnel, properties, contracts, commitments, Books and Records and such other information concerning the business, properties and personnel of the Acquired Business as Buyer may reasonably request; provided that Sellers shall not be obligated to provide or give access to any minutes of meetings or resolutions of a Seller's or any Acquired Subsidiary's board of directors (or similar governing body) or any committees thereof or any other business records or reports of or communication with any of its advisors relating to the evaluation or negotiation of this Agreement or the transactions contemplated hereby or any alternatives thereto.  Notwithstanding anything to the contrary contained in this Section 5.2(a), any document, correspondence or information or other access provided pursuant to this Section 5.2(a) may be redacted or otherwise limited to prevent disclosure of information concerning any aspect of the Pharma Business, the valuation of Sellers and/or the Acquired Business and the purchase of the Purchased Assets or other similarly confidential or competitively sensitive information.  All access pursuant to this Section 5.2(a) shall be (i) conducted in such a manner as not to interfere unreasonably with the normal operations of Sellers and the Acquired Subsidiaries and (ii) coordinated exclusively through the designated Representatives of Sellers. For the avoidance of doubt, Buyer shall not contact any customers, suppliers, employees, contractors or landlords of Sellers or any of its Subsidiaries, including the Acquired Subsidiaries, without Sellers' prior written consent, which shall not be unreasonably withheld.

      (b)    Notwithstanding anything to the contrary contained in this Section 5.2, neither a Seller nor any Acquired Subsidiary shall be required to provide any access, or make available any document, correspondence or information, if doing so would, in the reasonable judgment of such Seller's legal counsel, (i) jeopardize the attorney-client privilege of a Seller or any Acquired Subsidiary or (ii) conflict with any Law applicable to a Seller or any Acquired Subsidiary or the assets or operation of the Acquired Business; provided that in such instances, Sellers shall inform Buyer of the general nature of the information being withheld and, upon Buyer's request, reasonably cooperate with the other party to provide such information, in whole or in part, in a manner that would not result in any of the outcomes described in the foregoing clauses (i) and (ii).

      (c)    The parties hereto hereby agree that all information provided to them or their respective Representatives in connection with this Agreement and the consummation of the transactions contemplated hereby shall be governed in accordance with the Confidentiality Agreement, dated as of October 19, 2018, between Parent and New Mountain Capital, L.L.C. (the "Confidentiality Agreement"), which shall continue in full force and effect in accordance with its terms.

      (d)    In order to facilitate a Seller's efforts to (i) administer and close the Bankruptcy Case, including for purposes of administering and closing any insurance claims and any Proceedings to which any Seller or any of its Subsidiaries is a party (other than in connection with any Proceeding with Buyer) (together, the "Post-Close Proceedings"), and (ii) prepare Tax Returns (together, the "Post-Close Filings"), for a period of seven (7) years following the Closing, Buyer shall permit Sellers and Sellers' counsel, accountants and other Representatives (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to the financial and other Books and Records which comprised part of the Purchased Assets, and to

employees, officers, advisors and accountants of Buyer, in each case to the extent required to complete the Post-Close Filings or to administer and close the Post-Close Proceedings, which access shall include (A) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (B) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and applicable Permitted Access Party reimburses Buyer for the reasonable costs and expenses thereof; provided, however, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of Buyer's business.  For a period of seven (7) years following the Closing, or such longer period as may be required by applicable Law or necessitated by applicable statutes of limitations, Buyer shall, and shall cause its Subsidiaries to, maintain all such Books and Records in the jurisdiction in which such Books and Records were located prior to the Closing Date and shall not destroy, alter or otherwise dispose of any such Books and Records. On and after the end of such period, Buyer shall, and shall cause its Subsidiaries to, provide Sellers with at least ten (10) Business Days prior written notice before destroying, altering or otherwise disposing any such Books and Records, during which period the Sellers may elect to take possession, at its own expense, of such Books and Records. Notwithstanding anything contained in this Section 5.2 to the contrary, in no event shall a Seller have access to any information that, based on advice of Buyer's counsel, could (i) reasonably be expected to create liability under applicable Law, or waive any legal privilege, (ii) result in the discharge of any Trade Secrets of Buyer, its affiliates or any third parties or (iii) violate any obligation of Buyer with respect to confidentiality.  The Official Committee of the Unsecured Creditors in the Bankruptcy Case (through its court retained professionals and not members of the creditors committee individually, the "Unsecured Creditors") shall be a Permitted Access Party under this Section 5.2(d) until two (2) years after the Closing, subject to the terms, conditions and limitations hereof, including without limitation the reimbursement obligation hereunder and subject to the same limitations regarding confidential or competitively sensitive information as are set forth in Section 5.2(a) and, provided that the Unsecured Creditors execute a confidentiality agreement with Buyer and Sellers, in form and substance that is mutually acceptable to such parties.

5.3    Employees and Employee Benefit Plans.

(a)    Transferred Employees.  Prior to the date hereof, Buyer offered employment to Sellers' employees who are exclusively employed in respect of the Acquired Business as of the date of the Original Agreement (the "Business Employees") and who remain employed by Sellers or such Acquired Subsidiary immediately prior to the Closing (including employees on approved leave of absence) and who were listed on Section 5.3(b) of the Seller Disclosure Schedule as of the date of the Original Agreement, with Comparable Positions and Comparable Compensation and Benefits.  Offer letters were not sent to employees of the Acquired Subsidiaries.  As soon as practicable after the date hereof, and in any event no later than five Business Days prior to the Closing, Buyer shall offer employment to the four employees listed on Section 5.3(b) of the Seller Disclosure Schedule who were not listed on Section 5.3(b) of the Seller Disclosure Schedule as of the date of the Original Agreement, with Comparable Positions and Comparable Compensation and Benefits.  Those employees who accept Buyer's offer of employment and commence working for Buyer on the Closing Date (or upon return to work from approved leave of absence) shall hereafter be referred to as "Transferred Employees."

(b)    Business Employees.  Section 5.3(b) of the Sellers Disclosure Schedule sets out a complete and accurate list of all Business Employees, including, for each employee: (i) name (or to the extent not permitted by applicable Law, employee identification number); (ii) job title; (iii) hire date; (iv) work location; (v) current annual base compensation; (vi) commission, target bonus or other incentive-based compensation; (vii) leave status (including estimated return date), and (viii) visa or other work permit status (if applicable).

(c)      Credit under Buyer Benefit Plans.  Buyer will take commercially reasonable best efforts to cause any employee benefit plans of Buyer (or any Affiliate thereof sponsoring or maintaining such plans) in which the Transferred Employees are eligible to participate following the Closing Date (the "Buyer Benefit Plans") to take into account for purposes of eligibility, vesting and accrual of and entitlement to benefits (but not for accrual of benefits under any "defined benefit plan," as defined in Section 3(35) of ERISA), and all other purposes, all service by the Transferred Employees with Sellers prior to the Closing as if such service were with Buyer or its Affiliates, to the same extent such service was credited under a comparable Seller Benefit Plan prior to the Closing (except to the extent it would result in the duplication of benefits). In addition, with respect to each Buyer Benefit Plan that is a "welfare benefit plan" (as defined in Section 3(1) of ERISA), Buyer shall, or shall cause an Affiliate of Buyer sponsoring or maintaining such Buyer Benefit Plan, to take commercially reasonable best efforts to (i) cause there to be waived any pre-existing condition exclusions, actively at work requirements, insurability requirements or other eligibility limitations to the extent such exclusions, requirements or limitations were waived or were inapplicable under a comparable Seller Benefit Plan prior to the Closing, and (ii) give effect, in determining any deductible, co-insurance and maximum out-of-pocket limitations, to claims incurred and amounts paid by, and amounts reimbursed to, the Transferred Employees and their dependents under a comparable Seller Benefit Plan prior to the Closing.  Buyer shall be solely responsible for complying with the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code for any employee of any Seller who is an "M&A qualified beneficiary" as defined in Q&A-4 of Treas. Reg. §54.4980B-9 in connection with the transactions contemplated hereby.

(d)      Employment Tax Reporting.  With respect to Transferred Employees, Buyer and Sellers shall use the alternate procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, provided that Sellers provide to Buyer all information necessary for Buyer to complete such alternate procedure and that third party payroll provider agrees it can accommodate utilization of the alternate procedure to properly report and remit federal and state payroll.

(e)      No Obligation.  Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit levels or prevent any change in the employee benefits provided to any individual Transferred Employee.  No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of a Seller or any Acquired Subsidiary or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including in respect of continued employment (or resumed employment) for any specified period.  Nothing contained herein, express or implied, shall (i) be construed to establish, amend or modify any Seller Benefit Plan or other benefit plan, program, agreement or arrangement or (ii) alter or limit the ability of Sellers, Buyer or any of their respective Affiliates to amend, modify, or terminate any benefit plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them.  Nothing in this Section 5.3 is intended to interfere with Buyer's right from and after the Closing to terminate the employment of, or change the compensation and benefits available to, any Transferred Employee.

(f)      Nonqualified Deferred Compensation Plans.  To the extent that any Transferred Employee has any benefit payable to him or her as of the Closing Date in the nonqualified deferred compensation plans of Sellers (each, a "NQ Plan"), Sellers shall, and shall cause its Affiliates to, as soon as practical after the Closing Date, split such NQ Plans into one or more separate plans that contains only the benefits payable to Transferred Employees to the extent such benefits are not otherwise distributed upon or promptly following the Closing Date under the terms of such NQ Plan. Buyer and Sellers intend and agree in accordance with Treasury Regulation Section 1.409A-1(h)(4) that the transfer of employment of the Transferred Employees from Sellers (or their respective Affiliates) to Buyer (or its Affiliates) in connection with the transactions contemplated by this Agreement (and the related termination of employment of the Transferred Employees from Sellers) shall not constitute a "separation

from service" for purposes of Code Section 409A and the Treasury Regulations thereunder. If Seller maintains a "rabbi trust" with respect to a NQ Plan (each an "Existing NQ Trust"), to the extent transferred pursuant to Section 1.1(o), either (i) Seller shall, as soon as practical after the Closing Date, establish a new rabbi trust (each a "New NQ Trust") and cause the assets of the Existing NQ Trust, to the extent payable to a Transferred Employee who has a benefit as of the Closing Date in the NQ Plan that is not otherwise distributed upon or promptly following the Closing Date under the terms of the applicable NQ Plan (the "Transferable Assets"), to be transferred to the New NQ Trust, which New NQ Trust shall be assumed by Buyer, or (ii) Buyer shall, as soon as practical after the Closing Date, establish a new rabbi trust in form and substance satisfactory to the Sellers for the benefit of Transferred Employees who have benefits payable to them as of the Closing Date in the NQ Plan that are not otherwise distributed upon or promptly following the Closing Date under the terms of the applicable NQ Plan (the "Buyer Trust"), and Seller shall cause the Transferable Assets to be transferred to the Buyer Trust, and Buyer shall cause the Buyer Trust to accept the Transferable Assets, as soon as practical after such Buyer Trust is established.

      5.4      Regulatory Approvals; Efforts.

      (a)      Prior to the Closing, Buyer and Sellers shall, and shall cause their respective Affiliates to, use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under any applicable Laws to consummate the Asset Purchase as promptly as practicable, including (i) preparing and filing all forms, registrations and notifications with any Governmental Entities or third parties required to be filed to consummate the Asset Purchase, (ii) using reasonable best efforts to satisfy the conditions to consummating the Asset Purchase, (iii) using reasonable best efforts to obtain (and to cooperate with each other in obtaining) any consent, authorization, expiration or termination of a waiting period, permit, Order or approval of, waiver or any exemption by, any Governmental Entity required to be obtained or made by Buyer, Sellers or any of their respective Affiliates in connection with the Asset Purchase or the taking of any action contemplated hereby, (iv) defending any lawsuits or other legal Proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Asset Purchase, and (v) using reasonable best efforts with respect to the execution and delivery of all such instruments, deeds, assignments or assurances and do all other things reasonably necessary or desirable to consummate the Asset Purchase and to fully carry out the purposes or intent of this Agreement.

      (b)      Buyer, on the one hand, and Sellers, on the other hand, shall each keep the other apprised of the status of matters relating to the consummation of the Closing and work cooperatively in connection with obtaining all required consents, authorizations, Orders or approvals of, or any exemptions by, any Governmental Entity undertaken pursuant to the provisions of this Section 5.4. In that regard, prior to the Closing, each party shall promptly consult with the other parties to this Agreement with respect to and provide any necessary information and assistance as the other parties may reasonably request with respect to (and, in the case of correspondence, provide the other parties (or their counsel and, if reasonably determined necessary, advisable or convenient to protect attorney-client privilege or competitively sensitive information, outside counsel only basis) with copies of) all notices, submissions or filings made by or on behalf of such party or any of its Affiliates with any Governmental Entity or any other information supplied by or on behalf of such party or any of its Affiliates to, or correspondence with, a Governmental Entity in connection with this Agreement and the Asset Purchase. Each party to this Agreement shall promptly inform the other parties to this Agreement, and if in writing, furnish the other parties with copies of (or, in the case of oral communications, advise the other parties orally of) any communication from or to any Governmental Entity regarding the Asset Purchase, and permit the other parties to review and discuss in advance, and consider in good faith the views of the other parties in connection with, any proposed communication or submission with any such Governmental Entity. No party or any of its Affiliates shall participate in any meeting or teleconference with any Governmental Entity in connection with this Agreement and the Asset Purchase unless it consults with the other parties

in advance and, to the extent not prohibited by such Governmental Entity, gives the other parties the opportunity to attend and participate thereat.  Notwithstanding the foregoing, Buyer and Sellers may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.4(b) as "Antitrust Counsel Only Material."  Such materials and the information contained therein shall be given only to the outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient unless express permission is obtained in advance from the source of the materials (Buyer or Sellers, as the case may be) or its legal counsel.  Notwithstanding anything to the contrary contained in this Section 5.4, materials provided pursuant to this Section 5.4 may be redacted (i) to remove references concerning the valuation of the Acquired Business and the purchase of the Purchased Assets, (ii) as necessary to comply with contractual arrangements and (iii) as necessary to address reasonable privilege concerns.

(c)      Sellers and Buyer acknowledge that they have filed prior to the date hereof with the appropriate Governmental Entity all filings, forms, registrations and notifications required to be filed to consummate the purchase of the Purchased Assets under the HSR Act and any other applicable Antitrust Law, and that early termination of the applicable waiting period under the HSR Act was granted effective March 18, 2019.  Sellers and Buyer shall cause their respective Affiliates to, as promptly as practicable, respond to inquiries from Governmental Entities, or provide any supplemental information that may be requested by Governmental Entities, in connection with filings made with such Governmental Entities.

(d)      Notwithstanding anything to the contrary set forth in this Agreement, Buyer shall, in order to comply with Section 5.4(b) and so as to permit the Closing to occur as promptly as practicable and in any event before the End Date (i) propose, negotiate, commit to, effect and agree to, by consent decree, hold separate order, or otherwise, the sale, divestiture, license, holding separate, and other disposition of and restriction on the businesses, assets, properties, product lines, and equity interests of, or changes to the conduct of business of, the Acquired Business and Sellers, Buyer and their respective Affiliates (including, with respect to Sellers and the Acquired Subsidiaries), and (ii) create, terminate, or divest relationships, ventures, contractual rights or obligations of Buyer or its Affiliates or, solely in respect of the Acquired Business, Sellers, the Acquired Subsidiaries or their respective Affiliates,.  If requested by Buyer, Sellers will agree to any action contemplated by this Section 5.4; provided that any such agreement or action is conditioned on the consummation of the Asset Purchase.  Without limiting the foregoing, in no event will a Seller (and such Seller will not permit any of its Affiliates to) propose, negotiate, effect or agree to any such actions without the prior written consent of Buyer, such consent not to be unreasonably withheld, conditioned or delayed.

(e)      In furtherance and not in limitation of the covenants of the parties contained in this Section 5.4, if any administrative or judicial action or Proceeding, including any Proceeding by a private party, is instituted (or threatened to be instituted) challenging the Asset Purchase or any other transaction contemplated hereby as violative of any Antitrust Law, Sellers and Buyer shall use reasonable best efforts to contest and resist any such action or Proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Asset Purchase.

(f)      Except as specifically required by this Agreement, Buyer shall not, and shall not permit any of its Affiliates to, knowingly take any action, or knowingly refrain from taking any action, the effect of which would be to delay or impede the ability of the parties hereto to consummate the transactions contemplated hereby.  Without limiting the generality of the foregoing, Buyer shall not, and shall not permit any of its Affiliates to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into of a definitive

agreement relating to or the consummation of such acquisition, merger or consolidation could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or order of any Governmental Entity necessary to consummate the transactions contemplated hereby or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Entity entering an Order prohibiting the consummation of the transactions contemplated hereby or (iii) delay the consummation of the transactions contemplated hereby.

(g)    The fees and expenses for all filings under the HSR Act and any other necessary filings or submissions to any Governmental Entity pursuant to this Section 5.4 shall be borne in full by Buyer as and when due.

5.5    Notification of Certain Matters.  Except for litigations or other Proceedings commenced, filed or pending in the Bankruptcy Court, each Party shall promptly (and in any event, within two (2) Business Days) notify the other Parties in writing of any litigation or other Proceeding brought or threatened in writing against it or its directors or executive officers or other Representatives relating to this Agreement, the Asset Purchase and/or the other transactions contemplated hereby and shall keep the other Parties informed on a reasonably current basis with respect to the status thereof (including by promptly furnishing to the other Parties and their respective Representatives such information relating to such litigation or other Proceeding as may be reasonably requested).  Each Party shall, subject to the preservation of the attorney-client and similar privileges and confidential information, give the other Parties the opportunity to participate in (but not control) the defense or settlement of any litigation or other Proceeding against it and/or its directors or executive officers or other Representatives relating to this Agreement, the Asset Purchase or the other transactions contemplated hereby and shall give due consideration to such other Parties' advice with respect to such litigation or other Proceeding.

5.6    Adequate Assurances regarding the Buyer Assumed Agreements.  With respect to each Buyer Assumed Agreement, Buyer will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Buyer Assumed Agreement.  Sellers and Buyer agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Buyer Assumed Agreements, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Sellers' and Buyer's employees and representatives available to testify before the Bankruptcy Court.

5.7    Bankruptcy Court Approval.  Sellers and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  To assist in obtaining such approval, Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer with respect to the Buyer Assumed Agreements., including furnishing affidavits or other documents or information for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

5.8    Taxes.

(a)    Without the prior written consent of Sellers, Buyer shall not make any election under Section 336 or 338 of the Code for or with respect to any Acquired Subsidiary in connection with the transactions provided for herein. The provisions of this Section 5.8(a) shall expressly survive Closing or any earlier termination of this Agreement.

(b)      Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer, real property records recordation fees, documentary or stamp Tax, excise Tax or similar non-income Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order ("Transfer Taxes") shall be borne by Buyer.  Buyer shall, at its own expense, file any necessary Tax Returns relating to Transfer Taxes and other documentation with respect to any Transfer Taxes, and Sellers will provide such cooperation as Buyer shall reasonably request in connection with such filings, provided that Buyer shall reimburse Sellers for any reasonable and out of pocket expenses Sellers incur in connection with such cooperation.  For the avoidance of doubt, any China Enterprise Income Tax ("EIT") imposed on any capital gain in connection with a transfer of the Aceto (Shanghai) Ltd. shares ("Applicable EIT") shall not be a Transfer Tax and shall not be borne by Buyer and shall be borne by Sellers.  Buyer is entitled to withhold any amounts required to be withheld in respect of the Applicable EIT from amounts payable to Sellers pursuant to this Agreement and Sellers agree to provide any information reasonably requested by Buyer and such cooperation as may be reasonably requested by Buyer in order to permit the calculation of such Tax, and the making of required withholding and filings and other compliance with requirements of applicable Law.  Any amounts withheld by Buyer in respect of Applicable EIT in excess of the amounts required to be paid in respect of Applicable EIT shall be paid to Sellers reasonably promptly following the determination that there is such an excess amount.  Any refunds received by Buyer or any Acquired Subsidiary of any Applicable EIT imposed in connection with the transactions provided for herein paid with funds received or withheld from Sellers shall be paid by Buyer to Sellers reasonably promptly following such receipt. Notwithstanding anything to the contrary in this Agreement, any EIT imposed on any gain in connection with a direct or indirect transfer of the shares of Aceto HK (including indirect transfer of the real property owned by Aceto HK in China) shall be treated as a Transfer Tax for all purposes of this Agreement and borne by Buyer Any Tax, termination fee or similar payment attributable to an early termination of the "PILOT" ("payment in lieu of taxes") program of the Nassau County Industrial Development Agency ("NCIDA") applicable or otherwise relating to the Port Washington, NY property as to which Aceto Realty is the tenant pursuant to a sale leaseback arrangement with the NCIDA resulting from the transactions provided for herein shall be treated as a "Transfer Tax" for all purposes of this Agreement. The provisions of this Section 5.8(b) shall expressly survive Closing.

(c)      Tax Liabilities for a period that includes but does not end on the Closing Date shall be treated for purposes of determining the amount attributable to the portion of such period that ends on the Closing Date as follows: (i) in the case of any sales, use, value-added, employment, or withholding Tax and any Tax based on or measured by income, profits, gains, receipts or the level of any item or on a transactional basis shall be determined based on an interim closing of the books as of the end of the day on the Closing Date, except that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing, shall be allocated on a per diem basis, unless otherwise required by applicable law, and (ii) in the case of all other Taxes, shall be deemed to be the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period; provided that for these purposes any event occurring on the Closing Date following the Adjustment Time shall be treated as occurring on the day after the Closing Date to the extent such event is not provided for in this Agreement except that events on the Closing Date following the Adjustment Time but before the Closing that are not in the Ordinary Course of Business and are not contemplated or required by this Agreement shall be treated as occurring on the day before the Closing Date.

(d)      It is intended by Sellers that, prior to Closing, NY Agri will merge into a newly formed Delaware corporation, with such Delaware corporation surviving, in a transaction intended to qualify as a reorganization under Section 368(a)(1)(F) of the Code and that such surviving Delaware corporation will, following such merger, convert to a limited liability company under the Delaware

conversion statute.  The Parties agree that nothing in this Agreement, including Section 5.1, shall prevent such merger or conversion or impose any Liability upon any Seller as a result of such conversion.

(e)    In addition to the provisions of Section 5.2(d) with respect to Post-Closing Filings, Buyer and Sellers shall use commercially reasonable efforts (with respect to Sellers, taking into account the impact of the filing of the Bankruptcy Case and operating in bankruptcy) to cooperate with each other regarding Tax matters relating to the Purchased Assets, the Acquired Subsidiaries or the Acquired Business and shall make available to each other as reasonably requested all information, records and documents regarding Taxes relating to the Purchased Assets, the Acquired Subsidiaries or the Acquired Business until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

5.9    Public Announcements. Neither Sellers, on the one hand, nor Buyer, on the other hand, shall, without the approval of the other Parties, make any press release or other public announcement concerning the transactions contemplated hereby, except as and to the extent that any such Party shall be so obligated by Law, including as may be required by the Bankruptcy Case, securities laws, or the rules of any stock exchange, in which case, each Party shall be advised prior to such disclosure, consult with each other before issuing such press release or public announcement and consider in good faith any comments received from the other Party at least two (2) Business Days prior to such issuance. The provisions of this Section 5.9 shall expressly survive Closing or any earlier termination of this Agreement.

5.10    Consents; Notices.  At or prior to the Closing, Buyer and Sellers shall use commercially reasonable efforts to obtain all Consents and give all notices required for Sellers to assign the Buyer Assumed Agreements to which they are a party to Buyer to the extent not assignable without any such approval, consent, or notice pursuant to Section 363 or Section 365 of the Bankruptcy Code.  If any Consent is not obtained prior to the Closing, then, subject to Sellers having appropriate levels of resources and personnel, Sellers, at the sole cost of Buyer, shall continue to use commercially reasonable efforts after the Closing to obtain the Consents and, to the extent permitted by applicable Law, will establish an agency type or other similar arrangement reasonably satisfactory to Sellers and Buyer under which Buyer would obtain, to the extent practicable, all rights under the Buyer Assumed Agreements and assume the corresponding Assumed Liabilities for the period of time that the Consents are not obtained and the Buyer Assumed Agreements are not assigned.  For the avoidance of doubt, the Parties agree and acknowledge that (a) the failure by Sellers to obtain any Consents shall not relieve any party of its obligations to consummate the transactions contemplated hereby, (b) there will not be any adjustment to the Purchase Price if any Consents are not obtained or certain Buyer Assumed Agreements are not assigned, and (c) Buyer shall not have any claim against Sellers after the Closing in respect of any such Consents not being obtained or Buyer Assumed Agreements not being assigned.  Buyer (or its applicable Subsidiary) shall use commercially reasonable efforts (at its expense) to obtain Buyer Registrations prior to Closing or as soon thereafter as reasonably possible. If Buyer (or an applicable Subsidiary of Buyer) has not obtained Buyer Registrations prior to Closing, the applicable Seller entities which hold the Sellers' Registrations prior to Closing shall not dissolve their legal existence until Buyer (or an applicable Subsidiary of Buyer) has obtained its own Registrations. Notwithstanding anything to the contrary in this Agreement, upon confirmation of a Chapter 11 plan in the Bankruptcy Cases, Sellers may dissolve their legal existence and file their respective certificates of dissolution (or equivalent filings) but only upon fifteen (15) calendar days' written notice to Buyer, which notice shall contain Sellers' good faith reasonable estimate of all costs and expenses of continuing as a legal entity in good standing, including, without limitation, payment of all carrying costs and post-confirmation quarterly fees due to the U.S. Trustee on behalf of Sellers (all such costs and expenses, the "Costs"); provided, that, if Buyer provides a written request within ten (10) calendar days after receiving Sellers' notice that it desires any such Seller not to make such filing(s), then Sellers shall not make such filing(s) until the earlier of (x) the first anniversary of the Closing, and (y) the date that Buyer obtains Buyer Registrations, provided that Buyer shall not make such request unless

Buyer agrees (in a manner reasonably acceptable to Sellers) to pay, in advance, all Costs, as such Costs are reasonably estimated by Sellers in good faith. Nothing in this <u>Section 5.10</u>, or in <u>Section 2.8(j)</u> or <u>Section 2.10</u>, shall prevent any Seller from filing and seeking confirmation of a Chapter 11 plan.

5.11    <u>WARN Act</u>.    Buyer shall, or shall cause the Acquired Subsidiaries to, provide any required notice under and to otherwise comply with, the WARN Act with respect to any event affecting the Transferred Employees on or after the Closing Date. Seller shall cooperate with Buyer in determining whether any event affecting the Transferred Employees on or after the Closing Date requires notification under the WARN Act. Buyer shall not, and shall cause the Acquired Subsidiaries not to, take any action on or after the Closing that would cause Seller or any of its Affiliates to incur liability under the WARN Act.

5.12    <u>Directors and Officers</u>.    After the Closing, Buyer shall cause the Acquired Subsidiaries to, honor all the Acquired Subsidiaries' obligations to, exculpate, indemnify, defend and hold harmless (including advancing funds for expenses), to the fullest extent permitted by Law, the current and former directors and officers of the Acquired Subsidiaries, and any employee of the Acquired Subsidiaries who acts as a fiduciary under any employee benefit plan, in each case, solely with respect to acts or omissions by such persons occurring at or before the Closing and solely with respect to acts or omissions by such persons in their capacity as a director, officer or employee of the Acquired Subsidiaries (and not with respect to any other position with Sellers), and such obligations shall survive the Closing and shall continue in full force and effect in accordance with the terms of the certificate of incorporation and by-laws (or similar organizational documents) of the Acquired Subsidiaries and any individual indemnity agreements or other applicable documents that have been made available to Buyer at least two Business Days prior to the Agreement Date from the Closing until the expiration of the applicable statute of limitations with respect to any claims against such persons arising from, relating to, or otherwise in respect of, such acts or omissions. After the Closing, Buyer shall cause the Acquired Subsidiaries to maintain in effect substantially similar exculpation, indemnification and advancement of expenses provisions of the certificates of incorporation and by-laws or similar organizational documents of the Acquired Subsidiaries and any indemnification agreements of the Acquired Subsidiaries with any of their respective directors, officers or employees that have been made available to Buyer at least two Business Days prior to the Agreement Date, in each case as in effect as of the date hereof, and shall not amend, repeal or otherwise modify any such provisions in any manner that would materially adversely affect the rights thereunder of any individuals with respect to such periods on or prior to the Closing Date who at the time of the Closing were current or former directors, officers or employees of the Acquired Subsidiaries. If Buyer or any of its successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all its properties and assets, then, and in each case, Buyer shall ensure that such surviving corporation or entity or the transferees of such properties or assets assume the obligations set forth in this <u>Section 5.12</u>.

5.13    <u>Cooperation with Financing</u>.

(a)    Prior to the Closing, the Sellers shall use commercially reasonable efforts to, and shall cause the Acquired Subsidiaries to use their commercially reasonable efforts to, provide to Buyer, at Buyer's sole cost and expense, such cooperation as is reasonably requested by Buyer, or as otherwise reasonably necessary, in connection with the arrangement and consummation of any debt financing to be incurred by Buyer on the Closing Date to finance the consummation of the transactions contemplated hereunder (the "<u>Debt Financing</u>") (<u>provided</u> that such requested cooperation does not unreasonably interfere with the operations of the Sellers or the Acquired Subsidiaries), including (i) providing prior to the Closing Date (a) the Financial Statements and (b) an unaudited balance sheet of the Acquired Business as of December 31, 2018 and, if the Closing has not occurred on or before May 14, 2019, to the

38

extent such financials would otherwise be produced prior to the Closing in the ordinary course of business, March 31, 2019, and the related income statement and statement of cash flows for the six (6)-month period ended December 31, 2018 and, if the Closing has not occurred on or before May 1, 2019, to the extent such financials would otherwise be produced prior to the Closing in the ordinary course of business for the nine (9)-month period ended March 31, 2019 (all such statements and information referred to in this clause (i), the "Required Information"); (ii) assist with obtaining customary legal opinions, appraisals, surveys, title insurance, insurance certificates and endorsements, waivers, environmental reports and other customary documentation and items contemplated by the Debt Financing as reasonably requested by Buyer; (iii) facilitating the granting of a security interest (and perfection thereof) in collateral, guarantees, mortgages or other certificate or documents as may reasonably be requested by Buyer, in each case effective on or after the Closing, including obtaining releases of existing liens; (iv) furnish no later than four (4) Business Days prior to the Closing all documentation and other information required by a Governmental Entity under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act of 2001, but in each case, solely as relating to the Acquired Subsidiaries to the extent requested at least nine (9) days prior to the Closing; and (v) assist in the preparation, execution and delivery of one or more credit agreements, pledge and security documents and other definitive financing documents as may be reasonably requested by Buyer.  The Sellers hereby consent to the reasonable use of all of its and the Acquired Subsidiaries' logos, names, and trademarks in connection with the Debt Financing; provided, however, that such logos, names and trademarks are used solely in a manner that is not intended to or reasonably likely to harm or disparage the Sellers or the reputation or goodwill of the Sellers or any of their respective products, services, offerings or intellectual property rights; provided, further, that prior to the Closing Date no financing sources in connection with the Debt Financing (including any Affiliates thereof) shall obtain rights in such logos, names or trademarks.  Sellers shall, and shall cause the Acquired Subsidiaries to, use reasonable best efforts to promptly supplement the Required Information and all other information provided pursuant to this Section 5.13 to the extent that any such Required Information and all other information, to the knowledge of Sellers, when taken as a whole, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements made in such Required Information, in light of the circumstances under which they were made, not materially misleading.  Buyer shall keep Sellers informed on a current basis and in reasonable detail of the status of its efforts to arrange the Debt Financing and promptly upon request provide to Sellers copies (including drafts) of any definitive debt financing agreement and any other material documents relating to the Debt Financing.  No obligations of Sellers, the Acquired Subsidiaries or any of their Subsidiaries or any of their respective officers, directors, employees, accountants, consultants, legal counsel, agents and other representatives under any definitive debt financing agreement executed pursuant to this Section 5.13 shall be required to be effective until the Closing. In addition, notwithstanding anything in this Section 5.13 to the contrary, in fulfilling its obligations pursuant to this Section 5.13, none of Sellers, their Subsidiaries or their respective officers, directors, employees, accountants, consultants, legal counsel, agents and other representatives shall be required to (i) pay any commitment or other fee, provide any security or incur any Liability or obligation in connection with the Debt Financing or any other financing, (ii) take or permit the taking of any action that would reasonably be expected to conflict with, result in any violation or breach of, or default (with or without lapse of time, or both) under, the Organizational Documents of Sellers or any of their Subsidiaries, or any applicable Law or material contracts of Sellers or any of their Subsidiaries, (iii) pass resolutions or consents or approve or authorize the execution of the Debt Financing or any definitive debt financing agreements, (iv) provide any cooperation that would unreasonably interfere with the ongoing operations of the Acquired Business or (v) disclose any information which is legally privileged. Buyer acknowledges that the information being provided to it in connection with the Debt Financing is subject to the terms of Section 5.9 and the Confidentiality Agreement, and none of Sellers or any of Sellers' Subsidiaries or Affiliates shall have any liability to Buyer or any other Person in respect of any financial statements, other financial information or data or other information provided pursuant to this Section 5.13.

(b)    Buyer shall, following request by Sellers, immediately reimburse Sellers for all reasonable and documented out-of-pocket fees, costs and expenses incurred by Sellers and their Subsidiaries in cooperating with the Debt Financing (including reasonable attorneys' fees). Buyer shall indemnify, defend, and hold harmless the Sellers and the Acquired Subsidiaries (and their respective Representatives) from and against any and all liabilities, losses, damages, claims, costs and expenses suffered or incurred by them in connection with the Debt Financing or any other financing (including the arrangement thereof) and its assistance to Buyer in connection with the Debt Financing or any other financing (including the arrangement thereof) and any information utilized in connection therewith (other than any liabilities, losses, damages, claims, costs or expenses resulting from any Required Information or other financial statements provided pursuant to this <u>Section 5.13</u> by the Sellers or the Acquired Subsidiaries to Buyer).

(c)    With respect to information disclosed to any rating agency (the "<u>Confidential Rating Agency Information</u>"), Buyer shall (i) inform such rating agency of the confidential nature of the Confidential Rating Agency Information and mark any such information provided in writing to such rating agency as "confidential" and (ii) require such rating agency not to disclose the Confidential Rating Agency Information to any third party or to specifically exclude such information in such ratings agency's ratings report. Buyer shall be responsible for any breach of this covenant by any such rating agency. Notwithstanding anything in this Agreement to the contrary, in no event shall the receipt or availability of any funds or financing (including the Debt Financing) by or to Buyer or any of its Affiliates or any other financing transaction be a condition to any of Buyer's obligations hereunder.

5.14    <u>Controlled Substances</u>. All controlled substances and DEA listed chemicals will be inventoried by Buyer as of the Closing Date and will be maintained by Buyer or one of its Subsidiaries at Buyer's or such Subsidiary's expense as inventory of the applicable Seller under the authority and control of the Sellers' Registrations in accordance with existing Seller-established security systems and procedures. Such controlled substances and DEA listed chemicals will be used, added to and distributed from the registered address, specified by Buyer with Sellers' consent (not to be unreasonably withheld), in accordance with the Sellers' Registrations until the earlier of (x) such date as the requisite Buyer Registrations are issued to Buyer or one of its Subsidiaries or (y) the date on which Sellers are permitted to dissolve their legal existence pursuant to the terms herein. The controlled substances and DEA listed chemicals will be inventoried and transferred to Buyer or its applicable Subsidiary under the Buyer Registrations. With respect to transactions entered into with suppliers and customers, and internal use and transfer of controlled substances, the internal and external documentation of such transactions and activities, including recordkeeping, reporting and invoicing, shall be kept in accordance with the Sellers' Registrations; <u>provided</u>, <u>however</u>, to the extent permitted under applicable regulations or guidance, documentation may be issued and maintained in the name of Buyer or its Subsidiaries. Buyer agrees that, during the period it or its Subsidiaries are operating using the Powers of Attorney, all ownership of title, service and invoicing is Buyer's (or such Subsidiary's) sole responsibility and all documents using Sellers' license or registration numbers, if required, will disclose that the shipper is "NMC Atlas, L.P. or one of its subsidiaries under Power of Attorney from [the appropriate Sellers' organization that holds the license or Registration]" or such other disclosure as deemed necessary and appropriate by Buyer, provided such disclosure is approved by the DEA or other applicable Governmental Entity.

## ARTICLE VI
## CONDITIONS TO THE PURCHASE AND SALE

6.1    <u>Conditions to Each Party's Obligation to Close</u>. The respective obligations of each Party to effect the Asset Purchase shall be subject to the fulfillment (or waiver in a writing signed by the

waiving party, to the extent permissible under applicable Law and provided that such waiver shall only be effective as to the conditions of the waiving party) at or prior to the Closing of the following conditions:

(a)    no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no Law shall have been adopted that remains in effect, in each case, that prevents, enjoins, prohibits or makes illegal the consummation of the Asset Purchase; and

(b)    any waiting periods applicable to the Asset Purchase under any Antitrust Laws of the Federal Republic of Germany or the Republic of Austria have expired or been terminated and/or the relevant approvals under such Laws have been acquired.

6.2    Conditions to Obligation of Sellers to Close.  The obligation of Sellers to sell the Purchased Assets at Closing is further subject to the fulfillment (or waiver in a writing signed by Sellers, to the extent permissible under applicable Law) at or prior to the Closing of the following conditions:

(a)    the representations and warranties of Buyer contained herein shall be true and correct in all material respects as of the Agreement Date and as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date);

(b)    Buyer shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by Buyer prior to Closing;

(c)    Buyer shall have delivered to Sellers a certificate, dated the Closing Date and signed by a duly authorized executive officer (in such officer's capacity as such and not individually) of Buyer, certifying to the effect that the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied;

(d)    Buyer shall have satisfied the Base Purchase Price in accordance with Section 2.2;

(e)    Buyer shall be prepared to deliver, or cause to be delivered, to Sellers the items set forth in Section 2.7; and

(f)    the Sale Order shall have been entered, is not subject to any stay and is in effect.

6.3    Conditions to Obligation of Buyer to Close.  The obligation of Buyer to purchase the Purchased Assets at Closing is further subject to the fulfillment (or the waiver in a writing signed by Buyer, to the extent permissible under applicable Law) at or prior to the Closing of the following conditions:

(a)    (i) the representations and warranties contained in Section 3.2 (other than the second sentence of Section 3.2(a)) shall be true and correct as of the Agreement Date and as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date) in all respects except for *de minimis* inaccuracies and (ii) each of the representations and warranties contained herein (other than those listed in clause (i)) shall be true and correct as of the Agreement Date and as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case,

41

such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications or exceptions contained therein, except where all failures of such representations and warranties to be true and correct, in the aggregate, do not have, or would not reasonably be expected to have, a Material Adverse Effect;

(b)    Sellers shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them prior to the Closing (which, for the avoidance of doubt, shall not include Section 5.13 or the transactions referred to in Section 5.8(d));

(c)    each Seller shall have delivered to Buyer a certificate, dated the Closing Date and signed by a duly authorized executive officer (in such officer's capacity as such and not individually) of such Seller, certifying to the effect that the conditions set forth in Section 6.3(a) and Section 6.3(b) have been satisfied;

(d)    Sellers shall be prepared to deliver, or cause to be delivered, to Buyer all of the items set forth in Section 2.8; provided, however, that (i) provision of the certifications referenced in Section 2.8(e) shall not be a condition to Closing and (ii) the sole remedy for failure to provide such certifications shall be that Buyer shall be entitled to withhold any amount required to be withheld pursuant to applicable Law;

(e)    the Sale Order shall have been entered, is not subject to any stay, is in effect and has become a Final Order; and

(f)    from the date of this Agreement until the Closing, there shall not have been a Material Adverse Effect.

**ARTICLE VII**
**TERMINATION**

7.1    Termination.    Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing, as follows:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by either Sellers or Buyer, if the transactions contemplated hereby (other than the transactions referred to in Section 5.8(d)), including the Asset Purchase, shall not have been consummated on or prior to 5:00 p.m. New York City Time, on September 30, 2019 (the "End Date"); provided that, if as of the End Date any of the conditions set forth in Section 6.1(a) (solely to the extent such condition has not been satisfied due to an order or injunction arising under any Antitrust Law) or Section 6.1(b) shall not have been satisfied or waived, the End Date may be extended on one occasion by either Buyer or Sellers for a period of up to ninety (90) days by written notice to the other Party, and such date, as so extended, shall be the End Date; provided further that the right to terminate this Agreement pursuant to this Section 7.1(b) shall not be available to a Party if the failure of the transactions contemplated hereby to be consummated by such date shall be due to the breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(c)    by either Sellers or Buyer, if an Order by a Governmental Entity of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the

consummation of the transactions contemplated hereby and such Order shall have become final and nonappealable; provided that the right to terminate this Agreement pursuant to this Section 7.1(c) shall not be available to a Party if such Order resulted from, or could have been avoided but for, the breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(d)     by Sellers, if Buyer shall have materially breached or there is a material inaccuracy in any of its representations or warranties, or shall have materially breached or materially failed to perform any covenants or other agreements contained in this Agreement, which material breach, material inaccuracy or material failure to perform (i) if it occurred or was continuing to occur on the Closing Date, would result in a failure of a condition set forth in Section 6.2(a) or Section 6.2(b) and (ii) is either not curable or is not cured by the End Date; provided that the Sellers' right to terminate this Agreement pursuant to this Section 7.1(d) shall not be available to Sellers if a Seller shall have materially breached or there is any material inaccuracy in any of its representations or warranties, or shall have materially breached or materially failed to perform any of its covenants or other agreements contained in this Agreement;

(e)     by Buyer, if Sellers shall have materially breached or there is a material inaccuracy in any of their representations or warranties, or shall have materially breached or materially failed to perform any of their covenants or other agreements contained in this Agreement, which material breach, material inaccuracy or material failure to perform (i) if it occurred or was continuing to occur on the Closing Date, would result in a failure of a condition set forth in Section 6.3(a) or Section 6.3(b) and (ii) is either not curable or is not cured by the End Date; provided that the Buyer's right to terminate this Agreement pursuant to this Section 7.1(e) shall not be available to Buyer if Buyer shall have materially breached or there is any material inaccuracy in any of its representations or warranties, or shall have materially breached or materially failed to perform any of its covenants or other agreements contained in this Agreement;

(f)     by Buyer, if, subject to Section 7.1(j), the Sale Order has not been entered by the Bankruptcy Court by April 30, 2019;

(g)     by Buyer, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code for any reason prior to the Closing Date;

(h)     by Buyer, if the Sale Order is modified in any material respect to the detriment of Buyer without the consent of Buyer, such consent not to be unreasonably withheld, conditioned or delayed;

(i)     by Buyer, if the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting or modifying the automatic stay with respect to any material portion of the Purchased Assets;

(j)     by either Sellers or Buyer, if (A) the Bankruptcy Court approves, and Sellers consummate, an Alternative Transaction or (B) Buyer is not the Successful Bidder at the Auction; provided that, if Buyer is not the Successful Bidder at the Auction, but is the Back-Up Bidder, then notwithstanding anything to the contrary contained herein, (i) Buyer shall not be permitted to terminate this Agreement pursuant to this Section 7.1(j), Section 7.1(f) or Section 7.1(h) until the Back-Up Period End Date; provided, further, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 7.1(j) if Buyer is then in breach of the terms of this Agreement, which such breach would give rise to the failure of a condition set forth in Section 6.2 and cannot be cured or, if such breach can be cured, has not been cured within twenty (20) days following delivery of written notice of such breach; or

(k)    by Sellers, if (i) all of the conditions set forth in Sections 6.1 and 6.3 are satisfied (except for any conditions that by their nature can only be satisfied on the Closing Date, but subject to satisfaction of such conditions on the Closing Date or waiver by the Party entitled to waive such conditions in accordance with the terms thereof), (ii) Sellers have irrevocably confirmed in writing to Buyer that (A) all of the conditions set forth in Sections 6.1 and 6.2 to Sellers' obligations have been satisfied or waived (except for any conditions that by their nature can only be satisfied on the Closing Date, but subject to the satisfaction of such conditions on the Closing Date or waiver by the Party entitled to waive such conditions in accordance with the terms thereof), and (B) they are ready, willing and able to take the actions within their control to cause the Closing to occur, and (iii) Buyer fails to consummate the transactions contemplated by this Agreement, on the terms and subject to the conditions set forth in this Agreement, within five (5) Business Days (time being of the essence) following delivery of the confirmation by Sellers required by clause (ii) of this Section 7.1(k); provided, however, that (A) the confirmation required by clause (ii) of this Section 7.1(k) shall not be delivered to Buyer until the date on or after April 29, 2019 that is the third Business Day following satisfaction or waiver of all conditions to the Parties' obligations set forth in ARTICLE VI (except for any conditions that by their nature can only be satisfied on the Closing Date, but subject to satisfaction of such conditions on the Closing Date or waiver by the Party entitled to waive such conditions in accordance with the terms thereof), and if it is delivered prior to such date, the delivery date shall be deemed to be the third Business Day on or after April 29, 2019 following satisfaction or waiver of all conditions as set forth above and (B) for the avoidance of doubt, Sellers shall not be entitled to terminate this Agreement or retain the Good Faith Deposit as a result of the Closing not occurring prior to May 9, 2019.

7.2    Effect of Termination.  In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall terminate (except that the Confidentiality Agreement, Section 2.3, the last sentence of Section 5.8(d), Section 5.13(b), this Section 7.2, Section 7.3, and ARTICLE VIII shall survive any termination), and there shall be no other Liability on the part of Sellers or Buyer to the other Party, other than as set forth in Section 2.3; provided that nothing herein shall relieve any Party from Liability for a Willful Breach of its covenants or agreements set forth in this Agreement prior to such termination or relieve Buyer from Liability for any Willful Breach of its obligations to consummate the transactions contemplated hereby, in which case, the aggrieved Party shall be entitled to all rights and remedies available at law or in equity.  In the event of termination of this Agreement, and regardless of the reason for the termination, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms and any such termination shall not amend, modify, release, waive or otherwise limit any rights or obligations under the Confidentiality Agreement.

7.3    Break-Up Fee; Expense Reimbursement.

(a)    Sellers acknowledge (i) that Buyer has made a substantial investment in time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence with respect to the Purchased Assets, and its efforts to consummate the transactions contemplated hereby, and (ii) that Buyer's efforts have substantially benefited Sellers and will benefit Sellers and will benefit the bankruptcy estate of Sellers through the submission of the offer reflected in this Agreement which will serve as a minimum bid on which other potentially interested bidders can rely.  Therefore, as compensation for entering into this Agreement, taking action to attempt to consummate the transactions contemplated hereby and incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, subject to limitations set forth in the Bidding Procedures, Sellers agree, jointly and severally, to pay to Buyer the Expense Reimbursement, plus an amount equal to six million seven hundred sixty thousand dollars ($6,760,000.00) (the "Break-Up Fee") promptly following (a) this Agreement being validly terminated by Buyer or Sellers pursuant to Section 7.1(j) and (b) Sellers receiving the cash consideration in connection with the closing of the Alternative Transaction.

7.4    <u>Return of Good Faith Deposit</u>.  In the event that this Agreement is validly terminated pursuant to <u>Section 7.1(a)</u>, <u>7.1(b)</u>, <u>7.1(c)</u>, <u>7.1(e)</u>, <u>7.1(f)</u>, <u>7.1(g)</u>, <u>7.1(h)</u>, <u>7.1(i)</u>, or <u>7.1(j)</u>, the Good Faith Deposit Escrow Holder shall disburse to Buyer any amounts held in the Good Faith Deposit Escrow pursuant to the Bidding Procedures.

**ARTICLE VIII**
**<u>MISCELLANEOUS</u>**

8.1    <u>No Survival</u>.  The representations, warranties, covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall not survive the Closing and shall be extinguished by the Closing and the consummation of the transactions contemplated hereby, except for covenants and agreements that, by their terms, contemplate performance after, or otherwise expressly by their terms survive, the Closing.

8.2    <u>Expenses</u>.  Except as otherwise provided in this Agreement, whether or not the Asset Purchase is consummated, all costs and expenses incurred in connection with the Asset Purchase, this Agreement and the transactions contemplated hereby shall be paid by the Party incurring or required to incur such expenses; <u>provided</u> that Buyer shall pay all filing fees required under the HSR Act and all fees and expenses of the Escrow Agent.

8.3    <u>Counterparts; Effectiveness</u>.  This Agreement may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by telecopy, electronic delivery or otherwise) to the other Parties.  Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

8.4    <u>Governing Law; Jurisdiction</u>.

(a)    This Agreement, and all claims or causes of action (whether at Law, in contract, in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance hereof, shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b)    All Proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding.  The Parties consent to service of process by mail (in accordance with <u>Section 8.7</u>) or any other manner permitted by law.

8.5    <u>Remedies</u>.

(a)    The Parties agree and acknowledge that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and accordingly (i) each of the Parties shall be entitled to, and may seek in the alternative,

45

such remedies as are available at law and in equity, and (ii) (A) except as otherwise provided in <u>Section 8.5(b)</u> and <u>Section 8.5(c)</u>, the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and shall be entitled to specific performance of the terms hereof, in each case, in the Bankruptcy Court (as set forth in <u>Section 8.4(b)</u>), this being in addition to any other remedy to which they are entitled at law or in equity, (B) the Parties waive any requirement for the securing or posting of any bond in connection with the obtaining of any specific performance or injunctive relief and (C) the Parties agree, in any action for specific performance, that there is no adequate remedy at law. In circumstances where Buyer is obligated to consummate the Asset Purchase and the Asset Purchase has not been consummated, Buyer expressly acknowledges and agrees that Sellers shall have suffered irreparable harm, that monetary damages will be inadequate to compensate Sellers, and that Sellers shall be entitled (in addition to any other remedy that may be available to them whether in law or equity, including monetary damages) to enforce specifically Buyer's obligations to consummate the Asset Purchase. Sellers' pursuit of specific performance at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which Sellers may be entitled. In no event shall the Parties be entitled to receive both a grant of specific performance of the consummation of the Asset Purchase pursuant to this <u>Section 8.5</u> and monetary damages to which it is entitled pursuant to this Agreement with respect to termination of this Agreement. For the avoidance of doubt, the Parties shall be entitled to seek the remedies provided herein in the alternative, and not be required to elect their remedies, in any Proceeding brought to seek redress for the failure of Buyer to consummate the Asset Purchase pursuant to this Agreement.

(b)     In the event of any breach prior to the Closing by Sellers of any of Sellers' agreements, representations, or warranties contained herein or in the Bidding Procedures Order or the Sale Order, including any Willful Breach, Buyer's sole and exclusive remedies shall be (i) to exercise Buyer's rights to terminate this Agreement pursuant to <u>ARTICLE VII,</u> in accordance with the terms of such <u>ARTICLE VII,</u> (ii) the return of the Good Faith Deposit as provided in <u>Section 2.3</u>, and (iii) to the Break-Up Fee or the Expense Reimbursement, as applicable, if earned in accordance with <u>Section 7.3</u>, and Buyer shall not have any further cause of action for damages, specific performance, or any other legal or equitable relief against Sellers with respect thereto.

(c)     In the event of any breach prior to the Closing by Buyer of any of Buyer's agreements, representations, or warranties contained herein, including any Willful Breach, Sellers' sole and exclusive remedies shall be (i) to exercise Sellers' rights to terminate this Agreement pursuant to <u>ARTICLE VII,</u> in accordance with the terms of such <u>ARTICLE VII,</u> (ii) the payment of the Good Faith Deposit as provided in <u>Section 2.3</u>, and (iii) to enforce any provision of this Agreement pursuant to clause (ii) of <u>Section 8.5(a)</u> and the two sentences that immediately follow such clause (and, in the case of a Willful Breach of this Agreement by Buyer, to enforce any provision of this Agreement pursuant to any provision of <u>Section 8.5(a)</u>).

8.6     <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY.

8.7     <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given (a) upon personal delivery to the Party to be notified; (b) when received when sent by email or facsimile by the Party to be notified; <u>provided</u> that notice given by email or facsimile shall not be effective unless either (i) a duplicate copy of such email or fax notice is promptly given by one of the other methods described in this <u>Section 8.7</u> or (ii) the receiving Party delivers a written confirmation of receipt for such notice either by email or fax or any other method described in this <u>Section 8.7</u>; or

(c) when delivered by a courier (with confirmation of delivery); in each case to the Party to be notified at the following address:

    To Buyer:

        c/o New Mountain Capital, L.L.C.
        787 Seventh Avenue, 49th Floor
        New York, New York 10019
        Attention:      Andre Moura;  Joe Walker
        Email:  AMoura@newmountaincapital.com;  JWalker@newmountaincapital.com

    with a copy (which shall not constitute notice) to:

        Ropes & Gray LLP
        1211 Avenue of the Americas
        New York, New York 10036
        Attention:      John E. Sorkin; Robb Tretter; Matthew Roose
        Email:  john.sorkin@ropesgray.com; robb.tretter@ropesgray.com;
        Matthew.Roose@ropesgray.com

    To Sellers:

        Aceto Corporation
        4 Tri Harbor Ct.
        Port Washington, NY 11050
        Attention: Steven S. Rogers, Chief Legal Officer
        Facsimile: (516) 478-9857
        Email: srogers@aceto.com

    with a copy (which shall not constitute notice) to:

        Lowenstein Sandler LLP
        1251 Avenue of the Americas
        New York, New York 10020
        Facsimile:      (973) 597-2507
        Attention:      Steven E. Siesser, Esq.
                     Peter H. Ehrenberg, Esq.
        Email:         ssiesser@lowenstein.com
                     pehrenberg@lowenstein.com

or to such other address as any Party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated or personally delivered.  Any Party may notify any other Party of any changes to the address or any of the other details specified in this Section 8.7; provided that such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given, whichever is later.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

8.8    <u>Assignment; Binding Effect</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any of the Parties without the prior written consent of the other Parties.  Subject to the first sentence of this <u>Section 8.8</u>, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.  Any purported assignment not permitted under this <u>Section 8.8</u> shall be null and void.  Notwithstanding anything in this <u>Section 8.8</u> to the contrary, Buyer may, without any required consent from any other Party, assign or transfer this Agreement or any of its rights or obligations hereunder (a) to any of its Affiliates, (b) to any acquirer of all or substantially all of the business or assets of the Acquired Business or Buyer after the Closing or (c) as a collateral assignment to its or its Affiliates lenders in connection with any debt financing arrangements of Buyer or its Affiliates; <u>provided</u>, that no such assignment shall relieve Buyer of any Liability or obligation hereunder until such Liability or obligation has been performed.

8.9    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

8.10    <u>Entire Agreement</u>.  This Agreement together with the exhibits hereto, schedules hereto and the Confidentiality Agreement constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the Parties, or any of them, with respect to the subject matter hereof and thereof, and this Agreement is not intended to grant standing to any Person other than the Parties. If the Parties or any of their Affiliates are required by Law to enter into any local transfer (or similar) agreements to effect the transfer of any share certificates as contemplated by Section 2.8(h) (each, a "<u>Local Transfer Agreement</u>"), the Parties agree that such Local Transfer Agreements shall serve purely to effect the legal transfer of such shares and shall not expand or limit the rights and obligations of the Parties beyond those provided for in this Agreement. In furtherance of the foregoing, no Local Transfer Agreement shall provide for any additional rights or obligations of the Parties or their respective Affiliates that are not provided for in this Agreement. In the event of any conflict between the terms of this Agreement and any Local Transfer Agreement, the Parties agree and acknowledge that the terms of this Agreement shall control.

8.11    <u>Amendments; Waivers</u>. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Sellers and Buyer or, in the case of a waiver, by the Party against whom the waiver is to be effective. Notwithstanding the foregoing, no failure or delay by any Party in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

8.12    <u>Headings</u>.  Headings of the Articles and Sections of this Agreement are for convenience of the Parties only and shall be given no substantive or interpretive effect whatsoever.  The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.13    <u>No Third-Party Beneficiaries</u>.  Each of Sellers and Buyer agree that, except to the extent expressly provided in this Agreement (a) its representations, warranties, covenants and agreements set forth herein are solely for the benefit of the other Parties, in accordance with and subject to the terms of this Agreement, and (b) this Agreement is not intended to, and does not, confer upon any Person other than the Parties any rights or remedies hereunder, including the right to rely upon the representations and warranties set forth herein.

8.14    Interpretation.  When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, unless the context otherwise requires.  The word "or" shall not be deemed to be exclusive.  The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not mean simply "if."  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  References in this Agreement to specific laws or to specific provisions of laws shall include all rules and regulations promulgated thereunder.  Each of the Parties has participated in the drafting and negotiation of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any of the provisions of this Agreement.

8.15    Non-Recourse.  Notwithstanding anything herein to the contrary, no director, manager, officer, agent or representative of, Affiliate (or director, manager, officer, agent or representative of an Affiliate) of, or direct or indirect equity owner in, any Sellers shall have any personal liability to either Buyer or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Sellers in this Agreement, and no director, manager, officer, agent or representative of, Affiliate (or director, manager, officer, agent or representative of an Affiliate) of, or direct or indirect equity owner in, Buyer shall have any personal liability to Sellers or any other Person as a result of the breach of any representation, warranty, covenant, agreement or obligation of Buyer in this Agreement.

8.16    Definitions.

(a)    Certain Specified Definitions.  As used in this Agreement:

"Accounting Firm" means an accounting firm of national reputation mutually acceptable to Buyer and Sellers, with no existing relationship with either Buyer or Sellers.

"Accounting Principles" means GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Most Recent Balance Sheet and the Illustrative Calculation, subject to the modifications and limitations set forth on Section 8.16(a) of the Sellers Disclosure Schedule.  For the avoidance of doubt, all intercompany accounts payable and intercompany accounts receivable shall be excluded from the Illustrative Calculation and the definition of "Net Current Assets."

"Accounts Receivable" means all third party accounts receivable and other rights to payment of Sellers or the Acquired Subsidiaries, and the full benefit of all security for such accounts receivable or rights to payment, including all accounts receivable in respect of goods shipped or products sold or services rendered to customers by Sellers or the Acquired Subsidiaries, any other miscellaneous accounts receivable of Sellers or the Acquired Subsidiaries, and any claim, remedy or other right of Sellers or the Acquired Subsidiaries related to any of the foregoing, in each case derived primarily from the operation of the Acquired Business, as reflected in the Closing Statement prepared in accordance with the Accounting Principles and consistent with the Illustrative Calculation.

"Accrued Liabilities" means, without duplication, any Liabilities of the Acquired Business for: (i) deferred income (including any profit sharing arrangements); (ii) accrued payroll (including, for the avoidance of any doubt, both the employee and employer portions of accrued payroll Taxes, Assumed Plan contributions and premium payments and unemployment contributions); (iii) accrued (to the extent not paid by Sellers) and unused vacation and paid time off ("PTO") to which the employees of the Acquired Business are entitled pursuant to the PTO policies of Sellers applicable to such employees immediately prior to the Closing Date; (iv) retention bonus and key employee incentive obligations, severance obligations, enhanced executive severance arrangements and change of control payments; (v) any liabilities in connection with product returns, rebates, credits and related claims and any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to each Seller; (vi) unearned revenue; (vii) accrued and unpaid property, public utility commission and sales Taxes of Sellers attributable under the principles of Section 5.8(c) to periods (or portions thereof) ending on or before the Closing Date (as determined in accordance with the past practices of the relevant Seller and reduced (but not below zero) by refunds, credits or other receivables (including VAT receivable) in respect of such Taxes) and (viii) annual bonuses, annual cash incentives, short-term cash bonuses or commissions, in each case as reflected in the Closing Statement prepared in accordance with the Accounting Principles and consistent with the Illustrative Calculation.

"Aceto Bermuda" means Aceto Ltd., a company organized under the laws of Bermuda.

"Aceto HK" means Aceto (Hong Kong) Ltd., a company organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.

"Aceto Shanghai" means Aceto (Shanghai) Ltd.

"Acquired Business" means the Chemical Plus Business as conducted by Sellers and the Acquired Subsidiaries as of the Agreement Date. For the avoidance of doubt, the Acquired Business excludes the assets and liabilities primarily related to the Pharma Business.

"Acquired Real Property" means the Owned Real Property and Leased Real Property subject to Assumed Real Property Lease(s).

"Acquired Subsidiaries" means, collectively, the Purchased Subsidiaries and the Subsidiaries of the Purchased Subsidiaries (including, for the avoidance of doubt, the Joint Venture).

"Adjustment Time" means 12:01 a.m. New York, New York time on the Closing Date.

"Affiliate" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"Alternative Bid" means a higher or better competing bid, including in consideration of any sale, transfer, liquidation, or disposition of the Acquired Business, the Purchased Assets or the Acquired Subsidiaries or of a plan of reorganization or liquidation with respect to the Acquired Business, the Purchased Assets or the Acquired Subsidiaries.

"AMR" means the State Administration of Market Regulation of the PRC or its local counterpart.

"<u>Alternative Transaction</u>" means one or more agreements to sell, transfer, liquidate or otherwise dispose of any material portion of the Purchased Assets, either alone or together with any other portion of the Business, in a transaction or series of transactions (other than in the Ordinary Course of Business) with one or more Persons, other than Buyer, pursuant to an Alternative Bid that actually closes.

"<u>Ancillary Documents</u>" means the Bill of Sale, the Assignment and Assumption Agreement, the Assignment of Intellectual Property, the Assignment and Assumption of Leases, the Escrow Agreement and each other agreement, document or instrument (other than this Agreement) executed and delivered by the Parties in connection with the consummation of the transactions contemplated hereby.

"<u>Assignment and Assumption Agreement</u>" means an assignment and assumption agreement in substantially the form of <u>Exhibit B</u>.

"<u>Auction</u>" has the meaning specified in the Bidding Procedures Order.

"<u>Back-Up Bidder</u>" has the meaning specified in the Bidding Procedures Order.

"<u>Back-Up Period End Date</u>" means the earliest of (a) the date upon which an Alternative Transaction has been consummated following approval by the Bankruptcy Court, (b) 90 days after entry of the Order of the Bankruptcy Court pursuant to, *inter alia*, Section 363 and/or Section 365 of Bankruptcy Code approving the sale of the Acquired Business (or a substantial portion thereof) to the Successful Bidder (to the extent the Successful Bidder is not Buyer) and (c) August 15, 2019.

"<u>Bidding Procedures</u>" means the bidding procedures attached as Exhibit 1 to the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>" means the order of the Bankruptcy Court entered on March 15, 2019 at docket number 142.

"<u>Bill of Sale</u>" means a bill of sale in substantially the form attached hereto as <u>Exhibit C</u>.

"<u>Books and Records</u>" means all Tax Returns, books, records, files, invoices, inventory records, personnel records and Forms I-9, product specifications, advertising, marketing, and promotional materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media).

"<u>Bribery Legislation</u>" means all and any of the following: the Foreign Corrupt Practices Act of 1977, as amended; the Organization For Economic Co-operation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions and related implementing legislation; the relevant common law or legislation in England and Wales relating to bribery and/or corruption, including, the Public Bodies Corrupt Practices Act 1889; the Prevention of Corruption Act 1906 as supplemented by the Prevention of Corruption Act 1916 and the Anti-Terrorism, Crime and Security Act 2001; the Bribery Act 2010; the Proceeds of Crime Act 2002; and any applicable anti-bribery or anti-corruption related provisions in criminal and anti-competition laws and/or anti-bribery, anti-corruption and/or anti-money laundering laws of any jurisdiction in which the Acquired Business operates.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or any other calendar day on which commercial banks in New York, New York are authorized or required by Law to remain closed.

"Cash" means, as of Adjustment Time, all cash and cash equivalents of the Acquired Business, as determined in accordance with GAAP using the same accounting methods, policies, practices and procedures, with consistent classifications, judgments and estimation methodology, as were used in the preparation of the Most Recent Balance Sheet, excluding the effects of transactions on the Closing Date after the Closing outside of the Ordinary Course of Business.  Notwithstanding the foregoing, "Cash" shall include uncashed and uncleared checks and other deposits or transfers received or deposited for the accounts of Sellers or the Acquired Subsidiaries, including ACH transactions and other wire transfers, but shall exclude all outbound ACH and issued but uncleared checks, in each case, as of the Adjustment Time.

"Chemical Plus Business" means the Nutritional Business Sub Segment, Performance Chemicals, and Pharmaceutical Ingredients.

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing Cash Amount" means, as of the Adjustment Time, an amount equal to (a) Cash of the Acquired Subsidiaries up to an amount equal to $8,000,000 (such amount, the "Operating Cash Amount") and (b) (i) Cash of the Acquired Subsidiaries in excess the Operating Cash Amount *multiplied by* (ii) 0.90 (such amount, the "Excess Cash Amount"), in each case, calculated as of the Adjustment Time and calculated less any amounts of Cash used on the Closing Date after the Adjustment Time and prior to the Closing to repay Indebtedness of the Acquired Subsidiaries or Transaction Expenses that would have otherwise been taken into account in calculating the Purchase Price if unpaid at the Closing.

"Closing Debt Amount" means the aggregate amount of Indebtedness of the Acquired Subsidiaries (including any intercompany Indebtedness owed to the Sellers or their respective Affiliates (other than another Acquired Subsidiary)) existing as of the time of the Closing.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Comparable Compensation and Benefits" means a base salary, wage rate, annualized fixed or guaranteed remuneration, and opportunities to receive target incentive, commission or performance pay (other than equity compensation, change-in-control, retention, and severance, in each case, other than any such obligations under the Assumed Plans), as applicable, and other employee benefit plans and arrangements (including medical insurance plans and other welfare benefit plans and 401(k) or retirement plans, but excluding any retiree medical benefits, qualified defined benefit plans, or nonqualified deferred compensation plans, in each case, other than any such obligations under the Assumed Plans), that are generally comparable in the aggregate to those provided to the applicable employee by Sellers and the Acquired Subsidiaries immediately prior to the Closing Date.

"Comparable Position" means, with respect to any employee, a position that is substantially similar to the type and geographic location of the position held by such employee immediately prior to the Closing Date.

"Contract" means any written contract, note, bond, mortgage, indenture, deed of trust, license, lease, agreement, arrangement, commitment or other instrument or obligation that is legally binding.

"Credit Facility" means that certain Second Amended and Restated Credit Agreement, dated as of December 21, 2016 (as it may be amended or modified from time to time), among Parent, as borrower, the other loan parties party thereto, the lenders party thereto and Wells Fargo Bank, National Association, as administrative agent.

"DEA" means the United States Drug Enforcement Administration.

"Environmental Law" means any Law (i) relating to pollution or the protection, preservation or restoration of the environment (including air, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or any exposure to or release of, or the management of (including the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production or disposal of) any Regulated Substances or (ii) that regulates, imposes liability (including for enforcement, investigatory costs, cleanup, removal or response costs, natural resource damages, contribution, injunctive relief, personal injury or property damage) or establishes standards of care with respect to any of the foregoing. The term "Environmental Law" includes any common law or equitable doctrine (including injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to or threatened as a result of the presence of, exposure to, or ingestion of, any Regulated Substance.

"Environmental Permit" means any permit, certificate, registration, notice, approval, identification number, license or other authorization required under any applicable Environmental Law.

"EPA" means the United States Environmental Protection Agency.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes or included the first entity, trade or business.

"Excluded Subsidiaries" means the Subsidiaries of Sellers other than the Acquired Subsidiaries.

"Expense Reimbursement" means the actual out-of-pocket legal, accounting and other third party advisory or service costs and expenses of Buyer in connection with the transactions contemplated hereby, in an amount not to exceed two million dollars ($2,000,000).

"FDA" means the U.S. Food and Drug Administration or a successor thereto.

"FDCA" means the Federal Food, Drug and Cosmetic Act of 1938, as amended.

"FIFRA" means the Federal Insecticide, Fungicide, and Rodenticide Act.

"Final Order" means an action taken or Order issued by the applicable Governmental Entity as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Entity and the time for filing any such petition or protest is passed; (iii) the Governmental Entity does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review

pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Governmental Entity" means any federal, state, local or foreign governmental entity, transnational governmental organization or any subdivision, court of competent jurisdiction, judicial authority, court, tribunal, arbitral, self-regulatory organization, agency, authority, department, board, bureau, official or commission or instrumentality, in each case, whether domestic or foreign.

"Human Health" means the business segment of the Sellers historically identified as "Human Health" and comprised of: (i) finished dosage form generic drugs and nutraceutical products, including the sale of generic prescription products and over-the-counter pharmaceutical products to leading wholesalers, chain drug stores, distributors and mass merchandisers and (ii) the Nutritional Business Sub Segment.

"Illustrative Calculation" means the illustrative calculation set forth in Section 8.16(b) of the Sellers Disclosure Schedule.

"Indebtedness" means, as to any Person, without duplication, as of the date of determination (i) all obligations of such Person for borrowed money, including accrued and unpaid interest, and any prepayment fees or penalties, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all lease obligations of such Person capitalized on the Books and Records of such Person, (iv) all Indebtedness of others secured by a Lien on property or assets owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (v) all letters of credit or performance bonds issued for the account of such Person, to the extent drawn upon, and (vi) all guarantees of such Person of any Indebtedness of any other Person other than a wholly owned subsidiary of such Person.

"Intellectual Property" means all intellectual property and similar proprietary rights existing anywhere in the world associated with (i) patents and patent applications, including continuations, divisionals, continuations-in-part, reissues or reexaminations and patents issuing thereon (collectively, "Patents"), (ii) trademarks, service marks, trade dress, logos, corporate names, trade names and Internet domain names, together with the goodwill exclusively associated with any of the foregoing, and all applications and registrations therefor (collectively, "Marks"), (iii) copyrights (including such rights in software) and registrations and applications therefor, and works of authorship (collectively, "Copyrights"), (iv) designs, databases and data compilations, and (v) trade secrets and other proprietary and confidential information, including know-how, inventions (whether or not patentable), processes, formulations, technical data and designs, in each case, excluding any rights in respect of any of the foregoing that comprise or are protected by Patents (collectively, "Trade Secrets"); in each case, used for the operation of the Acquired Business.

"Intercompany Accounts Receivable" means all accounts receivable and other rights to payment of any Seller from any Acquired Subsidiary, and the full benefit of all security for such accounts receivable or rights to payment, including all accounts receivable in respect of goods shipped or products sold or services rendered to such Acquired Subsidiary by Sellers, any other miscellaneous accounts receivable of any Seller from any Acquired Subsidiary, and any claim, remedy or other right of any Seller from any Acquired Subsidiary related to any of the foregoing, in each case derived primarily from the operation of the Acquired Business.

"Inventory" means inventories of materials, parts, raw materials, packaging materials, supplies, spare parts, work-in-process, goods in transit, finished goods and products, in each case, primarily related to the Acquired Business.

"Joint Venture" means Canegrass LLC, a Delaware limited liability company.

"knowledge" means (i) with respect to Buyer, the actual knowledge, after due inquiry, of the individuals listed in Section 8.16(c) of the Buyer Disclosure Schedule, and (ii) with respect to Sellers, the actual knowledge, after due inquiry, of the individuals listed on Section 8.16(d) of the Sellers Disclosure Schedule.

"Leased Real Property" means real property leased by, licensed to or otherwise used or occupied (but not owned) by one or more Seller or any Acquired Subsidiary (other than the Joint Venture) with respect to the Acquired Business.

"Liability" means any debt, loss, Claim, damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Lien" means any "Interest" as that term is used in Section 363(f) of the Bankruptcy Code, lien (including any mechanics lien), encumbrance, pledge, mortgage, indenture, deed of trust, security interest, pledge, hypothecation, claim, lease, charge, escrow, option, right of first offer, right of first refusal, preemptive right, easement, servitude, reservation, covenant, encroachment, right of use, right of way, security agreement or other similar agreement, arrangement, contract, commitment, understanding or obligation (whether written or oral and whether or not relating in any way to credit or the borrowing of money) of any kind with respect to any Person, or any proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

"Material Adverse Effect" means, with respect to Parent (but solely with respect to the Acquired Business), NY Agri and the Acquired Subsidiaries, any change, effect, event, occurrence or development that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, operations or financial condition of Sellers and the Acquired Subsidiaries, taken as a whole and primarily in respect of the Acquired Business, excluding, however, the impact of (i) the filing of the Bankruptcy Case or operating in bankruptcy, (ii) any changes or developments in domestic, foreign or global markets or domestic, foreign or global economic conditions generally, including (A) any changes or developments in or affecting the domestic or any foreign securities, equity, credit or financial markets and the industry in which Sellers or Acquired Subsidiaries are engaged or (B) any changes or developments in or affecting domestic or any foreign interest or exchange rates and the industry in which Sellers or Acquired Subsidiaries are engaged, (iii) changes in GAAP or any official interpretation or enforcement thereof, (iv) changes in Law or any changes or developments in the official interpretation or enforcement thereof by Governmental Entities, (v) changes in domestic, foreign or global political conditions (including the outbreak or escalation of war, military actions, or acts of terrorism), including any worsening of such conditions threatened or existing on the Agreement Date, (vi) changes or developments in the business conditions or regulatory conditions affecting the industries in which the Acquired Business operates, (vii) the announcement or the existence of, compliance with or performance under, this Agreement or the transactions contemplated hereby (including the impact thereof on the relationships, contractual or otherwise, of Sellers or any Acquired Subsidiary with employees, labor unions, financing sources, customers, suppliers or partners), (viii) weather conditions or other acts of God (including storms, earthquakes, tornados, floods or other natural disasters), (ix) a decline in the trading price or trading volume of Parent's common stock or any change in the ratings or ratings outlook for Parent (provided that the underlying causes thereof may be considered in determining whether a Material

Adverse Effect has occurred if not otherwise excluded hereunder), (x) the failure to meet any projections guidance, budgets, forecasts or estimates (provided that the underlying causes thereof may be considered in determining whether a Material Adverse Effect has occurred if not otherwise excluded hereunder), (xi) taken or omitted to be taken by a Seller or any Acquired Subsidiary at the written request of Buyer or that is not prohibited by this Agreement, (xii) any Proceeding threatened, made or brought by any of the current or former shareholders of a Seller (or on their behalf or on behalf of such Seller) against such Seller or any of their respective directors, officers or employees arising out of this Agreement or the transactions contemplated hereby, (xiii) any Proceeding threatened, made or brought against a Seller for breach of a Material Contract in connection with the collection of payment due thereunder (whether alone or with other claims) or any modification of credit, cash on delivery or similar terms of a Material Contract, (xiv) the failure to obtain any approvals or consents from any Governmental Entity in connection with the transactions contemplated hereby, and (xv) changes in legislation or Law that directly or indirectly affect the purchasing or selling of products or services sold or provided by Sellers and the Acquired Subsidiaries; except, with respect to clauses (ii), (iv), (vi), (viii) and (xv), to the extent that such impact is disproportionately adverse to Sellers and the Acquired Subsidiaries, taken as a whole and primarily in respect of the Acquired Business, relative to others in the industry or industries in which the Acquired Business operates.

"MOFCOM" means the Ministry of Commerce of the PRC and the local counterpart.

"Net Current Assets" means (x) the sum of Inventory, Accounts Receivable and Purchased Deposits and other current assets of the Acquired Subsidiaries as set forth on the Illustrative Calculation minus (y) the sum of Accounts Payable, Accrued Liabilities (other than the liabilities described in clause (iv) of the definition of Accrued Liabilities) and other current liabilities of the Acquired Subsidiaries as set forth on the Illustrative Calculation and, without duplication of any items included in Accrued Liabilities, accrued and unpaid Tax Liabilities of the Acquired Subsidiaries (limited to 30% of such Tax Liabilities in the case of the Joint Venture) attributable under the principles of Section 5.8(c), to periods (or portions thereof) ending on or before the Closing Date (as determined in accordance with the past practices of the relevant Acquired Subsidiary and reduced (potentially below zero) by any rights to refunds, credits or other receivables (including VAT receivables) in respect of such Taxes), as calculated in a manner consistent with the Illustrative Calculation and the Accounting Principles as of the Adjustment Time (other than, in the case of Tax liabilities and Tax assets as contemplated by Section 5.8(c). For the avoidance of doubt, none of (i) Cash, (ii) Cure Costs, (iii) time deposits, (iv) Transfer Taxes for which Buyer is responsible pursuant to Section 5.8(b) or (v) Applicable EIT liability shall be included in the calculation of Net Current Assets.

"Net Debt" means the Closing Debt Amount plus the Transaction Expenses minus the Closing Cash Amount.

"Non-U.S. Seller Benefit Plan" means each Seller Benefit Plan that is maintained outside the jurisdiction of the United States.

"Nutritional Business Sub Segment" means the supply of ingredients and raw materials used in the production of food, nutritional and packaged dietary supplements, including vitamins, supplements, botanical extracts, amino acids, minerals, iron compounds and biochemicals used in pharmaceutical and nutritional preparations.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Entity.

"Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the Acquired Business (including acts and omissions of a Seller in the ordinary and usual course) through the date hereof, consistent with past practice or operations in or pending a bankruptcy.

"Organizational Documents" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"Owned Real Property" means any real property and interests in real property owned by a Seller or any Acquired Subsidiary (other than the Joint Venture) and used primarily for the operation of the Acquired Business, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances of a Seller or such Acquired Subsidiary relating thereto, but excluding any leasehold, license or other use or occupancy real property interest).

"Party" or "Parties" means, individually or collectively, Buyer and each Seller.

"Performance Chemicals" means the business segment of the Sellers historically identified as "Performance Chemicals" and consisting of the sourcing and distribution of specialty chemicals, including the supply to various industrial segments of chemicals used in the manufacture of plastics, surface coatings, cosmetics and personal care, textiles, fuels and lubricants, and agricultural protection products.

"Permits" means all material approvals, permits, certificates, qualifications, authorizations, licenses, franchises, consents, Orders and registrations, together with all modifications, amendments, supplements and extensions thereof, of all United States federal, state and local Governmental Entities and any other Person that are necessary for Sellers to own and operate the Acquired Business.

"Permitted Liens" means (i) any Liens for Taxes not yet due or that are being contested in good faith by appropriate Proceedings or for which adequate reserves have been established by a Seller or any Acquired Subsidiary in accordance with GAAP, (ii) vendors', mechanics', materialmen's, carriers', workers', landlords', repairmen's, warehousemen's, construction and other similar Liens (A) with respect to Liabilities that are not yet due and payable or, if due, are not delinquent or (B) that are being contested in good faith by appropriate Proceedings and for which adequate reserves (based on good faith estimates of management) have been set aside for the payment thereof or (C) arising or incurred in the Ordinary Course of Business and which are not, individually or in the aggregate, material to the operation of the Acquired Business and do not materially adversely affect the market value or continued use of the asset encumbered thereby, (iii) Liens imposed or promulgated by applicable Law or any Governmental Entity with respect to real property, including zoning, building or similar restrictions but only to the extent that Sellers and the Acquired Subsidiaries and their respective assets are materially in compliance with the same, (iv) pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation, (v) Liens relating to intercompany borrowings among a Person and its wholly owned subsidiaries, (vi) utility easements, minor encroachments, rights of way, imperfections in title, charges, easements, rights of way (whether recorded or unrecorded), restrictions, declarations, covenants, conditions, defects and similar Liens or Claims, but not including any monetary Liens, that are imposed by any Governmental Entity having jurisdiction thereon or otherwise are typical for the applicable property  type and locality as do not individually or in the aggregate materially interfere with

the present occupancy under the real property interest, or the use or market value of the real property interest, or materially impair the operation of the Acquired Business, (vii) Intellectual Property licenses, (viii) Liens to be released at or prior to Closing, (ix) Liens that do not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (x) liens consented to in writing by Buyer; provided that, in each case of clause (i) through (ix) above, such Lien shall only be a Permitted Lien if it cannot be satisfied solely through the payment of money or otherwise removed, discharged, released or transferred, as the case may be, pursuant to Section 363(f) of the Bankruptcy Code or otherwise.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Entity or other entity.

"Pharma Business" means Human Health, excluding the Nutritional Business Sub Segment.

"Pharmaceutical Ingredients" means the business segment of the Sellers historically identified as "Pharmaceutical Ingredients" and comprised of the following two product groups: Active Pharmaceutical Ingredients (APIs) and Pharmaceutical Intermediates.

"PRC" means the People's Republic of China, excluding Hong Kong and Macao Special Administration Regions and Taiwan area, only for the purpose of this Agreement.

"PRC Transfer Approvals" means any filing required to be made with, or consent or approval required to be obtained from, any Governmental Entity in the PRC to effectively transfer the equity interests of Aceto Shanghai to Buyer or its designee pursuant to this Agreement, including the filing of any amendment with the AMR, MOFCOM and the SAFE.

"Prepetition Credit Agreement Penalty" means, if determined to be payable pursuant to Section 2.1(d), and (i) the Closing occurs on or before May 30, 2019, an amount equal to the actual portion of the Waiver Fee (as defined in Section 2.12(e) of the Credit Facility) that becomes due and payable on April 30, 2019 pursuant to Section 2.12(e) of the Credit Facility, which as of the date hereof is estimated to be $4,100,000 (the "Initial Penalty") or (ii) the Closing occurs after May 30, 2019, an amount equal to the Initial Penalty plus the remaining portion of the Waiver Fee that becomes due and payable on May 31, 2019 pursuant to Section 2.12(e) of the Credit Facility.

"Proceeding" means any action, suit, claim, hearing, arbitration, litigation or other proceeding, in each case, by or before any Governmental Entity.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent (including such deposits made by a Seller, as lessee, or to a Seller, as lessor, in connection with the Assumed Real Property Lease(s)) and prepaid charges and expenses of, and advance payments made by a Seller, in each case, primarily for the operation of the Acquired Business and reflected in the Closing Statement.

"Purchased Subsidiaries" means Aceto (Shanghai) Ltd., Aceto Bermuda, Aceto Agricultural Chemicals Corp Mx S. de R.L. de CV, Aceto Agricultural Chemicals Corporation Ltd., the Joint Venture and Aceto HK; provided, however, that Aceto HK shall not be a Purchased Subsidiary (but will be an Acquired Subsidiary) if NY Agri, at the request of Buyer, transfers to Aceto Bermuda, contemporaneously with Closing, the one share of capital stock of Aceto HK owned by NY Agri.

"Real Property Lease" means any lease, sublease, license or other agreement under which a Seller or any Acquired Subsidiary (other than the Joint Venture) leases, subleases, licenses, uses or occupies (in

each case whether as landlord, tenant, sublandlord, subtenant or by other occupancy arrangement), or has the right to use or occupy, now or in the future, any real property, in each case, used for the operation of the Acquired Business.

"Regulated Substances" means pollutants, contaminants, radioactive, hazardous or toxic substances, compounds or related materials or chemicals, hazardous materials, solid or hazardous wastes, flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products (including waste petroleum and petroleum products) as regulated under applicable Environmental Laws.

"SAFE" means the State Administration of Foreign Exchange or its local counterpart.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated hereby or a competing transaction.

"Sale Motion" means the motion filed by Sellers in the Bankruptcy Case at docket number 45 pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to secure entry of the Sale Order by the Bankruptcy Court.

"Sale Order" means an Order of the Bankruptcy Court in substantially the form attached to the Sale Motion or otherwise in a form and substance reasonably acceptable to Buyer, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code (i) approving this Agreement and the terms and conditions hereof, (ii) authorizing and approving, *inter alia*, the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein free and clear of all Liabilities and Liens (other than Permitted Liens), the assignment to Buyer of, and the assumption by Buyer of, the Assumed Liabilities, and the assignment to Buyer of, and the assumption by Buyer of, the Buyer Assumed Agreements and (iii) containing certain findings of facts, including a finding that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

"Seller Benefit Plan" means any material "employee benefit plan" (within the meaning of Section 3(3) of ERISA) and any other material pension, retirement, profit-sharing, supplemental retirement or deferred compensation, stock option, change in control, retention, equity or equity-based compensation, stock purchase, employee stock ownership, severance pay, employment (including offer letters), consultancy, vacation, bonus or other incentive plans, medical or other welfare, retiree medical, vision, dental or other health plans, or life insurance plan, program, agreement, or arrangement, funded or unfunded, or insured or self-insured, (i) that is maintained, established, or sponsored by a Seller or any Acquired Subsidiary for the benefit of any current or former employee, officer or director of Parent (who are or were primarily employed in respect of the Acquired Business), NY Agri or any Acquired Subsidiary, or (ii) to which Parent (in respect of the Acquired Business), NY Agri or any Acquired Subsidiary contributes or is obligated to contribute or has any material Liability, other than a Multiemployer Plan and other than any plan or program maintained by a Governmental Entity to which Parent (in respect of the Acquired Business), NY Agri or any Acquired Subsidiary contributes pursuant to applicable Law.

"Shanghai Asset Closing Dates" means the dates on which the assignment by Aceto Shanghai to Buyer (or its designated Affiliate) of any assets or Liabilities of Aceto Shanghai pursuant to Section 2.10 becomes effective.

"Subsidiaries" means, as to any Person, any corporation, partnership, association, trust or other form of legal entity of which (i) 50% or more of the voting power of the outstanding voting securities are

directly or indirectly owned by such Person or (ii) such Person or any Subsidiary of such Person is a general partner.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures and Bidding Procedures Order.

"Tax" or "Taxes" means any and all federal, state, local or foreign taxes imposed by any Taxing Authority, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, environmental, stamp, occupation, premium, and property (real or personal) taxes, including any and all interest, penalties, additions to tax or additional amounts imposed by any Governmental Entity with respect thereto.

"Tax Return" means any return, declaration, report or similar filing required to be filed with respect to Taxes, including any information return, claim for refund, amended return, or declaration of estimated Taxes.

"Taxing Authority" means any Governmental Entity responsible for the administration or the imposition of any Tax.

"Transaction Expenses" means, without duplication, the unpaid amount of (i) any finder's, broker's or dealer's fees incurred by any Acquired Subsidiary in connection with the Closing as a result of the consummation of the transactions contemplated by this Agreement (including the Bankruptcy Case) and (ii) any third party legal, accounting or similar advisor fees and expenses incurred by any Acquired Subsidiary in connection with the negotiation, execution and delivery of this Agreement or the consummation of the transactions contemplated hereby (including the Bankruptcy Case) (except to the extent any such amount is caused by actions of the Buyer or any of its Affiliates after the Closing Date), in each case that are to be paid by any Acquired Subsidiary and that have not yet been paid as of the Closing; provided, that in no event shall "Transaction Expenses" be deemed to include any fees and expenses to the extent incurred by or at the direction of Buyer or any of its Affiliates otherwise relating to Buyer's or its Affiliates' financing (including obtaining any consent or waiver relating thereto) for the transactions contemplated hereby or any other liabilities or obligations incurred or arranged by or on behalf of Buyer or its Affiliates in connection with the transactions contemplated hereby (including any fees payable to any financing institution or the Sellers' or the Acquired Subsidiaries' accountants on behalf of Buyer or its Affiliates).

"U.S. Seller Benefit Plan" means, each Seller Benefit Plan that is not a Non-U.S. Seller Benefit Plan.

"VAT" means any value added Tax or similar Tax.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any other similar statutes or regulations of any jurisdiction relating to any plant closing or mass layoff (or such similar terms used in such statutes or regulations).

"Willful Breach" means, with respect to any representation, warranty, agreement or covenant, an action or omission where the breaching party knows such action or omission is a breach of such representation, warranty, agreement or covenant.

(b)    The following terms are defined elsewhere in this Agreement, as indicated below:

| **Defined Term** | | **Section** | |
|---|---|---|---|
| Accounts Payable | 1.3(b) | Confidentiality Agreement | 5.2(c) |
| Aceto Realty | Preamble | Consents | 3.3(c) |
| Adjustment Escrow | 10 | Costs | 5.10 |
| Adjustment Escrow Amount | 2.2(b) | Cure Costs | 1.5(a) |
| Agreement | Preamble | Debt Financing | 5.13(a) |
| Agreement Date | Preamble | Deferral Period | 2.10(a) |
| Antitrust Laws | 3.3(b) | Designated Parties | 1.1(u) |
| Applicable EIT | 5.8(b) | EIT | 5.8(b) |
| Asset Purchase | Recitals | End Date | 7.1 |
| Assignment and Assumption of Leases | 2.8(f) | Enforceability Exceptions | 3.3(a) |
| Assignment of Intellectual Property | 2.8(b) | Escrow Agent | 10 |
| Assumed Contracts | 1.1(c) | Escrow Agreement | 2.2(b) |
| Assumed Equipment Leases | 1.1(l) | Estimated Cash Balance | 2.4(a) |
| Assumed Liabilities | 1.3 | Estimated Net Current Assets | 2.4(a) |
| Assumed Plans | 1.1(o) | Estimated Net Debt | 2.4(a) |
| Assumed Purchase Orders | 1.1(c) | Excluded Assets | 1.2 |
| Assumed Real Property Lease(s) | 1.1(d) | Excluded Equipment Leases | 1.2(e) |
| Assumption Deadline | 1.5(a) | Excluded Liabilities | 1.4 |
| Bankruptcy Case | Recitals | Excluded Real Property Leases | 1.2(d) |
| Bankruptcy Code | Recitals | Existing NQ Trust | 5.3(f) |
| Bankruptcy Court | Recitals | Financial Statements | 3.4 |
| Bankruptcy Court Filings | Article III | GAAP | 3.4 |
| Base Purchase Price | 2.1 | Good Faith Deposit | 2.3 |
| Break-Up Fee | 7.3(a) | Good Faith Deposit Escrow | 2.3 |
| Business | Recitals | Good Faith Deposit Escrow Holder | 2.3 |
| Business Employees | 5.3(a) | Guarantee | 4.9 |
| Buyer | Preamble | Guarantor | 4.9 |
| Buyer Allocation Objection Notice | 2.5 | HSR Act | 3.3(b) |
| Buyer Assumed Agreements | 1.1(l) | IRS | 3.7(a) |
| Buyer Benefit Plans | 5.3(c) | Law | 3.5(a) |
| Buyer Disclosure Schedule | ARTICLE IV | Laws | 3.5(a) |
| Buyer Registrations | 2.8(j) | Local Transfer Agreement | 8.10 |
| Buyer Tax Adjustment | | Material Contracts | 3.13(a) |
| Objection Notice | 2.10(d) | Most Recent Balance Sheet | 3.4 |
| Buyer Trust | 5.3(f) | Multiemployer Plan | 3.7(c) |
| Cash Balance | 2.1(b) | NCIDA | 5.8(b) |
| Closing | 2.6 | New NQ Trust | 5.3(f) |
| Closing Date | 2.6 | NQ Plan | 5.3(f) |
| Closing Statement | 2.4(b) | NY Agri | Preamble |
| Collective Bargaining Agreement | 3.10(a) | Original Agreement | Recitals |
| Confidential Rating Agency | | Parent | Preamble |
| Information | 5.13(c) | Parent SEC Disclosures | ARTICLE III |

| | | | |
|---|---|---|---|
| Parent Shanghai Allocation | | Required Information | 5.13(a) |
| Objection Notice | 2.10(c) | SEC | ARTICLE III |
| Permitted Access Parties | 5.2(d) | Seller | Preamble |
| Petition Date | Recitals | Seller Deferred Compensation Plans | 3.7(a) |
| PILOT Unwind | 1.7 | Sellers | Preamble |
| Port Washington Property | 1.7 | Sellers Disclosure Schedule | ARTICLE III |
| Post-Close Filings | 5.2(d) | Shanghai APA | 2.10(b) |
| Post-Close Proceedings | 5.2(d) | Shanghai Assets | 16 |
| Powers of Attorney | 2.8(j) | Shortfall | 2.4(b) |
| Products | 1.1(f) | Surplus | 2.4(b) |
| Purchase Price | 2.4(e) | Tax Adjustment | 2.10(d) |
| Purchased Assets | 1.1 | Transaction Approvals | 3.3(b) |
| Purchased Avoidance Actions | 1.1(u) | Transfer Taxes | 5.8(b) |
| Registered Intellectual Property | 3.12(a) | Transferable Assets | 5.3(f) |
| Registrations | 2.8(j) | Transferred Employees | 5.3(a) |
| REPRESENTATIVES | 3.18 | Unsecured Creditors | 5.2(d) |

(c)      Other Definitional and Interpretive Matters.   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)      Calculation of Time Period.   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)      Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)      Exhibits/Schedules.   All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

8.17   Sellers Disclosure Schedule.  The Sellers Disclosure Schedule is qualified in its entirety by reference to specific provisions of this Agreement and is not intended to constitute, and shall not be construed as constituting, representations, warranties and covenants of Sellers, except as and to the extent expressly provided in this Agreement.  Each section or subsection referenced in the Sellers Disclosure Schedule corresponds to the section or subsection set forth in this Agreement; provided, however, that any matter set forth in any section or subsection of the Sellers Disclosure Schedule shall be deemed to be referred to and incorporated in all other sections or subsections of the Sellers Disclosure Schedule to which the relevance of such matter is reasonably apparent on its face to inform Buyer that such information is relevant to such other section or subsection.  The inclusion of any information or reference in the Sellers Disclosure Schedule shall not be deemed to be an admission, acknowledgment or representation, in and of itself, that such information is required by the terms hereof to be disclosed, is material, has resulted in a Material Adverse Effect, is outside the Ordinary Course of Business or defines further the meaning of such terms for purposes of this Agreement.  Nothing in this Agreement or in the Sellers Disclosure Schedule constitutes an admission (i) to any third party of any liability or obligation of Sellers to any third-party or (ii) that any information disclosed, set forth or incorporated by reference in

the Sellers Disclosure Schedule or in this Agreement is material or has (or may result in) a Material Adverse Effect.

8.18    Limitation on Good Faith Deposit Escrow Holder's Liability.  The Good Faith Deposit Escrow Holder's responsibilities and liabilities shall be limited as follows:

(a)    The Good Faith Deposit Escrow Holder shall not be responsible for or be required to enforce any of the terms or conditions of this Agreement or any other agreement between Sellers and Buyer.  The Good Faith Deposit Escrow Holder shall not be responsible or liable in any manner whatsoever for the performance by Sellers or Buyer or any other party for their respective obligations under this Agreement, nor shall the Good Faith Deposit Escrow Holder be responsible or liable in any manner whatsoever for the failure of the other parties to this Agreement or of any third party to honor any of the provisions of this Agreement.

(b)    The duties and obligations of the Good Faith Deposit Escrow Holder shall be limited to and determined solely by the express provisions of this Agreement and no implied duties or obligations shall be read into this Agreement against the Good Faith Deposit Escrow Holder.  The Good Faith Deposit Escrow Holder is not bound by and is under no duty to inquire into the terms or validity of any other agreements or documents, including any agreements which may be related to, referred to in or deposited with the Good Faith Deposit Escrow Holder in connection with this Agreement.

(c)    The Good Faith Deposit Escrow Holder shall be entitled to rely upon and shall be protected in acting in reliance upon any instruction, notice, information, certificate, instrument or other document which is submitted to it in connection with its duties under this Agreement and which the Good Faith Deposit Escrow Holder in good faith believes to have been signed or presented by the proper party or parties.  The Good Faith Deposit Escrow Holder shall have no liability with respect to the form, execution, validity or authenticity thereof.

(d)    The Good Faith Deposit Escrow Holder shall not be liable for any act which the Good Faith Deposit Escrow Holder may do or omit to do hereunder, or for any mistake of fact or law, or for any error of judgment, or for the misconduct of any employee, agent or attorney appointed by it, while acting in good faith, unless caused by or arising from its own willful misconduct.

(e)    The Good Faith Deposit Escrow Holder shall be entitled to consult with counsel of its own selection and the opinion of such counsel shall be full and complete authorization and protection to the Good Faith Deposit Escrow Holder in respect of any action taken or omitted by the Good Faith Deposit Escrow Holder hereunder in good faith and in accordance with the opinion of such counsel.

(f)    The Good Faith Deposit Escrow Holder shall have the right at any time to resign for any reason and be discharged of its duties as Good Faith Deposit Escrow Holder hereunder by giving written notice of its resignation to the parties hereto prior to the date specified for such resignation to take effect.  All obligations of the Good Faith Deposit Escrow Holder hereunder shall cease and terminate on the effective date of its resignation and its sole responsibility thereafter shall be to hold the Good Faith Deposit, for a period of no more than thirty (30) calendar days following the effective date of resignation, at which time:

(i)    if a successor holder of the Good Faith Deposit shall have been appointed, by the mutual consent of Buyer and the Sellers, and written notice thereof shall have been given to the resigning Good Faith Deposit Escrow Holder by the parties hereto and such successor holder, then the resigning Good Faith Deposit Escrow Holder shall deliver the Good Faith Deposit to such successor holder; or

(ii)      if a successor holder of the Good Faith Deposit shall not have been appointed, for any reason whatsoever, the resigning holder of the Good Faith Deposit shall deliver the Good Faith Deposit to a court of competent jurisdiction in the county in which the Good Faith Deposit is then being held and give written notice of the same to the parties hereto.

The resigning Good Faith Deposit Holder shall be reimbursed by Buyer and Sellers for any expenses incurred in connection with its resignation and transfer of the Good Faith Deposit Holder pursuant to and in accordance with the provisions of this Section 8.18.

(g)      Buyer and Sellers, jointly and severally, agree to indemnify and hold the Good Faith Deposit Holder harmless from and against any and all liabilities, causes of action, claims, demands, judgments, damages, costs and expenses (including reasonable attorneys' fees and expenses) that may arise out of or in connection with the Good Faith Deposit Holder's acceptance of or performance of its duties and obligations under this Agreement.  The Good Faith Deposit Holder shall be under no duty to institute any suit, or to take any remedial procedures under this Agreement, or to enter any appearance or in any way defend any suit in which it may be made a defendant hereunder until it shall be indemnified as provided above.

(h)      If the Good Faith Deposit Holder shall be uncertain as to its duties or rights hereunder or shall receive instructions with respect to the Good Faith Deposit which, in its sole discretion, are in conflict either with other instructions received by it or with any provision of this Agreement, the Good Faith Deposit Holder shall have the absolute right to suspend all further performance under this Agreement (except for the safekeeping of the Good Faith Deposit) until such uncertainty or conflicting instructions have been resolved to the Good Faith Deposit Holder's sole satisfaction by final judgment of a court of competent jurisdiction, joint written instructions from all of the other parties hereto, or otherwise.

(i)      The parties acknowledge that Lowenstein Sandler LLP, as Good Faith Deposit Holder, has agreed to serve in such capacity as an accommodation to the parties on the condition that it be allowed to continue to act as legal counsel to Sellers.  Buyer acknowledges that Lowenstein Sandler LLP has acted as legal counsel to Sellers in connection with this Agreement, the transactions contemplated hereby and other matters relating thereto and that Lowenstein Sandler LLP shall continue such representation of Sellers, including with respect to the Seller's rights and obligations under this Agreement, and all other matters.  Nothing in this Agreement, nor Lowenstein Sandler LLP's serving as Good Faith Deposit Holder hereunder, shall prevent or inhibit Lowenstein Sandler LLP from continuing to serve as legal counsel to Sellers and Buyer hereby consents to the continued representation of Sellers by Lowenstein Sandler LLP as its legal counsel.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed the day and year first above written.

BUYER:

NMC ATLAS, L.P.

By: NMC Atlas GP, L.L.C., its general partner

By: _____
     Name:  Joseph Walker
     Title:   Vice President and Secretary

**SELLERS:**

ACETO CORPORATION

By: _____
     Name: William C. Kennally, III
     Title:   Chief Executive Officer and President

ACETO REALTY LLC

By: _____
     Name: William C. Kennally, III
     Title:   Chief Executive Officer

ACETO AGRICULTURAL CHEMICALS
CORPORATION

By: _____
     Name:  William C. Kennally, III
     Title:   Authorized Signatory

*[Signature Page to Asset Purchase Agreement]*

## <u>EXHIBIT A</u>

## PURCHASE PRICE ALLOCATION CONSTRAINTS

- The purchase price allocable to 100% of the shares of Aceto (Shanghai) Ltd. will be limited to the greater of: (i) 4.21% of the Purchase Price, which represents Aceto (Shanghai) Ltd.'s percentage of the total gross margin of the Purchased Assets, or (ii) the book net equity value of Aceto (Shanghai) Ltd. as of the Closing.

- The purchase price allocable to 100% of the shares of Aceto Agricultural Chemicals Corp Mx S. de R.L. de CV shall not exceed $1.00.

**<u>EXHIBIT B</u>**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

*Agreed Form*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated as of [●], 2019, is made and entered into by and among Aceto Corporation, a New York corporation ("Parent"), Aceto Realty LLC, a New York limited liability company ("Aceto Realty"), and Aceto Agricultural Chemicals Corporation, a New York corporation ("NY Agri" and together with Parent and Aceto Realty, "Sellers" and each, a "Seller"), each a debtor and debtor in possession under Case No. 19-13448 pending in the United States Bankruptcy Court for the District of New Jersey, on the one hand, and NMC Atlas, L.P., a Delaware limited partnership ("Buyer"), on the other hand.  As used in this Agreement, "Party" or "Parties" means, individually or collectively, Sellers and Buyer.  Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings ascribed to such terms in that certain Amended and Restated Asset Purchase Agreement dated as of April [●], 2019 (as it may be amended from time to time, the "Purchase Agreement"), by and among Sellers and Buyer.

**WHEREAS**, concurrently with the execution and delivery of this Agreement, Sellers and Buyer are consummating the transactions contemplated by the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and as contemplated by the Purchase Agreement, Sellers and Buyer hereby agree as follows:

1.    Assignment.  Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer, free and clear of all Liens, sales, transfer or transaction taxes of any kind whatsoever, all of such Seller's right, title and interest in, to or under the Purchased Assets.  Notwithstanding the foregoing, the Parties acknowledge that the Purchased Assets constituting the Assumed Real Property Leases are being assigned to, and assumed by, Buyer pursuant to the Assignment and Assumption of Leases and not pursuant this Agreement.

2.    Assumption.  (a) Each Seller hereby delegates to Buyer such Seller's Assumed Liabilities (to the extent assumed by Buyer herein or in the Purchase Agreement), and (b) Buyer hereby assumes and agrees to discharge when due (in accordance with its respective terms and subject to the respective conditions thereof) only the Assumed Liabilities and no others.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obligated to pay, perform or otherwise discharge any Excluded Liability, and Sellers shall be solely and exclusively liable with respect to all Excluded Liabilities.

3.    Delivery Pursuant to Purchase Agreement.  Notwithstanding anything to the contrary herein, Sellers and Buyer are executing and delivering this Agreement in accordance with and subject to all of the terms and provisions of the Purchase Agreement, including, without limitation, the provisions of Section 3.23 thereof.  To the extent of any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

4.      <u>Successors and Assigns; Binding Effect</u>.

(a)      Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such Parties without the written consent of the other Parties hereto; <u>provided</u>, <u>however</u>, that Buyer shall be entitled to assign any or all of its rights under this Agreement to one or more of its Affiliates; <u>provided</u> that Buyer is not relieved of any of its obligations hereunder by virtue of any such assignment.

(b)      This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.  The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise).  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the Parties and successors and assigns permitted by this <u>Section 4</u> any right, remedy or claim under or by reason of this Agreement.

5.      <u>Amendments</u>.  This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties.

6.      <u>Governing Law</u>.

(a)      This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that State.

(b)      All Actions arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding.  The Parties hereby consent to service of process by mail (in accordance with Section 9.7 of the Purchase Agreement) or any other manner permitted by law.

(c)      THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER, OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

7.      <u>Headings</u>.  The section and paragraph headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

8.      <u>Execution in Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties.  Delivery of an executed counterpart of a

signature page to this Agreement by facsimile or electronic delivery (i.e., by electronic mail of a PDF signature page) shall be effective as delivery of a manually executed counterpart of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

**SELLERS:**

ACETO CORPORATION

By: _____
     Name:
     Title:

ACETO REALTY, LLC

By: _____
     Name:
     Title:

ACETO AGRICULTURAL CHEMICALS
CORPORATION

By: _____
     Name:
     Title:

**BUYER:**

NMC ATLAS, L.P.

By: _____
     Name:
     Title:

*[Signature Page to Assignment and Assumption Agreement]*

## <u>EXHIBIT C</u>

**FORM OF BILL OF SALE**

*Agreed Form*

## BILL OF SALE

### [•], 2019

Pursuant to that certain Amended and Restated Asset Purchase Agreement, dated as of April [●], 2019 (as it may be amended from time to time, the "Purchase Agreement"), by and among Aceto Corporation, a New York corporation ("Parent"), Aceto Realty, LLC, a New York limited liability company ("Aceto Realty"), and Aceto Agricultural Chemicals Corporation, a New York corporation ("NY Agri" and together with Parent and Aceto Realty, "Sellers" and each, a "Seller"), each a debtor and debtor in possession under Case No. 19-13448 pending in the United States Bankruptcy Court for the District of New Jersey, on the one hand, and NMC Atlas, L.P., a Delaware limited partnership ("Buyer"), on the other hand, and for good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer and Buyer's successors and assigns, free and clear of all Liens, sales, transfer or transaction taxes of any kind whatsoever, to have and to hold forever, all of its right, title and interest in and to each of the Purchased Assets.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used herein shall have the meanings ascribed to such terms in the Purchase Agreement.

Each Seller does hereby irrevocably constitute and appoint Buyer and Buyer's successors and assigns, such Seller's true and lawful attorney, with full power of substitution, in its name or otherwise, and on behalf of such Seller, or for its own use, to claim, demand, collect and receive at any time and from time to time any and all of the Purchased Assets, and to prosecute the same at law or in equity and, upon discharge thereof, to complete, execute and deliver any and all necessary instruments of satisfaction and release.

Notwithstanding anything to the contrary herein, each Seller is executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Purchase Agreement, including, without limitation, the provisions of Section 3.23 thereof, and Buyer accepts this Bill of Sale on such basis. To the extent of any conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail. This Bill of Sale shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties. This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that State. This Bill of Sale is for the sole benefit of Buyer and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

### [SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Sellers have caused this Bill of Sale to be executed as of the date first above written**.**

<u>**SELLERS**</u>**:**

ACETO CORPORATION

By: _____
    Name:
    Title:

ACETO REALTY, LLC

By: _____
    Name:
    Title:

ACETO AGRICULTURAL CHEMICALS
CORPORATION

By: _____
    Name:
    Title:

**Exhibit 2**

**Cure Objections**

| Docket No. | Objecting Party | Undisputed Cure Costs | Disputed Cure Costs |
|---|---|---|---|
| | None | | |
| | | | |
| | | | |
| | | | |
| | | | |