**LOWENSTEIN SANDLER LLP**
Gavin J. Rooney, Esq.
Reynold Lambert, Esq.
Kenneth A. Rosen, Esq.
Michael S. Etkin, Esq.
Wojciech F. Jung, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
*Counsel for Plaintiffs*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>ACETO CORPORATION, *et al.*,[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 19-13448 (VFP)<br><br>(Jointly Administered) |
| ACETO CORPORATION, KAVOD PHARMACEUTICALS LLC (*f/k/a* RISING PHARMACEUTICALS, LLC, *f/k/a* RISING PHARMACEUTICALS, INC.), KAVOD HEALTH LLC (*f/k/a* RISING HEALTH, LLC, *f/k/a* ROMEO CHARLIE ACQUISITION I, LLC), and KAVRIS HEALTH LLC (*f/k/a* ACETRIS HEALTH, LLC, *f/k/a* ROMEO CHARLIE ACQUISITION II, LLC),<br><br>      Plaintiffs,<br><br>      v.<br><br>P.V. RAMPRASAD REDDY, AUROBINDO PHARMA LTD., and AUROLIFE PHARMA LLC,<br><br>      Defendants. | Adv. Pro. No.:<br><br><br>**ADVERSARY COMPLAINT** |

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Tri Harbor Chemical Holdings LLC (f/k/a Aceto Agricultural Chemicals LLC, f/k/a Aceto Agricultural Chemicals Corporation) (3948); Tri Harbor Realty LLC (f/k/a Aceto Realty LLC) (7634); Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.) (7959); Kavod Health LLC (f/k/a Rising Health, LLC) (1562); Kavris Health LLC (f/k/a Acetris Health, LLC) (3236); KAVACK Pharmaceuticals LLC (f/k/a PACK Pharmaceuticals, LLC) (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

Plaintiffs Aceto Corporation ("Aceto"), Kavod Pharmaceuticals LLC, f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc. ("Rising Pharmaceuticals"), Kavod Health LLC, f/k/a Rising Health, LLC, f/k/a Romeo Charlie Acquisition I, LLC ("Rising Health"), and Kavris Health LLC, f/k/a Acetris Health LLC, f/k/a Romeo Charlie Acquisition II, LLC ("Acetris," and together with Aceto, Rising Pharmaceuticals, and Rising Health, "Plaintiffs"), by way of Adversary Complaint against Defendants Aurobindo Pharma Ltd. ("Aurobindo"), Aurolife Pharma LLC ("Aurolife"), and P.V. Ramprasad Reddy ("Mr. Reddy," and together with Aurobindo and Aurolife, "Defendants"), allege and say as follows:

## SUMMARY OF THE CASE

1.      This action arises out of Aurobindo's calculated and systematic scheme to destroy Aceto's generic pharmaceutical business operated through Rising Pharmaceuticals, which ultimately worked: Aurobindo succeeded in crippling Plaintiffs and substantially contributing to their bankruptcy filing.  Aurobindo's scheme was spearheaded by Mr. Reddy, who is a founder, substantial equity holder, erstwhile chairman, and present board member of Aurobindo.

2.      Aurobindo fired the first shot in 2016 when, to induce Aceto into paying $270 million in cash and other consideration for rights owned by Citron Pharma LLC ("Citron") and its affiliate Lucid Pharma LLC ("Lucid") in products manufactured by Aurobindo, Mr. Reddy made a series of representations regarding Aurobindo's capabilities, capacity, and good faith. Aceto recognized that the success of the business would be dependent upon the goodwill and good faith of Aurobindo, the sole supplier of most of the products at issue.  To induce Aceto to move forward with the transaction, Mr. Reddy—speaking on behalf of Aurobindo—made substantial representations intended to assure Aceto that Aurobindo would be a solid, reliable manufacturing partner.  In particular, Mr. Reddy represented to Aceto that Aurobindo would supply all of Rising Pharmaceuticals' manufacturing needs for the purchased products; that

Aurobindo had ample and redundant manufacturing capacity and capabilities to meet those needs; and that Aurobindo would act in good faith and not abuse its control over the supply of product to secure undue competitive advantage.

3.  Mr. Reddy's representations were unequivocally false and misleading. Aurobindo had no intention of partnering with Rising Pharmaceuticals or supplying Rising Pharmaceuticals' needs once the deal between Aceto and Citron/Lucid closed, and Mr. Reddy knew that. Indeed, although Mr. Reddy purported to speak during the negotiations of that transaction as a supposed disinterested bystander, his so-called "US wife"[2] in fact owned more than 60% of Citron's and Lucid's equity; therefore, Mr. Reddy had a personal interest in the transaction. And, once Citron sold the assets to Aceto and Mr. Reddy's "US wife" sold her economic interest in the business, Mr. Reddy knew that neither he nor Aurobindo would have any incentive to promote the success of the business. Quite to the contrary, Mr. Reddy knew that Aurobindo would become a competitor of Aceto in selling the same products to the same customers, and that Aurobindo would have every incentive to strangle Rising Pharmaceuticals and force it out of the generic pharmaceutical market.

4.  That is exactly what happened. Contemporaneously with the closing of the transaction, Rising Health executed supply and distribution agreements with Aurobindo that required Rising Health to buy certain products exclusively from Aurobindo and, in turn, required Aurobindo to supply those products to Rising Health. Aurobindo, however, had no intention of complying with its contractual obligations at the time it entered into those agreements. Between 2017 and 2018, Aurobindo failed to supply Rising Health with various products and imposed self-serving volume caps on other products. Aurobindo thereby caused Rising Pharmaceuticals

---

[2] Upon information and belief, Mr. Reddy maintains two marital-type relationships and families—a first wife and family in India, and second so-called "US wife," with whom he has an adult child, in the United States.

to lose substantial business and, even worse, caused Rising Pharmaceuticals to incur substantial failure-to-supply liabilities when Rising Pharmaceuticals was unable to fill customer orders. But Aurobindo did not stop there; it also manufactured pretextual disruptions in its supply of pharmaceutical products to Rising Pharmaceuticals for the very purpose of providing itself with an unfair competitive advantage in the United States market, as Aurobindo competed with Rising Pharmaceuticals to sell the same products to the same customers.

5.      Stuck with a manufacturing partner bent on sabotaging its business, Rising Pharmaceuticals experienced a cash-flow crisis and was ultimately driven to insolvency. By March 2018, a mere fifteen (15) months after closing the transaction and signing the supply agreements with Aurobindo and its American subsidiary, Aurolife, Aceto was forced to write off the $270 million purchase price amid an increasing cash flow crisis caused in large part by the Aurobindo's misfeasances. Then, in February 2019, Aceto and its subsidiaries were forced to file voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code.

6.      In this action, Aceto and its subsidiaries seek damages against Defendants caused by their fraud and multiple, material breaches of the supply agreements, among other relief.

## PARTIES

### I.      Plaintiffs

7.      During the time periods relevant to this complaint, Aceto was engaged in the development, marketing, sale, and distribution of finished dosage form generic pharmaceutical products, nutraceutical products, pharmaceutical active ingredients and intermediates, and specialty performance chemicals. Aceto was until recently a public company whose common stock traded on the NASDAQ Global Select Market under the symbol "ACET"; Aceto's stock was de-listed in connection with its bankruptcy filing. Aceto is a corporation organized under

the laws of the State of New York, with its previous principal place of business located at 4 Tri

Harbor Court, Port Washington, New York 11050.

8.      During the time periods relevant to this complaint, Rising Pharmaceuticals sold

and distributed generic prescription products and over-the-counter pharmaceutical products to

wholesalers, chain drug stores, distributors, and mass merchandisers.  Rising Pharmaceuticals is

a wholly-owned subsidiary of Aceto.  Rising Pharmaceuticals is a limited liability company

organized under the laws of the State of Delaware, with its previous principal place of business

located at Park 80 West, Plaza 1, 250 Pehle Avenue, Suite 601, Saddle Brook, New Jersey

07663.

9.      During the time periods relevant to this complaint, Rising Health was engaged in

the development, marketing, distribution, and sale of finished dosage form generic drugs.  Rising

Health is a wholly-owned subsidiary of Rising Pharmaceuticals.  Rising Health is a limited

liability company organized under the laws of the State of Delaware, with its previous principal

place of business located at Park 80 West, Plaza 1, 250 Pehle Avenue, Suite 601, Saddle Brook,

New Jersey 07663.

10.     During the time periods relevant to this complaint, Acetris focused on the

distribution and sale of generic pharmaceutical products to the United States government.

Acetris is a wholly-owned subsidiary of Rising Pharmaceuticals.  Acetris is a limited liability

company organized under the laws of the State of Delaware, with its previous principal place of

business located at Park 80 West, Plaza 1, 250 Pehle Avenue, Suite 601, Saddle Brook, New

Jersey 07663.

11.     On February 19, 2019, Aceto and certain affiliates, including Rising

Pharmaceuticals, Rising Health, and Acetris, filed a voluntary petition for relief under chapter 11

of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, (the "<u>Bankruptcy Code</u>")

commencing the Chapter 11 Cases in this Court.

## II.  <u>Defendants</u>

12.  Upon information and belief, Aurobindo is a manufacturer of generic

pharmaceutical products and raw materials, including active pharmaceutical ingredients ("<u>API</u>"),

whose stock is publicly traded on the National Stock Exchange of India under the symbol

"AUROPHARMA."  Aurobindo touts itself as a "fully integrated company" that is "among the

top 2 companies in India in terms of consolidated revenues."[3]  Upon information and belief,

Aurobindo is a company existing under the laws of India with its principal place of business at

Plot No. 2, Maitri Vihar, Ameerpet, Hyderabad-500038, India.

13.  Upon information and belief, Aurolife is a generic pharmaceutical company that

services the United States on behalf of Aurobindo.  Upon information and belief, Aurolife is a

subsidiary and/or affiliate of Aurobindo.  Upon information and belief, Aurolife is a limited

liability company organized under the laws of the State of Delaware, with its principal place of

business located at 2400 US-130, Dayton, New Jersey 08810.

14.  Upon information and belief, Mr. Reddy is an individual residing both in

Princeton, New Jersey (with his "US wife," as discussed further herein) and in Hyderabad, India.

According to Forbes Magazine, Mr. Reddy ranks among the top 50 richest persons in India, with

a reported net worth of $2.6 billion.[4]  Mr. Reddy formerly held the position of Aurobindo

chairman of the board, until he surrendered that title in 2012 amid a corporate scandal in India.[5]

---

[3] https://www.aurobindo.com/
[4] https://www.forbes.com/profile/pv-ramprasad-reddy/#6353b57f7f05
[5] https://economictimes.indiatimes.com/aurobindo-pharma-replaces-chairman-md-in-board-recast/articleshow/13679998.cms

## JURISDICTION AND VENUE

15.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

16.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C) and (O).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, Plaintiffs consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

17.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## FACTS COMMON TO ALL COUNTS

I.      **Aceto Spends $270 Million in Up-Front Cash to Partner With Aurobindo, Based on False Assurances Provided By Its Co-Founder, Mr. Reddy, Who Knew That Aurobindo Intended to Sabotage the Business Once the Deal Closed.**

18.      Mr. Reddy co-founded Aurobindo in 1986.  Aside from being a co-founder of Aurobindo, Mr. Reddy also is a member of its board of directors and, upon information and belief, a substantial equity holder of the company, through direct and indirect ownership interests.  At all relevant times, Mr. Reddy wielded—and continues to wield—considerable influence and power over Aurobindo, its management, and its board of directors.

19.      Upon information and belief, in 2013 Citron and Lucid were created as vehicles to capitalize on the United States generic pharmaceutical market with products manufactured by Aurobindo.  Citron and Lucid are headquartered in New Jersey.  The majority of Citron's and Lucid's equity—indeed, over 60% of it—was owned by Subha Sri Thogarchedu ("Subha"), through various shell companies.

20.    Subha is, in fact, Mr. Reddy's so-called "US wife," with whom he has an adult son, a relationship that Mr. Reddy maintained in secrecy given the fact that he has a wife and family in India.

21.    When they were founded, Citron and Lucid acquired certain rights to generic pharmaceutical products in the United States from Pfizer, Inc.  After their formation, Citron and Lucid executed long-term contracts with Aurobindo and Aurolife for the supply and distribution of those generic pharmaceutical products.  Mr. Reddy, of course, had interests on both sides of that relationship and, upon information and belief, evidently steered the opportunity represented by the Pfizer transaction to a company formed by his "US wife" to allow that company to profit from the distribution of Aurobindo-manufactured products in the United States.   Upon information and belief, Mr. Reddy used his considerable influence and power at Aurobindo and Aurolife to ensure that they faithfully and consistently fulfilled Citron's and Lucid's supply needs, particularly given the equity that Subha held in those companies.

22.    Rising Pharmaceuticals was an "asset-light" pharmaceutical company; while it marketed and distributed product, it did not possess any manufacturing facilities and instead relied upon its manufacturing partners to make the product.  Accordingly, the strength of its manufacturing partner relationships was integral to Rising Pharmaceuticals' success.

23.    In 2015, Aceto was looking for opportunities to expand Rising Pharmaceutical's generic pharmaceutical business.  Najib Ali, an investment banker working for JPMorgan, introduced Aceto to Citron and Lucid, and the parties commenced an initial round of discussions to determine if Aceto would purchase Citron's and Lucid's assets.

24.    However, Aceto quickly became concerned with the risk posed by the complete dependence that Citron/Lucid had upon Aurobindo which, if the deal closed, would become Rising Pharmaceuticals' principal manufacturing partner.  This was so for several reasons: (a)

Citron/Lucid licensed the rights to most of the products from Aurobindo, which held the Abbreviated New Drug Applications approved by the United States Food and Drug Administration; (b) Citron/Lucid's contracts made Aurobindo the exclusive company in the world that could manufacture the products, and Aurobindo therefore held a stranglehold over supply; (c) neither Aceto nor its subsidiaries had their own manufacturing capabilities; and (d) Aurobindo had the right to compete in the United States market for the sale of most of the same products to the same customers.

25.    In order to assuage Aceto's concerns, Mr. Ali and Citron/Lucid encouraged enhanced contact between Aceto and Mr. Reddy, so that Mr. Reddy could provide assurances intended to allay Aceto's fears concerning Aurobindo's good faith.

26.    Accordingly, Aceto's then Executive Chairman, Albert Eilender, discussed the supply relationship between Aurobindo and Citron directly with Mr. Reddy during in-person meetings that took place in the United States and during several phone conversations. Mr. Reddy's clear goal during these meetings was to allay Aceto's fears and lull it into believing that Aurobindo would be a good partner and committed to the success of the relationship.

27.    Mr. Reddy, purporting to speak solely on behalf of Aurobindo, repeatedly assured Mr. Eilender that Aurobindo would be a "true partner" to Rising Pharmaceuticals and a stable source of products, and that Aurobindo would work cooperatively with Rising Pharmaceuticals. In particular, Mr. Reddy touted Aurobindo's extensive production capabilities and represented that Aurobindo would supply all of Rising Pharmaceuticals' product needs. Mr. Reddy represented to Mr. Eilender that Aurobindo had multiple production facilities in India to produce products and avoid any supply problems or disruptions. Mr. Reddy represented that the redundant and excess supply capacity would, for example, protect Rising Pharmaceuticals against the risk of supply disruptions if a problem developed with one facility.

28.     Although Mr. Reddy presented himself to Aceto as a neutral third party who was simply providing information relevant to the contemplated transaction, he had his own self-interest in the transaction arising from the fact that his "US wife" was the majority owner of Citron and Lucid.  Mr. Reddy knew full well that Aurobindo and Aurolife would not cooperate in good faith with Aceto once his "US wife" sold her economic interest in the business.  He knew this fact because, in the past, Aurobindo's cooperation with and goodwill towards Citron and Lucid were due to his own personal intercession and influence within Aurobindo, which he intended to withdraw after the sale of the Citron/Lucid assets.  And he did not disclose that fact to Aceto.[6]

29.     Trusting the representations and assurances provided by Mr. Reddy, Aceto agreed to proceed with the transaction and formalize the manufacturing partnership with Aurobindo.  On November 2, 2016, Aceto executed a Product Purchase Agreement (the "PPA"), pursuant to which Aceto agreed to acquire certain generic products and related assets of Citron and Lucid in exchange for an up-front cash payment of $270 million plus additional consideration.  Aceto formed two subsidiaries under Rising Pharmaceuticals to consummate the product acquisition: Rising Health, which acquired certain commercial products and assets of Citron, and Acetris, which acquired certain government products and assets of Lucid.

30.     Contemporaneously with the execution of the PPA, on November 2, 2016, Aurobindo executed a Supply and Distribution Agreement with Rising Health (the "Aurobindo Supply Agreement"), which obligated Aurobindo to continue supplying products to Rising Health for a significant period of time.   In that agreement, Aurobindo represented that it "desire[d]" to supply—and "will supply"—Rising Health with products.  The parties agreed that

---

[6]   Aceto attempted to gain clarity on the nature of the relationship between Subha and Mr. Reddy from other sources, including Mr. Najib, but it received differing and contradictory responses; at times, Aceto was told no such relationship existed, and, at other times, Aceto was informed of a personal relationship.

the Aurobindo Supply Agreement would remain in effect for twelve (12) years and renew automatically for two (2) additional years.  During the term of the agreement, Rising Health agreed to "exclusively" purchase specific products from Aurobindo, and Aurobindo agreed to fulfill Rising Health's purchase orders with respect to those products.

31.    Thereafter, on August 14, 2017, Rising Health and Aurolife executed a Supply and Distribution Agreement that substantially mirrored the terms of the Aurobindo Supply Agreement (the "Aurolife Supply Agreement," and together with the Aurobindo Supply Agreement, the "Supply Agreements").  That agreement carried a term of three years.

32.    The Supply Agreements identified certain products where Aurobindo could compete with Rising Health in the United States market and other products where it could not compete.  Even where Aurobindo could compete, however, the implied covenant of good faith and fair dealing did not allow Aurobindo to compete by illegitimate means—such as by breaching its own contractual obligations to Rising Health, which is exactly what Aurobindo proceeded to do.

## II.    Following the Execution of the Supply Agreements, Aurobindo Gradually Begins Sabotaging the Supply Chain in Order to Steal Market Share From Rising Pharmaceuticals for its Own Benefit.

33.    Once Mr. Reddy induced Rising Pharmaceuticals into executing the Supply Agreements, Aurobindo held all of the cards and, in effect, controlled the most critical components of Rising Pharmaceuticals' vital supply chain from which it generated revenue. Indeed, Aurobindo became Rising Pharmaceuticals' largest and most important manufacturing partner, with an exclusive right to supply over 75 generic drugs to Rising Pharmaceuticals, including at least 12 of its most important and profitable products.  Aurobindo's supply chain represented over 50% of Rising Pharmaceuticals' business post-closing.

34.     Aurobindo, however, had no intention of allowing Rising Pharmaceuticals to reap the fruits of its bargained-for exchange under the Supply Agreements.  To the contrary, shortly following the execution of those agreements, Aurobindo leveraged its superior position to slowly wrest market share from Rising Pharmaceuticals in situations where the two companies competed in selling the same products.  Indeed, without Rising Pharmaceuticals as a middleman (and without Mr. Reddy directing Aurobindo to cooperate in order to benefit Subha, his "US wife"), Aurobindo would have free reign to sell the products directly to customers and reap much larger profit margins.

35.     Aurobindo—at the direction and under the control of Mr. Reddy—implemented this plan gradually over time.  Aurobindo began by deliberately failing to supply product, which caused massive failure-to-supply liability to Rising Pharmaceuticals that drained Aceto's cash flow and made it difficult for Aceto to service its debt.  Aurobindo then implemented arbitrary and capricious caps on the volume of product Rising Pharmaceuticals could purchase from Aurobindo.    And then, once Aurobindo had succeeded in critically wounding Rising Pharmaceuticals, Aurobindo struck the death blow: it began stealing critical customers from Rising Pharmaceuticals.

### A.    Aurobindo Fails to Deliver Product.

36.     As is customary in the generic pharmaceuticals industry, Rising Pharmaceuticals' customer contracts guaranteed those customers a supply of product in response to purchase orders at a fixed price.  If Rising Pharmaceuticals was unable to supply the ordered product, Rising Pharmaceuticals lost not only the revenue it stood to gain on those orders, but it also  was assessed failure-to-supply charges by the customer, representing the increased cost incurred by the customer to secure the product from a different supplier.  Accordingly, a failure by Aurobindo to supply products could—and, in fact, did—result in very significant losses to Rising

Pharmaceuticals. To avoid such losses, Rising Pharmaceuticals secured Aurobindo's agreement to supply the product before accepting customer orders.

37. In 2017 and 2018, however, Aurobindo repeatedly failed to supply Rising Health with product that Rising Pharmaceuticals required to fulfill its own customer orders and contracts, resulting in (a) substantial failure-to-supply penalties imposed by customers as a consequence of its inability to supply them with product, and (b) other losses in the form of lost profits from sales not made. For instance, with respect to a highly-profitable drug called Duloxetine, Aurobindo accepted purchase orders from Rising Health and promised to supply the requested quantities of the drug. Later citing supposed capacity constraints, however, Aurobindo failed to deliver products in response to those orders. As a result, Rising Pharmaceuticals lost a lucrative new contract with Rite-Aid worth $5 million in revenue.

38. But this was not Aurobindo's only failure to supply Duloxetine. In many other instances, Aurobindo failed to fill Rising Health's orders of this drug, resulting in over $6 million in failure-to-supply exposure with customers—orders that Aurobindo initially told Rising Health that it could and would supply. Rising Pharmaceuticals also lost revenue that it expected to realize on these sales.

39. Between 2017 and 2018, Rising Pharmaceuticals incurred at least $13 million in failure-to-supply liability caused by Aurobindo's calculated efforts to sabotage Rising Pharmaceuticals' supply chain. In addition to Duloxetine, Aurobindo failed to supply Rising Health's multiple orders of drugs such as Mirtazapine, Tamsulosin, Atomoxetine, Clarithromycin, and Valacyclovir, among others.

40. There was no excuse for Aurobindo's failure to supply these drugs. In fact, Aurobindo refused to honor these orders because it chose to favor production for its own account over Rising Pharmaceuticals' needs, thereby allocating production capacity to products that

Aurobindo sold directly to customers in competition with Rising Pharmaceuticals. Aurobindo thereby also sought to damage Rising Pharmaceuticals' position as a competitor in marketing the same drugs.

**B.   Aurobindo Implements Arbitrary Volume Caps to Divert Production to its Own Account.**

41.     Aside from its refusals to supply products to Rising Health, as required under the Supply Agreements, Aurobindo also imposed arbitrary volume constraints on drugs. For instance, with respect to another highly-profitable drug called Rosuvastatin, Aurobindo—for no legitimate reason—limited the active pharmaceutical ingredient available to Rising Health to 250 Kilos per month each for commercial units (which were manufactured by Aurobindo in India), and for government units (which were manufactured by Aurolife in the United States). Aurobindo had the capacity to produce for Rising Health more than 500 Kilos of Rosuvastatin API per month, but it refused to do so because it wanted to produce the API for its own account and shrink Rising Pharmaceuticals' supply. Aurobindo's arbitrary constraint in making available only 250 Kilos per month to manufacture Rosuvastatin for commercial units led to substantial shortfalls during 2017 and 2018, and significant damage to Rising Pharmaceuticals in the form of (a) failure-to-supply charges imposed on it by its largest customer, Walgreens, and (b) loss of revenue on lost sales.

42.     Moreover, in mid-2017, Aurobindo shifted production of finished dosages of Rosuvastatin for commercial units to Aurolife, given Aurolife's larger stock of the API, and Aurobindo subsequently determined that this arrangement should become permanent. As a result, Aurolife and Rising Health entered into the Aurolife Agreement discussed above.

43.     In February 2018, the government cancelled its contracts with Acetris, thus freeing up the 250 Kilos of API that Aurobindo was previously allocating to Acetris to fulfill the

government units.  Given the robust commercial market demand for Rosuvastatin, Rising Health asked Aurobindo to re-allocate those 250 kilos of API to the commercial production of the finished dosage form.  Aurobindo, however, refused, and instead allocated the 250 Kilos previously earmarked for Acetris' government contracts to manufacture for its own account. Aurobindo did so in order to hobble Rising Health and sell higher volumes of Rosuvastatin for itself.

44.    Even worse, when the government put the Rosuvastatin contract out for bid later in 2018, Acetris asked Aurolife to re-guarantee renewal supply, and again, Aurolife refused and thereby terminated all supply for Acetris' government contracts.  Consequently, it is clear that Aurobindo decided to allocate the 250 Kilos of API supply previously dedicated to Acetris' government contracts to manufacture finished dosage product for Aurobindo's own account, to sell in competition with Rising Pharmaceuticals and/or Acetris.

### C.    Aurobindo Steals a Critical Customer.

45.    Another critical blow came in late 2018, when Aurobindo stole the Rosuvastatin business of Rising Pharmaceuticals' largest customer, Walgreens, after wrongfully withholding API from Rising Health.  On September 13, 2018, Aurolife abruptly and without warning informed Rising Health that it would no longer supply Rosuvastatin, allegedly due to the loss of the government contracts six months prior in February 2018, and that it had no API on hand to produce finished dosage product.   Aurolife instructed Rising Health to secure future deliveries of the drug from Aurobindo.  However, during a call held the next day, Aurobindo professed ignorance of this development and made clear that no transitionary plans had been made.

46.    Aurolife intentionally stalled on providing any notice to Rising Health of its decision to stop supplying product, especially given the rolling forecasts and purchase orders submitted by Rising Health and accepted by Aurolife.  At a minimum, Aurobindo knew of this

development at least 30 days prior to informing Rising Health (and likely well before that), but remained silent during weekly conference calls with the Rising Health supply chain staff devoted to addressing inventory needs.

47.    This supply chain disruption seriously harmed Rising Pharmaceuticals' relationship with Walgreens, which ultimately awarded Rising Pharmaceutical's contract to Aurobindo.

### III.    Stuck with a Manufacturing Partner Intent on Squeezing it out of the Market, Rising Pharmaceuticals' Business Fails.

48.    This conduct proved the falsity of Mr. Reddy's prior representations and assurances.    Mr. Reddy's representation that Aurobindo had more than enough production capacity to fulfill all of Rising Pharmaceuticals' needs was plainly false given Aurobindo's multiple failures to supply and cited capacity constraints.    His assurance that Aurobindo intended to be a "true partner" were plainly false given Aurobindo's abuse of its stranglehold position over Rising Pharmaceuticals' supply to damage Rising Pharmaceuticals' business and steal its customers.

49.    Defendants' scheme had a deleterious impact on Rising Pharmaceuticals' cash flow and financial position, crippling Aceto and its subsidiaries and substantially contributing to their bankruptcy filing in February 2019.    Without an independent manufacturing partner who actually intended to comply with its contractual obligations to supply product, Rising Pharmaceuticals could not fully monetize its investment or service the debt Aceto assumed to fund the initial $270 million payment to partner with Aurobindo in the first instance.    As set forth more fully above, Aceto, through its subsidiaries, lost customer relationships and substantial profits, and suffered irreparable injury to its business reputations and significant failure-to-supply charges.    Indeed, due in part to Aurobindo's intentional and calculated supply disruptions, Aceto

ultimately was forced to write off substantial goodwill associated with the products acquired from Citron/Lucid—more than $250 million, almost the entirety of the purchase price. And the damage to its cash flow caused by Aurobindo's misconduct substantially contributed to Aceto's insolvency.

## <u>COUNT ONE</u>
### FRAUD
### (Against All Defendants)

50.     Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

51.     Mr. Reddy, in his individual capacity and as agent and alter ego of Aurobindo and Aurolife, falsely represented to Plaintiffs that: (i) Aurobindo would supply all of Rising Pharmaceutical's needs and would not cut its supply to meet Aurobindo's own needs; (ii) Aurobindo would be a "true partner" to Rising Pharmaceuticals; and (iii) Aurobindo had substantial capacity by virtue of several manufacturing facilities in India, which would provide excess capacity and redundancy and avoid the risk of disruptions in the supply chain to Rising Pharmaceuticals. Mr. Reddy made these representations to Plaintiffs for the express purpose of allaying its fears over the utter dependence on Aurobindo's cooperation and goodwill.

52.     These statements were false or, at best, half-truths. As illustrated by, among other things, Aurobindo's repeated failures to supply product to Rising Pharmaceuticals and the arbitrary volume caps it imposed on Rising Pharmaceuticals, Aurobindo did not have excess or even sufficient capacity, or any redundancies, to meet Rising Pharmaceuticals' supply needs. Moreover, following the closing of the transaction, Aurobindo had no intention of being a "true partner" of Rising Pharmaceuticals; to the contrary, Aurobindo intended to sabotage the supply chain in order to steal Rising Pharmaceuticals' market share and its customers.

53.     Mr. Reddy knew that his assurances were false or, at best, half-truths.  Indeed, Mr. Reddy knew that once his "US wife" sold her equity stake in Citron and Lucid, Aurobindo had no intention of continuing to partner in good faith with Rising Pharmaceuticals.  He knew that the success of the business was entirely done to his personal intercession to secure Aurobindo's cooperation and, once he withdrew that intercession, the relationship would fail.  Mr. Reddy also knew that Aurobindo had no intention of permitting Aceto and Rising Pharmaceuticals to realize the fruits of their transaction with Citron and Lucid.

54.     Aurobindo and Aurolife are liable for the fraudulent conduct of their agent and alter ego, Mr. Reddy.  Aurobindo and Aurolife also are liable for their own fraudulent conduct, including without limitation executing the Supply Agreements without any intention of fully performing their obligations thereunder and instead intending, following the execution of the Supply Agreements, to manufacture phony supply chain issues, impose arbitrary volume caps on drugs, and steal Rising Pharmaceuticals' customers.

55.     Defendants knew that these statements were false and misleading or, at a minimum, were reckless in not knowing whether the statements were true when made.  Defendants made the statements and caused the statements to be made with the intent and expectation that Plaintiffs would rely on them.

56.     Plaintiffs reasonably relied on Defendants' material misrepresentations and omissions to their detriment.

57.     Defendants' conduct, as alleged herein, was willful, malicious, reckless, and without regard to Plaintiffs' interests.

58.     As a direct, proximate, and foreseeable result of Defendants' conduct, Plaintiffs have suffered, and continue to suffer, substantial harm.  Accordingly, Plaintiffs are entitled to an award of damages in an amount sufficient to compensate Plaintiffs for all losses they suffered

and will continue to suffer as a result of Defendants' fraud, plus compensatory, consequential, and/or punitive damages.

## COUNT TWO
### NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

59.     Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

60.     As set forth more fully above, Defendants made numerous material statements and omissions of fact to Plaintiffs that were false and misleading.

61.     Defendants' conduct, as alleged herein, was—if not willful, malicious, or reckless—negligent.

62.     Plaintiffs reasonably relied on Defendants' material misrepresentations and omissions to their detriment.

63.     As a direct, proximate, and foreseeable result of Defendants' conduct, Plaintiffs have suffered, and continue to suffer, substantial harm.  Accordingly, Plaintiffs are entitled to an award of damages in an amount sufficient to compensate Plaintiffs for all losses they suffered and will continue to suffer as a result of Defendants' negligent misrepresentations, plus compensatory and consequential damages.

## COUNT THREE
### BREACH OF CONTRACT
### (Against Aurobindo Pharma Ltd. and Aurolife Pharma LLC)

64.     Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

65.     The Supply Agreements are valid and enforceable contracts.

66.     Under the Supply Agreements, Aurobindo and Aurolife were obligated to supply product ordered by Rising Health.

67.     As set forth more fully above, Aurobindo and Aurolife materially breached the Supply Agreements by failing to fulfill Rising's purchase orders.

68.     As a consequence of Aurobindo's and Aurolife's material breaches of the Supply Agreements, Plaintiffs have been harmed and continue to suffer harm.

69.     Plaintiffs are entitled to an award of damages against Aurobindo and Aurolife in an amount to be determined at trial, which amount includes damages for, among other harm, lost profits, recovery of any failure-to-supply liability for penalties Plaintiffs paid, owe, or will owe to their customers, and loss of or damages to business reputation or goodwill, as well as all compensatory, consequential and/or equitable damages.

**COUNT FOUR**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**(Against Aurobindo Pharma Ltd. and Aurolife Pharma LLC)**

70.     Plaintiffs repeat, reallege, and incorporate by reference all of the allegations in the preceding paragraphs as if set forth here at length.

71.     The Supply Agreements are valid and enforceable contracts.

72.     The law implies into every contract a duty of good faith and fair dealing, such that one party to the contract may not frustrate the other party's attempt to secure the fruits of that contract.

73.     The duty of good faith and fair dealing prohibits Aurobindo and Aurolife from refusing to accept orders in a manner designed to deprive Rising Health of the fruits of the Supply Agreements.  Aurobindo and Aurolife cannot, consistent with the duty of good faith and fair dealing, decline to supply Rising Health with product in order to disadvantage Rising Health in the marketplace and/or induce customers to buy product from Aurobindo and Aurolife over

Rising Health.  If Aurobindo and Aurolife experience a shortage of API, the duty of good faith and fair dealing prohibits them from preferring the supply of its own customer orders over orders placed by Rising Health.

74.    As set forth more fully above, Aurobindo and Aurolife breached the duty of good faith and fair dealing implied in the Supply Agreements by, among other things, withholding product from Rising Health and refusing to fulfill its purchase orders in order to disadvantage Rising Health and benefit their own businesses.  Aurobindo and Aurolife acted in bad faith and for the purpose of denying Rising Health the fruits of its bargained-for exchanges under the Supply Agreements.

75.    As a consequence of Aurobindo's and Aurolife's breaches of the duty of good faith and fair dealing, Plaintiffs have been and continue to suffer harm.

76.    Plaintiffs are entitled to an award of damages against Aurobindo and Aurolife in an amount to be determined at trial, which amount includes damages for, among other harm, lost profits, recovery of any failure-to-supply liability for penalties Plaintiffs paid, owe, or will owe to their customers, and loss of or damages to business reputation or goodwill.

## **PRAYER FOR RELIEF**

**WHEREFORE**, judgment should be entered in favor of Plaintiffs and against Defendants for one or more of the following forms of relief or some combination of them:

A.    On the first cause of action, an award of damages against all Defendants in an amount sufficient to compensate Plaintiffs for all losses they suffered and will continue to suffer as a result of Defendants' fraud, plus compensatory, consequential, and/or punitive damages.

B.    On the second cause of action, an award of damages against all Defendants in an amount sufficient to compensate Plaintiffs for all losses they suffered and will continue to suffer

as a result of Defendants' negligent misrepresentations, plus compensatory and/or consequential,

damages.

       C.      On the third and fourth causes of action, an award of damages against Aurobindo

and Aurolife in an amount to be determined at trial, which amount includes damages for, among

other harm, lost profits, recovery of any failure-to-supply liability for penalties Plaintiffs paid,

owe, or will owe to their customers, and loss of or damages to business reputation or goodwill, as

well as all compensatory, consequential and/or equitable damages;

       D.      An award of costs of suit and attorneys' fees;

       E.      An award of pre-judgment interest at the maximum legal rate; and

       F.      Any such other and further relief as the Court may deem just and proper.

Dated:  May 31, 2019            By: /s/    *Gavin J. Rooney*
                                     Gavin J. Rooney, Esq.
                                     Reynold Lambert, Esq.
                                     Kenneth A. Rosen, Esq.
                                     Michael S. Etkin, Esq.
                                     Wojciech F. Jung, Esq.
                                     **LOWENSTEIN SANDLER LLP**
                                     One Lowenstein Drive
                                     Roseland, New Jersey 07068
                                     (973) 597-2500 (Telephone)
                                     (973) 597-2400 (Facsimile)
                                     grooney@lowenstein.com
                                     rlambert@lowenstein.com
                                     krosen@lowenstein.com
                                     metkin@lowenstein.com
                                     wjung@lowenstein.com

                                     *Counsel for Plaintiffs*