## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
| ACETO CORPORATION, *et al.*, | Case No. 19-13448 (VFP) |
| Debtors.[1] | Jointly Administered |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION OF ACETO CORPORATION AND ITS AFFILIATED DEBTORS

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Michael S. Etkin, Esq.
Wojciech F. Jung, Esq.
Michael Savetsky, Esq.
Philip J. Gross, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068

*Counsel for Debtors and Debtors-in-Possession*

Dated: June 17, 2019

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Tri Harbor Chemical Holdings LLC (*f/k/a* Aceto Agricultural Chemicals LLC, *f/k/a* Aceto Agricultural Chemicals Corporation) (3948); Tri Harbor Realty LLC (*f/k/a* Aceto Realty LLC) (7634); Kavod Pharmaceuticals LLC (*f/k/a* Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.) (7959); Kavod Health LLC (*f/k/a* Rising Health, LLC) (1562); Kavris Health LLC (*f/k/a* Acetris Health, LLC) (3236); KAVACK Pharmaceuticals LLC (*f/k/a* PACK Pharmaceuticals, LLC) (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

## DISCLAIMER[2]

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY PROVIDE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN AND ANY PLAN SUPPLEMENT(S). THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

---

[2] Terms used in this Disclaimer that are not otherwise defined will have the meanings ascribed to such terms elsewhere in the Disclosure Statement.

# TABLE OF CONTENTS

ARTICLE I  INTRODUCTION .................................................................................................1

    A.    Purpose of the Disclosure Statement ....................................................................1

    B.    Disclosure Statement Enclosures ..........................................................................2

        1.    Order Approving the Disclosure Statement ..............................................2

        2.    Ballot .........................................................................................................2

        3.    Confirmation Notice .................................................................................2

    C.    Confirmation of the Plan .......................................................................................2

        1.    Requirements ............................................................................................2

        2.    Approval of the Plan and Confirmation Hearing ......................................2

        3.    Only Impaired Classes Vote .....................................................................2

    D.    Classification and Treatment of Claims and Interests ...........................................4

    E.    Overview of the Plan and Plan Settlement ...........................................................10

    F.    Releases and Exculpation ....................................................................................11

    G.    Limitation on Securities Claims and Enforcement of Judgments.........................13

    H.    Voting Procedures and Voting Deadline ..............................................................13

    I.    Confirmation Hearing .........................................................................................14

ARTICLE II  GENERAL INFORMATION REGARDING THE DEBTORS...........................14

    A.    Overview of the Debtors' Businesses and Organizational Structure.....................14

    B.    Other Debtor Affiliates .......................................................................................21

    C.    The Debtors' Prepetition Capital Structure..........................................................22

    D.    Summary of Events Leading to the Filing of the Chapter 11 Cases.....................27

    E.    Summary of Certain Other Prepetition Legal Proceedings...................................32

    F.    Causes of Action of the Debtors ..........................................................................33

ARTICLE III  THE CHAPTER 11 CASES ..............................................................................34

    A.    Commencement of the Chapter 11 Cases ............................................................34

    B.    "First Day" Motions and Related Applications ....................................................34

    C.    Retention of Professionals and Appointment of the Creditors' Committee ..........36

    D.    Significant Events During the Chapter 11 Cases..................................................36

ARTICLE IV  SUMMARY OF PLAN ......................................................................................49

    A.    Classification, Treatment, and Voting of Claims and Interests ............................50

    B.    Acceptance ..........................................................................................................59

    C.    Means of Implementation of the Plan...................................................................60

    D.    Unexpired Leases and Executory Contracts ........................................................75

E.    Procedures for Resolving Disputed Claims and Interests ...................................... 80

F.    Provisions Governing Distributions ....................................................................... 82

G.    Effect of Plan on Claims and Interests ................................................................... 90

H.    Conditions Precedent ............................................................................................. 96

I.    Bankruptcy Court Jurisdiction ............................................................................... 97

J.    Miscellaneous Provisions ....................................................................................... 97

ARTICLE V  VOTING REQUIREMENTS; ..................................................................... 98

A.    General .................................................................................................................... 98

B.    Parties in Interest Entitled to Vote ........................................................................ 98

C.    Classes Impaired and Entitled to Vote Under the Plan ......................................... 98

D.    Voting Procedures and Requirements ..................................................................... 99

E.    Acceptance of Plan ............................................................................................... 100

F.    Confirmation Without Necessary Acceptances; Cramdown ............................... 100

ARTICLE VI  FEASIBILITY AND BEST INTERESTS OF CREDITORS ........................... 101

A.    Best Interests Test ................................................................................................ 101

B.    Liquidation Analysis ............................................................................................ 102

C.    Feasibility ............................................................................................................. 103

ARTICLE VII  EFFECT OF CONFIRMATION .............................................................. 103

A.    Binding Effect of Confirmation ........................................................................... 103

B.    Good Faith ............................................................................................................ 103

ARTICLE VIII  CERTAIN RISK FACTORS TO BE CONSIDERED .................................. 103

A.    Certain Bankruptcy Considerations ..................................................................... 104

B.    The Value of Retained Causes of Action Is Uncertain ....................................... 106

C.    Financial Information Disclaimer ......................................................................... 106

D.    Tax Considerations ............................................................................................... 106

E.    Other Risk Factors and Disclaimers .................................................................... 106

ARTICLE IX  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .... 108

A.    Consequences to the Debtors ............................................................................... 110

B.    Consequences to Holders of Certain Claims ....................................................... 111

1.    Gain or Loss .............................................................................................. 111

2.    Market Discount ........................................................................................ 112

3.    Allocation of Plan Distributions Between Principal and Interest ........... 113

C.    Information Reporting and Backup Withholding ................................................. 113

D.    Importance of Obtaining Professional Tax Assistance ........................................ 113

ARTICLE X  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ...................................................................................................114

    A.    Alternative Plan of Liquidation .........................................................114

    B.    Liquidation Under Chapter 7 of the Bankruptcy Code ........................114

ARTICLE XI  RECOMMENDATION AND CONCLUSION...................................................115

## **TABLE OF EXHIBITS**

| **Exhibit** | **Title** |
| --- | --- |
| A | Joint Plan of Liquidation of Aceto Corporation and Its Affiliated Debtors |

# ARTICLE I

# INTRODUCTION

## A.    Purpose of the Disclosure Statement

On February 19, 2019 (the "<u>Petition Date</u>"), Aceto Corporation ("<u>Aceto</u>"), Aceto Agricultural Chemicals Corporation ("<u>Aceto Agri</u>"), Aceto Realty LLC ("<u>Aceto Realty</u>", and collectively with Aceto and Aceto Agri, the "<u>Aceto Chemical Plus Debtors</u>"), Rising Pharmaceuticals, Inc. ("<u>Rising</u>"), Rising Health, LLC ("<u>Rising Health</u>"), Acetris Health, LLC ("<u>Acetris</u>"), PACK Pharmaceuticals, LLC ("<u>PACK</u>", and collectively with Rising, Rising Health and Acetris, the "<u>Rising Pharma Debtors</u>"), Arsynco, Inc. ("<u>Arsynco</u>") and Acci Realty Corp. ("<u>Acci Realty</u>", and collectively with the Aceto Chemical Plus Debtors, the Rising Pharma Debtors and Arsynco, the "<u>Debtors</u>"), filed voluntary petitions for relief, thereby commencing cases (together, the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>").

The Debtors have filed the Joint Plan of Liquidation of Aceto Corporation and Its Affiliated Debtors (including all exhibits and schedules attached thereto, and as it may be amended, altered, modified or supplemented from time to time, the "<u>Plan</u>") with the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**.

**Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; <u>provided</u>, <u>however</u>, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.**

The Debtors submit this disclosure statement (as it may be amended, altered, modified, revised or supplemented from time to time, the "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with (i) the Debtors' solicitation of acceptances of the Plan, and (ii) the hearing to consider Confirmation of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Plan so they can make informed decisions in doing so. Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to provide adequate information to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases. This Disclosure Statement also contains information regarding significant events that have occurred during the Chapter 11 Cases. In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the

effects of Confirmation of the Plan and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses certain risk factors associated with the Plan, the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote on the Plan for their votes to be counted.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF AN ORDERLY LIQUIDATION THAT MAXIMIZES RECOVERIES TO CREDITORS AND INTEREST HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES AND ALL STAKEHOLDERS. ACCORDINGLY, THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

**B.    Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

1.    Order Approving the Disclosure Statement. A copy of the Bankruptcy Court's order (the "Solicitation Procedures Order") approving this Disclosure Statement on an interim basis and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to Confirmation of the Plan and scheduling the Confirmation Hearing (as defined herein).

2.    Ballot. A ballot (the "Ballot") for voting to accept or reject the Plan, if you are the record Holder of a Claim in a Class entitled to vote on the Plan (each, a "Voting Class").

3.    Confirmation Notice. A notice setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to final approval of this Disclosure Statement and Confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "Confirmation Notice").

**C.    Confirmation of the Plan**

1.    Requirements. The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.    Approval of the Plan and Confirmation Hearing. To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.    Only Impaired Classes Vote. Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of

the Bankruptcy Code and, therefore, such holders do not need to vote on such plan. Claims and Interests under the Plan are divided into the numbered Classes set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3A | General Unsecured Claims against Aceto Chemical Plus Debtors (including DPO Claim and Notes Claims) | Impaired | Entitled to Vote |
| 3B | General Unsecured Claims against Rising Pharma Debtors (including DPO Claim) | Impaired | Entitled to Vote |
| 3C | General Unsecured Claims against Arsynco | Impaired | Entitled to Vote |
| 3D | General Unsecured Claims against Acci Realty | Impaired | Entitled to Vote |
| 4A | Subordinated Claims Against Aceto Chemical Plus Debtors | Impaired | Deemed to Reject |
| 4B | Subordinated Claims Against Rising Pharma Debtors | Impaired | Deemed to Reject |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6A | Interests in Aceto | Impaired | Deemed to Reject |
| 6B | Interests in all Debtors Other than Aceto | Impaired | Deemed to Reject |

Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and therefore presumed to accept the Plan.

Under the Plan, Holders of Claims in Classes 3A, 3B, 3C and 3D are Impaired and are entitled to vote on the Plan.

Under the Plan, Holders of Claims and Interests in Classes 4A, 4B, 5, 6A and 6B are deemed to reject the Plan and are not entitled to vote on the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3A, 3B, 3C and 3D.

**D.      Classification and Treatment of Claims and Interests**

The table below summarizes the classification and treatment of Claims against and Interests in the Debtors and provides the estimated recoveries for each Class under the Plan.  For a complete description of Claims and Interests and their treatment under the Plan, reference should be made to the entire Plan.

**As noted in the risk factors included in Article VIII of this Disclosure Statement, the actual recoveries to Holders of Claims and Interests under the Plan are not certain and may be materially higher or lower than the estimates described in this Disclosure Statement.  In addition, any estimates of the Allowed amount of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. The General Bar Date (as defined below) is June 19, 2019, at 5:00 p.m. (Eastern Time) and the Governmental Bar Date (as defined below) is August 19, 2019, at 5:00 p.m. (Eastern Time). The Debtors intend to file an amended disclosure statement prior to the approval hearing on this Disclosure Statement, which will include, to the extent available, updated information with respect to estimates of Claims and recoveries to Holders of Allowed Claims and Interests.**

| Class Description | Proposed Treatment |
| --- | --- |
| Administrative Claims<br><br>Estimated Allowed Amount:<br>$_____<br><br>Estimated Recovery: 100% | Except to the extent that the Debtors or the Plan Administrator, and a Holder of an Allowed Administrative Claim agree to a less favorable treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which will be subject to Section 2.02 of the Plan) will receive, in full satisfaction, settlement, and release of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the later of (i) the Initial Distribution Date or (ii) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date when the Administrative Claim becomes an Allowed Administrative Claim; or (2) 30 days after the date when the Administrative Claim becomes payable pursuant to any agreement between the Debtors or the Plan Administrator and the Holder of the Administrative Claim; or (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; *provided, however*, that other than the Holder of (w) a Professional Claim, (x) an Administrative Claim Allowed by a Final Order of the Bankruptcy Court on or before the Effective Date, (y) an Administrative Claim that is not Disputed and arose in the ordinary course of business and was paid, or (z) an Administrative Claim arising under chapter 123 of title 28 of the United States Code, the Holder of any Administrative Claim will have filed a proof of Claim form no later than the Administrative Claim Bar Date and such Claim will have become an |

| Class Description | Proposed Treatment |
|---|---|
| | Allowed Claim. |
| Priority Tax Claims<br><br>Estimated Allowed Amount: TBD[3]<br><br>Estimated Recovery: 100% | On the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Priority Tax Claim becomes an Allowed Priority Tax Claim or (ii) 30 days after the date when a Priority Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Priority Tax Claim, except to the extent that the Debtors (or Plan Administrator) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date will receive, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Priority Tax Claim. Cash in an amount equal to the amount of such Allowed Priority Tax Claim. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim will be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. |
| Class 1: Other Priority Claims<br><br>Estimated Allowed Amount:<br>$_____<br><br>Estimated Recovery: 100% | Except as otherwise provided in and subject to Section 8.05 of the Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim will be paid in full in Cash on the later of (A) the Initial Distribution Date or (B) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date when an Other Priority Claim becomes an Allowed Other Priority Claim or (2) 30 days after the date when an Other Priority Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Other Priority Claim. |
| Class 2: Other Secured Claims<br><br>Estimated Allowed Amount:<br>$_____<br><br>Estimated Recovery: 100% | Except as otherwise provided in and subject to Section 8.05 of the Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim will, at the option of the Plan Administrator, (i) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, (ii) receive the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of |

---

[3] The IRS has filed a number of Claims against the Debtors, including a Claim asserting an estimated tax liability in the amount of $7,697,669.00. The Debtors dispute the IRS's Claims and intend to resolve such disputes either through agreement with the IRS or by adjudication by the Bankruptcy Court.

| Class Description | Proposed Treatment |
| --- | --- |
| | the interest of the Holder of such Allowed Other Secured Claim in such collateral, or (iii) receive the collateral securing such Allowed Other Secured Claim, in each case of (i), (ii), or (iii) on the later of (A) the Initial Distribution Date or (B) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (2) 30 days after the date when such Other Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Other Secured Claim; *provided, however,* that nothing in Section 3.02 or elsewhere in the Plan will preclude the Debtors or the Plan Administrator, as applicable, from challenging the validity of any alleged Lien on any asset of the Debtors or the value of the property that secures any alleged Lien. |
| Class 3A: General Unsecured Claims against Aceto Chemical Plus Debtors (including DPO Claim and Notes Claims)<br><br>Estimated Allowed Amount: $_____<br><br>Estimated Recovery: _____% | Except to the extent that a Holder of an Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors agrees to a less favorable treatment and subject to Section 8.12 of the Plan with respect to the DPO Claim, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors will receive its Pro Rata Share of the Aceto Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Aceto Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against the Aceto Chemical Plus Debtors is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable). |
| Class 3B: General Unsecured Claims against Rising Pharma Debtors (including DPO Claim)<br><br>Estimated Allowed Amount: $_____<br><br>Estimated Recovery: _____% | Except to the extent that a Holder of an Allowed General Unsecured Claim against the Rising Pharma Debtors agrees to a less favorable treatment and subject to Section 8.12 of the Plan with respect to the DPO Claim, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against the Rising Pharma Debtors, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against the Rising Pharma Debtors will receive its Pro Rata Share of the Rising Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Rising Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against the Rising Pharma Debtors is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the |

| Class Description | Proposed Treatment |
|---|---|
|  | contract non-default interest rate (if applicable). |
| Class 3C: General Unsecured Claims against Arsynco<br><br>Estimated Allowed Amount:<br>$_____<br><br>Estimated Recovery:<br>_____% | Except to the extent that a Holder of an Allowed General Unsecured Claim against Arsynco agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against Arsynco, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against Arsynco will receive its Pro Rata Share of the Arsynco Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Arsynco Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against Arsynco is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable). |
| Class 3D: General Unsecured Claims against Acci Realty<br><br>Estimated Allowed Amount: $0<br><br>Estimated Recovery: N/A | Except to the extent that a Holder of an Allowed General Unsecured Claim against Acci Realty agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against Acci Realty, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against Acci Realty will receive its Pro Rata Share of the Acci Realty Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Acci Realty Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against Acci Realty is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable). |
| Class 4A: Subordinated Claims Against Aceto Chemical Plus Debtors<br><br>Estimated Allowed Amount:<br>$_____ | On the Effective Date, each Holder of an Allowed Subordinated Claim (if any) against the Aceto Chemical Plus Debtors will not receive any distribution or other property on account of such Claim; *provided, however*, that if after payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors (including payment of post-petition interest, if any, as set forth in Section 3.02 of the Plan) and after reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3A and all other wind-down costs and expenses, the Plan Administrator determines that additional Aceto Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) of the Plan, the Plan Administrator will make such distributions to Holders of Allowed Subordinated Claims ratably with Holders of Allowed Interests in Aceto in the manner set forth |

| Class Description | Proposed Treatment |
|---|---|
| | immediately below.<br><br>With respect to distributions, if any, to be shared ratably between Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors and Holders of Allowed Interests in Aceto, each holder of an Allowed Subordinated Claim against the Aceto Chemical Plus Debtors will be entitled to its Pro Rata Share (up to the principal amount of its Allowed Claim) of the remaining Aceto Net Distributable Assets to be distributed on a *pari passu* basis with Holders of Allowed Interests in Aceto, and for purposes of determining the proportional amount of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors relative to the Allowed Interests, the Plan Administrator will use the Aceto Interest Distribution Value. |
| Class 4B: Subordinated Claims Against Rising Pharma Debtors<br><br>Estimated Allowed Amount:<br>$_____ | On the Effective Date, each Holder of an Allowed Subordinated Claim (if any) against the Rising Debtors will not receive any distribution or other property on account of such Claim; *provided, however,* that if after payment in full of all Allowed Class 3B General Unsecured Claims against the Rising Debtors (including payment of post-petition interest, if any, as set forth in Section 3.02 of the Plan) and after reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3B and all other wind-down costs and expenses, the Plan Administrator determines that additional Rising Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) of the Plan, the Plan Administrator will make such distributions and each Holder of an Allowed Subordinated Claim against the Rising Pharma Debtors will receive its Pro Rata Share of any available remaining Rising Net Distributable Assets up to the full principal amount of such Allowed Claim. |
| Class 5: Intercompany Claims<br><br>Estimated Recovery (other than the Settlement Distribution Subsidy): 0% | On the Effective Date, all Intercompany Claims will be eliminated and extinguished and the Holders of Intercompany Claims will not receive or retain any property under the Plan on account of such Claims, and such Claims will be deemed waived and released except as set forth with respect to the Intercompany Claim of the Rising Pharma Debtors against the Aceto Chemical Plus Debtors which will be settled through the Settlement Distribution Subsidy, provided, however, that nothing in the Plan will eliminate the Debtors' rights to distributions from any of their non-Debtor Affiliates on account of the Debtors' equity interests in any non-Debtor Affiliate. |
| Class 6A: Interests in Aceto<br><br>Estimated Recovery: | On the Effective Date, Interests in Aceto, including the Aceto Common Stock, will be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Plan Administrator, and without further distribution; provided that one share of common stock in Aceto will be issued and transferred to the Plan |

| Class Description | Proposed Treatment |
|---|---|
| 0% to TBD | Administrator for purposes of administering the wind-down of Aceto as may be required, including pursuant to the Chemical Plus Purchase Agreement; provided further that in the event that the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, each Holder of Interests in Aceto, including the Aceto Common Stock, as of the Distribution Record Date, will be entitled to retain such Interests in Aceto without further recovery or distribution on account of such interests and one share of common stock in Aceto will not be issued or transferred to the Plan Administrator as of the Effective Date; and provided further that if after payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors (including payment of post-petition interest, if any, as set forth in Section 3.02 of the Plan) and/or reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3A and all other wind-down costs and expenses, the Plan Administrator determines that additional Aceto Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) (and whether or not the Aceto Common Stock Non-Cancellation Election Notice was filed by the Debtors on or prior to the Effective Date) the Plan Administrator will make such distributions to Holders of Interests in Aceto as of the Distribution Record Date ratably with Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors in the manner set forth immediately below.

With respect to distributions, if any, to be shared ratably between Holders of Interests in Aceto and Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors, each Holder of an Interest in Aceto will be entitled to its Pro Rata Share of the remaining Aceto Net Distributable Assets to be distributed on a *pari passu* basis with Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors and, for purposes of determining the proportional amount of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors relative to the Interests in Aceto, the Plan Administrator will use the Aceto Interest Distribution Value. |
| Class 6B: Interests in all Debtors Other than Aceto

Estimated Recovery: 0% | On the Effective Date, Allowed Interests in Debtors other than Aceto will not receive any distribution on account of such Interests, provided that such Interests will be maintained by the Plan Administrator on and after the Effective Date as may be required pursuant to the Pharma Purchase Agreement and/or Chemical Plus Purchase Agreement and/or as necessary to administer the wind-down of each Debtor other than Aceto, including, *inter alia*, for purposes of transferring any particular Estates' assets to other Estates to the extent any particular Estate (or set of consolidated Estates) has additional Cash remaining after paying out all other required Plan distributions. |

### E.    Overview of the Plan and Plan Settlement

The Plan is proposed jointly for administrative purposes, and provides for the treatment of all Claims against and Interests in the Debtors.  Pursuant to the Plan Settlement, the Plan constitutes a separate Plan for each Debtor, provided that as set forth in further detail below, and in order to give effect to the Plan's comprehensive compromise and settlement structure pursuant to Bankruptcy Rule 9019 and section 1123(b) of the Bankruptcy Code, for purposes of distributions and recoveries to general unsecured creditors, the Plan provides for partial substantive consolidation of certain of the Debtors' estates, specifically the estates of the Aceto Chemical Plus Debtors (which consist of Aceto, Aceto Agri, and Aceto Realty) and the estates of the Rising Pharma Debtors (which consist of Rising, Rising Health, Acetris, and PACK).[4] Claims against the remaining Debtors, namely Arsynco, and Acci Realty, will be separately classified and the estates of Arsynco and Acci Realty will not be substantively consolidated with the estates of either the Aceto Chemical Plus Debtors or the Rising Pharma Debtors.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates the compromise and settlement (the "Plan Settlement") of numerous debtor-creditor and inter-estate issues designed to achieve an economic resolution of Claims against the Debtors and an efficient resolution of the Chapter 11 Cases, including the settlement of a number of potential issues such as allocation of Assets and expenses among the Estates as set forth in the Distribution Calculation, the nature, amount and allowability of the Intercompany Claim of Rising against Aceto,[5] the funding of the Wind-Down Reserve, the Wind-Down Budget, partial substantive consolidation of the Debtors' Estates, and the allowance of the Notes Claims, the resolution of which could have otherwise resulted in substantial uncertainty and costly litigation, as well as diminished and delayed distributions to creditors under the Plan. The Plan Settlement provides for the Settlement Distribution Subsidy[6] to be contributed from the Aceto Chemical Plus Debtors' Estates to the Rising Pharma Debtors' Estates in full and complete resolution of issues related to substantive consolidation and the Intercompany Claim of Rising against Aceto, which will enhance the *pro rata* distributions to Holders of Allowed General Unsecured Claims against the Rising Pharma Debtors (subject to any Excess Amounts being returned to the Aceto Chemical Plus Debtors' Estates based upon the amount of Allowed Claims in Classes 3B and 4B as set forth in the definition of Settlement Distribution Subsidy).

---

[4] Substantive consolidation is an equitable remedy pursuant to which the estates of related debtors and the assets and liabilities of such debtors are combined and treated as a single estate from which claims are paid (except for inter-entity liabilities, which are erased). Creditors of each debtor whose estate is substantively consolidated are treated as creditors of the consolidated estate and receive distributions from the consolidated estate.

[5] The Intercompany Claim of Rising against Aceto is approximately $61 million.

[6] "Settlement Distribution Subsidy" is defined in the Plan as follows: "a cash contribution of up to $10 million to be funded (or otherwise reserved) from the Aceto Chemical Plus Debtors to the Rising Pharma Debtors to increase the Rising Net Distributable Assets; provided that if, when added together with any Allowed Class 4B Subordinated Claims against the Rising Pharma Debtors, the amount of the fully resolved, liquidated and Allowed Class 3B General Unsecured Claims against the Rising Pharma Debtors (other than the DPO Claim) is less than the Rising Net Distributable Assets, then the excess (the "Excess Amounts") shall be returned to the Aceto Chemical Plus Debtors' Estates and increase the available Aceto Net Distributable Assets."

The Debtors believe that the Plan Settlement and the related provisions embodied in the Plan are fair and equitable and in the best interests of the Debtors, their Estates and all stakeholders.

The Confirmation Order will serve to, among other things, approve the Plan Settlement under section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, and will contain findings that the compromises and settlements under the Plan Settlement are in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and are fair, equitable, and well within the range of reasonableness and otherwise satisfy the requirements of Bankruptcy Rule 9019.

## F.    Releases and Exculpation

Article IX of the Plan includes certain proposed releases of the Released Parties and exculpation of the Exculpated Parties, subject to certain limitations as set forth in the Plan and the ability of Holders of claims in the Voting Classes to "opt-out" of the Third Party Release. The Debtor Release, the Third Party Release, and the exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the Plan.

All of the Released Parties are being consensually released, the Debtors have decided in their business judgment that they should be released, and all of the Released Parties have made substantial and valuable contributions to the Debtors' restructuring through, among other things, efforts to consummate the sale of substantially all of the Debtors' assets in the Chapter 11 Cases and negotiate and pursue confirmation of the Plan, which will maximize and preserve value for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties is entitled to the benefit of the release and exculpation provisions of the Plan. Only Holders of Claims that vote to accept the Plan, Holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and abstain from electing on their ballot to opt-out of the Third Party Release, and Holders of Claims that vote to reject the Plan but do not elect on their ballot to opt-out of the Third Party Release will be bound by the Third Party Release. In addition, the release and exculpation provisions of the Plan contain carve-outs for gross negligence, willful misconduct, and fraud.

Under the Plan:

• The "Released Parties" means, collectively, each of the following solely in their respective capacities as such: (a) the Debtors' current officers, directors, and managers (or any of the Debtors' officers, directors and managers that served as such during or immediately prior to the Chapter 11 Cases); (b) the Debtors' Professionals; (c) the Creditors' Committee's Professionals; (d) current and former members of the Creditors' Committee, but solely in their capacities as such and not in any other capacity; (e) the Notes Indenture Trustee; and (f) with respect to each of the foregoing entities in clauses (a) through (e), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates,

subsidiaries, divisions, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such.  For the avoidance of doubt, and notwithstanding anything herein to the contrary, in no event shall holders of Interests in Aceto be considered "Released Parties" on account of such Interests.

- The "Releasing Parties" means, collectively, each of the following in their respective capacities as such: (a) the Released Parties identified in subsections (a)–(d) of the definition of "Released Parties"; (b) all Holders of Claims that vote to accept the Plan; (c) all Holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and abstain from electing on their ballot to opt-out of the Third Party Release; (d) all Holders of Claims that vote to reject the Plan but do not elect on their ballot to opt-out of the Third Party Release; and (e) with respect to each of the foregoing entities in clauses (a) through (d), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; provided, however, that holders of Interests in Aceto shall not be considered "Releasing Parties" solely on account of such Interests.

- The "Exculpated Parties" means, collectively, each of the following in their respective capacities as such: (a) the Debtors; (b) the Liquidating Debtors; (c) the Debtors' current officers, directors, and managers (or any of the Debtors' officers, directors and managers that served as such during or immediately prior to the Chapter 11 Cases); (d) the Creditors' Committee and each of its current and former members, but solely in their capacities as such; and (e) with respect to each of the foregoing entities in clauses (a) through (d), such Entity's and its current and former Affiliates' subsidiaries, divisions, managed accounts or funds, and each of their respective current and former equity holders, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; provided that Holders of Interests in Aceto shall not be Exculpated Parties solely on account of such Interests, provided, further, that for the avoidance of doubt, any party against whom the Debtors or the Plan Administrator, as the case may be, have filed a Cause of Action before, on, or after the Effective Date shall not be an Exculpated Party with respect to such Cause of Action to the extent such Cause of Action asserts claims based upon events or actions that occurred prior to the Petition Date.

The Debtors believe that the release and exculpation provisions of the Plan are necessary and appropriate and meet the requisite legal standards for approval.  Moreover, the Debtors will present evidence as may be necessary at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, injunction, and related provisions contained in the Plan are also set forth in Article IV.G. of this Disclosure Statement, entitled "Effect of Plan on Claims and Interests."

## G.    Limitation on Securities Claims and Enforcement of Judgments

Subject to certain exceptions contained therein, Section 9.08 of the Plan includes limitations on the enforcement by the Plan Administrator or any Holders of Securities Claims of any judgments, recoveries or settlement obtained against the Specified Individuals or any of the Debtors' current or former directors, officers and managers (to the extent not released pursuant to Section 9.05 of the Plan) unless such judgment or settlement is actually covered by, and payable from, any available insurance coverage under the D&O Policies, without prejudice to any subrogation or other rights of any D&O Insurer under the D&O Policies.

The Specified Individuals are defined in the Plan as each of the former directors, officers, and/or managers of the Debtors prior to the Petition Date that did not serve in such capacity immediately prior to and after the Petition Date.

## H.    Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. To ensure your vote is counted, you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided, and (iii) sign and return the Ballot, with original signature, in the enclosed envelope or via the E-Balloting Portal to be established by Prime Clerk, LLC ("Prime Clerk" or the "Voting Agent").

The Ballot also contains an election to opt out of the release provisions contained in Section 9.05 of the Plan. As noted above, all Holders of Claims that vote to accept the Plan will be deemed to have consented to and provided the release contained in Section 9.05 of the Plan. All Holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and abstain from electing on their Ballot to opt-out of the release contained in Section 9.05 of the Plan will be deemed to have consented to and provided such release. All Holders of Claims that vote to reject the Plan and do not elect to opt-out of the release contained in Section 9.05 of the Plan will be deemed to have consented to and provided such release.

TO BE COUNTED, YOUR BALLOT **WITH YOUR ORIGINAL** SIGNATURE (OR E-BALLOT WITH ELECTRONIC SIGNATURE) INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M. (EASTERN TIME) ON [●], 2019 (THE "VOTING DEADLINE**").

Ballots that are not returned by the Voting Deadline or are otherwise improperly completed or invalid pursuant to the rules set forth in the Solicitation Procedures Order will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.

In order for the Plan to be accepted by an Impaired Class of Claims, more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR SUBMIT THROUGH THE E-BALLOTING PORTAL YOUR BALLOT FOR VOTING ON THE PLAN. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY, AND IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT, PRIME CLERK, AT (844) 216-7718 OR AT ACETOBALLOTS@PRIMECLERK.COM. THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

## I.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for [●], 2019 at [●] [a].m. (Eastern Time) in the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, 3rd Floor, Newark, New Jersey 07102 (the "Confirmation Hearing"). The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before [●], 2019 at [●] [p].m. (Eastern Time) in the manner described in the Confirmation Notice accompanying this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by way of announcement of such continuance in open Bankruptcy Court or otherwise, without further notice to parties in interest.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

## A.    Overview of the Debtors' Businesses and Organizational Structure

Aceto, incorporated in 1947 in the State of New York, together with its Debtor and non-debtor subsidiaries (collectively, the "Company"), was an international company, which heretofore had operations in ten countries, including the United States, China, Germany, France, the Netherlands, Singapore, India, Hong Kong, Philippines, and the United Kingdom. Prior to the sale of substantially all of the Debtors' assets in the Chapter 11 Cases pursuant to section 363 of the Bankruptcy Code, the Company was engaged in the development, marketing, sales and distribution of finished dosage form generic pharmaceuticals, nutraceutical products, pharmaceutical active ingredients and intermediates, specialty performance chemicals inclusive of agricultural intermediates and agricultural protection products.

The Company did not operate any manufacturing facilities.  Instead, the Company functioned as a "virtual" manufacturing company, distributing more than 1,100 chemical

compounds used principally as finished products or raw materials in the pharmaceutical, nutraceutical, agricultural, coatings and industrial chemical industries. The Company's global reach enabled the Company to source and supply quality products on a worldwide basis. Leveraging local connections, the Company sourced more than two-thirds of its products from Asia, buying from approximately 500 companies in China and 200 in India.

Other than (i) product rights and license agreements for certain finished dosage form generic products which were part of the Company's Human Health (defined below) business segment, (ii) U.S. Environmental Protection Agency (EPA) registrations for the Company's Performance Chemicals business, and (iii) FDA, U.S. Drug Enforcement Administration and related state licenses and registrations for the Chemical Plus Business, the Debtors held no patents, franchises or concessions that were material to their operations.

The Company's business was organized along product lines into three reporting segments:

(a)     the human health ("Human Health") segment, which was operated primarily through Aceto's wholly-owned subsidiary Rising (and Rising's wholly-owned subsidiaries, PACK, Rising Health and Acetris), focuses on the development, marketing, distribution and sale of finished dosage form generic drugs (the finished dosage generic drug business is referred to herein as the "Pharma Business" and excludes the Human Health Nutritional Products Line (defined below))[7] and, with respect to the sale of certain nutritional products (the "Human Health Nutritional Products Line"), is also operated through Aceto and certain non-Debtor subsidiaries of Aceto;

(b)     the pharmaceutical ingredients ("Pharmaceutical Ingredients") segment, operated through Aceto and certain foreign non-Debtor subsidiaries; and

(c)     the performance chemicals ("Performance Chemicals") segment, operated through Aceto, Aceto Agri, and certain foreign non-Debtor subsidiaries of Aceto (the Performance Chemicals segment, together with the Pharmaceutical Ingredients segment and the Human Health Nutritional Products Line, are collectively referred to herein as the "Chemical Plus Business" or "Chemical Plus").

Each of the above business segments is described further below.

For the fiscal year ended June 30, 2018, the Company generated net sales totaling approximately $711.4 million on a consolidated basis, consisting of: (a) net sales totaling approximately $374.5 million arising from the Company's Human Health segment; (b) net sales totaling approximately $158.9 million arising from the Company's Pharmaceutical Ingredients segment; and (c) net sales totaling approximately $178.0 million arising from the Company's Performance Chemicals segment.

---

[7] The Company's Human Health Nutritional Products Line (that is considered part of the Human Health segment) is not part of the Pharma Business.

Aceto was a publicly-traded company and its common stock traded on the NASDAQ Global Select Market using the symbol "ACET".  On February 21, 2019, Aceto received a notification from the Nasdaq Stock Market ("Nasdaq") informing the Company that, as a result of the Chapter 11 Cases and in accordance with Nasdaq Listing Rules 5101, 5110(b) and IM-5101-1, Nasdaq had determined that Aceto's common stock would be delisted from Nasdaq. Aceto timely appealed the delisting notice and appeared before the Nasdaq Hearings Panel (the "Panel") on March 28, 2019. The Panel issued a decision on April 1, 2019, and determined to delist the Company's common stock from Nasdaq. Aceto did not appeal Nasdaq's determination. The suspension of trading became effective at the open of business on April 3, 2019.  Upon delisting, Aceto's common stock commenced trading on the OTC Pink Market under the symbol "ACETQ."

As of the Petition Date, the Debtors employed approximately 180 employees ("Employees"), none of whom were subject to a collective bargaining agreement.  Of these Employees, approximately 120 were salaried and 60 were hourly.  To supplement their workforce, the Debtors utilized the services of approximately 36 temporary employees and independent contractors.

### 1.    The Human Health Business Segment

Products that fell within the Human Health segment included finished dosage form generic drugs and nutraceutical products.  The Rising Pharma Debtors sold generic prescription products and over-the-counter pharmaceutical products to leading wholesalers, chain drug stores, distributors and mass merchandisers.  Representative customers for the Human Health business segment included AmerisourceBergen, Cardinal Health, McKesson, CVS, Rite Aid, Walgreens, Costco, Walmart, and Publix.  As of the Petition Date, the Rising Pharma Debtors maintained a portfolio of approximately 125 pharmaceutical products, with an additional (i) approximately 39 Abbreviated New Drug Applications ("ANDAs")[8] filed and/or approved pending product launch, and (ii) approximately 48 pharmaceutical products under development.

The Rising Pharma Debtors were an industry leader in marketing and distributing generic prescription pharmaceutical products covering a variety of therapeutic areas and dosage forms. They focused on the development of ANDA-based generic products through a global network of development and manufacturing counterparties and had a robust emerging pipeline of niche pharmaceutical products.

Rising was founded in the late 1990s as a private company with a focus on selling niche pharmaceutical products and providing superior customer service.  Rising was acquired by Aceto on December 31, 2010 in an effort by Aceto to greatly expand its then-fledgling U.S. finished

---

[8] An Abbreviated New Drug Application ("ANDA") is an application for a U.S. generic drug approval for an existing licensed medication or approved drug.  The ANDA is submitted to the U.S. Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research, Office of Generic Drugs, which provides for the review and ultimate approval of a generic drug product. Once approved, an applicant may manufacture and market the generic drug product to provide a safe, effective, low cost alternative to the American public.

dosage generic drug business.[9]   Starting on January 1, 2011, Rising began operating as a wholly-owned subsidiary of Aceto.

Rising acquired PACK, another U.S. generic pharmaceuticals distributor, on April 30, 2014. That acquisition expanded the Debtors' portfolio of commercialized and pipeline pharmaceutical products.

On December 21, 2016, Aceto (through two wholly-owned subsidiaries of Rising) completed the acquisition (the "2016 Citron/Lucid Acquisition") of certain generic products and related assets of entities formerly known as Citron Pharma ("Citron"), and its affiliate Lucid Pharma ("Lucid") pursuant to that certain Product Purchase Agreement, dated as of November 2, 2016 (the "2016 Product Purchase Agreement").[10]   At closing of the Citron/Lucid Acquisition: (i) Aceto paid the sellers $270 million in cash, and (ii) subject to certain terms and conditions, (a) Aceto, Rising Health, and Acetris became obligated to make a $50 million deferred payment to the sellers (bearing interest at a rate of 5% per annum) on December 21, 2021, and (b) Aceto agreed to issue 5.122 million shares of Aceto common stock to the sellers beginning on December 21, 2019.  Aceto formed two subsidiaries under Rising to consummate the product acquisition – Rising Health (which acquired certain products and related assets of Citron) and Acetris (which acquired certain products and related assets of Lucid).  Citron was a privately-held New Jersey-based pharmaceutical company focused on developing and marketing generic pharmaceutical products together with leading generic pharmaceutical manufacturers based in India and the U.S.   Lucid was a privately-held New Jersey-based generic pharmaceutical distributor specializing in providing cost-effective products to various agencies of the U.S. Federal Government including the Veterans Administration and the Defense Logistics Agency. Lucid serviced 18 national contracts (the "Lucid Governmental Contracts") with the Federal Government, nearly all of which have 5-year terms.   Following the closing of the 2016 Citron/Lucid Acquisition, Acetris acquired the Lucid Governmental Contracts.

The Rising Pharma Debtors maintained a portfolio of finished dosage form generic products through product development agreements, acquisitions of late stage assets, and ANDAs. The 2016 Citron/Lucid Acquisition was intended to expand the Rising Pharma Debtors' roster of commercialized products and pipeline of products under development and was intended to expand their supplier network.

In order to bring a generic pharmaceutical product to market in the U.S., it is necessary to (i) develop such product for approval by the FDA, (ii) manufacture it, and (iii) sell/distribute it. The largest pharmaceutical companies in the world typically are vertically integrated with in-house capability in all three areas.

---

[9] Aceto did distribute several generic drugs in the year prior to the Rising acquisition, but such business represented a *de minimus* portion of Aceto's annual EBITDA.
[10] The 2016 Product Purchase Agreement was by and among Citron Pharma LLC, Lucid Pharma LLC, Citgen Pharma Holding LLC, Gensource Pharma LLC, Sudha Kavuru, SS Pharma LLC, Shore Pharma LLC, Pharma Reach LLC, Vimal Kavuru, Subha Sri Thogarchedu, Aceto Corporation, Romeo Charlie Acquisition I, LLC, Romeo Charlie Acquisition II, LLC, and Vimal Kavuru, as Agent for certain parties thereto.  A copy of the 2016 Product Purchase Agreement was attached as Exhibit B to the *Debtors' Motion for Entry of an Order (I) Approving Mutual Release of Claims by and Between the Releasing Debtors and the Stalking Horse Bidder Released Parties Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and in Furtherance of the Section 363 Sale of the Debtors' Pharma Business; and (II) Granting Related Relief* [Docket No. 172].

The Rising Pharma Debtors initially focused on the sale and distribution aspect of this process, and sales and distribution remained their main focus.  The Rising Pharma Debtors did not operate manufacturing facilities; all products were manufactured by third-party contract counterparties.  The Rising Pharma Debtors maintained in-house development expertise. However, in most instances, the technical scientific aspect of the development process was undertaken by development counterparties. The in-house development team both proposed products to development parties with the required scientific expertise and analyzed proposals from development parties who were seeking to work together with Rising. The Rising Pharma Debtors also maintained an in-house Regulatory and Quality Assurance team that had the scientific expertise to lead or assist with the product approval process.

There were generally three types of contractual arrangements between the Rising Pharma Debtors and their development counterparties (the counterparties were typically other pharmaceutical companies).  The first type was essentially a contractual arrangement through which Rising purchased products at arm's length for resale; in that type of arrangement, there was no contractual profit-sharing element. The second type of contractual arrangement resulted in a profit-sharing agreement between Rising and a developer and/or manufacturer of a finished dosage form generic drug. The third type of contractual arrangement included a collaboration arrangement with the contract counterparty whereby Rising and the counterparty jointly worked to bring certain generic drugs to market.  As just one example, this type of contractual arrangement existed between the Rising Pharma Debtors and their largest supplier, Aurobindo Pharma Ltd.

The nature and purpose of all of the above contractual arrangements was for the Rising Pharma Debtors to act as a distributor of finished dose generic drug products to their customers. Under all of these arrangements, the Rising Pharma Debtors maintained exclusive and non-exclusive distribution rights with respect to specific drugs within the U.S. marketplace.

Aceto, through itself and certain foreign non-debtor subsidiaries and affiliates, also sourced and supplied nutritional and functional food ingredients, known as nutraceuticals, by identifying areas of market demand and developing sources of supply to meet customer requirements.  Such raw materials were used in the production of nutritional and packaged dietary supplements such as vitamins, supplements, botanical extracts, amino acids, and minerals.  These ingredients were sold primarily in Europe and North America.

## 2.      The Pharmaceutical Ingredients Business Segment

The Pharmaceutical Ingredients segment had two product groups: Active Pharmaceutical Ingredients ("APIs") and Pharmaceutical Intermediates.

### a.    APIs

Aceto, through itself and certain Debtor and non-debtor subsidiaries and affiliates, supplied APIs[11] to many of the major drug companies.  Chemical Plus was a valued counterparty in the efforts of these companies to develop and market generic drugs.

The process of introducing a new API from pipeline to market spans a number of years and began with Chemical Plus working with a generic pharmaceutical manufacturer and together selecting an API for future genericizing.  Chemical Plus then identified the appropriate supplier, and concurrently utilized its global technical network to ensure the proposed supplier met quality standards.  Chemical Plus's client, the generic pharmaceutical company, then submitted an ANDA for FDA or European-equivalent approval.  The introduction of the API to the market occurred after all the development testing was completed and the ANDA or European-equivalent was approved and the patent expired or was deemed invalid.

As of the Petition Date, Chemical Plus had a pipeline of APIs at various stages of development both in the United States and Europe.  Additionally, as the pressure to lower the overall cost of healthcare increased, Chemical Plus focused on, and worked very closely with its customers, to develop new API opportunities to provide alternative, more economical, second-source options for existing generic drugs.

### b.    Pharmaceutical Intermediates

Chemical Plus had long been a supplier of pharmaceutical intermediates, the complex chemical compounds that are the building blocks used in producing APIs. Pharmaceutical intermediates are the critical components of all drugs, whether they are already on the market or currently undergoing clinical trials.  Faced with significant economic pressures as well as ever-increasing regulatory barriers, drug companies looked to Aceto as a source for high quality intermediates.

Chemical Plus employed, on occasion, a similar source strategy for its pharmaceutical intermediates business that it used in its API business. Historically, pharmaceutical manufacturers have had one source for the intermediates needed to produce their products. Utilizing Chemical Plus's global sourcing, regulatory support and quality assurance network, Chemical Plus worked with the large, global pharmaceutical companies, sourcing lower cost, quality pharmaceutical intermediates that met the high level standards required by those companies for their commercial products.

### c.    Pharmaceutical Ingredients Customers

Chemical Plus's products sold in connection with its Pharmaceutical Ingredients segment were primarily sourced from India and China, and Chemical Plus primarily sold product to

---

[11] An "API" is the ingredient in a pharmaceutical drug that is biologically active. Drug products are typically composed of two core components. The API is the primary component or ingredient.  Other ingredients are commonly known as "excipients", the substances other than the drug that helps deliver the medication to the system. Excipients are chemically inactive substances, such as lactose or mineral oil.  To give a simple example, the active ingredient in Tylenol is acetaminophen, while the liquid in the gel-capsule or the bulk of a pill is the excipient.

customers in the United States and Europe. Representative customers for the Pharmaceutical Ingredients segment included Mylan, Teva, Actavis, Dow, Pfizer, L'Oreal, P&G, Sandoz, Novasep, Merck, Bausch + Lomb, Alcon, Sanofi, Servier, and GlaxoSmithKline.

### 3.      The Performance Chemicals Business Segment

Aceto's Performance Chemicals segment was made up of two product groups: Specialty Chemicals and Agricultural Protection Products.

### a.      Specialty Chemicals

Specialty Chemicals include a variety of chemicals used in the manufacture of plastics, surface coatings, cosmetics and personal care, textiles, fuels and lubricants, to allow these products to perform to their designed capabilities. Dye and pigment intermediates are used in the color-producing industries such as textiles, inks, paper, and coatings. Organic intermediates are used in the production of agrochemicals.

Through its Specialty Chemicals product group, Chemical Plus served as a major supplier to many different industrial segments providing chemicals used in the manufacture of plastics, surface coatings, cosmetics and personal care products, textiles, fuels and lubricants. The paint and coatings industry produces products that bring color, texture, and protection to houses, furniture, packaging, paper, and durable goods. Many of today's coatings are eco-friendly, by allowing inks and coatings to be cured by ultraviolet light instead of solvents, or allowing power coatings to be cured without solvents. These growing technologies are critical in protecting and enhancing the world's ecology and Chemical Plus supplied the specialty additives that make modern coating techniques possible.

Chemical Plus also provided various specialty chemicals for the food, flavor, fragrance, paper and film industries. Chemical Plus's raw materials were also used in sophisticated technology products, such as high-end electronic parts used for photo tooling, circuit boards, production of computer chips, and in the production of many of today's modern gadgets.

### b.      Agricultural Protection Products

Chemical Plus's agricultural protection products included herbicides, fungicides and insecticides, which control weed growth as well as the spread of insects and microorganisms that can severely damage plant growth. One of Chemical Plus's most widely used agricultural protection products was a sprout inhibitor that extends the storage life of potatoes. Utilizing Chemical Plus's global sourcing and regulatory capabilities, Chemical Plus identified and qualified manufacturers either producing the product or with knowledge of the chemistry necessary to produce the product, and Chemical Plus then filed an application with the EPA for a product registration. Chemical Plus had a working relationship with manufacturers in China and India to determine which of the non-patented or generic, agricultural protection products they produced could be effectively marketed in the Western hemisphere. Chemical Plus successfully brought numerous products to market and maintained a strong pipeline, which included future additions to Aceto's product portfolio. The combination of Chemical Plus's global sourcing and regulatory capabilities made the generic agricultural market a niche for Chemical Plus and Chemical Plus planned to continue to offer new product additions in this market.

c.    **Performance Chemicals Customers**

Chemical Plus's products sold in connection with its Performance Chemicals segment were primarily sourced from China, and representative customers for the Performance Chemicals segment included 3M, Valspar, DuPont, Dow Chemicals, Univar, United Suppliers, Nufarm, SunChemical, Kodak, and Crop Production Services.

**B.    Other Debtor Affiliates**

**1.    Arsynco, Inc.**

Arsynco is a wholly-owned subsidiary of Aceto.  Arsynco was formerly involved in manufacturing chemicals at a plant on a 12 acre parcel of property located at 511 13th Street in Carlstadt, New Jersey (the "Carlstadt Property") and has certain environmental remediation obligations in connection with the Carlstadt Property.  The site was closed in 1993 and is currently subject to a contract for sale pursuant to a purchase agreement entered into in June 2018 with Capodagli Property Company, LLC.  The Debtors continue to negotiate a potential sale to this proposed buyer, but are also exploring other alternatives for disposition of the Carlstadt Property given that the prepetition purchase agreement may no longer be feasible under the circumstances.

In connection with its environmental remediation obligations with respect to the Carlstadt Property, in July 2009, Arsynco entered into a settlement agreement with BASF Corporation ("BASF"), the former owner of the Carlstadt Property.  In accordance with the settlement agreement, BASF paid for 45% of the prior remediation costs and agreed going forward to co-remediate the property with Arsynco.  Arsynco recorded a receivable from BASF, with an offset against the Carlstadt Property held for sale, representing its estimated portion of the future remediation costs. The balance of this receivable for future remediation costs as of June 30, 2018 was $2.586 million.

In March 2006, Arsynco received notice from the EPA of its status as a potentially responsible party ("PRP") under the Comprehensive Environmental Response, Compensation and Liability Act for a site described as the Berry's Creek Study Area ("BCSA").  There are over 150 PRPs which have potential liability for the required investigation and remediation of the BCSA.  The estimate of the potential liability, if any, is not quantifiable for a number of reasons, including the difficulty in determining the extent of contamination and the length of time remediation may require. In addition, any estimate of liability must also consider the number of other PRPs and their financial strength.  In July 2014, Arsynco received notice from the U.S. Department of Interior ("USDOI") regarding the USDOI's intent to perform a Natural Resource Damage ("NRD") Assessment at the BCSA.  Arsynco has to date declined to participate in the development and performance of the NRD assessment process.

It is possible that the State of New Jersey may assert a claim for natural resource damages with respect to the Carlstadt Property, and either the federal government or state authorities (or both) may assert claims against Arsynco for natural resource damages in connection with BCSA. Any such claim could also be asserted against the approximately 150 other PRPs which the EPA has identified in connection with the BCSA.  Any claim for natural resource damages with

respect to the Carlstadt Property may also be asserted against BASF, the former owner of the Carlstadt Property.

In September 2012, Arsynco entered into an agreement with three of the other PRPs that had previously been impleaded into *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corporation, et al.*, Docket No. ESX-L-9868-05 (the "NJDEP Litigation") and were considering impleading Arsynco into the same proceeding. Pursuant to that agreement, Arsynco agreed to (1) a tolling period that would not be included when computing the running of any statute of limitations that might provide a defense to the NJDEP Litigation; (2) the waiver of certain issue preclusion defenses in the NJDEP Litigation; and (3) arbitration of certain potential future liability allocation claims if the other parties to the agreement are barred by a court of competent jurisdiction from proceeding against Arsynco.

In July 2015, Arsynco was contacted by an allocation consultant retained by a group of the named PRPs, inviting Arsynco to participate in the allocation among the PRPs of investigation and remediation costs relating to the BCSA. Arsynco declined that invitation. The amount of any liability Arsynco may have relating to the BCSA cannot be reasonably estimated at this time.

Aside from the Carlstadt Property, Arsynco owns no other assets.

## 2.      Aceto Realty, LLC

Aceto Realty, a wholly-owned subsidiary of Aceto, acquired a 48,000-square-foot office building on an approximately 3-acre parcel of land located at 4 Tri-Harbor Court, Port Washington, Town of North Hempstead, New York (the "Port Washington Property") on February 16, 2010 from 4 Harbor Court LLC for a purchase price of $3,500,000. Effective October 1, 2010, (a) Aceto Realty conveyed the Port Washington Property to Nassau County Industrial Development Agency ("NCIDA") in connection with a payments in lieu of taxes ("PILOT") regime, (b) NCIDA leased the Port Washington Property back to Aceto Realty, and (c) Aceto Realty then subleased the entirety of the Port Washington Property to Aceto. As of the Petition Date, there were two mortgages affecting the Port Washington Property: one to secure Aceto Realty's obligations to make the PILOT payments for the benefit of Nassau County, New York ("Nassau County"), and another securing a loan to Aceto Realty from JPMorgan Chase Bank, N.A. in the original principal amount of $3,947,000. These two mortgages on the Port Washington Property were satisfied in connection with the sale of the Port Washington Property as part of the sale of the Chemical Plus Business (discussed below).

Aside from the Port Washington office building, Aceto Realty owns no other assets.

## 3.      Acci Realty Corp.

Acci Realty Corp., a wholly-owned subsidiary of Aceto, owns no material assets and currently is a non-operating entity.

## C.      The Debtors' Prepetition Capital Structure

Prior to the Petition Date, certain of the Debtors incurred and/or issued debt through two debt facilities, consisting of (i) a secured revolving and term loan A&R Credit Agreement (as defined below) with outstanding revolving loans borrowed thereunder as of the Petition Date in the approximate principal amount of $85 million (plus accrued interest) and outstanding term loans borrowed thereunder as of the Petition Date in the approximate principal amount of $120 million (plus accrued interest); and (ii) unsecured 2.00% Convertible Senior Notes due November 2020 in the outstanding principal amount as of the Petition Date of $143.75 million (plus accrued interest).  A summary of each of these debt facilities, along with a description of certain other liabilities of the Debtors as of the Petition Date, is provided below.

### 1.    A&R Credit Agreement

On December 21, 2016, Aceto, as borrower, entered into a Second Amended and Restated Credit Agreement (as amended, restated, or otherwise modified, the "A&R Credit Agreement") with eleven banks (collectively, the "Prepetition Lenders") and Wells Fargo Bank, National Association, as administrative agent (the "Prepetition Agent").[12]

The A&R Credit Agreement increased the aggregate available revolving commitment under the First Amended Credit Agreement from $150 million to an initial aggregate available revolving commitment of $225 million (the "Initial Revolving Commitment"). Under the A&R Credit Agreement, Aceto was initially permitted to borrow, repay and reborrow revolving loans from and as of December 21, 2016 to December 21, 2021 (the "Original Maturity Date"), provided, that if any of the Notes (as defined below) remained outstanding on the date that is 91 days prior to the maturity date of the Notes (the "Convertible Notes Maturity Date"), then the Original Maturity Date was 91 days prior to the Convertible Notes Maturity Date.

As of the Petition Date, Aceto had Revolving Loans (as defined under the A&R Credit Agreement) outstanding in the aggregate amount of $85 million, which loans were Alternate Base Rate Loans and Eurodollar Loans (as defined in the A&R Credit Agreement) at interest rates ranging from 9.5% to 11.50%.  Under the A&R Credit Agreement, Aceto originally borrowed $150 million in term loans (the "Term Loan").  As of the Petition Date, the outstanding balance under the Term Loan was $120 million and the Term Loan was payable as an Alternate Base Rate Loan at an interest rate of 11.50%.

The proceeds of the Initial Revolving Commitment and the Term Loan were used to partially finance the 2016 Citron/Lucid Acquisition and pay fees and expenses related thereto.

The Term Loan was initially payable as to principal in nineteen consecutive, equal quarterly installments of $3.75 million, commencing March 31, 2017.  To the extent not previously paid, the final payment on the Term Loan was initially due December 21, 2021 (the "Original Term Loan Maturity Date"; provided that if any of the Notes remained outstanding on

---

[12] The A&R Credit Agreement amended and restated in its entirety the Amended and Restated Credit Agreement, dated as of October 28, 2015, as amended by Amendment No. 1 to Amended and Restated Credit Agreement, dated as of November 10, 2015, and Amendment No. 2 to Amended and Restated Credit Agreement, dated as of August 26, 2016 (collectively, the "First Amended Credit Agreement").  On December 13, 2017, Aceto entered into a First Amendment to the A&R Credit Agreement, which amendment, among other things, contained several amendments to the financial covenants in the A&R Credit Agreement.

the date that is 91 days prior to the Convertible Notes Maturity Date, then the Original Term Loan Maturity Date was 91 days prior to the Convertible Notes Maturity Date) and would be in an amount equal to the then outstanding unpaid principal amount of the Term Loan.

As noted above, Aceto was the borrower and obligor under the A&R Credit Agreement. Aceto's obligations owed under the A&R Credit Agreement were also guaranteed by Rising, Rising Health, PACK and Aceto Agri (collectively, the "Guarantors"). The obligations due under the A&R Credit Agreement were secured by first priority liens and security interests in substantially all of the assets of Aceto and the Guarantors.

As of March 31, 2018, Aceto was in compliance with all of its financial covenants under the A&R Credit Agreement except for the maximum Total Net Leverage Ratio (as defined in the A&R Credit Agreement) and the minimum Debt Service Coverage Ratio (as defined in the A&R Credit Agreement).

On May 3, 2018, Aceto and each of the Guarantors entered into a Second Amendment and Waiver to the Second Amended and Restated Credit Agreement (the "May 2018 Amendment"). The May 2018 Amendment, among other things, contained a waiver of any event of default under the A&R Credit Agreement arising as a result of the non-compliance by Aceto with the Total Net Leverage Ratio and Debt Service Coverage Ratio financial covenants, in each case, solely for the fiscal quarter ended March 31, 2018. The May 2018 Amendment also contained several amendments to the A&R Credit Agreement including, among other things, reducing the available revolving commitment thereunder to $100 million.

On September 11, 2018, Aceto and each of the Guarantors entered into a Third Amendment and Limited Waiver (the "September Amendment"). The September Amendment provided for a waiver of any event of default under the A&R Credit Agreement arising as a result of the non-compliance by Aceto with the Total Net Leverage Ratio, Senior Secured Net Leverage Ratio (as defined in the A&R Credit Agreement) and Debt Service Coverage Ratio financial covenants, in each case, solely for the fiscal quarters ended or ending June 30, 2018, September 30, 2018, December 31, 2018, March 31, 2019 and June 30, 2019. The September Amendment also contained several amendments to the A&R Credit Agreement including, among other things, (a) a limitation on dividends for the fiscal quarters ending September 30, 2018, December 31, 2018, March 31, 2019 and June 30, 2019, to an amount not to exceed $325,000 for any fiscal quarter, (b) increasing the applicable margin with respect to the interest rates on all loans under the A&R Credit Agreement by 450 basis points and fixing (during the Limitation Period (as defined in the September Amendment)) the applicable margin with respect to the interest rate on all loans under the A&R Credit Agreement to the highest level provided under the A&R Credit Agreement which, as of the Petition Date, was 6.00% in the case of ABR Loans (as defined in the A&R Credit Agreement) and 7.00% in the case of Eurodollar Loans (as defined in the A&R Credit Agreement), (c) permitting the purchase, during fiscal year 2019, of assets for an aggregate consideration not to exceed $12,300,000 consisting of intangible assets relating to strategic product acquisitions and certain capital expenditures, and (d) restricting the incurrence of certain indebtedness, limiting acquisitions and other investments and imposing certain other restrictions.

On January 8, 2019, Aceto and each of the Guarantors entered into a Fourth Amendment and Limited Waiver (the "January Amendment").  The January Amendment provided for a waiver of any event of default under the A&R Credit Agreement arising as a result of the failure by Aceto to make certain principal, interest and deferred payments, and the non-compliance by Aceto with the liquidity financial covenant contained in the A&R Credit Agreement.  The January Amendment also contained several amendments to the A&R Credit Agreement including, among other things, (a) amending each of the Original Maturity Date and the Original Term Loan Maturity Date to June 30, 2019, (b) permitting Aceto, on or after the effectiveness of the January Amendment, to request and borrow revolving loans in an aggregate principal amount not to exceed $23,000,000, (c) a restriction of dividends and distributions for the remainder of the term of the A&R Credit Agreement, (d) on and after the effective date of the January Amendment, prohibiting Aceto from allowing Domestic Liquidity (as defined in the A&R Credit Agreement), calculated based on Bank Cash (as defined in the A&R Credit Agreement), to exceed $7,500,000, which prohibition constituted a condition precedent to the borrowing of any revolving loans and was calculated after giving effect to the requested borrowing, and also constituted a financial covenant under the A&R Credit Agreement, (e) on or after the effective date of the January Amendment, prohibiting Aceto and each of the Guarantors from transferring any funds from Aceto or any Domestic Subsidiary (as defined in the A&R Credit Agreement) to any Foreign Subsidiary (as defined in the A&R Credit Agreement), (f) requiring Aceto to use commercially reasonable efforts to complete all actions necessary to provide the Prepetition Agent with a perfected security interest in 100% of the equity interests in Aceto's Material Foreign Subsidiaries (as defined in the A&R Credit Agreement) within 10 business days of the effective date of the January Amendment, and (g) permitting the purchase, prior to the repayment of the revolving loans borrowed on or after the effective date of the January Amendment and during (x) fiscal year 2019, of assets in an aggregate amount not to exceed $6,500,000 or (y) the third quarter of fiscal year 2019, of assets in an aggregate amount not to exceed $3,105,000, in each case, consisting of intangible assets relating to strategic product acquisitions and certain capital expenditures.

## 2.    Convertible Senior Notes

In November 2015, Aceto issued $143,750,000 aggregate principal amount of 2.00% Convertible Senior Notes due 2020 (the "Notes").  The Notes were issued pursuant to that certain Indenture, dated as of November 16, 2015, between Aceto, and Citibank, N.A., as trustee (the "Indenture Trustee").  As of the Petition Date, the outstanding principal amount of the Notes was $143,750,000.

The Notes mature in November 2020, and pay 2.0% interest semi-annually in arrears on May 1 and November 1 of each year, which commenced on May 1, 2016. The Notes are convertible into 4.328 million shares of common stock, based on an initial conversion price of $33.215 per share.

The Notes are unsecured obligations of Aceto and rank senior in right of payment to any of Aceto's subordinated indebtedness, equal in right of payment to all of Aceto's unsecured indebtedness that is not subordinated, junior in right of payment to any of Aceto's secured indebtedness to the extent of the value of the assets securing such indebtedness, and effectively

junior to the obligations of Aceto's subsidiaries.  The Notes are not guaranteed by or obligations of any of the other Debtors or the Debtors' non-debtor subsidiaries.

### 3.    Other Liabilities

#### a.    Mortgage Payable in Connection With Port Washington Property

Effective October 1, 2010, Aceto Realty, together with the NCIDA, mortgaged the Port Washington, New York property for the benefit of Nassau County in order to secure the amounts owed by Aceto Realty under an associated Payment In Lieu of Taxes Agreement (the "PILOT Agreement") dated as of the same date.  This mortgage was released in connection with the sale of the Port Washington Property as part of the sale of the Chemical Plus Business and termination of the PILOT Agreement.

On June 30, 2011, Aceto Realty, together with NCIDA, further mortgaged the Port Washington Property for the benefit of JPMorgan Chase Bank, N.A. to secure a loan to Aceto Realty in the original principal amount of $3,947,000.  This mortgage was modified in October 2013 and, as of the Petition Date, was being amortized over a period of 20 years, bore interest at 4.92% per annum as of December 31, 2018, and was due to mature on June 30, 2021.  As of the Petition Date, the outstanding principal amount of this mortgage was $2,450,428.  This mortgage was satisfied and released in connection with the sale of the Port Washington Property as part of the sale of the Chemical Plus Business.

#### b.    Alleged Environmental Claims Asserted in Connection with Pulvair Site; Other Environmental Claims

In fiscal years 2007, 2008, 2009, and 2011, Aceto received letters from the Pulvair Site Group, a group of potentially responsible parties (the "Pulvair PRP Group") who are working with the State of Tennessee to remediate a contaminated property in Tennessee known as the "Pulvair Site".  Aceto has denied that it has any liability in connection with the Pulvair Site and has had no communication with the Pulvair PRP Group in more than seven years.

In addition, as discussed in detail above, Arsynco has environmental remediation obligations in connection with the Carlstadt Property, and certain alleged claims (which the Debtors dispute) may exist against Arsynco in connection with the BCSA.

#### c.    Debt Related to 2016 Citron/Lucid Acquisition

In connection with the 2016 Citron/Lucid Acquisition, Aceto, as purchaser, paid the sellers $270 million in cash.  Further, subject to certain terms and conditions, (i) the purchase agreement provided for Aceto, Acetris, and Rising Health to make a $50 million deferred payment, plus interest at the rate of 5% per annum, to the sellers (the "Deferred Payment Obligation") on December 21, 2021, and (ii) obligated Aceto to issue 5.122 million shares of Aceto common stock to the sellers beginning on December 21, 2019.  The purchase agreement also provided for a 5-year potential earn-out for the sellers of up to an additional $50 million in cash, based on the financial performance of four pre-specified pipeline products that were in development.  The foregoing obligations were all unsecured obligations of Aceto, Acetris, and

Rising Health and were resolved post-petition pursuant to the settlement reflected in the A&R Mutual Release that is discussed below.

### d.    Aceto's Non-Debtor Foreign Subsidiaries' Credit Facilities

Aceto's foreign non-debtor direct and indirect subsidiaries had available to them credit facilities with certain foreign financial institutions. As of September 30, 2018, certain of Aceto's foreign non-debtor affiliates had available lines of credit with foreign financial institutions totaling $1.810 million (the "Foreign Credit Facilities"). The Foreign Credit Facilities were guaranteed on an unsecured basis by Aceto, and the Debtors were not subject to any financial covenants under these facilities. The Debtors believe that as of the Petition Date, there were no amounts outstanding under the Foreign Credit Facilities.

### 4.    Aceto Equity

As of February 15, 2019, Aceto had various series of preferred stock and common stock, par value $.01, authorized, issued and/or outstanding, as follows: (i) preferred stock: 2,000,000 shares authorized, no shares issued or outstanding; and (ii) common stock: 75,000,000 shares authorized, approximately 30,839,470 shares issued and outstanding. As of the close of business on February 15, 2019, Aceto's common stock, which traded on the NASDAQ Global Select Market under the symbol "ACET", closed at $1.10 per share. As noted above, Aceto's common stock was delisted from Nasdaq effective on April 3, 2019 and commenced trading on the OTC Pink Market under the symbol "ACETQ."

The Plan effects the cancellation of shares of common stock of Aceto ("Aceto Common Stock") on the Effective Date of the Plan, unless the Debtors file the Aceto Common Stock Non-Cancellation Election Notice[13] on or prior to Effective Date. Regardless of whether the Debtors file the Aceto Common Stock Non-Cancellation Election Notice on or prior to Effective Date, the Plan provides for the potential for distributions on account of Aceto Common Stock as set forth in Section 3.02(j) of the Plan.

## D.    Summary of Events Leading to the Filing of the Chapter 11 Cases

### 1.    Challenges Faced by the Debtors

The Company entered the final quarter of fiscal 2018 (*i.e.*, April 1, 2018 through June 30, 2018) with $65.1 million of available cash and investments, with the Pharmaceutical Ingredients

---

[13] The "Aceto Common Stock Non-Cancellation Election Notice" is defined in the Plan as follows: "a notice which, to be effective, shall be filed by the Debtors in the Chapter 11 Cases on or before the Effective Date stating that the Debtors elect and intend to have the Interests in Aceto, including the Aceto Common Stock, continue to exist and remain outstanding on and after the Effective Date and not automatically cancelled, released, and extinguished as of the Effective Date without further action by the Debtors or the Plan Administrator, and without further distribution to such Holders of Aceto Common Stock subject to Section 3.02(j) below. For the avoidance of doubt, notwithstanding anything herein to the contrary, to the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, each Holder of Interests in Aceto, including the Aceto Common Stock, as of the Distribution Record Date, shall be entitled to retain such Interests in Aceto, and Post-Effective Date Aceto shall not be immediately dissolved or otherwise liquidated for U.S. federal income tax purposes and shall remain in existence until such time as the Plan Administrator determines otherwise."

and Performance Chemicals segments continuing to remain as stable, cash-generating businesses. Additionally, for the first nine months of fiscal 2018, the Company generated free cash flow of $50.0 million, $10.6 million in excess of the $39.4 million that was used for debt repayments.[14]  However, the Company's third quarter fiscal 2018 results reflected (as did prior quarterly results) adverse conditions impacting the Company's Human Health business segment.

The Company faced certain supply chain challenges in its Human Health business segment for several quarters preceding the Petition Date. Specifically, certain of the Rising Pharma Debtors' distribution agreements contain service level failure to supply penalties or similar provisions ("FTS") that potentially subject the Rising Pharma Debtors to charges and penalties in the event they fail to meet the supply obligations under such agreements.  Such charges and penalties can be substantial and may not be adequately or fully reimbursed by the Rising Pharma Debtors' suppliers.  As of the Petition Date, the Rising Pharma Debtors had incurred approximately $34.3 million in gross FTS penalties and had deducted approximately $13.4 million of such penalties from their suppliers.  The Rising Pharma Debtors disputed many of the FTS charges and worked with their customers to reverse some of these charges.

On April 18, 2018, the Company issued a press release (the "April 2018 Press Release") announcing, among other things, that (i) the Company was negotiating with its Prepetition Lenders a waiver under the A&R Credit Agreement with respect to the non-compliance by the Company with the Total Net Leverage Ratio and Debt Service Coverage Ratio financial covenants, in each case, solely for the fiscal quarter ended March 31, 2018; (ii) the financial guidance issued by the Company on February 1, 2018 should no longer be relied upon; (iii) the Company anticipated recording substantial non-cash intangible asset impairment charges, including goodwill, in the range of $230 million to $260 million on certain currently marketed and pipeline generic products; and (iv) the resignation of Edward Borkowski as Aceto's Chief Financial Officer.

The April 2018 Press Release also stated that Aceto's Board of Directors had taken several immediate and proactive steps to address these developments, including (i) initiating a process (the "Strategic Review Process") to identify and evaluate a range of strategic alternatives such as the sale of a key business segment(s), a merger or other business combination with another party, continuing as a standalone entity or other potential alternatives; (ii) retaining a financial advisor, PJT Partners ("PJT"), to assist with the evaluation of these strategic alternatives; and (iii) announcing the appointment of Rebecca A. Roof as Aceto's Interim Chief Financial Officer.

Subsequent to the April 2018 Press Release, the market price of Aceto's common stock declined.  Thereafter, in late April 2018, Aceto and certain individuals were named as defendants

---

[14] For the fiscal year ended June 30, 2018, the Company's operating activities provided cash of $101.8 million. Investing activities for the fiscal year ended June 30, 2018 used cash of $8.3 million primarily for purchases of property and equipment and intangible assets.  As a result, free cash flow (which the Company defines to be operating cash flow less net cash used in investing activities) was $93.5 million for fiscal year 2018.  Financing activities for the fiscal year ended June 30, 2018 used cash of $48.9 million primarily for the repayment of bank loans of $43.2 million and $6.3 million for cash dividend payments.  The Company ended fiscal 2018 with $103.9 million of available cash, cash equivalents and short-term investments.

in two putative securities class action lawsuits filed in the United States District Court for the Eastern District of New York (the "District Court"), captioned *Mulligan v. Aceto Corporation, et al.*, Case No. 2:18-cv-02425, and *Yang v. Aceto Corporation et al.*, Case No. 1:18-cv-02437.

On June 26, 2018, five motions were filed seeking to appoint lead plaintiff and approve lead plaintiff's counsel, as well as to consolidate the two securities class action lawsuits. On November 29, 2018, the District Court entered an order appointing a lead plaintiff and lead plaintiff's counsel and consolidated the two putative class action lawsuits (as consolidated, the "Securities Class Action"). On January 28, 2019, the lead plaintiff filed a consolidated amended class action complaint captioned *In re Aceto Corporation Securities Litigation*, No. 2:18-cv-02425. Defendants' motion to dismiss the amended class action complaint is fully briefed and pending before the District Court. The Company vigorously denies any allegations of wrongful or actionable conduct in connection with the Securities Class Action.[15]

In addition, two substantially similar shareholder derivative complaints were filed on October 17, 2018 and December 19, 2018 against Aceto's Board of Directors and certain then current and former officers of Aceto in the District Court (collectively, the "Derivative Actions"). Aceto was named as a nominal defendant in each of the Derivative Actions, which are captioned *Mun v. Kennally III et al.* (Case No. 2:18-cv-05788) and *Goh v. Roth et al.* (Case No. 2:18-cv-7250).[16]

Additionally, during the third quarter of fiscal 2018, the Company reported a decline in actual and forecasted revenue and earnings. The Company was also notified by the U.S. government that 11 generic drug products Rising acquired through its Acetris subsidiary in connection with the 2016 Citron/Lucid Acquisition were, in the government's view, not in compliance with the federal Trade Agreements Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid.[17] Based on these indicators and certain adverse actions of Aurobindo, the Company announced in a May 3, 2018 press release (the "May 2018 Press Release") that, as previously indicated in the April 2018 Press Release, it was necessary to perform an interim goodwill impairment analysis at March 31, 2018 for its Rising reporting unit, and the total impairment charges for goodwill and intangibles recorded in the third quarter of fiscal 2018 was $256.3 million, all of which related to the Rising Pharma Debtors.

---

[15] Upon the filing of the Chapter 11 Cases, the Securities Class Action was automatically stayed as against the Debtors pursuant to section 362 of the Bankruptcy Code.

[16] Upon the filing of the Chapter 11 Cases, the Derivative Actions were automatically stayed pursuant to section 362 of the Bankruptcy Code because the claims asserted therein are property of the Debtors' estates.

[17] On July 16, 2018, the U.S. Court of Federal Claims issued a decision invalidating the U.S. Department of Veterans Affairs' ("VA") interpretation of the Trade Agreements Clause, which had resulted in the termination of 11 VA contracts with Acetris, because the products contained ingredients sourced from India, based on alleged non-compliance with the Trade Agreements Act's "Buy American" requirements. Finding in favor of Acetris, the court granted a declaratory judgment establishing that under the Buy America Act, the agencies are permitted to buy domestic end products, including commercial off-the-shelf products like generic drugs, that are manufactured in the United States, even if their components are not all manufactured in the United States. Although U.S. Department of Defense contracts were not at issue in the case, the decision also impacts Acetris' ability to supply U.S. Department of Defense with its products. The government has appealed the court's decision. Even if the court's ruling is affirmed on appeal, the court's ruling did not have the effect of reinstating the 11 terminated government supply agreements.

Following entry into the May 2018 Amendment, the Company continued to work collaboratively with its Prepetition Lenders to develop long-term solutions to strengthen the Company's balance sheet.

As of June 30, 2018, Aceto was not in compliance with the Total Net Leverage Ratio, Senior Secured Net Leverage Ratio and Debt Service Coverage Ratio financial covenants in the A&R Credit Agreement. Accordingly, on September 11, 2018, Aceto and the Guarantors entered into the September Amendment with the Prepetition Lenders which provided for, among other things, (i) a waiver of the events of default arising from the non-compliance with certain financial covenants contained in the A&R Credit Agreement, and (ii) a covenant waiver through the quarter ending June 30, 2019.

The Company remained impacted by its debt load relative to operating results and faced future issues complying with the financial covenants contained in the A&R Credit Agreement. Additionally, the FTS charges continued to consume the Company's liquidity. As a result, the Company worked collaboratively with its Prepetition Lenders and entered into the January Amendment to, among other things, regain access to its revolving credit facility in order to provide for working capital through the borrowing of additional funds.

## 2.      Consideration of Strategic Alternatives and Prepetition Sale Process

As noted above, the Company announced initiation of the Strategic Review Process in April 2018 in order to identify and evaluate a range of strategic alternatives for the Company, including the potential sale of a key business segment(s), a merger or other business combination with another party, continuing as a standalone entity or other potential alternatives. The Company engaged PJT to assist it with the Strategic Review Process and to explore potential alternatives to maximize value, including a sale, restructuring or other transaction with respect to the Company. After a months' long and thorough process of considering all options available to them, the Debtors, in consultation with their professional advisors, ultimately determined that given the challenges the Company was facing described above, one or more sales of the Company's businesses and assets as a going concern was the best available option to maximize value.

In October 2018, at the instruction of the Company, PJT commenced a broad marketing process and contacted approximately 100 potential strategic and financial parties to garner interest in pursuing a strategic transaction. Approximately 80 of these parties were provided with a "teaser" to gauge their interest and the opportunity to enter into a non-disclosure agreement (an "NDA") with the Company to gain access to a virtual data room established by the Company for interested parties to conduct due diligence. The data room contained extensive information about the Company, including confidential documents and other information concerning the Company's business and financial results in considerable detail. Approximately 50 of the parties who received the teaser executed NDAs, were granted access to the data room, and received a confidential information memorandum prepared by the Company and PJT.

First round, non-binding indications of interest ("IOIs") to acquire the Company's assets were due on November 14, 2018. The Company received IOIs from eleven (11) potential bidders for proposed acquisitions of the Company as a whole, the Pharma Business and/or the Chemical

Plus Business. Thereafter, these potential acquirers continued to conduct further due diligence, including being granted access to a more expansive data room and the opportunity to participate in management presentations.   In late November and December 2018, the Company held extensive and detailed management presentations with each of the potential bidders and the Company's senior management team.

Second round, non-binding bids to acquire the Company or one of its key business units were due on January 15, 2019. The Company received a number of second round IOIs, including IOIs to acquire the Company as a whole, the Pharma Business and/or the Chemical Plus Business.  As a result of the bids received on January 15, 2019 and the Company's liquidity and operating results, the Company determined that an in-court sale process pursuant to section 363 of the Bankruptcy Code was the best available executable structure through which such sale transactions could be completed.

The Company and its advisors continued the prepetition marketing process by inviting these bidders to perform additional detailed diligence and to submit their best and final binding offers to acquire the Pharma Business and/or the Chemical Plus Business, including a binding asset purchase agreement and other documents by February 12, 2019.

The Company received a number of binding offers for the Chemical Plus Business. Thereafter, the Company's professionals engaged in further negotiations with those bidders. On February 16, 2019, bidders for the Chemical Plus Business submitted revised forms of purchase agreements and related documents (the "Final Bidding Documents"). After thoroughly evaluating the Final Bidding Documents, the Company's Board of Directors, in consultation with the Company's professionals, determined that NMC Atlas, L.P. ("NMC"), an affiliate of New Mountain Capital Group, L.L.C., submitted the highest and best bid for the Chemical Plus Business pursuant to a stalking horse agreement (the "NMC Stalking Horse Agreement") for an aggregate purchase price of $338,000,000 (subject to certain adjustments as set forth therein), plus payment of certain contract cure costs and assumption of certain liabilities. Thereafter, the Company, through its advisors, finalized definitive documentation with NMC to effectuate a sale of assets pursuant to section 363 of the Bankruptcy Code, subject to higher and/or better offers in accordance with agreed upon procedures to be approved by the Bankruptcy Court. The Company finalized and executed the NMC Stalking Horse Agreement on February 18, 2019.

While the Company received a number of binding offers for the Chemical Plus Business, Shore Suven Pharma, Inc. ("Shore Suven") was the only party to submit a binding asset purchase agreement and other documents to acquire the Pharma Business by the February 12, 2019 deadline.  After thoroughly evaluating all alternatives available to the Company, including a potential liquidation of the Pharma Business, the Company's Board of Directors, in consultation with the Company's professionals, determined that the proposed sale of the Pharma Business to Shore Suven as a going concern was the best alternative available to the Company to maximize the value of the Pharma Business for the benefit of the Company and its creditors.

Prior to the Petition Date and continuing thereafter, the Company, through its advisors, engaged in extensive negotiations with Shore Suven on the terms of the proposed sale of the Pharma Business and finalized definitive documentation in the form of a stalking horse agreement (the "Shore Suven Stalking Horse Agreement") for the sale of the Pharma Business

pursuant to section 363 of the Bankruptcy Code, subject to higher and/or better offers in accordance with agreed upon procedures to be approved by the Bankruptcy Court. The Debtors finalized and executed the Shore Suven Stalking Horse Agreement on March 7, 2019, approximately two weeks after the Petition Date.

## E.      Summary of Certain Other Prepetition Legal Proceedings

In addition to the Securities Class Action and the Derivative Actions described above, the Debtors were also involved in certain other prepetition legal proceedings and governmental investigations that are summarized below.

### 1.      Acetris TAA Matter

Acetris is a defendant in an action (the "Qui Tam Action") filed in the United States District Court for the Southern District of Ohio, captioned *Young, et al. v. Lucid Pharma LLC, et al.*, civil action no. 16-00969 (the "Acetris Complaint"). Brought by three relators, the Acetris Complaint asserts claims on behalf of the United States under the False Claims Act, contending that Acetris falsely certified certain pharmaceuticals sold to the Veteran's Administration as compliant with the Trade Agreements Act. The Acetris Complaint remained sealed from the initiation of the action in 2016 until the DOJ declined to intervene in the action in 2018. On January 15, 2019, the court entered an order staying the action pending the outcome of two separate litigations in which Acetris has challenged country of origin determinations made with respect to its Veteran's Administration contracts (each described below).[18]

As noted above, Rising was also notified by the U.S. government that 11 generic drug products it acquired through Acetris in the 2016 Citron/Lucid Acquisition were not in compliance with the TAA country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. The acquired contracts were novated to Acetris under the federal governmental contracting regulations pursuant to the 2016 Product Purchase Agreement. Rising disputed in an administrative proceeding before the U.S. Customs and Border Protection (the "CBP") the government's assertion that the 11 products sold pursuant to the novated contracts were not compliant with contract sourcing requirements because they did not qualify as U.S.-made end products as defined in the contracts, and appealed CBP's decision that, under the TAA, the products originated in India, to the U.S. Court of International Trade (*Acetris Health, LLC v. United States*, Case No. 18-00040) (such appeal, the "Court of International Trade Appeal"). Concurrently, Rising filed an action (*Acetris Health, LLC v. United States*, Case No. 18-433C) in the U.S. Court of Federal Claims to enjoin the VA from misinterpreting the Trade Agreements Clause in its contracts as not allowing Rising to offer products manufactured in the U.S. that are eligible for award under the Buy American Act. The U.S. Court of Federal Claims ruled in Rising's favor in July 2018. This favorable ruling is being appealed by the government to the United States Court of Appeals for the Federal Circuit (Case No. 18-2399) (such appeal, the "Federal Circuit Appeal"). While the ruling is a favorable outcome, the VA is not obligated to, and Rising does not expect the VA to, reinstate the terminated contracts.

---

[18] Upon the filing of the Chapter 11 Cases, the Qui Tam Action was also automatically stayed pursuant to section 362 of the Bankruptcy Code.

The foregoing matters, including the Qui Tam Action, the Court of International Trade Appeal and the Federal Circuit Appeal, are collectively referred to herein as the "Acetris TAA Matter". The Acetris TAA Matter constitutes an Assumed Proceeding (as defined in the Pharma Purchase Agreement (defined below)) and is an Assumed Liability (as defined in the Pharma Purchase Agreement) of Shore Suven.

### 2. SEC Investigation

On September 10, 2018, the SEC requested that Aceto voluntarily provide it with certain information and documents pursuant to the SEC's informal investigation of Aceto. Aceto provided responses to the SEC's requests and is currently awaiting further direction from the SEC.

### 3. DOJ Investigation

On April 16, 2018, Rising received a Grand Jury subpoena (the "DOJ Subpoena") from the Antitrust Division of the United States Department of Justice ("DOJ"). Rising is one of many operating companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry. As part of Rising's response to the subpoena, Aceto and Rising are continuing to review the matter internally. In addition, Rising continues to collect, review, and analyze documents, and is in the process of producing to the DOJ documents that are responsive to the DOJ Subpoena.

### F.    Causes of Action of the Debtors

As of the Petition Date, the Debtors held certain Causes of Action or potential Causes of Action against various parties. As set forth in the Plan and except as provided therein, the Debtors and their Estates will retain all of the Debtors' Causes of Action (including, but not limited to, those Causes of Action to be identified in the Plan Supplement) and such retained Causes of Action will remain vested in the Liquidating Debtors and Plan Administrator on the Effective Date and will be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Debtors.

The Debtors, prior to the Effective Date, and/or the Liquidating Debtors and Plan Administrator, on and after the Effective Date, may pursue any and all available Causes of Action of the Debtors against any party, whether or not such party or Causes of Action are identified in the Plan Supplement, including, but not limited to, Causes of Action against (a) Aurobindo Pharma Ltd., Aurolife Pharma LLC, and P.V. Ramprasad Reddy (collectively "Aurobindo") and/or their Affiliates for, without limitation, fraud, negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing, (b) Sigmapharm Laboratories, LLC and/or its Affiliates for, without limitation, breach of contract and breach of the covenant of good faith and fair dealing, and (c) Lonza Sales AG and/or its Affiliates for, without limitation, breach of contract and breach of the covenant of good faith and fair dealing.

On May 31, 2019, certain of the Debtors, including Aceto, Rising, Rising Health, and Acetris commenced an adversary proceeding in the Bankruptcy Court (Adv. Proc. No. 19-01981-VFP) against Aurobindo asserting claims against Aurobindo for fraud, negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing.

The adversary complaint seeks damages against Aurobindo caused by its fraud and multiple, material breaches of certain supply agreements, among other relief.

## ARTICLE III

## THE CHAPTER 11 CASES

### A.      Commencement of the Chapter 11 Cases

As set forth above, on the Petition Date the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. By order entered on February 21, 2019, [Docket No. 29], the Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only.  No trustee or examiner has been appointed in the Chapter 11 Cases.

Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession.

### B.      "First Day" Motions and Related Applications

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the Debtors' assets and minimize the effects of the commencement of the Chapter 11 Cases. Subsequently, the Bankruptcy Court entered interim and final orders providing various first-day relief, including:

(i)      granting the Debtors an extension of time to file their schedules of assets and liabilities and statements of financial affairs, extending the Debtors' time to file financial reports under Bankruptcy Rule 2015.3 and waiving the requirement that Aceto file a list of its equity security holders pursuant to Bankruptcy Rule 1007(a)(3) (order entered on February 21, 2019) [Docket No. 30];

(ii)      approving notification and hearing procedures for transfers of, or declarations of worthlessness with respect to, beneficial ownership of stock of Aceto (interim order entered on February 21, 2019) [Docket No. 31], final ordered entered on March 15, 2019) [Docket No. 144];

(iii)      authorizing (a) the Debtors to pay certain prepetition taxes and fees in the ordinary course of business, and (b) banks and financial institutions to honor and process checks and transfers related thereto (interim order entered on February 21, 2019) [Docket No. 32], final ordered entered on March 15, 2019) [Docket No. 146];

(iv)      (a) authorizing the Debtors to continue their cash management system, honor certain related prepetition obligations, maintain existing business forms, continue to perform certain intercompany transactions, (b) authorizing and directing the Debtors' banks to honor all related payment requests, (c) waiving the Debtors' compliance with section 345(b) of the Bankruptcy Code, and (d) granting related relief (interim order entered on February 21, 2019) [Docket No. 33], final ordered entered on March 15, 2019) [Docket No. 138];

(v)     authorizing the Debtors to continue to (a) honor prepetition obligations owed to customers and otherwise continue their prepetition customer programs and practices in the ordinary course of business and (b) continue other government programs and pay related obligations (interim order entered on February 21, 2019) [Docket No. 34], final ordered entered on March 15, 2019) [Docket No. 145];

(vi)    granting the Debtors an extension of time to file their list of creditors; (b) authorizing the Debtors and/or their agent to prepare a consolidated list of creditors in lieu of a mailing matrix and mail initial notices; and (c) granting related relief (order entered on February 21, 2019) [Docket No. 37];

(vii)   authorizing the Debtors to pay claims related to certain prepetition shipping, warehousing and related charges (interim order entered on February 21, 2019) [Docket No. 38], final ordered entered on March 15, 2019) [Docket No. 137];

(viii)  authorizing (a) payment of prepetition claims of certain critical vendors, and (b) banks to honor and process checks and electronic transfer requests related thereto (interim order entered on February 21, 2019) [Docket No. 39], final ordered entered on March 15, 2019) [Docket No. 140];

(ix)    (a) authorizing but not directing the Debtors to (i) pay prepetition wages, salaries, benefits, and related obligations, (ii) pay and remit payroll taxes and other deductions to third parties, and (iii) honor employee benefit programs in the ordinary course of business; (b) authorizing and directing banks to honor checks and transfers for payment of prepetition employee obligations; and (c) granting related relief (interim order entered on February 21, 2019) [Docket No. 40], final ordered entered on March 15, 2019) [Docket No. 136];

(x)     (a) prohibiting utility providers from altering, refusing, or discontinuing service, (b) deeming utilities adequately assured of future performance, and (c) establishing procedures for resolving requests for additional or different adequate assurance of payment (interim order entered on February 21, 2019) [Docket No. 41], final ordered entered on March 15, 2019) [Docket No. 139].

(xi)    authorizing the Debtors to (a) continue their prepetition insurance program, (b) pay any prepetition premiums and related obligations, and (c) renew or enter into new insurance arrangements, and granting related relief (interim order entered on February 21, 2019) [Docket No. 42], final ordered entered on March 15, 2019) [Docket No. 143].

(xii)   (a) enforcing and restating the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code, (b) approving the form and manner of notice, and (c) granting related relief (order entered on February 22, 2019) [Docket No. 44]; and

(xiii)  authorizing the Debtors to obtain post-petition financing; authorizing the Debtors to use cash collateral; granting adequate protection; granting liens and

superpriority administrative claims; modifying the automatic stay; and granting related relief (interim order entered on February 21, 2019) [Docket No. 36], final ordered entered on March 15, 2019) [Docket No. 141].

## C.   Retention of Professionals and Appointment of the Creditors' Committee

### 1.   Retention of Debtors' Professionals

The Debtors were authorized to retain (i) Lowenstein Sandler LLP as their bankruptcy counsel (order entered March 22, 2019) [Docket No. 207], (ii) PJT Partners LP as their investment bankers (order entered March 22, 2019) [Docket No. 208], and (iii) KPMG LLP to provide tax advisory and related services (order entered March 18, 2019) [Docket No. 170]. The Debtors were also authorized to retain AP Services, LLC to provide certain restructuring and litigation services and to designate Rebecca A. Roof as Chief Financial Officer for each of the Debtors (order entered March 14, 2019) [Docket No. 133].[19]

The Debtors also were authorized to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date pursuant to an order entered by the Bankruptcy Court on April 10, 2019 [Docket No. 377].

### 2.   Retention of Claims and Noticing Agent and Administrative Advisor

By order entered on February 22, 2019 [Docket No. 43], the Bankruptcy Court authorized the Debtors to retain Prime Clerk as their claims and noticing agent in the Chapter 11 Cases. By an application filed on June 13, 2019 [Docket No. 634], the Debtors have sought authorization to retain Prime Clerk as their administrative advisor in the Chapter 11 Cases to provide additional services relating to balloting and the chapter 11 plan solicitation process.

### 3.   Appointment of Creditors' Committee and Retention of Creditors' Committee Professionals

On February 28, 2019, Andrew R. Vara, Acting United States Trustee for Region 3 (the "United States Trustee"), appointed an Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "Committee"), effective February 27, 2019, pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 92]. The initial members of the Committee were: (i) Wilmington Trust, National Association, (ii) Aurobindo Pharma USA, Inc., (iii) FDC Limited, (iv) Ingenus Pharmaceuticals NJ, LLC, and (v) Thinq Pharma CRO PVT LTD.

The Committee was authorized to retain (i) Strock & Strock & Lavan LLP as co-counsel to the Committee (order entered April 17, 2019) [Docket No. 431], (ii) Porzio, Bromberg & Newman, P.C. as co-counsel to the Committee (order entered April 3, 2019) [Docket No. 304], (iii) Houlihan Lokey Capital, Inc. as investment banker to the Committee (order entered April 3, 2019) [Docket No. 305], and (iv) GlassRatner Advisory & Capital Group, LLC as financial advisor to the Committee (order entered May 13, 2019) [Docket No. 537].

## D.   Significant Events During the Chapter 11 Cases

---

[19] As noted above, Ms. Roof is a managing director of AlixPartners, LLP, an affiliate of AP Services, LLC.

In addition to the "first-day" relief sought and received by the Debtors, the Debtors have sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates. A summary of significant events since the commencement of the Chapter 11 Cases is set forth below.

### 1.    Debtor-In-Possession Financing and Use of Cash Collateral

In the weeks leading up to the Petition Date, the Debtors and their advisors engaged in extensive, hard-fought negotiations with their prepetition lenders regarding potential proposals for debtor-in-possession financing that would provide the Debtors with critical liquidity to fund their operations during these Chapter 11 Cases to effectuate one or more value-maximizing transactions for the benefit of all of their stakeholders. This process proved successful, culminating in a post-petition financing facility provided by the Debtors' secured prepetition lenders and the consensual use of cash collateral during these Chapter 11 Cases.

The Debtors required immediate access to cash collateral to ensure that they were able to continue operating during these Chapter 11 Cases and preserve the value of their estates for the benefit of all parties-in-interest. In addition, ample post-petition financing was necessary to send a strong signal to the market that these Chapter 11 Cases were well-funded, which was particularly important to provide vendors and customers with comfort regarding the Debtors' liquidity and ability to continue to operate and consummate the sale of substantially all of their assets during these Chapter 11 Cases.

Accordingly, among other first-day relief sought, on February 20, 2019 the Debtors filed the *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtor In Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363; (IV) Granting Liens and Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364(c); (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (VII) Granting Related Relief* [Docket No. 17] (the "DIP Motion").

By the DIP Motion, the Debtors sought authority (1) to use cash collateral and (2) obtain $60,000,000 in post-petition secured financing from certain of Aceto's Prepetition Lenders under the A&R Credit Agreement pursuant to a senior secured, super-priority debtor-in-possession credit facility (the "DIP Facility"), on the terms and conditions set forth in the Senior Secured, Priming and Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement"), dated as of February 21, 2019, among Aceto, and its Subsidiaries party thereto (each of the other Debtors and, together with Aceto, collectively, the "Borrowers"), as debtors and debtors-in-possession, the Lenders party thereto (the "DIP Lenders"), and Wells Fargo Bank, National Association, as Administrative Agent and Collateral Agent (in such capacity, the "DIP Administrative Agent").

The DIP Facility included, among other things, a limited "roll-up" of the $23,000,000 in additional revolving loans that the Prepetition Lenders agreed to provide *via* the January Amendment to the A&R Credit Agreement.  The Debtors sought authority to draw up to

$15,000,000 under the DIP Facility on an interim basis pending entry of an order approving the DIP Facility on a final basis.

The Debtors entered into the DIP Facility after significant efforts were made by the Debtors' investment banker, PJT, to obtain the best available financing terms available under the circumstances. In particular, PJT solicited debtor-in-possession financing from not fewer than eleven (11) third party financial institutions that had previously signed nondisclosure agreements with the Debtors, and received only two (2) non-binding proposals from third parties. However, neither of the two proposals provided workable solutions because neither was fully committed, both were more expensive than the proposal from the Prepetition Lenders, and both required priming of the prepetition loans made by the Prepetition Lenders. The Prepetition Lenders expressly communicated to the Debtors that they would not consent to the priming of their senior debt by a third party.

The DIP Facility reflected vigorous, arm's-length negotiations between the Debtors, with the assistance of their advisors, on the one hand, and the proposed DIP Lenders and their advisors, on the other hand. The Debtors and their advisors negotiated over a number of weeks regarding the structure and economics of the proposed DIP Facility. Ultimately, the Debtors and the DIP Administrative Agent agreed to a set of terms that provided the Debtors with necessary access to liquidity to operate their businesses through consummation of the asset sales described below at fees and rates that the Debtors and their advisors consider to be reasonable under the circumstances.

In addition to milestones associated with the approval of the DIP Facility, the DIP Facility was tied to a short timeline for the sale of the assets comprising the Debtors' Chemical Plus Business and Pharma Business, respectively. Among other things, section 5.10 of the DIP Credit Agreement[20] required that the Debtors (a) not later than (7) days following the Effective Date under the DIP Credit Agreement (which occurred on February 22, 2019) file a motion to approve bidding procedures for the sale of the Chemical Plus Business; (b) (1) not later than fourteen (14) days after the Effective Date, execute a stalking horse asset purchase agreement for the sale of the Pharma Business, and not later than five (5) days thereafter, file a file a motion to approve bidding procedures for the sale of the Pharma Business, or (2) not later than nineteen (19) days after the Effective Date, deliver to the DIP Administrative Agent a wind-down or liquidation plan with respect to the orderly liquidation of accounts receivable, inventory and other assets of the Pharma Business (the "Pharma Liquidation Plan"); (c) not later than thirty (30) days following the Effective Date, obtain entry of bidding procedures orders for one or both sales, as applicable; (d) not later than forty (40) days (or forty-five (45) days, depending on the timing of entry of one or both bidding procedures orders), obtain the approval of the Bankruptcy Court for (1) the sale or sales, as applicable, and (2) if applicable, the Pharma Liquidation Plan; and (e) not later than thirty (30) days following entry of the respective sale order(s), consummate such sale(s).

On February 21, 2019, the Bankruptcy Court held an interim hearing on the DIP Motion and thereafter entered an order [Docket No. 36] granting the relief requested in the DIP Motion

---

[20] To the extent of any inconsistency between this summary and section 5.10 of the DIP Credit Agreement, section 5.10 of the DIP Credit Agreement sets forth the actual requirements described herein.

and approving the DIP Facility on an interim basis. On March 15, 2019, the Bankruptcy Court held a final hearing on the DIP Motion and thereafter entered an order [Docket No. 141] granting the relief requested in the DIP Motion and approving the DIP Facility on a final basis (the "Final DIP Order"). The Debtors' use of cash collateral and access to the DIP Facility provided the Debtors with ample liquidity to fund the their business operations and administrative expenses during the post-petition sale process leading up to the sales of the Pharma Business and the Chemical Plus Business, as described below.

The DIP Facility was partially repaid by the Debtors on April 19, 2019 from the proceeds of the sale of the Pharma Business pursuant to paragraph 23 of the Final DIP Order and section 2.18(b) of the DIP Credit Agreement. The remaining amounts owed under the DIP Facility were fully repaid by the Debtors on April 29, 2019 from the proceeds of the sale of the Chemical Plus Business.

2.      **The Post-Petition Sale Process and Asset Sales**

a.      **Bidding Procedures and Sale of the Chemical Plus Business**

As described above, prior to the Petition Date, the Company's Board of Directors, in consultation with the Company's professionals, determined that NMC had submitted the highest and best bid for the Chemical Plus Business during the prepetition marketing process pursuant to the NMC Stalking Horse Agreement for an aggregate purchase price of $338,000,000 (subject to certain adjustments as set forth therein), plus payment of certain contract cure costs and assumption of certain liabilities. The Company finalized and executed the NMC Stalking Horse Agreement on February 18, 2019.

On February 22, 2019, the Debtors filed a motion [Docket No. 45] seeking approval of, *inter alia*, (a) bidding procedures (the "Chemical Plus Bidding Procedures") in connection with the sale of substantially all assets comprising the Chemical Plus Business (the "Chemical Plus Assets") pursuant to the NMC Stalking Horse Agreement, subject to higher or otherwise better offers at an auction to be held if the Debtors received one or more Qualified Bids (as defined in the Chemical Plus Bidding Procedures); (b) payment to NMC of a "break-up" fee of $6,760,000 (2% of the cash component of the Base Purchase Price (as defined in the NMC Stalking Horse Agreement)) and an expense reimbursement of no more than $2,000,000 if and when payable pursuant to the terms of the NMC Stalking Horse Agreement; (c) procedures for the assumption and assignment of certain executory contracts and unexpired leases; (d) certain notice procedures in connection with the foregoing; and (e) the sale to NMC or such other purchaser submitting the highest or otherwise best offer for the Chemical Plus Assets.

On March 15, 2019, the Bankruptcy Court entered an order [Docket No. 142] (the "Chemical Plus Bidding Procedures Order") approving the Chemical Plus Bidding Procedures. The key dates for the sale process established by the Chemical Plus Bidding Procedures Order were as follows:

| Sale Dates and Deadlines - Chemical Plus Business | |
|---|---|
| Sale Objection Deadline (for parties other than the Committee) | April 5, 2019 at 5:00 p.m. prevailing ET |
| Bid Deadline | April 8, 2019 at 5:00 p.m. prevailing ET |
| Auction (if required) | April 12, 2019 at 9:00 a.m. prevailing ET |
| Sale Objection Deadline (for the Committee) | April 14, 2019 at 12:00 p.m. prevailing ET |
| Deadline for Reply Pleadings in Support of Sale | April 15, 2019 at 12:00 p.m. prevailing ET |
| Sale Hearing | April 16, 2019 at 10:00 a.m. prevailing ET |

The Debtors received one other Qualified Bid (as defined in the Chemical Plus Bidding Procedures) for the Chemical Plus Assets, which was submitted by LBB Specialties Intermediate Holding Company LLC. After an auction held on April 12, 2019 in accordance with the Chemical Plus Bidding Procedures Order, and upon consideration of all Qualified Bids submitted to the Debtors, the Debtors, in consultation with the Consultation Parties (as defined in the Chemical Plus Bidding Procedures), selected NMC as the Successful Bidder (as defined in the Chemical Plus Bidding Procedures) for the Chemical Plus Assets. NMC's Successful Bid (as defined in the Chemical Plus Bidding Procedures) was reflected in an Amended and Restated Asset Purchase Agreement, dated as of April 14, 2019 (the "Chemical Plus Purchase Agreement"), and provided the Debtors with approximately $42 million in incremental value over the consideration provided by the NMC Stalking Horse Agreement.

At a hearing held on April 16, 2019, the Bankruptcy Court approved the sale (the "Chemical Plus Sale") of the Chemical Plus Assets to NMC pursuant to the Chemical Plus Purchase Agreement and, thereafter, entered an order (the "Chemical Plus Sale Order") [Docket No. 429] approving the Chemical Plus Sale, free and clear of all claims, liens, rights, interests and encumbrances pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code. The closing of the Chemical Plus Sale occurred on April 29, 2019.[21]

Aceto Agri holds a 30% membership interest (the "Canegrass Membership Interest") in Canegrass LLC ("Canegrass"). As set forth in paragraph 43 of the Chemical Plus Sale Order, the Canegrass Membership Interest was excluded from the Chemical Plus Sale. The Debtors are in the process of negotiating with the party that holds the remaining 70% membership interest in Canegrass, UPL NA Inc. (f/k/a United Phosphorus Inc.), regarding the terms of an agreed dissolution of Canegrass and a final distribution to Aceto Agri from Canegrass.

**b.    Bidding Procedures and Sale of the Pharma Business**

---

[21] The foregoing description of the Chemical Plus Sale does not purport to be complete and is qualified in its entirety by reference to the Amended and Restated Asset Purchase Agreement, dated as of April 14, 2019.

As noted above, the DIP Lenders set a deadline of March 8, 2019 (fourteen (14) days after the Effective Date of the DIP Facility) by which, if the Debtors had not entered into an acceptable stalking horse agreement for the sale of the Pharma Business, the Debtors were required to propose an immediate wind-down or liquidation plan with respect to the orderly liquidation of the Pharma Business.

As described above, Shore Suven was the only party to submit a binding asset purchase agreement and other documents to acquire the Pharma Business by the February 12, 2019 prepetition deadline.  Prior to the Petition Date and continuing thereafter, the Debtors, through their advisors, engaged in extensive negotiations with Shore Suven on the terms of the proposed sale of the Pharma Business. The Debtors finalized and executed the Shore Suven Stalking Horse Agreement on March 7, 2019, approximately two weeks after the Petition Date.

The proposed sale embodied in the Shore Suven Stalking Horse Agreement was finalized and executed after weeks of hard fought arm's length negotiations. Those negotiations occurred between and among the Debtors—acting through a disinterested executive committee of Aceto's Board of Directors with the assistance of their disinterested advisors and officers, including PJT, Rebecca A. Roof (a managing director of AlixPartners, LLP who is serving as Chief Financial Officer of Aceto), and Lowenstein Sandler LLP (counsel for the Debtors)—and Shore Suven and its CEO, Mr. Vimal Kavuru ("Kavuru").  Kavuru had become a member of the Board of Directors in early 2017 following the closing of the 2016 Citron/Lucid Acquisition. However, once it became apparent that Kavuru or parties affiliated with Kavuru were potentially interested in purchasing assets of the Debtors, Kavuru executed a letter agreement dated November 14, 2018, pursuant to which he fully recused himself from all Aceto board meetings related to Aceto's sale / strategic review process.

On March 8, 2019, the Debtors filed a motion [Docket No. 109] seeking approval of, *inter alia*, (a) bidding procedures (the "Pharma Bidding Procedures") in connection with the sale of substantially all assets comprising the Pharma Business (the "Pharma Assets") pursuant to the Shore Suven Stalking Horse Agreement, subject to higher or otherwise better offers at an auction to be held if the Debtors received one or more Qualified Bids (as defined in the Pharma Bidding Procedures); (b) payment to Shore Suven of a "break-up" fee of $672,000 and an expense reimbursement of no more than $750,000 if and when payable pursuant to the terms of the Shore Suven Stalking Horse Agreement; (c) procedures for the assumption and assignment of certain executory contracts and unexpired leases; (d) certain notice procedures in connection with the foregoing; and (e) the sale to Shore Suven or such other purchaser submitting the highest or otherwise best offer for the Pharma Assets.

Between the filing of the Pharma Bidding Procedures Motion and the hearing with respect to approval of the Pharma Bidding Procedures held on March 18, 2019 (the "March 18 Hearing"), the Committee, through its professionals, engaged in negotiations with Shore Suven in an effort to improve certain terms of the Shore Suven Stalking Horse Agreement. Those negotiations led to certain agreed modifications to the Shore Suven Stalking Horse Agreement, which were announced on the record at the March 18 Hearing.

On March 19, 2019, the Bankruptcy Court entered an order [Docket No. 174] (the "Pharma Bidding Procedures Order") approving the Pharma Bidding Procedures.  The key dates for the sale process established by the Pharma Bidding Procedures Order were as follows:

| Sale Dates and Deadlines – Pharma Business | |
|---|---|
| Sale Objection Deadline (for parties other than the Committee, Indenture Trustee, Prepetition Agent and DIP Administrative Agent) | March 28, 2019 at 5:00 p.m. prevailing ET |
| Bid Deadline | March 29, 2019 at 5:00 p.m. prevailing ET |
| Auction (if required) | April 2, 2019 at 10:00 a.m. prevailing ET |
| Sale Objection Deadline (for the Committee and Indenture Trustee) | One (1) day after filing of the notice of the Successful Bidder at 4:00 p.m. prevailing ET |
| Sale Objection Deadline (for Prepetition Agent and DIP Administrative Agent) | April 6, 2019 at 4:00 p.m. prevailing ET |
| Deadline for Reply Pleadings in Support of Sale | April 7, 2019 at 4:00 p.m. prevailing ET |
| Sale Hearing | April 8, 2019 at 10:00 a.m. prevailing ET |

The Debtors did not receive any Qualified Bid for the Pharma Assets other than the Qualified Bid submitted by Shore Suven.  Accordingly, the auction with respect to the Pharma Assets was cancelled and Shore Suven was declared the Successful Bidder (as defined in the Pharma Bidding Procedures) for the Pharma Assets.

Shore Suiven's Successful Bid (as defined in the Pharma Bidding Procedures) was reflected in an Amended and Restated Asset Purchase Agreement, dated as of March 31, 2019 (the "Pharma Purchase Agreement"), which included, among other modifications, the modifications to the Shore Suven Stalking Horse Agreement that were negotiated between the Committee and Shore Suven and announced on the record at the March 18 Hearing.

At a hearing held on April 9, 2019, the Bankruptcy Court approved the sale (the "Pharma Sale") of the Pharma Assets to Shore Suven pursuant to the Pharma Purchase Agreement and, on April 10, 2019, entered an order [Docket No. 372] approving the Pharma Sale, free and clear of all claims, liens, rights, interests and encumbrances pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code.  The closing of the Pharma Sale occurred on April 19, 2019.[22]

---

[22] The foregoing description of the Pharma Sale does not purport to be complete and is qualified in its entirety by reference to the Amended and Restated Asset Purchase Agreement, dated as of March 31, 2019.

### 3.    Mutual Release Agreement Between the Debtors and the Released Sellers

The Debtors extensively negotiated with Shore Suven regarding the purchase of the Pharma Business both before and after the Petition Date, including rejecting an offer submitted by Shore Suven after the Petition Date that might have left the Debtors' estates owing money to Shore Suven. After weeks of hard fought arm's length negotiations, the Debtors ultimately agreed to accept the Shore Suven Stalking Horse Agreement as a stalking horse bid for the Pharma Business (subject to higher or otherwise better offers in accordance with the Pharma Bidding Procedures) based on the improved terms and benefits that the Debtors were able to obtain through those negotiations.

One of the negotiated conditions to Shore Suven's obligation to close under the Shore Suven Stalking Horse Agreement was Bankruptcy Court approval of a certain Mutual Release of Claims, dated as of March 7, 2019 (the "Mutual Release"), by and between (i) Aceto, Rising, Acetris and Rising Health, and (ii) Shore Pharma LLC, Cedar Pharma LLC (f/k/a Citron Pharma LLC), Aster Pharma LLC (f/k/a Lucid Pharma LLC), Citgen Pharma Holding LLC, Gensource Pharma LLC, SS Pharma LLC, Pharma Reach LLC, Citgen Realty LLC, Sudha Kavuru, Vimal Kavuru, in his capacity as an individual and in his capacity as Agent, and Subha Sri Thogarchedu (collectively, the "Released Sellers").

The Released Sellers that are party to the 2016 Product Purchase Agreement were affiliated with Shore Suven. The Mutual Release was negotiated at arms' length between the Debtors and Shore Suven in connection with the negotiation of the Shore Suven Stalking Horse Agreement. Without entry into the Mutual Release, Shore Suven would not have entered into the Shore Suven Stalking Horse Agreement and the Debtors could not have achieved the significant benefits of the Pharma Sale. In addition, given the March 8, 2019 deadline under the DIP Credit Agreement for entry into an acceptable stalking horse agreement for the sale of the Pharma Business, the Debtors would have been forced to liquidate the Pharma Business to the detriment of their estates, creditors and employees of the Pharma Business.

Between the Debtors' entry into the Mutual Release on March 7, 2019 and the March 18 Hearing, the Committee, through its professionals, engaged in negotiations with Shore Suven and the Released Sellers in an effort to further improve the terms of the Mutual Release for the benefit of the Debtors' estates. Those negotiations led to certain agreed modifications to the Mutual Release, which were announced on the record at the March 18 Hearing and were subsequently incorporated into an Amended and Restated Mutual Release of Claims, dated as of March 31, 2019 (the "A&R Mutual Release"), between each of the Debtors and the Released Sellers.

The A&R Mutual Release amended and restated the terms and provisions of the Mutual Release in their entirety to, among other things, impose additional limitations on the recovery of the Deferred Payment Amount (as defined in the 2016 Product Purchase Agreement) by the Released Sellers. Specifically, section 3 of the A&R Mutual Release provided for limitations on the treatment of the Deferred Payment Amount (as defined in the 2016 Product Purchase Agreement), including any interest thereon (the "DPO Claims"). The A&R Mutual Release provides, in relevant part, as follows:

DPO Claims. Any right to recovery or distribution of proceeds of or to any of the Released Sellers with respect to or on account of the DPO Claims, whether under any plan confirmed in connection with the Bankruptcy Cases or otherwise, shall be subject to, limited by and in accordance with this Section 3. "Intercompany Claims" as used herein means any claim by any Debtor or any affiliate thereof (including any Debtor or non- Debtor affiliate) against any other Debtor. The DPO Claims shall be allowed in an aggregate amount equal to and not more than $30,000,000 against each respective DPO Obligor's[23] bankruptcy estate. The holder(s) of the DPO Claims shall receive, with respect to the DPO Claims, such distributions solely from the respective DPO Obligor's bankruptcy estates on a *pro rata* basis (based on allowed DPO Claims in the amount of $30,000,000) together with the allowed claims of all other general unsecured creditors of the respective DPO Obligors participating in such distributions until such holder(s) of the DPO Claims have received, in the aggregate, their *pro rata* distribution in an amount up to, but not exceeding, $6,500,000 (the "Initial Recovery Amount"). From and after the time when the holder(s) of the DPO Claims have received, in the aggregate, the Initial Recovery Amount, the DPO Claims shall be subordinated to the allowed claims of all other general unsecured creditors of the Debtors' collective bankruptcy estates and the holder(s) of the DPO Claims shall not receive any additional recovery thereon, under a confirmed plan or otherwise, until all such other holders of general unsecured claims collectively in the bankruptcy estates of the Debtors (treated as if all estates are substantively consolidated, whether substantive consolidation is sought or approved and without giving effect to Intercompany Claims) have received a recovery of 65% of the allowed amount of their general unsecured claims against the collective bankruptcy estates of the Debtors, without giving effect to Intercompany Claims (the "Other Creditors' Threshold"). After such time when the Other Creditors' Threshold has been so received by such other general unsecured creditors in the bankruptcy estates of the Debtors (without giving effect to Intercompany Claims), the holder(s) of the DPO Claims shall become once again entitled to, and shall (to the extent of any available distributions) receive, such distributions on a *pro rata* basis (based on allowed DPO Claims in the amount of $30,000,000) with the allowed claims of all other general unsecured creditors in the bankruptcy estates of the DPO Obligors until the holder(s) of the DPO Claims recover a maximum aggregate amount of $20,000,000 (inclusive of the Initial Recovery Amount and all other amounts received by them in respect of the DPO Claims) (the Initial Recovery Amount (as modified by the last sentence of this Section 3), plus any amount recovered by the holder(s) of the DPO Claims in accordance with the terms hereof, being hereinafter referred to as the "Maximum Recoverable Amount").  Notwithstanding any provision herein or in the Product Purchase Agreement to the contrary, the holder(s) of the DPO Claims hereby irrevocably and

---

[23] The DPO Obligors are defined in the A&R Mutual Release as Aceto, Acetris and Rising Health.

unconditionally waive, effective as of the Effective Date, any right to receive any amount relating to the Deferred Payment Amount other than, or in excess of, the Maximum Recoverable Amount.

On March 18, 2019, the Debtors filed a motion [Docket No. 172] pursuant to Bankruptcy Rule 9019 seeking Bankruptcy Court approval of the Mutual Release, as the same was to be amended and restated in the form of the A&R Mutual Release to reflect the modifications to the Mutual Release announced on the record at the March 18 Hearing. On April 10, 2019, the Bankruptcy Court entered an order approving the A&R Mutual Release [Docket No. 373].

### 4.    Key Employee Retention Plan and Key Employee Incentive Plan

The Debtors believed that in order to continue to successfully pursue the sale(s) of substantially all of the assets of their Chemical Plus Business and Pharma Business, it was imperative that the Debtors' employees were appropriately incentivized to remain with the Debtors through the sale process, to maintain stable operations during the pendency of the Chapter 11 Cases, and to expend the efforts necessary to maximize the value received by the Debtors in each sale transaction.

Accordingly, after consulting with compensation experts from Mercer (US), Inc. ("Mercer"), the Debtors sought Bankruptcy Court approval to implement a post-petition key employee retention plan (the "KERP") for twenty-six (26) of the Debtors' non-insider employees (out of a population of approximately 180 employees) that the Debtors determined were essential to the Debtors' business operations (the "KERP Participants"). The KERP Participants were chosen prepetition when the Debtors embarked on the marketing process for the sale(s) of their assets. The proposed post-petition KERP bonuses that the Debtors sought Bankruptcy Court approval to pay ranged from $27,624 to $624,000 per KERP Participant, with a total of $4.91 million potentially available for payment under the KERP.

In addition, prior to the Petition Date, in connection with the extensive marketing process undertaken by PJT, and after substantial deliberation and consultation with compensation experts from Mercer, the members of the Compensation Committee of Aceto's Board of Directors developed and subsequently approved a key employee incentive plan (the "KEIP"), which was designed to incentivize the Debtors' Chief Executive Officer (the "KEIP Participant") – the one executive who was likely to have the most measurable impact on the Debtors' sale process – to remain actively involved in and facilitate competitive auction processes for the Debtors' assets to create additional value for the Debtors' stakeholders, while also continuing his current day-to-day responsibilities to ensure that the Debtors were operating efficiently and effectively.

After the Petition Date, the Debtors sought Bankruptcy Court approval to implement the KEIP on a post-petition basis. The KEIP was narrowly tailored to incentivize the KEIP Participant to maximize value for the benefit of all stakeholders. Because distributable value to stakeholders would be substantially derived from the proceeds of the sale(s) of the Debtors' assets, the amount of the proposed KEIP bonus was tied to sale-related metrics. As reflected in the table below, the KEIP had "Threshold," "Goal" and "Maximum" performance metrics for the sale(s) which set the floor for when the KEIP Participant was eligible to receive a bonus and the maximum bonus amount that could be received by the KEIP Participant. Under these metrics,

the KEIP Participant was eligible to receive a payout under the proposed KEIP (*i.e.*, the Threshold level) if (i) a competing bidder participated in an auction and increased the sales price for the Chemical Plus Business over and above the $338 million stalking horse bid, (ii) if the Debtors were able to consummate a sale of the Pharma Business or (iii) proceeds or value were otherwise generated from the sale(s) or as a result of an Other Realization Event.[24]  The KEIP bonus amount would increase to the "threshold," "goal" or "maximum" level based on the ultimate results of the Debtors' sale(s) efforts.[25] As set forth in the table below, the KEIP had an estimated post-petition bonus amount ranging from a minimum of $0 to a maximum of $800,000.

|  | Sale Proceeds (Millions) | Proposed KEIP (000's) |
| --- | --- | --- |
| Chemical Plus Stalking Horse Bid | $338 | $0 |
| Threshold | $360 | $400 |
| Goal | $391 | $600 |
| Maximum | $424 | $800 |

On March 15, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' (A) Key Employee Retention Plan and (B) Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 147] (the "KERP/KEIP Motion"), seeking approval to implement the KERP and KEIP on a post-petition basis.  On April 3, 2019, the United States Trustee filed an objection to the KERP/KEIP Motion [Docket No. 310] (the "KERP/KEIP Objection").  The Debtors filed a reply to the KERP/KEIP Objection and a declaration in further support of the KERP/KEIP Motion [Docket Nos. 354 and 355].  A hearing on the KERP/KEIP Motion was held on April 9, 2019, and on April 10, 2019, the Bankruptcy Court entered an order approving the KERP/KEIP Motion [Docket No. 378].

**5.      Motion to Allow Payment and/or Advancement of Defense Expenses Under D&O Insurance Policy**

On April 15, 2019, the Travelers Casualty and Surety Company of America ("Travelers"), which had issued an Executive Choice+ Directors, Officers and Organization Liability Policy No. 105958465 (the "Policy") to Aceto, filed a motion for authorization, to the extent necessary, to advance and/or reimburse Defense Expenses (as defined in the Policy) in

---

[24] As used herein, "Other Realization Event" means a transaction, other than a sale of the Pharma Business, that results in the recognition by the Company of gain or loss with respect to the Pharma Business.

[25] For the avoidance of doubt, the KEIP Participant was eligible to receive a KEIP bonus, up to the maximum amount, as a result of the Debtors' cumulative sale(s) efforts. The KEIP Participant would not be entitled to multiple "maximum" KEIP bonuses even if the proceeds generated from multiple sale(s) were to each achieve the maximum level.

accordance with, and subject to, the terms and conditions of the Policy, for the benefit of Aceto and its directors, officers and other Insured Persons (as defined in the Policy), or in the alternative, for relief from the automatic stay to the extent applicable (the "D&O Motion") [Docket No. 417].

As set forth in the D&O Motion, since the Petition Date, certain directors and officers of Aceto (the "Aceto D&Os") which were named in the Securities Class Action (described above) had incurred Defense Expenses in connection with those lawsuits. In addition, the Aceto D&Os were expected to continue to incur Defense Expenses in connection with the Securities Class Action and may continue to incur Defense Expenses in connection with the Derivative Actions (described above). The Policy provides coverage for Claims (as defined therein) first made during the Policy period of July 1, 2017 to July 1, 2018. The Policy provides a primary layer of insurance in the amount of $10 million for covered claims.

On May 8, 2019, the Bankruptcy Court entered an order approving the D&O Motion [Docket No. 507].

### 6.    Changes to Certain Debtor Names

Pursuant to an order entered on April 10, 2019 [Docket No. 374], the Bankruptcy Court authorized, but did not direct, the Debtors to effectuate certain merger and conversion transactions (collectively, the "Merger/Conversion Transactions") in aid of the Pharma Sale and the Chemical Plus Sale.[26] Pursuant to that order and the Merger/Conversion Transactions, the names of certain of the Debtors were changed as follows, as set forth in a notice filed with the Bankruptcy Court on April 25, 2019 [Docket No. 464]:

| Former Name | New Name |
|---|---|
| Aceto Agricultural Chemicals Corporation | Aceto Agricultural Chemicals LLC |
| Rising Pharmaceuticals, Inc. | Rising Pharmaceuticals, LLC |

Thereafter, in order to satisfy their obligations under the Pharma Purchase Agreement and Chemical Plus Purchase Agreement, respectively, and pursuant to authority granted by an order entered by the Bankruptcy Court on June 4, 2019 [Docket No. 607], the Debtors effectuated the following additional name changes:

| Former Name | New Name |
|---|---|
| Aceto Agricultural Chemicals LLC | Tri Harbor Chemical Holdings LLC |

---

[26] The specifics of the Merger/Conversion Transactions, including, without limitation, (i) the merger of Aceto Agri into a newly formed Delaware corporation, with such Delaware corporation surviving and immediately converting into a limited liability company under the Delaware conversion statute, and (ii) Rising converting into a limited liability company under the Delaware conversion statute, are described in the *Debtors' Motion for Entry of an Order (I) Authorizing But Not Directing the Debtors to Effectuate Certain Merger and Conversion Transactions in Aid of Section 363 Sales, and (II) Granting Related Relief* [Docket No. 172], filed with the Bankruptcy Court on March 18, 2019.

| Aceto Realty LLC | Tri Harbor Realty LLC |
|---|---|
| Rising Pharmaceuticals, LLC | Kavod Pharmaceuticals LLC |
| Rising Health, LLC | Kavod Health LLC |
| Acetris Health, LLC | Kavris Health LLC |
| PACK Pharmaceuticals, LLC | KAVACK Pharmaceuticals LLC |

### 7.      The Claims Process

#### a.      Schedules and SOFAs

On April 4, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 329-337] (collectively, and as amended, the "Schedules").  The Debtors filed certain amendments to the Schedules for certain of the Debtors on May 13, 2019 [Docket Nos. 519-524]. Among other things, the Schedules set forth the claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to further amend the Schedules during the pendency of the Chapter 11 Cases.

#### b.      Bar Date Order

On April 15, 2019, the Debtors filed a motion seeking to establish bar dates for filing claims against the Debtors and approving the form and manner of notice thereof [Docket No. 412]. On May 9, 2019, the Bankruptcy Court entered an order [Docket No. 509] establishing the following deadlines for filing claims against the Debtors:

> **General Bar Date**.  All persons and entities (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts and non-governmental units) that assert a claim (as defined in section 101(5) of the Bankruptcy Code), including but not limited to all claims of setoff or recoupment and claims arising under section 503(b)(9) of the Bankruptcy Code, against the Debtors that arose or is deemed to have arisen prior to the Petition Date, must file a proof of such claim with Prime Clerk so that it is actually received on or before **June 19, 2019, at 5:00 p.m. (Eastern Time)** (the "General Bar Date"); provided, however, that all governmental units (as defined in section 101(27) of the Bankruptcy Code) that assert a claim (as defined in section 101(5) of the Bankruptcy Code), against the Debtors which arose or is deemed to have arisen prior to the Petition Date, must file a proof of such claim in writing or electronically with Prime Clerk so that it is actually received on or before **August 19, 2019, at 5:00 p.m. (Eastern Time)** (the "Governmental Bar Date," and together with the General Bar Date, the "Bar Dates").

**Amended Schedules Bar Date**. If the Debtors amend or supplement their Schedules in a manner that adds a new claim, reduces the undisputed, non-contingent or liquidated amount of a claim, or changes the nature or classification of a claim, the Debtors will give notice of any such amendment or supplement to each Holder of a Claim affected thereby advising each such Holder of the requirement to file a proof of claim and the deadline for such filing, and each such Holder will be required to file a proof of claim by the later of (i) the applicable Bar Date and (ii) thirty (30) calendar days after such person or entity is served with notice that the Debtors have amended their Schedules.

**Rejection Bar Date**.   Any person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts, and governmental units) that asserts a claim that arises from the rejection of an executory contract or unexpired lease must file a proof of claim based on such rejection by the later of (i) the applicable Bar Date and (ii) the date that is thirty (30) days following the entry of the order approving such rejection, or be forever barred from doing so.

### c.      Claims Review and Reconciliation

The Debtors are in the process of reconciling the proofs of claim that have been filed in these Chapter 11 Cases and anticipate objecting to certain claims.  The Debtors anticipate that the claims review, reconciliation and objection process will continue and be concluded by the Plan Administrator after the Effective Date of the Plan.

### ARTICLE IV

### SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN. THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT A**.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN. UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS

AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN, THE PLAN ADMINISTRATOR AGREEMENT OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN, THE PLAN ADMINISTRATOR AGREEMENT AND SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.    Classification, Treatment, and Voting of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in, the Debtors (except for certain claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that they have complied with such requirement. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

Pursuant to the Plan Settlement, the Plan, though proposed jointly, constitutes a separate plan for the Aceto Chemical Plus Debtors, the Rising Pharma Debtors, Arsynco, and Acci Realty for voting purposes and, except as set forth in Section 5.01 of the Plan with respect to the substantive consolidation of the Estates of the Aceto Chemical Plus Debtors and the Estates of the Rising Pharma Debtors, does not otherwise constitute a substantive consolidation of the Debtors' Estates. Therefore, all Claims against and Interests in each of the Debtors are placed in the Classes set forth below with respect to such Debtor(s).  Classes that are not applicable as to a particular Debtor will be eliminated as set forth more fully in Section 4.03 of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II of the Plan.

A Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided, however*, that a Claim or Interest is placed in a particular Class for the purpose of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan. UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained in the Plan with respect to the aggregate Claims in any Impaired Class. Thus, the value of property that ultimately will be received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of claims or interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.    **Administrative Claims and Priority Tax Claims**

a.    **Administrative Claims**

Except to the extent that the Debtors or the Plan Administrator, and a Holder of an Allowed Administrative Claim agree to a less favorable treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which will be subject to Section 2.02 of the Plan) will receive, in full satisfaction, settlement, and release of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the later of (i) the Initial Distribution Date or (ii) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date when the Administrative Claim becomes an Allowed Administrative Claim; or (2) 30 days after the date when the Administrative Claim becomes payable pursuant to any agreement between the Debtors or the Plan Administrator and the Holder of the Administrative Claim; or (b) if the Allowed Administrative Claim is based on

liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; *provided, however*, that other than the Holder of (w) a Professional Claim, (x) an Administrative Claim Allowed by a Final Order of the Bankruptcy Court on or before the Effective Date, (y) an Administrative Claim that is not Disputed and arose in the ordinary course of business and was paid, or (z) an Administrative Claim arising under chapter 123 of title 28 of the United States Code, the Holder of any Administrative Claim will have filed a proof of Claim form no later than the Administrative Claim Bar Date and such Claim will have become an Allowed Claim. Except as otherwise provided in the Plan and as set forth in Section 2.02 of the Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims and Solicitation Agent and served on counsel for the Debtors and the Plan Administrator no later than the Administrative Claim Bar Date. Any request for payment of an Administrative Claim pursuant to Section 2.01 of the Plan that is not timely filed and served will be Disallowed automatically without the need for any objection from the Debtors or the Plan Administrator. The Plan Administrator may settle any Administrative Claim without further Bankruptcy Court approval.  In the event that the Debtors or the Plan Administrator object to an Administrative Claim and there is no settlement, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. For the avoidance of doubt, any payments made by the Distribution Agent on account of Allowed Administrative Claims (other than Professional Claims) will be paid from the Administrative and Priority Claims Reserve.

### b.    Professional Claims

(a)    *Final Fee Applications*. All final requests for payment of Professional Claims must be filed no later than thirty (30) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

(b)    *Payment of Interim Amounts and Fee Estimates*. Following the Effective Date, the Liquidating Debtors will continue to comply with the Interim Compensation Order with respect to amounts owing to Professionals for the period from the Petition Date through the Effective Date.  No later than two days prior to the Effective Date, each Professional will estimate fees and expenses due for periods that have not or will not have been billed as of the Effective Date and will deliver such estimate to the Debtors and such estimate will be included in the Professional Claim Estimate.

(c)    *Professional Claims Reserve*. On the Effective Date, the Debtors will fund the Professional Claims Reserve with Cash equal to the aggregate Professional Claim Estimate for all Professionals of the Debtors and Creditors' Committee; <u>provided that</u> any Cash remaining in the Carve Out Account as of the Effective Date will be funded into the Professionals Claims Reserve on the Effective Date and thereby reduce the amount of Cash required to be funded into the Professional Claims Reserve by the Debtors.  The Professional Claims Reserve will be held and maintained in trust by Lowenstein Sandler LLP for all Professionals with respect to whom

fees have not yet been Allowed or paid pursuant to the Interim Compensation Order. The funds in the Professional Claims Reserve will not be considered property of the Debtors, the Liquidating Debtors, the Plan Administrator, or the Estates, as applicable. Following any payments from the Professional Claims Reserve as set forth in Section 2.02(b) of the Plan, the remaining amount of Professional Claims owing to the Professionals will be paid to such Professionals from the Professional Claims Reserve when such Claims are finally Allowed by the Bankruptcy Court.

(d)    *Post-Effective Date Retention.* Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date will terminate, and the Plan Administrator will be permitted to employ and pay Professionals in the exercise of its business judgment (including the fees and expenses incurred by professionals in preparing, reviewing, prosecuting, defending, or addressing any issues with respect to final fee applications), subject to the terms of the Plan Administrator Agreement (and with respect to Professionals not specifically listed as retained by the Plan Administrator following the Effective Date, subject to consultation with the Oversight Committee (to the extent not disbanded pursuant to Section 5.14 of the Plan)).

### c.    Priority Tax Claims

On the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Priority Tax Claim becomes an Allowed Priority Tax Claim or (ii) 30 days after the date when a Priority Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Priority Tax Claim, except to the extent that the Debtors (or Plan Administrator) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date will receive, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Priority Tax Claim. Cash in an amount equal to the amount of such Allowed Priority Tax Claim. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim will be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. For the avoidance of doubt, any payments made by the Plan Administrator on account of Allowed Priority Tax Claims will be paid from the Administrative and Priority Claims Reserve

### 2.    Classification of Claims and Interests

### a.    Class 1: Other Priority Claims

*Classification.* Class 1 consists of all Other Priority Claims.

*Treatment.* Except as otherwise provided in and subject to Section 8.05 of the Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim will be paid in full in Cash on the later of (A) the Initial Distribution Date or (B) the first Periodic

Distribution Date occurring after the later of (1) 30 days after the date when an Other Priority Claim becomes an Allowed Other Priority Claim or (2) 30 days after the date when an Other Priority Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Other Priority Claim.

*Voting.* Class 1 is Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan.

> ### b.    Class 2: Other Secured Claims

*Classification.* Class 2 consists of all Other Secured Claims.

*Treatment.* Except as otherwise provided in and subject to Section 8.05 of the Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim will, at the option of the Plan Administrator, (i) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, (ii) receive the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the interest of the Holder of such Allowed Other Secured Claim in such collateral, or (iii) receive the collateral securing such Allowed Other Secured Claim, in each case of (i), (ii), or (iii) on the later of (A) the Initial Distribution Date or (B) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (2) 30 days after the date when such Other Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Other Secured Claim; *provided, however*, that nothing in Section 3.02 or elsewhere in the Plan will preclude the Debtors or the Plan Administrator, as applicable, from challenging the validity of any alleged Lien on any asset of the Debtors or the value of the property that secures any alleged Lien.

*Voting.* Class 2 is Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan.

> ### c.    Class 3A: General Unsecured Claims Against Aceto Chemical Plus Debtors

*Classification.* Class 3A consists of all General Unsecured Claims against the Aceto Chemical Plus Debtors.

*Allowance.* The Notes Claims will be Allowed in Class 3A in the aggregate amount of $144,612,500 (consisting of principal in the aggregate amount of $143,750,000, *plus* accrued and unpaid interest as of the Petition Date in the aggregate amount of $862,500), and the DPO Claim will be Allowed in Class 3A in the amount of $30,000,000, provided that the DPO Claim will have its recovery capped and/or subordinated as set forth in Section 8.12 of the Plan and consistent with the Mutual Release Agreement.

*Treatment.* Except to the extent that a Holder of an Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors agrees to a less favorable treatment and subject to

Section 8.12 of the Plan with respect to the DPO Claim, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors will receive its Pro Rata Share of the Aceto Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Aceto Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against the Aceto Chemical Plus Debtors is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

*Voting.* Class 3A is Impaired, and Holders of General Unsecured Claims against the Aceto Chemical Plus Debtors are entitled to vote to accept or reject the Plan.

### d.        Class 3B: General Unsecured Claims Against Rising Pharma Debtors

*Classification.* Class 3B consists of all General Unsecured Claims against the Rising Pharma Debtors.

*Allowance.* The DPO Claim will be Allowed in Class 3B in the amount of $30,000,000, provided that the DPO Claim will have its recovery capped and/or subordinated as set forth in Section 8.12 of the Plan and consistent with the Mutual Release Agreement.

*Treatment.* Except to the extent that a Holder of an Allowed General Unsecured Claim against the Rising Pharma Debtors agrees to a less favorable treatment and subject to Section 8.12 of the Plan with respect to the DPO Claim, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against the Rising Pharma Debtors, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against the Rising Pharma Debtors will receive its Pro Rata Share of the Rising Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Rising Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against the Rising Pharma Debtors is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

*Voting.* Class 3B is Impaired, and Holders of General Unsecured Claims against the Rising Pharma Debtors are entitled to vote to accept or reject the Plan.

### e.        Class 3C: General Unsecured Claims Against Arsynco

*Classification.* Class 3C consists of all General Unsecured Claims against Arsynco.

*Treatment.* Except to the extent that a Holder of an Allowed General Unsecured Claim against Arsynco agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against Arsynco, on the Initial Distribution Date and each applicable Periodic Distribution Date

thereafter, each Holder of an Allowed General Unsecured Claim against Arsynco will receive its Pro Rata Share of the Arsynco Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Arsynco Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against Arsynco is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

*Voting.* Class 3C is Impaired, and Holders of General Unsecured Claims against Arsynco are entitled to vote to accept or reject the Plan.

### f.      Class 3D: General Unsecured Claims Against Acci Realty

*Classification.* Class 3D consists of all General Unsecured Claims against Acci Realty.

*Treatment.* Except to the extent that a Holder of an Allowed General Unsecured Claim against Acci Realty agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against Acci Realty, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against Acci Realty will receive its Pro Rata Share of the Acci Realty Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Acci Realty Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against Acci Realty is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

*Voting.* Class 3D is Impaired, and Holders of General Unsecured Claims against Acci Realty are entitled to vote to accept or reject the Plan.

### g.      Class 4A: Subordinated Claims Against Aceto Chemical Plus Debtors

*Classification.* Class 4A consists of all Subordinated Claims against the Aceto Chemical Plus Debtors.

*Allowance.* Notwithstanding anything to the contrary in the Plan, a Subordinated Claim against the Aceto Chemical Plus Debtors, if any such Claim exists, may only become Allowed by Final Order.

*Treatment.* On the Effective Date, each Holder of an Allowed Subordinated Claim (if any) against the Aceto Chemical Plus Debtors will not receive any distribution or other property on account of such Claim; *provided, however*, that if after payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors (including payment of post-petition interest, if any, as set forth in Section 3.02 of the Plan) and after reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3A and all other wind-down costs and expenses, the Plan Administrator determines that additional Aceto Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) of the Plan, the Plan Administrator will make such distributions to Holders of Allowed

Subordinated Claims ratably with Holders of Allowed Interests in Aceto in the manner set forth immediately below.

With respect to distributions, if any, to be shared ratably between Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors and Holders of Allowed Interests in Aceto, each holder of an Allowed Subordinated Claim against the Aceto Chemical Plus Debtors will be entitled to its Pro Rata Share (up to the principal amount of its Allowed Claim) of the remaining Aceto Net Distributable Assets to be distributed on a *pari passu* basis with Holders of Allowed Interests in Aceto, and for purposes of determining the proportional amount of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors relative to the Allowed Interests, the Plan Administrator will use the Aceto Interest Distribution Value.

*Voting.* Class 4A is Impaired, and Holders of Subordinated Claims against the Aceto Chemical Plus Debtors are deemed to have rejected the Plan.

### h.    Class 4B: Subordinated Claims Against Rising Pharma Debtors

*Classification.* Class 4B consists of all Subordinated Claims against the Rising Pharma Debtors.

*Allowance.* Notwithstanding anything to the contrary in the Plan, a Subordinated Claim against the Rising Pharma Debtors, if any such Claim exists, may only become Allowed by Final Order.

*Treatment.* On the Effective Date, each Holder of an Allowed Subordinated Claim (if any) against the Rising Debtors will not receive any distribution or other property on account of such Claim; *provided, however*, that if after payment in full of all Allowed Class 3B General Unsecured Claims against the Rising Debtors (including payment of post-petition interest, if any, as set forth in Section 3.02 of the Plan) and after reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3B and all other wind-down costs and expenses, the Plan Administrator determines that additional Rising Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) of the Plan, the Plan Administrator will make such distributions and each Holder of an Allowed Subordinated Claim against the Rising Pharma Debtors will receive its Pro Rata Share of any available remaining Rising Net Distributable Assets up to the full principal amount of such Allowed Claim.

*Voting.* Class 4B is Impaired, and Holders of Subordinated Claims against the Rising Pharma Debtors are deemed to have rejected the Plan.

### i.    Class 5: Intercompany Claims

*Classification.* Class 5 consists of all Intercompany Claims.

*Treatment.* On the Effective Date, all Intercompany Claims will be eliminated and extinguished and the Holders of Intercompany Claims will not receive or retain any property under the Plan on account of such Claims, and such Claims will be deemed waived and released except as set forth with respect to the Intercompany Claim of the Rising Pharma Debtors against the Aceto Chemical Plus Debtors which will be settled through the Settlement Distribution

-57-

Subsidy, provided, however, that nothing in the Plan will eliminate the Debtors' rights to distributions from any of their non-Debtor Affiliates on account of the Debtors' equity interests in any non-Debtor Affiliate.

*Voting.* Class 5 is Impaired, and Holders of Allowed Intercompany Claims are deemed to have rejected the Plan.

### j.        Class 6A: Interests in Aceto

*Classification.* Class 6A consists of all Interests in Aceto.

*Treatment.* On the Effective Date, Interests in Aceto, including the Aceto Common Stock, will be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Plan Administrator, and without further distribution; provided that one share of common stock in Aceto will be issued and transferred to the Plan Administrator for purposes of administering the wind-down of Aceto as may be required, including pursuant to the Chemical Plus Purchase Agreement; provided further that in the event that the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, each Holder of Interests in Aceto, including the Aceto Common Stock, as of the Distribution Record Date, will be entitled to retain such Interests in Aceto without further recovery or distribution on account of such interests and one share of common stock in Aceto will not be issued or transferred to the Plan Administrator as of the Effective Date; and provided further that if after payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors (including payment of post-petition interest, if any, as set forth in Section 3.02 of the Plan) and/or reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3A and all other wind-down costs and expenses, the Plan Administrator determines that additional Aceto Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) (and whether or not the Aceto Common Stock Non-Cancellation Election Notice was filed by the Debtors on or prior to the Effective Date) the Plan Administrator will make such distributions to Holders of Interests in Aceto as of the Distribution Record Date ratably with Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors in the manner set forth immediately below.

With respect to distributions, if any, to be shared ratably between Holders of Interests in Aceto and Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors, each Holder of an Interest in Aceto will be entitled to its Pro Rata Share of the remaining Aceto Net Distributable Assets to be distributed on a *pari passu* basis with Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors and, for purposes of determining the proportional amount of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors relative to the Interests in Aceto, the Plan Administrator will use the Aceto Interest Distribution Value

*Voting.* Class 6A is Impaired, and Holders of Allowed Interests in Aceto are deemed to have rejected the Plan.

### k.        Class 6B: Interests in Debtors Other Than Aceto

*Classification.* Class 6B consists of all Interests in all Debtors other than Aceto.

*Treatment.* On the Effective Date, Allowed Interests in Debtors other than Aceto will not receive any distribution on account of such Interests, provided that such Interests will be maintained by the Plan Administrator on and after the Effective Date as may be required pursuant to the Pharma Purchase Agreement and/or Chemical Plus Purchase Agreement and/or as necessary to administer the wind-down of each Debtor other than Aceto, including, *inter alia*, for purposes of transferring any particular Estates' assets to other Estates to the extent any particular Estate (or set of consolidated Estates) has additional Cash remaining after paying out all other required Plan distributions.

*Voting.* Class 6B is Impaired, and Holders of Allowed Interests in Debtors other than Aceto are deemed to have rejected the Plan.

## B.    Acceptance

### 1.    Classes Entitled to Vote

Classes 3A, 3B, 3C, and 3D are Impaired and are entitled to vote to accept or reject the Plan.  By operation of law, Classes 1 and 2 are Unimpaired and are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote. By operation of law, Classes 4A, 4B, 5, 6A and 6B are deemed to have rejected the Plan and are not entitled to vote.

### 2.    Acceptance by Impaired Classes

An Impaired Class of Claims will have accepted the Plan if (a) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### 3.    Elimination of Classes

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Confirmation Hearing for all Debtors or with respect to any particular Debtor will be deemed to have been deleted from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

### 4.    Deemed Acceptance if No Votes Cast

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan will be deemed accepted by the Holders of such Claims in such Class.

### 5.    Cramdown

To the extent necessary, the Debtors will request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify, amend, or withdraw the Plan, with respect to all Debtors or any individual Debtor, to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

C.      **Means of Implementation of the Plan**

1.      **Partial Substantive Consolidation**

Pursuant to the Plan Settlement, the Plan contemplates and is predicated upon the deemed substantive consolidation of the Estates and Chapter 11 Cases of, respectively, (i) each of the Aceto Chemical Plus Debtors, and (ii) each of the Rising Pharma Debtors.

On the Effective Date, each Claim filed or to be filed against (or Allowed against) (i) any of Aceto, Aceto Agri or Aceto Realty will be deemed filed against Aceto and will be deemed a single Claim against and a single obligation of Aceto for distribution purposes only and the claims register will be updated accordingly, and (ii) any of Rising, Rising Health, Acetris and PACK will be deemed filed against Rising and will be deemed a single Claim against and a single obligation of Rising for distribution purposes only and the claims register will be updated accordingly. This limited substantive consolidation effected pursuant to the Plan will not (i) otherwise affect the rights of any Holder of any Claim, or (ii) affect the treatment of Claims against Arsynco and Acci Realty, which Claims are separately classified in Section 3.02 of the Plan. For the avoidance of doubt, the Estates of Arsynco and Acci Realty are not substantively consolidated with the Estates of either the Aceto Chemical Plus Debtors or the Rising Pharma Debtors.

Entry of the Confirmation Order will constitute approval, pursuant to sections 105(a) and 1123(A)(5) of the Bankruptcy Code and Bankruptcy Rule 9019, effective as of the Effective Date, of the substantive consolidation of the Estates of, respectively, (i) each of the Aceto Chemical Plus Debtors and (ii) each of the Rising Pharma Debtors, for the purposes of confirming and consummating the Plan, including but not limited to voting, confirmation and Plan distributions.  Accordingly, (I) (a) the assets and liabilities of each of the Aceto Chemical Plus Debtors will be deemed the assets and liabilities of a single, consolidated entity, Aceto, (b) each and every non-contingent, liquidated, non-disputed Claim listed on the Schedules and/or filed in the Chapter 11 Cases against any of the Aceto Chemical Plus Debtors will be considered filed against the consolidated Aceto Chemical Plus Debtors and will be considered one Claim against and obligation of the consolidated Aceto Chemical Plus Debtors on and after the Effective Date, (c) all joint obligations of two or more of the Aceto Chemical Plus Debtors and all multiple Claims against such entities on account of such joint obligations will be considered a single Claim against the Aceto Chemical Plus Debtors, (d) all guarantee by any of the Aceto Chemical Plus Debtors of the obligations of any other Aceto Chemical Plus Debtors arising prior to the Effective Date will be deemed eliminated under the Plan so that any Claim against any of the Aceto Chemical Plus Debtors and any guaranty thereof by any other Aceto Chemical Plus Debtors and any joint and several liability of any of the Aceto Chemical Plus Debtors will be deemed to be one obligation of the deemed consolidated Aceto Chemical Plus Debtors, and (e) all Intercompany Claims between and among the Aceto Chemical Plus Debtors will be cancelled and extinguished; and (II) (a) the assets and liabilities of each of the Rising Pharma Debtors will be deemed the assets and liabilities of a single, consolidated entity, Rising, (b) each and every non-contingent, liquidated, non-disputed Claim listed on the Schedules and/or filed in the Chapter 11 Cases against any of the Rising Pharma Debtors will be considered filed against the consolidated Rising Pharma Debtors and will be considered one Claim against and obligation of the consolidated Rising Pharma Debtors on and after the Effective Date, (c) all joint obligations

of two or more of the Rising Pharma Debtors and all multiple Claims against such entities on account of such joint obligations will be considered a single Claim against the Rising Pharma Debtors, (d) all guarantee by any of the Rising Pharma Debtors of the obligations of any other Rising Pharma Debtors arising prior to the Effective Date will be deemed eliminated under the Plan so that any Claim against any of the Rising Pharma Debtors and any guaranty thereof by any other Rising Pharma Debtors and any joint and several liability of any of the Rising Pharma Debtors will be deemed to be one obligation of the deemed consolidated Rising Pharma Debtors, and (e) all Intercompany Claims between and among the Rising Pharma Debtors will be cancelled and extinguished.

Such deemed consolidation will not, however, (other than for purposes related to funding Distributions under the Plan) affect (a) the legal and organizational structure of the Aceto Chemical Plus Debtors and/or Rising Pharma Debtors (including as required to be maintained following the Effective Date pursuant to the Chemical Plus Purchase Agreement and Pharma Purchase Agreement, respectively), (b) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, assumed and assigned, or rejected, (c) any agreements entered into by the Liquidating Debtors on or after the Effective Date, (d) the Debtors or Liquidating Debtors or Plan Administrator's ability to commence and prosecute any Causes of Action against any Entity as if there was no substantive consolidation.

## 2.    Post-Effective Date Governance and Dissolution of Debtors

Immediately following the occurrence of the Effective Date, (a) the respective boards of directors and/or manager of each of the Debtors will be terminated and the members of the boards of directors of the Debtors will be deemed to have resigned, (b) the Plan Administrator will be appointed as the sole director and/or manager of each of the Liquidating Debtors (to the extent such Debtors are not being dissolved as of or in connection with the Effective Date) and (c) the Debtors will continue to exist as the Liquidating Debtors after the Effective Date in accordance with the laws of the respective states of incorporation of each of the Debtors and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except if and to the extent such organizational documents are amended under the Plan, including for the limited purposes of liquidating all of the assets of the Estates, making distributions in accordance with the Plan, reducing the size of boards of directors or the number of managers, and performing such obligations under the Chemical Plus Purchase Agreement, Pharma Purchase Agreement and Sale Orders as are required to be performed, until such time as the Plan Administrator reasonably concludes (upon consultation with the Oversight Committee, to the extent not disbanded pursuant to Section 5.14) such performance is complete or no longer required, and such other activities as are ancillary, necessary or convenient to the foregoing and the implementation of the Plan.

On the Effective Date, and without further order of the Bankruptcy Court, the Debtors or the Plan Administrator, on behalf of the Liquidating Debtors, may execute and file documents and take all other actions as they deem appropriate relating to the foregoing corporate actions under applicable state laws and, in such event, all applicable regulatory or governmental agencies will take all steps necessary to allow and effect any necessary corporate changes of the

Debtors as provided in the Plan, without the payment of any fee, tax or charge and without the need for the filing of reports or certificates.

Moreover, on and after the Effective Date, Aceto Realty, Acci Realty, PACK, and Rising Health (i) will be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and will not be required to file any document, pay any sum or take any other action in order to effectuate such withdrawal, and (ii) will not be liable in any manner to any taxing or other authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

As soon as practicable after the conclusion of all litigation relating to the Debtors, the Plan Administrator will, at the expense of the Debtors' Estates, (i) provide for the retention and storage of the books, records and files (including any necessary tax records) that shall have been held or maintained by the Debtors, subject to Section 5.17 of the Plan; (ii) file a certificate stating that the assets of the Debtors' Estates have been exhausted and final distributions of Cash have been made under the Plan; (iii) file the necessary paperwork in the relevant states of incorporation of each of the Liquidating Debtors to effectuate the dissolution of the Liquidating Debtors in accordance with the laws of such jurisdiction; and (iv) upon completion of all duties pursuant to the Plan, resign as the sole officer and manager, as applicable, of the Liquidating Debtors; provided that, for the avoidance of doubt, to the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, the Plan Administrator will not immediately take the foregoing actions described in clauses (i) – (iv) with respect to Post-Effective Date Aceto and Post-Effective Date Aceto will remain in existence until such time as the Plan Administrator determines otherwise.  Upon the filing of certificate(s) described in clause (ii) of the preceding sentence, the relevant Debtors and/or Liquidating Debtors (which, for the avoidance of doubt, to the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, will not include Aceto immediately after the Effective Date) will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith.

3.      **Causes of Action**

On the Effective Date, all Causes of Action belonging to the Debtors will remain vested in the Liquidating Debtors.  For the avoidance of doubt, all derivative Causes of Action that have been, or may be, brought on behalf of the Debtors, including any pending or future derivative Causes of Action against the Specified Individuals (to the extent not released under the Plan), will be vested in the Liquidating Debtors on the Effective Date.  The Plan Administrator will have the authority to determine, for each pending derivative action on behalf of the Debtors, whether to dismiss such action or to be deemed the plaintiff in such matter with respect to the pending derivative action on behalf of the Debtors. Any recovery from Causes of Action that vest in the Liquidating Debtors on the Effective Date will become available for *pro rata* distribution and to increase the Aceto Net Distributable Assets and/or the Rising Net Distributable Assets as set forth in the Distribution Calculation.  Notwithstanding anything to the contrary in the Plan, the Plan Administrator will control the Causes of Action, including the

investigation, prosecution and disposition of same, in accordance with the terms of the Plan Administrator Agreement.

### 4. Plan Settlement and General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates the compromise and settlement (the "Plan Settlement") of numerous debtor-creditor issues designed to achieve an economic resolution of Claims against the Debtors and an efficient resolution of these Chapter 11 Cases, including, among other things, the settlement of a number of potential issues such as allocation of Assets and expenses among the Estates as set forth in the Distribution Calculation, the nature, amount and allowability of the Intercompany Claim of Rising against Aceto, the funding of the Wind-Down Reserve, the Wind-Down Budget, partial substantive consolidation of the Debtors' Estates, and the allowance of the Notes Claims. The Confirmation Order will serve to, among other things, approve the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and will contain findings that the compromises and settlements under the Plan Settlement are in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and are fair, equitable, and well within the range of reasonableness and otherwise satisfy the requirements of Bankruptcy Rule 9019. Each provision of the Plan Settlement will be deemed non-severable from each other and from the remaining terms of the Plan. Commencing on the Effective Date, the Plan Administrator will implement the allocation of the Debtors' Assets to the respective Debtors' Estates in accordance with the Distribution Calculation.

Accordingly, on the Effective Date, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan and the Plan Settlement, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests or Causes of Action that (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released pursuant to Section 9.04 of the Plan; (c) have been released pursuant to Section 9.05 of the Plan; (d) are subject to the exculpation pursuant to Section 9.06 of the Plan; or (e) are otherwise stayed or terminated pursuant to the terms of the Plan.

The Plan Settlement also provides for the Settlement Distribution Subsidy contributed from the Aceto Chemical Plus Debtors' Estates to the Rising Pharma Debtors' Estates in full and complete resolution of issues related to substantive consolidation and the Intercompany Claim of Rising against Aceto, and will enhance the *pro rata* distributions to holders of Allowed General Unsecured Claims against the Rising Pharma Debtors (subject to any Excess Amounts being returned to the Aceto Chemical Plus Debtors' Estates based upon the amount of Allowed Claims in Classes 3B and 4B as set forth in the definition of Settlement Distribution Subsidy)

### 5. Plan Funding

Distributions under the Plan and the Plan Administrator's post-Effective Date operations will be funded from the Debtors' Cash on hand and proceeds of the Sales held by the Estates as of the Effective Date, and proceeds of other asset dispositions and net proceeds of Litigation and Other Recoveries.

6.    **Certificate of Incorporation and By-Laws**

The certificate and articles of incorporation, certificate of conformation, by-laws, limited liability company agreement and other relevant organizational documents of each of the Liquidating Debtors will be amended consistent with the Plan Administrator Agreement and as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Liquidating Debtors to matters authorized under the Plan, the Chemical Plus Purchase Agreement and the Pharma Purchase Agreement.

7.    **Cancellation of Certain Instruments and Agreements**

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, options, warrants, rights, and other instruments evidencing an ownership interest in the Debtors, contractual, legal, equitable, or otherwise, to acquire any of the foregoing, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including Notes Claims, and Interests in Aceto, will be automatically canceled and surrendered (provided that, for the avoidance of doubt, to the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, each Holder of Interests in Aceto, including the Aceto Common Stock, as of the Distribution Record Date, will be entitled to retain such Interests in Aceto without further recovery or distribution on account of such interests subject to Section 3.02(j) of the Plan and such Interests in Aceto, including the Aceto Common Stock, will not be deemed automatically cancelled, released, and surrendered) without any need for further action, notice, deed or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtors or the Liquidating Debtors, as applicable, thereunder or in any way related thereto will be deemed satisfied in full, and the Notes Indenture Trustee will be released from all duties thereunder; provided that notwithstanding Confirmation or consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim will continue in effect solely for purposes of:  (1) allowing Holders to receive distributions under the Plan; (2) allowing the Notes Indenture Trustee to enforce its rights, claims, and interests vis-à-vis any parties other than the Debtors or the Liquidating Debtors; (3) allowing the Indenture Trustee to make the distributions in accordance with the Plan (if any), as applicable; (4) preserving any rights of the Indenture Trustee and to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture including any rights to priority of payment and/or to exercise charging liens; (5) allowing the Indenture Trustee to enforce any obligations owed to it under the Plan; (6) allowing the Indenture Trustee to exercise rights and obligations relating to the interests of the Holders under the Indenture; (7) allowing the Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including, but not limited, to enforce obligations owed to such party under the Plan; and (8) permitting the Indenture Trustee to perform any functions that are necessary to effectuate the foregoing; provided, further, that except as provided in the Plan, the preceding proviso will not affect the settlement and release of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtors or the Liquidating Debtors, as applicable.

Additionally, as of the Effective Date, and solely to the extent the Aceto Common Stock Non-Cancellation Election Notice is not filed by the Debtors on or prior to the Effective Date, the Debtors' securities registered under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, will be automatically deregistered and all related reporting obligations with the Securities and Exchange Commission will be automatically terminated.

### 8.     Compliance with the Asset Purchase Agreements

Notwithstanding anything in the Plan to the contrary, nothing herein will modify any obligations of the Debtors under the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement or the Sale Orders, the Chemical Plus Buyer under the Chemical Plus Purchase Agreement or the Chemical Plus Sale Order or the Pharma Buyer under the Pharma Purchase Agreement or the Pharma Sale Order.

### 9.     The Plan Administrator

#### a.     Appointment of the Plan Administrator

From and after the Effective Date, an individual to be designated by the Debtors (in consultation with the Creditors' Committee) will serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan.

The Debtors will include the information set forth in sections 1129(a)(4) and (5) of the Bankruptcy Code in the Plan Supplement designating the individual selected as Plan Administrator. The appointment of the Plan Administrator will be approved in the Confirmation Order, and such appointment will be effective as of the Effective Date. The Plan Administrator will have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the Plan Administrator Agreement.

#### b.     The Plan Administrator Agreement

Prior to or on the Effective Date, the Debtors will execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date will be ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan and to facilitate the orderly and effective liquidation of the Debtors' remaining assets and to maximize the recovery thereof; provided that any such modifications will be done in consultation with and will not alter or impair the rights of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14) without its consent, which consent will not be unreasonably withheld.

#### c.     Rights, Powers, and Duties of the Liquidating Debtors and the Plan Administrator

The Liquidating Debtors will retain and have all the rights, powers and duties necessary to carry out their responsibilities under the Plan, which for the avoidance of doubt, will include pursuing (or not pursuing) the Causes of Action and the investigation, prosecution and/or settlement or other disposition of such Causes of Action. The Plan Administrator will seek to preserve and protect all applicable privileges of the Liquidating Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) as set forth in more detail in Section 5.16 of the Plan. Such rights, powers and duties, which will be exercisable by the Plan Administrator on behalf of the Liquidating Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement (subject to the rights of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14 of the Plan) as set forth in Section 5.14 of the Plan and in the Plan Administrator Agreement), will include, among others, the rights, powers and duties set forth in Section 5.09(c) of the Plan.

### d.    Compensation of the Plan Administrator

The Plan Administrator will be compensated from the Wind-Down Reserve pursuant to the terms of the Plan Administrator Agreement, as provided in the Wind-Down Budget (as may be modified with the consent of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14 of the Plan) which consent will not be unreasonably withheld or by further order of the Bankruptcy Court). Any professionals retained by the Plan Administrator will similarly be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve, as provided in the Wind-Down Budget (as may be modified (i) with the consent of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14 of the Plan) which consent will not be unreasonably withheld, or (ii) by further order of the Bankruptcy Court). The payment of the fees and expenses of the Plan Administrator and its retained professionals will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court; *provided, however*, that any disputes related to such fees and expenses raised by the Oversight Committee (to the extent not disbanded pursuant to Section 5.14 of the Plan) will be brought before the Bankruptcy Court.

### e.    Indemnification

The Liquidating Debtors will indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as sole officer, director or member/manager of the Liquidating Debtors), (ii) additional individuals that may serve as officers or members/managers of the Liquidating Debtors, if any, and (iii) the Plan Administrator Professionals (collectively, the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Liquidating Debtors or the implementation or administration of the Plan or the Plan Administrator Agreement. To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification will be advanced to such Indemnified Party (and such Indemnified Party

undertakes to repay such amounts if it ultimately shall be determined through a Final Order that such Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Reserve or any available Insurance Contracts, including insurance purchased using the Wind-Down Reserve. The indemnification provisions of the Plan Administrator Agreement will remain available to and be binding upon any former Plan Administrator or the estate of any decedent of the Plan Administrator and will survive the termination of the Plan Administrator Agreement.

### f.    Exculpation

The organizational documents of the Liquidating Debtors will provide for the exculpation of the Plan Administrator to the fullest extent permitted by applicable law.

### g.    Insurance

The Plan Administrator will be authorized to obtain and pay for out of the Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Liquidating Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Liquidating Debtors or their Estates and (ii) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator (in consultation with the Oversight Committee) after the termination of the Plan Administrator Agreement.

### h.    Revesting of Assets

Except as expressly provided in the Plan (including pursuant to the Distribution Calculation), on the Effective Date, the property of each Debtor's Estate will revest in the applicable Liquidating Debtor and be distributed according to the Plan.

### 10.    Distributions to Holders of General Unsecured Claims

### a.    Initial Distributions

On the Initial Distribution Date, the Plan Administrator will make, or will make adequate reserves in the GUC Claims Reserve for, the distributions required to be made under the Plan to Holders of Allowed General Unsecured Claims. The Distribution Agent will not make any distributions to the Holders of Allowed General Unsecured Claims unless the Distribution Agent retains and reserves in the GUC Claims Reserve such amounts as are required under Section 8.05(c) of the Plan.

### b.    Interim Distributions

The Distribution Agent will make interim distributions of Cash in accordance with the Plan (i) to Holders of Allowed General Unsecured Claims at least once each four-month period (to the extent practicable), unless the aggregate amount of such distributions, except for the last anticipated distributions, is $50.00 or less, and (ii) from the GUC Claims Reserve (x) to Disputed

General Unsecured Claims that become Allowed General Unsecured Claims or (y) to the DPO Claim, to the extent that the Other Creditors' Threshold is satisfied and distributions of greater than 65% have previously been made to any Holders of Allowed General Unsecured Claims (other than the DPO Claim) in Classes 3A, 3B, 3C, or 3D prior to the satisfaction of the Other Creditors' Threshold.

### c.      Final Distributions

The Liquidating Debtors will be dissolved and their affairs wound up and the Plan Administrator will make the final distributions on the date when, in the reasonable judgment of the Plan Administrator (and, if still in existence, in consultation with the Oversight Committee), substantially all of the assets of the Liquidating Debtors have been liquidated and there are no substantial potential sources of additional Cash for distribution and all pending Claims and/or governmental investigations (including any investigations by the United States Securities and Exchange Commission, United States Department of Justice, and/or the United States Attorney's Office, collectively, the "Governmental Investigations") are resolved and concluded. The date on which the Plan Administrator determines (in consultation with the Oversight Committee if still in existence) that all obligations under the Plan and the Plan Administrator Agreement have been satisfied is referred to as the "Plan Termination Date".  On the Plan Termination Date, the Plan Administrator will, to the extent not already done, request that the Bankruptcy Court enter an order closing any remaining Chapter 11 Cases.

### 11.      Accounts and Reserves

### a.      Professional Claims Reserve

On or before the Effective Date, the Debtors will create and fund the Professional Claims Reserve in Cash in the amount of the Professional Claim Estimate. Subject to Section 5.11(e) of the Plan, the Cash so transferred will not be used for any purpose other than to pay Allowed Professional Claims. Notwithstanding anything to the contrary, Lowenstein Sandler LLP (i) will segregate and will not commingle the Cash held in the Professional Claims Reserve and (ii) will pay each Professional Claim of a Professional employed by the Debtors on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim, upon entry of a Final Order allowing such Claim. After all Professional Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid from the Professional Claims Reserve, any remaining Cash in the Professional Claims Reserve will be released and transferred to the Administrative and Priority Claims Reserve.  Only Professionals employed in the Chapter 11 Cases by the Debtors and the Creditors' Committee, and whose retention and compensation has been approved by the Bankruptcy Court, will be entitled to payment from the Professional Claims Reserve.

The Professionals employed by the Debtors will be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities authorized by an order of the Bankruptcy Court, the Plan, or the Plan Administrator, including the preparation, filing and prosecution (subject to applicable law) of such Professional's final fee applications (if applicable), upon the submission of invoices to the Plan Administrator for payment from the Professional Claims Reserve. The Professionals employed by the Creditors' Committee will be

entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities related to the preparation, filing and prosecution (subject to applicable law) of such Professional's final fee applications. Any time or expenses incurred in the preparation, filing and prosecution of final fee applications will be disclosed by each Professional in its final fee application and will be subject to approval of the Bankruptcy Court.

### b. Administrative and Priority Claims Reserve

On or before the Effective Date, the Debtors will create and fund the Administrative and Priority Claims Reserve in Cash in the amount of the Administrative and Priority Claims Estimate. On or before ten Business Days prior to the Effective Date, the Debtors will provide the Creditors' Committee with a schedule of estimated Administrative Claims, Priority Tax Claims and Other Priority Claims to be funded from the Administrative and Priority Claims Reserve (the "Administrative and Priority Claims Schedule"). On or before five Business Days prior to the Effective Date, the Creditors' Committee will provide the Debtors with a schedule which lists the individual Administrative Claims, Priority Tax Claims and Other Priority Claims set forth in the Administrative and Priority Claims Schedule over which the Oversight Committee shall reserve consent rights (collectively, the "Reserved Claims"). With respect to any Reserved Claim and any other Administrative Claim, Priority Tax Claim and Other Priority Claim that was not included in the Administrative and Priority Claims Schedule, such claim will only be Allowed (i) upon agreement of the Plan Administrator and the Oversight Committee or (ii) as determined by Final Order of the Bankruptcy Court (the "Administrative Claims Protocol"). Until each Allowed Administrative and Priority Claim is paid in full, the Cash in the Administrative and Priority Claims Reserve will not be used for any purpose other than to pay Allowed Administrative Claims (except Professional Claims, which will be paid from the Professional Claims Reserve), Priority Tax Claims and Other Priority Claims, and, subject to Section 5.11(e) of the Plan, no payments on account of the foregoing Claims will be made from any source other than the Administrative and Priority Claims Reserve.

The Plan Administrator (i) will segregate and will not commingle the Cash held in the Administrative and Priority Claims Reserve and (ii) will pay each Administrative Claim (except Professional Claims, which will be paid from the Professional Claims Reserve), Priority Tax Claim and Other Priority Claim, on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim. After all Administrative Claims (including Professional Claims), Priority Tax Claims and Other Priority Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Plan Administrator, any remaining Cash in the Administrative and Priority Claims Reserve will be released and transferred from the Administrative and Priority Claims Reserve to the Wind-Down Reserve so as to provide adequate funding of the Wind-Down Budget, as may be modified as set forth in the Plan, and then to the GUC Claims Reserve.

### c. GUC Claims Reserve

On or before the Initial Distribution Date, the Plan Administrator will create one or more GUC Claims Reserve(s). On each Distribution Date, the Distribution Agent, as applicable, will fund the GUC Claims Reserve(s) in Cash in the amount of the GUC Claims Reserve Amount. Subject to Section 5.11(e) of the Plan, no payments made on account of Disputed General

Unsecured Claims that become Allowed General Unsecured Claims after the Effective Date will be made from any source other than the GUC Claims Reserve. After all Disputed Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid their respective Pro Rata distribution by the Distribution Agent, any remaining Cash in the GUC Claims Reserve will be released and transferred to the Wind-Down Reserve so as to provide adequate funding of the Wind-Down Budget, as may be modified as set forth in the Plan, and then to the GUC Claims Reserve.

### d.      Wind-Down Reserve

On or before the Effective Date, the Debtors will create and fund the Wind-Down Reserve in Cash in the amount set forth in the Wind-Down Budget. Subject to Section 5.11(e) of the Plan, no payments to the Plan Administrator and Plan Administrator Professionals will be made from any source other than the Wind-Down Reserve. The Plan Administrator will segregate and will not commingle the Cash held in the Wind-Down Reserve. Upon the dissolution of the Liquidating Debtors and the conclusion of all wind-down activities of the Plan Administrator, any remaining Cash in the Wind-Down Reserve will be distributed in accordance with Section 3.02 of the Plan as Aceto Net Distributable Assets and/or Rising Net Distributable Assets in accordance with the Distribution Calculation.  The Wind-Down Budget and Wind-Down Reserve may be modified by the Plan Administrator, subject to the consent of the Oversight Committee (not to be unreasonably withheld) to the extent not disbanded pursuant to Section 5.14 of the Plan.

### e.      Other Reserves and Modification to Reserves

Subject to and in accordance with the provisions of the Plan Administrator Agreement and the Wind-Down Budget, the Plan Administrator may establish and administer any other necessary reserves that may be required under the Plan or the Plan Administrator Agreement.

Additionally, and notwithstanding anything to the contrary contained in the Plan, the Plan Administrator may make transfers of money between the reserves established under the Plan to satisfy Claims and other obligations in accordance with the Plan, and may increase any reserve from the Aceto Net Distributable Assets and/or Rising Net Distributable Assets, as applicable, based on Allowed Administrative Claims or Allowed Priority Claims to the extent that the amounts originally funded into the reserves are insufficient to satisfy such Claims.

For the further avoidance of doubt, and notwithstanding anything in the Plan to the contrary, (i) all reserves established under the Plan will not be construed as a cap or limitation on the allowance and payment of any Administrative Claims or Priority Claims; and (ii) to the extent that the Wind-Down Reserve and Wind-Down Budget is insufficient to satisfy all wind-down costs and expenses of the Liquidating Debtors, no distributions will be made to Holders of Interests in Aceto, Allowed Subordinated Claim against the Aceto Chemical Plus Debtors and Allowed Subordinated Claims against the Rising Pharma Debtors (*i.e.* Classes 4A, 4B and 6A) unless and until the Wind-Down Reserve is increased by the Plan Administrator (with the prior consent of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14), which consent will not be unreasonably withheld) with available funds from the Aceto Net

Distributable Assets and/or Rising Net Distributable Assets in an amount sufficient to satisfy all wind-down costs and expenses of the Liquidating Debtors.

## 12.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents will be directed to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 13.    Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtors and their Estates will retain all of the Debtors' Causes of Action (including those Causes of Action to be identified in the Plan Supplement) other than any Causes of Action that are Purchased Assets under the Chemical Plus Purchase Agreement or Pharma Purchase Agreement or otherwise expressly released pursuant to the terms of the Plan or an order of the Bankruptcy Court, including the Final DIP Order, and such retained Causes of Action of the Debtors will remain vested in the Liquidating Debtors on the Effective Date.  The Plan Administrator may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including, without limitation, any actions or categories of actions specifically enumerated in a list of retained Causes of Action contained in the Plan Supplement, and such Causes of Action will be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Debtors. The Plan Administrator, subject to Section 5.14 of the Plan but otherwise in its sole discretion, will determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action.  The Plan Administrator may pursue Causes of Action in accordance with the best interests of the beneficiaries of the Debtors' estates. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator will pursue or not pursue any and all available Causes of Action. The Plan Administrator and Liquidating Debtors expressly reserve all rights to prosecute any and all Causes of Action of the Debtors against any Entity, except as otherwise expressly provided in the Plan or to the extent released pursuant to other Orders of the Bankruptcy Court.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Plan Administrator expressly reserves all of the Debtors' Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

### 14.    Oversight Committee

(a)    As of the Effective Date, a post-confirmation committee to oversee certain actions of the Plan Administrator (the "Oversight Committee") will be formed. The Oversight Committee will be comprised of three (3) members to be designated by the Creditors' Committee and reasonably acceptable to the Debtors.  The members of the Oversight Committee will be identified in the Plan Supplement and (i) may include the Notes Indenture Trustee and one Holder of the Notes and (ii) will include at least one creditor that is a Holder of General Unsecured Claim(s) against the Rising Pharma Debtors; provided that to the extent all Class 3A Holders of Allowed General Unsecured Claims against the Aceto Chemical Plus Debtors are paid in full as set forth in Section 3.02(c) of the Plan, any such Notes Indenture Trustee, Holder of the Notes or other Class 3A creditor that is a member of the Oversight Committee (and does not also hold an Allowed Class 3B General Unsecured Claim against the Rising Pharma Debtors that has not been paid in full as set forth in Section 3.02(d)) will be deemed to have automatically resigned from the Oversight Committee. Upon the death or resignation (or deemed resignation) of a member of the Oversight Committee, the remaining members of the Oversight Committee will fill the applicable vacancy on the Oversight Committee, subject to the consent of the Plan Administrator, which consent will not be unreasonably withheld.

After the Effective Date, and until the Oversight Committee is dissolved and discharged, the Plan Administrator will (i) provide quarterly reports to the Oversight Committee in connection with the wind-down of the Liquidation Debtors and (ii) consult with the Oversight Committee regarding the following:

(i)    commencing additional Causes of Action (to the extent not filed or otherwise commenced prior to the Effective Date) and any Claims to the extent that the Plan Administrator proposes a settlement (including providing for an Allowed Claim) in the amount of $1,000,000 and above;

(ii)    any decision of the Plan Administrator to retain additional Professionals (to the extent not specified in the Plan Administrator Agreement);

(iii)    material issues regarding the any tax, regulatory or other governmental filings in connection with the wind-down of the Liquidating Debtors; and

(iv)    the Oversight Committee's consent to any proposed changes to the Wind-Down Budget (which consent will not be unreasonably withheld).

(b)    Plan Administrator Control/Dispute Resolution:  The Plan Administrator will have complete control over the day-to-day decisions and operations of the Liquidating Debtors except as otherwise provided for in the Plan or Plan Administrator Agreement.  Any disputes regarding consultation rights or consent rights provided to the Oversight Committee under the Plan or Plan Administrator Agreement will be brought before the Bankruptcy Court on the condition that the party seeking such Bankruptcy Court determination shall file a certification or declaration indicating that the parties met and conferred (or had previously met and conferred) regarding such dispute(s) in good faith and were unable to reach resolution.

(c)     The Oversight Committee will have the rights to: employ and compensate professionals on behalf of the Oversight Committee (subject to the agreed-upon budgeted amounts for such professionals as set forth in the Wind-Down Budget), and as further set forth in the Plan Administrator Agreement.

(d)     Members of the Oversight Committee will receive no compensation from the Debtors, the Liquidating Debtors or the Plan Administrator on account of their membership on the Oversight Committee except for reimbursement of their reasonable out of pocket expenses (which, for the avoidance of doubt, will not include the fees or expenses of any professionals retained individually or independently by any member of the Oversight Committee). The Oversight Committee itself will be reimbursed in accordance with the Wind-Down Budget for professional fees of the Oversight Committee. Upon the earlier to occur of (i) the closing of the Chapter 11 Cases or (ii) the payment in full of Allowed General Unsecured Claims in Class 3A and 3B as provided in the Plan, the Oversight Committee will be automatically disbanded and its members will have no further duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation.

(e)     Indemnification: The Liquidating Debtors will indemnify and hold harmless (i) the Oversight Committee, its members and the Oversight Committee's Professionals (collectively, the "OC Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such OC Indemnified Party's willful misconduct or gross negligence, with respect to the Oversight Committee's implementation or administration of the Plan or the Plan Administrator Agreement or its oversight of the Plan Administrator. To the extent an OC Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the OC Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification will be advanced to such OC Indemnified Party (and such OC Indemnified Party undertakes to repay such amounts if it ultimately is determined through a Final Order that such OC Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Reserve or any available Insurance Contracts, including insurance purchased using the Wind-Down Reserve. These indemnification provisions will remain available to and be binding upon any former member of the Oversight Committee or the decedent's estate of any former Oversight Committee member, and will survive the termination of the Oversight Committee.

(f)     Exculpation: The Plan Administrator Agreement will provide for the exculpation of each OC Indemnified Parties to the fullest extent permitted by applicable law.

1.     **Insured Claims**

Notwithstanding anything to the contrary contained in the Plan, to the extent any Insurance Contract(s) provides coverage with respect to any General Unsecured Claim or Subordinated Claim, the Holder of such Claim will, without duplication, (a) be paid only to the extent of any available coverage under any applicable Insurance Contract(s), and (b) if such Claim is entitled to receive the treatment provided for in the Plan for Allowed General

Unsecured Claims or Allowed Subordinated Claims, be paid only to the extent the applicable Insurance Contract(s) does not provide coverage with respect to any portion of the Claim.  If the Holder of any such Claim has received payment under the Plan and under any Insurance Contract that results in a double recovery, then (i) the Holder will be required to return the amount received under the Plan, to the extent of such double recovery, to the Plan Administrator (for the benefit of the relevant Liquidating Debtor(s), and (ii) the Plan Administrator and relevant Liquidating Debtor(s) will be entitled to commence legal action against such Holder, if necessary, to recover such double recovery in accordance with the Plan

### 2.    Preservation of Privilege and Defenses

The Confirmation Order will provide that, on the Effective Date, all of the Debtors' privileges and work product, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral), related to Causes of Action, will be maintained by the Plan Administrator, which will have exclusive authority to waive or not waive the Debtors' privileges in its sole discretion. The Confirmation Order will further provide that nothing in the Plan (including Section 5.16 of the Plan) or the Confirmation Order is intended to, does, or may be construed to expand the privileges or other protections against disclosure, if any, belonging to the Debtors as of the Effective Date, it being understood that the purpose of Section 5.16 of the Plan and any corresponding provisions in the Confirmation Order is to ensure that any privileges and other protections against disclosure existing as of the Effective Date are preserved and are not waived.

The Plan Administrator will seek to preserve and protect all applicable privileges and work product vested in the Liquidating Debtors. The Plan Administrator's receipt of such information will not waive any privileges and such privileges are preserved.  The Liquidating Debtors and the individual directors, officers or members/managers of the Debtors will remain in control of all of their respective privileges (subject to the provisions of the foregoing paragraphs), and the Liquidating Debtors, and the individual directors, officers or members/ managers of the Debtors, each as applicable, retain the right to waive their own privileges prospectively.

### 3.    Books and Records

On the Effective Date, all books and records of the Debtors that were not required to be transferred to the Chemical Plus Buyer or Pharma Buyer pursuant to the terms of the Chemical Plus Purchase Agreement or the Pharma Purchase Agreement will be transferred to the Liquidating Debtors.

The Plan Administrator will be free, in its discretion (subject to consultation with the Oversight Committee, to the extent not disbanded pursuant to Section 5.14 of the Plan) to abandon, destroy or otherwise dispose of any books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, upon reasonable notice to parties in interest, including relevant governmental entities.  With respect to any books and records that are not, in the view of the Plan Administrator, relevant for the continuing prosecution of any objections to Claims, defense of any potential Claims or actions against the Debtors or Liquidating Debtors, any Causes of Action, or the wind-down of the Debtors' Estates, the Plan

Administrator will be free, in its discretion (subject to consultation with the Oversight Committee, to the extent not disbanded pursuant to Section 5.14 of the Plan) to abandon, destroy or otherwise dispose of such books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other Order of the Bankruptcy Court and will have no liability for same.

## D.    Unexpired Leases and Executory Contracts

### 1.    Executory Contracts and Unexpired Leases to Be Rejected

Upon the occurrence of the Effective Date, each Executory Contract and Unexpired Lease will be deemed rejected in accordance with, and subject to, sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is listed on the Schedule of Assumed Executory Contracts contained in the Plan Supplement; (ii) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; (iv) is an Insurance Contract; or (v) is otherwise assumed pursuant to the terms of the Plan. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date will have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements of the Plan.

### a.    Preexisting Obligations to Debtors

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Liquidating Debtors, and the Plan Administrator expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts.

### b.    Rejection Damages Claim Procedures

Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date, the effective date of rejection, or the date notice of such rejection is transmitted by the Debtors or the Plan Administrator, as applicable, to the counterparty to such Executory Contract or Unexpired Lease. Any proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases that are not timely filed will be Disallowed automatically and forever barred, estopped, and enjoined from assertion and will not be enforceable against the Debtors or the Liquidating Debtors, without the need for any objection by the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy

Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease will be deemed fully satisfied and released, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases will be classified as General Unsecured Claims.

### c.      Reservation of Rights

Notwithstanding anything to the contrary in the Plan, prior to the Effective Date, the Debtors may amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease

### 2.      Executory Contracts to Be Assumed

Upon the occurrence of the Effective Date, each Executory Contract that is listed on the Schedule of Assumed Executory Contracts contained in the Plan Supplement, will be deemed assumed, in accordance with, and subject to, sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. To the extent any provision in any Executory Contract assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Liquidating Debtors' assumption of such Executory Contract, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto. Each Executory Contract assumed pursuant to Article VI of the Plan will revest in the Liquidating Debtors and be fully enforceable by the Plan Administrator on behalf of the Liquidating Debtors, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### a.      Modifications, Etc.

Unless otherwise provided in the Plan, each Executory Contract that is assumed will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated pursuant to the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### b.      Proofs of Claim Based on Assumed Contracts or Leases

Any and all proofs of Claim based on Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including under the Plan, except proofs of Claim asserting Cure Amounts, pursuant to the order approving such assumption or assumption and assignment, including the Sale Orders and the Confirmation Order, will be deemed Disallowed and expunged from the Claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

### c.    Cure Proceedings and Payments

With respect to each of the Executory Contracts assumed under the Plan, the Debtors or the Plan Administrator will designate a proposed Cure Amount, and the assumption of such Executory Contract will be conditioned upon the disposition of all issues with respect to the Cure Amount. Except as otherwise set forth on the Schedule of Assumed Executory Contracts, the Cure Amount with respect to each of the Executory Contracts assumed under the Plan is designated by the Debtors as zero dollars, subject to the determination of a different Cure Amount pursuant to the procedures set forth in the Plan (including Section 6.02(e) of the Plan) and in the Cure Notices. Except with respect to Executory Contracts for which the Cure Amount is zero dollars, or for which the Cure Amount is in dispute, the Cure Amount will be satisfied by the Liquidating Debtors, if any, by payment of the Cure Amount in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract without any further notice to or action, order, or approval of the Bankruptcy Court.

Any provisions or terms of the Executory Contracts to be assumed pursuant to the Plan that are or may be, alleged to be in default, will be satisfied solely by payment of the Cure Amount, or by an agreed-upon waiver of the Cure Amount. If there is a dispute regarding such Cure Amount, the ability of the Liquidating Debtors to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Amount will occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption, or as may be agreed upon by the Debtors or the Plan Administrator, as applicable, and the counterparty to the Executory Contract; *provided, however*, that the Debtors or the Plan Administrator, as applicable, will have the right either to reject or nullify the assumption of any Executory Contract after entry of a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise will result in the full release and satisfaction of any Cure Amount, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption, as applicable.

### d.    Cure Notice

No later than seven days before the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts a Cure Notice that will (i) notify the counterparty of

the proposed assumption of the applicable Executory Contract, (ii) list the applicable Cure Amount, if any, set forth on the Schedule of Assumed Executory Contracts, (iii) describe the procedures for filing objections to the proposed assumption of the applicable Executory Contract, (iv) describe the procedures for filing objections to the proposed Cure Amount of the applicable Executory Contract, and (v) explain the process by which related disputes will be resolved by the Bankruptcy Court. If no objection is timely received, (A) the non-Debtor party to the assumed Executory Contract will be deemed to have consented to the assumption of the applicable Executory Contract and will be forever barred from asserting any objection with regard to such assumption, and (B) the proposed Cure Amount will be controlling, notwithstanding anything to the contrary in any applicable Executory Contract or other document as of the date of the filing of the Plan, and the non-Debtor party to an applicable Executory Contract will be deemed to have consented to the Cure Amount and will be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors or the Liquidating Debtors, or the property of any of them.

### e.    Cure Objections

If a proper and timely objection to the Cure Notice or proposed Cure Amount was filed by the Cure Objection Deadline, the Cure Amount will be equal to (i) the amount agreed to between the Debtors or Plan Administrator, as applicable, and the applicable counterparty or (ii) to the extent the Debtors or Plan Administrator and counterparty do not reach an agreement regarding any Cure Amount or any other matter related to assumption, the Bankruptcy Court will determine the Allowed amount of such Cure Amount and any related issues. Objections, if any, to the proposed assumption and/or Cure Amount must be in writing, filed with the Bankruptcy Court, and served in hard-copy form on the parties identified in the Cure Notice so that they are actually received by the Cure Objection Deadline.

### f.    Hearing with Respect to Objections

If an objection to the proposed assumption of an Executory Contract and/or to the proposed Cure Amount thereof is timely filed and received in accordance with the procedures set forth in Section 6.02(e) of the Plan, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection will be held at such time scheduled by the Bankruptcy Court or the Debtors or the Plan Administrator, as applicable. Objections to the proposed Cure Amount or assumption of an Executory Contract will not be treated as objections to Confirmation of the Plan.

### g.    Reservation of Rights

Notwithstanding anything to the contrary in the Plan, prior to the Effective Date, the Debtors may amend their decision with respect to the assumption of any Executory Contract and provide a new notice amending the information provided in the applicable notice. In the case of an Executory Contract designated for assumption that is the subject of a Cure Amount objection that has not been resolved prior to the Effective Date, the Debtors or the Plan Administrator, as applicable, may designate such Executory Contract for rejection at any time prior to the payment of the Cure Amount, as set forth in Section 6.02(c) of the Plan.

### 3.    General Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on the Schedule of Assumed Executory Contracts, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors, the Liquidating Debtors, the Plan Administrator, or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, will have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 4.    Insurance Contracts

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Plan Administrator Agreement, the Confirmation Order, any bar date order or notice or claim objection order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt in to any releases, or any provision that sets a reserve): (a) all Insurance Contracts will continue in effect after the Effective Date pursuant to their respective terms and conditions and will be treated, to the extent necessary, as if assumed by the Plan Administrator on behalf of the Liquidating Debtors, and subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute both approval of such assumption pursuant to sections 105 and 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption is in the best interests of the Estates; (b) all rights and obligations of the Debtors under any Insurance Contracts will automatically become vested in the Liquidating Debtors (with such rights to be enforceable by the Plan Administrator on behalf of the Liquidating Debtors), unaltered and without necessity for further approvals or orders and nothing will alter the legal, equitable or contractual rights, obligations and defenses of the Debtors and the Insurers under the Insurance Contracts or modify the coverage provided thereunder or the terms and conditions thereof except that on and after the Effective Date, the Plan Administrator on behalf of the Liquidating Debtors, will become and remain liable for all of the Debtors' obligations under the Insurance Contracts regardless of whether such obligations arise before or after the Effective Date and without the need or requirement for any Insurer to file a proof of Claim or Administrative Claim. For the avoidance of doubt, the Debtors or the Plan Administrator on behalf of the Liquidating Debtors, as applicable, will retain the right, if any, to challenge any amounts owed under the Insurance Contracts in accordance with their terms; and (c) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, will be deemed lifted without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any

Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

The Debtors or the Plan Administrator on behalf of the Liquidating Debtors, as the case may be, will maintain D&O Policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and will maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years from the closing of the Chemical Plus Sale, to the fullest extent permitted by such provisions (subject to the Wind-Down Budget), in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors; *provided*, *however*, that nothing in the Plan or the Confirmation Order alters the terms and conditions of the D&O Policies. Nothing in the Plan will be deemed to impair any Entity's claim, if any, to proceeds of the D&O Policies or the priority of payment on such claim, if any, under the D&O Policies.

## E.      Procedures for Resolving Disputed Claims and Interests

### 1.      Determination of Claims and Interests

After the Effective Date, the Plan Administrator will have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Section 5.13 of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan or other order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest will become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed (including to the extent no objection to such Claim or Interest is filed on or prior to the Claim Objection Deadline) or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, will be binding on all parties. For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending) will be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan.

Nothing contained in Section 7.01 of the Plan will constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Liquidating Debtors may have against any Entity in connection with or arising out of any Claim, including any rights under section 157(b) of title 28 of the United States Code.

### 2.      Claims Administration Responsibility

Notwithstanding anything to the contrary in the Plan, after the Effective Date, the Plan Administrator will, subject to Section 5.14 of the Plan and the Plan Administrator Agreement, retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims, including, in each case, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the Claims register to reflect any such settlements or compromises, all without any further notice to or action, order, or approval by the Bankruptcy Court.

### 3.        Objections to Claims

Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) will be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Plan Administrator without further notice to parties-in- interest). Notwithstanding any authority to the contrary, an objection to a Claim will be deemed properly served on the Holder of the Claim if the Debtors or the Plan Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address); or (c) by either first class mail, postage prepaid, or email, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

### 4.        Disallowance of Claims

Except as otherwise agreed, any and all proofs of Claim filed after the applicable deadline for filing such proofs of Claim will be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of the Bankruptcy Court, and Holders of such Claims will not receive any distributions on account of such Claims, unless any such late proof of Claim is deemed timely filed by a Final Order of the Bankruptcy Court.

Nothing in the Plan will in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Plan Administrator, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification. Nothing in the Plan will preclude amendments to timely filed proofs of Claim to the extent permitted by applicable law.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Plan Administrator allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code will be Disallowed if (a) the Entity, on the one hand, and the Debtors or the Plan Administrator, on the other hand, agree or the Bankruptcy Court has

determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### 5.      Estimation of Claims

Before the Effective Date, the Debtors, and after the Effective Date the Plan Administrator, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of funding any applicable reserves), without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. All estimation procedures set forth in the Plan will be applied in accordance with section 502(c) of the Bankruptcy Code. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

### 6.      No Interest on Disputed Claims

Unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest will not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest will be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest will not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

### 7.      Amendments to Claims

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Liquidating Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed will be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court and the Claims and Solicitation Agent is authorized to immediately expunge any such Claim.

## F.      Provisions Governing Distributions

1. **Timing of Distributions for Allowed Claims**

Except as otherwise provided for in the Plan (including as set forth in Sections 8.12 and 8.13 of the Plan) or ordered by the Bankruptcy Court, distributions under the Plan with respect to Allowed Claims will be made on the later of (a) the Initial Distribution Date or (b) on the first Periodic Distribution Date occurring after the later of, (i) 30 days after the date when a Claim is Allowed or (ii) 30 days after the date when a Claim becomes payable pursuant to any agreement between the Debtors, the Liquidating Debtors, the Plan Administrator, and the Holder of such Claim; *provided, however*, that the Plan Administrator may make one-time distributions on a date that is not a Periodic Distribution Date.

2. **Currency**

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars will be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of the Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next The Wall Street Journal following the Effective Date.

3. **Distribution Agent**

The Distribution Agent will make all distributions required under the Plan, subject to the terms and provisions of the Plan. If the Distribution Agent is an independent third party designated to serve in such capacity, such Distribution Agent will receive, without further Court approval, reasonable compensation from the Wind-Down Reserve for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses. No Distribution Agent will be required to give any bond or surety or other security for the performance of its duties. The Distribution Agent will be authorized and directed to rely upon the Debtors' books and records and, as applicable, the Plan Administrator's representatives and professionals in determining Allowed Claims not entitled to distributions under the Plan in accordance with the terms and conditions of the Plan. The Distribution Agent will be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

4. **Claims Administered by Servicers**

In the case of Holders of Claims governed by an agreement and administered by a Servicer, including the Notes Indenture Trustee with respect to the Allowed Notes Claims, the Servicer will be deemed to be the Holder of such Claims for purposes of distributions to be made under the Plan. The Distribution Agent will make all distributions on account of such Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion. Each Servicer will, at its option, hold or direct such distributions for the beneficial Holders of such Allowed Claims, as applicable; *provided, however*, that the Servicer will retain all rights under its

respective agreement in connection with delivery of distributions to the beneficial Holders of such Allowed Claims, including rights on account of its charging lien as set forth in the relevant Notes Indenture; *provided, further, however*, that the Debtors' and the Liquidating Debtors' obligations to make distributions pursuant to the Plan will be deemed satisfied upon delivery of distributions to the relevant Servicer (including the Notes Indenture Trustee with respect to the Allowed Notes Claims) or any Entity or Entities designated by the Servicers. The Servicers will not be required to give any bond, surety, or other security for the performance of their duties with respect to such distributions.

### 5.    Distributions on Claims Allowed After the Effective Date

### a.    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

### b.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision to the contrary in the Plan, and except as otherwise agreed by the relevant parties, no partial payments and no partial distributions will be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. All distributions made pursuant to the Plan on account of a Disputed Claim that is later deemed an Allowed Claim by the Bankruptcy Court will be made together with any other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; *provided*, *however*, that no interest will be paid on account of such Allowed Claims unless required under applicable bankruptcy law.

### c.    Distributions from GUC Claims Reserve

The Plan Administrator will establish and administer the GUC Claims Reserve.  Each Holder of a Disputed General Unsecured Claim that becomes an Allowed General Unsecured Claim after the Effective Date will receive the treatment set forth in Section 3.02 of the Plan. On each Periodic Distribution Date, all amounts in the GUC Claims Reserve on account of (A) the DPO Claim to the extent it is conclusively determined that the Other Creditors' Threshold will not and cannot be satisfied, or (B) a Disputed General Unsecured Claim that has become Disallowed in whole or in part (or has been Allowed in an amount less than its Provisionally Allowed amount) will be available for distribution to Holders of Allowed General Unsecured Claims in Classes 3A, 3B, 3C and/or 3D (depending on which Estates funded the GUC Claims Reserve).

### d.    Withholding and Reporting Requirements

In connection with the consummation of the Plan, to the extent applicable, the Debtors, the Liquidating Debtors, the Plan Administrator and Distribution Agent will comply with all

applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions under the Plan will be subject to any such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a Distribution under the Plan will have the sole and exclusive responsibility for providing any requested Tax Information or documentation to the Distribution Agent, and for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution. The Debtors, the Liquidating Debtors, the Plan Administrator and the Distribution Agent each have the right, but not the obligation, to not make a Distribution until such Holder has (i) made arrangements satisfactory to any disbursing party for payment of any such tax obligations and (ii) provided any requested Tax Information or documentation to the Distribution Agent. The Debtors, the Liquidating Debtors, the Plan Administrator and the Distribution Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim or Interest in Aceto complete and return a Form W-8 or W-9, or other applicable form, as applicable to each such Holder, and additional Tax Information.  If the Debtors, Liquidating Debtors or Plan Administrator make such a request and the Holder fails to comply before the date that is 60 days after the request is made, the amount of such Distribution will irrevocably revert to the Liquidating Debtors and any Claim or Interest in respect of such Distribution will be disallowed and forever barred from receiving a Distribution under the Plan.

6.    **Delivery of Distributions**

a.    **Record Date for Distributions**

As of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, the transfer registers for Claims will be closed. The Distribution Agent will have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and will be entitled for all purposes to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date will be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

b.    **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Distribution Agent, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

c.    **Address for Distributions**

Distributions to Holders of Allowed Claims will be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of Claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or

if the Debtors or the Distribution Agent have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer. The Debtors, the Liquidating Debtors, and the Distribution Agent will not incur any liability whatsoever on account of any distributions under the Plan.

### d.    Undeliverable Distributions

If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim will be made unless and until the Distribution Agent or the appropriate Servicer is notified of then-current address of such Holder of the Claim, at which time all missed distributions will be made to such Holder of the Claim without interest on the next Periodic Distribution Date. Amounts in respect of undeliverable distributions will be returned to the Liquidating Debtors' Estate from which such distribution originated.

### e.    Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of three (3) months after such distribution will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution will revert to and vest in the Liquidating Debtors free of any restrictions thereon. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property will be cancelled and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions, de minimis distributions, and Unclaimed Distributions will apply with equal force to distributions that are issued by the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute) and Holders of Allowed Interest in Aceto (to the extent entitled to any distributions), and notwithstanding any provision in such indenture, Certificate or otherwise to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

### f.    De Minimis Distributions

Notwithstanding any other provision of the Plan to the contrary, the Distribution Agent and any Servicer will not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $50.00; *provided, however*, that the Distribution Agent will make, or cause to be made, a distribution on a Periodic Distribution Date of less than $50.00 if the Distribution Agent expects that such Periodic Distribution Date will be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

To the extent that any final Distribution would be *de minimis* or otherwise impracticable in the judgment of the Plan Administrator, the Plan Administrator may donate any such remaining funds to a 501(c)(3) charity such as the New Jersey Bankruptcy Lawyers Foundation.

### 7.   Surrender of Securities or Instruments

As soon as practicable after the Effective Date, each Holder of Notes will surrender its note(s) to the Notes Indenture Trustee, and each Holder of Notes will be deemed to have surrendered such Holder's security, note, debenture, or other evidence of indebtedness upon surrender of such global security by the Holder or a securities depository or custodian thereof. No distributions under the Plan will be made for or on behalf of such Holder unless and until such note(s) is received by the Notes Indenture Trustee or the loss, theft, or destruction of such note(s) is established to the reasonable satisfaction of the Notes Indenture Trustee, which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Liquidating Debtors, and the Notes Indenture Trustee, harmless in respect of such note and distributions made thereof. Upon compliance with Section 8.07 of the Plan by a Holder of Notes, such Holder will, for all purposes under the Plan, be deemed to have surrendered such Claim. Any Holder that fails to surrender such Notes or satisfactorily explain its non-availability to the Notes Indenture Trustee within one year of the Effective Date will be deemed to have no further Claim against the Debtors, the Liquidating Debtors (or their property), or the Notes Indenture Trustee in respect of such Claim and will not participate in any distributions under the Plan. All property in respect of such forfeited distributions, including interest thereon, will be promptly returned to the Liquidating Debtors by the Notes Indenture Trustee, and any such security will be cancelled. Notwithstanding the foregoing, if the record Holder of a Notes Claim is a securities depository or custodian thereof, or if a Notes Claim is held in book-entry or electronic form pursuant to a global security held by a securities depository or custodian thereof, then the beneficial Holder of such an Allowed Notes Claim will be deemed to have surrendered such Holder's security, note, debenture, or other evidence of indebtedness upon surrender of such global security by the securities depository or custodian thereof.

### 8.   Compliance Matters

In connection with the Plan, to the extent applicable, the Distribution Agent will comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Debtors and Plan Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 9.   Claims Paid or Payable by Third Parties

The Claims and Solicitation Agent will reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Distribution Agent without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Distribution Agent on account of such Claim, such Holder will, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### 10.    Setoffs

Except as otherwise expressly provided for in the Plan and except with respect to any Notes Claim, and any distribution on account thereof, the Liquidating Debtors, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtors or the Liquidating Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan will constitute a waiver or release by the Debtors or the Liquidating Debtors of any such Claims, rights, and Causes of Action that the Debtors or Liquidating Debtors may possess against such Holder. In no event will any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Liquidating Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Bankruptcy Code section 553 or otherwise.

### 11.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 12.    DPO Claim Recovery and Distribution Matters

Consistent with and pursuant to the Mutual Release Agreement, the Holder of the DPO Claim will receive its recovery in Classes 3A and 3B as follows: the DPO Claim will receive on account of its Allowed $30,000,000 Claim a recovery on a *pro rata* basis together with the Allowed General Unsecured Claims in Classes 3A and 3B participating in such distributions until the Holder of such DPO Claim has received, in the aggregate, its *pro rata* distribution in an amount up to, but not exceeding, $6,500,000 (the "Initial Recovery Amount"); *provided that* the

Initial Recovery Amount will first be recovered from any available Aceto Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors, and only to the extent such assets prove insufficient to fund the Initial Recovery Amount will the Initial Recovery Amount (or the amount remaining to provide for payment of the Initial Recovery Amount) be recovered from the Rising Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Rising Pharma Debtors.  From and after the time when the Holder of the DPO Claim has received, in the aggregate, the Initial Recovery Amount, the DPO Claim will be subordinated to the Allowed Claims of all other General Unsecured Creditors of the Debtors' collective bankruptcy estates and the Holder of the DPO Claim will not receive any additional recovery thereon until all such other Holders of General Unsecured Claims collectively in all of the Debtors' Estates (treated as if all of the Debtors' Estates are substantively consolidated, and without giving effect to any Intercompany Claims) collectively have received a recovery of 65% of the Allowed amount of their General Unsecured Claims against the collective Estates of the Debtors (or would have received such a 65% recovery of the Allowed amount of their General Unsecured Claims had all of the Estates been substantively consolidated), without giving effect to any Intercompany Claims (the "Other Creditors' Threshold").  After such time when the Other Creditors' Threshold have been so received (or would have been so received) by such other General Unsecured Creditors (aside from the Holder of the DPO Claim) in the Debtors' Estates (without giving effect to any Intercompany Claims and to the extent all of the Debtors' Estates had been substantively consolidated), the Holder of the DPO Claims will once again become entitled to, and will (to the extent of any available further distributions) receive such further distributions (the "Additional Recovery Amount") on a *pro rata* basis (based on an allowed DPO Claim in the amount of $30,000,000) together with the Allowed General Unsecured Claims in Classes 3A and 3B participating in such distributions until the Holder of such DPO Claim has received a maximum aggregate recovery amount of $20,000,000 (inclusive of the Initial Recovery Amount and all other amounts received in respect of the DPO Claim), *provided that* the Additional Recovery Amount will first be recovered from any available Aceto Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors, and only to the extent such assets prove insufficient to fund the Additional Recovery Amount will the Additional Recovery Amount (or the amount remaining to provide for payment of the Additional Recovery Amount) be recovered from the Rising Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Rising Pharma Debtors.  For the avoidance of doubt, the Holder of the DPO Claim will receive a maximum aggregate recovery of $20,000,000 on account of the DPO Claim.

### 13.    Distributions (if any) to Holders of Allowed Interests in Aceto

Distributions, if any (and solely to the extent and at such time that Aceto Net Distributable Assets are available following payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors, including payment of post-petition interest as set forth in Section 3.02 of the Plan), to Holders of Interests in Aceto will be made by the Plan Administrator in accordance with such procedures that the Plan Administrator deems proper and appropriate and that are consistent with standard practice and applicable law regarding the payment of amounts to holders of publicly traded securities in a manner customary in the securities industries reasonably intended to maximize the likelihood that such Holders will

receive payment in a timely fashion.  Thus, the Plan Administrator will use reasonable efforts to deliver (or cause to be delivered) Distributions (if any) to Holders of Interests in Aceto to (a) each directly registered Holder of Interests in Aceto as of the Confirmation Date, and (b) each broker, commercial bank, transfer agent, trust company, dealer, or other intermediary or nominee, or their mailing agent (each a "Nominee") identified by Aceto's Transfer Agent, American Stock Transfer & Trust Company, LLC (American Stock Transfer & Trust Company, LLC or such other entity as may be identified by the Plan Administrator, the "Transfer Agent"), as an entity through which beneficial holders indirectly hold Interests in Aceto.    Such distributions, if any, will only be made to Holders of Interests in Aceto as of the Confirmation Date through and as recorded by the Transfer Agent (or such other paying agent to be identified by the Plan Administrator).  For the avoidance of doubt, no distributions on account of Allowed Interests in Aceto will be made unless and until all claims of a higher priority under the Bankruptcy Code and the then incurred wind-down expenses of the Plan Administrator have been paid or reserved for in full.

## G.    Effect of Plan on Claims and Interests

### 1.    Vesting of Assets

Except as otherwise explicitly provided in the Plan, as of the Effective Date, the property of each Debtors' Estate, if any, will revest in the applicable Liquidating Debtor, as applicable, and will be free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.

### 2.    [Reserved]

### 3.    Compromise and Settlement

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to the Effective Date. After the Effective Date, any such right will pass to the Liquidating Debtors without the need for further approval of the Bankruptcy Court. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan including the Plan Settlement will constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.

### 4.    Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Liquidating Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of any of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of**

Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtors, the Liquidating Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Liquidating Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sales, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement, the Sale Orders or related agreements, instruments, or other documents, the pursuit of the Sales, the pursuit of consummation of the Sales, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan; *provided* that, nothing in Section 9.04 of the Plan will be construed to release the Released Parties from gross negligence, willful misconduct, or fraud as determined by a Final Order, *provided*, *further*, that there will be no releases given, or be deemed to have been given under the Plan, to any Person or Entity that is a defendant in a lawsuit or Cause of Action commenced by any of the Debtors before the Effective Date or the Liquidating Debtors or Plan Administrator commenced after the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Liquidating Debtors or their respective Estates or the Litigation Trust asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

5.    **Third Party Release**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the

contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended after the Effective Date, each of the Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sales, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement, the Sale Orders or related agreements, instruments, or other documents, the pursuit of the Sales, the pursuit of consummation of the Sales, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, *provided* that, nothing in Section 9.05 of the Plan will be construed to release the Released Parties from gross negligence, willful misconduct, or fraud as determined by a Final Order; *provided*, *further*, that notwithstanding anything to the contrary in the Plan, the foregoing release will not affect the releases granted to the applicable entities pursuant to the Final DIP Order or the Mutual Release Agreement; *provided*, *further*, that this release will not (1) preclude the United States Securities and Exchange Commission from enforcing its regulatory or police powers or (2) operate to release any claims or causes of action held directly (but not derivatively) by the United States Securities and Exchange Commission against any non-Debtor person or non-Debtor entity; *provided*, *further*, that this release will not release any Securities Claims with respect to the Specified Individuals, provided that any such claims and any judgment or recoveries arising therefrom by Holders of Securities Claims will be subject to and limited by Section 9.08 of the Plan. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of claims released by the Third Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related

thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Third Party Release.

6.     **Exculpation and Limitation of Liability**

Effective as of the Effective Date, without affecting or limiting either the Debtor Release or the Third Party Release, and notwithstanding anything in the Plan to the contrary, each Exculpated Party will be released and exculpated from any claim, obligation, Cause of Action, or liability for any postpetition action taken or omitted to be taken during the period commencing on the Petition Date through and including the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement, the Sale Orders, the Sales, the Final DIP Order, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, provided that, nothing in Section 9.06 of the Plan will be construed to release the Exculpated Parties from gross negligence, willful misconduct, or fraud as determined by a Final Order, *provided, further*, that there will be no exculpation given or limitation of liability provided, or be deemed to have been given or provided under the Plan, to any Person or Entity that is a defendant in a lawsuit or Cause of Action commenced by any of the Debtors before the Effective Date or the Liquidating Debtors or Plan Administrator commenced after the Effective Date. Each Exculpated Party has, and upon completion of the Plan will be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

7.     **[Reserved]**

8.     **Limitation on Securities Claims and Enforcement of Judgments**

The Plan Administrator and any Holders of Securities Claims will not, subject to Section 9.08 of the Plan, enforce any judgment, recoveries or settlement obtained against the Specified Individuals or any of the Debtors' current or former directors, officers and managers (to the extent not released pursuant to Section 9.05 of the Plan) unless such judgment or settlement is actually covered by, and payable from, any available insurance coverage under the D&O Policies; *provided* that such prohibition will not apply to any Specified Individual in the event such Specified Individual (a) fails to reasonably cooperate

with any D&O Insurer to the fullest extent requested by such D&O Insurer in the defense and/or settlement of any Cause of Action brought against such Specified Individual or any other party, **(b)** knowingly or unreasonably takes any action that has the effect of impairing, or knowingly or unreasonably fails to take any action necessary to preserve, coverage under the D&O Policies for any Cause of Action brought against such Specified Individual or any other party (provided that a Specified Individual's election to satisfy these conditions and take steps to qualify such Specified Individual for the protections of the injunction described above will not under any circumstances be deemed to be knowingly or unreasonably taking an action or failing to take an action for purposes of this subsection **(b)**), **(c)** fails to satisfy any required co-insurance obligations, if any, under the D&O Policies arising from any Cause of Action brought against such Specified Individuals or **(d)** asserts any Claim relating to any prepetition Indemnification Obligations in violation of Section 9.14 of the Plan, without prejudice to any subrogation or other rights of any D&O Insurer under the D&O Policies. For the avoidance of doubt, each Specified Individual may, in his/her sole discretion, elect to satisfy the foregoing conditions that qualify such Specified Individual to the protections of the injunction described in Section 9.08 of the Plan and the decision and/or acts or omissions of one Specified Individual will have no impact on any other Specified Individual.

9.    **Injunction**

Effective as of the Effective Date, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests or Causes of Action that **(a)** are subject to compromise and settlement pursuant to the terms of the Plan; **(b)** have been released pursuant to Section 9.04 of the Plan; **(c)** have been released pursuant to Section 9.05 of the Plan; **(d)** are subject to the exculpation pursuant to Section 9.06 of the Plan; or **(e)** are otherwise stayed or terminated pursuant to the terms of the Plan, will be permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidating Debtors, the Exculpated Parties, or the Released Parties: **(1)** commencing or continuing in any manner any action or other proceeding of any kind including on account of or in connection with or with respect to any such Claims, Interests or Causes of Action that have been compromised or settled against the Debtors, Liquidating Debtors, or any Entity so released or exculpated (or the property or estate of the Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action; **(2)** enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, Liquidating Debtors or any Entity so released or exculpated (or the property or Estates of the Debtors, Liquidating Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action; **(3)** creating, perfecting, or enforcing any Lien, claim or encumbrance of any kind against the Debtors, Liquidating Debtors or any entity so released or exculpated (or the property or Estate of the Debtors, Liquidating Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action; **(4)** asserting any right of setoff, subrogation, or recoupment of any

**kind against any obligation due to the Debtors, Liquidating Debtors or any Entity so released or exculpated (or the property or Estates of the Debtors, Liquidating Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action, except as set forth in Section 8.10 of the Plan, and notwithstanding an indication in a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff or subrogation pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, Liquidating Debtors, or any Entity so released or exculpated (or the property or estate of the Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action. Notwithstanding anything to the contrary in the foregoing or in the Plan, the injunction set forth above will not enjoin the Securities Claims. For the avoidance of doubt, the Debtors are not receiving a discharge under section 524(a) of the Bankruptcy Code.**

### 10.    Subordination Rights

Except as otherwise provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, will be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights will be deemed waived, released and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims thereunder will not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.

Except as otherwise provided in the Plan, the right of the Debtors or the Plan Administrator on behalf of the Liquidating Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code or otherwise is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time will reflect such subordination. Unless the Plan or the Confirmation Order otherwise provide, no distributions will be made on account of a Subordinated Claim unless ordered by the Bankruptcy Court or otherwise provided for in the Plan.

### 11.    Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code, no Governmental Unit will be permitted to discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to,

discriminate with respect to such a grant against, the Liquidating Debtors, Plan Administrator or another Entity with whom the Liquidating Debtors have been associated, solely because the Liquidating Debtors have been debtors under chapter 11, have been insolvent before the commencement of the Chapter 11 Cases, or have not paid a debt that is settled and released in the Chapter 11 Cases.

## 12. Release of Liens

Except as otherwise provided in the Plan, including Section 3.02 of the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates will be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert to the Liquidating Debtors and their successors and assigns.

## 13. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim will be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as non-contingent or is a Claim described in Section 9.14 of the Plan or (b) the relevant Holder of a Claim has filed a contingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## 14. Limitations on Indemnification Claims

The following will govern any claims for indemnification asserted by any Specified Individual or other parties set forth below against the Debtors or the Liquidating Debtors:

Except to the extent necessary to preserve available insurance coverage under the D&O Policies, each Specified Individual or other party subject to the Limitation on Enforcement of Judgments in Section 9.08 of the Plan will be deemed to have waived all of his/her indemnification claims against the Debtors on account of any judgment covered by Section 9.08 of the Plan.

## H. Conditions Precedent

## 1. Conditions Precedent to the Effective Date of the Plan

Section 10.01 of the Plan contains certain conditions precedent to the occurrence of the Effective Date, each of which may be waived by the Debtors in accordance with Section 10.02 of the Plan with the consent of the Creditors' Committee (such consent not to be unreasonably withheld).

## 2. Notice of Effective Date

The Plan Administrator will file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 10.01 of the Plan have been satisfied or waived pursuant to Section 10.02 of the Plan. The Debtors will provide at least five (5) days' advance notice to the Creditors' Committee of the expected occurrence of the Effective Date.

### 3. Effect of Non-Occurrence of Conditions to Consummation

If, prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement will (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## I. Bankruptcy Court Jurisdiction

### 1. Retention of Jurisdiction

Section 11.01 of the Plan provides that pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan (without prejudice to the rights, if any, of any party in interest to seek to withdraw the bankruptcy reference pursuant to 28 U.S.C. § 157(d) and related law with respect to any issue or proceeding subject to mandatory or discretionary withdrawal). Section 11.01 of the Plan contains a nonexclusive lists of such matters. From the Confirmation Date through the Effective Date, the Bankruptcy Court will retain jurisdiction with respect to each of such matters and all other matters that were subject to its jurisdiction prior to the Confirmation Date. Nothing contained in the Plan will be construed to increase, decrease, or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## J. Miscellaneous Provisions

Article XII of the Plan includes numerous miscellaneous provisions governing, among other things, (a) the binding effect of the Plan, (b) the payment by the Liquidating Debtors of fees required to be paid pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed, (c) the filing by the Plan Administrator of quarterly reports in compliance with Bankruptcy Rule 2015(a)(5), (d) the closing of the Chapter 11 Cases of each of the Debtors other than Aceto on the Effective Date, (e) authority for the name of Aceto Corporation to be changed to Tri Harbor Holdings Corporation without the necessity for any further order of the Bankruptcy Court or approval of any other Entity, (f) the application of Bankruptcy Rule 7068 to offers of judgment with respect to Disputed Claims, (g), the dissolution of any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee, (h) limitations with respect to post-Effective Date notices in the Chapter 11 Cases, (i) modifications and amendments to the Plan, (j) revocation or withdrawal of the Plan and the effect thereof, (k) requests for expedited determination of taxes under section 505 of the Bankruptcy Code, and (l) post-Effective Date service or delivery of pleadings, notices or other

documents required by the Plan to the Debtors or Liquidating Debtors, the Plan Administrator and the Oversight Committee.

## ARTICLE V

## VOTING REQUIREMENTS;
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    General

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### B.    Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing defaults and reinstating the Claims. Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### C.    Classes Impaired and Entitled to Vote Under the Plan

The following Classes are Impaired under the Plan and entitled to vote on the Plan:

| Class | Claim |
|---|---|
| 3A | General Unsecured Claims against Aceto Chemical Plus Debtors (including DPO Claim and Notes Claims) |

| 3B | General Unsecured Claims against Rising Pharma Debtors (including DPO Claim) |
|----|------------------------------------------------------------------|
| 3C | General Unsecured Claims against Arsynco |
| 3D | General Unsecured Claims against Acci Realty |

Acceptances of the Plan are being solicited only from Holders of Claims in Classes 3A, 3B, 3C and 3D under the Plan. Holders of Claims and Interests in Classes 4A, 4B, 5, 6A and 6B are deemed to reject the Plan and are not entitled to vote on the Plan. Holders of Claims in Classes 1 and 2 are Unimpaired and therefore presumed to accept the Plan and are not entitled to vote on the Plan.

**D.    Voting Procedures and Requirements**

**1.    Ballots**

The Solicitation Procedures Order sets [●], 2019, as the record date for voting on the Plan (the "Record Date"). Accordingly, only Holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement. If you are a Holder of a Claim in Classes 3A, 3B, 3C or 3D and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Voting Agent at (844) 216-7718 or at acetoballots@primeclerk.com.

**2.    Returning Ballots**

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, sign and return your Ballot, with original signature, in the enclosed envelope or via Prime Clerk's E-Balloting Portal.

TO BE COUNTED, YOUR BALLOT **WITH YOUR ORIGINAL** SIGNATURE (OR E-BALLOT WITH ELECTRONIC SIGNATURE) INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN **4:00 P.M. (EASTERN TIME) ON [●], 2019** (THE "**VOTING DEADLINE**").

**3.    Voting**

Pursuant to Bankruptcy Rules 2002(a)(7) and 3003(c)(2) and the Bar Date Order, any creditors whose claims are not the subject of a timely-filed proof of claim, or a proof of claim deemed timely filed pursuant to either the Bankruptcy Code or order of the Bankruptcy Court, and (a) are scheduled in the Debtors' Schedules as disputed, contingent or unliquidated; or (b) are not scheduled in the Debtors' Schedules, will be denied treatment as creditors with respect to such claims for purposes of voting on and receiving distributions under the Plan.

For purposes of voting, the amount of a Claim used to calculate acceptance or rejection of the Plan under section 1126 of the Bankruptcy Code will be determined in accordance with the criteria set forth in the Solicitation Procedures Order.

Pursuant to the Solicitation Procedures Order, the deadline for filing and serving any motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of claims for the purpose of accepting or rejecting the Plan is [●], 2019 at [●] [p].m. (Eastern Time).

## E.      Acceptance of Plan

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept the Plan, except under certain circumstances. *See* "Confirmation Without Necessary Acceptances; Cramdown" below. A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of those that vote in such class vote to accept the plan. Only those holders of claims who actually vote count in this determination. Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan is otherwise found by the court to be in the best interests of each holder of a claim or interest in such class. *See* "Best Interests Test" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code, which are discussed below.

## F.      Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may seek confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that the court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Here, because Classes 4A, 4B, 5, 6A and 6B are deemed to reject the Plan, and Classes 3A, 3B, 3C and 3D are entitled to vote on the Plan, the Debtors will seek Confirmation of the Plan from the Bankruptcy Court for any rejecting Class by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that the Plan satisfies such requirements.

### 1.      No Unfair Discrimination

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that under

the Plan all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

## 2.      Fair and Equitable Test

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class receive everything to which they are legally entitled or that classes junior in priority to the class receive nothing. The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests, which may be summarized as follows:

a.      *Secured Claims.* Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds is as provided in clause (i) or (ii) of this subparagraph.

b.      *Unsecured Claims.* Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims or interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such claims or interests.

c.      *Equity Interests.* Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such equity interest or (b) the value of the equity interest or (ii) the holders of equity interests that are junior to such equity interest will not receive or retain any property under the plan on account of such junior equity interests.

The Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

## A.      Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors remaining unliquidated assets if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee (who would require time to familiarize themselves with the Debtors' Estates, assets, Claims asserted, and related matters), all unpaid expenses incurred by the debtor in its Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

## B.    Liquidation Analysis

If these cases were to be converted to chapter 7 cases, the Debtors' Estates would incur the costs of payment of a statutorily allowed commission to the chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimately distribution to unsecured creditors. There would be a new bar date that would be 70 days following the date that the cases are converted to chapter 7. *See* Fed. R. Bankr. 1019(2); 3002. Therefore, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, reducing creditor recoveries compared to those currently contemplated under the Plan. The Debtors' Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during these Chapter 11 Cases (such as compensation for professionals) which are allowed in the chapter 7 cases. Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases. A hypothetical liquidation analysis will be filed with the Bankruptcy Court by no later than the Plan Supplement Filing Deadline.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties

and contingencies, many of which would be beyond the control of the Debtors. The liquidation analysis to be filed by the Debtors will be solely for the purpose of disclosing the effects of a hypothetical chapter 7 liquidation of the Debtors. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. Inasmuch as the Debtors are being liquidated and the Plan provides for the distribution of all of the proceeds of that liquidation to Holders of Allowed Claims and Interests, the Plan is effectively exempted from the feasibility requirement in accordance with the express terms of section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE VII

## EFFECT OF CONFIRMATION

## A.    Binding Effect of Confirmation

Pursuant to section 1141(a) of the Bankruptcy Code and except as otherwise provided therein, confirmation of the Plan will bind the Debtors and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan. Confirmation will have the effect of converting all Claims and Interests into rights to receive the treatment specified in the Plan.

## B.    Good Faith

Unless otherwise provided in the Confirmation Order, Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

## CERTAIN RISK FACTORS TO BE CONSIDERED

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are not contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

## A.   Certain Bankruptcy Considerations

### 1.   The Plan May Not Be Accepted

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, while the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

### 2.   The Plan May Not Be Confirmed

Even if the Holders of Claims who are entitled to vote accept the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting Holders of Claims or Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe the Plan meets such requirement, there can be no assurance the Bankruptcy Court will reach the same conclusion.

In the event that the Plan is not accepted by all impaired classes but is accepted by at least one impaired class of Claims, the Plan may be confirmed under cramdown provisions set forth in section 1129(b) of the Bankruptcy Code.  Although the Debtors believe the Plan meets such requirements, there can be no assurance the Bankruptcy Court will reach the same conclusion.

### 3.   Distributions to Holders of Allowed Claims Under the Plan

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 4.   Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other

Claims or Interests in such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any creditor for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors may, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity interest holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest in a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 5. Conditions Precedent to Consummation of the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be consummated.

### 6. Undue Delay in Confirmation May Result in Substantial Expenses

The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, creates a significant risk that the value of the Debtors' Estates would be eroded to the detriment of all stakeholders. If Confirmation does not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased Administrative Claims or Professional Claims, and similar expenses. Excessive delays or the

inability to confirm or consummate a plan may result in conversion of the Chapter 11 Cases to chapter 7 liquidations.

### 7.     Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date, there can be no assurance as to the timing of the Effective Date, or as to whether the Effective Date will, in fact, occur.

### 8.     Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

### B.     The Value of Retained Causes of Action Is Uncertain

The Causes of Action that will vest in the Liquidating Debtors and the Plan Administrator are inherently difficult to value, and any such Cause of Action may prove to have limited or zero value. In addition, litigating Causes of Action is a time consuming and expensive process. While the Debtors believe that the Causes of Action are valuable, the Debtors have not placed a specific value on any of the Causes of Action.

### C.     Financial Information Disclaimer

To the extent financial information is contained in this Disclosure Statement or any document filed in connection herewith (including the hypothetical liquidation analysis to be filed with the Bankruptcy Court by no later than the Plan Supplement Filing Deadline), such information is derived from the Debtors' books and records available at the time of preparation and has not been audited. Although the Debtors have used their reasonable business judgment to ensure the accuracy of any financial information provided in this Disclosure Statement, and while the Debtors believe that any such information fairly reflects, in all material respects, the financial condition and results of the Debtors as of the date or time period stated, the Debtors are unable to warrant or represent that such information is without inaccuracies.

### D.     Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan. Holders of Claims and Interests and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth below.

### E.     Other Risk Factors and Disclaimers

1. **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

2. **This Disclosure Statement May Contain Forward Looking Statements**

This Disclosure Statement may contain "forward looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," believe," "project," "plan," "intend," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Debtors undertake no obligation to update any forward-looking statements in this Disclosure Statement.

The hypothetical liquidation analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests, if applicable, may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds available for distribution or amount of Claims in the various Classes that might be allowed.

3. **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**

This Disclosure Statement is not legal, business or tax advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or financial advisor with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4. **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

5. **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

### 6. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 7. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement or other materials included in the solicitation package. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel for the Debtors and the United States Trustee.

## ARTICLE IX

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of implementation the Plan to the Debtors and certain Holders of Claims that are impaired under the Plan and that are entitled to vote to accept or reject the Plan. This discussion is intended for general information purposes only, and is not a complete analysis of all potential U.S. federal income tax consequences that may be relevant to the Debtors or any particular Holder.

The discussion of U.S. federal income tax consequences below is based on the U.S. Internal Revenue Code of 1986, as amended, (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and published positions of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect as of the date hereof, and all of which are subject to change or differing interpretations, possibly with retroactive effect.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim in light of its particular facts and circumstances, or to certain types of Holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, governmental entities and entities exercising

governmental authority, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction or other integrated transaction, Holders of Claims that are, or hold their Claims through, a partnership or other pass-through entity, persons that have a functional currency other than the U.S. dollar, dealers in securities or foreign currencies, employees of the Debtors, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, or persons subject to the alternative minimum tax). This discussion does not address any aspects of state, local, non-U.S. taxation or U.S. federal taxation other than income taxation, nor does it address the Foreign Account Tax Compliance Act. Furthermore, this discussion does not address the U.S. federal income tax consequences to Holders of Claims that are unimpaired under the Plan or Holders of Interests that are not entitled to vote on the Plan.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds Claims, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

The tax treatment of Holders of Claims and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder of the Claim in exchange for the Claim and whether the Holder of the Claim receives distributions under the Plan in more than one taxable year; (iii) whether the Holder of the Claim is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder of the Claim acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder of the Claim has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder of the Claim has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder of the Claim; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder of the Claim. Therefore, each Holder of a Claim should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of a Claim of the transactions contemplated by the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the Confirmation or implementation of the Plan as to any Holder of a Claim.

This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The discussion set forth below of certain U.S. federal income tax consequences of the Plan is not binding upon the IRS.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any discussed herein, resulting in U.S. federal income tax consequences to the Debtors and/or Holders of Claims or Interests that are substantially different from those discussed herein. The Debtors have not requested and do not expect to request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan, and no opinion is given by this Disclosure Statement.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON PARTICULAR CIRCUMSTANCES.**

A.      **Consequences to the Debtors**

Each of the Debtors is a member of an affiliated group of corporations that files a consolidated federal income tax returns with Aceto as the common parent (the "Tax Group") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group.  For U.S. federal income tax purposes, the Debtors anticipate that prior to the Effective Date, the Tax Group may have significant consolidated net operating losses ("NOLs").

As a result of the consummation of the transactions contemplated by the Plan, the Debtors may realize cancellation of indebtedness income ("CODI"). In general, absent an exception, a taxpayer will realize and recognize CODI upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. CODI is taxable as ordinary income. The amount of CODI, in general, is the excess of (i) the adjusted issue price of the indebtedness discharged, over (ii) the sum of (x) the issue price of any new indebtedness of the taxpayer issued, (y) the amount of cash paid, and (z) the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange. There are exceptions to the recognition of CODI. For example, a taxpayer is not required to include CODI in gross income if the taxpayer is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that case, as specifically defined for U.S. federal income tax purposes, at the time the CODI is triggered.  However, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—including NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets (but not below the amount of liabilities to which the debtor remains subject)—by the amount of any CODI incurred pursuant to a confirmed chapter 11 plan.  Any reduction in tax

attributes in respect of CODI incurred does not occur until the end of the taxable year after such attributes have been applied. As a result, any income incurred on the Effective Date in connection with the implementation of the Plan, or prior to the end of such taxable year, generally could be offset by any NOL carryforwards or current year NOLs of the Tax Group prior to any attribute reduction on account of any CODI incurred, but subject to any ownership change limitation.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," *i.e.*, economically accrued but unrecognized, as of the date of the ownership change) that may be utilized to offset future income generally are subject to an annual limitation. The Tax Group's ability to utilize its NOLs and certain other tax attributes could be subject to limitation if the Tax Group underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code after the commencement of the Chapter 11 Cases. Accordingly, the Debtors obtained a Bankruptcy Court order, effective as of February 21, 2019, imposing certain restrictions with respect to trading in Aceto stock (and the claiming of worthless stock deduction by any 50-percent shareholder of Aceto, within the meaning of section 382 of the Tax Code) so as to avoid such an ownership change. The Debtors believe that no such ownership change of the Tax Group for purposes of section 382 of the Tax Code has occurred to date and expect that no such ownership change will occur prior to the Effective Date.

To the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, it is unclear whether the implementation of the Plan would result in an ownership change of the Debtors. Such determination depends, in part, on the treatment of the Interests of Post-Effective Date Aceto as "stock" for purposes of section 382 of the Tax Code. To the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, the Debtors intend to treat the Interests of Post-Effective Date Aceto as "stock." There can be no assurance, however, that the IRS would not be successful if it sought to recharacterize the Interests of Post-Effective Date Aceto as not "stock" because, for example, it lacked certain voting rights of "stock". In that case, the NOLs available to Post-Effective Date Aceto could be subject to the annual limitation imposed by section 382 of the Tax Code.

The amount of any NOLs and other tax attributes, as well as the application of any limitations, remain subject to review and adjustment by the IRS.

The Debtors reserve their rights in all respects whether or not to file the Aceto Common Stock Non-Cancellation Election Notice and the inclusion of the above discussion should not be construed as an expression of the Debtors intentions in this regard.

## B.    Consequences to Holders of Certain Claims

1.    Gain or Loss

The U.S. federal income tax consequences to a Holder of a Claim receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim will depend on a number of factors,

including the nature of the Claim, the Holder's method of tax accounting, and the Holder's own particular tax situation.

Because the Claims and each Holder's tax situation differ, Holders of Claims should consult their own tax advisors to determine how the Plan affects them for U.S. federal, state, local, and non-U.S. tax purposes, based on their particular tax situations. Among other things, the U.S. federal income tax consequences of a payment to a Holder of a Claim may depend initially on the nature of the original transaction pursuant to which the Claim arose.

The U.S. federal income tax consequences of a transfer to a Holder of a Claim may also depend on whether the item to which the payment relates has previously been included in the gross income of the Holder or has previously been subject to a loss or a worthless security or bad debt deduction. For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a Holder's trade or business, the Holder had previously included the amount of such receivable payment in its gross income under its method of tax accounting, and had not previously claimed a loss or a worthless security or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the Holder of a Claim but may result in a loss. Conversely, if the Holder of a Claim had previously claimed a loss or worthless security or bad debt deduction with respect to the item previously included in income, the Holder generally would be required to include the amount of the payment in income.

A Holder of a Claim receiving a payment pursuant to the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (a) the amount of Cash, and (b) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. The character of any income or loss that is recognized will depend upon a number of factors, including the status of the Holder of a Claim, the nature of the Claim in the hands of the Holder, whether the Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Claim, and the Holder of a Claim's holding period of the Claim. Each Holder of a Claim should consult its own tax advisor to determine the character of any gain or loss recognized by such Holder of a Claim. Holders of Claims who were not previously required to include any accrued but unpaid interest on a Claim in their gross income may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan. Whether such losses qualify as ordinary losses under the Tax Code is unclear.  It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the distributions to such Holder are received.

2.    Market Discount

The market discount provisions of the Tax Code may apply to Holders of Claims. Generally, if a Holder of a Claim purchased the Claim at a price less than such Claim's principal amount, the difference would constitute "market discount" for federal income tax purposes. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original

issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. Any gain recognized by such a Holder on the receipt of Cash in respect of its Claim would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

3.      Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position that, for income tax purposes, such distribution shall be allocated to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest. No assurances can be made in this regard. If, contrary to the Debtors' intended position, such a distribution were treated as being allocated first to accrued but unpaid interest, a Holder of such an Allowed Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder otherwise realized a loss as a result of the Plan. Conversely, a Holder generally would recognize a deductible loss to the extent that any accrued interest was previously included in its gross income and was not paid in full. To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

## C.      Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims or Interests pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, a Holder of a Claim or Interest may be subject to "backup withholding" at the applicable rate. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against U.S. federal income tax liability, and a Holder of a Claim or Interest may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Each Holder of a Claim or Interest is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

## D.      Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Claim Holder's particular circumstances. Accordingly, Holders of Claims are urged to consult their tax advisors about the federal, state and local, and applicable foreign income and other tax consequences of the Plan.

**ARTICLE X**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (A) an alternative plan or plans of liquidation; or (B) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## A.    Alternative Plan of Liquidation

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases (if the Debtors' exclusive period in which to file a chapter 11 plan has expired) could propose a different plan or plans of liquidation.

## B.    Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee (or trustees) would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. A chapter 7 trustee, who would lack the Debtors' knowledge of their affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Debtors' estates. If a trustee is (or trustees are) appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims may receive distributions of a lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions. A liquidation under chapter 7 likely would result in smaller distributions made to creditors than that provided for in the Plan because of a number of factors, including, but not limited to: (i) additional Administrative Claims generated by conversion to a chapter 7 case, (ii) the administrative costs of liquidation, (iii) associated delays in connection with a chapter 7 liquidation, (iv) the low likelihood that recoveries on assets (including litigation assets) will be maximized in a chapter 7 case, and (v) additional Claims, some of which would be entitled to priority, which would be generated during the chapter 7 liquidation process.

## ARTICLE XI

### RECOMMENDATION AND CONCLUSION

[This Disclosure Statement was approved by the Bankruptcy Court on an interim basis after notice and a hearing. The Bankruptcy Court has determined, on an interim basis, that this Disclosure Statement contains information adequate to permit Holders of Claims to make an informed judgment about the Plan. Such approval, however, does not mean that the Bankruptcy Court recommends either acceptance or rejection of the Plan.  In addition, approval of this Disclosure Statement on a final basis will not be considered by the Bankruptcy Court until the Confirmation Hearing.]

The Debtors believe that Confirmation and consummation of the Plan is in the best interests of the Debtors, their Estates and their creditors. The Plan provides for an equitable distribution to creditors. The Debtors believe that any alternative to Confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes. Consequently, the Debtors urge all eligible Holders of Impaired Claims to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before the Voting Deadline.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 17, 2019

Respectfully submitted,

ACETO CORPORATION, on
behalf of itself and its affiliated Debtors

*/s/ Steven S. Rogers*
Name:  Steven S. Rogers
Title:  Chief Legal Officer and Secretary

## Exhibit A

**Joint Plan of Liquidation of Aceto Corporation
and Its Affiliated Debtors**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| ACETO CORPORATION, *et al.*, | Case No. 19-13448 (VFP) |
| Debtors.[1] | Jointly Administered |

## JOINT PLAN OF LIQUIDATION OF ACETO CORPORATION
## AND ITS AFFILIATED DEBTORS

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Michael S. Etkin, Esq.
Wojciech F. Jung, Esq.
Philip J. Gross, Esq.
Michael Savetsky, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068

*Counsel for Debtors and Debtors-in-Possession*

Dated: June 17, 2019

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Tri Harbor Chemical Holdings LLC (*f/k/a* Aceto Agricultural Chemicals LLC, *f/k/a* Aceto Agricultural Chemicals Corporation) (3948); Tri Harbor Realty LLC (*f/k/a* Aceto Realty LLC) (7634); Kavod Pharmaceuticals LLC (*f/k/a* Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.) (7959); Kavod Health LLC (*f/k/a* Rising Health, LLC) (1562); Kavris Health LLC (*f/k/a* Acetris Health, LLC) (3236); KAVACK Pharmaceuticals LLC (*f/k/a* PACK Pharmaceuticals, LLC) (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................... 1

ARTICLE I    DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION
             OF TIME ................................................................................................................1

ARTICLE II   ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ...................... 21

Section 2.01.   Administrative Claims ......................................................................................21
Section 2.02.   Professional Claims .........................................................................................21
Section 2.03.   Priority Tax Claims ..........................................................................................22

ARTICLE III  CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
             INTERESTS ........................................................................................................23

Section 3.01.   Classification of Claims and Interests ..............................................................23
Section 3.02.   Treatment and Voting of Claims and Interests .................................................24

ARTICLE IV   ACCEPTANCE ..................................................................................................29

Section 4.01.   Classes Entitled to Vote ...................................................................................29
Section 4.02.   Acceptance by Impaired Classes ......................................................................30
Section 4.03.   Elimination of Classes .....................................................................................30
Section 4.04.   Deemed Acceptance if No Votes Cast ..............................................................30
Section 4.05.   Cramdown ........................................................................................................30

ARTICLE V    MEANS OF IMPLEMENTATION OF THE PLAN ...........................................30

Section 5.01.   Partial Substantive Consolidation ....................................................................30
Section 5.02.   Post-Effective Date Governance and Dissolution of Debtors ............................32
Section 5.03.   Causes of Action ..............................................................................................33
Section 5.04.   Plan Settlement and General Settlement of Claims and Interests .......................33
Section 5.05.   Plan Funding ....................................................................................................34
Section 5.06.   Certificate of Incorporation and By-laws ..........................................................34
Section 5.07.   Cancellation of Certain Instruments and Agreements .......................................34
Section 5.08.   Compliance with the Asset Purchase Agreements..............................................35
Section 5.09.   The Plan Administrator .....................................................................................35
Section 5.10.   Distributions to Holders of General Unsecured Claims ......................................39
Section 5.11.   Accounts and Reserves .....................................................................................39
Section 5.12.   Exemption from Certain Transfer Taxes ...........................................................42
Section 5.13.   Preservation of Causes of Action......................................................................42
Section 5.14.   Oversight Committee ........................................................................................43
Section 5.15.   Insured Claims .................................................................................................45
Section 5.16.   Preservation of Privilege and Defenses ............................................................45
Section 5.17.   Books and Records ...........................................................................................45

ARTICLE VI  UNEXPIRED LEASES AND EXECUTORY CONTRACTS.............................46

Section 6.01.  Executory Contracts and Unexpired Leases to Be Rejected..................46
Section 6.02.  Executory Contracts to Be Assumed ................................................47
Section 6.03.  General Reservation of Rights ........................................................49
Section 6.04.  Insurance Contracts......................................................................50

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS .51

Section 7.01.  Determination of Claims and Interests .............................................51
Section 7.02.  Claims Administration Responsibility................................................51
Section 7.03.  Objections to Claims....................................................................51
Section 7.04.  Disallowance of Claims .................................................................52
Section 7.05.  Estimation of Claims.....................................................................52
Section 7.06.  No Interest on Disputed Claims .......................................................53
Section 7.07.  Amendments to Claims..................................................................53

ARTICLE VIII          PROVISIONS GOVERNING DISTRIBUTIONS ....................................53

Section 8.01.  Timing of Distributions for Allowed Claims........................................53
Section 8.02.  Currency....................................................................................53
Section 8.03.  Distribution Agent .......................................................................53
Section 8.04.  Claims Administered by Servicers....................................................54
Section 8.05.  Distributions on Claims Allowed After the Effective Date ....................54
Section 8.06.  Delivery of Distributions ...............................................................55
Section 8.07.  Surrender of Securities or Instruments .............................................57
Section 8.08.  Compliance Matters......................................................................57
Section 8.09.  Claims Paid or Payable by Third Parties ...........................................58
Section 8.10.  Setoffs ......................................................................................58
Section 8.11.  Allocation of Plan Distributions Between Principal and Interest ..............58
Section 8.12.  DPO Claim Recovery and Distribution Matters ..................................58
Section 8.13.  Distributions (if any) to Holders of Allowed Interests in Aceto............59

ARTICLE IX  EFFECT OF PLAN ON CLAIMS AND INTERESTS.......................................60

Section 9.01.  Vesting of Assets .........................................................................60
Section 9.02.  [RESERVED] ..............................................................................60
Section 9.03.  Compromise and Settlement ..........................................................60
Section 9.04.  Debtor Release ............................................................................60
Section 9.05.  Third Party Release......................................................................61
Section 9.06.  Exculpation and Limitation of Liability ............................................62
Section 9.07.  [RESERVED] ..............................................................................63
Section 9.08.  Limitation on Securities Claims and Enforcement of Judgments............63
Section 9.09.  Injunction ..................................................................................64
Section 9.10.  Subordination Rights ....................................................................65
Section 9.11.  Protection Against Discriminatory Treatment ....................................65
Section 9.12.  Release of Liens...........................................................................65

Section 9.13.  Reimbursement or Contribution ...........................................................................66
Section 9.14.  Limitations on Indemnification Claims ................................................................66

ARTICLE X   CONDITIONS PRECEDENT ............................................................................66

Section 10.01. Conditions Precedent to the Effective Date of the Plan.......................................66
Section 10.02. Waiver of Conditions Precedent ..........................................................................67
Section 10.03. Notice of Effective Date .......................................................................................67
Section 10.04. Effect of Non-Occurrence of Conditions to Consummation ................................67

ARTICLE XI  BANKRUPTCY COURT JURISDICTION.........................................................67

Section 11.01. Retention of Jurisdiction ......................................................................................67

ARTICLE XII MISCELLANEOUS PROVISIONS.....................................................................69

Section 12.01. Binding Effect.......................................................................................................69
Section 12.02. Payment of Statutory Fees ...................................................................................70
Section 12.03. Closing of Certain Debtor Cases Upon the Effective Date...................................70
Section 12.04. Authorization for Name Change ...........................................................................70
Section 12.05. Application of Bankruptcy Rule 7068 ..................................................................71
Section 12.06. Statutory Committee Dissolution..........................................................................71
Section 12.07. Post Effective Date Limitation of Notice...............................................................71
Section 12.08. Modification and Amendment ...............................................................................71
Section 12.09. Confirmation of Plan.............................................................................................72
Section 12.10. Additional Documents ..........................................................................................72
Section 12.11. Revocation, Withdrawal, Non-Consummation......................................................72
Section 12.12. Post-Confirmation Reporting................................................................................72
Section 12.13. Substantial Consummation of the Plan ................................................................73
Section 12.14. Substitution of the Liquidating Debtors for the Debtors ......................................73
Section 12.15. Request for Expedited Determination of Taxes.....................................................73
Section 12.16. Notices .................................................................................................................73
Section 12.17. Term of Injunctions or Stays.................................................................................74
Section 12.18. Governing Law .....................................................................................................74
Section 12.19. Immediate Binding Effect.....................................................................................74
Section 12.20. Entire Agreement .................................................................................................74
Section 12.21. Severability ..........................................................................................................74
Section 12.22. No Waiver or Estoppel..........................................................................................75
Section 12.23. Conflicts...............................................................................................................75

## INTRODUCTION

Aceto Corporation and its affiliated debtors in the above-captioned chapter 11 cases jointly propose this chapter 11 plan of liquidation.  The Plan is proposed jointly for administrative purposes, and provides for the treatment of all Claims against and Interests in the Debtors.  The Plan constitutes a separate Plan for each Debtor, provided that as set forth in further detail below, and in order to give effect to the Plan's comprehensive compromise and settlement structure pursuant to Bankruptcy Rule 9019 and section 1123(b) of the Bankruptcy Code, for purposes of distributions and recoveries to general unsecured creditors, the Plan provides for partial substantive consolidation of certain of the Debtors' estates,  specifically the Aceto Chemical Plus Debtors (which consist of Debtors Aceto, Aceto Agri, and Aceto Realty) and the Rising Pharma Debtors (which consist of Debtors Rising, Rising Health, Acetris, and PACK).  Claims against the remaining Debtors, namely Arsynco and Acci Realty, are separately classified and these estates are not substantively consolidated with either the Aceto Chemical Plus Debtors or the Rising Pharma Debtors.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A hereof or the Bankruptcy Code or Bankruptcy Rules.  Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, and operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A.    Defined Terms.

As used in this Plan, capitalized terms have the meanings set forth below.

**1.01**    **"Acci Realty"** means Acci Realty Corp.

**1.02**    "**Acci Realty Net Distributable Assets**" means, with respect to Acci Realty, and as allocated pursuant to the Distribution Calculation, all of the Cash held by Acci Realty on each Distribution Date, including but not limited to any Cash in any bank accounts of Acci Realty as shall be increased by any Litigation and Other Recoveries allocable to Acci Realty.

**1.03**    **"Aceto"** means Aceto Corporation.

**1.04**    **"Aceto Agri"** means Tri Harbor Chemical Holdings LLC (f/k/a Aceto Agricultural Chemicals LLC, f/k/a Aceto Agricultural Chemicals Corporation).

**1.05**    **"Aceto Chemical Plus Debtors"** mean Debtors Aceto, Aceto Agri, and Aceto Realty.

**1.06**    "**Aceto Common Stock**" means shares of common stock of Aceto that are authorized, issued, and outstanding prior to the Effective Date.

**1.07**    "**Aceto Common Stock Non-Cancellation Election Notice**" means a

notice which, to be effective, shall be filed by the Debtors in the Chapter 11 Cases on or before the Effective Date stating that the Debtors elect and intend to have the Interests in Aceto, including the Aceto Common Stock, continue to exist and remain outstanding on and after the Effective Date and not automatically cancelled, released, and extinguished as of the Effective Date without further action by the Debtors or the Plan Administrator, and without further distribution to such Holders of Aceto Common Stock subject to Section 3.02(j) below.  For the avoidance of doubt, notwithstanding anything herein to the contrary, to the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, each Holder of Interests in Aceto, including the Aceto Common Stock, as of the Distribution Record Date, shall be entitled to retain such Interests in Aceto, and Post-Effective Date Aceto shall not be immediately dissolved or otherwise liquidated for U.S. federal income tax purposes and shall remain in existence until such time as the Plan Administrator determines otherwise.

1.08    **"Aceto Interest Distribution Value"** means, solely for the purposes of calculating distributions under the Plan, if any, the aggregate value of all Interests in Aceto outstanding as of February 19, 2019, which amount shall be the product of: (a) $1.03, which is equal to the price of Interests in Aceto at the close of trading on the Nasdaq Stock Market ("Nasdaq") on February 19, 2019 and as listed by Nasdaq at https://www.nasdaq.com/symbol/acetq/historical; and (b) 30,839,470 which is equal to the total approximate number of shares in Aceto outstanding as of the close of business on February 19, 2019.

1.09    "**Aceto Net Distributable Assets**" means, with respect to the Aceto Chemical Plus Debtors, and as allocated pursuant to the Distribution Calculation, all of the Cash held by the Aceto Chemical Plus Debtors' Estates on each Distribution Date, including but not limited to the net Cash proceeds from the Chemical Plus Sale, the net Cash proceeds to be received from the wind-down and dissolution of Canegrass LLC ("Canegrass"), the Chemical Plus Sale Adjustment Escrow Released Amount, and any other Cash in the bank accounts of the Aceto Chemical Plus Debtors and as shall be increased by any Litigation and Other Recoveries allocable to the Aceto Chemical Plus Debtors; provided, however, that the Aceto Net Distributable Assets shall be reduced by the amounts used to fund (as allocated pursuant to the Distribution Calculation) the Professional Claims Reserve, the Administrative and Priority Claims Reserve, the Wind-Down Reserve, and the Settlement Distribution Subsidy; provided further, that any Excess Amounts included in or attributable to the Settlement Distribution Subsidy shall be deemed Aceto Net Distributable Assets and made available for distributions to holders of General Unsecured Claims against the Aceto Chemical Plus Debtor.

1.10    **"Aceto Realty"** means Tri Harbor Realty LLC (f/k/a Aceto Realty LLC).

1.11    **"Acetris"** means Kavris Health LLC (f/k/a Acetris Health, LLC).

1.12    "**Administrative and Priority Claims Estimate**" means the amount reasonably estimated by the Debtors (determined by no later than the Effective Date), in consultation with the Creditors' Committee, of all unpaid Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims other than Professional Claims which shall be subject to and paid from the Professional Claims Reserve.

**1.13** "**Administrative and Priority Claims Reserve**" means the reserve of Cash funded by the Debtors on the Effective Date, in an amount equal to the Administrative and Priority Claims Estimate, for the benefit of Holders of unpaid Allowed Administrative Claims (other than Holders of Professional Claims which shall be subject to and paid from the Professional Claims Reserve), Allowed Priority Tax Claims and Allowed Other Priority Claims.

**1.14** "**Administrative and Priority Claims Schedule**" has the meaning set forth in Section 5.11(b) of the Plan.

**1.15** "**Administrative Claim**" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) Professional Claims; (c) Section 503(b)(9) Claims; and (d) all fees and charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code.

**1.16** "**Administrative Claim Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to (a) Professional Claims, (b) Administrative Claims Allowed by a Final Order of the Bankruptcy Court on or before the Effective Date, (c) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid, (d) Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code (which Claims are subject to the June 19, 2019 deadline as established by the Bar Date Order), or (e) Administrative Claims arising under chapter 123 of title 28 of the United States Code.

**1.17** "**Administrative Claim Request Form**" means the form to be included in the Plan Supplement for submitting Administrative Claim requests.

**1.18** "**Administrative Claims Protocol**" has the meaning set forth in Section 5.11(b) of the Plan.

**1.19** "**Affiliates**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

**1.20** "**Allowed**" means (a) any Claim against the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009 (and upon prior notice to the Creditors' Committee or the Oversight Committee, as applicable) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any Claim included in a timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with this Plan or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the

extent such Final Order is in favor of the respective Holder, (c) any Claim expressly allowed by the Plan, or (d) any Claim expressly allowed by a Final Order.

     **1.21** **"Arsynco"** means Arsynco, Inc.

     **1.22** **"Arsynco Carlstadt Property"** means that certain real property owned by Arsynco and located at the Foot of 13th Street, Carlstadt, New Jersey 07072, which real property was formerly operated by Arsynco as a chemicals manufacturing plant until the site was closed in 1993.

     **1.23** **"Arsynco Net Distributable Assets"** means, with respect to Arsynco, and as allocated pursuant to the Distribution Calculation, all of the Cash held by Arsynco on each Distribution Date, including but not limited to the net Cash proceeds and other assets (including collateralized letters of credit) realized from any sale with respect to the Arsynco Carlstadt Property, and any other Cash in the bank accounts of Arsynco as shall be increased by any Litigation and Other Recoveries allocable to Arsynco.

     **1.24** **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time and in effect during the pendency of these Chapter 11 Cases.

     **1.25** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Cases (or, in the event such court does not have or ceases to exercise jurisdiction over the Chapter 11 Cases, such other court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases).

     **1.26** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

     **1.27** **"Bar Date"** means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of Claim in the Chapter 11 Cases.

     **1.28** **"Bar Date Order"** means the order by the Bankruptcy Court, dated May 9, 2019 entered at Docket No. 509 in the Chapter 11 Cases, which established the Bar Date, and any subsequent order supplementing such order or relating thereto.

     **1.29** **"Business Day"** means any day, excluding Saturdays, Sundays, and "**legal holidays**" (as defined in Bankruptcy Rule 9006(a)).

     **1.30** **"Cash"** means legal tender of the United States of America.

     **1.31** **"Causes of Action"** means any action, claim, cause of action, controversy, including but not limited to those identified in the Plan Supplement, third-party claim, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured,

assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including but not limited to any Claim to avoid a transfer of property or an obligation incurred by any of the Debtors, including pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, or under similar or related state or federal statutes, common law and foreign law fraudulent transfer or similar claims); and (d) any claim or defense including fraud, mistake, duress, and usury, and any other defense set forth in section 558 of the Bankruptcy Code.  For the avoidance of doubt, Causes of Action shall not include (a) any Causes of Action pursuant to chapter 5 of the Bankruptcy Code transferred to the Chemical Plus Buyer pursuant to the Chemical Plus Purchase Agreement or (b) any Causes of Action released under this Plan.

      **1.32** **"Carve Out Account"** means an account held and maintained by Lowenstein Sandler LLP and established and funded, in connection with the closing of the Pharma Sale and Chemical Plus Sale and pursuant to paragraph 39 of the Final DIP Order, for the purpose of, *inter alia*, paying Allowed Professional Claims of Professionals retained by the Debtors and the Creditors' Committee.

      **1.33** **"Certificate"** means any instrument evidencing a Claim or an Interest.

      **1.34** **"Chapter 11 Cases"** means the chapter 11 cases of the Debtors pending in the Bankruptcy Court and being jointly administered under Case No. 19-13448.

      **1.35** **"Chemical Plus Purchase Agreement"** means that certain Amended and Restated Asset Purchase Agreement, dated as of April 14, 2019 attached as Exhibit 1 to the Chemical Plus Sale Order (together with the schedules and/or exhibits thereto and all related documents, and as may be amended, supplemented or otherwise modified from time to time in accordance with paragraph 40 of the Chemical Plus Sale Order) by and among Aceto, Aceto Agri and Aceto Realty LLC and Aceto Holdings, L.P. (f/k/a NMC Atlas, L.P., and together with its subsidiaries and permitted assignees under the Purchase Agreement, the "Chemical Plus Buyer").

      **1.36** **"Chemical Plus Sale"** means the sale of substantially all of the Chemical Plus Business (as defined in the Chemical Plus Sale Motion) as authorized pursuant to the Chemical Plus Sale Order and which sale closed on April 29, 2019.

      **1.37** **"Chemical Plus Sale Adjustment Escrow Released Amount"** means an amount of Cash of up to $10,000,000 to be released to Aceto from the Adjustment Escrow (as defined in the Chemical Plus Purchase Agreement) by Escrow Agent (as defined in the Chemical Plus Purchase Agreement) pursuant to and in accordance with section 2.4 of the Chemical Plus Purchase Agreement.

      **1.38** **"Chemical Plus Sale Motion"** means the *Debtors' Motion for Orders (I) (A) Authorizing and Approving Bidding Procedures in Connection with the Sale of Substantially*

*all Assets Comprising the Debtors' Pharma Business; (B) Authorizing and Approving Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Scheduling a Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors Pharma Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* filed by the Debtors in the Chapter 11 Cases at Docket No. 109.

   **1.39**  "**Chemical Plus Sale Order**" means the *Order (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors' Pharma Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* entered by the Court on April 10, 2019 in the Chapter 11 Cases at Docket No. 372 granting the Pharma Sale Motion

   **1.40**  "**Claim**" means a "**claim**" against the Debtors, as defined in section 101(5) of the Bankruptcy Code.

   **1.41**  "**Claims and Solicitation Agent**" means Prime Clerk LLC, or any successor thereto.

   **1.42**  "**Claims Objection Deadline**" means the later of (a) (i) as to Rejection Damages Claims, the first Business Day that is at least 180 days after such Rejection Damages Claim is timely filed pursuant to Section 6.01(b) of the Plan; (ii) as to late-filed proofs of Claim, the first Business Day that is at least 60 days after a Final Order is entered deeming the late-filed Claim timely filed; and (iii) as to all other Claims the first Business Day that is at least 180 days after the Effective Date; or (b) such later date as may be established by the Bankruptcy Court by motion of the Plan Administrator, which deadline shall be automatically extended upon the filing of such a motion until such time as the Bankruptcy Court enters an order on such motion.  The requirements of D.N.J. LBR 3007-1(b) are waived.

   **1.43**  "**Class**" means a category of Claims or Interests classified together under this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

   **1.44**  "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, on the docket of the Chapter 11 Cases.

   **1.45**  "**Confirmation Date**" means the date on which Confirmation occurs.

   **1.46**  "**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

   **1.47**  "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code which shall be in form and substance acceptable to the Debtors (in consultation with the Creditors' Committee).

**1.48** "**Creditors' Committee**" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102(a)(1) of the Bankruptcy Code, as may be constituted from time to time.

**1.49** "**Cure Amount**" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (ii) permit the Debtors to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

**1.50** "**Cure Notice**" means the notice of proposed Cure Amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Section 6.02(d) of the Plan.

**1.51** "**Cure Objection Deadline**" means the deadline for filing objections to a Cure Notice or proposed Cure Amount, which shall be on or before 14 days after the applicable counterparty was served with a Cure Notice.

**1.52** "**D&O Insurer**" means any insurance company that issued a D&O Policy, including Travelers Casualty & Surety Company of America, Illinois National Insurance Company, Wesco Insurance Company, XL Specialty Insurance Company, State National Insurance Company, RSUI Indemnity Company, and Continental Casualty Company.

**1.53** "**D&O Policies**" means, collectively, all unexpired directors' and officers' liability insurance policies (including any tail policy) issued to any of the Debtors covering potential liability of directors, officers and/or employees of the Debtors, including, for the avoidance of doubt, those policies listed on **Exhibit A** to the Plan.

**1.54** "**Debtor Release**" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Section 9.04 of the Plan.

**1.55** "**Debtors**" mean, collectively, Aceto, Aceto Agri, Aceto Realty, Acci Realty, Arsynco, Rising, Rising Health, PACK, and Acetris.

**1.56** "**Disallowed**" means, with respect to any Claim, or any portion thereof, that such Claim, or such portion thereof, is not Allowed.

**1.57** "**Disclosure Statement**" means the disclosure statement for this Plan, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, which is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law, which shall be in form and substance acceptable to the Debtors (in consultation with the Creditors' Committee).

**1.58** "**Disclosure Statement Order**" means the Final Order entered by the Bankruptcy Court approving the Disclosure Statement, which shall be in form and substance acceptable to the Debtors (in consultation with the Creditors' Committee).

        1.59    "**Disputed**" means any Claim, or any portion thereof, that is not yet Allowed or Disallowed.

        1.60    "**Dissolution Date**" means the date that the Liquidating Debtors, or any of them, dissolve.

        1.61    "**Distribution Agent**" means the Plan Administrator; *provided, however*, that the Debtors, or the Plan Administrator, as applicable, may, in its discretion, retain a third party to act as Distribution Agent.

        1.62    "**Distribution Calculation**" means the allocation to the relevant Debtors' Estates of certain assets (including but not limited to remaining proceeds from the Sales and other Cash available to the Debtors' Estates (including any net Litigation and Other Recoveries)) and certain liabilities and obligations (including Administrative Claims, Priority Claims and the Wind-Down Budget), as set forth for illustrative purposes in the Plan Supplement.

        1.63    "**Distribution Date**" means each of the Initial Distribution Date and Periodic Distribution Date(s), as applicable.

        1.64    "**Distribution Record Date**" means the record date for purposes of making distributions under the Plan, which date shall be the Confirmation Date; *provided* that the Distribution Record Date shall be the Effective Date with respect to Noteholders that hold Notes and whose distributions will be effectuated through the Notes Indenture Trustee and Depository Trust Company.

        1.65    "**DPO Claim**" means the DPO Claims (as defined in the Mutual Release Agreement) held by certain of the Released Sellers (as defined in the Mutual Release Agreement), which DPO Claims are Allowed as General Unsecured Claims in an aggregate amount equal to and not more than $30,000,000 (subject to the other distribution limitations set forth in the Mutual Release Agreement) and which Allowed Claims shall be classified in and receive recoveries from Class 3A (General Unsecured Claims Against the Aceto Chemical Plus Debtors) and Class 3B (General Unsecured Claims Against the Rising Pharma Debtors), subject to and in accordance with Sections 3.02 and 8.12.

        1.66    "**Effective Date**" means the first Business Day on which (i) all conditions precedent to the effectiveness of this Plan set forth in Section 10.01 of the Plan have been satisfied or waived in accordance with the terms of this Plan and (ii) no stay of the Confirmation Order is in effect.

        1.67    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

        1.68    "**Estates**" means the bankruptcy estates of each of the Debtors created under section 541 of the Bankruptcy Code.

        1.69    "**Exculpated Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors; (b) the Liquidating Debtors; (c) the Debtors'

current officers, directors, and managers (or any of the Debtors' officers, directors and managers that served as such during or immediately prior to the Chapter 11 Cases); (d) the Creditors' Committee and each of its current and former members, but solely in their capacities as such; and (e) with respect to each of the foregoing entities in clauses (a) through (d), such Entity's and its current and former Affiliates' subsidiaries, divisions, managed accounts or funds, and each of their respective current and former equity holders, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; *provided* that Holders of Interests in Aceto shall not be Exculpated Parties solely on account of such Interests, *provided, further*, that for the avoidance of doubt, any party against whom the Debtors or the Plan Administrator, as the case may be, have filed a Cause of Action before, on, or after the Effective Date shall not be an Exculpated Party with respect to such Cause of Action to the extent such Cause of Action asserts claims based upon events or actions that occurred prior to the Petition Date.

1.70 "**Executory Contract**" means any contract to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.71 "**Federal Judgment Rate**" means the federal judgment rate (which is based on based on the average prices for U.S. Government Securities - Treasury Constant Maturities -1- Year) of 2.55% as in effect on the Petition Date, compounded annually.

1.72 "**Final DIP Order**" means the *Final Order (I) Authorizing Debtor in Petition Financing Pursuant to 11 U.S.C. §§ 105(a), 362 and 364(c) and (d); (II) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (III) Granting Adequate Protection Pursuant to 11 U.S.C. § 361 and 363; (IV) Granting Liens and Superpriority Administrative Claims Pursuant to 11 U.S.C. § 364; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* entered by the Bankruptcy Court on March 15, 2019 at Docket No. 141.

1.73 "**Final Decree**" means a final decree entered by the Bankruptcy Court closing the Chapter 11 Cases pursuant to Bankruptcy Rule 3022.

1.74 "**Final Order**" means an order, the operation or effect of which has not been stayed, reversed, or amended and as to which order the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by all Entities possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which reargument or rehearing was sought or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

**1.75** "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Subordinated Claim, or Intercompany Claim. Without limiting the foregoing, General Unsecured Claims include (a) Rejection Damages Claims, (b) Reclamation Claims (if any) that are not Allowed Section 503(b)(9) Claims, (c) Notes Claims, and (d) the DPO Claim.

**1.76** "**Governmental Bar Date**" means August 19, 2019 at 5:00 p.m. (Prevailing Eastern Time).

**1.77** "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

**1.78** "**GUC Claims Reserve**" means one or more reserves of Cash funded by the Distribution Agent on each Distribution Date in an amount equal to the GUC Claims Reserve Amount and maintained by the Distribution Agent, in each case, for the benefit of (i) Holders of Disputed General Unsecured Claims that subsequently become Allowed General Unsecured Claims, or (ii) the DPO Claim, to the extent distributions of greater than 65% are being made or proposed to be made to any Holders of Allowed General Unsecured Claims (other than the DPO Claim) in Classes 3A, 3B, 3C, or 3D prior to the satisfaction of the Other Creditors' Threshold (as defined in Section 8.12 below); provided that the Distribution Agent may, in its discretion (after consultation with the Creditors' Committee or Oversight Committee (to the extent not disbanded pursuant to Section 5.14), as applicable) establish separate GUC Claims Reserves or sub-accounts within such reserves with respect to Holders of Disputed General Unsecured Claims in each of Classes 3A, 3B, 3C and 3D and/or the DPO Claim which Claim is Allowed in Classes 3A and 3B.

**1.79** "**GUC Claims Reserve Amount**" means, as applicable, Cash equal to the aggregate Pro Rata Share that would be distributable to (A) Holders of Disputed General Unsecured Claims in accordance with Section 3.02 (i) if such Claims were Allowed Claims on the Effective Date in the full amount asserted, or (ii) if any such Claim has been estimated or otherwise Provisionally Allowed by the Bankruptcy Court, in such estimated or Provisionally Allowed amount, whichever is less; or (B) the DPO Claim if and to the extent that the Other Creditors' Threshold (as defined in Section 8.12 below) is ultimately satisfied, in each case as reasonably estimated by the Debtors or the Plan Administrator and which estimate shall be provided on five (5) days' notice to the Creditors' Committee or Oversight Committee, as applicable.

**1.80** "**Holdback Amount**" means the sum of the aggregate amounts withheld by the Debtors as of the Effective Date as a holdback on payment of Professional Claims pursuant to the Interim Compensation Order.

**1.81** "**Holder**" means a holder of a Claim against or Interest in the Debtors.

**1.82** "**Impaired**" means "**impaired**", as defined in section 1124 of the Bankruptcy Code.

**1.83** "**Indemnification Obligations**" means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an

Indemnitee pursuant to the Debtors' certificates of incorporation or functional equivalents thereof, as applicable, bylaws or functional equivalents thereof, as applicable, policies of providing employee indemnification, applicable law, or specific agreements in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors.

1.84    "**Indemnified Parties**" shall have the meaning ascribed to such term in Section 5.09(e) of the Plan.

1.85    "**Indemnitee**" means all directors, officers, or employees of the Debtors who are entitled to assert Indemnification Obligations.

1.86    "**Initial Distribution Date**" means the date on which the Distribution Agent makes an initial distribution to Holders of Allowed Claims, which date shall occur as soon as reasonably practicable but in no event later than forty-five (45) calendar days after the Effective Date.

1.87    "**Insurance Contract**" means all insurance policies that have been issued at any time to or provide coverage to any of the Debtors, and all agreements, documents or instruments relating thereto, including, without limitation, D&O Policies and any other insurance policies issued at any time providing directors and officers coverage to the Debtors.

1.88    "**Insurer**" means any company or other entity that issued an Insurance Contract, any third party administrator, and any respective predecessors and/or affiliates thereof, including, without limitation, the D&O Insurers.

1.89    "**Intercompany Claim**" means a Claim held by a Debtor against another Debtor.

1.90    "**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor or direct or indirect subsidiary of a Debtor, including all shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent ownership interest in any Debtor or any direct or indirect subsidiary of a Debtor, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor or direct or indirect subsidiary of a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

1.91    "**Interim Compensation Order**" means the *Administrative Fee Order Establishing Certain Procedures for Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of this Court and Reimbursement of Expenses by Committee Members* entered by the Bankruptcy Court on March 22, 2019 at Docket No. 205 in the Chapter 11 Cases, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

1.92    "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.93** "**Liquidating Debtors**" means the Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

**1.94** "**Litigation and Other Recoveries**" mean net recoveries from any Causes of Action or other asset disposition(s) and/or receipt(s) of additional Cash at any Estates, as may be allocated pursuant to the Distribution Calculation.

**1.95** "**Mutual Release Agreement**" means that certain Amended and Restated Mutual Release of Claims agreement dated as of March 31, 2019 by and among the Debtors and the Released Sellers (as defined in the Mutual Release Agreement), which agreement is annexed as Exhibit 1 to the Mutual Release Approval Order.

**1.96** "**Mutual Release Approval Order**" means the *Order (I) Approving Mutual Release of Claims by and Between the Releasing Debtors and the Stalking Horse Bidder Released Parties Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and in Furtherance of the Section 363 Sale of the Debtors' Pharma Business; and (II) Granting Related Relief* entered by the Bankruptcy Court on April 10, 2019 in the Chapter 11 Cases at Docket No. 373.

**1.97** "**Noteholders**" means the Holders of Notes Claims.

**1.98** "**Notes**" mean the unsecured 2.00% Convertible Senior Notes due November 2020 and issued by Aceto.

**1.99** "**Notes Claim**" means any and all Claims of a Holder of Notes arising under, derived from or based upon the Notes or the Notes Indenture, including principal (in the amount of $143,750,000), *plus* accrued but unpaid interest as of the Petition Date in the amount of $862,500, *plus* reasonable costs and fees due and owing through the Petition Date, which Claims shall be Allowed as General Unsecured Claims and which Allowed Notes Claims shall be classified and receive recoveries in Class 3A (General Unsecured Claims Against the Aceto Chemical Plus Debtors).

**1.100** "**Notes Indenture**" means that certain Indenture, dated as of November 16, 2015, among Aceto and Wilmington Trust, National Association, as successor indenture trustee, as may be amended from time to time.

**1.101** "**Notes Indenture Trustee**" means Wilmington Trust, National Association, in its capacity as the successor indenture trustee for the Notes under the Notes Indenture.

**1.102** "**OC Indemnified Parties**" has the meaning ascribed to such term in Section 5.14 of the Plan.

**1.103** "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority of payment as set forth in section 507(a) of the Bankruptcy Code.

**1.104** "**Other Secured Claim**" means a Claim, to the extent it is unpaid as of the Effective Date and (i) secured by a Lien on property of a Debtor's Estate, which Lien is valid, perfected and enforceable pursuant to applicable law or by a Final Order, to the extent of the value of the applicable creditor's interest in such Estate's interest such property, or (ii) secured by the amount of any rights of setoff of the Holder thereof under section 553 of the Bankruptcy Code, in each case, as determined pursuant to section 506(a) of the Bankruptcy Code.

**1.105** "**Oversight Committee**" has the meaning ascribed to such term in Section 5.14 of the Plan.

**1.106** "**PACK**" means KAVACK Pharmaceuticals LLC (f/k/a PACK Pharmaceuticals, LLC).

**1.107** "**Periodic Distribution Date**" means, as applicable, (a) the first Business Day occurring 90 days after the Initial Distribution Date, (b) subsequently, the first Business Day occurring 90 days after the immediately preceding Periodic Distribution Date, (c) with respect to excess Cash in the Professional Claims Reserve, not later than the first Business Day occurring 30 days after adjudication of all final fee applications in respect of Professional Claims and (d) with respect to excess Cash in the Administrative and Priority Claims Reserve, not later than the first Business Day occurring 20 days after the payment of all Allowed Administrative and Priority Claims.

**1.108** "**Petition Date**" means February 19, 2019, the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

**1.109** "**Pharma Purchase Agreement**" means that certain Amended and Restated Asset Purchase Agreement, dated as of March 31, 2019 attached as Exhibit 1 to the Pharma Sale Order (together with the schedules and/or exhibits thereto and all related documents, and as may be amended, supplemented or otherwise modified from time to time in accordance with paragraph 45 of the Pharma Sale Order) by and among Rising, PACK, Rising Health, and Acetris, as Sellers, Aceto, as Parent, and Shore Suven Pharma, Inc. and/or its permitted designees (each, the "Pharma Buyer").

**1.110** "**Pharma Sale**" means the sale of substantially all of the Rising Pharma Debtors' Pharma Business (as defined in the Pharma Sale Motion) as authorized pursuant to the Pharma Sale Order and which sale closed on April 19, 2019.

**1.111** "**Pharma Sale Motion**" means the *Debtors' Motion for Orders (I) (A) Authorizing and Approving Bidding Procedures in Connection with the Sale of Substantially all Assets Comprising the Debtors' Pharma Business; (B) Authorizing and Approving Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Scheduling a Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors Pharma Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases Related Thereto, and (C) Granting Related Relief* filed by the Debtors in the Chapter 11 Cases at Docket No. 109.

      **1.112** "**Pharma Sale Order"** means the *Order (A) Authorizing and Approving the Sale of Substantially All Assets Comprising the Debtors' Pharma Business Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* entered by the Bankruptcy Court on April 10, 2019 in the Chapter 11 Cases at Docket No. 372 granting the Pharma Sale Motion.

      **1.113** "**Plan**" means this joint plan of liquidation for the Debtors, including all appendices, exhibits, schedules, and supplements hereto, as it may be altered, amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms hereof, which shall be in form and substance acceptable to the Debtors (in consultation with the Creditors' Committee).

      **1.114** "**Plan Administrator**" means the Entity acceptable to the Debtors, in consultation with the Creditors' Committee, and identified in the Plan Supplement and approved by the Bankruptcy Court pursuant to the Confirmation Order to administer the Plan in accordance with the terms of the Plan and the Plan Administrator Agreement and to take such other actions as may be authorized under the Plan Administrator Agreement, and any successor thereto.

      **1.115** "**Plan Administrator Agreement**" means the agreement by and among the Debtors, the Liquidating Debtors and the Plan Administrator, in form and substance reasonably acceptable to the Creditors' Committee, which acceptance shall not be unreasonably withheld, specifying the rights, duties and responsibilities of the Plan Administrator under the Plan and providing that the Plan Administrator may retain Plan Administrator Professionals. The Plan Administrator Agreement shall be consistent with the Plan (to the extent applicable) and filed with the Plan Supplement.

      **1.116** "**Plan Administrator Professionals**" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives and other professionals of the Plan Administrator and the Liquidating Debtors, in their capacities as such.

      **1.117** "**Plan Settlement**" has the meaning set forth in Section 5.04 of the Plan.

      **1.118** "**Plan Supplement**" means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date, as may be amended from time to time, which Plan Supplement shall include: (a) the Distribution Calculation, (b) Executory Contracts assumed pursuant to the Plan, (c) the Wind-Down Budget, (d) a listing of certain Causes of Action, (e) Administrative Claim Request Form, and (f) the Plan Administrator Agreement, in each case, which shall be in form and substance acceptable to the Debtors (and reasonably acceptable to the Creditors' Committee, whose acceptance shall not be unreasonably withheld).

1.119 "**Plan Supplement Filing Date**" means the date or dates on which the Plan Supplement shall be filed with the Bankruptcy Court. The Plan Supplement Filing Date shall be at least seven (7) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court.

1.120 "**Plan Termination Date**" shall have the meaning ascribed to such term in Section 5.10(c) of the Plan.

1.121 "**Post-Effective Date Aceto**" means, in the event that the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, Aceto, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

1.122 "**Priority Tax Claim**" means any Claim of a Governmental Unit entitled to priority of payment under section 507(a)(8) of the Bankruptcy Code.

1.123 "**Pro Rata Share**" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claims or Allowed Interests under the Plan.

1.124 "**Professional**" means any Entity retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, including any Entity retained pursuant to an order of the Bankruptcy Court authorizing the retention of "ordinary-course professionals".

1.125 "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Effective Date.

1.126 "**Professional Claim Estimate**" means the sum of (a) the Holdback Amount, (b) the billed but unpaid fees and expenses of Professionals as of the Effective Date, and (c) the unbilled fees and expenses of Professionals reasonably estimated pursuant to Section 2.02(b) of the Plan attributable to fees and expenses to be incurred through the Effective Date; *provided, however*, that if a Professional does not provide an estimate pursuant to Section 2.02(b) of the Plan, the Debtors may reasonably estimate the unbilled fees and expenses of such Professional incurred as of the Effective Date, and the sum of clauses (a), (b), and (c) above and the total amount so estimated shall comprise the Professional Claim Estimate.

1.127 "**Professional Claims Reserve**" means the account to be established on the Effective Date and maintained by Lowenstein Sandler LLP into which Cash equal to the Professional Claim Estimate shall be deposited by the Debtors on the Effective Date to fund Allowed Professional Claims of Professionals employed by the Debtors and the Creditors' Committee, provided that any Cash remaining in the Carve Out Account as of the Effective Date shall be funded into the Professionals Claims Reserve on the Effective Date and thereby

reduce the amount of Cash required to be funded into the Professional Claims Reserve by the Debtors.

1.128  **"Provisionally Allowed"** means a Disputed Claim or Interest (a) that has been deemed temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018, or (b) the maximum amount of which has been estimated pursuant to Bankruptcy Code section 502(c) and the procedures set forth in Section 7.05 of the Plan; *provided, however*, that, if a Claim or Interest has been subject to multiple such estimation or temporary allowance proceedings, the Provisionally Allowed amount shall refer to the lowest amount established in any such proceedings, unless the Bankruptcy Court orders otherwise.

1.129  **"Reclamation Claim"** means any Claim for the reclamation of goods delivered to the Debtors and asserted under section 546(c) of the Bankruptcy Code.

1.130  **"Rejection Damages Claim"** means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

1.131  **"Released Parties"** means, collectively, each of the following solely in their respective capacities as such: (a) the Debtors' current officers, directors, and managers (or any of the Debtors' officers, directors and managers that served as such during or immediately prior to the Chapter 11 Cases); (b) the Debtors' Professionals; (c) the Creditors' Committee's Professionals; (d) current and former members of the Creditors' Committee, but solely in their capacities as such and not in any other capacity; (e) the Notes Indenture Trustee; and (f) with respect to each of the foregoing entities in clauses (a) through (e), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, subsidiaries, divisions, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such.  For the avoidance of doubt, and notwithstanding anything herein to the contrary, in no event shall holders of Interests in Aceto be considered "Released Parties" on account of such Interests.

1.132  **"Releasing Parties"** means, collectively, each of the following in their respective capacities as such: (a) the Released Parties identified in subsections (a)–(d) of the definition of "Released Parties"; (b) all Holders of Claims that vote to accept the Plan; (c) all Holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and abstain from electing on their ballot to opt-out of the Third Party Release; (d) all Holders of Claims that vote to reject the Plan but do not elect on their ballot to opt-out of the Third Party Release; and (e) with respect to each of the foregoing entities in clauses (a) through (d), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers,

directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; provided, however, that holders of Interests in Aceto shall not be considered "Releasing Parties" solely on account of such Interests.

**1.133** "**Reserved Claims**" has the meaning set forth in Section 5.11(b) of the Plan.

**1.134** "**Rising**" means Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.).

**1.135** "**Rising Health**" means Kavod Health LLC (f/k/a Rising Health, LLC).

**1.136** "**Rising Pharma Debtors**" mean Rising, Rising Health, Acetris, and PACK.

**1.137** "**Rising Net Distributable Assets**" means, with respect to the Rising Pharma Debtors, and as allocated pursuant to the Distribution Calculation, all of the Cash held by the Rising Pharma Debtors' Estates on each Distribution Date, including but not limited to the net Cash proceeds from the Pharma Sale, and any other Cash in the bank accounts of the Rising Pharma Debtors, and as may be increased by the Settlement Distribution Subsidy and any Litigation and Other Recoveries allocable to the Rising Pharma Debtors; provided, however, that the Rising Net Distributable Assets shall be reduced by the amounts used to fund (as allocated pursuant to the Distribution Calculation) the Professional Claims Reserve, the Administrative and Priority Claims Reserve, and the Wind-Down Reserve; provided further, that any Excess Amounts included in or attributable to the Settlement Distribution Subsidy shall ultimately not be Rising Net Distributable Assets.

**1.138** "**Sale Motions**" mean the Pharma Sale Motion and the Chemical Plus Sale Motion.

**1.139** "**Sale Orders**" mean the Chemical Plus Sale Order and the Pharma Sale Order.

**1.140** "**Sales**" mean the Chemical Plus Sale and the Pharma Sale.

**1.141** "**Schedule of Assumed Executory Contracts**" means the schedule of certain Executory Contracts to be assumed by the Debtors pursuant to the Plan, along with the proposed Cure Amount, if any, with respect to each such Executory Contract, in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time in consultation with the Creditors' Committee.

**1.142** "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

**1.143** "**Schedules**" means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements

thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

1.144 "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtors within 20 days before the Petition Date in which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

1.145 "**Section 510(b) Claim**" means any Claim arising from rescission of a purchase or sale of an equity security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such an equity security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

1.146 "**Section 510(c) Claim**" means any Claim subordinated under section 510(c) of the Bankruptcy Code.

1.147 "**Securities Claims**" means any claims and Causes of Action arising from the Securities Litigation.

1.148 "**Securities Litigation**" means the litigation filed in the United States District Court for the Eastern District of New York and captioned as *In re Aceto Corporation Securities Litigation*, No. 2:18-cv-02425.

1.149 "**Servicers**" means any indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors, including without limitation, the Notes Indenture Trustee with respect to the Notes Claims.

1.150 "**Settlement Distribution Subsidy**" means a cash contribution of up to $10 million to be funded (or otherwise reserved) from the Aceto Chemical Plus Debtors to the Rising Pharma Debtors to increase the Rising Net Distributable Assets; provided that if, when added together with any Allowed Class 4B Subordinated Claims against the Rising Pharma Debtors, the amount of the fully resolved, liquidated and Allowed Class 3B General Unsecured Claims against the Rising Pharma Debtors (other than the DPO Claim) is less than the Rising Net Distributable Assets, then the excess (the "Excess Amounts") shall be returned to the Aceto Chemical Plus Debtors' Estates and increase the available Aceto Net Distributable Assets.

1.151 "**Specified Individuals**" means each of the former directors, officers, and/or managers of the Debtors prior to the Petition Date that did not serve in such capacity immediately prior to and after the Petition Date.

1.152 "**Subordinated Claim**" means any (i) Claim that is subject to subordination under section 510 of the Bankruptcy Code (including a Section 510(b) Claim and Section 510(c) Claim), or (ii) Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code or otherwise.

1.153 **"Tax Information"** means any information relating to the tax obligations of the Debtors or the Liquidating Debtors as determined to be needed by the Debtors or the Plan Administrator or Distribution Agent, as applicable, including, without limitation, a Form W-8, a Form W-9, and information or certifications from brokers for Holders of Interests in Aceto holding in street name regarding the identity of such Holders and the number of Interests held by such Holders as of the Confirmation Date.

1.154 **"Third Party Release"** means the release given by each of the Releasing Parties to the Released Parties as set forth in Section 9.05 of the Plan.

1.155 **"Unclaimed Distribution"** means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated and/or cashed such check; (b) given notice to the Liquidating Debtors of an intent to accept a particular distribution; (c) responded to the Debtors', the Liquidating Debtors' or the Plan Administrator's (or the Plan Administrator's designee's), as applicable, request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.156 **"Unexpired Lease"** means a lease of nonresidential real property to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.157 **"Unimpaired"** means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

1.158 **"Voting Deadline"** means the date and time established by order of the Bankruptcy Court as the deadline for ballots to be received by the Claims and Solicitation Agent.

1.159 **"Wind-Down Budget"** means a budget to be prepared by the Debtors and reasonably acceptable to the Creditors' Committee, which shall be filed with the Bankruptcy Court as part of the Plan Supplement, and which may be amended from time to time after entry of the Confirmation Order, subject to the consent of the Plan Administrator and, to the extent not disbanded pursuant to Section 5.14, the Oversight Committee, which consent shall not be unreasonably withheld, and which shall reasonably estimate the funds necessary to administer the Plan and wind down the Debtors' affairs, including the costs of holding and liquidating the Estates' remaining property, reconciling, objecting to and resolving Claims and Interests, making the distributions required by the Plan, prosecuting Causes of Action, paying taxes, paying premiums and expenses for any Insurance Contracts, filing tax returns, paying professionals' fees and expenses, paying the fees and expenses of the Plan Administrator and the Oversight Committee, funding payroll and other employee costs, providing for the purchase of errors and omissions insurance and/or other forms of indemnification for the Plan Administrator, paying any statutory fees required to be paid pursuant to section 1930 of title 28 of the United States Code until each of the Chapter 11 Cases (to the extent not closed on the Effective Date) are closed by entry of the Final Decree, dissolving the Liquidating Debtors and for all such items and other costs of administering the Plan and the Estates (other than the

Administrative and Priority Claims Reserve, the GUC Claims Reserve, and the Professional Claims Reserve).

**1.160** "**Wind-Down Reserve**" means the reserve of Cash funded by the Debtors in the amount set forth in the Wind-Down Budget and to be maintained by the Plan Administrator on behalf of the Liquidating Debtors, plus any other amounts transferred to the Wind-Down Reserve from funds available in the Administrative and Priority Claims Reserve and the GUC Claims Reserve.  Upon completion of dissolution of the Liquidating Debtors and final resolution of all pending Claims, Causes of Action, litigation and tax matters with respect to any of the Debtors, any remaining Cash in the Wind-Down Reserve shall be released to the respective Aceto Chemical Plus Debtors' and/or Rising Pharma Debtors' Estates for final distributions (subject to the Distribution Calculation).

**B.**     **Rules of Interpretation.** For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter shall include the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," "hereto," and the like refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (j) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (k) references to "shares," "shareholders," "directors," and/or "officers" shall also include "membership units," "members," "managers," or other functional equivalents, as applicable, as such terms are defined under the applicable state limited liability company or alternative comparable laws, as applicable; and (l) any immaterial effectuating provision may be interpreted by the Liquidating Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further order of the Bankruptcy Court.

**C.**     **Computation of Time.** In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**D.**     **Reference to Monetary Figures.** All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

**E.**     **Exhibits.** All Exhibits are incorporated into and are part of this Plan as if set forth in full herein and such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the Plan Supplement Filing Date, copies of Exhibits may be obtained upon email request to the Claims and Solicitation Agent at acetoinfo@primeclerk.com,

or by downloading such Exhibits from the Debtors' informational website at https://cases.primeclerk.com/Aceto.

## ARTICLE II

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

**Section 2.01.    Administrative Claims**. Except to the extent that the Debtors or the Plan Administrator, and a Holder of an Allowed Administrative Claim agree to a less favorable treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which shall be subject to Section 2.02 of this Plan) shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the later of (i) the Initial Distribution Date or (ii) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date when the Administrative Claim becomes an Allowed Administrative Claim; or (2) 30 days after the date when the Administrative Claim becomes payable pursuant to any agreement between the Debtors or the Plan Administrator and the Holder of the Administrative Claim; or (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; *provided, however*, that other than the Holder of (w) a Professional Claim, (x) an Administrative Claim Allowed by a Final Order of the Bankruptcy Court on or before the Effective Date, (y) an Administrative Claim that is not Disputed and arose in the ordinary course of business and was paid, or (z) an Administrative Claim arising under chapter 123 of title 28 of the United States Code, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claim Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and as set forth in Section 2.02 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims and Solicitation Agent and served on counsel for the Debtors and the Plan Administrator no later than the Administrative Claim Bar Date. Any request for payment of an Administrative Claim pursuant to this Section 2.01 that is not timely filed and served shall be Disallowed automatically without the need for any objection from the Debtors or the Plan Administrator. The Plan Administrator may settle any Administrative Claim without further Bankruptcy Court approval. In the event that the Debtors or the Plan Administrator object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. For the avoidance of doubt, any payments made by the Distribution Agent on account of Allowed Administrative Claims (other than Professional Claims) shall be paid from the Administrative and Priority Claims Reserve.

**Section 2.02.    Professional Claims**.

(a)    *Final Fee Applications*. All final requests for payment of Professional Claims must be filed no later than thirty (30) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and

prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b)      *Payment of Interim Amounts and Fee Estimates*. Following the Effective Date, the Liquidating Debtors shall continue to comply with the Interim Compensation Order with respect to amounts owing to Professionals for the period from the Petition Date through the Effective Date. No later than two days prior to the Effective Date, each Professional shall estimate fees and expenses due for periods that have not or will not have been billed as of the Effective Date and shall deliver such estimate to the Debtors and such estimate shall be included in the Professional Claim Estimate.

(c)      *Professional Claims Reserve*. On the Effective Date, the Debtors shall fund the Professional Claims Reserve with Cash equal to the aggregate Professional Claim Estimate for all Professionals of the Debtors and Creditors' Committee; <u>provided that</u> any Cash remaining in the Carve Out Account as of the Effective Date shall be funded into the Professionals Claims Reserve on the Effective Date and thereby reduce the amount of Cash required to be funded into the Professional Claims Reserve by the Debtors. The Professional Claims Reserve shall be held and maintained in trust by Lowenstein Sandler LLP for all Professionals with respect to whom fees have not yet been Allowed or paid pursuant to the Interim Compensation Order. The funds in the Professional Claims Reserve shall not be considered property of the Debtors, the Liquidating Debtors, the Plan Administrator, or the Estates, as applicable. Following any payments from the Professional Claims Reserve as set forth in Section 2.02(b) above, the remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals from the Professional Claims Reserve when such Claims are finally Allowed by the Bankruptcy Court.

(d)      *Post-Effective Date Retention*. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate, and the Plan Administrator shall be permitted to employ and pay Professionals in the exercise of its business judgment (including the fees and expenses incurred by professionals in preparing, reviewing, prosecuting, defending, or addressing any issues with respect to final fee applications), subject to the terms of the Plan Administrator Agreement (and with respect to Professionals not specifically listed as retained by the Plan Administrator following the Effective Date, subject to consultation with the Oversight Committee (to the extent not disbanded pursuant to Section 5.14)).

**Section 2.03.      Priority Tax Claims**. On the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Priority Tax Claim becomes an Allowed Priority Tax Claim or (ii) 30 days after the date when a Priority Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Priority Tax Claim, except to the extent that the Debtors (or Plan Administrator) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Priority Tax Claim, Cash in an amount equal to the amount of such Allowed Priority Tax Claim. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance

with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. For the avoidance of doubt, any payments made by the Plan Administrator on account of Allowed Priority Tax Claims shall be paid from the Administrative and Priority Claims Reserve.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

**Section 3.01.** **Classification of Claims and Interests**.

(a)    Pursuant to the Plan Settlement, the Plan, though proposed jointly, constitutes a separate plan for the Aceto Chemical Plus Debtors, the Rising Pharma Debtors, the Arsynco Debtor, and the Acci Realty Debtors for voting purposes and, except as set forth in Section 5.01 of the Plan with respect to the substantive consolidation of the Aceto Chemical Plus Debtors and Rising Pharma Debtors, does not otherwise constitute a substantive consolidation of the Debtors' Estates. Therefore, all Claims against and Interests in each of the Debtors are placed in the Classes set forth below with respect to such Debtor(s). Classes that are not applicable as to a particular Debtor shall be eliminated as set forth more fully in Section 4.03 of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

A Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided, however*, that a Claim or Interest is placed in a particular Class for the purpose of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

Claims and Interests are divided into the numbered Classes set forth below:

| CLASS | CLAIM OR INTEREST | STATUS | VOTING RIGHTS |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3A | General Unsecured Claims against Aceto Chemical Plus Debtors (including DPO Claim and Notes Claims) | Impaired | Entitled to Vote |
| 3B | General Unsecured Claims against Rising Pharma Debtors (including DPO Claim) | Impaired | Entitled to Vote |
| 3C | General Unsecured Claims against Arsynco | Impaired | Entitled to Vote |

| 3D | General Unsecured Claims against Acci Realty | Impaired | Entitled to Vote |
| 4A | Subordinated Claims Against Aceto Chemical Plus Debtors | Impaired | Deemed to Reject |
| 4B | Subordinated Claims Against Rising Pharma Debtors | Impaired | Deemed to Reject |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6A | Interests in Aceto | Impaired | Deemed to Reject |
| 6B | Interests in all Debtors Other than Aceto | Impaired | Deemed to Reject |

**Section 3.02.       Treatment and Voting of Claims and Interests**.

(a)      *Class 1 – Other Priority Claims*

(i)      *Classification*. Class 1 consists of all Other Priority Claims.

(ii)      *Treatment*. Except as otherwise provided in and subject to Section 8.05 of this Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the later of (A) the Initial Distribution Date or (B) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date when an Other Priority Claim becomes an Allowed Other Priority Claim or (2) 30 days after the date when an Other Priority Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and the Holder of such Other Priority Claim.

(iii)      *Voting*. Class 1 is Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan.

(b)      *Class 2 – Other Secured Claims*

(i)      *Classification*. Class 2 consists of all Other Secured Claims.

(ii)      *Treatment*. Except as otherwise provided in and subject to Section 8.05 of this Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Plan Administrator, (i) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, (ii) receive the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the interest of the Holder of such Allowed Other Secured Claim in such collateral, or (iii) receive the collateral securing such Allowed Other Secured Claim, in each case of (i), (ii), or (iii) on the later of (A) the Initial Distribution Date or (B) the first Periodic Distribution Date occurring after the later of (1) 30 days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (2) 30 days after the date when such Other Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Plan Administrator) and

the Holder of such Other Secured Claim; *provided, however*, that nothing in this Section 3.02 or elsewhere in this Plan shall preclude the Debtors or the Plan Administrator, as applicable, from challenging the validity of any alleged Lien on any asset of the Debtors or the value of the property that secures any alleged Lien.

(iii)     *Voting*. Class 2 is Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan.

(c)     *Class 3A – General Unsecured Claims Against Aceto Chemical Plus Debtors*

(i)     *Classification*. Class 3A consists of all General Unsecured Claims against the Aceto Chemical Plus Debtors.

(ii)     *Allowance*.  The Notes Claims shall be Allowed in Class 3A in the aggregate amount of $144,612,500 (consisting of principal in the aggregate amount of $143,750,000, *plus* accrued and unpaid interest as of the Petition Date in the aggregate amount of $862,500), and the DPO Claim shall be Allowed in Class 3A in the amount of $30,000,000, provided that the DPO Claim shall have its recovery capped and/or subordinated as set forth in Section 8.12 below and consistent with the Mutual Release Agreement.

(iii)     *Treatment*.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors agrees to a less favorable treatment and subject to Section 8.12 with respect to the DPO Claim, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against the Aceto Chemical Plus Debtors shall receive its Pro Rata Share of the Aceto Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Aceto Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against the Aceto Chemical Plus Debtors is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date, on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

(iv)     *Voting*. Class 3A is Impaired, and Holders of General Unsecured Claims against the Aceto Chemical Plus Debtors are entitled to vote to accept or reject the Plan.

(d)     *Class 3B – General Unsecured Claims Against Rising Pharma Debtors*

(i)     *Classification*. Class 3B consists of all General Unsecured Claims against the Rising Pharma Debtors.

(ii)     *Allowance*.  The DPO Claim shall be Allowed in Class 3B in the amount of $30,000,000, provided that the DPO Claim shall have its recovery capped and/or subordinated as set forth in Section 8.12 below and consistent with the Mutual Release Agreement.

(iii)     *Treatment*.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Rising Pharma Debtors agrees to a less favorable treatment and

subject to Section 8.12 with respect to the DPO Claim, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against the Rising Pharma Debtors, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against the Rising Pharma Debtors shall receive its Pro Rata Share of the Rising Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Rising Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against the Rising Pharma Debtors is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

(iv)    *Voting*. Class 3B is Impaired, and Holders of General Unsecured Claims against the Rising Pharma Debtors are entitled to vote to accept or reject the Plan.

(e)    *Class 3C – General Unsecured Claims Against Arsynco*

(i)    *Classification*. Class 3C consists of all General Unsecured Claims against Arsynco.

(ii)    *Treatment*.  Except to the extent that a Holder of an Allowed General Unsecured Claim against Arsynco agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against Arsynco, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against Arsynco shall receive its Pro Rata Share of the Arsynco Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Arsynco Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against Arsynco is paid in full, post-petition interest from the Petition Date through the Initial Distribution Date on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

(iii)    *Voting*. Class 3C is Impaired, and Holders of General Unsecured Claims against Arsynco are entitled to vote to accept or reject the Plan.

(f)    *Class 3D – General Unsecured Claims Against Acci Realty*

(i)    *Classification*. Class 3D consists of all General Unsecured Claims against Acci Realty.

(ii)    *Treatment*.  Except to the extent that a Holder of an Allowed General Unsecured Claim against Acci Realty agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed General Unsecured Claim against Acci Realty, on the Initial Distribution Date and each applicable Periodic Distribution Date thereafter, each Holder of an Allowed General Unsecured Claim against Acci Realty shall receive its Pro Rata Share of the Acci Realty Net Distributable Assets (a) up to the full principal amount of such Allowed Claim, and (b) solely if and to the extent sufficient Acci Realty Net Distributable Assets are available once the principal amount of all Allowed General Unsecured Claims against Acci Realty is paid in full, post-petition interest

from the Petition Date through the Initial Distribution Date on account of such Claims, at the lower of the (i) Federal Judgment Rate and (ii) the contract non-default interest rate (if applicable).

(iii)    *Voting*. Class 3D is Impaired, and Holders of General Unsecured Claims against Acci Realty are entitled to vote to accept or reject the Plan.

(g)    *Class 4A – Subordinated Claims Against Aceto Chemical Plus Debtors*

(i)    *Classification*. Class 4A consists of all Subordinated Claims against the Aceto Chemical Plus Debtors.

(ii)    *Allowance*. Notwithstanding anything to the contrary herein, a Subordinated Claim against the Aceto Chemical Plus Debtors, if any such Claim exists, may only become Allowed by Final Order.

(iii)    *Treatment*. On the Effective Date, each Holder of an Allowed Subordinated Claim (if any) against the Aceto Chemical Plus Debtors shall not receive any distribution or other property on account of such Claim; *provided, however*, that if after payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors (including payment of post-petition interest, if any, as set forth herein in Section 3.02) and after reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3A and all other wind-down costs and expenses, the Plan Administrator determines that additional Aceto Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) the Plan Administrator shall make such distributions to Holders of Allowed Subordinated Claims ratably with Holders of Allowed Interests in Aceto in the manner set forth immediately below.

With respect to distributions, if any, to be shared ratably between Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors and Holders of Allowed Interests in Aceto, each holder of an Allowed Subordinated Claim against the Aceto Chemical Plus Debtors shall be entitled to its Pro Rata Share (up to the principal amount of its Allowed Claim) of the remaining Aceto Net Distributable Assets to be distributed on a *pari passu* basis with Holders of Allowed Interests in Aceto, and for purposes of determining the proportional amount of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors relative to the Allowed Interests, the Plan Administrator shall use the Aceto Interest Distribution Value.

(iv)    *Voting*. Class 4A is Impaired, and Holders of Subordinated Claims against the Aceto Chemical Plus Debtors are deemed to have rejected the Plan.

(h)    *Class 4B – Subordinated Claims Against Rising Pharma Debtors*

(i)    *Classification*. Class 4B consists of all Subordinated Claims against the Rising Pharma Debtors.

(ii)    *Allowance*. Notwithstanding anything to the contrary herein, a Subordinated Claim against the Rising Pharma Debtors, if any such Claim exists, may only become Allowed by Final Order.

-27-

(iii)    *Treatment*. On the Effective Date, each Holder of an Allowed Subordinated Claim (if any) against the Rising Debtors shall not receive any distribution or other property on account of such Claim; *provided, however*, that if after payment in full of all Allowed Class 3B General Unsecured Claims against the Rising Debtors (including payment of post-petition interest, if any, as set forth herein in Section 3.02) and after reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3B and all other wind-down costs and expenses, the Plan Administrator determines that additional Rising Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) the Plan Administrator shall make such distributions and each Holder of an Allowed Subordinated Claim against the Rising Pharma Debtors shall receive its Pro Rata Share of any available remaining Rising Net Distributable Assets up to the full principal amount of such Allowed Claim.

(iv)    *Voting*. Class 4B is Impaired, and Holders of Subordinated Claims against the Rising Pharma Debtors are deemed to have rejected the Plan.

(i)    *Class 5 – Intercompany Claims*

(i)    *Classification*. Class 5 consists of all Intercompany Claims.

(ii)    *Treatment*. On the Effective Date, all Intercompany Claims shall be eliminated and extinguished and the Holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims, and such Claims will be deemed waived and released except as set forth with respect to the Intercompany Claim of the Rising Pharma Debtors against the Aceto Chemical Plus Debtors which will be settled through the Settlement Distribution Subsidy, provided, however, that nothing herein shall eliminate the Debtors' rights to distributions from any of their non-Debtor Affiliates on account of the Debtors' equity interests in any non-Debtor Affiliate.

(iii)    *Voting*. Class 5 is Impaired, and Holders of Allowed Intercompany Claims are deemed to have rejected the Plan.

(j)    *Class 6A – Interests in Aceto*

(i)    *Classification*. Class 6A consists of all Interests in Aceto.

(ii)    *Treatment*. On the Effective Date, Interests in Aceto, including the Aceto Common Stock, shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Plan Administrator, and without further distribution; provided that one share of common stock in Aceto will be issued and transferred to the Plan Administrator for purposes of administering the wind-down of Aceto as may be required, including pursuant to the Chemical Plus Purchase Agreement; provided further that in the event that the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, each Holder of Interests in Aceto, including the Aceto Common Stock, as of the Distribution Record Date, shall be entitled to retain such Interests in Aceto without further recovery or distribution on account of such interests and one share of common stock in Aceto will not be issued or transferred to the Plan Administrator as of the Effective Date; and provided further that if after payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors (including payment of post-petition

interest, if any, as set forth herein in Section 3.02) and/or reserving for sufficient amounts for the payment of all potential Allowed Claims in Class 3A and all other wind-down costs and expenses, the Plan Administrator determines that additional Aceto Net Distributable Assets are available for distribution, then subject in all respects to Section 5.11(e) (and whether or not the Aceto Common Stock Non-Cancellation Election Notice was filed by the Debtors on or prior to the Effective Date) the Plan Administrator shall make such distributions to Holders of Interests in Aceto as of the Distribution Record Date ratably with Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors in the manner set forth immediately below.

With respect to distributions, if any, to be shared ratably between Holders of Interests in Aceto and Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors, each Holder of an Interest in Aceto shall be entitled to its Pro Rata Share of the remaining Aceto Net Distributable Assets to be distributed on a *pari passu* basis with Holders of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors and, for purposes of determining the proportional amount of Allowed Subordinated Claims against the Aceto Chemical Plus Debtors relative to the Interests in Aceto, the Plan Administrator shall use the Aceto Interest Distribution Value.

(iii)    *Voting*. Class 6A is Impaired, and Holders of Allowed Interests in Aceto are deemed to have rejected the Plan.

(k)    *Class 6B – Interests in Debtors Other Than Aceto*

(i)    *Classification*. Class 6B consists of all Interests in all Debtors other than Aceto.

(ii)    *Treatment*. On the Effective Date, Allowed Interests in Debtors other than Aceto shall not receive any distribution on account of such Interests, provided that such Interests shall be maintained by the Plan Administrator on and after the Effective Date as may be required pursuant to the Pharma Purchase Agreement and/or Chemical Plus Purchase Agreement and/or as necessary to administer the wind-down of each Debtor other than Aceto, including, *inter alia*, for purposes of transferring any particular Estates' assets to other Estates to the extent any particular Estate (or set of consolidated Estates) has additional Cash remaining after paying out all other required Plan distributions.

(iii)    *Voting*. Class 6B is Impaired, and Holders of Allowed Interests in Debtors other than Aceto are deemed to have rejected the Plan.

## ARTICLE IV

## ACCEPTANCE

**Section 4.01.    Classes Entitled to Vote**. Classes 3A, 3B, 3C, and 3D are Impaired and are entitled to vote to accept or reject this Plan.  By operation of law, Classes 1 and 2 are Unimpaired and are conclusively presumed to have accepted this Plan and, therefore, are not entitled to vote. By operation of law, Classes 4A, 4B, 5, 6A and 6B are deemed to have rejected this Plan and are not entitled to vote.

**Section 4.02.        Acceptance by Impaired Classes**. An Impaired Class of Claims shall have accepted this Plan if (a) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (b) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

**Section 4.03.        Elimination of Classes**. To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Confirmation Hearing for all Debtors or with respect to any particular Debtor shall be deemed to have been deleted from this Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**Section 4.04.        Deemed Acceptance if No Votes Cast**. If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

**Section 4.05.        Cramdown**. To the extent necessary, the Debtors shall request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify, amend, or withdraw this Plan, with respect to all Debtors or any individual Debtor, to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS OF IMPLEMENTATION OF THE PLAN

**Section 5.01.        Partial Substantive Consolidation**. Pursuant to the Plan Settlement, this Plan contemplates and is predicated upon the deemed substantive consolidation of the Estates and Chapter 11 Cases of, respectively, (i) each of the Aceto Chemical Plus Debtors, and (ii) each of the Rising Pharma Debtors.

On the Effective Date, each Claim filed or to be filed against (or Allowed against) (i) any of Aceto, Aceto Agri or Aceto Realty shall be deemed filed against Aceto and shall be deemed a single Claim against and a single obligation of Aceto for distribution purposes only and the claims register shall be updated accordingly, and (ii) any of Rising, Rising Health, Acetris and PACK shall be deemed filed against Rising and shall be deemed a single Claim against and a single obligation of Rising for distribution purposes only and the claims register shall be updated accordingly. This limited substantive consolidation effected pursuant to this Plan shall not (i) otherwise affect the rights of any Holder of any Claim, or (ii) affect the treatment of Claims against Arsynco and Acci Realty, which Claims are separately classified in Section 3.02.  For the avoidance of doubt, the Estates of Arsynco and Acci Realty are not substantively consolidated with the Estates of either the Aceto Chemical Plus Debtors or the Rising Pharma Debtors.

Entry of the Confirmation Order shall constitute approval, pursuant to sections 105(a) and 1123(A)(5) of the Bankruptcy Code and Bankruptcy Rule 9019, effective as of the Effective

Date, of the substantive consolidation of the Estates of, respectively, (i) each of the Aceto Chemical Plus Debtors and (ii) each of the Rising Pharma Debtors, for the purposes of confirming and consummating the Plan, including but not limited to voting, confirmation and Plan distributions.   Accordingly, (I) (a) the assets and liabilities of each of the Aceto Chemical Plus Debtors will be deemed the assets and liabilities of a single, consolidated entity, Aceto, (b) each and every non-contingent, liquidated, non-disputed Claim listed on the Schedules and/or filed in the Chapter 11 Cases against any of the Aceto Chemical Plus Debtors shall be considered filed against the consolidated Aceto Chemical Plus Debtors and shall be considered one Claim against and obligation of the consolidated Aceto Chemical Plus Debtors on and after the Effective Date, (c) all joint obligations of two or more of the Aceto Chemical Plus Debtors and all multiple Claims against such entities on account of such joint obligations shall be considered a single Claim against the Aceto Chemical Plus Debtors, (d) all guarantee by any of the Aceto Chemical Plus Debtors of the obligations of any other Aceto Chemical Plus Debtors arising prior to the Effective Date shall be deemed eliminated under the Plan so that any Claim against any of the Aceto Chemical Plus Debtors and any guaranty thereof by any other Aceto Chemical Plus Debtors and any joint and several liability of any of the Aceto Chemical Plus Debtors shall be deemed to be one obligation of the deemed consolidated Aceto Chemical Plus Debtors, and (e) all Intercompany Claims between and among the Aceto Chemical Plus Debtors shall be cancelled and extinguished; and (II) (a) the assets and liabilities of each of the Rising Pharma Debtors will be deemed the assets and liabilities of a single, consolidated entity, Rising, (b) each and every non-contingent, liquidated, non-disputed Claim listed on the Schedules and/or filed in the Chapter 11 Cases against any of the Rising Pharma Debtors shall be considered filed against the consolidated Rising Pharma Debtors and shall be considered one Claim against and obligation of the consolidated Rising Pharma Debtors on and after the Effective Date, (c) all joint obligations of two or more of the Rising Pharma Debtors and all multiple Claims against such entities on account of such joint obligations shall be considered a single Claim against the Rising Pharma Debtors, (d) all guarantee by any of the Rising Pharma Debtors of the obligations of any other Rising Pharma Debtors arising prior to the Effective Date shall be deemed eliminated under the Plan so that any Claim against any of the Rising Pharma Debtors and any guaranty thereof by any other Rising Pharma Debtors and any joint and several liability of any of the Rising Pharma Debtors shall be deemed to be one obligation of the deemed consolidated Rising Pharma Debtors, and (e) all Intercompany Claims between and among the Rising Pharma Debtors shall be cancelled and extinguished.

Such deemed consolidation shall not, however, (other than for purposes related to funding Distributions under the Plan) affect (a) the legal and organizational structure of the Aceto Chemical Plus Debtors and/or Rising Pharma Debtors (including as required to be maintained following the Effective Date pursuant to the Chemical Plus Purchase Agreement and/or Pharma Purchase Agreement, respectively), (b) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, assumed and assigned, or rejected, (c) any agreements entered into by the Liquidating Debtors on or after the Effective Date, (d) the Debtors or Liquidating Debtors or Plan Administrator's ability to commence and prosecute any Causes of Action against any Entity as if there was no substantive consolidation.

**Section 5.02.        Post-Effective Date Governance and Dissolution of Debtors.**

Immediately following the occurrence of the Effective Date, (a) the respective boards of directors and/or manager of each of the Debtors shall be terminated and the members of the boards of directors of the Debtors shall be deemed to have resigned, (b) the Plan Administrator shall be appointed as the sole director and/or manager of each of the Liquidating Debtors (to the extent such Debtors are not being dissolved as of or in connection with the Effective Date) and (c) the Debtors shall continue to exist as the Liquidating Debtors after the Effective Date in accordance with the laws of the respective states of incorporation of each of the Debtors and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except if and to the extent such organizational documents are amended under the Plan, including for the limited purposes of liquidating all of the assets of the Estates, making distributions in accordance with the Plan, reducing the size of boards of directors or the number of managers, and performing such obligations under the Chemical Plus Purchase Agreement, Pharma Purchase Agreement and Sale Orders as are required to be performed, until such time as the Plan Administrator reasonably concludes (upon consultation with the Oversight Committee, to the extent not disbanded pursuant to Section 5.14) such performance is complete or no longer required, and such other activities as are ancillary, necessary or convenient to the foregoing and the implementation of this Plan.

On the Effective Date, and without further order of the Bankruptcy Court, the Debtors or the Plan Administrator, on behalf of the Liquidating Debtors, may execute and file documents and take all other actions as they deem appropriate relating to the foregoing corporate actions under applicable state laws and, in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect any necessary corporate changes of the Debtors as provided herein, without the payment of any fee, tax or charge and without the need for the filing of reports or certificates.

Moreover, on and after the Effective Date, Aceto Realty, Acci Realty, PACK, and Rising Health (i) shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum or take any other action in order to effectuate such withdrawal, and (ii) shall not be liable in any manner to any taxing or other authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

As soon as practicable after the conclusion of all litigation relating to the Debtors, the Plan Administrator shall, at the expense of the Debtors' Estates, (i) provide for the retention and storage of the books, records and files (including any necessary tax records) that shall have been held or maintained by the Debtors, subject to Section 5.17; (ii) file a certificate stating that the assets of the Debtors' Estates have been exhausted and final distributions of Cash have been made under the Plan; (iii) file the necessary paperwork in the relevant states of incorporation of each of the Liquidating Debtors to effectuate the dissolution of the Liquidating Debtors in accordance with the laws of such jurisdiction; and (iv) upon completion of all duties pursuant to the Plan, resign as the sole officer and manager, as applicable, of the Liquidating Debtors; provided that, for the avoidance of doubt, to the extent the Aceto Common Stock Non-

Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, the Plan Administrator shall not immediately take the foregoing actions described in clauses (i) – (iv) with respect to Post-Effective Date Aceto and Post-Effective Date Aceto shall remain in existence until such time as the Plan Administrator determines otherwise.  Upon the filing of certificate(s) described in clause (ii) of the preceding sentence, the relevant Debtors and/or Liquidating Debtors (which, for the avoidance of doubt, to the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, shall not include Aceto immediately after the Effective Date) shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith.

**Section 5.03.    Causes of Action**.

On the Effective Date, all Causes of Action belonging to the Debtors shall remain vested in the Liquidating Debtors.  For the avoidance of doubt, all derivative Causes of Action that have been, or may be, brought on behalf of the Debtors, including any pending or future derivative Causes of Action against the Specified Individuals (to the extent not released under this Plan), will be vested in the Liquidating Debtors on the Effective Date.  The Plan Administrator shall have the authority to determine, for each pending derivative action on behalf of the Debtors, whether to dismiss such action or to be deemed the plaintiff in such matter with respect to the pending derivative action on behalf of the Debtors. Any recovery from Causes of Action that vest in the Liquidating Debtors on the Effective Date shall become available for *pro rata* distribution and to increase the Aceto Net Distributable Assets and/or the Rising Net Distributable Assets as set forth in the Distribution Calculation.  Notwithstanding anything to the contrary herein, the Plan Administrator shall control the Causes of Action, including the investigation, prosecution and disposition of same, in accordance with the terms of the Plan Administrator Agreement.

**Section 5.04.    Plan Settlement and General Settlement of Claims and Interests**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates the compromise and settlement (the "Plan Settlement") of numerous debtor-creditor issues designed to achieve an economic resolution of Claims against the Debtors and an efficient resolution of these Chapter 11 Cases, including, among other things, the settlement of a number of potential issues such as allocation of Assets and expenses among the Estates as set forth in the Distribution Calculation, the nature, amount and allowability of the Intercompany Claim of Rising against Aceto, the funding of the Wind-Down Reserve, the Wind-Down Budget, partial substantive consolidation of the Debtors' Estates, and the allowance of the Notes Claims.  The Confirmation Order will serve to, among other things, approve the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and will contain findings that the compromises and settlements under the Plan Settlement are in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and are fair, equitable, and well within the range of reasonableness and otherwise satisfy the requirements of Bankruptcy Rule 9019. Each provision of the Plan Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  Commencing on the Effective Date, the Plan Administrator shall implement the allocation of the Debtors' Assets to the respective Debtors' Estates in accordance with the Distribution Calculation.

Accordingly, on the Effective Date, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan and the Plan Settlement, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests or Causes of Action that (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released pursuant to Section 9.04 of the Plan; (c) have been released pursuant to Section 9.05 of the Plan; (d) are subject to the exculpation pursuant to Section 9.06 of the Plan; or (e) are otherwise stayed or terminated pursuant to the terms of the Plan.

The Plan Settlement also provides for the Settlement Distribution Subsidy contributed from the Aceto Chemical Plus Debtors' Estates to the Rising Pharma Debtors' Estates in full and complete resolution of issues related to substantive consolidation and the Intercompany Claim of Rising against Aceto, and will enhance the *pro rata* distributions to holders of Allowed General Unsecured Claims against the Rising Pharma Debtors (subject to any Excess Amounts being returned to the Aceto Chemical Plus Debtors' Estates based upon the amount of Allowed Claims in Classes 3B and 4B as set forth in the definition of Settlement Distribution Subsidy).

**Section 5.05.      Plan Funding**. Distributions under this Plan and the Plan Administrator's post-Effective Date operations will be funded from the Debtors' Cash on hand and proceeds of the Sales held by the Estates as of the Effective Date, and proceeds of other asset dispositions and net proceeds of Litigation and Other Recoveries.

**Section 5.06.      Certificate of Incorporation and By-laws**. The certificate and articles of incorporation, certificate of conformation, by-laws, limited liability company agreement and other relevant organizational documents of each of the Liquidating Debtors shall be amended consistent with the Plan Administrator Agreement and as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Liquidating Debtors to matters authorized under the Plan, the Chemical Plus Purchase Agreement and the Pharma Purchase Agreement.

**Section 5.07.      Cancellation of Certain Instruments and Agreements**. Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, options, warrants, rights, and other instruments evidencing an ownership interest in the Debtors, contractual, legal, equitable, or otherwise, to acquire any of the foregoing, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including Notes Claims, and Interests in Aceto, shall be automatically canceled and surrendered (provided that, for the avoidance of doubt, to the extent the Aceto Common Stock Non-Cancellation Election Notice is filed by the Debtors on or prior to the Effective Date, each Holder of Interests in Aceto, including the Aceto Common Stock, as of the Distribution Record Date, shall be entitled to retain such Interests in Aceto without further recovery or distribution on account of such interests subject to Section 3.02(j) and such Interests in Aceto, including the Aceto Common Stock, shall not be deemed automatically cancelled, released, and surrendered) without any need for further action, notice, deed or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtors or the Liquidating Debtors, as applicable, thereunder or in any way related thereto shall be deemed

-34-

satisfied in full, and the Notes Indenture Trustee shall be released from all duties thereunder; provided that notwithstanding Confirmation or consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of: (1) allowing Holders to receive distributions under the Plan; (2) allowing the Notes Indenture Trustee to enforce its rights, claims, and interests vis-à-vis any parties other than the Debtors or the Liquidating Debtors; (3) allowing the Indenture Trustee to make the distributions in accordance with the Plan (if any), as applicable; (4) preserving any rights of the Indenture Trustee and to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture including any rights to priority of payment and/or to exercise charging liens; (5) allowing the Indenture Trustee to enforce any obligations owed to it under the Plan; (6) allowing the Indenture Trustee to exercise rights and obligations relating to the interests of the Holders under the Indenture; (7) allowing the Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including, but not limited, to enforce obligations owed to such party under the Plan; and (8) permitting the Indenture Trustee to perform any functions that are necessary to effectuate the foregoing; provided, further, that except as provided herein, the preceding proviso shall not affect the settlement and release of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtors or the Liquidating Debtors, as applicable.

Additionally, as of the Effective Date, and solely to the extent the Aceto Common Stock Non-Cancellation Election Notice is not filed by the Debtors on or prior to the Effective Date, the Debtors' securities registered under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, shall be automatically deregistered and all related reporting obligations with the Securities and Exchange Commission shall be automatically terminated.

**Section 5.08.      Compliance with the Asset Purchase Agreements**. Notwithstanding anything in the Plan to the contrary, nothing herein shall modify any obligations of the Debtors under the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement or the Sale Orders, the Chemical Plus Buyer under the Chemical Plus Purchase Agreement or the Chemical Plus Sale Order or the Pharma Buyer under the Pharma Purchase Agreement or the Pharma Sale Order.

**Section 5.09.      The Plan Administrator**.

(a)      Appointment of the Plan Administrator

From and after the Effective Date, an individual to be designated by the Debtors (in consultation with the Creditors' Committee) shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan.

The Debtors shall include the information set forth in sections 1129(a)(4) and (5) of the Bankruptcy Code in the Plan Supplement designating the individual selected as Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation

Order, and such appointment shall be effective as of the Effective Date. The Plan Administrator shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the Plan Administrator Agreement.

(b)      The Plan Administrator Agreement

Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan and to facilitate the orderly and effective liquidation of the Debtors' remaining assets and to maximize the recovery thereof; provided that any such modifications shall be done in consultation with and shall not alter or impair the rights of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14) without its consent, which consent shall not be unreasonably withheld.

(c)      Rights, Powers, and Duties of the Liquidating Debtors and the Plan Administrator

The Liquidating Debtors shall retain and have all the rights, powers and duties necessary to carry out their responsibilities under the Plan, which for the avoidance of doubt, shall include pursuing (or not pursuing) the Causes of Action and the investigation, prosecution and/or settlement or other disposition of such Causes of Action. The Plan Administrator shall seek to preserve and protect all applicable privileges of the Liquidating Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) as set forth in more detail in Section 5.16 of the Plan. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Liquidating Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement (subject to the rights of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14) as set forth in Section 5.14 hereof and in the Plan Administrator Agreement), shall include, among others:

(i)      making distributions to Holders of Allowed Claims and Interests as provided for in the Plan;

(ii)      administering, reconciling, objecting to, and settling or otherwise litigating to resolution all Claims, including Administrative Claims, Professional Claims, Priority Tax Claims, and Other Priority Claims (subject to the Administrative Claims Protocol set forth in Section 5.11(b) of the Plan), General Unsecured Claims and Subordinated Claims;

(iii)      filing tax returns and paying taxes, and challenging disputing, negotiating and resolving the assessment of any of the foregoing by any foreign, domestic, federal, state, local or other taxing authority;

(iv)      administering the Liquidating Debtors' 401(k) benefit plans;

(v)     defending the Debtors and Liquidating Debtors in any litigation, including any governmental litigation(s) and/or investigations against or involving the Debtors or Liquidating Debtors;

(vi)    prosecution and settlement of Causes of Action, including but not limited to certain specified Causes of Action to be identified in the Plan Supplement;

(vii)   the wind-down and/or dissolution of Aceto Agri's interest in Canegrass LLC (to the extent not resolved prior to the Effective Date);

(viii)  the sale or other disposition of the Arsynco Carlstadt Property;

(ix)    maintaining sufficient insurance coverage pending conclusion of the wind-down of the Liquidating Debtors;

(x)     insuring the completion of the transfer of all assets (including licenses, permits and government contracts) required to be transferred pursuant to the Pharma Purchase Agreement and/or Chemical Plus Purchase Agreement and entering into any additional necessary transactions related to such transfer(s);

(xi)    dissolving the Liquidating Debtors; and

(xii)   taking such other actions, or omitting to take such other actions, as the Plan Administrator shall reasonably determine are necessary, advisable or convenient in furtherance of the Plan and the discharge of its duties under the Plan and pursuant to the Plan Administrator Agreement

(d)     Compensation of the Plan Administrator

The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms of the Plan Administrator Agreement, as provided in the Wind-Down Budget (as may be modified with the consent of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14) which consent shall not be unreasonably withheld or by further order of the Bankruptcy Court). Any professionals retained by the Plan Administrator shall similarly be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve, as provided in the Wind-Down Budget (as may be modified (i) with the consent of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14) which consent shall not be unreasonably withheld, or (ii) by further order of the Bankruptcy Court). The payment of the fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided, however*, that any disputes related to such fees and expenses raised by the Oversight Committee (to the extent not disbanded pursuant to Section 5.14) shall be brought before the Bankruptcy Court.

(e)     Indemnification

The Liquidating Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as sole officer, director or member/manager of the Liquidating Debtors),

-37-

(ii) additional individuals that may serve as officers or members/managers of the Liquidating Debtors, if any, and (iii) the Plan Administrator Professionals (collectively, the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Liquidating Debtors or the implementation or administration of the Plan or the Plan Administrator Agreement. To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined through a Final Order that such Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Reserve or any available Insurance Contracts, including insurance purchased using the Wind-Down Reserve. The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent of the Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(f)    Exculpation

The organizational documents of the Liquidating Debtors shall provide for the exculpation of the Plan Administrator to the fullest extent permitted by applicable law.

(g)    Insurance

The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Liquidating Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Liquidating Debtors or their Estates and (ii) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator (in consultation with the Oversight Committee) after the termination of the Plan Administrator Agreement.

(h)    Revesting of Assets

Except as expressly provided elsewhere in this Plan (including pursuant to the Distribution Calculation), on the Effective Date, the property of each Debtor's Estate shall revest in the applicable Liquidating Debtor and be distributed according to this Plan.

**Section 5.10.    Distributions to Holders of General Unsecured Claims**.

(a)    Initial Distributions

On the Initial Distribution Date, the Plan Administrator shall make, or shall make adequate reserves in the GUC Claims Reserve for, the distributions required to be made under the Plan to Holders of Allowed General Unsecured Claims. The Distribution Agent shall not make any distributions to the Holders of Allowed General Unsecured Claims unless the Distribution Agent retains and reserves in the GUC Claims Reserve such amounts as are required under Section 8.05(c) of the Plan.

(b)    Interim Distributions

The Distribution Agent shall make interim distributions of Cash in accordance with this Plan (i) to Holders of Allowed General Unsecured Claims at least once each four-month period (to the extent practicable), unless the aggregate amount of such distributions, except for the last anticipated distributions, is $50.00 or less, and (ii) from the GUC Claims Reserve (x) to Disputed General Unsecured Claims that become Allowed General Unsecured Claims or (y) to the DPO Claim, to the extent that the Other Creditors' Threshold is satisfied and distributions of greater than 65% have previously been made to any Holders of Allowed General Unsecured Claims (other than the DPO Claim) in Classes 3A, 3B, 3C, or 3D prior to the satisfaction of the Other Creditors' Threshold.

(c)    Final Distributions

The Liquidating Debtors shall be dissolved and their affairs wound up and the Plan Administrator shall make the final distributions on the date when, in the reasonable judgment of the Plan Administrator (and, if still in existence, in consultation with the Oversight Committee), substantially all of the assets of the Liquidating Debtors have been liquidated and there are no substantial potential sources of additional Cash for distribution and all pending Claims and/or governmental investigations (including any investigations by the United States Securities and Exchange Commission, United States Department of Justice, and/or the United States Attorney's Office, collectively, the "Governmental Investigations") are resolved and concluded. The date on which the Plan Administrator determines (in consultation with the Oversight Committee if still in existence) that all obligations under the Plan and the Plan Administrator Agreement have been satisfied is referred to as the "Plan Termination Date".  On the Plan Termination Date, the Plan Administrator shall, to the extent not already done, request that the Bankruptcy Court enter an order closing any remaining Chapter 11 Cases.

**Section 5.11.    Accounts and Reserves.**

(a)    Professional Claims Reserve

On or before the Effective Date, the Debtors shall create and fund the Professional Claims Reserve in Cash in the amount of the Professional Claim Estimate. Subject to Section 5.11(e), the Cash so transferred shall not be used for any purpose other than to pay Allowed Professional Claims. Notwithstanding anything to the contrary, Lowenstein Sandler LLP (i) shall segregate and shall not commingle the Cash held in the Professional Claims Reserve and (ii)

shall pay each Professional Claim of a Professional employed by the Debtors on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim, upon entry of a Final Order allowing such Claim. After all Professional Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid from the Professional Claims Reserve, any remaining Cash in the Professional Claims Reserve shall be released and transferred to the Administrative and Priority Claims Reserve.  Only Professionals employed in the Chapter 11 Cases by the Debtors and the Creditors' Committee, and whose retention and compensation has been approved by the Bankruptcy Court, shall be entitled to payment from the Professional Claims Reserve.

The Professionals employed by the Debtors shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities authorized by an order of the Bankruptcy Court, this Plan, or the Plan Administrator, including the preparation, filing and prosecution (subject to applicable law) of such Professional's final fee applications (if applicable), upon the submission of invoices to the Plan Administrator for payment from the Professional Claims Reserve. The Professionals employed by the Creditors' Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities related to the preparation, filing and prosecution (subject to applicable law) of such Professional's final fee applications.  Any time or expenses incurred in the preparation, filing and prosecution of final fee applications shall be disclosed by each Professional in its final fee application and shall be subject to approval of the Bankruptcy Court.

(b)    Administrative and Priority Claims Reserve

On or before the Effective Date, the Debtors shall create and fund the Administrative and Priority Claims Reserve in Cash in the amount of the Administrative and Priority Claims Estimate.  On or before ten Business Days prior to the Effective Date, the Debtors will provide the Creditors' Committee with a schedule of estimated Administrative Claims, Priority Tax Claims and Other Priority Claims to be funded from the Administrative and Priority Claims Reserve (the "Administrative and Priority Claims Schedule"). On or before five Business Days prior to the Effective Date, the Creditors' Committee will provide the Debtors with a schedule which lists the individual Administrative Claims, Priority Tax Claims and Other Priority Claims set forth in the Administrative and Priority Claims Schedule over which the Oversight Committee shall reserve consent rights (collectively, the "Reserved Claims"). With respect to any Reserved Claim and any other Administrative Claim, Priority Tax Claim and Other Priority Claim that was not included in the Administrative and Priority Claims Schedule, such claim shall only be Allowed (i) upon agreement of the Plan Administrator and the Oversight Committee or (ii) as determined by Final Order of the Bankruptcy Court (the "Administrative Claims Protocol"). Until each Allowed Administrative and Priority Claim is paid in full, the Cash in the Administrative and Priority Claims Reserve shall not be used for any purpose other than to pay Allowed Administrative Claims (except Professional Claims, which shall be paid from the Professional Claims Reserve), Priority Tax Claims and Other Priority Claims, and, subject to Section 5.11(e), no payments on account of the foregoing Claims shall be made from any source other than the Administrative and Priority Claims Reserve.

The Plan Administrator (i) shall segregate and shall not commingle the Cash held in the Administrative and Priority Claims Reserve and (ii) shall pay each Administrative Claim (except

Professional Claims, which shall be paid from the Professional Claims Reserve), Priority Tax Claim and Other Priority Claim, on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim. After all Administrative Claims (including Professional Claims), Priority Tax Claims and Other Priority Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Plan Administrator, any remaining Cash in the Administrative and Priority Claims Reserve shall be released and transferred from the Administrative and Priority Claims Reserve to the Wind-Down Reserve so as to provide adequate funding of the Wind-Down Budget, as may be modified as set forth herein, and then to the GUC Claims Reserve.

(c)    GUC Claims Reserve

On or before the Initial Distribution Date, the Plan Administrator shall create one or more GUC Claims Reserve(s). On each Distribution Date, the Distribution Agent, as applicable, shall fund the GUC Claims Reserve(s) in Cash in the amount of the GUC Claims Reserve Amount. Subject to Section 5.11(e), no payments made on account of Disputed General Unsecured Claims that become Allowed General Unsecured Claims after the Effective Date shall be made from any source other than the GUC Claims Reserve. After all Disputed Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid their respective Pro Rata distribution by the Distribution Agent, any remaining Cash in the GUC Claims Reserve shall be released and transferred to the Wind-Down Reserve so as to provide adequate funding of the Wind-Down Budget, as may be modified as set forth herein, and then to the GUC Claims Reserve.

(d)    Wind-Down Reserve

On or before the Effective Date, the Debtors shall create and fund the Wind-Down Reserve in Cash in the amount set forth in the Wind-Down Budget. Subject to Section 5.11(e), no payments to the Plan Administrator and Plan Administrator Professionals shall be made from any source other than the Wind-Down Reserve. The Plan Administrator shall segregate and shall not commingle the Cash held in the Wind-Down Reserve. Upon the dissolution of the Liquidating Debtors and the conclusion of all wind-down activities of the Plan Administrator, any remaining Cash in the Wind-Down Reserve shall be distributed in accordance with Section 3.02 of the Plan as Aceto Net Distributable Assets and/or Rising Net Distributable Assets in accordance with the Distribution Calculation.   The Wind-Down Budget and Wind-Down Reserve may be modified by the Plan Administrator, subject to the consent of the Oversight Committee (not to be unreasonably withheld) to the extent not disbanded pursuant to Section 5.14.

(e)    Other Reserves and Modification to Reserves

Subject to and in accordance with the provisions of the Plan Administrator Agreement and the Wind-Down Budget, the Plan Administrator may establish and administer any other necessary reserves that may be required under the Plan or the Plan Administrator Agreement.

Additionally, and notwithstanding anything to the contrary contained in the Plan, the Plan Administrator may make transfers of money between the reserves established under the Plan to

satisfy Claims and other obligations in accordance with the Plan, and may increase any reserve from the Aceto Net Distributable Assets and/or Rising Net Distributable Assets, as applicable, based on Allowed Administrative Claims or Allowed Priority Claims to the extent that the amounts originally funded into the reserves are insufficient to satisfy such Claims.

For the further avoidance of doubt, and notwithstanding anything herein to the contrary, (i) all reserves established under the Plan shall not be construed as a cap or limitation on the allowance and payment of any Administrative Claims or Priority Claims; and (ii) to the extent that the Wind-Down Reserve and Wind-Down Budget is insufficient to satisfy all wind-down costs and expenses of the Liquidating Debtors, no distributions shall be made to Holders of Interests in Aceto, Allowed Subordinated Claim against the Aceto Chemical Plus Debtors and Allowed Subordinated Claims against the Rising Pharma Debtors (*i.e.* Classes 4A, 4B and 6A) unless and until the Wind-Down Reserve is increased by the Plan Administrator (with the prior consent of the Oversight Committee (to the extent not disbanded pursuant to Section 5.14), which consent shall not be unreasonably withheld) with available funds from the Aceto Net Distributable Assets and/or Rising Net Distributable Assets in an amount sufficient to satisfy all wind-down costs and expenses of the Liquidating Debtors.

**Section 5.12.    Exemption from Certain Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall be directed to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Section 5.13.    Preservation of Causes of Action**. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtors and their Estates shall retain all of the Debtors' Causes of Action (including those Causes of Action to be identified in the Plan Supplement) other than any Causes of Action that are Purchased Assets under the Chemical Plus Purchase Agreement or Pharma Purchase Agreement or otherwise expressly released pursuant to the terms of this Plan or an order of the Bankruptcy Court, including the Final DIP Order, and such retained Causes of Action of the Debtors shall remain vested in the Liquidating Debtors on the Effective Date.  The Plan Administrator may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including, without limitation, any actions or categories of actions specifically enumerated in a list of retained Causes of Action contained in the Plan Supplement, and such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Debtors. The Plan Administrator, subject to Section 5.14 but otherwise in its sole discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Plan Administrator may pursue Causes of Action in accordance with the best interests of the beneficiaries of the Debtors' estates. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan**

**Administrator will pursue or not pursue any and all available Causes of Action. The Plan Administrator and Liquidating Debtors expressly reserve all rights to prosecute any and all Causes of Action of the Debtors against any Entity, except as otherwise expressly provided in the Plan or to the extent released pursuant to other Orders of the Bankruptcy Court.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or an order of the Bankruptcy Court, the Plan Administrator expressly reserves all of the Debtors' Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

### Section 5.14.    Oversight Committee

(a)    As of the Effective Date, a post-confirmation committee to oversee certain actions of the Plan Administrator (the "Oversight Committee") shall be formed. The Oversight Committee shall be comprised of three (3) members to be designated by the Creditors' Committee and reasonably acceptable to the Debtors.  The members of the Oversight Committee shall be identified in the Plan Supplement and (i) may include the Notes Indenture Trustee and one Holder of the Notes and (ii) shall include at least one creditor that is a Holder of General Unsecured Claim(s) against the Rising Pharma Debtors; provided that to the extent all Class 3A Holders of Allowed General Unsecured Claims against the Aceto Chemical Plus Debtors are paid in full as set forth in Section 3.02(c), any such Notes Indenture Trustee, Holder of the Notes or other Class 3A creditor that is a member of the Oversight Committee (and does not also hold an Allowed Class 3B General Unsecured Claim against the Rising Pharma Debtors that has not been paid in full as set forth in Section 3.02(d)) shall be deemed to have automatically resigned from the Oversight Committee. Upon the death or resignation (or deemed resignation) of a member of the Oversight Committee, the remaining members of the Oversight Committee shall fill the applicable vacancy on the Oversight Committee, subject to the consent of the Plan Administrator, which consent shall not be unreasonably withheld.

After the Effective Date, and until the Oversight Committee is dissolved and discharged, the Plan Administrator shall (i) provide quarterly reports to the Oversight Committee in connection with the wind-down of the Liquidation Debtors and (ii) consult with the Oversight Committee regarding the following:

(i)    commencing additional Causes of Action (to the extent not filed or otherwise commenced prior to the Effective Date) and any Claims to the extent that the Plan Administrator proposes a settlement (including providing for an Allowed Claim) in the amount of $1,000,000 and above;

(ii)    any decision of the Plan Administrator to retain additional Professionals (to the extent not specified in the Plan Administrator Agreement);

(iii)    material issues regarding the any tax, regulatory or other governmental filings in connection with the wind-down of the Liquidating Debtors; and

(iv)    the Oversight Committee's consent to any proposed changes to the Wind-Down Budget (which consent shall not be unreasonably withheld).

(b)    Plan Administrator Control/Dispute Resolution:  The Plan Administrator shall have complete control over the day-to-day decisions and operations of the Liquidating Debtors except as otherwise provided for in the Plan or Plan Administrator Agreement.  Any disputes regarding consultation rights or consent rights provided to the Oversight Committee under the Plan or Plan Administrator Agreement shall be brought before the Bankruptcy Court on the condition that the party seeking such Bankruptcy Court determination shall file a certification or declaration indicating that the parties met and conferred (or had previously met and conferred) regarding such dispute(s) in good faith and were unable to reach resolution.

(c)    The Oversight Committee shall have the rights to: employ and compensate professionals on behalf of the Oversight Committee (subject to the agreed-upon budgeted amounts for such professionals as set forth in the Wind-Down Budget), and as further set forth in the Plan Administrator Agreement.

(d)    Members of the Oversight Committee shall receive no compensation from the Debtors, the Liquidating Debtors or the Plan Administrator on account of their membership on the Oversight Committee except for reimbursement of their reasonable out of pocket expenses (which, for the avoidance of doubt, shall not include the fees or expenses of any professionals retained individually or independently by any member of the Oversight Committee).  The Oversight Committee itself will be reimbursed in accordance with the Wind-Down Budget for professional fees of the Oversight Committee   Upon the earlier to occur of (i) the closing of the Chapter 11 Cases or (ii) the payment in full of Allowed General Unsecured Claims in Class 3A and 3B as provided in the Plan, the Oversight Committee shall be automatically disbanded and its members shall have no further duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation.

(e)    Indemnification:  The Liquidating Debtors shall indemnify and hold harmless (i) the Oversight Committee, its members and the Oversight Committee's Professionals (collectively, the "OC Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such OC Indemnified Party's willful misconduct or gross negligence, with respect to the Oversight Committee's implementation or administration of the Plan or the Plan Administrator Agreement or its oversight of the Plan Administrator. To the extent an OC Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the OC Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such OC Indemnified Party (and such OC Indemnified Party undertakes to repay such amounts if it ultimately shall be determined through a Final Order that such OC Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Reserve or any available Insurance Contracts, including insurance purchased using the Wind-Down Reserve. These indemnification provisions shall remain available to and be binding upon any

former member of the Oversight Committee or the decedent's estate of any former Oversight Committee member, and shall survive the termination of the Oversight Committee.

(f)    Exculpation: The Plan Administrator Agreement shall provide for the exculpation of each OC Indemnified Parties to the fullest extent permitted by applicable law.

**Section 5.15.    Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent any Insurance Contract(s) provides coverage with respect to any General Unsecured Claim or Subordinated Claim, the Holder of such Claim shall, without duplication, (a) be paid only to the extent of any available coverage under any applicable Insurance Contract(s), and (b) if such Claim is entitled to receive the treatment provided for in this Plan for Allowed General Unsecured Claims or Allowed Subordinated Claims, be paid only to the extent the applicable Insurance Contract(s) does not provide coverage with respect to any portion of the Claim.  If the Holder of any such Claim has received payment under this Plan and under any Insurance Contract that results in a double recovery, then (i) the Holder shall be required to return the amount received under the Plan, to the extent of such double recovery, to the Plan Administrator (for the benefit of the relevant Liquidating Debtor(s), and (ii) the Plan Administrator and relevant Liquidating Debtor(s) shall be entitled to commence legal action against such Holder, if necessary, to recover such double recovery in accordance with this Plan.

**Section 5.16.    Preservation of Privilege and Defenses**.

The Confirmation Order shall provide that, on the Effective Date, all of the Debtors' privileges and work product, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral), related to Causes of Action, shall be maintained by the Plan Administrator, which will have exclusive authority to waive or not waive the Debtors' privileges in its sole discretion. The Confirmation Order shall further provide that nothing in the Plan (including this Section 5.16) or the Confirmation Order is intended to, does, or may be construed to expand the privileges or other protections against disclosure, if any, belonging to the Debtors as of the Effective Date, it being understood that the purpose of this Section 5.16 and any corresponding provisions in the Confirmation Order is to ensure that any privileges and other protections against disclosure existing as of the Effective Date are preserved and are not waived.

The Plan Administrator will seek to preserve and protect all applicable privileges and work product vested in the Liquidating Debtors. The Plan Administrator's receipt of such information shall not waive any privileges and such privileges are preserved.  The Liquidating Debtors and the individual directors, officers or members/managers of the Debtors shall remain in control of all of their respective privileges (subject to the provisions of the foregoing paragraphs), and the Liquidating Debtors, and the individual directors, officers or members/managers of the Debtors, each as applicable, retain the right to waive their own privileges prospectively.

**Section 5.17.    Books and Records**. On the Effective Date, all books and records of the Debtors that were not required to be transferred to the Chemical Plus Buyer or Pharma Buyer pursuant to the terms of the Chemical Plus Purchase Agreement or the Pharma Purchase Agreement shall be transferred to the Liquidating Debtors.

The Plan Administrator shall be free, in its discretion (subject to consultation with the Oversight Committee, to the extent not disbanded pursuant to Section 5.14) to abandon, destroy or otherwise dispose of any books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, upon reasonable notice to parties in interest, including relevant governmental entities.  With respect to any books and records that are not, in the view of the Plan Administrator, relevant for the continuing prosecution of any objections to Claims, defense of any potential Claims or actions against the Debtors or Liquidating Debtors, any Causes of Action, or the wind-down of the Debtors' Estates, the Plan Administrator shall be free, in its discretion (subject to consultation with the Oversight Committee, to the extent not disbanded pursuant to Section 5.14) to abandon, destroy or otherwise dispose of such books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other Order of the Bankruptcy Court and shall have no liability for same.

## ARTICLE VI

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**Section 6.01.      Executory Contracts and Unexpired Leases to Be Rejected**. Upon the occurrence of the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected in accordance with, and subject to, sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is listed on the Schedule of Assumed Executory Contracts contained in the Plan Supplement; (ii) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; (iv) is an Insurance Contract; or (v) is otherwise assumed pursuant to the terms herein. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements herein.

(a)      *Preexisting Obligations to Debtors*. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Liquidating Debtors, and the Plan Administrator expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts.

(b)      *Rejection Damages Claim Procedures*. Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date, the

effective date of rejection, or the date notice of such rejection is transmitted by the Debtors or the Plan Administrator, as applicable, to the counterparty to such Executory Contract or Unexpired Lease. Any proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases that are not timely filed shall be Disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Liquidating Debtors, without the need for any objection by the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(c)     *Reservation of Rights*. Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors may amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

**Section 6.02.     Executory Contracts to Be Assumed**. Upon the occurrence of the Effective Date, each Executory Contract that is listed on the Schedule of Assumed Executory Contracts contained in the Plan Supplement, shall be deemed assumed, in accordance with, and subject to, sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. To the extent any provision in any Executory Contract assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Liquidating Debtors' assumption of such Executory Contract, then such provision shall be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto. Each Executory Contract assumed pursuant to this Article VI of the Plan will revest in the Liquidating Debtors and be fully enforceable by the Plan Administrator on behalf of the Liquidating Debtors, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(a)     *Modifications, Etc*. Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated pursuant to this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)      *Proofs of Claim Based on Assumed Contracts or Leases*. Any and all proofs of Claim based on Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including hereunder, except proofs of Claim asserting Cure Amounts, pursuant to the order approving such assumption or assumption and assignment, including the Sale Orders and the Confirmation Order, shall be deemed Disallowed and expunged from the Claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      *Cure Proceedings and Payments*. With respect to each of the Executory Contracts assumed hereunder, the Debtors or the Plan Administrator shall designate a proposed Cure Amount, and the assumption of such Executory Contract shall be conditioned upon the disposition of all issues with respect to the Cure Amount. Except as otherwise set forth on the Schedule of Assumed Executory Contracts, the Cure Amount with respect to each of the Executory Contracts assumed hereunder is designated by the Debtors as zero dollars, subject to the determination of a different Cure Amount pursuant to the procedures set forth herein (including Section 6.02(e) below) and in the Cure Notices. Except with respect to Executory Contracts for which the Cure Amount is zero dollars, or for which the Cure Amount is in dispute, the Cure Amount shall be satisfied by the Liquidating Debtors, if any, by payment of the Cure Amount in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract without any further notice to or action, order, or approval of the Bankruptcy Court.

Any provisions or terms of the Executory Contracts to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Amount, or by an agreed-upon waiver of the Cure Amount. If there is a dispute regarding such Cure Amount, the ability of the Liquidating Debtors to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption, or as may be agreed upon by the Debtors or the Plan Administrator, as applicable, and the counterparty to the Executory Contract; *provided, however*, that the Debtors or the Plan Administrator, as applicable, shall have the right either to reject or nullify the assumption of any Executory Contract after entry of a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Amount, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption, as applicable.

(d)      *Cure Notice*. No later than seven days before the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts a Cure Notice that will (i) notify the counterparty of the proposed assumption of the applicable Executory Contract, (ii) list the applicable Cure Amount, if any, set forth on the Schedule of Assumed Executory Contracts, (iii) describe the procedures for filing objections to the proposed assumption of the applicable

Executory Contract, (iv) describe the procedures for filing objections to the proposed Cure Amount of the applicable Executory Contract, and (v) explain the process by which related disputes will be resolved by the Bankruptcy Court. If no objection is timely received, (A) the non-Debtor party to the assumed Executory Contract shall be deemed to have consented to the assumption of the applicable Executory Contract and shall be forever barred from asserting any objection with regard to such assumption, and (B) the proposed Cure Amount shall be controlling, notwithstanding anything to the contrary in any applicable Executory Contract or other document as of the date of the filing of the Plan, and the non-Debtor party to an applicable Executory Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors or the Liquidating Debtors, or the property of any of them.

(e)     *Cure Objections*. If a proper and timely objection to the Cure Notice or proposed Cure Amount was filed by the Cure Objection Deadline, the Cure Amount shall be equal to (i) the amount agreed to between the Debtors or Plan Administrator, as applicable, and the applicable counterparty or (ii) to the extent the Debtors or Plan Administrator and counterparty do not reach an agreement regarding any Cure Amount or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure Amount and any related issues. Objections, if any, to the proposed assumption and/or Cure Amount must be in writing, filed with the Bankruptcy Court, and served in hard-copy form on the parties identified in the Cure Notice so that they are actually received by the Cure Objection Deadline.

(f)     *Hearing with Respect to Objections*. If an objection to the proposed assumption of an Executory Contract and/or to the proposed Cure Amount thereof is timely filed and received in accordance with the procedures set forth in Section 6.02(e) of the Plan, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or the Plan Administrator, as applicable. Objections to the proposed Cure Amount or assumption of an Executory Contract will not be treated as objections to Confirmation of the Plan.

(g)     *Reservation of Rights*. Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors may amend their decision with respect to the assumption of any Executory Contract and provide a new notice amending the information provided in the applicable notice. In the case of an Executory Contract designated for assumption that is the subject of a Cure Amount objection that has not been resolved prior to the Effective Date, the Debtors or the Plan Administrator, as applicable, may designate such Executory Contract for rejection at any time prior to the payment of the Cure Amount, as set forth in Section 6.02(c) of the Plan.

**Section 6.03.     General Reservation of Rights**. Neither the exclusion nor inclusion of any contract or lease on the Schedule of Assumed Executory Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors, the Liquidating Debtors, the Plan Administrator, or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**Section 6.04.        Insurance Contracts.** Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Plan Administrator Agreement, the Confirmation Order, any bar date order or notice or claim objection order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt in to any releases, or any provision that sets a reserve): (a) all Insurance Contracts shall continue in effect after the Effective Date pursuant to their respective terms and conditions and shall be treated, to the extent necessary, as if assumed by the Plan Administrator on behalf of the Liquidating Debtors, and subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption pursuant to sections 105 and 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption is in the best interests of the Estates; (b) all rights and obligations of the Debtors under any Insurance Contracts shall automatically become vested in the Liquidating Debtors (with such rights to be enforceable by the Plan Administrator on behalf of the Liquidating Debtors), unaltered and without necessity for further approvals or orders and nothing shall alter the legal, equitable or contractual rights, obligations and defenses of the Debtors and the Insurers under the Insurance Contracts or modify the coverage provided thereunder or the terms and conditions thereof except that on and after the Effective Date, the Plan Administrator on behalf of the Liquidating Debtors, shall become and remain liable for all of the Debtors' obligations under the Insurance Contracts regardless of whether such obligations arise before or after the Effective Date and without the need or requirement for any Insurer to file a proof of Claim or Administrative Claim. For the avoidance of doubt, the Debtors or the Plan Administrator on behalf of the Liquidating Debtors, as applicable, shall retain the right, if any, to challenge any amounts owed under the Insurance Contracts in accordance with their terms; and (c) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non- bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

The Debtors or the Plan Administrator on behalf of the Liquidating Debtors, as the case may be, shall maintain D&O Policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years from the closing of the Chemical Plus Sale, to the fullest extent permitted by such provisions (subject to the Wind-Down Budget), in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors; *provided, however*, that nothing in the Plan or the Confirmation Order alters the terms and conditions of the D&O Policies. Nothing in this Plan

shall be deemed to impair any Entity's claim, if any, to proceeds of the D&O Policies or the priority of payment on such claim, if any, under the D&O Policies.

## ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**Section 7.01.      Determination of Claims and Interests**. After the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Section 5.13 of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan or other order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed (including to the extent no objection to such Claim or Interest is filed on or prior to the Claim Objection Deadline) or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties. For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this Section 7.01 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Liquidating Debtors may have against any Entity in connection with or arising out of any Claim, including any rights under section 157(b) of title 28 of the United States Code.

**Section 7.02.      Claims Administration Responsibility**. Notwithstanding anything to the contrary herein, after the Effective Date, the Plan Administrator shall, subject to Section 5.14 and the Plan Administrator Agreement, retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims, including, in each case, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the Claims register to reflect any such settlements or compromises, all without any further notice to or action, order, or approval by the Bankruptcy Court.

**Section 7.03.      Objections to Claims**. Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Plan Administrator without further notice to parties-in-

interest). Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Plan Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address); or (c) by either first class mail, postage prepaid, or email, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

  **Section 7.04.**  **Disallowance of Claims**. Except as otherwise agreed, any and all proofs of Claim filed after the applicable deadline for filing such proofs of Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims, unless any such late proof of Claim is deemed timely filed by a Final Order of the Bankruptcy Court.

  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Plan Administrator, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification. Nothing in this Plan shall preclude amendments to timely filed proofs of Claim to the extent permitted by applicable law.

  All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Plan Administrator allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed if (a) the Entity, on the one hand, and the Debtors or the Plan Administrator, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

  **Section 7.05.**  **Estimation of Claims**. Before the Effective Date, the Debtors and after the Effective Date, the Plan Administrator, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of funding any applicable reserves), without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such

Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. All estimation procedures set forth in the Plan shall be applied in accordance with section 502(c) of the Bankruptcy Code. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

**Section 7.06.    No Interest on Disputed Claims**. Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**Section 7.07.    Amendments to Claims**. On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Liquidating Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court and the Claims and Solicitation Agent is authorized to immediately expunge any such Claim.

# ARTICLE VIII

# PROVISIONS GOVERNING DISTRIBUTIONS

**Section 8.01.    Timing of Distributions for Allowed Claims**. Except as otherwise provided for herein (including as set forth in Sections 8.12 and 8.13) or ordered by the Bankruptcy Court, distributions under this Plan with respect to Allowed Claims shall be made on the later of (a) the Initial Distribution Date or (b) on the first Periodic Distribution Date occurring after the later of, (i) 30 days after the date when a Claim is Allowed or (ii) 30 days after the date when a Claim becomes payable pursuant to any agreement between the Debtors, the Liquidating Debtors, the Plan Administrator, and the Holder of such Claim; *provided, however*, that the Plan Administrator may make one-time distributions on a date that is not a Periodic Distribution Date.

**Section 8.02.    Currency**. Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of the Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next The Wall Street Journal following the Effective Date.

**Section 8.03.    Distribution Agent**. The Distribution Agent shall make all distributions required under this Plan, subject to the terms and provisions of this Plan. If the Distribution Agent is an independent third party designated to serve in such capacity, such Distribution Agent shall receive, without further Court approval, reasonable compensation from

the Wind-Down Reserve for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses. No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties. The Distribution Agent shall be authorized and directed to rely upon the Debtors' books and records and, as applicable, the Plan Administrator's representatives and professionals in determining Allowed Claims not entitled to distributions under the Plan in accordance with the terms and conditions of this Plan. The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

Section 8.04.      **Claims Administered by Servicers**. In the case of Holders of Claims governed by an agreement and administered by a Servicer, including the Notes Indenture Trustee with respect to the Allowed Notes Claims, the Servicer shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder. The Distribution Agent shall make all distributions on account of such Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion. Each Servicer shall, at its option, hold or direct such distributions for the beneficial Holders of such Allowed Claims, as applicable; *provided, however*, that the Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to the beneficial Holders of such Allowed Claims, including rights on account of its charging lien as set forth in the relevant Notes Indenture; *provided, further, however*, that the Debtors' and the Liquidating Debtors' obligations to make distributions pursuant to this Plan shall be deemed satisfied upon delivery of distributions to the relevant Servicer (including the Notes Indenture Trustee with respect to the Allowed Notes Claims) or any Entity or Entities designated by the Servicers. The Servicers shall not be required to give any bond, surety, or other security for the performance of their duties with respect to such distributions.

Section 8.05.      **Distributions on Claims Allowed After the Effective Date**.

(a)      *No Distributions Pending Allowance*. No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

(b)      *Special Rules for Distributions to Holders of Disputed Claims*. Notwithstanding any provision to the contrary in the Plan, and except as otherwise agreed by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. All distributions made pursuant to the Plan on account of a Disputed Claim that is later deemed an Allowed Claim by the Bankruptcy Court shall be made together with any other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; *provided, however*, that no interest shall be paid on account of such Allowed Claims unless required under applicable bankruptcy law.

(c)     *Distributions from GUC Claims Reserve*.  The Plan Administrator shall establish and administer the GUC Claims Reserve.  Each Holder of a Disputed General Unsecured Claim that becomes an Allowed General Unsecured Claim after the Effective Date shall receive the treatment set forth in Section 3.02 of the Plan. On each Periodic Distribution Date, all amounts in the GUC Claims Reserve on account of (A) the DPO Claim to the extent it is conclusively determined that the Other Creditors' Threshold will not and cannot be satisfied, or (B) a Disputed General Unsecured Claim that has become Disallowed in whole or in part (or has been Allowed in an amount less than its Provisionally Allowed amount) shall be available for distribution to Holders of Allowed General Unsecured Claims in Classes 3A, 3B, 3C and/or 3D (depending on which Estates funded the GUC Claims Reserve).

(d)     *Withholding and Reporting Requirements*.  In connection with the consummation of this Plan, to the extent applicable, the Debtors, the Liquidating Debtors, the Plan Administrator and Distribution Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a Distribution under this Plan shall have the sole and exclusive responsibility for providing any requested Tax Information or documentation to the Distribution Agent, and for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution. The Debtors, the Liquidating Debtors, the Plan Administrator and the Distribution Agent each have the right, but not the obligation, to not make a Distribution until such Holder has (i) made arrangements satisfactory to any disbursing party for payment of any such tax obligations and (ii) provided any requested Tax Information or documentation to the Distribution Agent. The Debtors, the Liquidating Debtors, the Plan Administrator and the Distribution Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim or Interest in Aceto complete and return a Form W-8 or W-9, or other applicable form, as applicable to each such Holder, and additional Tax Information.   If the Debtors, Liquidating Debtors or Plan Administrator make such a request and the Holder fails to comply before the date that is 60 days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Debtors and any Claim or Interest in respect of such Distribution shall be disallowed and forever barred from receiving a Distribution under this Plan.

**Section 8.06.      Delivery of Distributions**.

(a)     *Record Date for Distributions*.  As of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Distribution Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

-55-

(b)     *Cash Distributions*. Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Distribution Agent, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(c)     *Address for Distributions*. Distributions to Holders of Allowed Claims shall be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of Claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors or the Distribution Agent have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer. The Debtors, the Liquidating Debtors, and the Distribution Agent shall not incur any liability whatsoever on account of any distributions under the Plan.

(d)     *Undeliverable Distributions*. If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or the appropriate Servicer is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest on the next Periodic Distribution Date. Amounts in respect of undeliverable distributions shall be returned to the Liquidating Debtors' Estate from which such distribution originated.

(e)     *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of three (3) months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Liquidating Debtors free of any restrictions thereon. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions, de minimis distributions, and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute) and Holders of Allowed Interest in Aceto (to the extent entitled to any distributions), and notwithstanding any provision in such indenture, Certificate or otherwise to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(f)     *De Minimis Distributions*. Notwithstanding any other provision of the Plan to the contrary, the Distribution Agent and any Servicer shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $50.00; *provided, however*, that the Distribution Agent shall make, or cause to be made, a distribution on a Periodic

-56-

Distribution Date of less than $50.00 if the Distribution Agent expects that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

To the extent that any final Distribution would be *de minimis* or otherwise impracticable in the judgment of the Plan Administrator, the Plan Administrator may donate any such remaining funds to a 501(c)(3) charity such as the New Jersey Bankruptcy Lawyers Foundation.

**Section 8.07.     Surrender of Securities or Instruments**. As soon as practicable after the Effective Date, each Holder of Notes shall surrender its note(s) to the Notes Indenture Trustee, and each Holder of Notes shall be deemed to have surrendered such Holder's security, note, debenture, or other evidence of indebtedness upon surrender of such global security by the Holder or a securities depository or custodian thereof. No distributions under the Plan shall be made for or on behalf of such Holder unless and until such note(s) is received by the Notes Indenture Trustee or the loss, theft, or destruction of such note(s) is established to the reasonable satisfaction of the Notes Indenture Trustee, which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Liquidating Debtors, and the Notes Indenture Trustee, harmless in respect of such note and distributions made thereof. Upon compliance with this Section 8.07 by a Holder of Notes, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such Claim. Any Holder that fails to surrender such Notes or satisfactorily explain its non-availability to the Notes Indenture Trustee within one year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Debtors (or their property), or the Notes Indenture Trustee in respect of such Claim and shall not participate in any distributions under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Debtors by the Notes Indenture Trustee, and any such security shall be cancelled. Notwithstanding the foregoing, if the record Holder of a Notes Claim is a securities depository or custodian thereof, or if a Notes Claim is held in book-entry or electronic form pursuant to a global security held by a securities depository or custodian thereof, then the beneficial Holder of such an Allowed Notes Claim shall be deemed to have surrendered such Holder's security, note, debenture, or other evidence of indebtedness upon surrender of such global security by the securities depository or custodian thereof.

**Section 8.08.     Compliance Matters**. In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Debtors and Plan Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Section 8.09.    **Claims Paid or Payable by Third Parties**. The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Distribution Agent without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Distribution Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

Section 8.10.    **Setoffs**. Except as otherwise expressly provided for in the Plan and except with respect to any Notes Claim, and any distribution on account thereof, the Liquidating Debtors, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtors or the Liquidating Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Liquidating Debtors of any such Claims, rights, and Causes of Action that the Debtors or Liquidating Debtors may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Liquidating Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Bankruptcy Code section 553 or otherwise.

Section 8.11.    **Allocation of Plan Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

Section 8.12.    **DPO Claim Recovery and Distribution Matters**.  Consistent with and pursuant to the Mutual Release Agreement, the Holder of the DPO Claim shall receive its recovery in Classes 3A and 3B as follows:  the DPO Claim shall receive on account of its Allowed $30,000,000 Claim a recovery on a *pro rata* basis together with the Allowed General Unsecured Claims in Classes 3A and 3B participating in such distributions until the Holder of such DPO Claim has received, in the aggregate, its *pro rata* distribution in an amount up to, but not exceeding, $6,500,000 (the "Initial Recovery Amount"); *provided that* the Initial Recovery Amount shall first be recovered from any available Aceto Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors, and only to the extent such assets prove insufficient to fund the Initial

Recovery Amount shall the Initial Recovery Amount (or the amount remaining to provide for payment of the Initial Recovery Amount) be recovered from the Rising Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Rising Pharma Debtors.   From and after the time when the Holder of the DPO Claim has received, in the aggregate, the Initial Recovery Amount, the DPO Claim shall be subordinated to the Allowed Claims of all other General Unsecured Creditors of the Debtors' collective bankruptcy estates and the Holder of the DPO Claim shall not receive any additional recovery thereon until all such other Holders of General Unsecured Claims collectively in all of the Debtors' Estates (treated as if all of the Debtors' Estates are substantively consolidated, and without giving effect to any Intercompany Claims) collectively have received a recovery of 65% of the Allowed amount of their General Unsecured Claims against the collective Estates of the Debtors (or would have received such a 65% recovery of the Allowed amount of their General Unsecured Claims had all of the Estates been substantively consolidated), without giving effect to any Intercompany Claims (the "Other Creditors' Threshold").   After such time when the Other Creditors' Threshold have been so received (or would have been so received) by such other General Unsecured Creditors (aside from the Holder of the DPO Claim) in the Debtors' Estates (without giving effect to any Intercompany Claims and to the extent all of the Debtors' Estates had been substantively consolidated), the Holder of the DPO Claims shall once again become entitled to, and shall (to the extent of any available further distributions) receive such further distributions (the "Additional Recovery Amount") on a *pro rata* basis (based on an allowed DPO Claim in the amount of $30,000,000) together with the Allowed General Unsecured Claims in Classes 3A and 3B participating in such distributions until the Holder of such DPO Claim has received a maximum aggregate recovery amount of $20,000,000 (inclusive of the Initial Recovery Amount and all other amounts received in respect of the DPO Claim), *provided that* the Additional Recovery Amount shall first be recovered from any available Aceto Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors, and only to the extent such assets prove insufficient to fund the Additional Recovery Amount shall the Additional Recovery Amount (or the amount remaining to provide for payment of the Additional Recovery Amount) be recovered from the Rising Net Distributable Assets on a *pro rata* basis together with other Allowed Class 3A General Unsecured Claims against the Rising Pharma Debtors.   For the avoidance of doubt, the Holder of the DPO Claim shall receive a maximum aggregate recovery of $20,000,000 on account of the DPO Claim.

**Section 8.13.       Distributions (if any) to Holders of Allowed Interests in Aceto**. Distributions, if any (and solely to the extent and at such time that Aceto Net Distributable Assets are available following payment in full of all Allowed Class 3A General Unsecured Claims against the Aceto Chemical Plus Debtors, including payment of post-petition interest as set forth in Section 3.02), to Holders of Interests in Aceto shall be made by the Plan Administrator in accordance with such procedures that the Plan Administrator deems proper and appropriate and that are consistent with standard practice and applicable law regarding the payment of amounts to holders of publicly traded securities in a manner customary in the securities industries reasonably intended to maximize the likelihood that such Holders will receive payment in a timely fashion.   Thus, the Plan Administrator shall use reasonable efforts to deliver (or cause to be delivered) Distributions (if any) to Holders of Interests in Aceto to (a) each directly registered Holder of Interests in Aceto as of the Confirmation Date, and (b) each broker, commercial bank, transfer agent, trust company, dealer, or other intermediary or

nominee, or their mailing agent (each a "<u>Nominee</u>") identified by Aceto's Transfer Agent, American Stock Transfer & Trust Company, LLC (American Stock Transfer & Trust Company, LLC or such other entity as may be identified by the Plan Administrator, the "**Transfer Agent**"), as an entity through which beneficial holders indirectly hold Interests in Aceto.    Such distributions, if any, shall only be made to Holders of Interests in Aceto as of the Confirmation Date through and as recorded by the Transfer Agent (or such other paying agent to be identified by the Plan Administrator).  For the avoidance of doubt, no distributions on account of Allowed Interests in Aceto shall be made unless and until all claims of a higher priority under the Bankruptcy Code and the then incurred wind-down expenses of the Plan Administrator have been paid or reserved for in full.

## ARTICLE IX

## EFFECT OF PLAN ON CLAIMS AND INTERESTS

**Section 9.01.** **Vesting of Assets**. Except as otherwise explicitly provided in this Plan, as of the Effective Date, the property of each Debtors' Estate, if any, shall revest in the applicable Liquidating Debtor, as applicable, and shall be free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.

**Section 9.02.** **[RESERVED]**.

**Section 9.03.** **Compromise and Settlement**. Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to the Effective Date. After the Effective Date, any such right shall pass to the Liquidating Debtors without the need for further approval of the Bankruptcy Court. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan including the Plan Settlement shall constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.

**Section 9.04.** **Debtor Release. Pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Liquidating Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtors, the Liquidating Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Liquidating Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of**

any Claim or Interest or any other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sales, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement, the Sale Orders or related agreements, instruments, or other documents, the pursuit of the Sales, the pursuit of consummation of the Sales, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan; *provided* that, nothing in this Section 9.04 shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud as determined by a Final Order, *provided, further*, that there shall be no releases given, or be deemed to have been given hereunder, to any Person or Entity that is a defendant in a lawsuit or Cause of Action commenced by any of the Debtors before the Effective Date or the Liquidating Debtors or Plan Administrator commenced after the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration *provided* by the Released Parties, (2) a good-faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Liquidating Debtors or their respective Estates or the Litigation Trust asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

Section 9.05.    Third Party Release. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law,

equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sales, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement, the Sale Orders or related agreements, instruments, or other documents, the pursuit of the Sales, the pursuit of consummation of the Sales, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, *provided* that, nothing in this Section 9.05 shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud as determined by a Final Order; *provided*, further, that notwithstanding anything to the contrary herein, the foregoing release shall not affect the releases granted to the applicable entities pursuant to the Final DIP Order or the Mutual Release Agreement; *provided*, *further,* that this release shall not (1) preclude the United States Securities and Exchange Commission from enforcing its regulatory or police powers or (2) operate to release any claims or causes of action held directly (but not derivatively) by the United States Securities and Exchange Commission against any non-Debtor person or non-Debtor entity; *provided, further,* that this release shall not release any Securities Claims with respect to the Specified Individuals, provided that any such claims and any judgment or recoveries arising therefrom by Holders of Securities Claims shall be subject to and limited by Section 9.08. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of claims released by the Third Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Third Party Release.

Section 9.06.    **Exculpation and Limitation of Liability. Effective as of the Effective Date, without affecting or limiting either the Debtor Release or the Third Party Release, and notwithstanding anything herein to the contrary, each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for**

any postpetition action taken or omitted to be taken during the period commencing on the Petition Date through and including the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement, the Sale Orders, the Sales, the Final DIP Order, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, provided that, nothing in this Section 9.06 shall be construed to release the Exculpated Parties from gross negligence, willful misconduct, or fraud as determined by a Final Order, *provided, further*, that there shall be no exculpation given or limitation of liability provided, or be deemed to have been given or provided hereunder, to any Person or Entity that is a defendant in a lawsuit or Cause of Action commenced by any of the Debtors before the Effective Date or the Liquidating Debtors or Plan Administrator commenced after the Effective Date.  Each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Section 9.07.    [RESERVED].

Section 9.08.    **Limitation on Securities Claims and Enforcement of Judgments.** The Plan Administrator and any Holders of Securities Claims shall not, subject to this Section 9.08, enforce any judgment, recoveries or settlement obtained against the Specified Individuals or any of the Debtors' current or former directors, officers and managers (to the extent not released pursuant to Section 9.05) unless such judgment or settlement is actually covered by, and payable from, any available insurance coverage under the D&O Policies; *provided* that such prohibition shall not apply to any Specified Individual in the event such Specified Individual (a) fails to reasonably cooperate with any D&O Insurer to the fullest extent requested by such D&O Insurer in the defense and/or settlement of any Cause of Action brought against such Specified Individual or any other party, (b) knowingly or unreasonably takes any action that has the effect of impairing, or knowingly or unreasonably fails to take any action necessary to preserve, coverage under the D&O Policies for any Cause of Action brought against such Specified Individual or any other party (provided that a Specified Individual's election to satisfy these conditions and take steps to qualify such Specified Individual for the protections of the injunction described above shall not under any circumstances be deemed to be knowingly or unreasonably taking an action or failing to take an action for purposes of this subsection (b)), (c) fails to satisfy any required co-insurance obligations, if any, under the D&O Policies arising from

any Cause of Action brought against such Specified Individuals or (d) asserts any Claim relating to any prepetition Indemnification Obligations in violation of Section 9.14 of the Plan, without prejudice to any subrogation or other rights of any D&O Insurer under the D&O Policies. For the avoidance of doubt, each Specified Individual may, in his/her sole discretion, elect to satisfy the foregoing conditions that qualify such Specified Individual to the protections of the injunction described in this section and the decision and/or acts or omissions of one Specified Individual shall have no impact on any other Specified Individual.

Section 9.09.    Injunction. Effective as of the Effective Date, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests or Causes of Action that (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released pursuant to Section 9.04 of the Plan; (c) have been released pursuant to Section 9.05 of the Plan; (d) are subject to the exculpation pursuant to Section 9.06 of the Plan; or (e) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidating Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind including on account of or in connection with or with respect to any such Claims, Interests or Causes of Action that have been compromised or settled against the Debtors, Liquidating Debtors, or any Entity so released or exculpated (or the property or estate of the Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, Liquidating Debtors or any Entity so released or exculpated (or the property or Estates of the Debtors, Liquidating Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action; (3) creating, perfecting, or enforcing any Lien, claim or encumbrance of any kind against the Debtors, Liquidating Debtors or any entity so released or exculpated (or the property or Estate of the Debtors, Liquidating Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtors, Liquidating Debtors or any Entity so released or exculpated (or the property or Estates of the Debtors, Liquidating Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action, except as set forth in Section 8.10 of the Plan, and notwithstanding an indication in a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff or subrogation pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, Liquidating Debtors, or any Entity so released or exculpated (or the property or estate of the Debtors or any Entity so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised or exculpated Claims, Interests or Causes of Action.

**Notwithstanding anything to the contrary in the foregoing or in the Plan, the injunction set forth above shall not enjoin the Securities Claims. For the avoidance of doubt, the Debtors are not receiving a discharge under section 524(a) of the Bankruptcy Code.**

> ### Section 9.10.    Subordination Rights.

(a)    Except as otherwise provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan

(b)    Except as otherwise provided in the Plan, the right of the Debtors or the Plan Administrator on behalf of the Liquidating Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code or otherwise is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall reflect such subordination. Unless the Plan or the Confirmation Order otherwise provide, no distributions shall be made on account of a Subordinated Claim unless ordered by the Bankruptcy Court or otherwise provided for in this Plan.

> ### Section 9.11.    Protection Against Discriminatory Treatment.
Consistent with section 525 of the Bankruptcy Code, no Governmental Unit shall discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Liquidating Debtors, Plan Administrator or another Entity with whom the Liquidating Debtors have been associated, solely because the Liquidating Debtors have been debtors under chapter 11, have been insolvent before the commencement of the Chapter 11 Cases, or have not paid a debt that is settled and released in the Chapter 11 Cases.

> ### Section 9.12.    Release of Liens.
Except as otherwise provided in this Plan, including Section 3.02, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Debtors and their successors and assigns.

**Section 9.13.**    **Reimbursement or Contribution**. If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as non-contingent or is a Claim described in Section 9.14 of the Plan or (b) the relevant Holder of a Claim has filed a contingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**Section 9.14.**    **Limitations on Indemnification Claims**. The following shall govern any claims for indemnification asserted by any Specified Individual or other parties set forth below against the Debtors or the Liquidating Debtors:

(a)    Except to the extent necessary to preserve available insurance coverage under the D&O Policies, each Specified Individual or other party subject to the Limitation on Enforcement of Judgments in Section 9.08 shall be deemed to have waived all of his/her indemnification claims against the Debtors on account of any judgment covered by said section 9.08.

## ARTICLE X

## CONDITIONS PRECEDENT

**Section 10.01.**    **Conditions Precedent to the Effective Date of the Plan**. The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 10.02 of this Plan:

(a)    the Plan and Confirmation Order shall be in form and substance acceptable to the Debtors, upon consultation with the Creditors' Committee;

(b)    the Confirmation Order shall have been entered and shall be a Final Order;

(c)    all agreements set forth in the Plan Supplement, including the Plan Administrator Agreement, shall have been executed;

(d)    the Professional Claims Reserve and the Administrative and Priority Claims Reserve shall have been funded in Cash in full and the Wind-Down Reserve shall have been funded with the amount agreed pursuant to Section 5.11(d) of the Plan;

(e)    the Plan Administrator and Oversight Committee shall have been appointed and shall have assumed their respective rights and responsibilities under the Plan and the Plan Administrator Agreement;

(f)    all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents, or actions required by any law, regulation, or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Liquidating Debtors; and

(g)     all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

**Section 10.02.     Waiver of Conditions Precedent**. The conditions set forth in Section 10.01 may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee (such consent not to be unreasonably withheld).

**Section 10.03.     Notice of Effective Date**. The Plan Administrator shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 10.01 of this Plan have been satisfied or waived pursuant to Section 10.02 of this Plan.  The Debtors shall provide at least five (5) days' advance notice to the Creditors' Committee of the expected occurrence of the Effective Date.

**Section 10.04.     Effect of Non-Occurrence of Conditions to Consummation**. If, prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI

## BANKRUPTCY COURT JURISDICTION

**Section 11.01.     Retention of Jurisdiction**. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan (without prejudice to the rights, if any, of any party in interest to seek to withdraw the bankruptcy reference pursuant to 28 U.S.C. § 157(d) and related law with respect to any issue or proceeding subject to mandatory or discretionary withdrawal), including jurisdiction to:

(a)     resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine, and, if necessary, liquidate any Claims arising therefrom including Cure Amounts pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (iii) the Liquidating Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VI of this Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

(b)     adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings

to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)     ensure that distributions to Holders of Allowed Claims and Interests are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)     allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan or the Sale Orders;

(f)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Pharma Purchase Agreement, the Chemical Plus Purchase Agreement, the Sale Orders, or, subject to any applicable forum selection clause, any contract, instrument, release, or other document created in connection with the Plan, the Disclosure Statement or the Sales;

(g)     enter and implement such orders as may be appropriate if the Confirmation Order or the Sale Orders are for any reason stayed, revoked, modified, and/or vacated;

(h)     enter and implement such orders as may be necessary or appropriate to further execute, implement and/or consummate the provisions of the Plan, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement, and all contracts, instruments, releases, and other agreements and documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, and the Sales;

(i)     enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code, including but not limited to the Sale Orders;

(j)     consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order and the Sale Orders;

(k)     hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(l)     determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code;

(m)    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(n)    hear and determine all disputes involving the existence, nature, scope, or enforcement of the exculpations, injunctions and releases granted in connection with and under the Plan, including under Article IX of the Plan;

(o)    enforce the injunction, release and exculpation provisions set forth in Article IX of the Plan;

(p)    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with consummation of the Plan or the Sales, including the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Chemical Plus Purchase Agreement, the Pharma Purchase Agreement and the Sale Orders, including disputes arising under agreements, documents, or instruments executed in connection with this Plan or the Sales or any disputes arising in connection with any Entity's obligations incurred in connection with the Plan or the Sales;

(q)    hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, including all Causes of Action, wherever located;

(r)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(s)    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

(t)    enter a Final Decree closing the Chapter 11 Cases;

(u)    hear any other matter not inconsistent with the Bankruptcy Code; and

(v)    enforce all orders previously entered by the Bankruptcy Court.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date. Nothing contained herein shall be construed to increase, decrease, or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**Section 12.01.    Binding Effect**. Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Liquidating Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**Section 12.02.     Payment of Statutory Fees**. All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Plan Administrator on behalf of the Liquidating Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree. Furthermore, following entry of the Confirmation Order, the Plan Administrator shall continue to file quarterly reports in compliance with Bankruptcy Rule 2015(a)(5); *provided, however*, such reports shall not purport to be prepared in accordance with GAAP, may not be construed as reports filed under the Securities Exchange Act, and may not be relied upon by any party for any purpose except as set forth in Bankruptcy Rule 2015(a)(5).

**Section 12.03.     Closing of Certain Debtor Cases Upon the Effective Date**.     Upon and as of the Effective Date, without the need for further order of the Bankruptcy Court or motion of, or notice from, the Debtors or the Plan Administrator, the Chapter 11 Cases of each of the Debtors shall be deemed closed without prejudice to the rights of any party in interest to seek to reopen any such Chapter 11 Cases under section 350(b) of the Bankruptcy Code; *provided, however*, that the case of Aceto shall remain open until the Plan Administrator files a motion seeking entry of a final decree closing such case and anything to the contrary set forth in D.N.J. LBR 3022-1 is waived.  Furthermore, (i) all motions, contested matters, adversary proceedings and other matters with respect to those closed cases and those Debtors (including Causes of Action, Claims administration and objections to Claims) shall be administered in the open case of Aceto without prejudice to the rights of any party in interest and (ii) the case caption shall be amended to reflect that the Aceto case is the only remaining open case for each of the Debtors. Upon the Effective Date, the Liquidating Debtors or the Plan Administrator may submit proposed orders for entry by the Bankruptcy Court to memorialize the closing of each of the Chapter 11 cases other than the case of Aceto.

**Section 12.04.     Authorization for Name Change**. Effective as of the Confirmation Date, the name of Aceto Corporation shall be automatically changed to Tri Harbor Holdings Corporation without the necessity for any further order of the Bankruptcy Court or approval of any other Entity, and the Debtors, Liquidating Debtors, and the Plan Administrator are authorized to take any and all actions to effectuate same.  Furthermore, effective as of the Effective Date, the Clerk of the Bankruptcy Court is directed to make a docket entry in the Chapter 11 Cases pending at case number 19-13448 (VFP) substantially as follows: "An order has been entered in this case directing that the caption of this case be changed from Aceto Corporation to Tri Harbor Holdings Corporation" and the new caption of the Debtors' Chapter 11 Cases shall read as follows:

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| Tri Harbor Holdings Corporation (*f/k/a* Aceto Corporation), *et al.,*[1] | Case No. 19-13448 (VFP) |
| Liquidating Debtors. | (Jointly Administered) |

[1]    The Liquidating Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Tri Harbor Holdings Corporation (*f/k/a* Aceto Corporation) (0520); Tri Harbor Chemical Holdings LLC (*f/k/a* Aceto Agricultural Chemicals LLC, *f/k/a* Aceto Agricultural Chemicals Corporation) (3948); Tri Harbor Realty LLC (*f/k/a* Aceto Realty LLC) (7634); Kavod Pharmaceuticals LLC (*f/k/a* Rising Pharmaceuticals, LLC, *f/k/a* Rising Pharmaceuticals, Inc.) (7959); Kavod Health LLC (f/k/a Rising Health, LLC) (1562); Kavris Health LLC (*f/k/a* Acetris Health, LLC) (3236); KAVACK Pharmaceuticals LLC (*f/k/a* PACK Pharmaceuticals, LLC) (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

**Section 12.05.    Application of Bankruptcy Rule 7068.**  The Debtors, before the Effective Date, and the Liquidating Debtors and the Plan Administrator, after the Effective Date, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Disputed Claim must pay the costs incurred by the Debtors or the Liquidating Debtors after the making of such offer, the Debtors and the Liquidating Debtors are entitled to set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

**Section 12.06.    Statutory Committee Dissolution**. On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve, and members thereof shall be released from all rights and duties from or related to the Chapter 11 Cases, *provided, however*, that the Creditors' Committee will stay in existence solely for the limited purpose of filing and prosecuting final fee applications and may seek payment of its Professional Claims in connection therewith.

**Section 12.07.    Post Effective Date Limitation of Notice**. After the Effective Date, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, Persons and Entities must file with the Bankruptcy Court a renewed request to receive documents pursuant to Bankruptcy Rule 2002.   After the Effective Date, the Liquidating Debtors and Plan Administrator are authorized to limit the list of Persons and Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Persons and Entities that have filed with the Bankruptcy Court such a renewed request.

**Section 12.08.    Modification and Amendment**. Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, subject to any applicable consent rights set forth herein, whether such modification is material or immaterial prior to

Confirmation, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan) and any consent rights as set forth herein, the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan after Confirmation, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**Section 12.09.    Confirmation of Plan**. The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**Section 12.10.    Additional Documents**. On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Plan Administrator, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

**Section 12.11.    Revocation, Withdrawal, Non-Consummation**

(a)    *Right to Revoke or Withdraw*. The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    *Effect of Withdrawal, Revocation, or Non-Consummation*. If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain Claims or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void in all respects. In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**Section 12.12.    Post-Confirmation Reporting**.    After the Effective Date, in accordance with the Guidelines established by the United States Trustee, the Plan Administrator

will file quarterly operating reports with Bankruptcy Court.  The Plan Administrator will also file a Report of Distribution as set forth in D.N.J. LBR 3021-1(d).

**Section 12.13.**    **Substantial Consummation of the Plan**.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**Section 12.14.**    **Substitution of the Liquidating Debtors for the Debtors**.  On the Effective Date, the Liquidating Debtors shall be deemed to be substituted as the party in lieu of the Debtors in all pending matters including but not limited to (i) motions, contested matters and adversary proceeding pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums or administrative proceedings outside of the Bankruptcy Court without the need or requirement for the Plan Administrator to file motions or substitutions of parties and counsel.

**Section 12.15.**    **Request for Expedited Determination of Taxes**.   The Debtors, the Liquidating Debtors, and the Plan Administrator, as applicable shall have the right to request an expedited determination under section 505 of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through dissolution.

**Section 12.16.**    **Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered on the parties below shall be served as follows:

If to the Debtors or Liquidating Debtors:

Tri Harbor Holdings Corporation
c/o  Plan Administrator


*With a copy (which shall not constitute notice) to:*

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068
Attn:   Kenneth A. Rosen, Esq. Michael S. Etkin, Esq.,
Wojciech F. Jung, Esq. Philip J. Gross, Esq.


If to the Plan Administrator:

[ ]


If to the Office of the United States Trustee:
U.S. Department of Justice
Office of the United States Trustee

Attn:   David Gerardi, Esq.
One Newark Center
1085 Raymond Blvd, Suite 2100
Newark, NJ 07102

If to the Oversight Committee:

[ ]

**Section 12.17.**   **Term of Injunctions or Stays**. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**Section 12.18.**   **Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state of incorporation, formation, or functional equivalent thereof, as applicable, of the applicable Liquidating Debtor.

**Section 12.19.**   **Immediate Binding Effect**. Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 6006(d) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims against or Interests in the Debtors (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Persons and Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.  All Claims and debts shall be fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**Section 12.20.**   **Entire Agreement**. Except as otherwise indicated, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**Section 12.21.**   **Severability**. If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable

to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, and (c) non-severable and mutually dependent.

**Section 12.22.     No Waiver or Estoppel**. Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**Section 12.23.     Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern. In the event the provisions of this Plan and the Sale Order conflict with respect to the Acceptable Sale, the Sale Order shall govern. In the event that the provisions of this Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 17, 2019

Respectfully submitted,

ACETO CORPORATION, on
behalf of itself and its affiliated Debtors

*/s/ Steven S. Rogers*
Name:  Steven S. Rogers
Title:  Chief Legal Officer and Secretary

**Exhibit A**

**D&O Policies**

| | Policy Type | Insurer | Policy Number | Policy Begins | Policy Ends |
|---|---|---|---|---|---|
| 1 | Directors & Officers Liability (Primary $10M) | Travelers Casualty & Surety Co. of America | 105958465 | 7/1/2017 | 4/29/25 (6 year tail) |
| 2 | Directors & Officers Liability ($10M Excess $10M) | Illinois National Insurance Co. | 01-593-05-33 | 7/1/2017 | 4/29/25 (6 year tail) |
| 3 | Directors & Officers Liability ($10M Excess $20M) | Wesco Insurance Co. | EUW113062902 | 7/1/2017 | 4/29/25 (6 year tail) |
| 4 | Directors & Officers Liability ($10M Excess $30M) | XL Specialty Insurance Co. | ELU 156574-18 | 7/1/2018 | 4/29/25 (6 year tail) |
| 5 | Directors & Officers Liability ($10M Excess $40M) | State National Ins. Co. | EXN CUAI0065-00 | 7/1/2018 | 4/29/25 (6 year tail) |
| 6 | Directors & Officers Liability ($5M Excess $50M) | RSUI Indemnity Co. | NHS677634 | 7/1/2018 | 4/29/25 (6 year tail) |
| 7 | Directors & Officers Liability ($5M Excess $55M) | Continental Casualty Co. | 59650019 | 7/1/2017 | 4/29/25 (6 year tail) |