**LOWENSTEIN SANDLER LLP**
Gavin J. Rooney, Esq.
Reynold Lambert, Esq.
Kenneth A. Rosen, Esq.
Michael S. Etkin, Esq.
Wojciech F. Jung, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>ACETO CORPORATION, *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 19-13448 (VFP)<br><br>(Jointly Administered) |
| KAVOD PHARMACEUTICALS LLC (*f/k/a* RISING PHARMACEUTICALS, LLC, *f/k/a* RISING PHARMACEUTICALS, INC.*) and ACETO CORPORATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>SIGMAPHARM LABORATORIES, LLC,<br><br>    Defendant. | Adv. Pro. No.:<br><br>**Adversary Complaint** |

**OBJECTION TO CLAIM NOS. 155 AND 162 AND COUNTERCLAIMS AGAINST
SIGMAPHARM LABORATORIES, LLC**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Tri Harbor Chemical Holdings LLC (f/k/a Aceto Agricultural Chemicals LLC, f/k/a Aceto Agricultural Chemicals Corporation) (3948); Tri Harbor Realty LLC (f/k/a Aceto Realty LLC) (7634); Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.) (7959); Kavod Health LLC (f/k/a Rising Health, LLC) (1562); Kavris Health LLC (f/k/a Acetris Health, LLC) (3236); KAVACK Pharmaceuticals LLC (f/k/a PACK Pharmaceuticals, LLC) (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

Plaintiffs Kavod Pharmaceuticals LLC, f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc. ("Rising"), and Aceto Corporation ("Aceto," and together with Rising, "Plaintiffs"), hereby file this objection to proofs of claim numbers 155 and 162 filed by Sigmapharm Laboratories, LLC ("Sigmapharm" or "Defendant"), and counterclaims against Sigmapharm (collectively, the "Complaint"). In support of the Complaint, Plaintiffs allege as follows:

## SUMMARY OF THE CASE

1.      This Complaint arises out of Sigmapharm's unlawful termination and breach of the Master Product Development and Collaboration Agreement (the "Agreement"), which governed the business relationship between Rising and Sigmapharm since June 2006.  The Agreement created a strategic collaboration between Rising and Sigmapharm, pursuant to which Sigmapharm had exclusive rights to develop and manufacture certain generic pharmaceutical products, and Rising had exclusive rights to commercialize (or market, distribute, and sell) Sigmapharm's products.  The parties agreed to share certain costs and profits derived from Rising's sales of products.

2.      This was not a short-term arrangement that could be terminated on a whim.  The parties agreed that the Agreement would remain in effect unless and until the parties jointly agreed in writing to end the relationship.  In order to unilaterally terminate the Agreement without cause, a party was required to, *inter alia*, transfer its rights to the products to the non-terminating party. Moreover, a termination "for cause" was reserved for a material breach of the Agreement and, even then, could be valid only upon strict compliance with various conditions, including (i) the provision of a written notice identifying the alleged material breach, (ii) a cure period of up to 180 days following the transmission of the notice of breach, and (iii) the allegedly breaching party failing to cure the material breach identified in the written notice.

3.      For more than a decade after executing the Agreement, the parties collaborated in the manufacture and commercialization of products, and earned millions of dollars in shared profits along the way.  But Sigmapharm became greedy and wanted to keep all profits to itself. Although Sigmapharm had no ability to commercialize products when it executed the Agreement, it learned how to do so from Rising.  Sigmapharm then developed its own sales force and implemented a scheme to improperly strip Rising of its bargained-for rights under the Agreement. Indeed, unwilling to pursue legitimate ways to terminate the relationship that were permissible under the Agreement—including a mutual termination (which would require Sigmapharm to buy Rising's interests) or a termination without cause (which would require Sigmapharm to sell its interests to Rising)—Sigmapharm chose to manufacture pretextual grounds on which to unlawfully terminate the Agreement "for cause."

4.      Sigmapharm's ploy was revealed to Rising on March 23, 2018, when Sigmapharm out of the blue sent Rising a purported "Notice of Termination."  This pretextual termination was utterly groundless and invalid under the plain terms of the Agreement.  Sigmapharm tried desperately to find a past communication that it could attempt to pass off as a contractually-required "notice of breach," but it failed miserably.  Grasping at straws, Sigmapharm landed on a letter Sigmapharm sent to Rising fifteen months prior, in December 2016, which is not a "notice of breach" and does not even reference the terms "breach" or "termination."  Rather, the letter was nothing more than a routine business communication in which Sigmapharm identified minor "issues" it saw from documents provided by Rising, and thanked Rising for its continued cooperation.  Regardless, Rising and Sigmapharm worked cooperatively and resolved all "issues" identified in the letter well before Sigmapharm tried to use it to justify a pretextual termination. Therefore, Sigmapharm's purported termination of the Agreement "for cause" is unlawful and invalid under the Agreement.

5.    Even worse, Sigmapharm stopped supplying any products to Rising and has been marketing and selling the products itself directly to customers, in clear breach of the Agreement and in violation of Rising's bargained-for exclusivity rights.

6.    Sigmapharm's unlawful termination of the Agreement and refusal to supply products to Rising caused Rising substantial harm to its business and reputation, and exposed Rising to substantial failure-to-supply liability resulting from Rising's inability to comply with its contractual obligations to supply products to customers.

7.    As a consequence of Sigmapharm's breaches of the Agreement, Rising seeks an award of damages in an amount to be determined at trial, including, but not limited to: (i) Rising's own lost profits from products that Sigmapharm refused to supply, in breach of the Agreement; (ii) disgorgement of any profits or revenues realized by Sigmapharm arising from its sale of products directly or indirectly through a third party, in breach of Rising's exclusivity rights; (iii) recovery of any failure-to-supply liability or damages that Rising owes or will owe to its own customers; and (iv) loss of or damages to business reputation or goodwill, as well as declaratory and other relief.

8.    In addition, Rising seeks an award of damages: (i) for moneys advanced to Sigmapharm that Rising is entitled to claw back under the Agreement on account of chargebacks, rebates, and other pricing concessions and adjustments provided to customers, which amount totaled no less than approximately $5.5 million as of January 2019, and may increase substantially as additional pricing concessions or adjustments are accounted for or accrue in the future; and (ii) for moneys due Rising on account of past improper calculation and allocation of the costs of goods sold in conjunction with the revenue-sharing formula pursuant to the Agreement, which amount totals no less than approximately $3.5 million.

9.      Plaintiffs also object to and seek disallowance, pursuant to 11 U.S.C. § 502(b), of claim number 155 ("Claim No. 155") filed by Sigmapharm against Aceto and claim number 162 ("Claim No. 162") filed by Sigmapharm against Rising (collectively, the "Sigmapharm Claims") in the above-captioned bankruptcy cases (the "Chapter 11 Cases").  The Sigmapharm Claims are inextricably intertwined with Rising's claims against Sigmapharm.  In the event the Sigmapharm Claims are not promptly disallowed pursuant to 11 U.S.C. § 502(b), Plaintiffs also seek estimation, pursuant to 11 U.S.C. § 502(c), of the allowed amount of the Sigmapharm Claims for all purposes in the Chapter 11 Cases, including distributions under any confirmed plan, at zero dollars ($0.00).

10.      Finally, to the extent that the Sigmapharm Claims are allowed in any amount, Plaintiffs have valid setoff rights and, under applicable law, the Unpaid Obligations (as defined below) should be setoff first against the allowed amount (if any) of the Sigmapharm Claims.

## PARTIES

11.      During the time periods relevant to this Complaint, Rising sold and distributed generic prescription products and over-the-counter pharmaceutical products to wholesalers, chain drug stores, distributors, and mass merchandisers.  Rising is a wholly-owned subsidiary of Aceto. Rising is a limited liability company organized under the laws of the State of Delaware, with its previous principal place of business located at Park 80 West, Plaza 1, 250 Pehle Avenue, Suite 601, Saddle Brook, New Jersey 07663.

12.      During the time periods relevant to this Complaint, Aceto was engaged in the development, marketing, sale, and distribution of finished dosage form generic pharmaceutical products, nutraceutical products, pharmaceutical active ingredients and intermediates, and specialty performance chemicals.  Aceto is a corporation organized under the laws of the State of New York, with its previous principal place of business located at 4 Tri Harbor Court, Port Washington, New York, 11050.

13.      On February 19, 2019 (the "Petition Date"), Aceto and certain affiliates, including Rising (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), commencing these Chapter 11 Cases in this Court.

14.      Upon information and belief, Sigmapharm is a privately-held pharmaceutical company that claims to be engaged in the development, manufacturing, and marketing of generic and branded products.  Sigmapharm is a Pennsylvania limited liability company, with its principal place of business located at 3375 Progress Drive, Bensalem, PA 19020.

## JURISDICTION AND VENUE

15.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984 and amended on September 18, 2012.

16.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Plaintiffs consent to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

17.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

18.      The statutory and legal predicates for the relief requested herein are sections 105, 502, 541 and 558 of the Bankruptcy Code, Bankruptcy Rules 3007, 6009, and 7001, and D.N.J. LBR 3007-1 and 7003-1.

## FACTS COMMON TO ALL COUNTS

### I.    The Agreement

19.    Rising and Sigmapharm executed the Agreement[2] approximately 13 years ago, on June 22, 2006.  At that time, Sigmapharm had been in business for only one year, having been founded in March 2005, and specialized in the development and manufacture of generic pharmaceutical products.  Sigmapharm, however, had no ability to commercialize its own products.  By virtue of the Agreement, that fundamental void was filled by Rising, who was one of the premier experts in the commercialization of generic pharmaceutical products.

20.    As the Agreement recites at the outset: "SigmaPharm has certain expertise and technology relating to the development and manufacture of solid dose form pharmaceutical products and obtaining regulatory approval for such pharmaceutical products and Rising has certain expertise relating to the marketing, distribution and sale of pharmaceutical products[.]" (Agreement, First WHEREAS Clause).  Based on these synergies, the parties executed the Agreement "to collaborate with each other in a cost and profit sharing arrangement related to the shared ownership or licensing of regulatory approvals for certain generic and/or pharmaceutical drugs . . . and to invest their respective resources in developing, obtaining regulatory approval for, manufacturing and marketing such drugs[.]" (*Id.*, Second WHEREAS Clause).

21.    Under the Agreement, the parties agreed to "jointly collaborate" in, *inter alia*, the manufacturing and marketing of certain generic pharmaceutical products (referred to as "Products").  (*Id.* § 2.1.1).  Sigmapharm was responsible for developing, manufacturing, and securing regulatory approvals for Products.  (*Id.*).  Rising, in turn, was responsible for marketing, distributing, and selling Products.  (*Id.*).  Rising also was responsible for "customer service, rebate

---

[2] A copy of the Agreement is attached as **Exhibit A**.

management, billing, warehousing of the finished Products and such other responsibility as regularly performed by a pharmaceutical distributor." (*Id.*).

22.     By its terms, the Agreement created a relationship that "is intended to and shall be exclusive to the Parties." (*Id.* § 7). Thus, the Agreement states that "SigmaPharm shall manufacture and exclusively supply to Rising and Rising shall exclusively purchase from SigmaPharm all of Rising's requirements of Products for distribution and sale in the Territory." (*Id.* § 5.1). In accordance with Sigmapharm's obligation to supply Products exclusively to Rising, the Agreement required Sigmapharm to "execute" Rising's purchase orders for Products "by delivery to the destination recited therein of all ordered quantities of the Products no later than the delivery dates provided in" the purchase orders. (*Id.* §§ 5.4, 5.5).

23.     In connection with the manufacturing, marketing, and sale of Products, Rising and Sigmapharm agreed to share certain costs and profits in accordance with the parameters set forth in the Agreement. (*Id.* § 8). Within 45 days of the end of each calendar quarter, Rising agreed to calculate Net Sales and Net Profits (as defined in the Agreement) obtained from the sale of Products, and distribute to Sigmapharm its share of the Net Profits. (*Id.* § 8.3; *see* §§ 1.36, 1.37).

24.     Under the Agreement, Net Sales are calculated by subtracting from gross sales, among other things, "chargebacks, cash and quantity discounts, returns, invoice adjustments, rebates (*e.g.* customer and government) and other credits taken by customers or granted by Rising with respect to such Product sales other than as a result of recalls," "invoice adjustments made for errors on invoiced sales included in previous calculations of Net Sales and not yet accounted for," and "marketing and advertising expenses (*e.g.*, trade journals, direct marketing, physician detailing, etc.) directly related to the marketing of the Products." (*Id.* § 1.37).

25.     Net Profits, in turn, are calculated by subtracting from Net Sales: "(i) Cost of Goods; (ii) Rising's Fee; (iii) amounts repaid or credited by reason of recalls; (iv) pre-approved

consulting and legal fees; (v) Litigation Expenses; (vi) the cost of all Product(s) that are unsaleable

or no longer marketable; and (vii) any other cost or expense approved by the Parties." (*Id.* § 1.36).

26.     Generally, Sigmapharm was entitled to 55% of the Net Profits.

27.     To commercialize Products, Rising executed contracts with customers that required

it to regularly supply large volumes of Products.  As both parties knew, Sigmapharm's failure to

supply Products to Rising would, in turn, create substantial failure-to-supply liabilities for Rising[3]

and irreparably harm its reputation, goodwill, and standing in the market place.

28.     Given the monumental importance of the continued viability of the Agreement, the

parties agreed that it will continue and remain in effect unless and until the parties "jointly agree

in writing" to end the relationship, and the effect of the termination "shall be as set forth in the

agreement between the Parties relating to such termination." (*Id.* §§ 12.4, 12.5).  Moreover, a

party wishing to terminate the Agreement "with respect" to one or more individual Products

without cause, faced significant consequences (*id.* § 12.3.2), including a requirement that it assign

or license the Product(s) being terminated to the other party in exchange for $1.00 or as otherwise

agreed to by the parties in the corresponding schedule for the Product(s) (*id.* § 12.5.3).

29.     While the parties included a "for cause" termination provision for "a particular

Product," they set strict parameters that must be followed before a party could properly exercise

that right.  A valid termination of "a particular Product" "for cause" was conditioned upon the

occurrence of the following five events: (i) one party "materially breach[es]" the Agreement (*id.*

§ 12.2); (ii) the non-breaching party sends the allegedly breaching party a "written notice . . . for

material breach" (*id.*); (iii) the written notice of material breach complies with the requirements of

---

[3] Sigmapharm is solely responsible for all failure-to-supply liabilities. In the pharmaceutical industry, customers
typically have the ability to deduct these liabilities as an offset to other unrelated payments owed the seller. Thus,
failure to supply penalties, which may amount to millions of dollars in this matter, will automatically be deducted by
customers from payments owed Rising, and Rising is entitled to seek reimbursement from Sigmapharm as the entity
that caused the failure to supply.

Section 14.4.2 for "extraordinary notices" (*id.* § 14.4.2); (iv) the purported "material breach" identified in the written notice remains uncured for a 90-day period "measured from the date written notice of such breach is given to the breaching Party" (*id*. § 12.2) (v); and, following the expiration of the first 90-day cure period, the purported "material breach" identified in the written notice remains uncured for a second 90-day period if "the breaching Party uses diligent good faith efforts to cure such breach" (*id*.).

30.    In the event that any termination—including a termination "for cause," provided that it is valid and properly effectuated in accordance with the requirements of the Agreement—results in the termination of "all of the individual products and related Schedules," the terminating party cannot immediately terminate the Agreement in its entirety; rather, it can do so only "by providing the other Party with thirty (30) days' prior written notice." (*Id.* § 12.1).

## II.    Sigmapharm's Unlawful Termination and Breach of the Agreement

31.    Upon the execution of the Agreement in 2006, Sigmapharm became one of Rising's most important partners.  The parties spent the first three years developing and obtaining regulatory approvals for Products.  In 2009, Rising brought the first Product to market.  Since then, Rising has commercialized at least seven Products (comprising 18 SKU's), and Rising's sales of Products have generated approximately $177,400,000 in Net Sales and $139,600,000 in Net Profits, with $83,900,000[4] of the Net Profits going directly to Sigmapharm.

32.    While Rising was generating millions of dollars in Net Profits for Sigmapharm, Sigmapharm was secretly plotting to eliminate Rising from the picture.  As noted, Sigmapharm had no expertise in commercializing Products when it signed the Agreement.  Over time, however, Sigmapharm realized that, if it internalized the process of marketing and selling its Products, it

---

[4] As discussed below, at least $9,000,000 of that amount represents overpayments of Net Profits that Sigmapharm was not entitled to receive under the Agreement and must return to Rising.

could avoid paying fees and keep all Net Profits for itself.  Therefore, Sigmapharm closely studied how Rising commercialized Products and began building its own sales force.

33.    Sigmapharm's plan to strip Rising of its bargained-for rights under the Agreement faced one considerable roadblock: it could not terminate the Agreement without cause unless it relinquished its rights to the Products.  Thus, Sigmapharm faced two choices: either attempt to negotiate a mutually-agreeable buyout of Rising's rights under the Agreement, or manufacture a baseless, pre-textual justification to unlawfully terminate the Agreement "for cause."

34.    Sigmapharm chose to unlawfully terminate the Agreement.

35.    On March 23, 2018, Sigmapharm sent Rising a letter with a re: line stating: "Notice of Termination."[5]  In that letter, Sigmapharm proclaimed that it "hereby terminates for cause the entirety of the [Agreement], as it applies to each and every drug product covered by said Agreement," and alleged without any specificity that Rising "has failed to cure the material breaches of its contractual obligations to Sigmapharm outlined in Sigmapharm's notice of breach dated December 16, 2016[.]"  Sigmapharm's attempt to terminate the Agreement "for cause" was utterly baseless and, in any event, unquestionably invalid because Sigmapharm did not even come close to satisfying the contractual conditions set forth in the Agreement.

36.    *First,* as is obvious from even a cursory review of Sigmapharm's December 16, 2016 letter, it is not a "notice of breach."[6]  Indeed, the words "termination" or "breach" appear nowhere in the letter.  As illustrated by its re: line—which reads "Review of Profit Share Payment Support"—the letter does nothing more than summarize Sigmapharm's review of "documentation" Rising provided between March and September 2016.  (Ex. C at 1).  Moreover, Sigmapharm concludes the letter not by demanding that Rising cure any material breaches

---

[5] A copy of Sigmapharm's March 23, 2018 letter is attached hereto as **Exhibit B**.

[6] A copy of Sigmapharm's December 16, 2016 letter is attached hereto as **Exhibit C**.

(because there were none) or threatening termination, but rather by *expressing gratitude* with Rising's continued cooperation: "Thank you once again for your assistance with this historical review." (*Id.*). Thus, having failed to send a valid "notice of breach" to Rising, Sigmapharm's purported termination is invalid on that basis alone. (Agreement § 12.2).

37. *Second*, putting aside Sigmapharm's *post hoc* mischaracterization of the December 2016 letter, the letter also does not allege a single *material* breach. In fact, the letter identifies only routine and minor "issues" (Ex. C at 1)—not "material breaches"—that often arise during the normal course of any business collaboration, especially one that has been in effect for more than a decade and that involves complex formulas for profit sharing.

38. In Exhibits A and C of the December 2016 letter, Sigmapharm claimed it was owed an additional $3 million in Net Profits from *all* sales Rising made during the *entire seven-year period* it had been commercializing Products. That amount is not "material" and, in fact, is legally insignificant given the magnitude of sales Rising made during that time period. Sigmapharm's December 2016 letter indicates that, between April 2009 and March 2016, gross sales totaled $309 million and Net Sales totaled $144 million. (*Id.*, Ex. A). Because Sigmapharm's alleged "issue" concerned a mere 1% of gross sales and 2% of Net Sales, it is not a "material" component of the relationship and, therefore, cannot give rise to a valid basis to terminate the Agreement.

39. In Exhibits B and D of the December 2016 letter, Sigmapharm simply asked questions about cash discounts or rebates that Rising provided to customers and about damaged shipments, which by definition are not claims of material breaches. In any event, under the express terms of the Agreement, even *bona fide* disputes concerning discounts and rebates cannot be "considered a breach of th[e] Agreement." (Agreement § 5.7).

40.     In Exhibit E of the December 2016 letter, Sigmapharm asked Rising to pay $225,000, representing its alleged share of costs to buy equipment.  As noted, this "issue" is trivial and, in any event, is based on a supposed agreement *extraneous* to the Agreement.

41.     Accordingly, because none of the "issues" raised in Sigmapharm's December 2016 letter were even remotely close to a claim of a "material" breach of the Agreement, Sigmapharm's termination was invalid.  (Agreement § 12.2).

42.     *Third*, even if the minor "issues" Sigmapharm identified in the December 2016 letter were "material" (and they were not), Rising and Sigmapharm reached agreement on revenue figures and Rising paid the amount requested.   Consequently, under the plain terms of the Agreement, Sigmapharm had no right to terminate the Agreement.  (Agreement § 12.2).

43.     In short, Sigmapharm had no basis for seeking to terminate the Agreement on March 23, 2018.  Sigmapharm clearly scrambled to find any prior correspondence upon which it could feign compliance with the Agreement's express conditions to termination, landing on the December 2016 letter (which, by then, was more than a year old), and dubbing it a "notice of breach."  But a "notice of breach" it is not.  Moreover, the December 2016 letter raised only minor "issues"—not material breaches—and Rising worked with Sigmapharm to resolve those "issues." Therefore, Sigmapharm's pretextual attempt to terminate the Agreement "for cause," and deprive Rising of its bargained-for rights under the Agreement, is invalid.

44.     Notably, even if the December 2016 letter was valid and identified material breaches which Rising never cured, Sigmapharm's purported termination of the Agreement still would be invalid.  That is because Sigmapharm waived any right it would have had to terminate the Agreement.  After sending the December 2016 letter, Sigmapharm waited more than *fifteen months*, or until March 23, 2018, to unlawfully terminate the Agreement.  During that time period, Sigmapharm continued to supply Products to Rising and accept Net Profits.  Therefore, having

continued to perform under and accept the fruits of the Agreement—even after the expiration of

the Agreement's 180-day cure period—Sigmapharm waived any right to terminate the Agreement

(which right it never had in the first instance).

45.    In any event, Sigmapharm purported to terminate all Products without providing

Rising with the "thirty (30) days' prior written notice" required under the Agreement (Agreement

§ 12.1), which further strips Sigmapharm's baseless termination of any validity.

### III.    Sigmapharm Stops Supplying Products to Rising and Starts Selling Products Directly to Customers

46.    After unlawfully terminating the Agreement on March 23, 2018, Sigmapharm

rolled out the next phase of its scheme.  Sigmapharm immediately stopped supplying Products to

Rising, in breach of its obligations under the Agreement to fulfill Rising's purchase orders for

Products.  This left Rising with no choice but to tell its customers that it would no longer be able

to deliver Products.

47.    Then, Sigmapharm rolled out its own marketing campaign, and began offering (and

continues to offer) Products for sale to the public, including to the very customers Rising no longer

was able to service precisely because of Sigmapharm's refusal to comply with its obligations under

the Agreement to supply Products to Rising.

48.    Therefore, having improperly booted Rising from the Agreement by virtue of a

pretextual termination in violation of the Agreement, Sigmapharm, is now pillaging Rising's share

of profits to which Rising is unquestionably entitled to receive under the Agreement.  Indeed, in

the last three quarters alone preceding Sigmapharm's invalid termination of the Agreement,

Rising's sales of Products generated over $4.15 million in gross profits and $3.5 million in Net

Profits.

49.    Sigmapharm's refusal to supply Products to Rising—as it was required to do under

the Agreement—caused significant harm to Rising, including by exposing Rising to substantial

failure-to-supply liability (for which Sigmapharm is solely responsible), and damaging Rising's

business reputation, goodwill with its customers, and standing in the marketplace.  Moreover,

Sigmapharm's unlawful marketing and sales of Products likewise violate the Agreement, which

gives Rising the sole and exclusive right to market and sell Products.  Therefore, Rising is entitled

to recover any and all profits Sigmapharm earns from its unlawful sales of Products, and any and

all profits Rising would have earned from sales of Products had Sigmapharm not breached the

Agreement.

**IV.    Sigmapharm's Additional Breaches of the Agreement**

50.    Rising currently does not owe Sigmapharm any monies pursuant to the Agreement,

by way of profit sharing or otherwise.  Moreover, over the course of the parties' relationship,

Sigmapharm has made informal requests for documentation supporting Rising's calculation of Net

Sales and Net Profits, and Rising has provided that information and supporting documentation to

Sigmapharm.

51.    In contrast, Sigmapharm is liable to Rising for substantial overpayments of Net

Profits that it was not entitled to receive under the Agreement and must return to Rising.  Under

the Agreement, profit sharing was calculated on a cash basis, rather than on an accrual basis.  In

the normal course, when pricing concessions or adjustments (including customer chargebacks,

rebates, credits, etc.) accrued after Rising made a profit-sharing payment to Sigmapharm, Rising

was entitled under the Agreement to (and did) offset accruals against future profit sharing

payments to Sigmapharm.  However, because of Sigmapharm's unlawful termination and breach

of the Agreement, Rising was unable to offset accruals against future profits and, therefore, is

entitled to a refund of overpayments directly from Sigmapharm.

52.    As of January 2019, Sigmapharm owed Rising approximately $5.5 million in

overpayments of Net Profits on account of accrued pricing concessions and adjustments, and that

liability may rise significantly as additional pricing concessions are accounted for or accrue in the future.[7]  Moreover, Rising is entitled to recover from Sigmapharm approximately $3.5 million in Net Profits paid to Sigmapharm in error, based on an improper allocation of the costs of goods sold under the profit-sharing formula set forth in the Agreement.  Accordingly, given the reconciliation procedures and audit provisions of the Agreement, together with the parties' past practices, Rising is owed a substantial refund of no less than approximately $9 million, plus all additional liabilities that are hereafter accounted for or accrue in the future.

53.    In addition, Rising has demanded that Sigmapharm submit to an inspection and audit pursuant to Sections 5.3.4 and 8.6 of the Agreement.  But, Sigmapharm refused.

## V.    The Prior Proceedings and Sigmapharm's Meritless Claims

54.    Prior to the Petition Date, on March 23, 2018, Sigmapharm filed a complaint against Rising and Aceto in the United States District Court for the Eastern District of Pennsylvania.  That complaint, like the Sigmapharm Claims, was meritless.  The crux of Sigmapharm's complaint was the notion that Rising and Aceto purportedly "cheated" Sigmapharm by underpaying profits under the Agreement; yet, Sigmapharm conceded that Rising paid every dollar Sigmapharm claimed it was owed under the Agreement.  Indeed, the complaint did not actually identify any monies due to Sigmapharm.  That is because Rising and Aceto did not, and currently do not, owe any money to Sigmapharm.

55.    The litigation commenced by Sigmapharm was later stayed pending arbitration, in which Sigmapharm filed "Counterclaims" against Rising and "Claims" against Aceto that mirrored the complaint Sigmapharm filed in the District Court.  The arbitration was, in turn, stayed upon commencement of the Chapter 11 Cases.

---

[7] Rebates and other offsets often take as long as two years to crystallize.

56.     On June 12, 2019, Sigmapharm filed the Sigmapharm Claims with the Debtors'
Court-approved claims agent in the Chapter 11 Cases.  The Sigmapharm Claims assert identical
claims against Rising and Aceto.  They allege that Rising breached its contractual obligations
under sections 1.37 and 8.6 of the Agreement to allow Sigmapharm to complete certain audits of
"Rising's accounting" covering (i) the period from the inception of the parties' relationship to
March 31, 2016, and (ii) the period from April 1, 2017 through "the present." (Sigmapharm
Claims, Ex. 1, ¶ 2).  They also assert a claim against Rising and Aceto, respectively, in the amount
of "in excess of $37,840,800.97" consisting of various alleged amounts due to Sigmapharm under
the Agreement, which Sigmapharm alleges to have terminated.  (*Id.* ¶ 1).

57.     Contrary to the allegations in the Sigmapharm Claims, Rising did not breach the
Agreement in any manner and Rising and Aceto do not owe any amounts to Sigmapharm under
the terms of the Agreement or otherwise.  After conceding in prior pleadings that Rising paid all
monies to which Sigmapharm claimed it was entitled under the Agreement, Sigmapharm now
asserts that Rising and Aceto owe it more than $37 million, which is a number Sigmapharm
invented out of whole cloth for purpose of its proofs of claim.  The Sigmapharm Claims are as
conclusory as they are meritless, and they are nothing more than a transparent attempt to distract
from the millions of dollars Sigmapharm owes Rising under the Agreement.

58.     To illustrate, as Sigmapharm itself concedes (*Id*. ¶¶ 6-7), Rising allowed
Sigmapharm an audit for the period of 2009 to April 2016, which Sigmapharm completed more
than two years ago.  During that audit, Rising provided to Sigmapharm documents and data it
requested and that Rising was required to provide under the Agreement.  In fact, before it attempted
to manufacture a pretextual termination of the Agreement for alleged cause, Sigmapharm advised
Rising that the information it provided during that audit was satisfactory to Sigmapharm.

59.    Sigmapharm's assertion that the audit revealed a so-called "error rate" of "16% of reductions to net sales" (*Id*. ¶ 10) is blatantly false, even by its own account.  As discussed above, Sigmapharm summarized its view of the results of its audit in its letter dated December 16, 2016. (**Exhibit C**).  As reflected in that letter, the audit reviewed a seven-year period during which Rising's Gross Sales of Products totaled $309 million and Net Sales totaled $144 million. Sigmapharm claimed a $3 million adjustment of additional Net Profits due to it pursuant to the audit, which even if accurate would amount to an adjustment of just 2% of the total Net Sales, not 16% as Sigmapharm now asserts.  Furthermore, Sigmapharm's claimed $3 million adjustment failed to take into account cash discounts and rebates due to the Center for Medicare and Medicaid Services.  After application of those discounts and rebates, the figure in question is reduced to $277,101, equivalent to an error rate of just 0.2%.  Rising paid that amount to Sigmapharm.

60.    As for the period following March 2016, Rising agreed to submit to an audit in accordance with the procedures set forth in the Agreement, and provided Sigmapharm an audit package for that period.  Sigmapharm speculates that this audit will reveal an underpayment of roughly $9 million in 2017.  (Sigmapharm Claims, Ex. 1, ¶ 10).  Once again, Sigmapharm invented that number out of whole cloth.  Indeed, Sigmapharm relied solely on the supposed 16% error rate from the prior audit, which is irrelevant and, in any event, demonstrably false.

61.    In truth, the audit package revealed that Sigmapharm owes Rising over $5.5 million on account of chargebacks, rebates, and similar items alone as of January 2019—money which is plainly due and owing, and which Sigmapharm has simply refused to pay.

62.    Sigmapharm's remaining allegations—which seek damages totaling nearly $25 million for supposed recovery of administrative fees previously paid to Rising, lost profits, expert and attorneys' fees and costs, and products (*id*. ¶¶ 11-16)—are predicated entirely on the fiction

that Rising breached the Agreement and that Sigmapharm validly terminated it. As discussed herein, this contention is patently false.

63.    In any event, Sigmapharm's allegations and requested relief have no basis in the Agreement and/or applicable law. For instance, Sigmapharm claims that it paid Rising $11.6 million between April 2009 through December 2017 in "administrative fees pursuant to Sections 1.36, 1.37, 1.52, 8.1.2, and 8.6 of the contract, which was to compensate Rising for maintaining the records for audit," and further that it is entitled to a refund of that amount because Rising failed to maintain such records for audit. (*Id.* ¶ 11). In truth, Rising maintained all records it was required to maintain under the Agreement. Regardless, Sigmapharm's allegation mischaracterizes the Agreement. Of the cited provisions, the only "fee" mentioned is "Rising's Fee," which is a fee set by formula that itself is composed of two separate fees: a "distribution" fee and a "marketing and sales" fee, each of which is made up of multiple components. (Agreement § 1.52). Consequently, Sigmapharm paid Rising that fee to compensate Rising for conducting numerous distribution and marketing tasks, not to "maintain records for audit."

## COUNT ONE
### (Objection to Claim No. 155 Pursuant to 11 U.S.C. § 502(b))

64.    Plaintiffs repeat the allegations above as if fully set forth herein.

65.    Claim No. 155 fails to allege the existence of any agreement between Sigmapharm and Aceto or any facts that could form the basis for any liability of Aceto to Sigmapharm.

66.    Aceto is not a signatory to the Agreement, and Sigmapharm cannot seek to enforce the Agreement against Aceto.

67.    Even if Sigmapharm could enforce the Agreement against Aceto, Aceto has not breached the Agreement.

68.    To the extent that Aceto has breached the Agreement and Sigmapharm has suffered damages as a result of such breach, Sigmapharm has failed to mitigate any such damages.

69.     To the extent that Aceto has breached the Agreement and Sigmapharm has suffered damages as a result of such breach, Aceto is entitled to exercise setoff rights based on the affirmative claims against Sigmapharm set forth herein to reduce the amount of any claim that may be allowed against Aceto.

70.     After thorough review of its books and records, Aceto has determined that it does not owe any amounts to Sigmapharm under the terms of the Agreement or otherwise.

71.     Failure to disallow Claim No. 155 would result in Sigmapharm receiving an unwarranted recovery to the detriment of other stakeholders in the Chapter 11 Cases.

72.     Accordingly, Claim No. 155 should be disallowed pursuant to 11 U.S.C. § 502(b)(1) because it is not enforceable against Aceto or property of Aceto under any agreement or applicable law.

## COUNT TWO
### (Request for Estimation of Claim No. 155 Pursuant to 11 U.S.C. § 502(c))

73.     Plaintiffs repeat the allegations above as if fully set forth herein.

74.     Claim No. 155 is contingent and unliquidated and the fixing or liquidation of the allowed amount of Claim No. 155, if any, would unduly delay the administration of the Chapter 11 Cases.

75.     In the event that Claim No. 155 is not promptly disallowed, Plaintiffs also seek estimation, pursuant to 11 U.S.C. § 502(c), of the allowed amount of Claim No. 155 for all purposes in the Chapter 11 Cases, including distributions under any confirmed plan, at zero dollars ($0.00).

## COUNT THREE
### (Objection to Claim No. 162 Pursuant to 11 U.S.C. § 502(b))

76.     Plaintiffs repeat the allegations above as if fully set forth herein.

77.    Rising has at all times fulfilled all of its obligations under the Agreement and has not breached the Agreement.

78.    To the extent that Rising has breached the Agreement and Sigmapharm has suffered damages as a result of such breach, Sigmapharm has failed to mitigate any such damages.

79.    To the extent that Rising has breached the Agreement and Sigmapharm has suffered damages as a result of such breach, Rising is entitled to exercise setoff rights based on its affirmative claims against Sigmapharm set forth herein to reduce the amount of any claim that may be allowed against Rising.

80.    After thorough review of its books and records, Rising has determined that it does not owe any amounts to Sigmapharm under the terms of the Agreement or otherwise.

81.    Failure to disallow Claim No. 162 would result in Sigmapharm receiving an unwarranted recovery to the detriment of other stakeholders in the Chapter 11 Cases.

82.    Accordingly, Claim No. 162 should be disallowed pursuant to 11 U.S.C. § 502(b).

## COUNT FOUR
### (Request for Estimation of Claim No. 162 Pursuant to 11 U.S.C. § 502(c))

83.    Plaintiffs repeat the allegations above as if fully set forth herein.

84.    Claim No. 162 is contingent and unliquidated and the fixing or liquidation of the allowed amount of Claim No. 162, if any, would unduly delay the administration of the Chapter 11 Cases.

85.    In the event that Claim No. 162 is not promptly disallowed, Plaintiffs also seek estimation, pursuant to 11 U.S.C. § 502(c), of the allowed amount of Claim No. 162 for all purposes in the Chapter 11 Cases, including distributions under any confirmed plan, at zero dollars ($0.00).

## COUNT FIVE
### (Declaratory Judgment – Unlawful Termination)

86.     Plaintiffs repeat the allegations above as if fully set forth herein.

87.     An actual controversy has arisen and now exists between the parties concerning their respective rights, liabilities, and duties.

88.     On March 23, 2018, Sigmapharm purported to terminate the Agreement "for cause." Sigmapharm, however, had no basis to terminate the Agreement and the supposed termination was unlawful and invalid.

89.     Rising is entitled to a declaration that Sigmapharm's purported termination of the Agreement was unlawful and invalid, and that the Agreement remains in full force and effect.

## COUNT SIX
### (Breach of the Agreement – Damages: Unlawful Termination)

90.     Plaintiffs repeat the allegations above as if fully set forth herein.

91.     Sigmapharm breached the Agreement by, *inter alia*: (i) unlawfully terminating the Agreement; (ii) ceasing all performance under the Agreement; (iii) refusing to supply Products to Rising and fulfill Rising's purchase orders; and (iv) marketing, distributing, and/or selling Products to customers.

92.     Rising is entitled to recover any and all damages resulting from Sigmapharm's breaches of the Agreement, including, but not limited to: (i) Rising's own lost profits from Products that Sigmapharm is refusing to supply, in breach of the Agreement; (ii) disgorgement of any profits or revenues realized by Sigmapharm arising from its sale of the Products directly or indirectly through a third party, in breach of Rising's exclusivity rights; (iii) recovery of any failure-to-supply liability or damages that Rising owes or will owe to its own customers; and (iv) loss of or damages to business reputation or goodwill.

93.     Rising seeks an award of damages on this claim in an amount to be determined at trial, plus interest and such other relief as the Court deems just and proper.

## COUNT SEVEN
### (Breach of the Agreement – Damages: Failure to Return Net Profits)

94.     Plaintiffs repeat the allegations above as if fully set forth herein.

95.     Sigmapharm breached the Agreement by refusing to return at least $9,000,000 in Net Profits to which it was not entitled to receive under the Agreement as of January 2019.  Rising also is entitled to recover from Sigmapharm any and all additional liabilities that have accrued since January 2019 or will accrue in the future.

96.     Rising seeks an award of damages on this claim in the amount of at least $9,000,000, plus any additional liabilities that have accrued or will accrue in the future, interest, and such other relief as the Court deems just and proper.

## COUNT EIGHT
### (Breach of Contract – Specific Performance: Inspection and Audit Rights)

97.     Plaintiffs repeat the allegations above as if fully set forth herein.

98.     Pursuant to Sections 5.3.4 and 8.4 of the Agreement, Rising is entitled to inspect and audit Sigmapharm's books and records concerning the "manufacture of the Products" and expenses.

99.     Sigmapharm has refused, and continues to refuse, to permit Rising to exercise its inspection and audit rights under the Agreement.

100.    Rising is entitled to an order of specific performance requiring Sigmapharm to comply with its obligations under Sections 5.3.4 and 8.6 of the Agreement.

## COUNT NINE
### (Setoff of Unpaid Obligations)

101.    Plaintiffs repeat the allegations above as if fully set forth herein.

102.   The Unpaid Obligations arose from the Agreement and are debts owed by Sigmapharm to Rising.

103.   The Sigmapharm Claims allegedly arise from the Agreement.

104.   Pursuant to section 558 of the Bankruptcy Code, Rising's defenses to the Sigmapharm Claims, including setoff, are preserved.

105.   To the extent that the Sigmapharm Claims are allowed in any amount, Plaintiffs have valid setoff rights and, under applicable law, the Unpaid Obligations should be setoff first against the allowed amount (if any) of the Sigmapharm Claims.

## PRAYER FOR RELIEF

**WHEREFORE**, judgment should be entered in favor of Plaintiffs and against Defendant for one or more of the following forms of relief or some combination of them:

A.   On Count One, disallowance of Claim No. 155 in its entirety.

B.   On Count Two, in the event that Claim No. 155 is not promptly disallowed, estimation, of the allowed amount of Claim No. 155 for all purposes in the Chapter 11 Cases, including distributions under any confirmed plan, at zero dollars ($0.00).

C.   On Count Three, disallowance of Claim No. 162 in its entirety

D.   On Count Four, in the event that Claim No. 162 is not promptly disallowed, estimation, of the allowed amount of Claim No. 162 for all purposes in the Chapter 11 Cases, including distributions under any confirmed plan, at zero dollars ($0.00).

E.   On Count Five, a declaration that Sigmapharm's termination of the Agreement was unlawful, invalid, and in violation of the Agreement, and that the Agreement remains in full force and effect.

F.   On Count Six, an award of damages in an amount to be determined at trial, plus interest and such other relief as the Court deems just and proper.

G.      On Count Seven, an award damages in the amount of at least $9,000,000, plus any

additional liabilities that have accrued or will accrue in the future, interest, and such other relief as

the Court deems just and proper.

H.      On Count Eight, an award of specific performance requiring Sigmapharm to

comply with its inspection and audit obligations under Sections 5.3.4 and 8.6 of the Agreement.

I.      On Count Nine, to the extent that the Sigmapharm Claims are allowed in any

amount, authorization for Rising to effect a setoff of the Unpaid Obligations against the

Sigmapharm Claims.

J.      An award of costs of suit and attorneys' fees;

K.      An award of pre-judgment interest at the maximum legal rate; and

L.      Any such other and further relief as the Court may deem just and proper.


Dated:  July 18, 2019                         By: /s/ *Gavin J. Rooney*
                                              Gavin J. Rooney, Esq.
                                              Reynold Lambert, Esq.
                                              Kenneth A. Rosen, Esq.
                                              Michael S. Etkin, Esq.
                                              Wojciech F. Jung, Esq.
                                              **LOWENSTEIN SANDLER LLP**
                                              One Lowenstein Drive
                                              Roseland, New Jersey 07068
                                              (973) 597-2500 (Telephone)
                                              grooney@lowenstein.com
                                              rlambert@lowenstein.com
                                              krosen@lowenstein.com
                                              metkin@lowenstein.com
                                              wjung@lowenstein.com

                                              *Counsel for Plaintiffs*