**fexLOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Michael S. Etkin, Esq.
Wojciech F. Jung, Esq.
Philip J. Gross, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>ACETO CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-13448 (VFP)<br><br>(Jointly Administered)<br><br>**Hearing Date: September 4, 2019 at 10:00 a.m. (ET)**<br>**Objection Deadline: Aug. 28, 2019 at 5:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING AND APPROVING PRIVATE SALE OF DEBTOR ARSYNCO'S PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS WITH BASF CORPORATION, (III) AUTHORIZING THE PAYMENT OF BROKER'S <u>COMMISSION, AND (IV) GRANTING RELATED RELIEF</u>

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), by

and through their undersigned counsel, submit this motion (the "<u>Motion</u>") pursuant to Sections

105(a), 363 and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002,

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Tri Harbor Chemical Holdings LLC (*f/k/a* Aceto Agricultural Chemicals LLC, *f/k/a* Aceto Agricultural Chemicals Corporation) (3948); Tri Harbor Realty LLC (*f/k/a* Aceto Realty LLC) (7634); Kavod Pharmaceuticals LLC (*f/k/a* Rising Pharmaceuticals, LLC, *f/k/a* Rising Pharmaceuticals, Inc.) (7959); Kavod Health LLC (f/k/a Rising Health, LLC) (1562); Kavris Health LLC (*f/k/a* Acetris Health, LLC) (3236); KAVACK Pharmaceuticals LLC (*f/k/a* PACK Pharmaceuticals, LLC) (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Rules 6004-1 and 6004-5 of the Local Rules of the United States Bankruptcy Court for the

District of New Jersey (the "Local Rules") for entry of an order substantially in the form submitted

herewith (the "Sale Order") (i) authorizing and approving the private sale of certain real property

assets of Debtor Arsynco, Inc. ("Arsynco") free and clear of liens, claims and encumbrances,

subject to higher and better offers, (ii) authorizing and approving the assumption and assignment

of certain executory contracts of Arsynco with BASF Corporation ("BASF") to 511 Thirteenth

Street LLC ("511 Thirteenth" or "Purchaser") (the assets described in clause (i) and (ii)

collectively, the "Purchased Assets"), pursuant to a Purchase and Sale Agreement, dated as of July

31, 2019 (the "Arsynco Sale Agreement," a copy of which is attached to the Sale Order as an

exhibit), (iii) authorizing the payment of a broker's commission (the "Broker's Commission") to

Quantum Realty Services, Inc. ("Quantum")[2] at the Closing, and (iv) granting related relief.

Without limiting the foregoing, and as directed by this Court, Arsynco will entertain competing

bids for the Purchased Assets at the Sale Hearing in Arsynco's sole discretion on the terms set

forth herein and in the Sale Order.

In support of the Motion, the Debtors incorporate the *Declaration of Rebecca A. Roof in

Support of First Day Relief* (the "First Day Declaration") [Docket No. 19].  In further support of

the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and

1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United

---

[2]  Contemporaneously with this Motion, the Debtors are filing the *Debtors' Motion Pursuant to 11 U.S.C.
§§ 327, 328 and 1107, and Fed. R. Bankr. P. 2014(A) And 2016 For Order Authorizing the Debtors to
Retain Quantum Realty Services, Inc. as Real Estate Broker as of July 31, 2019*, which is incorporated
herewith.

States District Court for the District of New Jersey, entered on July 23, 1984, and amended on

September 18, 2012. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The legal predicates for the relief requested herein are sections 105(a), 363 and 365

of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and Local Rules 6004-1 and

6004-5.

## GENERAL BACKGROUND

3.      On February 19, 2019 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned

chapter 11 cases (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for

the District of New Jersey.

4.      The Debtors are operating their businesses and managing their property as debtors-

in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the filing of

this Motion, no request has been made for the appointment of a trustee or examiner in the Chapter

11 Cases.

5.      On February 28, 2019, the Office of the United States Trustee appointed the Official

Committee of Unsecured Creditors (the "Committee") in these Chapter 11 Cases. *See Notice of

Appointment of Official Committee of Unsecured Creditors* [Doc. No. 80].

6.      A detailed description of the Debtors' business and the facts surrounding the

commencement of the Chapter 11 Cases is set forth in the First Day Declaration, which is

incorporated herein by reference.[3]

---

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
First Day Declaration.

A.    **The Sales of the Chemical Plus and Pharma Businesses**

7.    As described in the First Day Declaration and various other pleadings filed with the Court, the Debtors commenced the Chapter 11 Cases with the goal of addressing immediate liquidity issues by consummating going concern sales of their Chemical Plus Business and their Pharma Business.

8.    During the course of these Chapter 11 Cases, the Debtors simultaneously conducted two section 363 sale processes for their Chemical Plus and Pharma Businesses.  This involved, among other things, (i) negotiating with prospective purchasers, (ii) reviewing, negotiating, and resolving objections related to the cure notices filed by the Debtors with respect to each sale, (iii) reviewing and analyzing bids, (iv) conducting an auction with respect to the sale of the Chemical Plus Business on April 12, 2019 and (v) negotiating and finalizing asset purchase agreements with the successful purchasers of each business.

9.    These sale processes resulted in the Debtors presenting and obtaining the approval of the successful bids with respect to each sale at hearings held merely one week apart.  On April 9, 2019, the Court conducted a sale hearing with respect to the Pharma Business, and the Court entered an order authorizing the sale of the Pharma Business on April 10, 2019 [Docket No. 372]. On April 16, 2019, the Court conducted a sale hearing with respect to the Chemical Plus Business, and entered an order approving such sale [Docket No. 429].

10.    Subsequent to the entry of each respective Sale Order, the sale with respect to the Debtors' Pharma Business closed on April 19, 2019, and the sale with respect to the Debtors' Chemical Plus Business closed on April 29, 2019.

B.     **The Property**

11.     Arsynco is a wholly-owned subsidiary of Debtor Aceto Corporation ("Aceto"). Arsynco was formerly involved in manufacturing chemicals at a plant on property located at 511 13th Street in Carlstadt, New Jersey (the "Property"). The site was closed in 1993.

12.     Arsynco has on-going environmental remediation obligations in connection with the Property. Arsynco has been conducting an investigation of environmental contamination on the Property pursuant to the Industrial Site Recovery Act, N.J.S.A. 13:lK-6, et seq. ("ISRA") and its accompanying regulations, under the supervision of the New Jersey Department of Environmental Protection ("NJDEP") designated as ISRA Case No. E93024 (the "ISRA Case"). As part of the ISRA Case, Arsynco has been investigating environmental contamination on the Property to the non-residential / restricted use cleanup standards acceptable to NJDEP.

13.     In March 2006, Arsynco received notice from the EPA of its status as a potentially responsible party ("PRP") under the Comprehensive Environmental Response, Compensation and Liability Act for a site described as the Berry's Creek Study Area ("BCSA"). There are over 150 PRPs which have potential liability for the required investigation and remediation of the BCSA. The estimate of the potential liability, if any, is not quantifiable for a number of reasons, including the difficulty in determining the extent of contamination and the length of time remediation may require. In addition, any estimate of liability must also consider the number of other PRPs and their financial strength. In July 2014, Arsynco received notice from the U.S. Department of Interior ("USDOI") regarding the USDOI's intent to perform a Natural Resource Damage ("NRD") Assessment at the BCSA. Arsynco has to date declined to participate in the development and performance of the NRD assessment process.

14.     On February 12, 2009, the U.S. Environmental Protection Agency ("USEPA") issued an approval of a Risk-Based Clean-Up/Disposal of Polychlorinated Biphenyl Remediation

Waste issued in accordance with the federal regulations for polychlorinated biphenyls ("PCBs") promulgated pursuant to the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 et seq., and the regulations set forth in Part 761 of Title 40 of the Code of Federal Regulations (40 C.F.R. § 761) (hereinafter referred to as "TSCA Approval").

15.    In connection with its environmental remediation obligations with respect to the Property, in July 2009, Arsynco entered into a settlement agreement with BASF Corporation ("BASF"), the former owner of the Property.  In accordance with the settlement agreement dated July 16, 2009 (the "BASF Settlement"), BASF paid for 45% of the prior remediation costs and agreed going forward to co-remediate the property with Arsynco.  In connection with the BASF Settlement, Arsynco and BASF also entered into a trust agreement that provides for a mechanism for the joint funding for the investigation and remediation of the Property (the "BASF Trust Agreement", and collectively with the BASF Settlement Agreement, the "BASF Agreements"). Arsynco recorded a receivable from BASF, with an offset against the Property held for sale, representing its estimated portion of the future remediation costs.

16.    In September 2012, Arsynco entered into an agreement with three of the other PRPs that had previously been impleaded into *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corporation, et al.*, Docket No. ESX-L-9868-05 (the "NJDEP Litigation") and were considering impleading Arsynco into the same proceeding.  Pursuant to that agreement, Arsynco agreed to (1) a tolling period that would not be included when computing the running of any statute of limitations that might provide a defense to the NJDEP Litigation; (2) the waiver of certain issue preclusion defenses in the NJDEP Litigation; and (3) arbitration of certain potential future liability allocation claims if the other parties to the agreement are barred by a court of competent jurisdiction from proceeding against Arsynco.

17.     In July 2015, Arsynco was contacted by an allocation consultant retained by a group of the named PRPs, inviting Arsynco to participate in the allocation among the PRPs of investigation and remediation costs relating to the BCSA.  Arsynco declined that invitation.  The amount of any liability Arsynco may have relating to the BCSA cannot be reasonably estimated at this time.

18.     In connection with the closing of the sale of the Chemical Plus Business, Debtor Aceto Corporation funded $1.9 million of sale proceeds to a bank account maintained by Arsynco with JPMorgan Chase Bank, N.A. (the "Remediation Funding Source Bank Account") as required cash collateral related to on-going remediation obligations at the Property.  Such funds replaced certain letters of credit that were posted as a Remediation Funding Source provided to the NJDEP and a TSCA Financial Assurance Amount provided to the USEPA in compliance with certain environmental laws.  The Remediation Funding Source Bank Account is not property of Arsynco, is not included within the Purchased Assets, and is not being sold to the Purchaser.

## C.     Arsynco's Efforts to Sell the Property

19.     Arsynco has been extensively engaged in pursuing a sale transaction for the Property for an extended period of time consisting of no less than five years.  During this time period, Arsynco has engaged multiple real estate brokers to market the Property, including, most recently, Quantum.  During the time period from March 2016 through July 2017, approximately eight potential purchasers executed confidentiality agreements with Arsynco with respect to the Property.  Thereafter, in or about the Fall of 2017, Arsynco entered into substantial negotiations with Stalwart Equities Inc. ("Stalwart") for a sale of the Property but were unable to agree to the terms of a sale contract.  Such negotiations were discontinued in or about February 2018.

20.     After additional marketing efforts, Arsynco entered into a purchase and sale agreement, dated June 22, 2018 (together with the schedules and/or exhibits thereto and all related

documents, and as the same has been or may be amended, restated, supplemented and/or otherwise modified from time to time, the "Capodagli PSA") with Capodagli Property Company, LLC ("Capodagli") that provided for, among other things, the sale of the Property to Capodagli. The parties subsequently entered into four amendments of the Capodagli PSA.

21.    Subsequent to the Petition Date, Arsynco and Capodagli continued to negotiate the terms of further amendments to the Capodagli PSA to address, among other things, indemnification obligations in the Capodagli PSA and the environmental remediation obligations with respect to the Property. The Debtors were also exploring other alternatives for disposition of the Property given the possibility that the Capodagli PSA might no longer be feasible under the circumstances.

22.    On July 2, 2019, counsel for the escrow agent for the Capodagli PSA and Arsynco received correspondence from Capodagli dated June 28, 2019 (the "Capodagli Termination Notice"), advising Arsynco that Capodagli had elected to exercise its right to terminate the Capodagli PSA and seeking return of a deposit previously placed in escrow by Capodagli. Arsynco and Capodagli agreed to enter into a stipulation and consent order resolving issues related to the Capodagli PSA, the proof of claim filed by Capodagli in these Chapter 11 Cases, the Capodagli Termination Notice and a deposit in connection with the Capodagli PSA (the "Capodagli Stipulation and Consent Order"). The Capodagli Stipulation and Consent Order was entered by the Court on July 25, 2019 [Docket No. 754].

23.    As discussed above, Arsynco continued to engage in discussions for a sale of the Property with multiple other potential purchasers, including with Stalwart, both prior and subsequent to Capodagli's termination of the Capodagli PSA. However, due to the environmental remediation obligations for the Property, Arsynco was unable to reach agreement with any party

for a sale of the Property on terms similar to those under the Capodagli PSA.  As a result, Arsynco continues to incur expenses in connection with the Property.

**D.    Summary of the Proposed Sale**

24.    Arsynco recently received an offer to purchase the Property from 511 Thirteenth that resulted in Arsynco's July 31, 2019 entry into the Arsynco Sale Agreement for a Sale scheduled to close within thirty (30) days of the entry of the Sale Order.  In a summary fashion only, the Arsynco Sale Agreement provides:[4]

> (a)    Arsynco will sell the Property, together with any and all buildings, improvements and fixtures thereon and all tenements, hereditaments, appurtenances, and rights of way incident and belonging thereto and assign the BASF Agreements to the Purchaser.
>
> (b)    The aggregate Purchase Price for the Property is $1,050,000 subject to certain adjustments for taxes and assessments set forth in the Arsynco Sale Agreement.
>
> (c)    The Purchaser will purchase the Property in "as-is" condition "with all faults" (including, without limitation, the environmental condition of the Property).
>
> (d)    The Purchaser's bid is subject to higher and better offers that may be submitted at the Sale Hearing.

**RELIEF REQUESTED**

25.    By this Motion, the Debtors seek entry of an order, substantially in the form submitted herewith (the "Sale Order") (i) approving the transaction set forth in the Arsynco Sale Agreement comprising the sale of Arsynco's Property in Carlstadt, New Jersey (the "Sale") to the Purchaser or the entity that submits the highest and best offer at the Sale Hearing (defined herein),

---

[4]  To the extent any inconsistency or conflict arises between the terms set forth in the Arsynco Sale Agreement and the description of the Arsynco Sale Agreement contained herein, the Arsynco Sale Agreement shall govern.

(ii) authorizing the assumption and assignment of the BASF Agreements, effective as of the

Closing Date, (iii) approving the payment of the Broker's Commission at the Closing, and (iv)

granting related relief.

**DESCRIPTION OF THE PROPOSED SALE**

A.    **Material Terms of the Proposed Sale**[5]

26.    In accordance with Local Rule 6004-1(a)(3), the material terms of the proposed sale

to the Purchaser (or other successful bidder for the Purchased Assets) are as follows:

- **Seller**. Arsynco, Inc.

- **Property to be Sold**. The Purchased Assets consist of:

  All of Seller's right, title and interest in and to that certain tract of land, consisting
  of approximately 12.3 acres, situate in the Borough of Carlstadt, County of Bergen,
  State of New Jersey, and designated on the Official Tax Map of the Borough of
  Carlstadt as Block 91, Lot 1, and more commonly known as 511 Thirteenth Street,
  all as more fully described on Exhibit A attached to the Arsynco Sale Agreement,
  together with any and all buildings, improvements and fixtures thereon and all
  tenements, hereditaments, appurtenances, and rights of way incident and belonging
  thereto upon the terms and conditions set forth herein subject to the Sale Order, free
  and clear of liens, claims and encumbrances, except for: (a) such tenancies,
  easements, covenants, restrictions, agreements, encumbrances and other matters of
  title as enumerated on Exhibit B attached to the Arsynco Sale Agreement, (b) all
  present and future zoning and other governmental laws and regulations, (c) all facts
  that would be revealed by an accurate survey or physical inspection of the Property,
  and (d) the BASF Settlement, which is to be assumed and assigned by Seller to
  Purchaser, as further set forth in Section 4.3 of the Arsynco Sale Agreement (the
  items enumerated in (a) through (c) are hereinafter collectively referred to in the
  Arsynco Sale Agreement as the "Permitted Encumbrances"). *See* Arsynco Sale
  Agreement § 1.1 and Preamble.

- **Date, Time and Place of Sale**. The parties agree that the consummation of the
  transaction contemplated by the Arsynco Sale Agreement (the "Closing") shall take

---

[5] The following summaries of the material terms of the proposed Sale and "special provisions" of the
Arsynco Sale Agreement and Sale Order are provided in accordance with Local Rule 6004-1 and are
qualified in their entirety by reference to the provisions of the Arsynco Sale Agreement and Sale Order. In
the event of any inconsistencies between these summaries and the actual provisions of the Arsynco Sale
Agreement and Sale Order, the terms of the Arsynco Sale Agreement and Sale Order shall govern in all
respects. Capitalized terms used, but not otherwise defined, in this section shall have the meanings ascribed
thereto in the Arsynco Sale Agreement.

place as soon as practicable following the entry of the Sale Order, if approved in the form submitted to the Bankruptcy Court, but in any event no later than thirty (30) days after the entry of the Sale Order, or at such other date as may be agreed upon by the parties or their respective counsel.  The Closing will occur via escrow through the services of the Title Company (as defined in the Arsynco Sale Agreement), or at any other place as may be agreed upon by the parties or their respective counsel.  *See* Arsynco Sale Agreement §§ 2.1 & 2.2.

- **Purchase Price**.  The purchase price under the Arsynco Sale Agreement is as follows:

The purchase price for the Property (the "<u>Purchase Price</u>") is One Million Fifty Thousand and 00/100 Dollars ($1,050,000.00) subject to certain prorations and adjustments.  *See* Arsynco Sale Agreement §§ 1.2 and Art. 2.  The realty transfer fee, if any, in connection with the transfer of the Property shall be paid by Seller. *See* Arsynco Sale Agreement § 2.6.

Additionally, Section 2.3 of the Arsynco Sale Agreement provides:

At the Closing, the following items shall be apportioned for the Property as of 11:59 p.m. EST, on the day preceding the Closing Date:

(1) Real estate taxes including, without limitation, county, school and town taxes;

(2) Water and sewer charges; and

(3) Fuel, if any.

*See* Arsynco Sale Agreement § 2.3.

Furthermore, Section 2.7 of the Arsynco Sale Agreement provides:

If, at Closing, the Property or any part thereof shall have been affected by a governmental assessment or assessments, which are or may become payable in annual installments, of which the first installment is then a charge or lien, then for the purposes of this [Arsynco Sale] Agreement, all the unpaid installments of any such assessment due and payable in calendar years prior to the year in which the Closing occurs shall be paid by the Seller and all installments  becoming due and payable after the delivery of the Deed shall be assumed and paid by the Purchaser.  However, if such an assessment or assessments shall be due in one lump sum payment, then to the extent such assessment(s) is for improvements in place as of the Effective Date, then such assessment(s) shall be paid by the Seller but if such assessment(s) is for improvements to be made subsequent to the Effective Date, then the same shall be paid by the Purchaser.

*See* Arsynco Sale Agreement § 2.7.

- **Conditions of the Sale**. The closing of the transactions contemplated by the Arsynco Sale Agreement is subject to the satisfaction or waiver of a number of closing conditions set forth in Article 11 of the Arsynco Sale Agreement.

The conditions to the Purchaser's obligation to close the Sale as set forth in Section 11.1 of the Arsynco Sale Agreement are as follows:

<u>Conditions Precedent to Obligation of Purchaser</u>.

The obligation of the Purchaser to consummate the transaction under the Arsynco Sale Agreement is subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by the Purchaser in its sole discretion (unless otherwise indicated):

(a)      all of the representations and warranties of Seller contained in the Arsynco Sale Agreement shall have been true and correct in all material respects as of the Effective Date and shall be true and correct in all material respects as of the Closing Date;

(b)      Seller shall have performed and observed, in all material respects, all covenants and agreements of the Arsynco Sale Agreement to be performed and observed by Seller as of the Closing Date;

(c)      the Property shall be free and clear of any and all tenancies and occupants; and;

(d)      entry of a Sale Order by the Bankruptcy Court approving the Arsynco Sale Agreement, and the transactions contemplated thereby, which is not a waivable condition.

For the avoidance of doubt, the obligation of the Purchaser to consummate the Sale is not subject to a contingency for the Purchaser's due diligence. Subject to each and all of the other terms and provisions of the Arsynco Sale Agreement (including applicable notice and cure provisions), and without limiting any other right or remedy to which the Purchaser may be entitled elsewhere under the Arsynco Sale Agreement, in the event that any condition contained in this Section 11.1 is not satisfied or waived on or prior to the Closing Date (as the same may be extended pursuant to the express provisions of the Arsynco Sale Agreement), then, unless Seller is in default of its obligations under the Arsynco Sale Agreement (in which event the Purchaser shall have the rights and remedies provided in Section 9.2 of the Arsynco Sale Agreement), the Purchaser shall have the right to terminate the Arsynco Sale Agreement, whereupon, and notwithstanding any terms to the contrary in the Arsynco Sale Agreement, the Deposit shall be returned to the Purchaser and neither party shall have any further liability or obligation to the other under the Arsynco Sale Agreement, except as otherwise specifically provided in the Arsynco Sale Agreement.  The

Closing of the transactions contemplated by the Arsynco Sale Agreement shall be deemed to waive, as conditions to Closing, any remaining unsatisfied conditions set forth [in the Arsynco Sale Motion].

The conditions to the Seller's obligation to close the Sale as set forth in Section 11.2 of the Arsynco Sale Agreement are as follows:

<u>Conditions Precedent to Obligation of the Seller</u>.

The obligation of the Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by the Seller in its sole discretion:

(a)    All of the representations and warranties of the Purchaser contained in the Arsynco Sale Agreement shall have been true and correct in all material respects as of the Effective Date and shall be true and correct as of the Closing Date;

(b)    The Purchaser shall have performed and observed, in all material respects, all covenants and agreements of the Arsynco Sale Agreement to be performed and observed by the Purchaser as of the Closing Date;

(c)    (i) BASF Corporation shall have consented to the transfer of the Property to the Purchaser, or (ii) the Bankruptcy Court shall have determined that the consent of BASF Corporation to the transfer of the Property to the Purchaser is not required; and

(d)    entry of a Sale Order by the Bankruptcy Court approving the Arsynco Sale Agreement, and the transactions contemplated thereby, which is not a waivable condition.

Subject to each and all of the other terms and provisions of the Arsynco Sale Agreement (including applicable notice and cure provisions), and without limiting any other right or remedy to which the Seller may be entitled elsewhere under the Arsynco Sale Agreement, in the event that any condition contained in Section 11.3 (sic) is not satisfied or waived on or prior to the Closing Date (as the same may be extended pursuant to the express provisions of the Arsynco Sale Agreement), then, unless the Purchaser is in default of its obligations under the Arsynco Sale Agreement (in which event the Seller shall have the rights and remedies provided in Section 9.1 of the Arsynco Sale Agreement), the Seller shall have the right to terminate the Arsynco Sale Agreement, whereupon the Deposit shall be paid to Purchaser, and neither party shall have any further liability or obligation to the other under the Arsynco Sale Agreement, except as otherwise specifically provided in the Arsynco Sale Agreement.  The Closing of the transactions contemplated by the Arsynco Sale Agreement

shall be deemed to waive, as conditions to Closing, any remaining unsatisfied conditions set forth [in the Arsynco Sale Motion].

*See* Arsynco Sale Agreement §§ 11.1-11.2.

- **Deadlines for Approval or Closing of Sale**. The Arsynco Sale Agreement provides that the Closing of the Sale shall take place as soon practicable following the entry of the Sale Order, if approved in the form submitted to the Bankruptcy Court, but in any event no later than thirty (30) days after the entry of the Sale Order, or at such other date as may be agreed upon by the parties or their respective counsel. *See* Arsynco Sale Agreement § 2.1.

- **Deposit and Forfeiture of Deposit**. Pursuant to Section 1.2(a) of the Arsynco Sale Agreement, the Purchaser has deposited $1,050,000 into escrow as a good faith deposit (the "Deposit"). The Deposit will be applied to the Purchase Price at closing or retained by the Seller in the event the Arsynco Sale Agreement is terminated due to certain breaches of the Arsynco Sale Agreement by Purchaser or returned to the Purchaser if the Arsynco Sale Agreement is terminated for other reasons.

Section 1.2(a) of the Arsynco Sale Agreement provides as follows:

> A deposit in the amount of One Million Fifty Thousand and 00/100 Dollars ($1,050,000.00) (the "Deposit") paid by wire transfer of immediately available funds in U.S. dollars by Purchaser to the Riker Danzig Scherer Hyland & Perretti LLP Attorney Trust Account (the "Escrow Agent") within three (3) business days after the Effective Date. The Deposit shall be held by the Escrow Agent in a non-interest bearing trust account in accordance with the provisions of Article 10 of [the Arsynco Sale Agreement]. Except as otherwise provided [in the Arsynco Sale Agreement], the Deposit shall be non-refundable to the Purchaser but fully applicable to the Purchase Price.

Section 3.1(c) of the Arsynco Sale Agreement provides as follows:

> If at any time Seller elects (or is deemed to have elected) not to cure a Title Objection, or if Seller elects to attempt to cure a Title Objection but fails to do so prior to Closing, then Purchaser's sole right and remedy shall be to elect, within five (5) days after: (i) the receipt of Seller's election or (ii) the date Seller is deemed to have elected not to cure a Title Objection (but in any event prior to the Closing Date), as applicable, to either: (x) terminate this  Agreement and the Deposit shall be returned to Purchaser; or (y) proceed to Closing in accordance with this Agreement subject to such Title Objection without reduction in or abatement of the Purchase Price. If Purchaser fails to timely elect, then Purchaser shall be deemed to have elected to proceed to Closing in accordance with this Agreement subject to such Title Objection without reduction in or abatement of the Purchase

Price.  If Purchaser elects (or is deemed to have elected) to proceed to Closing in accordance with this Agreement such Title Objection shall be deemed a Permitted Encumbrance.

Section 4.2 of the Arsynco Sale Agreement provides as follows:

This Agreement is conditioned upon Seller not receiving, after notice and hearing, a higher or better offer which Seller is prepared to accept.  Seller agrees that no offer shall be deemed higher or better unless it provides for a Purchase Price greater than ONE MILLION FIFTY THOUSAND AND 00/100 ($1,050,000.00) DOLLARS and has a closing date which is the same or similar as is provided in this Agreement.  If such an offer is accepted by Seller and approved or authorized by the Bankruptcy Court, and this Agreement has not previously been approved or authorized by the Bankruptcy Court, (a) this Agreement shall be null and void with respect to the named Purchaser referred to in the preamble of this Agreement and any assignee of the same, the Deposit shall be refunded to Purchaser, and (b) neither party shall have any further rights or obligations hereunder, except all rights or obligations under this Agreement which expressly survive Closing or other termination of this Agreement.

*See* Arsynco Sale Agreement §§ 1.2(a), 3.1(c) and 4.2.

- **Request for a Tax Determination Under Section 1146(b) of the Bankruptcy Code**.  The proposed Sale is not being effectuated pursuant to a plan.  Thus, section 1146(b) of the Bankruptcy Code is inapplicable.

- **Retention / Access to Books and Records**.  The Arsynco Sale Agreement and Sale Order do not provide for the sale of any books or records of the Debtors and the Debtors shall retain such books and records.

- **Assumption and Assignment of Executory Contracts and Unexpired Leases**. The Arsynco Sale Agreement provides for the assumption and assignment of the BASF Agreements to the Purchaser pursuant to section 365 of the Bankruptcy Code.  *See* Arsynco Sale Agreement §§ 1.1, 4.3 and 4.4.

- **Credit Bidding**. The proposed Sale to the Purchaser does not involve a credit bid pursuant to section 363(k) of the Bankruptcy Code.

- **Broker or Sales Agent's Anticipated Fee or Commission.**  Pursuant to the proposed Sale and the Quantum Broker Agreement, the Debtors will pay a broker's commission of 4% of the Purchase Price to Quantum at the Closing.  See Sale Order ¶¶ S & 13.  Furthermore, Section 13.2 of the Arsynco Sale Agreement provides as follows:

Purchaser and Seller represent and warrant to each other that neither has dealt with any broker in connection with this sale, except for Craig Sheinker

of Quantum Realty Services, Inc. (the "Broker").  Subject to Seller and Broker entering into a binding commission agreement and approval of same by the Bankruptcy Court, Seller shall be responsible for any commissions due to Broker pursuant to a separate agreement between Seller and Broker. Seller and Purchaser each agree to hold the other harmless and to indemnify the other against any claims of or liabilities to any broker based on dealings or alleged dealings with the indemnifying party.  The obligations of Purchaser and Seller under this Section 13.2 shall survive whether or not the Closing hereunder takes place and notwithstanding any release of either party pursuant to any other provisions of this Agreement.

See Arsynco Sale Agreement §§ 13.2.

27.     In accordance with Local Rule 6004-1(b), the Arsynco Sale Agreement and/or the

Sale Order, as applicable, include the following "special provisions":

- **Sale to Insider**:  The proposed Sale is not to an insider.

- **Agreements with Management or Key Employees**:  There are no agreements with management or key employees regarding compensation or future employment in connection with the proposed Sale.

- **Waiver, Release or Satisfaction of Any Claim**:  Section 3.2(h) of the Arsynco Sale Agreement provides that:

    Without in any way limiting the generality of sections 3.2(a)-(g) of the Arsynco Sale Agreement, the Purchaser "specifically waives, releases and discharges any claim it has, might have had or may have against the Seller, its members and principals (and their respective predecessors in title or interest) with respect to the condition of the Property (including, without limitation, the environmental condition of the Property and any and all Hazardous Substances on, under or emanating from the Property), either patent or latent, its ability or inability to obtain or maintain either temporary or final certificates of occupancy or other licenses for the use or operation of the Property, and/or certificates of compliance for the Property, violations affecting the Property, the actual or potential income or profits to be derived from the Property, the real estate taxes or assessments now or hereafter payable thereon, the compliance with any environmental protection, pollution or land use laws, rules, regulations or requirements, and any other state of facts which exist with respect to the Property."

    Section 7.4(b) of the Arsynco Sale Agreement provides that:

    Purchaser specifically waives, releases and discharges any claim it has, might have had or may have against the Seller Entities with respect to: (i) the presence of Hazardous Substances at, on, under, or emanating from the

Property; (ii) any acts or omissions of the Seller Entities involving Hazardous Substances at, on, under or emanating from the Property; and (iii) the failure of the Seller Entities to comply with Environmental Laws with respect to the Property or to conduct any investigation or remediation required thereby, including all ISRA requirements, provided that Purchaser does not waive, release or discharge claims relating to and/or arising out of the investigation and/or remediation of Hazardous Substances with respect to Berry's Creek, except to the extent that Purchaser discharged such Hazardous Substances to Berry's Creek.

Section 9.1 of the Arsynco Sale Agreement provides that:

The parties agree that if Purchaser defaults in the performance of the terms of this Agreement prior to Closing which default remains uncured for a period of fifteen (15) days after written notice from Seller, Seller may, at its option, as Seller's sole and exclusive remedies at law or in equity: (i) waive all claims on account of such default and proceed to Closing or (ii) retain the Deposit as consideration to Seller for acceptance of this Agreement and as Seller's and Purchaser's good faith estimate of the damages that may be sustained by Seller as a result of Purchaser's breach and as liquidated damages and not as a penalty. Seller and Purchaser agree that it would be impractical and extremely difficult to fix the actual damages suffered by Seller as a result of Purchaser's default, and further that under the circumstances existing as of the date hereof, the liquidated damages provided by the Deposit represent a reasonable estimate of the damages which Seller would incur as a result of such default. This shall be Seller's sole and exclusive remedy in the event of default hereunder by Purchaser, and Seller hereby waives and releases any right to (and hereby covenants that it shall not) sue Purchaser: (a) for specific performance of this Agreement, or (b) any damages of any kind whatsoever. Notwithstanding the foregoing, if Purchaser defaults under any of the surviving obligations under this Agreement after the Closing, Seller shall also be entitled to all rights and remedies afforded to Seller under this Agreement (or any documents executed in connection herewith) at law or in equity, including without limitation, specific performance.

Section 9.2 of the Arsynco Sale Agreement provides that:

9.2.    Default by Seller. In the event that Seller materially breaches or defaults under this Agreement prior to Closing and such material breach or default continues for fifteen (15) days after written notice from Purchaser to Seller specifying such material breach or default, Purchaser shall, as its sole and exclusive remedy, have the right either (a) to seek specific performance of this Agreement, or, in the alternative, (b) to terminate this Agreement and receive the return of the Deposit. The parties agree that no damages of any kind whatsoever (including, without limitation, special or consequential damages), shall be awarded as a result of Seller's breach.

- **<u>Agreement to Limit Marketing or Not Solicit Competing Offers</u>**: The Arsynco Sale Agreement and Sale Order do not include any agreement to limit marketing of the Purchased Assets or not solicit competing offers for the Purchased Assets. The Sale will be subject to higher and better offers (as determined by the Debtors and approved by the Court) submitted at the hearing to approve the Sale. *See* Arsynco Sale Agreement § 4.2.

- **<u>Interim Agreement with the Proposed Purchaser:</u>** The Debtors have not entered into any interim agreement with the Purchaser.

- **<u>Release or Allocation of Sale Proceeds Without Further Court Order</u>**: The Arsynco Sale Agreement provides for the payment of the realty transfer fee, if any, by Arsynco in connection with the transfer of the Property. *See* Arsynco Sale Agreement § 2.6. Additionally, Section 2.7 of the Arsynco Sale Agreement provides:

  > If, at Closing, the Property or any part thereof shall have been affected by a governmental assessment or assessments, which are or may become payable in annual installments, of which the first installment is then a charge or lien, then for the purposes of this [Arsynco Sale] Agreement, all the unpaid installments of any such assessment due and payable in calendar years prior to the year in which the Closing occurs shall be paid by the Seller and all installments becoming due and payable after the delivery of the Deed shall be assumed and paid by the Purchaser. However, if such an assessment or assessments shall be due in one lump sum payment, then to the extent such assessment(s) is for improvements in place as of the Effective Date, then such assessment(s) shall be paid by the Seller but if such assessment(s) is for improvements to be made subsequent to the Effective Date, then the same shall be paid by the Purchaser.

  *See* Arsynco Sale Agreement § 2.7. The Arsynco Dale Agreement and Sale Order provide for the payment of the Broker's Commission to Quantum. *See* Arsynco Sale Agreement § 13.2; Sale Order ¶¶ S & 13.

- **<u>Sale or Limitation of Right to Pursue Avoidance Actions</u>**: The Arsynco Sale Agreement and Sale Order do not include a sale or limitation of the right to pursue avoidance claims under chapter 5 of the Code.

- **<u>Limitation on Successor Liability</u>**: The Arsynco Sale Agreement and Sale Order do not include any limitation on the Purchaser's successor liability.

- **<u>Sale Free and Clear</u>**: The Arsynco Sale Agreement provides that the Purchased Assets shall be sold to the Purchaser free and clear of all liens, claims and encumbrances, except for the Permitted Encumbrances as defined therein. *See* Arsynco Sale Agreement §§ 1.1 and 4.4.

The Sale Order provides that as of the Closing, the Purchased Assets shall have been transferred to the Purchaser free and clear of all liens, claims and encumbrances, except for the Permitted Encumbrances as defined in the Arsynco Sale Agreement. *See* Sale Order ¶¶ N & 8.

- **Relief From Bankruptcy Rules 6004(h) and 6006(d)**: The Debtors seek a waiver of the 14-day stay of the effectiveness of the Sale Order imposed by Bankruptcy Rules 6004(h) and 6006(d), respectively. *See* Sale Order ¶ 26.

**B.**    **Notice of Sale Hearing and Opportunity to Submit Higher or Better Offers**

28.    The Debtors seek a hearing to consider approval of the Sale at the Court's earliest convenience (the "Sale Hearing"). The Debtors submit that the Sale offers the most value for the Property. As previously discussed, Arsynco had not received any firm offers despite having received several expressions of interest and engaged in sale discussions with several parties after the termination of the Capodagli PSA. Nonetheless, the Debtors desire to receive the greatest value for the assets. To this end, the Sale will be subject to higher and better offers (as determined by Arsynco and approved by the Court) submitted at the Sale Hearing.

29.    In order for a bid submitted at the Sale Hearing to be considered a higher and better offer, it must:

(a)    be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are not more burdensome or conditional to Arsynco than those contained in the Arsynco Sale Agreement,

(b)    not be contingent on obtaining financing or the outcome of unperformed due diligence,

(c)    be in an amount equal to at least the purchase price reflected in the Sale Agreement, plus $100,000.00,

(d)    not be conditioned on or request any bid protections,

(e)    include a commitment to consummate the purchase of the assets within not more than thirty (30) days after entry of an order approving such offer, and

(f)    be accompanied by a deposit in immediately available funds equal to twenty-five percent (25%) of the proposed purchase price.

30.    The Debtors submit that these requirements will encourage bidders to submit offers at the Sale Hearing without exposing the Debtors to the whims of non-serious parties who are unable or unwilling to close a transaction.  Arsynco will entertain information requests from any interested parties regarding the Purchased Assets through the date that is one (1) business day prior to the Sale Hearing.

31.    Bankruptcy Rule 2002(a)(2) provides that not less than twenty-one (21) days' notice by mail shall be given of a proposed sale of property of the estate other than in the ordinary course of business.  Bankruptcy Rule 2002(c)(1) governs the contents of the notice of a proposed sale and requires that the notice include the terms and conditions of any private sale and the time fixed for filing objections.  A general description of the property to be sold is also required.  Section 363(f) of the Bankruptcy Code, Bankruptcy Rule 2002 and Local Bankruptcy Rule 6004-1(h) set forth further requirements for a notice of the sale.  Contemporaneously herewith, the Debtors have filed and served a sale notice (the "Sale Notice") setting forth, among other information, the required information in the Local Form Notice of Proposed Private Sale.

32.    The Debtors have provided the Sale Notice, a copy of which is attached hereto as **Exhibit A**, this Sale Motion, and the proposed Sale Order by first class mail, postage prepaid or electronic mail to: (a) the Office of The United States Trustee for the District of New Jersey;(b) Stroock & Stroock & Lavan LLP, c/o Erez E. Gilad, Esq., Jayme T. Goldstein, Esq., Gabriel Sasson, Esq., and Joanne Lau, Esq., as co-counsel for the Committee; (c) Porzio, Bromberg & Newman, P.C., c/o Warren J. Martin, Jr., Esq., Robert M. Schecter, Esq., and Rachel A. Parisi, Esq., as co-counsel for the Committee; (d) counsel to the Indenture Trustee for the Convertible Senior Notes; (e) the U.S. Securities and Exchange Commission, New York Regional Office; (f)

the Internal Revenue Service; (g) the Assistant Attorney General in charge of the Antitrust

Division of the U.S. Department of Justice; (h) all applicable federal, state, and local regulatory or

taxing authorities or recording offices which have a reasonably known interest in the relief

requested by the Motion; (i) the New Jersey Department of Environmental Protection; (j) the

United States Department of Environmental Protection Agency; (k) all persons known by the

Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased

Assets during the previous six months; (l) all entities known by the Debtors that may have a lien,

claim, encumbrance, or other interest in the Purchased Assets (for which identifying information

and addresses are available to the Debtors); (m) all non-Debtor parties to the BASF Agreements;

(n) all of Arsynco's known creditors; (o) the Office of the Attorney General of the State of New

Jersey; (p) the United States Attorney's Office for the District of New Jersey; (q) the New Jersey

Division of Taxation Compliance and Enforcement - Bankruptcy Unit; (r) the United States

Attorney's Office for the District of New Jersey; and (s) all parties that have requested to receive

notice in these cases under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

33.    In light of the present circumstances, which include the sale of substantially all of

the Debtors' operations, Arsynco seeks to sell the Purchased Assets to the Purchaser in a private

sale.  While Arsynco, both pre and post-petition, received interest in the Property from third

parties, the Debtors do not believe that upon further diligence those expressions of interest would

materialize, and, more importantly, would be more beneficial to Arsynco's estate than the

Purchaser's offer set forth in the Arsynco Sale Agreement.  Moreover, as discussed herein, the

Purchased Assets are burdened by environmental remediation obligations.  The Debtors believe it

is in the best interest of Arsynco's creditor constituents to move to an immediate sale of the

Purchased Assets, avoiding the additional expense of a prolonged sale process that will, in the Debtors' view, not result in additional proceeds to these estates.

34.     The Debtors seek to proceed immediately to the Sale Hearing to approve the Arsynco Sale Agreement with the Purchaser to close no later than thirty (30) business days after entry of the Sale Order or at such other date as may be agreed upon by the parties hereto or their respective counsel and have proposed that the deadline for filing objections, if any, to the proposed sale of the Purchased Assets (the "Sale Objection Deadline") be set for seven (7) days prior to the date of the Sale Hearing. To the extent any objections are received by the Sale Objection Deadline and not resolved by the parties, such objections will be considered at the Sale Hearing.

**C.     Assumption and Assignment of BASF Agreement.**

35.     In connection with the Sale, Arsynco seeks to assign the BASF Agreements to the Purchaser, in accordance with the procedures outlined below. The Debtors submit that there are no prepetition defaults under the BASF Agreements and no amount that must be paid to cure the BASF Agreements (the "Cure Amount"). The Debtors have provided BASF with notice of this Motion and request that objections, if any, to the proposed assumption and assignment of any of the BASF Agreements, including, but not limited to, objections relating to the Cure Amount and/or adequate assurance of future performance (each, an "Assumption Objection"), be filed no later than seven (7) days prior to the date of the Sale Hearing (the "Assumption Objection Deadline") and served, so as to be actually received by the Assumption Objection Deadline, upon: (i) Lowenstein Sandler LLP, c/o Wojciech Jung, Esq., as counsel for the Debtors; (ii) counsel to the Purchaser, MM Zalta, PLLC , c/o Mousa Zalta, Esq.; (iii) the Office of the United States Trustee for the District of New Jersey; (iv) Stroock & Stroock & Lavan LLP, c/o Jayme T. Goldstein, Esq. and Erez E. Gilad, Esq., as co-counsel for the Committee; and (v) Porzio, Bromberg & Newman, P.C., c/o Warren J. Martin, Jr., Esq. and Robert M. Schecter, Esq., as co-counsel for the

Committee.  Any Assumption Objection relating to the Cure Amount must state with specificity what cure is required (with appropriate documentation in support thereof).  If an Assumption Objection is timely filed, a hearing with respect to the Assumption Objection will be held at the Sale Hearing.

36.    Unless an Assumption Objection is received by the Assumption Objection Deadline, the BASF Agreements shall be assumed by and/or assigned to the Purchaser in accordance with the Arsynco Sale Agreement and the Cure Amount set forth herein shall be controlling, notwithstanding anything to the contrary in any BASF Agreement or any other document, and the non-Debtor counterparty to the BASF Agreements shall be forever barred from asserting any other claims against the Debtors or the Purchaser (as appropriate), or the Property of any of them, as to such assumed BASF Agreements.

## **BASIS FOR RELIEF**

**A.    The Sale of the Purchased Assets Pursuant to the Arsynco Sale Agreement is Authorized by Section 105, 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment**

37.    While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363(b), courts uniformly agree that the business judgment standard applies. *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  Courts typically apply four factors in determining whether a section 363 sale is appropriate under the business judgment standard—namely, whether: (a) a sound business justification exists for the sale; (b) adequate and reasonable notice of the sale was provided to interested parties; (c) the sale will produce a fair and reasonable price for the property; and (d) the parties have acted in good

faith. *Id.* at 1070 (setting forth the "sound business" purpose standard for the sale of the debtor's assets under section 363 of the Bankruptcy Code); *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transportation Industries, Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing nonexclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)).  When a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

38.    As long as a valid business justification exists – as it does under the present circumstances – the decision to sell estate property is entitled to a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *In re Integrated Res., Inc.*, at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  This presumption results in courts giving substantial deference to the business decisions of debtors. *See In re Global Crossing, Ltd.*, 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw.")

39.    As part of this analysis, courts may also consider (a) whether fair and reasonable consideration is provided, (b) whether the transaction has been proposed and negotiated in good

faith, and (c) whether reasonable notice has been provided.  *See In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998); *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008) (citations omitted); 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev. 2009) ("It is now generally accepted that Section 363 allows such sales [of substantial portions of the debtor's assets] in chapter 11, as long as the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable.").

40.     These factors are satisfied in this case.  First, the sale consideration is fair and reasonable under the circumstances.  Although a relatively short time has elapsed since the Debtors' chapter 11 filing, the Sale will reduce expenses and generate the best value for Arsynco's assets; therefore, it is crucial to preserving and maximizing the value of Arsynco's estate.  The Purchase Price ($1.05 million) represents fair market value for the Purchased Assets, particularly in light of the Purchaser's agreement to purchase the Property in "as-is" condition "with all faults" (including, without limitation, the environmental condition of the Property).  Likewise, the value of the Purchased Assets will decline with each additional day under Arsynco's ownership due to mounting expenses related to the environmental remediation obligations and the loss of interest by potential bidders concerned with such obligations.

41.     There has been sufficient marketing of the Purchased Assets.  Arsynco has been extensively engaged in pursuing a sale transaction for the Property for at least five years.  During this time period, Arsynco has engaged multiple real estate brokers to market the Property.  While Arsynco previously engaged in substantial negotiations with Stalwart and reached an agreement

with Capodagli, Arsynco was not able to finalize a sale with either due, in large part, to the environmental remediation obligations for the Property.

42.     Since filing these Chapter 11 Cases, multiple parties reached out to Arsynco with interest in the Property, both prior and subsequent to Capodagli's termination of its PSA. However, except for the transaction set forth in the Arsynco Sale Agreement, Arsynco received only one formal indication of interest setting forth the terms of a potential transaction, but not a binding offer.  Based on past indications of interest, the Debtors do not believe that a superior bid to that of the Purchaser is likely.  As such, further marketing of Property, in the Debtors' view, would be futile.

43.     Second, the transaction is proposed in good faith.  The Arsynco Sale Agreement is the result of arm's length negotiations between Arsynco and the Purchaser which were conducted in good faith.  Both Arsynco and the Purchaser are represented by sophisticated counsel with extensive experience in similar transactions.  There is no evidence of fraud or collusion in the terms of the proposed Sale.  The Purchaser is not an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Furthermore, the Sale is subject to higher and better offers, a process that is designed to ensure that no party is able to exert undue influence over the sale process.  Finally, all parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard.

44.     Third, reasonable notice of the Sale, under the circumstances, will have been provided, as discussed above.  Under Bankruptcy Rules 2002(a) and (c)(1), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the terms and conditions of any private sale, and the deadline for filing any objections to such sale. This Motion, and the notice hereof, fully complies with Bankruptcy Rule 2002 and is reasonably

calculated to provide timely and adequate notice of the terms and conditions of the Sale to

Arsynco's creditors and other parties in interest, as well as to those parties who have expressed an

interest, or may express an interest, in making a bid to purchase the Purchased Assets since the

filing of the Chapter 11 Cases.  As discussed above, the Debtors have provided notice of this

Motion, including the Sale Notice, to the Notice Parties.

45.     Finally, the Sale will provide a substantial benefit to Arsynco and the Debtors due

to the environmental obligations to be taken on by the Purchaser.  The Arsynco Sale Agreement

provides:

> Purchaser acknowledges and agrees that, from and following
> Closing, it will be responsible, at its sole cost and expense, for
> compliance with all applicable requirements of ISRA and all other
> applicable NJDEP regulations and guidance arising therefrom,
> including complying with all RAPs issued thereunder, and
> Purchaser agrees to diligently and expeditiously carry out those
> compliance obligations and requirements under the supervision of
> its LSRP.

*See* Arsynco Sale Agreement, § 7.2(e).  *See also* Arsynco Sale Agreement, § 7.3(c) (Purchaser's

acknowledgment that it shall be "responsible, at its sole cost and expense, for compliance with the

PCB Remediation Approval and all other applicable EPA regulations and guidance arising from

TSCA… .").

46.     Moreover, the Arsynco Sale Agreement provides that:

> (a) … Purchaser shall protect, defend, indemnify, and hold harmless
> Seller and any past, present, or future officers, directors, affiliates,
> employees, contractors or agents thereof, which shall include,
> without limitation, Michael DiBello and Steven Rogers, any past,
> present, or future officers, directors, employees, contractors or
> agents of parents, subsidiaries, or affiliates of Seller, and any person
> who provided information to Purchaser on behalf of Seller
> (collectively, the "Seller Entities") from and against any and all loss,
> liability, cost, damage, fine, penalty and expense (including, without
> limitation, reasonable attorneys' fees) (Loss") incurred by any of the
> Seller Entities that relate to and/or arise out of the following:

(1) the presence of Hazardous Substances at, on, under, or emanating from the presence of Hazardous Substances at, on, under, or emanating from the Property, including any natural resource damage claims, except that the indemnity provided by this **Section 7.4(a)(1)** shall not include claims arising from investigation and/or remediation of Hazardous Substances with respect to Berry's Creek, except to the extent that Purchaser discharged such Hazardous Substances to Berry's Creek;

(2) the failure of Purchaser to comply with Environmental Laws with respect with respect to the Property or to perform Purchaser's Remediation;

(3) the breach by Purchaser of any of its representations or obligations under this Agreement

*See also* Arsynco Sale Agreement, § 7.4. As a result of the foregoing, Arsynco will be relieved of the ongoing expenses for remediation at the Property.

47. Additionally, as a result of the Sale, the Debtors will be able to access the $1.9 million currently held in the Remediation Funding Source Bank Account. Pursuant to the Sale, the Purchaser is required to "establish a Remediation Funding Source(s) acceptable to NJDEP… ." *See* Arsynco Sale Agreement, § 7.2(b)(2) & (d) ("Upon Closing, Purchaser shall retain its LSRP and file the fully executed Initial Environmental Forms with the NJDEP in a form acceptable to the Seller. The Purchaser shall pay all fees associated with the submission of the Initial Environmental Forms, including, without limitation, the Remediation Funding Source surcharge."). *See also* Arsynco Sale Agreement, § 7.3(f) (requiring establishment of TSCA Financial Assurance Amount by the Purchaser). The Debtors request that the Sale Order authorize and direct the Debtors to transfer all funds held in the Remediation Funding Source Bank Account to Aceto Corporation as soon as reasonably practicable after the Closing of the Sale and provide that no claims or interests will attach to any portion of the funds held in the Remediation Funding Source Bank Account.

48.     As each factor demonstrates, the Sale satisfies the "sound business judgment" test and presents the best opportunity to realize the maximum value of the Purchased Assets for the benefit of creditors and other parties in interest.  Furthermore, the Sale will allow Arsynco to reduce its environmental remediation obligations, for the benefit of its estate, creditors and all parties in interest.  For the foregoing reasons, the Debtors submit that the Sale should be approved pursuant to section 363 of the Bankruptcy Code.

**B.      An Auction of the Purchased Assets Is Not Required.**

49.     In accordance with Bankruptcy Rule 6004(f)(1), asset sales outside of the ordinary course of business may be by private or public sale.  Fed. R. Bankr. P. 6004(f)(1).  A debtor has broad discretion in determining the manner in which its assets are sold.  *Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . ."); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property.") (internal quotations and citations omitted).  As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment of how to conduct a sale of its assets.  *Id.* at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re Nepsco, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate.").  Accordingly, if a debtor concludes that conducting a private sale, as opposed to a public auction, is in the best interest of the estate, the debtor should be permitted to do so.  *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that,

with respect sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

50.    The Debtors are unaware of any other parties that would submit a higher offer than that of Purchaser.  The delay and costs associated with further marketing the Purchased Assets may negate any benefit to be derived through a public sale of the Purchased Assets.  Accordingly, the Debtors submit that a private sale of the Purchased Assets, subject to the receipt of any bids at the Sale Hearing, is appropriate under the circumstances, is in the best interest of the Debtors' estates and should be approved.

## C.    <u>The Sale of the Purchased Assets Should Be Free and Clear of Liens, Claims and Encumbrances</u>

51.    The Debtors request that the sale and transfer of the Purchased Assets be approved free and clear of all liens, claims, encumbrances and other interests, whether arising pre- or post-petition, with any such liens or interests attaching to the proceeds of the Sale.  The Debtors do not believe that, other than the Permitted Encumbrances, the Purchased Assets are subject to any other liens, claims or encumbrances.  Such relief is consistent with the provisions of Section 363(f), which authorizes a debtor to sell assets free and clear of interests in property of an entity other than the estate if:

(i)    applicable nonbankruptcy law permits a sale of such property free and clear of such interest;

(ii)    such entity consents;

(iii)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(iv)    such interest is in *bona fide* dispute; or

(v)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

52.     Because section 363(f) of the Bankruptcy Code is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale.  *See id.*; *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that court may approve sale "free and clear" provided at least one of the subsections of section 363(f) is met); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D.Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have been met"); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

53.     The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to Section 105 of the Bankruptcy Code, even if Section 363(f) of the Bankruptcy Code did not apply.  *See In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

54.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the Sale of the Purchased Assets pursuant to the Arsynco Sale Agreement.  All parties known to have asserted a lien or other encumbrance on the Purchased Assets will receive notice of the Sale.  To the extent they have not objected by the Sale Objection Deadline, they will be deemed to have consented to the Sale free and clear of all liens, claims and encumbrances (except for the Permitted Encumbrances as defined in the Arsynco Sale Agreement) pursuant to section

363(f)(2).  Further, where consent is not obtained, a sale free and clear can proceed pursuant to

section 363(f)(5) of the Bankruptcy Code because the relevant lien or other encumbrances will

attach to the proceeds of the Sale with the same validity, priority, and force and effect as such lien

or encumbrance had immediately prior to the closing of the Sale, and the Debtors will establish at

the Sale Hearing that the relevant creditors can be compelled to accept a monetary satisfaction of

their respective claims.

55.    Accordingly, section 363(f) authorizes the Sale of the Purchased Assets free and

clear of all liens, claims and encumbrances (except for the Permitted Encumbrances as defined in

the Arsynco Sale Agreement or other definitive purchase agreement).

**D.     Purchaser Should be Afforded All Protections Under Section 363(m) as a Good Faith Buyer and the Proposed Sale Transaction Does Not Violate Section 363(n) of the Bankruptcy Code.**

56.    Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's

assets to a good faith purchaser. Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale . . . were stayed pending
> appeal.

11 U.S.C. § 363(m).

57.    While the Bankruptcy Code does not define good faith, the Third Circuit has held

that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders

or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Cumberland Farms*

*Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.)*, 788 F.2d 143,

147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th

Cir. 1983) (other citations omitted)); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (noting that the type of "misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders.").

58.     As set forth in detail above, the Arsynco Sale Agreement was negotiated at arm's-length and without collusion, with all parties represented by their own sophisticated counsel and advisors.  In addition, the Purchaser is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code.  Accordingly, the Debtors request that the Sale Order include a finding that the Purchaser (or any successful bidder at the Sale Hearing) is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors believe that providing the Purchaser (or any successful bidder at the Sale Hearing) with such protection will ensure that the maximum price for the Purchased Assets will be received by Arsynco and that the closing of the Sale will occur promptly.

59.     In addition, neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Arsynco Sale Agreement to be avoided under section 363(n) of the Bankruptcy Code.

**E.     Assumption and Assignment of the BASF Agreements Should be Approved Under Section 365 of the Bankruptcy Code.**

60.     The assumption and assignment of the BASF Agreements is an integral part of the proposed Sale and should be approved by the Bankruptcy Court.  Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume and assign an executory contract or unexpired lease subject to Court approval.  Section 365(b) of the Bankruptcy Court requires a debtor in

possession to satisfy certain requirements, including the provision of adequate assurance of future performance, at the time of assumption if a default exists under the contract to be assumed.

61.    By enacting section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983). Further, it is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. *See In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) (noting that "[i]n determining whether a debtor may be permitted to reject an executory contract, courts usually apply the business judgment test. Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered") (citations omitted); *see also Sharon Steel Corp. v. National Fuel Gas Dist Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986). Indeed, to impose more exacting scrutiny would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provisions for private control" of the estate's administration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

62.    Adequate business justification exists to approve the proposed assumption and assignment of the BASF Agreements. The BASF Agreements are valuable assets of Arsynco and

the inclusion of such BASF Agreements will significantly increase the purchase price for the

Purchased Assets. Thus, the assumption and assignment of BASF Agreements is critical to

Arsynco's efforts to maximize the value realized in the Sale. Moreover, the Debtors submit that

there are no incurable defaults under any of the BASF Agreements.

63. Moreover, the Debtors submit that the counterparty to BASF Agreements will be

provided with adequate assurance of future performance as required by section 365(b)(1)(C) of the

Bankruptcy Code. The meaning of "adequate assurance of future performance" depends on the

facts and circumstances of each case, but should be given "practical, pragmatic construction." *See*

*Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr D.N.J. 1988)

(internal citations omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (holding that adequate assurance of future performance does not mean absolute assurance

of payment); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required assurance will fall considerably

short of an absolute guarantee of performance."). Among other things, adequate assurance may

be given by demonstrating the assignee's financial health and experience in managing the type of

enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y.

1986) (chief determinant of adequate assurance is whether rent will be paid).

64. With respect to the BASF Agreements of Arsynco, the Purchaser, its designee or a

successful bidder for the Purchased Assets will provide adequate assurance information to BASF

upon request. If the parties are unable to facilitate a consensual resolution of any adequate

assurance dispute, or a dispute related to cure amounts or the assignability of the BASF

Agreements, BASF will be able to file an objection by the Assumption Objection Deadline set

forth in the Sale Order. Should any objections to the assignability of a contract or lease be filed

by the Assumption Objection Deadline, such disputes will be resolved by the Court at the Sale

Hearing.  No final approval of assumption and assumption of a BASF Agreement will occur unless

all assignability objections are resolved or adjudicated.

65.    The Debtors should be relieved of future obligations under the BASF Agreements.

Section 365(k) of the Bankruptcy Code provides that "[a]ssignment . . . of a contract . . . assumed

under this section relieves the [debtor] and the estate from any liability for any breach of such

contract or lease occurring after such assignment."  The Debtors respectfully request that the order

approving the sale of any BASF Agreement expressly decree that the Debtors are relieved from

all future liability under the BASF Agreements assigned thereunder.

66.    Accordingly, the Debtors respectfully request that the Bankruptcy Court approve

the assumption and assignment of the BASF Agreements, in accordance with the Arsynco Sale

Agreement.

**F.    Authority to Pay the Broker's Commission at Closing Should Be Granted.**

67.    The Debtors also seek authority to pay Quantum the Broker's Commission pursuant

to Local Rule 6004-5(a), which provides:

> A motion for the use, sale, or lease of property may include a request
> to pay a commission or fee at closing to a professional person
> retained to provide services relating to the use, sale, or lease. The
> motion, Local Form Notice of Proposed Private Sale, and proposed
> order must: (i) identify the professional; (ii) describe the services
> rendered; and (iii) state the amount to be paid.

68.    As detailed above, the Debtors seek authority to pay Quantum a commission in the

amount of 4% of the Purchase Price.  *See* Quantum Broker's Agreement, attached hereto as

**Exhibit B**.  Among other things, Quantum provided the following services during Arsynco's sale

process:

(a)     took the necessary steps to market the Property in a manner to maximize the value thereof and to generate the highest and best offers therefor;

(b)     facilitated the dissemination of information to interested parties with respect to the Property; and

(c)     correspondingly assisted Arsynco with the sale process by introducing multiple parties interested in the Property to Arsynco, including the Purchaser.

69.     The proposed terms to compensate Quantum are typical of Quantum and other real estate brokers.  The Debtors believe that, given the success of Quantum's services, the proposed payment of the Broker's Commission to compensate Quantum is reasonable and is in the best interest of the estates.  If a party other than the Purchaser identified in the Arsynco Sale Agreement purchases the Property, the Quantum Broker Agreement will not apply and Quantum will not be entitled to any compensation.

70.     Accordingly, the Debtors request that Arsynco be authorized to pay the Broker's Commission at the Closing from the proceeds of the Sale.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

71.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Sale Order.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court order otherwise."

72.     As set forth above, the relief requested herein is necessary and appropriate to maximize the value of Arsynco's assets.  Accordingly, the Debtors submit that ample cause exists

to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that each such rule applies.

## **WAIVER OF MEMORANDUM OF LAW**

73.    The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J.  LBR 9013-1(a)(3) because the legal basis upon which the Debtors rely is incorporated herein and this Sale Motion does not raise any novel issues of law.

## **NO PRIOR REQUEST**

74.    No prior request for the relief sought herein has been made to this Court or to any other court.

## **NOTICE**

75.    Notice of this Motion has been given to: (a) the Office of The United States Trustee for the District of New Jersey;(b) Stroock & Stroock & Lavan LLP, c/o Erez E. Gilad, Esq., Jayme T. Goldstein, Esq., Gabriel Sasson, Esq., and Joanne Lau, Esq., as co-counsel for the Committee; (c) Porzio, Bromberg & Newman, P.C., c/o Warren J. Martin, Jr., Esq., Robert M. Schecter, Esq., and Rachel A. Parisi, Esq., as co-counsel for the Committee; (d) counsel to the Indenture Trustee for the Convertible Senior Notes; (e) the U.S. Securities and Exchange Commission, New York Regional Office; (f) the Internal Revenue Service; (g) the Assistant Attorney General in charge of the Antitrust Division of the U.S. Department of Justice; (h) all applicable federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (i) the New Jersey Department of Environmental Protection; (j) the United States Department of Environmental Protection Agency; (k) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased

Assets during the previous six months; (l) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Purchased Assets (for which identifying information and addresses are available to the Debtors); (m) all non-Debtor parties to the BASF Agreements; (n) all of Arsynco's known creditors; (o) the Office of the Attorney General of the State of New Jersey; (p) the United States Attorney's Office for the District of New Jersey; (q) the New Jersey Division of Taxation Compliance and Enforcement - Bankruptcy Unit; (r) the United States Attorney's Office for the District of New Jersey; and (s) all parties that have requested to receive notice in these cases under Bankruptcy Rule 2002

**WHEREFORE**, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form submitted herewith, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: August 12, 2019                          Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

/s/ *Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Michael S. Etkin, Esq.
Wojciech F. Jung, Esq.
Philip J. Gross, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
metkin@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

*Counsel to the Debtors and Debtors-in-Possession*