**HAHN & HESSEN**

Hahn & Hessen LLP
488 Madison Avenue, New York, NY 10022
T 212.478.7200  F 212.478.7400  hahnhessen.com

October 30, 2019

John P. Amato
Partner
212.478.7380
jamato@hahnhessen.com

**Via ECF and Hand Delivery**
Honorable Vincent F. Papalia
50 Walnut Street
Newark, NJ 07102
Courtroom 3B

Re:   In re Aceto Corporation, *et al.*[1]; Chartwell Therapeutics Licensing LLC's ("Chartwell") letter brief re Aceto's liability to Chartwell as parent of wholly-owned subsidiary Rising

Dear Judge Papalia:

As you know, Hahn & Hessen LLP and Forman Holt are counsel to Chartwell in the above-referenced chapter 11 cases. Chartwell submits this letter brief (the "Brief")[2] to specifically address the issue of Aceto's liability, as parent of wholly-owned subsidiary Rising, to Chartwell under the well-established principal/agency doctrine of parental liability. As requested by the Court, for purposes of this Brief, we will presume that Rising is liable to Chartwell as a result of its (a) implied or express assumption of the Citron Agreement pursuant to the PPA, or (b) the implied assumption of liability of the Citron Agreement by virtue of a *de facto* merger or mere continuation of business doctrines through its 2016 acquisition of the Citron Pharma Business. Thus, this Brief focuses on whether there are material issues of fact as to whether Rising's successor liability to Chartwell can be imputed to Aceto, as Rising's parent under principal/agency law principles. Under the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Aceto Corporation (0520); Tri Harbor Chemical Holdings LLC (f/k/a Aceto Agricultural Chemicals LLC, f/k/a Aceto Agricultural Chemicals Corporation) (3948); Tri Harbor Realty LLC (f/k/a Aceto Realty LLC) (7634); Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.) (7959); Kavod Health LLC (f/k/a Rising Health, LLC) (1562); Kavris Health LLC (f/k/a Acetris Health, LLC) (3236); KAVACK Pharmaceuticals LLC (f/k/a PACK Pharmaceuticals, LLC) (2525); Arsynco, Inc. (7392); and Acci Realty Corp. (4433).

[2] Capitalized terms not defined in this Brief shall have the meanings ascribed to them in the *Chartwell Therapeutics Licensing LLC's Response to Debtors' (I) Fourth Omnibus Objection to and, Alternatively, Motion to Estimate, Proofs of Claim Nos. 140, 149, 151, 152, and 153 Due to (A) Assumption by the Purchaser of the Debtors' Pharma Business and (B) No Liability of the Debtors; (II) Motion Seeking Enforcement of the Pharma Sale Order; and (III) Request for Related Relief* [D.I. 994] (the "Chartwell Response") or *Chartwell Therapeutics Sur-Reply in Further Opposition to Debtors' (I) Fourth Omnibus Objection to and, Alternatively, Motion to Estimate, Proofs of Claim Nos. 140, 149, 151, 152, and 153 Due to (A) Assumption by the Purchaser of the Debtors' Pharma Business and (B) No Liability of the Debtors; (II) Motion Seeking Enforcement of the Pharma Sale Order; and (III) Request For Related Relief* [D.I. 1103] (the "Chartwell Sur-Reply").

F0065169 - 1

**HAHN&
HESSEN**

October 30, 2019
Page 2

Third Circuit's decision in *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988), the answer is unequivocally yes.

On Monday of this week Chartwell provided *Phoenix Canada* to the Liquidating Debtors which they summarily dismissed as not being on point because the case was not decided in the context of a *de facto* merger. However, the legal basis of the subsidiary's liability as agent for a disclosed principal is irrelevant under principal/agency law. The Court's holding in *Phoenix Canada* stands for the proposition that any underlying claims or causes of action against a subsidiary may be extended to its parent entity when (1) the subsidiary acted on behalf of the parent within customary principal-agency principles and (2) the parent-subsidiary relationship is relevant to the claim being asserted. The principal-agent relationship must be tied to a specific transaction and, when it is, the parent entity can be held responsible for the subsidiary's liability stemming from the transaction.

As set forth in the Chartwell Response and subsequent Sur-Reply, and matters this Court can take judicial notice of, there are sufficient facts in the record to support the conclusion that Aceto created Rising to act as its agent to acquire the Citron's Pharma Business under the PPA and directed the negotiations surrounding the PPA transaction. As such, there are at least material issues at this time that Rising acted as Aceto's agent in connection with the PPA. Consequently, Chartwell has a viable claim against Aceto for the amounts owed to it by Rising under the Third Circuit's holding in *Phoenix Canada*.

### I. Third Circuit Case Law Supports the Extension of Liability to Aceto

In *Phoenix Canada*, the Third Circuit recognized that customary agency principles can extend the liability of an independent subsidiary to its parent without piercing the corporate veil. Specifically, the agency theory of parental liability is applicable when the subsidiary becomes the parent's agent in the course of a specific transaction. 842 F.2d 1466, 1477 (3d Cir. 1988) (citing the Second Restatement of Agency). This limited agency exists "for a specific transaction," and thus can apply even though the parent and subsidiary are "completely independent of one another" outside the limited agency setting. *Id.* at 1477-78. As such, a claimant against a parent does not need to pierce the corporate veil or otherwise prove that the parent completely dominated or controlled the subsidiary to hold the parent liable. *Id.* ("Under this second theory, total domination or general alter ego criteria need not be proven."). Instead, to establish the existence of this limited parental agency: (1) the facts must indicate that the subsidiary acted on behalf of the parent within customary agency principles and (2) the parent-subsidiary relationship "must be relevant to the [] claim of wrongdoing." *Id.*

In *Phoenix Canada*, a judgment was entered against subsidiaries on the plaintiff's breach of contract claim for undercalculated royalties which the plaintiff sought to extend to parent

**HAHN & HESSEN**

October 30, 2019
Page 3

corporations Texaco, Inc. and Gulf Oil Corporation. The district court denied the plaintiff's request to extend liability because it found insufficient facts to "show complete domination or control by Texaco and Gulf over their subsidiaries." *Id.* at 1746 (internal citations omitted)[3]. The Third Circuit disagreed with the district court because it "did not analyze customary agency principles as another possible source of parental liability." *Id.* at 1477-78. As the Third Circuit explained:

> When using that approach, the completeness of the subsidiary's domination by a parent is not material—the focus instead centers on whether the Ecuadorian corporations, though separate and independent from the United States corporations, acted as agents for disclosed principals.
>
> In conducting this review, the focus must be directed to the pertinent cause of action. Thus, only the judgment in favor of Phoenix on the undercalculation of royalties due for the three quarters in 1973 and 1974 is relevant. The evidence of relationship between the parents and subsidiaries as it bears on that breach of contract is the proper subject of our inquiry.

*Id.* at 1478.

Under the parental agency doctrine, the Third Circuit noted several significant facts which would bear on the creation of an agency relationship between the subsidiaries and parents in connection with the contract that was breached, including that: (1) the parents "negotiated and drafted" the contract at issue, (2) the parents issued a joint press release announcing their ownership rights in the discovered oil reserves, subject to the contractual obligation at issue (*i.e.* paying 2% royalty), (3) employees of the parents assumed control of the renegotiation of the contract, and (4) one of the parents directly received the buyout payment for the subsidiary's business. *Id.* Given these "significant events" and the district court's failure to explore "customary agency principles as a possible source of parental liability", the Third Circuit remanded the issue to the district court for further inquiry and fact-finding to determine the applicability of the parental agency theory. *Id.* As the Third Circuit reiterated, "complete domination by the parents in the general conduct of the subsidiaries' affairs is not a prerequisite[,]" and "parents and subsidiaries may fully maintain their separate corporate existences; yet, as any two unrelated companies, they might have entered into a limited agency relationship for a specific transaction." *Id.*

---

[3] "The district court found that the parents and the subsidiaries shared several common officers and directors, but their boards were otherwise separate," and while "the parents [] participated in the substantial financial dealings of their subsidiaries (who were required to secure approval for large investments and acquisitions or disposals of major assets)[,]" "the subsidiaries kept separate books and records, maintained their own bank accounts, paid their own taxes, and were responsible for their own day-to-day operations in Ecuador, including drilling oil wells and constructing the pipeline in question." *Phoenix*, 842 F.2d at 1476.

F0065169 - 1

**HAHN&
HESSEN**

October 30, 2019
Page 4

Other federal courts in the Second and Third Circuits have also examined a parent's relationship to the contracts out of which their subsidiary's liability arose to determine whether a limited agency relationship existed. *See e.g., In Automated Salvage Transp., Inc. v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 626 (D.N.J. 1999) (*citing Phoenix Canada Oil Co.*, 842 F.2d 1466 (3d Cir.1988)) (holding that the parent may be held liable for the breach of contract and fraud claims against the subsidiary without piercing the corporate veil and that a reasonable juror could find that the subsidiary was the parent's agent, in part, because negotiations of the contract at issue involved representations that the parent would make an "equity investment" in proposed business ventures); *In Pullman v. Alpha Media Pub., Inc.*, No. 12-CV-1924 PAC SN, 2013 WL 1290409, at *20 (S.D.N.Y. Jan. 11, 2013), report and recommendation adopted, No. 12 CIV. 1924 PAC SN, 2013 WL 1286144 (S.D.N.Y. Mar. 28, 2013), aff'd, 624 F. App'x 774 (2d Cir. 2015) (concluding that the plaintiff sufficiently pled a limited agency relationship such that the parent would be directly liable for its subsidiary's fraudulent activity where the allegations included that (1) subsidiary was "ultimately controlled" by the parent, (2) parent created the subsidiary to consummate the transaction at issue, and (3) the parent executed "key agreements" in connection with the transaction at issue)[4].

### II. *Aceto's Involvement in the Negotiation, Drafting and Terms of the PPA Results in the Extension of the Chartwell Liability to Aceto, as Parent of Rising*

Rising's successor liability to Chartwell extends to Aceto under the parental agency doctrine as a result of Aceto's controlling role in the PPA transaction. Specifically, Aceto was significantly involved in the creation and execution of the PPA as it (i) created subsidiary Rising to acquire Citron's assets, (ii) directly negotiated the terms of the PPA with Citron and (iii) signed several ancillary agreements that were instrumental to the PPA.

**First**, Aceto created wholly-owned subsidiary Rising to act as its agent in the acquisition of Citron's Pharma Business under the PPA. As stated by the Debtors in their own Adversary Complaint:

> Trusting the representations and assurances provided by Mr. Reddy, Aceto agreed to proceed with the transaction and formalize the manufacturing partnership with Aurobindo. On November 2, 2016, Aceto executed a

---

[4] These courts conducted their analysis under New Jersey law and applied the agency principles from the *Phoenix* opinion (which applied Pennsylvania law), which is consistent with the fact that the Third Circuit (in the *Phoenix* opinion) and New Jersey law follow the Restatement of Agency. *See Automated Salvage*, 106 F. Supp. 2d at 618 n. 4 ("New Jersey tends to follow the Restatement"); *Pullman*, 2013 WL 1290409, at *8-9 (applying New Jersey law and citing to the Restatement); *Phoenix*, 842 F.2d at 1477 (citing Restatement of Agency).

F0065169 - 1

**HAHN&
HESSEN**

October 30, 2019
Page 5

> Product Purchase Agreement (the "PPA"), pursuant to which Aceto agreed to acquire certain generic products and related assets of Citron and Lucid in exchange for an up-front cash payment of $270 million plus additional consideration. **Aceto formed two subsidiaries under Rising Pharmaceuticals to consummate the product acquisition: Rising Health, which acquired certain commercial products and assets of Citron, and Acetris, which acquired certain government products and assets of Lucid.** (emphasis added).

Adversary Complaint, ¶ 29, annexed to the *Certification of John P. Amato in Connection with Chartwell Therapeutics Licensing LLC's Letter Brief in Further Opposition to Debtors' Fourth Omnibus Objection to and, Alternatively, Motion to Estimate, Proofs of Claim Nos. 140, 149, 151, 152 and 153* (the "Amato Certification") as **Exhibit A**. Thus, it is undisputed that Aceto specifically formed subsidiary Rising to absorb Citron's assets pursuant to the terms of the PPA. *See Pullman v. Alpha Media Pub., Inc.*, No. 12-CV-1924 PAC SN, 2013 WL 1290409, at *20 (S.D.N.Y. Jan. 11, 2013) (concluding that plaintiff sufficiently pled a limited agency relationship such that the parent would be directly liable for its subsidiary's fraudulent activity where, *inter alia*, the parent created the subsidiary to consummate the transaction at issue).

**Second**, Aceto's own public filings make clear that Aceto, not Rising, led the PPA negotiations with Citron. Aceto's November 2, 2016 Press Release explicitly provides that "ACETO, through its wholly-owned subsidiary Rising Pharmaceuticals, signed a definitive product purchase agreement to acquire generic products and related assets of Citron Pharma LLC and Lucid Pharma LLC for a total consideration, prior to a potential earn-out payment, of approximately $412 million, or $332 million net of expected tax benefits." Press Release, Aceto Corp., Ex. 99.1 to Form 8-K (Nov. 2, 2016), annexed to the Amato Certification as **Exhibit B**; *See also Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d at 1478 (parents issued a press release announcing the transaction at issue as their own).

Similarly, Aceto's own allegations in the Adversary Complaint make it abundantly clear that Aceto was controlling the PPA transaction and it was Aceto, not Rising, who was leading the negotiations with Citron regarding the PPA and related discussions with Aurobindo. As the Debtors highlight at the outset of the Adversary Complaint:

> Aurobindo fired the first shot in 2016 when, **to induce Aceto into paying $270 million in cash and other consideration for rights owned by Citron Pharma LLC ("Citron") and its affiliate Lucid Pharma LLC ("Lucid")** in products manufactured by Aurobindo, Mr. Reddy made a series of representations regarding Aurobindo's capabilities, capacity, and good faith. Aceto recognized that the success of the business would be dependent upon

**HAHN&
HESSEN**

October 30, 2019
Page 6

>  the goodwill and good faith of Aurobindo, the sole supplier of most of the
>  products at issue. **To induce Aceto to move forward with the transaction**,
>  Mr. Reddy—speaking on behalf of Aurobindo—made substantial
>  representations **intended to assure Aceto that Aurobindo would be a solid,
>  reliable manufacturing partner. In particular, Mr. Reddy represented to
>  Aceto** that Aurobindo would supply all of Rising Pharmaceuticals'
>  manufacturing needs for the purchased products; that Aurobindo had ample
>  and redundant manufacturing capacity and capabilities to meet those needs;
>  and that Aurobindo would act in good faith and not abuse its control over the
>  supply of product to secure undue competitive advantage. (emphasis added).

*See* Adversary Complaint, ¶ 2; *See also id.*, ¶ 23 ("In 2015, Aceto was looking for opportunities to expand Rising Pharmaceutical's generic pharmaceutical business."); ¶¶ 26-27 (discussing Mr. Eilender's, Aceto's Executive Chairman, role in leading negotiations with Mr. Reddy regarding Aurobindo's agreement to supply Rising Pharmaceuticals with its product needs, which the Debtors assert induced Aceto into entering into the PPA transaction); *see also Phoenix*, 842 F.2d at 1478 (parents "negotiated and drafted" the contract at issue).

**Third**, in addition to being a signatory under the PPA, Aceto entered into several ancillary agreements which were integral to the PPA transaction. *See Pullman*, 2013 WL 1290409, at *20 (parents executed key ancillary agreements). As an initial matter, the court in *Phoenix* specifically found that liability may attach to a principal corporation under a parental agency theory "even though it is not a party named in the agreement." 842 F.2d at 1477. Here, it is undisputed that Aceto, as "Parent", was a signatory to the PPA and had various obligations thereunder, including the issuance of 5,121,951 shares of its common stock to the Sellers as part of the consideration contemplated under the PPA. *See* PPA, § 1.8(a), annexed to the Amato Certification as **Exhibit D**.

In addition to being a signatory to the PPA, Aceto entered into several ancillary agreements on November 2, 2016 which were integral to the PPA transaction. As set forth in Aceto's Form 8-K, Aceto entered into a stockholders' rights agreement with the Sellers (the "Stockholders' Rights Agreement") which governed Aceto's and the Sellers' respective rights and obligations regarding the Equity Consideration. *See* Aceto Corp., Current Report (Form 8-K) p. 4 (Nov. 2, 2016), annexed to the Amato Certification as **Exhibit C**. Similarly, Aceto also entered into a voting agreement with the Sellers and the Members (as defined therein) (the "Voting Agreement") pursuant to which Sellers agreed to, and the Members agreed to cause the Sellers to, vote 50% of the shares of common stock received as Equity Consideration in the manner directed by the Board in respect of any and all matters put to a vote of the stockholders of Aceto. *Id.* Aceto also secured financing in connection with the PPA by entering into a commitment letter (the "Commitment Letter") with several

**HAHN & HESSEN**

October 30, 2019
Page 7

lenders pursuant to which the lenders committed to (i) provide Aceto with a term loan in the aggregate principal amount of $150,000,000, and (ii) increase Aceto's existing revolving credit facility. *Id.* at p.5. These key agreements executed by Aceto in connection with the PPA lend further support to the extension of liability for claims arising out of the PPA to Aceto as parent of Rising as a result of its significant role in the transaction. *See In Pullman v. Alpha Media Pub., Inc.*, No. 12-CV-1924 PAC SN, 2013 WL 1290409, at *20 (S.D.N.Y. Jan. 11, 2013).

### *III.    There are Sufficient Facts to Support Extension of Liability to Aceto and There is No Undue Delay By Establishing a $15 Million Aceto Reserve*

As set forth in the Chartwell Response and Sur-Reply, there will be no undue delay in these Chapter 11 Cases while Chartwell establishes and liquidates its claims against Aceto and Rising. While the Chartwell Claims were filed as unliquidated claims in an **amount not less than $15 million** (and were subsequently amended to unliquidated claims in an amount **not less than $25 million dollars**), Chartwell will consent to a $15 million reserve against Aceto pending a resolution of its claims so that the Liquidating Debtors can move forward with making distributions to Aceto creditors. The Liquidating Debtors have indicated to the Court that, even with a $15 million reserve for the Chartwell Claims, they will be making a significant distribution of approximately 70% to general unsecured creditors of the Aceto estate, and anticipate making additional distributions upon the resolution of remaining claims. Thus, the ultimate determination with respect to the allowance and amount of the Chartwell Claims will not delay the administration of the Debtors' estates or prejudice unsecured creditors.

Very truly yours,

/s/ *John P. Amato*

John P. Amato

cc: *All Counsel of Record (via email)*

F0065169-1