**WEBBER MCGILL LLC**
Douglas J. McGill, Esq.
760 Route 10, Suite 104
Whippany, New Jersey 07981
(973) 739-9559

**SLARSKEY LLC**
David Slarskey, Esq. *(pro hac vice admission pending)*
Evan Fried, Esq. *(pro hac vice admission pending)*
420 Lexington Avenue, Suite 2525
New York, New York 10170
(212) 658-0661

*Attorneys for Palm Global Small Cap Master Fund LP and Kenneth Grossman*

| | |
|---|---|
| In re: | Chapter 11 |
| Tri Harbor Holdings Corp. f/k/a Aceto Corporation), et al, | Case No. 19-13448 (VFP) |
| Liquidating Debtors. | Honorable Vincent F. Papalia |
| Palm Global Small Cap Master Fund LP and Kenneth Grossman, | Adv. Pro. No. 19- |
| Plaintiffs, | |
| v. | |
| Tri Harbor Holdings Corp. (f/k/a Aceto Corporation), Tri Harbor Chemical Holdings LLC, Tri Harbor Realty LLC, Kavod Pharmaceuticals LLC, Kavod Health LLC, Kavris Health LLC, KAVACK Pharmaceuticals LLC, Arsynco, Inc., Acci Realty Corp. and Lowenstein Sandler LLP | |
| Defendants. | |

**COMPLAINT TO REVOKE ORDER CONFIRMING PLAN PURSUANT TO 11 U.S.C. § 1144 AND FOR DISGORGEMENT OF PROFESSIONAL FEES FOR FAILURE TO MAKE MATERIAL DISCLOSURE IN CONNECTION WITH CONFIRMATION PROCESS**

Plaintiffs Palm Global Small Cap Master Fund LP ("**Palm**") and Kenneth Grossman ("**Mr. Grossman**" and, together with "Palm," "**Plaintiffs**"), hereby allege as follows:

## NATURE OF THE COMPLAINT

1. This is an action for revocation of the order of plan confirmation in this case, and disgorgement of fees paid to Debtors' counsel, Lowenstein Sandler LLP ("**Lowenstein**"), based on failures to disclose a material connection between Lowenstein and Steven Rogers ("**Mr. Rogers**"). Mr. Rogers was the Debtors' sole officer and director and has since been appointed as "Plan Administrator" to act as the sole representative of the above-captioned Liquidating Debtors.

2. More specifically, in seeking confirmation of the plan, pursuant to which Mr. Rogers (a) is to be paid a minimum of $720,000 per year to act as Plan Administrator, and (b) stands to approve millions of dollars in budgeted post-confirmation fees to Lowenstein (after having apparently signed off without objection to Lowenstein's approximately $13,800,000 fee request in these cases), neither Mr. Rogers nor Lowenstein saw fit to disclose to the Court that Rogers and Lowenstein had *also* agreed to make Mr. Rogers a partner in Lowenstein.

3. Mr. Rogers now serves as both the *client* (Plan Administrator), charged with oversight of Lowenstein, and also a *partner in the law firm* that is providing virtually all of the post-confirmation legal services to the Liquidating Debtors. While the conflict of interest is clear, at minimum the appearance of impropriety is palpable as Plaintiffs and other shareholders – who are "in the money" – now (and perhaps forever) have reason to wonder whether their rightful distributions will be or were negatively impacted by decisions which primarily benefit Lowenstein and Mr. Rogers.

4. Further, parties-in-interest, and indeed neutral observers, are now left to wonder as to the reasons for this material non-disclosure and whether the integrity of the bankruptcy process has been compromised. Because questions of these sort should not be left to overhang and plague this case (and thus future cases), the simple failure to disclose material information described herein warrants revocation of the reorganization plan under 11 U.S.C. § 1144 and disgorgement of fees.

## JURISDICTION AND VENUE

5. This adversary proceeding is brought pursuant to section 1144 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "**Bankruptcy Code**") in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure.

6. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).

7. Plaintiffs consent to the entry by the Bankruptcy Court of final orders and/or judgments on all Counts of this Complaint.

8. Venue properly lies in this Court pursuant to 28 U.S.C. § 1409.

## PARTIES

9. Plaintiff Palm Global Small Cap Master Fund, LP is a limited partnership which owns shares of stock of Aceto Corporation ("**Aceto**") n/k/a Tri Harbor Holdings Corp.

10. Plaintiff Kenneth Grossman is an individual who owns shares of stock of Aceto.

11. Defendant Tri Harbor Holdings Corp. f/k/a Aceto Corporation is one of the liquidating debtors in the above-captioned bankruptcy case.

12. Defendant Tri Harbor Chemical Holdings f/k/a Aceto Agricultural Chemicals LLC, f/k/a Aceto Agricultural Chemicals Corporation, is one of the liquidating debtors in the

above-captioned bankruptcy case.

13. Defendant Tri Harbor Realty LLC, f/k/a Aceto Realty LLC, is one of the liquidating debtors in the above-captioned bankruptcy case.

14. Defendant Kavod Pharmaceuticals LLC, f/k/a/ Rising Pharmaceuticals, LLC, is one of the liquidating debtors in the above-captioned bankruptcy case.

15. Defendant Kavod Heath LLC, f/k/a Rising Heath LLC, is one of the liquidating debtors in the above-captioned bankruptcy case.

16. Defendant Kavris Health LLC, f/k/a Acetris Health, LLC, is one of the liquidating debtors in the above-captioned bankruptcy case.

17. Defendant KAVACK Pharmaceuticals LLC, f/k/a PACK Pharmaceuticals, LLC, is one of the liquidating debtors in the above-captioned bankruptcy case.

18. Defendant Arsynco, Inc. is one of the liquidating debtors in the above-captioned bankruptcy case.

19. Defendant Acci Realty Corp. is one of the liquidating debtors in the above-captioned bankruptcy case.

20. Defendant Lowenstein is, upon information and belief, a limited liability partnership organized and existing under the laws of New Jersey, with a primary place of business located at One Lowenstein Drive, Roseland, New Jersey 07068.

## BACKGROUND

*Commencement of Bankruptcy Cases and Anticipated Dividend to Equity Holders*

21. Aceto and the other above-captioned debtors (jointly, severally and collectively, the "**Debtors**"), commenced the above-captioned cases on February 19, 2019.

4

22. In or about April of 2019, this Court approved respective sales (collectively, the "**Asset Sales**") of the Debtors' Chemical Business for $338,000,000, including the assumption of certain liabilities, and the Debtors' Pharma Business for $15,000,000 and assumption of certain liabilities.

23. Following the Asset Sales, Mr. Rogers, who had been the Debtors' general counsel, became the sole officer and director of the Debtors.

24. The proceeds of the Asset Sales positioned the Debtors to satisfy creditors in full and distribute a dividend to equity holders.

25. Upon information and belief, no later than May 2019, Lowenstein and other of the Debtors' professionals, as well as Mr. Rogers, knew that there would be a distribution to equity holders in these cases.

*Confirmation of the Debtors' Plan and Appointment of Mr. Rogers as Plan Administrator*

26. By Order dated September 18, 2019 [Docket No. 996] (the "**Confirmation Order**"), this Court confirmed the Second Modified Joint Plan of Liquidation of Aceto Corporation and Affiliated Debtors (the "**Plan**").

27. Pursuant to the Plan and the Confirmation Order, Mr. Rogers was appointed as Plan Administrator and sole representative of the post-confirmation Debtor entities (the "**Liquidating Debtors**").

28. As Plan Administrator, Rogers has assumed complete and exclusive authority over the management of the Liquidating Debtors as sole employee and sole decision-maker.

29. As Plan Administrator, Rogers is responsible for litigation and resolution of all claims brought against or on behalf of the Liquidating Debtors, and has authority to retain and pay professionals.

5

30. Pursuant to the Plan Administrator Agreement, Lowenstein acts as counsel to the Plan Administrator and the Liquidating Debtors.

31. The Plan Administrator Agreement established an Oversight Committee tasked with overseeing the Plan Administrator's performance. The Oversight Committee is composed of five members, four of whom have been designated by the Creditors' Committee, and one of whom is a pre-petition Aceto stockholder. The Oversight Committee is *supposed* to provide a meaningful check on the Plan Administrator, including the option to remove the Plan Administrator.

32. In practice, however, the Oversight Committee has been neutered because creditors stand to be paid in full in relative short order, and have no incentive to preserve any surplus funds for the benefit of equity holders. Illustrative of this, despite acknowledging the non-disclosure and conflict of interest issues surrounding the Lowenstein-Rogers relationship, the Oversight Committee appears to have been mollified without receiving answers to the pointed questions raised in the UST Letter.

33. The Plan became effective on October 1, 2019 (the "**Effective Date**").

***Belated Post-Confirmation Disclosure That Mr. Rogers Has Joined Lowenstein as a Partner and U.S. Trustee's Demand For Information Surrounding the Timing and Circumstances of Such Hiring***

34. On October 15, 2019, Lowenstein issued a press release publicly announcing that Mr. Rogers had joined Lowenstein as a non-equity partner.

35. Upon information and belief, almost immediately thereafter, the Oversight Committee and other parties-in-interest demanded information from Lowenstein regarding the failure to disclose during the Plan confirmation process the possibility and/or intent that Mr. Rogers would join Lowenstein as a partner post-confirmation.

36. In the apparent absence of any forthcoming information from Lowenstein, on October 16, 2019 – the day after the announcement that Mr. Rogers had joined Lowenstein - counsel for the Oversight Committee sent a letter to the United States Trustee (the "**UST**") asking the UST to investigate the relationship between Mr. Rogers and Lowenstein and the associated non-disclosure issues.

37. On or about October 30, 2019, the UST sent a letter (the "**UST Letter**") to Lowenstein stating that the UST "share[d] concern with the disclosure and conflict [of interest] raise[d]," and demanding answers to the following questions:

- When did discussions begin for Mr. Rogers to join Lowenstein?
- On what date(s) did Lowenstein discuss terms of employment with Mr. Rogers?
- On what date was the decision made to tender an offer to Mr. Rogers?
- On what date was the offer made?
- On what date was the offer accepted?
- To the extent any actions were made prior to the confirmation of these cases: (i) why did Lowenstein decide not to file a supplemental affidavit pursuant to Rule 2014; and (ii) why was there no disclosure to the court and the parties-in-interest prior to confirmation?
- (i) What procedures are in place to review Lowenstein's requests for compensation, and (ii) will Mr. Rogers be involved in such reviews in his capacity as disbursing agent?
- (i) What procedures are in place for Mr. Rogers to review Lowenstein's forthcoming final fee application, and (ii) will Mr. Rogers be involved in such reviews in his capacity as disbursing agent?

A true and correct copy of the UST Letter is attached hereto as Exhibit A.

***Lowenstein's Apparent Refusal to Directly Respond to the U.S. Trustee's Questions and Concerns Surrounding Mr. Rogers's Employment With Lowenstein***

38. On November 19, 2019, Lowenstein filed a Supplemental Declaration [Docket No. 1168] (the "**Supplemental Declaration**") in an apparent effort to address the questions and concerns raised in the UST Letter.

39. The Supplemental Declaration fails to directly or adequately address the pointed questions set forth in the UST Letter and whether adequate disclosure of all relevant connections between Lowenstein and Mr. Rogers were or have been made, and if so, whether such disclosures have been made in timely fashion.

40. Meanwhile, on October 31, 2019, the day after the UST Letter was sent, Lowenstein filed its Final Application for Compensation [Docket No. 1130] (the "**LS Fee Application**"), seeking a final allowance of more than $13,800,000 in fees for its work in this case.

41. In a proposed form of order granting the LS Fee Application submitted to the Bankruptcy Court by Lowenstein on December 16, 2019, Lowenstein indicated that it would voluntarily reduce its fee request by $275,000 to address "the UST's concerns (which Lowenstein Sandler disputes) regarding, among other things . . . that earlier notice should have been provided by Lowenstein Sandler of the post-Effective Date employment by Lowenstein Sandler of Steven Rogers, the current Aceto Plan Administrator."

42. Notwithstanding the apparent resolution agreed to between Lowenstein and the UST, it is unknown whether the UST ever received answers to the specific questions it demanded in the UST Letter, let alone answers which might somehow support a finding that Lowenstein had no duty to disclose during the confirmation process its relationship with Mr. Rogers. As noted above, Lowenstein's Supplemental Declaration does not provide such answers and Plaintiffs have received none.

43. Lowenstein's failure to make adequate disclosure in the first instance during the confirmation process is now exacerbated by what appears to be a refusal to disclose the details requested in the UST Letter.

*The Lowenstein-Rogers Relationship, and Non-Disclosure of Such Relationship During the Confirmation Process, Breeds Cynicism Which Jeopardizes the Integrity of the Bankruptcy Process*

44. The non-disclosure of the Lowenstein-Rogers relationship is material and adversely impacts the integrity of the bankruptcy process because, among other things, it causes Plaintiffs, and indeed any objective observer, to question whether Mr. Rogers has breached his fiduciary duty of loyalty to the Debtors by taking action during these cases primarily for the benefit of himself or Lowenstein – his future employer - to the detriment of the Debtors' estates and their various stakeholders;[1] and indeed whether Mr. Rogers now serves Lowenstein at the expense of the Liquidating Debtors and equity holders such as Plaintiffs.

45. For example, Plaintiffs are now burdened by the question of why the Debtors' Disclosure Statement presented a wind-down budget which appears to have overstated the magnitude of certain liabilities by including material liabilities that appear to have already been resolved. As part of the wind-down budget submitted to the Court and to stakeholders in support of confirmation of the Plan, the Debtors represented substantial reserves for the IRS, SEC, and Department of Justice Antitrust Division, including a material tax liability in the millions. Upon information and belief, now, only several months later, those claims have been reduced to a fraction of what was projected in the wind-down budget and in the Disclosure Statement.

46. Plaintiffs now also question why Lowenstein initially presented a budget of $7.2 million for the time period beginning September 15, 2019 [Docket No. 892], and upon receiving objections to the size of the budget (from parties other than Mr. Rogers), immediate reduced its projected fees to over $5.6 million for the same time period — which appears still to have been

---

[1] Plaintiffs reserve the right to seek derivative standing and amend this Complaint to, among other things, include a claim for removal of Mr. Rogers as Plan Administrator for breach of his fiduciary duties of loyalty and care, based upon, among other things, apparent self-dealing in connection with the confirmation process.

9

an inflated figure. [Docket No. 958-3—958-4)]. For frame of reference, no other item in the wind-down budget, which included line items for operating expenses, fees for a large accounting firm, and other claims resolution, was more than $1 million.

47. It is fair to wonder whether Lowenstein's budget was the product of a sham negotiation, or no negotiation at all, between Lowenstein and Rogers, with no *bona fide* analysis as to whether that budget was reasonable. Lowenstein's litigation budget did not break out litigation versus transactional work, did not itemize the fees attributable to each litigation it intended to pursue, and did not describe whether Lowenstein intended to use associates or partners for particular tasks—despite the fact that Lowenstein was handling a wide array of matters for Debtors, which varied substantially in scope.

48. Upon information and belief, a number of the budgeted matters Lowenstein was handling — including disputes with the government and several litigations — had already been resolved or were about to be resolved. Particularly in light of the only recently disclosed Lowenstein-Rogers relationship, and the unwaivable "simultaneous attorney and client" conflict presented by that relationship, Plaintiffs are left to wonder whether Lowenstein accurately disclosed the status such matters and/or overstated the extent of reasonably anticipated post-confirmation work, to the ultimate benefit of Lowenstein and Rogers and ultimate detriment of shareholders.

49. Similar concerns now plague perceptions of the Liquidating Debtors' handling of pending litigation.

50. Aceto was a party to at least six pre-petition litigations. Several of those litigations, including the *Lonza* and later-filed *Aurobindo* litigations, were purely affirmative claims against third-parties. Seeing the need to limit cash spend and preserve equity's surplus,

numerous parties — including equity holders — requested that Mr. Rogers and Lowenstein pursue risk-sharing options including identifying law firms (including Lowenstein) that would take the cases on a contingency-fee basis, and sharing the risk with third-party litigation funders.

51. Prudence would suggest those alternatives where, as here, there was a thinly-capitalized plaintiff with potentially large claims, but also with a surplus to protect that would be available for distribution to shareholders. Lowenstein rejected all of the foregoing, and instead insisted on the most expensive and riskiest route to the Debtors (and most advantageous to Lowenstein), *i.e.,* permitting Lowenstein to litigate these matters at a full hourly rate, without any discount for the fact that Lowenstein was handling at least ***six matters at once*** (along with transactional and regulatory affairs) and with *carte blanche* to pursue scorched-earth litigation tactics, in pursuit of questionable value. In light of the tardily disclosed Lowenstein-Rogers relationship, it is not unreasonable to ask why all of the aforementioned litigation alternatives were rejected out-of-hand.

52. In addition, Lowenstein appears to have unnecessarily incurred fees on the *Chartwell* litigation, in the face of a contractually agreed-upon path to stem this legal expense. The *Chartwell* case is one of the cases in which the Pharma Business is a party, and where Aceto had specifically negotiated that the legal costs and potential liabilities would be transferred to the Pharma Business buyer. In other words, a negotiated benefit of the Pharma Business transaction was to ***eliminate*** (through transferring to the buyers' counsel) rather than ***increase***, exposure, particularly legal fees, arising out of the case. Had this matter been handled in a manner that afforded Aceto the full benefit of the elimination of the liabilities, Lowenstein would have notified opposing counsel and/or the Court that Lowenstein was transitioning out of the case, and that Reed Smith LLP (buyer's new counsel) would be substituting into the case. Instead of

ceasing work on the matter, Lowenstein continued to perform work, jammed in substantial last-minute invoices during the transition of Lowenstein's engagement on this matter, and performed legal work duplicative of that which Reed Smith would perform moving forward and for which the Pharma Company buyer—not Aceto—would have otherwise borne the cost.

53. The need to maintain confidence in, and the integrity of, the bankruptcy system demands that parties be held to strict standards of disclosure, so that conflicts of interest and appearances of the sort described above are avoided.

## COUNT I
### (Revocation of Confirmation Order – 11 U.S.C. § 1144)

54. Plaintiffs repeat and reallege each of the paragraphs above as if fully set forth herein.

55. Section 1144 of the Bankruptcy Code provides that an order confirming a plan of reorganization may be revoked if the confirmation order was procured by fraud.

56. For purposes of section 1144, "fraud does not necessarily require proof of pecuniary loss to the plaintiff but instead may be satisfied by anticipated loss to the estate as a whole, prejudice to the estate, or even, in the case of fraud on the court, by harm to the integrity of the judicial process (without proof of economic harm of any sort)." *In re V&M Mgmt., Inc.*, 215 B.R. 895, 904 (Bankr. D.Mass. 1997).

57. "Disclosure 'goes to the heart of the integrity of the bankruptcy system.'" *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr .D.Del. 2005) (internal quotation omitted).

58. The failure to disclose material information known by a person that is obligated to disclose such information constitutes a fraud on the court which may justify revocation under section 1144. *See Ogden v. Ogden Modulars, Inc. (In re Ogden Modulars, Inc.)*, 180 B.R. 544 (Bankr. E.D.Mo. 1995).

12

59. Upon information and belief, including without limitation, the timing of the announcement that Mr. Rogers had joined Lowenstein as a partner, the UST's questions that appear to remain unanswered and the other concerns raised herein, Lowenstein and/or Mr. Rogers knew at all relevant times that there was a meaningful possibility that Mr. Rogers might join Lowenstein following confirmation of the Plan.

60. In connection with the confirmation process, Lowenstein had a duty and obligation to disclose to the Court and parties-in-interest that Lowenstein was negotiating with Mr. Rogers to join the firm and/or that Lowenstein was aware that there was a meaningful possibility that Mr. Rogers might join the firm following confirmation of the Plan.

61. In connection with the confirmation process, Mr. Rogers had a duty and obligation to disclose to the Court and parties-in-interest that he was negotiating with Lowenstein to join the firm and/or that he was aware that there was a meaningful possibility that he might join the firm following confirmation of the Plan.

62. The failure of either Lowenstein or Rogers to make such disclosure was a material non-disclosure in that it was material to the confirmation process and materially and negatively impacts the integrity of the bankruptcy process.

63. The patent conflict of interest and, at minimum, appearance of impropriety issues discussed herein establish that the non-disclosure of the Lowenstein-Rogers relationship was material. Any doubt as to whether the non-disclosure of the relationship between Lowenstein and Mr. Rogers was material is conclusively dispelled by the fact that the Creditors' Committee, the UST and other parties-in-interest have demanded details and answers concerning that relationship.

64. Had the Lowenstein-Rogers relationship been adequately disclosed, Plaintiffs would not have withdrawn their objections to the proposed plan of administration.

65. Had the Lowenstein-Rogers relationship been adequately disclosed, Plaintiffs would have sought interim relief to stay the effectiveness of the Plan, so that Mr. Rogers could not have taken the position as Plan Administrator.

66. Had the Lowenstein-Rogers relationship been adequately disclosed, the Court would not have confirmed the Plan as presented.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment on Count I, revoking and vacating the Confirmation Order pursuant to section 1144 of the Bankruptcy Code, awarding attorneys' fees and costs, and granting such other and further relief as the Court deems just and proper.

## COUNT II
### (Disgorgement)

67. Plaintiffs repeat and reallege each of the paragraphs above as if fully set forth herein.

68. "A bankruptcy court has power to remedy an injustice caused by fraud with damages ... without upsetting a confirmed plan or the finality of the confirmation order." *Huse v. Huse-Sporsem, A.S. (In re Birting Fisheries, Inc.)*, 300 B.R. 489, 505 (9th Cir. B.A.P. 2003).

69. Failure to make adequate disclosure in bankruptcy cases warrants disallowance and disgorgement of fees and/or disqualification, even if such failure is not willful. *See, e.g., In re eToys, Inc.*, 331 B.R. at 197.

**WHEREFORE**, Plaintiffs request that the Court enter judgment on Count II, ordering disgorgement of fees paid to Lowenstein, in an amount to be determined at trial, awarding attorneys' fees and costs, and granting such other and further relief as the Court deems just and proper.

      **WEBBER MCGILL, LLC**
      760 Route 10, Suite 104
      Whippany, New Jersey 07981
      (973) 739-9559
      dmcgill@webbermcgill.com


      By: */s/ Douglas J. McGill*
           Douglas J. McGill

      -and-

      **SLARSKEY LLC**
      David Slarskey, Esq. *(pro hac vice admission pending)*
      Evan Fried, Esq. *(pro hac vice admission pending)*
      420 Lexington Avenue, Suite 2525
      New York, New York 10170
      (212) 658-0661

      *Attorneys for Palm Global Small Cap Master Fund LP and Kenneth Grossman*

Dated: December 17, 2019
      Whippany, New Jersey

# EXHIBIT A



**U.S. Department of Justice**

*Office of the United States Trustee*
*District of New Jersey*

One Newark Center
Suite 2100
Newark, New Jersey 07102

(973) 645-3014   Telephone
(973) 645-5993   Facsimile

October 30, 2019

**SENT VIA EMAIL**

Michael S. Etkin, Esq.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
metkin@lowenstein.com

Subject:  Plan Administrator
In re Tri Harbor Holdings Corporation (*f/k/a* Aceto Corporation, Inc.) et al.
Case No. 19-13448 (VFP)

Dear Mr. Etkin:

The U.S. Trustee has received correspondence from various parties concerning Steven S. Rogers, Esq., Plan Administrator in the above-captioned cases and his subsequent employment at Lowenstein Sandler LLP ("Lowenstein"):

(i) An October 16, 2019 letter from Warren J. Martin, Jr., Porzio, Bromberg & Newman, P.C., counsel to the Oversight Committee, to Kenneth A. Rosen, Lowenstein, counsel to the Debtors and Plan Administrator;

(ii) An October 16, 2019 letter from Joshua Horowitz, Portfolio Manager, Palm Global Small Cap Master Fund LP to the U.S. Trustee;

(iii) An email inquiry on October 16, 2019 from Paul R. DeFilippo, Wollmuth Maher & Deutsch LLP to our office;

(iv) An October 18, 2019 response letter from Lowenstein to the Oversight Committee; and

(v) An October 29, 2019 letter from Joshua Horowitz, Portfolio Manager, Palm Global Small Cap Master Fund LP to the U.S. Trustee.

As a result of our review, we share concern with the disclosure and conflict issues that are raised. Before reaching any conclusions and the initiation of formal discovery, the U.S. Trustee has the following questions:

1. When did discussions begin for Mr. Rogers to join Lowenstein?
2. On what date(s) did Lowenstein discuss terms of employment with Mr. Rogers?
3. On what date was the decision made to tender an offer to Mr. Rogers?
4. On what date was the offer made?
5. On what date was the offer accepted?
6. To the extent any actions were made prior to the confirmation of these cases: (i) why

did Lowenstein decide not file a supplemental affidavit pursuant to Rule 2014; and (ii) why was there no disclosure to the court and the parties-in-interest prior to confirmation?
7. (i) What procedures are in place to review Lowenstein's requests for compensation, and (ii) will Mr. Rogers be involved in such reviews in his capacity as disbursing agent?
8. (i) What procedures are in place for Mr. Rogers to review Lowenstein's forthcoming final fee application, and (ii) will Mr. Rogers be involved in such reviews in his capacity as disbursing agent?

Please be advised that the U.S. Trustee reserves all rights and remedies to preserve its position relating to these issues.

We are copying parties from whom we have received correspondence. Please direct your response to the U.S. Trustee. You may copy other parties as you see fit.

Please respond by close of business, Tuesday, November 5, 2019.

Very truly yours,

Andrew R. Vara
Acting U.S. Trustee, Region 3

Martha Hildebrandt
Assistant U.S. Trustee

Mitchell Hausman
Trial Attorney

cc:
Warren J. Martin, Jr., Counsel to the Oversight Committee
Paul R. DeFilippo, Wollmuth Maher & Deutsch LLP